# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

<table>
<tr>
<td>

**W.E. AUBUCHON CO., INC., AUBUCHON
DISTRIBUTION, INC., W.E. AUBUCHON
CO. INC. EMPLOYEE MEDICAL
BENEFIT PLAN, and AUBUCHON
DISTRIBUTION, INC. EMPLOYEE
MEDICAL BENEFIT PLAN**
                    **Plaintiffs,**

v.

**BENEFIRST, LLC**,
                    **Defendant.**

</td>
<td>

CIVIL ACTION NO. 05-40159 FDS

</td>
</tr>
</table>

## MEMORANDUM IN SUPPORT OF BENEFIRST'S
## MOTION FOR RECONSIDERATION OF COURT'S DISCOVERY ORDER
## RELATED TO MEDICAL BILLS
_____

## I.    INTRODUCTION

On September 7, 2006, this Court issued its Opinion and Order on the Plaintiffs' Motion to

Compel Further Production of Documents in this matter.  The Court allowed the Plaintiffs' motion

in part and denied it in part.  The Court essentially issued three rulings as part of its Order.

First, with regard to the Plaintiffs' motion to compel the production of RPC reports, the Court

denied Plaintiffs' request, but ordered BeneFirst to identify the locations of the RPC reports on the

CD-rom produced to the Plaintiffs, for example, by directory and/or document name, prefix or suffix.

Second, the Court ordered further production of the claims files related to the Aubuchon

accounts.  Interestingly, with regard to this part of the ruling, there is no dispute at this point that,

with the exception of the actual medical bills themselves, all documents relating to Aubuchon that

BeneFirst can produce either have been produced or are in the process of being prepared for

production by BeneFirst's counsel by September 30. Thus, with regard to this particular portion of the Court's Order, the only outstanding question is whether the medical bills that were submitted to BeneFirst during the time that it administered the W.E. Aubuchon Co., Inc. Employee Medical Benefit Plan must be located and produced by BeneFirst. This particular point is the subject of this Motion for Reconsideration and is discussed in detail below. In the Court's Opinion and Order, the Court ordered BeneFirst to produce those bills unless BeneFirst, "within ten days of this Order moves for reconsideration with evidentiary affidavits from a person with first-hand knowledge (such as a chief information officer or other person with authority) providing the Court with" sufficient information to establish that locating and producing all of the specific medical bills for the W.E. Aubuchon Co., Inc., Employee Medical Benefit Plan processed at any time by BeneFirst would be a Sisyphean task. This Motion for Reconsideration submits that exact evidence to the Court.

This Court's third ruling rejected the Plaintiffs' demand for access to the RIMS computer system, ordering only that BeneFirst identify the time, manner and date of the disposition of the system, together with the identity of its current custodian, and produce any documents in its possession related to the disposition of that computer system.

Each of these rulings is discussed below, with a focus on the Court's order related to the production of the medical bills, which is the subject of this Motion for Reconsideration.

II.    **THIS COURT SHOULD RECONSIDER ITS ORDER THAT BENEFIRST LOCATE AND PRODUCE THE ACTUAL MEDICAL BILLS AND INSTEAD DENY PLAINTIFFS' REQUEST FOR THE ACTUAL MEDICAL BILLS**

As noted above, the Court, at page 12 of its Opinion and Order, ordered BeneFirst to produce the claims files materials sought by the Plaintiffs. The only "claims file" materials[1] at issue for purposes of the Motion to Compel, however, are the actual medical bills submitted to BeneFirst for payment during the time that BeneFirst administered the W.E. Aubuchon Co., Inc. Employee

---

[1]As noted in the accompanying affidavit of Charles T. Dobens, the former Managing Member of BeneFirst, at no time did BeneFirst ever maintain "claim files" categorized by person or by group. See Dobens Affidavit at ¶3.

Medical Benefit Plan.[2]  All other Aubuchon-related material in BeneFirst's possession, custody or control either has been produced or is in the process of being produced.

In essence, in its ruling on this issue, the Court was unwilling to credit BeneFirst's explanation of the burden that locating and producing the actual medical bills would place upon it without "evidence from BeneFirst witnesses having personal knowledge of the same." Opinion and Order at p.12.  As a result, the Court granted BeneFirst leave to submit such evidence and move for reconsideration within ten days of the Order. Id.

Ironically, on the very day that the Court was filing its Opinion and Order asking for such evidence, Plaintiffs' counsel was conducting the Rule 30(b)(6) deposition of BeneFirst for the specific purpose of testing the propriety of BeneFirst's document responses to date and its claim of burden with regard to the near impossibility of producing these exact medical bills.

Charles Dobens, the former managing member of BeneFirst, which is a limited liability company, testified on behalf of BeneFirst.  Mr. Dobens is the only managing member of BeneFirst. Dobens Dep. at p.6.  Mr. Dobens is very knowledgeable about BeneFirst's computer systems, both historically and at present.  Dobens Aff. at ¶1, Dobens Dep. at pp.7-12.  As BeneFirst had no information technology person, Mr. Dobens was directly involved with and familiar with BeneFirst's computer systems, its network, and the present status of its data.  Dobens Dep. at pp.10-13.

In response to specific questioning from Plaintiffs' counsel concerning what became of the actual medical bills and why BeneFirst cannot produce them, Mr. Dobens provided detailed testimony establishing the extreme burden that producing the medical bills would impose on BeneFirst.  Mr. Dobens testified that it was BeneFirst's standard operating procedure with regard to all of its clients – not just the Aubuchon accounts – to scan all medical bills into the computer

---

[2]Pursuant to footnote 5 of the Court's Opinion and Order, BeneFirst is not required to produce the medical bills related to the separate Aubuchon Distribution, Inc. Employee Medical Benefit Plan.  Even if the Court did intend to order such production with regard to that Plan, the exact same issues of burden that prevent producing the medical bills related to the W.E. Aubuchon Co., Inc. Employee Medical Benefit Plan that are discussed in this Motion for Reconsideration would apply as well to producing the medical bills related to the Aubuchon Distribution, Inc. Employee Medical Benefit Plan and, therefore, the Court should not order production of those medical bills either.

system and to destroy the originals after sixty days.  Dobens Dep. at p. 20.  At this point in time, BeneFirst, therefore, does not have in its possession, custody or control, any hard copies of any of the actual medical bills submitted during the time that it administered the Aubuchon plans, given that Aubuchon stopped using BeneFirst as the administrator for its plans, well over a year ago. Dobens Dep. at pp.71-72.

With regard to the scanned copies of the medical bills, they cannot be located on the BeneFirst computer systems by running a search for "Aubuchon" or any type of a similar search, and the scanned copies of the medical bills are not segregated by account or client or by a particular plan into different directories or folders on the computers.  Dobens Dep. at pp. 82-83. This was not only the case for the Aubuchon plans but for all plans administered by BeneFirst.

Mr. Dobens explained in response to direct questioning by Plaintiffs' counsel exactly how the medical bills were scanned into and recorded in BeneFirst's computer system and why that process does not allow BeneFirst to locate the specific medical bills submitted on the Aubuchon accounts—or on any other account administered by BeneFirst for that matter—in the absence of a page-by-page review of every medical bill processed at any time, on any benefit plan, during the time that BeneFirst administered the Aubuchon plans.[3]  Dobens Dep. at pp. 81-83.  Mr. Dobens explained that each claims examiner would process and pay medical bills throughout the course of each workday on a number of accounts and would simply enter the payment and medical bill information line by line for each bill as it was paid.  The claims examiner did not segregate them in any manner, but simply entered them chronologically; each medical bill and accompanying payment would be logged sequentially, without distinguishing among the client's plan's accounts.  Dobens Dep. at 82.  As a result, to locate all of the medical bills processed by BeneFirst relating to the Aubuchon plans would require an individual from BeneFirst to review literally hundreds of thousands of claims images to identify the specific subset of medical bill entries within that number

---

[3]As explained in greater detail infra, the claims forms are now stored as images that are more easily tracked if the claim number and processing date are known.

that involve medical bills submitted under the Aubuchon plans. As noted in Mr. Dobens' affidavit, by reviewing the quarterly individual payment reports generated by BeneFirst and already produced to the Plaintiffs, BeneFirst has determined that it processed approximately 34,112 claims on behalf of Aubuchon during its 3.5 years as Aubuchon's third-party administrator. <u>Dobens Aff. at ¶16</u>. While locating a single claim requires a relatively modest investment of time and expense, as explained in further detail <u>infra</u>, identifying and producing the image associated with every one of the 34,112 itemized claims would require and extremely time consuming and expensive effort.

As testifed by Mr. Dobens, the scanned images of each medical bill that constitutes a claim are organized by claims examiner and not by client, group, or plan.[4] <u>Dobens Dep. at p. 80</u>. It was actually logical, as part of operating BeneFirst and administering plans such as the Aubuchon plans, to proceed in this manner, rather than to segregate them in some manner by client or particular plan. In BeneFirst's experience, medical bills were almost always paid promptly and correctly, but if they were not, BeneFirst could expect a provider to complain about his or her payment well within the sixty-day period during which hard copies of the medical bills were kept. <u>Dobens Dep. at 24</u>. Beyond that fact, if a medical provider were to complain, the medical provider would be able to submit specific identifying information, such as the date of the payment about which it was complaining, which would allow BeneFirst to target the appropriate group of entries and isolate the particular medical bill and payment about which the complaint was being lodged. <u>Dobens Dep. at 82-83</u>. In BeneFirst's experience, there was no need to segregate medical bills in any other manner. It simply was not necessary for BeneFirst to do its work, regardless of whether today, years later, having done so would have made the production of documents in litigation easier.

As Mr. Dobens testified, locating all of the medical bills in question would be particularly burdensome because, at this point, BeneFirst has essentially stopped operating as a business in

---

[4]The terms "client,"group," or "plan" are common references to employer-sponsored group health plans.

the wake of BeneFirst's sale to America's Choice Health Plans.  <u>Dobens Dep. at p.7</u>.  BeneFirst's former operations are presently managed by only two employees: Mr. Dobens and one other employee, named Nicole Mahoney, both of whom are presently employees of America's Choice Health Plans.  The defendant, therefore, has essentially no staff at this point that can be assigned to such an undertaking.  <u>Dobens Aff. at ¶18</u>.  As detailed in his affidavit, Mr. Dobens estimates that locating the particular medical bills in question would take nearly 4000 manhours – resources that BeneFirst simply does not have at its disposal.  <u>Dobens Aff. at ¶17</u>.

Accordingly, requiring BeneFirst to produce the images of each and every medical bill or claim form that it processed for Aubuchon would impose an extraordinary burden upon BeneFirst. To provide the Court with further information on this issue, the Defendant submits the affidavit of Mr. Dobens, which specifically addresses the issues on which the Court requested information in its Opinion and Order.

To summarize in the sequence specified by this Court's opinion and order, Mr. Dobens' Affidavit discloses that:

a.  There are no "claims files" per se, but instead images that are stored on BeneFirst's server, which is physically located in Pembroke, Massachusetts, and to a smaller degree on certain CDs that were scanned by a third-party vendor for BeneFirst. <u>Dobens Aff. at 14</u>.  The image files are stored in batches that are grouped according to their process date and processor.  For a known claim (whether received as a HCFA form, a UB form, or a dental form) with an assigned claim number, its image can be located by identifying the processor and date of processing.  Identifying the individually numbered claim requires picking the proper claim out of the batch of claims processed by that examiner on that date.  <u>Dobens Aff. at ¶¶3, 4, 6, 11</u>.  The claim images themselves are stored as .cpy files, which can be viewed with an application called eCopy.  <u>Dobens Aff. at ¶11</u>.

b.      On any given day, three or four claims examiners would process claims received by BeneFirst. The claims were processed as they came in, and were not necessarily confined to a single health plan. In fact, it was very common for one claims examiner to process claims from multiple health plans in a single day. Dobens Aff. at ¶¶8-9. Over the 3.5 years that BeneFirst was Aubuchon's third-party administrator, BeneFirst employed approximately 14 different claims examiners. Dobens Aff. at 8.

c.      The decision to store images grouped by claims examiner and production date was made by Paul Gatanti, BeneFirst's former claims manager, and Mr. Dobens, and was designed to locate, within a reasonable amount of time, a particular claim image if it became necessary. However, the organization of image files was never intended for the wholesale retrieval of claim images on a plan-by-plan basis. Dobens Aff. at 13.

d.      During the 3.5 years in question, BeneFirst administered as many as 48 different group plans, and processed somewhere in the neighborhood of 550,000 to 600,000 claims. Dobens Aff. at 15. Of that, BeneFirst processed approximately 34,112 claims on behalf of Aubuchon, as detailed by the Individual Payment Reports already produced to the plaintiffs. Dobens Aff. at 16.

e.      Although there is no documentation that discusses the decision and process by which BeneFirst's claims are organized, the server itself that houses the image files for the claims as processed by BeneFirst continues to store those images by claims examiner and processing date.

f.      The physical claim forms processed by BeneFirst were retained for 60 days following processing. After 60 days, the batch of claim forms was scanned as

processed, and the hard copies were then shredded.  The scans of the claim forms are what continue to reside on BeneFirst's server.  <u>Dobens Aff. at 5</u>.[5]

g.    The estimated cost, in terms of hours and wages, to identify and produce the 34,112 claims processed by BeneFirst for Aubuchon would take nearly 4,000 hours. <u>Dobens Aff. at 17</u>.  In terms of cost, the effort would run more than $70,000, and likely more since BeneFirst does not have the staffing to accomplish this task, which would require the hiring of temporary (and more expensive help.)  Assuming a 37.5 hour work week,  retrieving all of the claims images would take more than two years for one person to accomplish; two people could finish the task in about a year, and five people could finish the task in about 5 months.  <u>Dobens Aff. at 19</u>.

h.    BeneFirst cannot simply turn over the image batch files from groups other than Aubuchon without violating privacy restrictions pertaining to medical records. <u>Dobens Aff. at 20</u>.

The foregoing evidence and testimony establishes that requiring BeneFirst to produce all of the images of the claims in question would amount to the imposition of a burden of substantial and extreme proportion.  In contrast, the Plaintiffs have not produced any evidence establishing the significance of the actual medical bills themselves.  The data as to payments under the plan are already included in great detail in the documentation already produced to the Plaintiffs.  <u>See Dobens Dep. at 50-51</u> (discussing the creation of reports that have previously been produced to plaintiffs, both at the time they were originally printed and in conjunction with the present lawsuit). To date, the Plaintiffs have provided no affidavits or other evidence documenting why they instead need the actual medical bills themselves, and certainly have not shown that the value to the Plaintiffs of those actual bills, particularly in light of the information they already possess as to the payments in question, outweighs the remarkable burden, detailed above, that their request imposes

---

[5]As noted at Mr. Dobens' deposition, BeneFirst would find out within 60 days whether a claim had been paid incorrectly or additional information was required.  <u>Dobens Dep. at p.24</u>.

on BeneFirst.  In the end, even if such a showing could be made, if production of the records is ordered, the costs associated with said production should be borne by the plaintiffs.

### III.    OTHER INFORMATION AS TO THE RPC REPORTS

The Court denied the Plaintiffs' request for further production of monthly RPC reports, but did order BeneFirst to identify the virtual location of the RPC reports on the CD-R already produced to the Plaintiffs.  BeneFirst's counsel is in the process of preparing its identification of the virtual location and will produce them to the Plainiffs.

### IV.    INFORMATION RELATED TO THE RIMS SYSTEM

The Court properly denied the Plaintiffs' demand for access to the RIMS system.  Under questioning by Plaintiffs' counsel, Mr. Dobens explained at the present Rule 30(b)(6) deposition that the RIMS system is a leased internet-based claims-processing system that BeneFirst no longer has a relationship with the vendor,  and that BeneFirst no longer has access to the RIMS system.  In his testimony, Mr. Dobens identified the time, manner and date of the disposition of BeneFirst's RIMS system and the identity of its current custodian.  Dobens Dep. at 26-28, 35, 75-76.  Thus, the Plaintiffs have already been provided with the information ordered by the Court with regard to the RIMS system.  BeneFirst will determine whether it has any documents relating to the disposition of the RIMS system, and if so, will produce them as ordered by the Court.

**V.    CONCLUSION**

For the reasons detailed above, BeneFirst requests that this Court reconsider that part of its September 7, 2006 opinion and order requiring production of the medical bills submitted to BeneFirst during the time that it was administering the Aubuchon plans and deny the Plaintiffs' request for production of those documents in light of the extraordinary burden that the request places on BeneFirst.

Respectfully submitted,
The Defendant, **BeneFirst, LLC**
By its attorneys,

**Dated:**  September 18, 2006          /s/  *Stephen D. Rosenberg*

/s/  *Eric L. Brodie*
Stephen D. Rosenberg          [BBO# 558415]
Eric L. Brodie          [BBO# 639833]
**THE MCCORMACK FIRM, LLC**
One International Place - 7th Floor
Boston, MA    02110
Ph:    617•951•2929
Fax:    617•951•2672

88918.1

10

1                     I N D E X

2

3              DEPONENT:  **CHARLES T. DOBENS**

4                                              <u>PAGE</u>

5

6     EXAMINATION BY MR. CIAVARRA                3

7

8                     <u>EXHIBITS</u>

9     <u>NUMBER</u>                                   <u>PAGE</u>

10        1   Notice of Taking Deposition         4

11        2   Individual Payment Report          49

12        3   Reinsurance Census Report          51

13        4   Benefit Analysis                   53

14        5   Claim Lag Study Analysis           54

15        6   Coverage Analysis                  55

16        7   Account Statement                  56

17        8   Monthly Check Register             60

18        9   Monthly Paid claims Register       61

19       10   Paid Claims Analysis               61

20       11   Specific Analysis                  62

21       12   Loss Ratio Report                  63

22       13   Eligibility Listing Report         64

23

24    Certificate of Court Reporter             99

BAY  STATE  REPORTING  AGENCY

```
 1          Q.      All right.  Where's your office?

 2          A.      It is 31 Schoosett,

 3    S-C-H-O-O-S-E-T-T, Street in Pembroke, Mass.

 4          Q.      Is that where Benefirst's offices

 5    were?

 6          A.      No, no.

 7          Q.      What's your educational background?

 8          A.      College.  Boston College, Mass

 9    School of Law.

10          Q.      When did you get out of BC?

11          A.      '86.

12          Q.      Have you ever practiced law?

13          A.      No.

14          Q.      The Defendant in this case,

15    Benefirst, LLC --

16          A.      Yes.

17          Q.      -- was there a time which you had

18    some relationship with that company?

19          A.      Yes.

20          Q.      And what was that relationship?

21          A.      I was the managing member.

22          Q.      Were there other managing members?

23          A.      Yes -- no.  No other managing

24    member.
```

1       Q.     When was Benefirst formed?

2       A.     August of 1999.  I don't know the

3  exact date.

4       Q.     Were you one of the original

5  members?

6       A.     Yes.

7       Q.     And you held that position as the

8  managing member until April 15th of 2006?

9       A.     That's correct.

10      Q.     What happened to Benefirst at that

11  time?

12      A.     It was sold.  The assets were

13  acquired by America's Choice Health Plans out

14  of Houston, Texas.

15      Q.     So it was an asset sale, not a stock

16  sale?

17      A.     There's no stock in an LLC, so...

18      Q.     Right.  Were all the assets of

19  Benefirst sold?

20      A.     Yes.

21      Q.     Did those assets include computers?

22      A.     Yes.

23      Q.     So whatever computers were owned by

24  Benefirst were sold to America's Choice?

1          A.     Yes.

2          Q.     Where are they physically located

3      now?

4          A.     Well, about four of them are still

5      left.  The other ones were taken over by a

6      company called Pembroke Computer as part of the

7      transaction for them to set up our new office.

8      As a form of compensation to them, ACH decided

9      that they didn't need all those computers, and

10     so they sold them -- you know, they reduced

11     their fee with Pembroke Computer by giving them

12     the computers.

13         Q.     These are stand-alone PCs?

14         A.     Yes.

15         Q.     How many -- Benefirst, how many PCs

16     did they have?

17         A.     I'd say -- Benefirst had about 15

18     PCs.

19         Q.     Of which now four are physically

20     where?

21         A.     Physically in Pembroke.

22         Q.     And that means about 11 were sold to

23     Pembroke Computer?

24         A.     That's correct.

```
 1          Q.     Were the computers at Benefirst
 2   networked?
 3          A.     Yes.
 4          Q.     On a server?
 5          A.     Yes.
 6          Q.     And where is, physically, the
 7   server?
 8          A.     The server is physically in
 9   Pembroke.
10          Q.     Still in Pembroke.  Where was
11   Benefirst located?
12          A.     Marshfield.
13          Q.     So they had to be moved from
14   Marshfield to Pembroke?
15          A.     Right.  That's what Pembroke
16   Computer did.
17          Q.     Okay.  How many servers did
18   Benefirst have?
19          A.     Just one.
20          Q.     Who makes that server?
21          A.     Dell.  Dell Edge, I think is what
22   they are called.
23          Q.     Do you know when Benefirst first got
24   that server?
```

1          A.      Geez, I'm going to say around 2001,

2     2002.  I'm not exactly sure of the date.

3          Q.      Did Benefirst have an IT person

4     in-house that helped with this stuff?

5          A.      No.

6          Q.      Did you have some direct

7     involvement?

8          A.      Yeah.  Oh, sure.

9          Q.      So you're familiar with the computer

10    system.

11         A.      Exactly, yep.

12         Q.      Were all 15 -- I know 15 is probably

13    an estimate not necessarily an exact number.

14         A.      Yeah, because I think it got as high

15    as 19.  But I think when Pembroke took it over,

16    I think it was about 15.

17         Q.      Prior to the sale to America's

18    Choice, did you dispose of any of the PCs at

19    Benefirst?

20         A.      Dispose --

21         Q.      Did you throw any away?

22         A.      No.

23         Q.      Did you give any to any employees?

24         A.      Yeah.  I gave one to Linda Hart,

1    yep.  And I think I took one myself and gave it

2    to my kids.  The rest of them I -- we may have

3    given one to another employee.  I just don't

4    remember.

5        Q.    What did you do to -- when you gave

6    a computer whether to Linda Hart or your kids,

7    what did you do to take the data off it that

8    belonged to Benefirst?

9        A.    There really wasn't any data on it.

10   It was all networked.  So it didn't hold any --

11   if you go back and look at it, there's no data

12   on that computer.  They always drew down off of

13   the server.  Nothing was really saved on those

14   computers.

15       Q.    What e-mails -- wouldn't e-mails be

16   saved on the computers, each individual PC?

17       A.    Saved on the server.

18       Q.    But also on the PC for that day,

19   aren't they?  This is a question, I'm not --

20       A.    Yeah, you know?  I don't know the

21   answer.  I think it was all dependent upon how

22   the computer was set up.

23       Q.    And to the best of your knowledge,

24   all the computers, individual PCs, used at

BAY STATE REPORTING AGENCY

1    Benefirst were networked into the server?

2        A.    Yes.  All of them were.

3        Q.    Did they all have e-mail access?

4        A.    Yes.

5        Q.    Okay.  And what e-mail system did

6    you use at Benefirst?

7        A.    Microsoft Exchange server.

8        Q.    So to the best of your knowledge,

9    any e-mails that were exchanged or -- at

10   Benefirst with anyone outside the company would

11   reside on the server?

12       A.    Exactly, yep.

13       Q.    And that server's still at -- well,

14   now it's at America's Choice.

15       A.    That's right.

16       Q.    Have you done anything to protect or

17   segregate that information -- the Benefirst

18   data from America's Choice, or is it pretty

19   seamless?

20       A.    It's totally separated.  The only

21   thing we're pulling off of the F drive --

22   that's the server, I call it the F drive -- is

23   files that we had on the server prior to ACH.

24   Everything after April 15th is ACH's business,

 1    asset, it all goes down to Texas.

 2          Q.      Okay.  Let me make sure I

 3    understand.  As of -- well, let me ask you a

 4    different question.  When did Benefirst stop

 5    operating its business?

 6          A.      Essentially April 15th.

 7          Q.      So whatever data was on the server

 8    on April 15th, to the best of your knowledge is

 9    it still on the server?

10          A.      Yes.

11          Q.      There's been, as far as you know, no

12    dumping of data or elimination of data.

13          A.      There was only one screw-up in the

14    transition.  That was for one client that's

15    still a client of Benefirst where we were

16    trying to burn a drive -- burn the file onto a

17    drive to send to ACH, and that data was lost,

18    one company.  But that's -- everything else

19    made it through the transition.

20          Q.      Okay.  And for my client, Aubuchon,

21    whatever data existed on the server on

22    April 15th, to the best of your knowledge,

23    should still be on the server?

24          A.      Absolutely, yep.

 1          Q.      And to the best of your knowledge,
 2    has any of the Aubuchon data been moved to any
 3    other computer or server off of the Dell one
 4    you told us about?
 5          A.      No.  I mean, it's been copied in the
 6    lawsuit to give to my attorney.
 7          Q.      Right.
 8          A.      Copied.  It's still housed on the
 9    server.
10          Q.      And who has access to that today?
11          A.      I do.
12          Q.      Any other employees?
13          A.      Nicole Mahoney would have access to
14    it as well.
15          Q.      Is it password protected?
16          A.      Yes.
17          Q.      Did you use a laptop --
18          A.      Yes.
19          Q.      -- at Benefirst?
20          A.      Yes.
21          Q.      Was that networked as well --
22          A.      Yes.
23          Q.      -- or did it have its own hard
24    drive?

1          A.      Both.

2          Q.      Let's talk about Aubuchon for a

3     second.

4          A.      Yep.

5          Q.      Well, let me back up one more step.

6     The laptop that you used, do you still have

7     that?

8          A.      Yes.

9          Q.      Do you use that for America's Choice

10    work?

11         A.      Yes.

12         Q.      Have you searched that laptop to see

13    if there is any information about Aubuchon?

14         A.      Yep.

15         Q.      And what did you find out?

16         A.      We found some e-mails on there.

17    There were no files or folders.  The only thing

18    that we found were e-mails that went back to

19    2003.  Those were all copied, and my attorney

20    has those.

21         Q.      Do you know if those e-mails were

22    produced to us in this case?

23         A.      I --

24         Q.      If you don't know, you can say you

```
 1   don't know.

 2        A.     I don't know.  I don't know.  Yeah.

 3               MR. ROSENBERG:  Lou, just for the

 4   record, they are going to be part of the

 5   September 30 production.

 6               MR. CIAVARRA:  Okay.

 7        Q.     Who else used laptops -- that's --

 8   you don't have to answer that question.

 9               Did Carrie Reddie use a laptop?

10        A.     No.

11        Q.     Did Paul -- how do you spell Paul's

12   last name?

13        A.     Gatanti.

14        Q.     Gatanti.  G-A-T-E-N-T-I?

15        A.     T-A-N-T-I.

16        Q.     I'm sorry, G-A-T-E-N-T-I?

17        A.     T-A-N-T-I.

18        Q.     A-N-T-I.  I'm sorry.  It's your

19   lawyer's list, not mine.

20               MR. ROSENBERG:  I think it was the

21   prior lawyer.

22               MR. CIAVARRA:  Not this lawyer.

23               THE WITNESS:  Prior lawyer, yeah.

24   Steve would never do that.
```

1          A.       Right.

2          Q.       Paper files.

3          A.       Sure.  The physical files, they

4    would include every sales and service file for

5    each plan year for Aubuchon.  They would

6    include plan documents.  They would include

7    some monthly reports.  They would include

8    specific files, specific filings files.

9          Q.       What does that mean?

10         A.       If we had to file a specific claim

11   with the stop loss carrier, that would go.

12   Categorically I think that would essentially

13   cover everything.

14         Q.       Would it include the medical bills?

15         A.       No, no.

16         Q.       Where are the -- where physically

17   are the medical bills?

18         A.       Shredded and gone.

19         Q.       When did that take place?

20         A.       That takes place about 60 days after

21   the claim was processed.

22         Q.       Has that been your policy at

23   Benefirst since you started there?

24         A.       Absolutely.

BAY STATE REPORTING AGENCY

1      Q.     And it's across all clients.

2      A.     Absolutely.

3      Q.     How good were you at Benefirst of

4    actually following through with that policy?

5      A.     It was the way that we did

6    everything.  It was a claims examiner's

7    responsibility to take their paper files, scan

8    them into the server through a program that we

9    have, and then have -- those all went into this

10   big bin.  We had Shred-It Company come in and

11   shred all the claims.  That was for HIPAA

12   privacy reasons.

13     Q.     But a mirror image of that bill

14   would exist on the server?

15     A.     That is correct.

16     Q.     That is -- that's how people could

17   come back -- for example, are you familiar that

18   from time to time a stop loss carrier would

19   want to have an audit?

20     A.     Exactly.

21     Q.     And they would audit it off the data

22   on the server as opposed to the paper file.

23     A.     Exactly, yep.

24     Q.     And to the best of your knowledge,

1    those mirror images of the medical bills still

2    reside on the server?

3         A.    That's correct.

4         Q.    Do you know if that data off the

5    server has been provided to us in this case?

6         A.    That data, the claim -- individual

7    claims -- has not been provided.

8         Q.    And when we say the individual

9    claims, that would be the medical bill?

10         A.    Yeah.

11         Q.    What else -- what other type of

12    document or information is associated with an

13    individual claim?

14         A.    Let me try to give you the

15    categories.  You have what's call a HCFA, which

16    is H-C-F-A, form.  You have a UB form.  You

17    could have what's called a super bill, which is

18    essentially a HCFA or UB with additional pages

19    to it.  You may have handwritten notes from the

20    patient or the provider that all gets -- that's

21    part of the record for that particular claim.

22    I think that's essentially all the different

23    ways that a claim could come to us.

24         Q.    And all of that data would be

1    scanned onto the server?

2        A.     That's correct.

3        Q.     So if you received handwritten notes

4    from a doctor with respect to treatment that

5    one of -- that W.E. Aubuchon employees needed,

6    that actual note would be scanned onto the

7    server?

8        A.     If it was part of a claim record?

9        Q.     Yeah.

10       A.     Yeah.

11       Q.     Okay.  And those are the -- okay.

12   And so those documents -- I should say since

13   they are not really documents anymore, now they

14   reside electronically --

15       A.     Right.

16       Q.     -- in a server, copies of that

17   information has not been made available yet.

18       A.     That's correct.

19       Q.     And each claims examiner is

20   responsible for scanning this data onto the

21   server?

22       A.     Correct.

23       Q.     And the way Benefirst was organized,

24   did claims examiners, did they have

1    responsibility for certain clients?

2        A.    Yes.

3        Q.    So there would be a claims examiner

4    responsible for Aubuchon.

5        A.    That's correct.

6        Q.    Do you remember -- was that one

7    person throughout the -- or did it change?

8        A.    No, it changed, yep.

9        Q.    We're talking dozens of people or

10   like a couple?

11       A.    No, we're probably talking three to

12   four.

13       Q.    Okay.  And the policies at least at

14   Benefirst were -- at what point would they scan

15   it?  Right away?

16       A.    No.  60 days afterwards.  We gave it

17   a 60-day, sat on the shelf in the --

18       Q.    Physically.

19       A.    Physically, in case the examiner had

20   to physically go back and pull something out of

21   that claim.  Typically 60 days when we received

22   notification as to whether a claim was paid

23   incorrectly or we needed additional

24   information, that type of thing.  After 60 days

1   we could scan them in and, you know, get rid of

2   the paper.

3       Q.    Did Benefirst have a policy with

4   respect to how long it would retain that data

5   on a server?

6       A.    No, it did not.

7       Q.    To the best of your knowledge was

8   everything retained since 1999 still on the

9   server?

10      A.    Yes -- not since 1999.  Since we got

11  the server.

12      Q.    All right.  Of course.

13      A.    Yeah.

14      Q.    And you're not sure when that was?

15      A.    No, I'm not exactly sure.  I think

16  it was -- you know, it was before Aubuchon

17  became a client.  So all of Aubuchon's is on

18  the server.

19      Q.    You think so?

20      A.    Yeah, I believe so.  I'm just trying

21  to answer your question --

22      Q.    I know.

23      A.    -- to the letter, but I'm pretty

24  certain that all of Aubuchon's on the server.

1          Q.      Where is the pre-server information

2     now?

3          A.      The pre-server information was held

4     by -- at that time we were using RIMS, a

5     division of RIMS, to process our claims out in

6     Chicago, and they handled all the paper.

7          Q.      I'm familiar -- and just we can get

8     our definitions straight.  There's a company

9     I'm going to call it TriZetto?

10         A.      Yes.

11         Q.      When you say RIMS, TriZetto is the

12    company that owns that RIMS system, right?

13         A.      TriZetto is the big stock exchanged,

14    you know, company.  They went out and bought,

15    you know -- TriZetto, they went out and bought

16    RIMS, Web M.D., Erisco.  They purchased a whole

17    host of medical administration-type companies.

18    RIMS was one of them.  And OSG, Option Services

19    Group, was a division of RIMS.

20         Q.      Okay.  I'm going to take a step --

21    thank you.  I'm going to take a step back then.

22    There was a time period in which Benefirst

23    contracted with one of these companies for

24    services, right?

```
 1          A.      There was never a time that we did
 2   not contract with them.
 3          Q.      Right from the beginning --
 4          A.      Right from the beginning --
 5          Q.      -- in 1999.
 6          A.      -- correct.
 7          Q.      Who was that company initially?
 8          A.      Initially it was Option Services
 9   Group, OSG.
10          Q.      And you believe that was before
11   Aubuchon became a client.
12          A.      Yeah.  Yeah, I believe so.  It may
13   have been right around the cut-over.
14          Q.      And then was there then a -- and the
15   data that you would accumulate in servicing
16   your clients would exist on the OSG server
17   somewhere?
18          A.      Yes, yep.  Which essentially is the
19   RIMS server.
20          Q.      Okay.
21          A.      So when we made the transition, all
22   the data remained with RIMS.
23          Q.      So then we go from OSG, at some
24   point we go to RIMS -- you go to RIMS at some
```

```
 1   point.
 2         A.      Yeah.   To be more specific, we go to
 3   the DCCC, the Data Services Center Computer
 4   Center.
 5         Q.      That's in Chicago.
 6         A.      That's in Naperville, Illinois.  And
 7   that is a -- it's not even a division of RIMS,
 8   it's just -- yeah.
 9         Q.      The service they provide.
10         A.      That's right.  It's the ASP model
11   that they provide.
12         Q.      What's ASP stand for?
13         A.      Application service provider.
14         Q.      And at that point in time the
15   data -- and when I say, "data," I'm talking
16   about the claims files, the reports -- reside
17   in their server in Illinois.
18         A.      Right.
19         Q.      And you can access it remotely from
20   Marshfield.
21         A.      That's correct.   That's correct.
22         Q.      And how long does that process stay
23   in place at RIMS -- I mean, I'm sorry,
24   Benefirst?
```

BAY STATE REPORTING AGENCY

1    operating with the highest level of their

2    product.

3         Q.     My understanding that there were

4    certain modules, you could pick modules that

5    you would --

6         A.     Right.

7         Q.     -- license from RIMS.

8         A.     Right.

9         Q.     And I'm going to say RIMS.  I'm not

10   even sure if technically that's the name of the

11   company at the right time?

12        A.     No.  That was always RIMS -- if you

13   say, "RIMS," anyone in the industry knows what

14   you're talking about.

15        Q.     You know what we're talking about.

16        A.     I know exactly what you're talking

17   about.

18        Q.     It was the company with whom you had

19   the relationship --

20        A.     Right.

21        Q.     -- to house the data for Aubuchon

22   and others.

23        A.     Right.

24        Q.     Okay.  Did Benefirst always license

1    created?

2         A.     Well, I'm not quite sure if this was

3    a monthly report -- no, this would not be a

4    monthly report.  This report was typically

5    generated whenever we had some issue on a

6    specific person or family.

7         Q.     Okay.  And to the best of your

8    knowledge, that report would continue to exist

9    on the RIMS server in Chicago?

10        A.     I cannot -- I don't know.

11        Q.     Well, to the best of your knowledge.

12   Is there any reason why it wouldn't?

13        A.     Unless they did something where

14   they -- you know, after we terminated our

15   contract they did something with the data.

16        Q.     Do you know whether or not they are

17   required by law to maintain this data for a

18   period of time?

19        A.     I do not.

20        Q.     Okay.  Now, you also had copies of

21   that, obviously, because you gave it to us.

22        A.     Right.

23        Q.     Why would Benefirst have a copy on

24   its server of reports that existed on the RIMS

1    server?

2         A.    Because they would have been the

3    monthly reports.  We set up a folder -- when I

4    said we had the distribution list and it went

5    to different people, it also went to a folder

6    we -- every month created a monthly folder on

7    the server.

8         Q.    Let me make sure I understand.  So

9    whatever reports, these monthly reports -- or

10   daily or weekly or whatever the report is --

11   would presumably exist in two places:  on the

12   RIMS in Chicago and also a copy on your server?

13        A.    And a copy that was sent to the

14   client.

15        Q.    The client.

16        A.    Right.

17              (Exhibit No. 3, Reinsurance Census

18   Report; so marked.)

19        Q.    Exhibit 3 is something called a

20   reinsurance census report.

21        A.    Yeah.  That's a RIMS -- this is --

22   yeah.  This is a RIMS report.  You've heard me

23   talk about the RLR.  This is the sister report

24   to the RLR.  And we found this report to be

```
 1    stuff around, looked for boxes, went through

 2    boxes.

 3          Q.    Is there still stuff there?

 4          A.    Yeah.  But we're going to shut it

 5    down this month like within the next two weeks.

 6          Q.    Anything relating to Aubuchon in

 7    that physical off-site space?

 8          A.    No, no, no.

 9          Q.    No medical reports, no medical

10    bills?

11          A.    No, no, no.  We didn't keep anything

12    there.  It all got shredded.

13          Q.    Let me make sure I understand this

14    as well because -- let me strike this.  Do you

15    recall when the relationship with Aubuchon

16    ended?

17          A.    When did it end?  It ended in

18    January of --

19          Q.    '05?

20          A.    '05.  Is that when it was?  Yeah.

21          Q.    So the last claim you would have

22    processed would be at the end of the year?

23          A.    Yes.

24          Q.    Okay.  My question is really -- it
```

BAY STATE REPORTING AGENCY

1    was more than 60 days before April.  There

2    are -- of '06.  So in April of '06 when you

3    ended business as Benefirst, presumably you

4    would have no more original copies of medical

5    bills because the 60 days would have expired.

6          A.    Oh, yeah, yeah, yeah.  That happened

7    long before that.

8          Q.    That's what I'm saying.

9          A.    Yeah.

10         Q.    To the best of your knowledge, you

11   haven't deleted -- well, therefore you haven't

12   deleted or destroyed any information relating

13   to Benefirst since this lawsuit started.

14         A.    Related to Benefirst?

15         Q.    I'm sorry, to Aubuchon.

16         A.    Yeah.  The answer is going to be the

17   same.  No, we haven't.  Yeah.

18         Q.    Except with that one exception of

19   the lost data on one client.

20         A.    On one client.

21         Q.    Which was not Aubuchon?

22         A.    In had nothing to do with Aubuchon,

23   yeah.

24         Q.    Okay.  When the relationship with

1    administrator.

2        A.    I don't know.

3        Q.    No.  I'm saying to the best of your

4    knowledge it wasn't.

5        A.    To the best of my knowledge, I don't

6    know.

7        Q.    How would you determine that today?

8        A.    You'd have to go ask the new TPA,

9    ask them what they received from us.  But to

10   get into the crux of the issue, you're getting

11   back to what you said before.  You're

12   absolutely right.  For them to process claims

13   correctly on a takeover basis, they would need

14   data.  They would need history.  So my

15   assumption is that they got what they needed.

16       Q.    So is there something called a

17   run-out report?

18       A.    A run-out report?  No.

19       Q.    Okay.

20       A.    No.

21       Q.    When did Benefirst's ability to

22   access the RIMS system end?

23       A.    I'd say it ended like May 31st when

24   we moved out of Marshfield.

1           Q.     As you sit here today you can't

2    access that system.

3           A.     No, absolutely not.

4           Q.     Have you tried?

5           A.     No.  Physically we can't do it.

6           Q.     What do you mean?

7           A.     Well, you need a piece of hardware,

8    that frame relay from AT&T, and we don't have

9    it.

10          Q.     Okay.

11          A.     Yep.

12          Q.     Did you have other clients other

13    than Aubuchon that utilized that RIMS system?

14          A.     Everyone utilized --

15          Q.     At Benefirst.

16          A.     Everyone utilized it.

17          Q.     That's what I'm saying.  All of

18    Benefirst's clients utilized the RIMS system.

19          A.     Yeah.

20          Q.     So on May 31st, I take it you

21    obviously no longer used the RIMS system.

22          A.     Right.

23          Q.     America's Choice uses a different

24    system?

1     what we did on the RIMS system.  We adjudicated

2     claims.  I think what you're referring to is

3     what's called a CA program, a claims

4     adjudication program, I think.

5          Q.     And that's a RIMS program?

6          A.     Yeah.

7          Q.     And it's -- again it exists within

8     RIMS, not within Benefirst independently.

9          A.     That's correct, yep.

10         Q.     With respect to medical bills, my

11    understanding is that within the Benefirst

12    system, they are -- once they are scanned in,

13    they are organized by claims examiner and not

14    by client.

15         A.     That's correct.  So claims examiner

16    for that day housed the claim files.

17         Q.     Okay.

18         A.     The medical scan.

19         Q.     And they would have -- this is a

20    hypothetical situation, but they would have a

21    box of -- or files of medical bills in front of

22    them, and they would scan them into the system.

23         A.     Right.

24         Q.     If there was going to be an audit,

1    or somebody needed to look for that medical

2    bill, how would they search the server for

3    that?

4        A.    They would be able to tell if

5    they -- if like, say, Adria Garneau came in,

6    she could pull up that claim off the CA report

7    and it would have the adjuster code which is --

8    which essentially were the initials of the

9    claims examiners.  And they would have the date

10    the claim was processed.  With those two pieces

11    of information, we could go back in -- go back

12    to that particular folder, find the batch of

13    claims that she processed that day, and then

14    those are all in chronological order based upon

15    the claims number.

16           So she would be able to tell from

17    the CA program what the claims number is, and

18    match it up to the claim, print off that claim

19    and hand it to the auditor.

20        Q.    A claim number.  Would there be a

21    different claim number for every client?

22        A.    Every claim.

23        Q.    Every claim and every client?

24        A.    Every claim got a different number.

1    They were not group specific.  And, you know,

2    it would have a suffix of 01.  If the claim was

3    paid incorrectly and had to be readjudicated,

4    it would be the same claim number, 02.  So...

5         Q.    And the claim number, is there any

6    way to identify a client based upon a claim

7    number?

8         A.    No, absolutely not.

9         Q.    You just ran them sequentially?

10         A.    The system ran them sequentially.

11         Q.    Okay.  Do you know whether or not

12    that data can be searched by doing a word

13    search?

14         A.    No, no, no.  Because it's in -- I

15    want to say EFX.   E-F something application.

16    So it's not --

17         Q.    Searchable?

18         A.    -- it's -- you can't do it that way,

19    yeah.

20         Q.    So it's just copies of documents

21    that exist in the server.

22         A.    Right.

23         Q.    And if I wanted to find -- for

24    example, in April of 2004 I was an employee of

1    Aubuchon and I received medical treatment and I

2    wanted a copy of my medical bill, you'd have to

3    go to find the date the claim was paid and

4    physically, visually search the file to find my

5    bill.

6         A.    Right.

7         Q.    There's no way to search for it

8    other than that.

9         A.    No.   That's the only way.

10        Q.    Okay.   And other than on the server

11   in Pembroke today, the old Benefirst server,

12   and other than original documents with your

13   attorney, copies of -- in Pembroke, and in

14   Illinois on the RIMS system, and, I guess,

15   possibly with Paul Sullivan or Maureen

16   Fitzgerald, is there any other location of any

17   data, information, or documents relating to

18   Aubuchon and Benefirst that you can think of?

19   Let's just say and with Aubuchon.   Do you

20   understand the sources of information I'm

21   giving you?

22        A.    I'm trying to think of where

23   possibly there could be anything else other

24   than those sources that you just mentioned.