UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| W.E. AUBUCHON CO., INC., AUBUCHON DISTRIBUTION, INC., W.E. AUBUCHON CO. INC. EMPLOYEE MEDICAL BENEFIT PLAN, and AUBUCHON DISTRIBUTION, INC. EMPLOYEE MEDICAL BENEFIT PLAN,<br><br>          Plaintiffs,<br><br>v.<br><br>BENEFIRST, LLC,<br><br>          Defendant. | C.A. No. 05-40159FDS<br>(Louis M. Ciavarra BBO# 546481)<br>(Ryan T. Killman BBO# 654562)<br>(Colleen E. Cushing BBO# 663498) |

**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN RESPONSE
TO ISSUES RAISED IN THE DECEMBER 8, 2006 HEARING
ON DEFENDANT'S MOTION FOR RECONSIDERATION**

       Plaintiffs hereby request that the Court allow them to respond to certain issued raised during the December 8, 2006 hearing on Defendant's Motion for Reconsideration. During the course of that hearing the Court made reference to the potential for cost-shifting under the Zubulake line of cases. Under the Zubulake line of cases, cost-shifting would be inappropriate in this matter and the Court should order Defendant to carry all costs of the production of medical bills requested by Plaintiffs.

**I.    The Data Requested by Plaintiffs is Accessible.**

       The default rule used in allocating the costs of discovery is that each party should pay its own costs of production. Oppenheimer Fund v. Sanders, 437 U.S. 340, 358 (1978) ("under discovery rules, the presumption is that the responding party must bear the expense of complying with discovery requests.") Cost-shifting should be considered only when electronic discovery imposes an "undue burden or expense" on the responding party. Zubulake v. UBS Warburg

<u>LLC</u>, 217 F.R.D. 309, 318 (S.D.N.Y. 2003) ("*Zubulake I*").  "[W]hether production of documents is unduly burdensome or expensive turns primarily on whether it is kept in an accessible or inaccessible format…" <u>Id</u>.  The *Zubulake I* decision identified the following five categories of data, listed in order from most accessible to least accessible:

1.  Active, online data:  On-line storage is generally provided by magnetic disk.  It is used in the very active stages of an electronic records life – when it is being created or received and processed, as well as when the access frequency is high and the required speed of access is very fast, i.e., milliseconds.  Examples of online data include hard drives.

2.  Near-line data:  This typically consists of a robotic storage device (robotic library) that houses removable media, uses robotic arms to access the media, and uses multiple read/write devices to store and retrieve records.  Access speeds can range from as low as milliseconds if the media is already in a read device, up to 10-30 seconds for optical disk technology, and between 20-120 seconds for sequentially searched media, such as magnetic tape.  Examples include optical disks.

3.  Offline storage/archives:  This is removable optical disk or magnetic tape media, which can be labeled and stored in a shelf or rack.  Off-line storage of electronic records is traditionally used for making disaster copies of records and also for records considered 'archival' in that their likelihood of retrieval is minimal.  Accessibility to off-line media involves manual intervention and is much slower then on-line or near-line storage.  Access speed may be minutes, hours, or even days, depending on the access-effectiveness of the storage facility.  The principled difference between nearline data and offline data is that offline data lacks the coordinated control of an intelligent disk subsystem, and is, in the lingo, JBOD ("Just a Bunch Of Disks").

4.  Backup tapes:  A device, like a tape recorder, that reads data from and writes it onto a tape.  Tape drives have data capacities of anywhere from a few hundred kilobytes to several gigabytes.  Their transfer speeds also vary considerably … The disadvantages of tape drives is that they are sequential-access devices, which means that to read any particular block of data, you need to read all the preceding blocks.  As a result, the data of a backup tape are not organized for retrieval of individual documents or files because the organization of the data mirrors the computer's structure, not the human records management structure.  Backup tapes also typically employ some sort of data compression, permitting more data to be stored on each tape, but also making restoration more time-consuming and expensive, especially given the lack of uniform standard governing data compression.

5.  Erased, fragmented or damaged data:  When a file is first created and saved, it is laid down on the storage media in contiguous clusters.  As files are erased, their clusters are made available again as free space.  Eventually, some newly created files become

larger than the remaining contiguous free space. These files are then broken up and randomly placed throughout the disk. Such broken-up files are said to be "fragmented," and along with damaged and erased data can only be accessed after significant processing.

*Zubulake I* at 318-319. "Of these, the first three categories are typically identified as accessible, and the latter two as inaccessible." Id. at 319-320. "Information deemed 'accessible' is stored in a readily usable format. Although the time it takes to actually access the data ranges from milliseconds to days, the data does not need to be restored or otherwise manipulated to be usable." Id. at 320. Based on the *Zubulake I* analysis outlined above, the medical bills requested by Plaintiffs in this matter are accessible and the cost of their production should be borne by Defendant.

## II.    Under the *Zubulake I* Cost-Shifting Analysis, Defendant Should Bear All Costs of Production.

Even if the Court were to partake in a cost-shifting analysis using the seven-factor test outlined in *Zubulake I*, such an analysis should result in Defendant bearing the total cost of production of the medical bills at issue. *Zubulake I* lists the following seven factors to be used when evaluating cost-shifting and determining whether Plaintiffs' request for medical bills imposes an "undue burden or expense" on Defendant:

1. The extent to which the request is specifically tailored to discover relevant information;

2. The availability of such information from other sources;

3. The total cost of production, compared to the amount in controversy;

4. The total cost of production, compared to the resources available to each party;

5. The relative ability of each party to control costs and its incentive to do so;

6. The importance of the issues at stake in the litigation; and

7. The relative benefits to the parties of obtaining the information.

3

*Zubulake I* at 322.  The above-referenced factors should be weighed in descending order.  See Id. at 323.  "The first two factors - comprising the marginal utility test - are the most important."  Id.

With respect to the first factor (the extent to which the request is specifically tailored to discover relevant information), Plaintiffs are requesting medical bills which correspond to a list of approximately 3,000 claims out of the approximately 34,000 Plaintiff-related claims handled by Defendant.  Plaintiffs provided this list of 3000 claims to Defendant in order to narrow the scope of Defendant's production and lessen their burden.  Plaintiffs have expended significant sums of money in order to specifically tailor their requests to discover relevant information.  Furthermore, Defendant has never objected to the relevancy of Plaintiffs' request for medical bills.

With respect to the second factor (the availability of such information from other sources), the medical bills requested by Plaintiffs are solely in the possession, custody and control of Defendant.  There are no other sources available for Plaintiffs to retrieve this information.

With respect to the third and fourth factors (the total cost of production compared to the amount in controversy and compared to the resources available to each party), the total cost of production may be high, however, such production is necessary in order to ascertain the total amount in controversy.  The production of these medical bills is essential to Plaintiffs' expert conducting an audit of claims handled by Defendant as Third Party Administrator.  It should be noted that any excessive burden or expense related to the production of these medical bills

{J:\CLIENTS\lit\302508\0002\PLD\00817992.DOC;1}

results solely from Defendant's chosen method of record keeping, which makes searching for medical bills difficult.[1]

With respect to the fifth factor (the relative ability of each party to control costs and its incentive to do so), whereas Defendant has possession, custody and control of the medical bills at issue, it is able to control the costs of production and has incentive to do so.

With respect to the sixth and seventh factors (the importance of the issues at stake in the litigation and the relative benefits to the parties of obtaining the information), the medical bills requested by Plaintiffs are essential to assessing Plaintiffs' damages in this case and therefore extremely important to the issues at stake in this litigation. Furthermore, the information is potentially beneficial to Plaintiffs and Defendant. The medical bills at issue are necessary to conduct an audit analyzing Defendant's handling of claims made by Plaintiff's plan participants as Third Party Administrator. This audit may yield evidence of Defendant's negligence in the handling of such claims and the resulting damages sustained by Plaintiffs or evidence of Defendant's proper claims-handling practices.

Lastly, unlike *Zubulake I*, the Court does not need to order a sampling of the requested electronic documents to determine their relevancy and to assist it in conducting the above-

---

[1] It is also important to note that the medical bills at issue are Plaintiffs' property pursuant to the terms of the Service Agreement entered into between the parties, which provides:

> The Plan Administrator, as agent of the Plan Sponsor shall: …[m]aintain, for the duration of this Agreement and for two (2) years thereafter, adequate records of all transactions between Plan Sponsor, the Plan Administrator and plan participants. The records are the property of the Plan Sponsor. The Plan Sponsor has the right of continuing access to their records….

(Emphasis added.) Given this contractual language, Plaintiffs, W.E. Aubuchon Co., Inc. and Aubuchon Distribution, Inc., as Plan Sponsors, have demanded the return of these records which, to date, Defendant has ignored.

referenced analysis.  Such a sampling has already been performed as is evidenced by <u>Exhibit 1</u>,

attached to Plaintiffs' Answers to Interrogatories.[2]

WHEREFORE, Plaintiffs request that this Court take this Supplemental Memorandum

into consideration when considering Defendant's Motion for Reconsideration and Order

Defendant to produce all medical bills corresponding to the lists of claims provided to it by

Plaintiffs and bear the entire cost of their production.

> W.E. AUBUCHON CO., INC., AUBUCHON
> DISTRIBUTION, INC., W.E. AUBUCHON
> CO. INC. EMPLOYEE MEDICAL
> BENEFIT PLAN, and AUBUCHON
> DISTRIBUTION, INC. EMPLOYEE
> MEDICAL BENEFIT PLAN
>
> By Their Attorneys,
>
> /s/ Ryan T. Killman
> Louis M. Ciavarra  (BBO#546481)
> Ryan T. Killman (BBO#654562)
> Colleen E. Cushing (BBO# 663498)
> Bowditch & Dewey, LLP
> 311 Main Street
> P.O. Box 15156
> Worcester, MA 01615-0156
> Telephone:  (508) 926-3408
> Facsimile:   (508) 929-3011

Date:   December 11, 2006

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on December 11, 2006.

/s/ Ryan T. Killman

---

[2] <u>Exhibit 1</u> to Plaintiffs' Answers to Interrogatories, was submitted to the Court by Defendant's counsel at the hearing on December 8, 2006 and is not part of the public record where it contains confidential personal information.