UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| W.E. AUBUCHON CO., INC., AUBUCHON DISTRIBUTION, INC., W.E. AUBUCHON CO. INC. EMPLOYEE MEDICAL BENEFIT PLAN, and AUBUCHON DISTRIBUTION, INC. EMPLOYEE MEDICAL BENEFIT PLAN<br>    Plaintiffs,<br><br>v.<br><br>BENEFIRST, LLC,<br>    Defendant. | C.A. No. 05-40159FDS<br>(Louis M. Ciavarra. BBO# 546481)<br>(Ryan T. Killman BBO# 654562) |

### NORTHSHORE INTERNATIONAL INSURANCE SERVICES, INC.'S OPPOSITION TO DEFENDANT BENEFIRST, LLC'S MOTION TO ENFORCE THIRD-PARTY SUBPOENA

Northshore International Insurance Services, Inc. ("Northshore") hereby opposes Defendant, BeneFirst, LLC's ("BeneFirst") Motion to Enforce Third-Party Subpoena (the "Motion"), which seeks an Order compelling Northshore to produce documents which are not only irrelevant to this litigation but contain information which is clearly protected from disclosure.

### BACKGROUND

Northshore is a consulting and insurance services firm specializing in auditing and claims management. See Affidavit of Stephen V. Murphy ("Murphy Aff."), ¶ 1. It regularly provides auditing services for insurance carriers across the United States, including auditing the claims practices of third-party administrators like BeneFirst. See Murphy Aff., ¶ 2. In fact, prior to the filing of this litigation, Northshore had conducted audits of BeneFirst's practices on behalf of

Plaintiffs and their excess insurance carrier.[1]  See Murphy Aff., ¶ 3-4.  Northshore had also conducted audits of BeneFirst for its work with clients other than Plaintiffs.  Id., ¶ 5.  It is documentation relating to this work that BeneFirst now seeks from Northshore.

Northshore was retained by Plaintiffs' counsel as an expert in this litigation to, among other things, conduct an audit of BeneFirst's claims adjudication practices.  This audit has been delayed as a result of BeneFirst's refusal to produce the claims records necessary for Northshore to conduct its audit.  On February 6, 2007, the Court ordered BeneFirst to produce all of the claims records requested by Plaintiffs in this matter.  Under the recently amended discovery timeline, BeneFirst must produce said records by July 31, 2007, which will finally allow Northshore to conduct its audit.

On or about December 1, 2006, Northshore was served with a Subpoena issued by BeneFirst which sought, among other things, documents relating to other audits of BeneFirst by Northshore on behalf of clients other than those named as Plaintiffs in this matter.  On December 7, 2006, Northshore filed a Rule 45 Objection objecting to, among other things, the extremely broad scope of Paragraph 12 of BeneFirst's Subpoena's Schedule "A" which requests the "complete contents of any and all files related to, concerning or discussing any audits or reviews of the activities of BeneFirst, LLC."  This request is clearly objectionable as it encompasses a vast amount of documents that are utterly irrelevant to this litigation and would only result in undue burden to Northshore.

---

[1] On March 2 - 3, 2005, Northshore conducted an audit of BeneFirst on behalf of BP, Inc., Plaintiffs' stop loss insurance carrier, of an aggregate claim that had been submitted to BP, Inc. by BeneFirst on behalf of Aubuchon and identified $107,057.90 in claim errors.  In June 2005, Northshore conducted an audit on behalf of W.E. Aubuchon Co., Inc. of BeneFirst's claims adjudication and identified potential claim errors in the amount of $278,476.39 and confirmed claim errors of $194,055.17.  Neither of these audits were prepared in Northshore's capacity as an expert retained by Plaintiff's Counsel.  The findings of these prior audits have already been produced to BeneFirst.

{Client Files\lit\302508\0002\PLD\00877393.DOC;2}

**ARGUMENT**

I.  **Discovery Relating to Northshore's Previous Audits of BeneFirst Bears No Relevance Whatsoever to the Claims Asserted in this Action and Is Not Reasonably Calculated to Lead to the Discovery of Admissible Evidence.**

Paragraph 12 of BeneFirst's Subpoena's Schedule "A" requests the "complete contents of any and all files related to, concerning or discussing any audits or reviews of the activities of BeneFirst, LLC." The Court should note that all documents requested by BeneFirst relating to Northshore's work for or relating to Plaintiffs have been produced to BeneFirst. The problem is that, as drafted, Paragraph 12 seeks documents pertaining to Northshore's audits of BeneFirst on behalf of entities other than Plaintiffs or their insurers. It is without question that such documents would be irrelevant and outside the scope of discovery in this matter. These audits relate to other companies and their medical claims; they have nothing to do with Plaintiffs or any claims asserted in this action. Further, if Northshore is compelled to produce all documents responsive to BeneFirst's Subpoena relating to "other audits," Northshore would be forced to produce thousands of pages of documents and electronic data relating to audits performed on behalf of other clients with no connection whatsoever to this litigation. See Murphy Aff., ¶ 6. This would unquestionably be unduly burdensome to Northshore. Id.

BeneFirst attempts to justify the breadth of its Subpoena by arguing that by reviewing "other audits" conducted by Northshore, BeneFirst will be able to ascertain whether Northshore "applies the same standards and norms to its review of BeneFirst's activities in its role as a paid expert for the plaintiffs as it applied when simply engaged in the routine reviews of BeneFirst's operations that it has conducted for other clients in other situations and for less adversarial purposes." See BeneFirst's Memorandum in Support of its Motion to Enforce Third Party Subpoena ("Memorandum"), p. 4. BeneFirst's assumption with respect to the uniformity of all audits clearly demonstrates its misunderstanding of the auditing process.

3

The "other audits" performed by Northshore were conducted for a variety of reasons, for a variety of clients, each with different goals. See Murphy Aff., ¶ 7. Some of the "other audits" were not even claim audits; they were operational reviews with no claim component whatsoever. Id. Further, Northshore conducted a reviews which strictly focused on specific categories of claims covered under the specific excess portion of a stop loss contract. Id., ¶ 8.

Even if the scope of an audit is an adjudication of claims transactions, the results differ depending upon who the client is, such as a stop loss carrier, a reinsurer, or an employer. Id., ¶ 9. Report formats differ from simple executive summaries to detailed, lengthy narratives, depending on the requirements of the client and the circumstances and scope of the audit. Id., ¶ 10. Therefore, it is not logical to consider that various audit reports can be compared to each other and is not reasonable to utilize a comparison of audit reports to ascertain the consistency of Northshore's protocols and findings. Id., ¶ 11.

Furthermore, BeneFirst has not even reviewed Northshore's audit concerning Plaintiffs (because it has yet to be performed) and any attempt to compel the production of documents which will be used to test the standards and methodologies used in such an audit is unnecessary and certainly premature. In fact, the newly revised discovery schedule, agreed to by the parties, provides for ample time in which BeneFirst can conduct expert discovery if it is displeased with the standards and methodologies used by Northshore in conducting its audit.

## II. Both Privacy and HIPAA Concerns are Implicated by Production of the "Other Audit" Documents Requested in BeneFirst's Subpoena.

The documents and information requested by BeneFirst in connection with the "other audits" of BeneFirst performed by Northshore unquestionably contain confidential client information. Audit reports contain, among other things, information regarding client relationships, financial relationships and reinsurance relationships and therefore likely contain

4

confidential information relating to Northshore's clients and their respective business partners. See Murphy Aff., ¶ 12.

In addition, in instances where Northshore's audits include a review of claim transactions, the reports will have detailed information regarding patient information, social security numbers, diagnoses and other sensitive personal information which qualifies as "Protected Health Information" under the Health Insurance Portability & Accountability Act ("HIPAA") regulations. See 45 C.F.R. § 164.501. Id., ¶ 13. While it may be true that BeneFirst had access to this information in the course of the administration of its clients' claims, BeneFirst would never have been allowed to share one client's Protected Health Information with another client. That is, in fact, what BeneFirst is seeking to do in its Motion.

The disclosure of Protected Health Information by certain employers to BeneFirst was done pursuant to a service agreement or other contract executed between the employer and BeneFirst as third-party administrator. Such information would have been disclosed specifically for the purpose of BeneFirst administering claims. BeneFirst cannot now argue that as a result of an employer's previous disclosure of claims-related information to BeneFirst in connection with providing administrative services allows BeneFirst to have access to and disclose such information whenever it desires and for purposes wholly unrelated to the administration of claims. See 45 C.F.R. § 164.506 (a)(5) ("… A consent obtained by a covered entity under this section is not effective to permit another covered entity to use or disclose protected health information.") Certainly, these employers would not have anticipated that the information they provided to BeneFirst would be disclosed to third-parties, such as Plaintiffs and the Court, in the course of unrelated litigation.

Further, BeneFirst's position that Northshore waived any objection to the production of

5

the "other audit" documents on the basis of privacy grounds by not raising it in it Rule 45 Objection is misguided. Regardless of whether or not Northshore stated in its Rule 45 Objection that documents requested by BeneFirst would include private, confidential, and/or HIPAA protected information, it does not negate the fact that documents and information sought by BeneFirst contain Protected Health Information which is expressly protected under HIPAA and can not be waived by Northshore as that Protected Health Information belongs to each respective company their employees and they have not been joined or provided notice in connection with this action.

### III. The Enforcement of BeneFirst's Subpoena will Materially Harm Northshore's Ability to Continue Providing Services to its Clients.

Northshore has been in operation since 1988 and since its inception, has never been asked to produce reports of audits unrelated to the parties to the lawsuit in which it is involved in an expert capacity. See Murphy Aff., ¶ 14. Northshore has an understanding with all of its clients that the services it provides and the documentation created in connection with such services will remain confidential. Id., ¶ 15. Northshore does not publish a client list; it does not speak of one client to another client; and only shares the results of an audit with the client or specific individuals which the client designates. Id., ¶ 16.

Northshore's reputation for providing effective claim auditing services in a confidential manner will be harmed if BeneFirst is successful in its Motion and Northshore is forced to produce documents relating to other clients which are entirely irrelevant to this litigation. Id., ¶ 17. If that happens, potential clients will hesitate to utilize Northshore's services if they are worried that an audit report may later become public knowledge because of litigation which Northshore is involved in, either as a witness or an expert, that has nothing to do with that potential client. Id., ¶ 18.

6

WHEREFORE, Northshore respectfully requests that this Court deny Defendant, BeneFirst, LLC's, Motion to Enforce Third-Party Subpoena and grant such other relief as the court deems just and appropriate.

NORTHSHORE INTERNATIONAL
INSURANCE SERVICES, INC.

By its Attorneys,

/s/ Ryan T. Killman
Louis M. Ciavarra (BBO#546481)
Ryan T. Killman (BBO#654562)
Bowditch & Dewey, LLP
311 Main Street
Worcester, MA 01615-0156
Telephone: (508) 926-3408

Dated: March 21, 2007

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this 21st day of March, 2007.

/s/ Ryan T. Killman

7

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

W.E. AUBUCHON CO., INC., AUBUCHON )
DISTRIBUTION, INC., W.E. AUBUCHON )
CO. INC. EMPLOYEE MEDICAL ) C.A. No. 05-40159FDS
BENEFIT PLAN, and AUBUCHON ) (Louis M. Ciavarra. BBO# 546481)
DISTRIBUTION, INC. EMPLOYEE ) (Ryan T. Killman BBO# 654562)
MEDICAL BENEFIT PLAN )
    Plaintiffs, )
 )
v. )
 )
BENEFIRST, LLC, )
    Defendant. )
 )

## AFFIDAVIT OF STEPHEN V. MURPHY

I, Stephen V. Murphy, Executive Vice President of Northshore International Insurance Services, Inc. ("Northshore"), make an oath that the facts recited herein are true and correct, except as to matters herein stated to be on information and belief, and as to these matters I believe them to be true and state as follows:

1. Northshore is a consulting and insurance services firm specializing in auditing and claims management.

2. It regularly provides auditing services for insurance carriers across the United States, including auditing the claims practices of third-party administrators like BeneFirst.

3. Prior to the filing of this litigation, Northshore had conducted audits of BeneFirst's practices on behalf of Plaintiffs and their excess insurance carrier.

4. On March 2 - 3, 2005, Northshore conducted an audit of BeneFirst on behalf of BP, Inc., Plaintiffs' stop loss insurance carrier, of an aggregate claim that had been submitted to BP, Inc. by BeneFirst on behalf of Aubuchon and identified $107,057.90 in claim errors. In June 2005, Northshore conducted an audit on behalf of W.E. Aubuchon Co., Inc. of BeneFirst's

claims adjudication and identified potential claim errors in the amount of $278,476.39 and confirmed claim errors of $194,055.17. Neither of these audits were prepared in Northshore's capacity as an expert retained by Plaintiff's Counsel.

5.  Northshore has also conducted audits of BeneFirst for its work with clients other than Plaintiffs.

6.  If Northshore is compelled to produce all documents responsive to BeneFirst's Subpoena, it would be forced to produce thousands of pages of documents and electronic data relating to audits performed on behalf of other clients with no connection whatsoever to this litigation. This would be unduly burdensome to Northshore.

7.  Northshore's audits of BeneFirst, performed on behalf of clients other than Plaintiffs, were conducted for a variety of reasons, for a variety of clients, each with different goals. Some were not even claim audits; some were operational reviews with no claim component whatsoever.

8.  Further, Northshore conducted reviews which strictly focused on specific categories of claims covered under the specific excess portion of a stop loss contract.

9.  Even if the scope of an audit is an adjudication of claims transactions, the results differ depending upon who the client is, such as a stop loss carrier, a reinsurer, or an employer.

10. Report formats differ from simple executive summaries to detailed, lengthy narratives, depending on the requirements of the client and the circumstances and scope of the audit.

11. It is not logical to consider that various audit reports can be compared to each other and is not reasonable to utilize a comparison of audit reports to ascertain the consistency of Northshore's protocols and findings.

12. Audit reports contain, among other things, information regarding client

{Client Files\LIT\302508\0002\PLD\00879928.DOC;1}

relationships, financial relationships and reinsurance relationships and therefore likely contain confidential information relating to Northshore's clients and their respective business partners.

13. In instances where Northshore's audits include a review of claim transactions, the reports will have detailed information regarding patient information, social security numbers, diagnoses and other sensitive personal information which qualifies as "Protected Health Information" under the Health Insurance Portability & Accountability Act ("HIPAA") regulations. See 45 C.F.R. § 164.501.

14. Northshore has been in operation since 1988 and since its inception, has never been asked to produce reports of audits unrelated to the parties to the lawsuit in which it is involved in an expert capacity.

15. Northshore has an understanding with all of its clients that the services it provides and the documentation created in connection with such services will remain confidential.

16. Northshore does not publish a client list; it does not speak of one client to another client; and only shares the results of an audit with the client or specific individuals which the client designates.

17. Northshore's reputation for providing effective claim auditing services in a confidential manner will be harmed if BeneFirst is successful in its Motion to Enforce Third-Party Subpoena and Northshore is forced to produce documents relating to other clients which are entirely irrelevant to this litigation.

18. If that happens, potential clients may hesitate to utilize Northshore's services if they are worried that an audit report may later become public knowledge because of litigation which Northshore is involved in, either as a witness or an expert, that has nothing to do with that potential client.

{Client Files\LIT\302508\0002\PLD\00879928.DOC;1}

Signed under the pains and penalties of perjury this 21st day of March, 2007.

_____
Stephen V. Murphy, Executive Vice President
Northshore International Insurance Services, Inc.

4

{Client Files\LIT\302508\0002\PLD\00879928.DOC;1}