# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

W.E. AUBUCHON CO., INC., AUBUCHON
DISTRIBUTION, INC., W.E. AUBUCHON CO., INC.
EMPLOYEE MEDICAL BENEFIT PLAN, and
AUBUCHON DISTRIBUTION, INC. EMPLOYEE
MEDICAL BENEFIT PLAN,

                                    Plaintiffs,

v.

BENEFIRST, LLC,

                                    Defendant.

CIVIL ACTION NO.
05-40159FDS

## DEFENDANT'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

_____

In support of its accompanying motion for summary judgment, the defendant, BeneFirst,

LLC, pursuant to L.R. 56.1, hereby submits the following statement of material facts of record as

to which it contends there is no genuine issue to be tried:

**Deposition References:**    Sarah Arel, excerpts          Kim McMahon, excerpts

                              Paul Gatanti, excerpts         Marcus Moran, Jr., excerpts

                              Carrie Reddie, excerpts


**Exhibit References:** A -   Administrative Services Agreement (exemplar)

                        B -   Aubuchon Distribution Employee Medical Benefit Plan, excerpts

                        C -   Aubuchon Employee Medical Benefit Plan, July 1, 2001, excerpts

                        D -   Aubuchon Employee Medical Benefit Plan, Sept. 1, 2002, excerpts

                        E -   Plaintiffs' Supplemental Disclosure, AUB 7595-7634

                        F -   Aubuchon Distribution's Supplemental Answers to Interrogatories,
                              excerpts
                        G -   W.E. Aubuchon Health Plan's Supplemental Answers to
                              Interrogatories, excerpts

                        H -   Report of Plaintiffs' Expert, April 8, 2008

1.  Defendant BeneFirst, L.L.C. ("BeneFirst") was the third-party administrator for W.E. Aubuchon Co., Inc.'s employee benefit plan from July 1, 2001, until December 31, 2004. In addition, BeneFirst was the third-party administrator for Aubuchon Distribution, Inc.'s employee benefit plan from August 25, 2001, until August 24, 2002. **Deposition of Sarah Arel ("Arel Tr.") at p. 11.** The employee benefit plan of Aubuchon Distribution, Inc. terminated earlier and ceased to exist when that company's employees' began instead to receive their benefits under a union health and welfare plan. *Id.*

2.  An Administrative Services Agreement was entered into by Aubuchon Distribution, Inc. (identified in the document as the "Plan Sponsor") and BeneFirst (identified as the "Plan Administrator"), which delineates the terms and conditions under which BeneFirst agreed to provide administrative services to Aubuchon Distribution, as the Plan Sponsor, for purposes of the operation of Aubuchon Distribution's employee benefit Plan. A separate Administrative Services Agreement was entered into by W.E. Aubuchon Co., Inc. and BeneFirst covering the benefit plan operated and maintained by W.E. Aubuchon, Inc. for its employees. Although no executed copies of these agreements have been located, the plaintiffs' F.R.C.P. 30(b)(6) designee has testified that both Agreements were identical to the Agreement version that was Exhibit 7 to the F.R.C.P. 30(b)(6) deposition of the plaintiffs. *Arel Tr.* **pp. 32-36.** The binding contractual agreement as between the parties, according to the plaintiffs, consists of the terms set forth in the Administrative Services Agreement that was authenticated by Ms. Arel at her deposition, a copy of which is **Exhibit A** to this filing.

3.  Section I of these governing contracts, entitled Claims Administration, at paragraph A1 provides that "[t]he plan sponsor [which is the applicable Aubuchon company] shall [r]etain the final authority and responsibility for the Benefit Plan and its operations. **Exhibit A**.

4.  Under the terms of the Administrative Services Agreement, the Plan Sponsor gives the "Plan Administrator [which is BeneFirst] the authority to act on behalf of the Plan Sponsor in connection with the Benefit Plan, but only as expressly stated in this Agreement or as mutually agreed upon in writing by the Plan Sponsor and the Plan Administrator." **Exhibit A.**

5.  Paragraph B4 of the Section I of the Administrative Services Agreement provides that BeneFirst, as the plan administrator, shall "[r]efer to the Plan Sponsor for determination of: (a) any claim or class of claims the Plan Sponsor may specify, (b) any disputed claim, (c) any claim involving any question of eligibility or entitlement of the claimant for coverage under the Benefit Plan, (d) any question with respect to the amount of payment due, or (e) any other question."  **Exhibit A.**

6.  The Plan Sponsor for purposes of the terms of the Administrative Services Agreement is the applicable Aubuchon company, consisting of Aubuchon Distribution when the contract applies to that company's employee benefit plan or W.E. Aubuchon Co., Inc, when the contract applies to that company's employee benefit plan.   **Exhibit A.**   The Plan Administrator is BeneFirst.  **Exhibit A.**

7.  The Administrative Services Agreement does not state that BeneFirst is a fiduciary. **Exhibit A.**

8.  The terms of the Administrative Services Agreement do not grant to BeneFirst any discretionary authority, control or responsibility in the administration of either Plan, and instead retain for W.E. Aubuchon Co., Inc. and Aubuchon Distribution, Inc. final responsibility for the benefit plans. **Exhibit A.**  The Administrative Services Agreements further provide that BeneFirst must refer to those companies for resolution of any issues that require any discretionary decision-making.  **Exhibit A.**

9.    The Administrative Services Agreements contain certain performance standards at Section VI, Performance Standards. **Exhibit A.**

10.   BeneFirst's performance of claims processing met and exceeded the percentage of accuracy required under the Administrative Services Agreements. **Deposition of Paul Gatanti ("Gatanti Tr.") at pp. 58-59.**

11.   The employee benefit plans administered by BeneFirst consisted of the medical benefit plans maintained by W.E. Aubuchon Co., Inc. and Aubuchon Distribution, Inc. for their employees. These are referred to herein as the "Aubuchon Distribution Inc. Plan" and the "W.E. Aubuchon Co., Inc. Plan."

12.   The Aubuchon Distribution Inc. Plan is governed by an applicable plan document. **Exhibit B.** The plaintiffs admit that this as the plan applicable to Aubuchon Distribution. **Arel Tr. at 17-18.**

13.   The Aubuchon Distribution Inc. Plan provides on page one, in the Introduction, that the "Company has retained the services of an independent Contract Administrator to assist it in administering the Plan." Furthermore, the plan names on page three W.E. Aubuchon Co., Inc. and Aubuchon Distribution, Inc., c/o M. Marcus Moran, Jr., as the Plan Administrators. In addition, on page four of the document, the terms of the plan provide that the "Plan is self-administered by the Employer, which is a 'named fiduciary' and the 'plan administrator' under ERISA. The Employer has delegated claims administration and other day-to-day functions for all benefits . . . to the following Contract Administrator as of August 25, 2001: BeneFirst." Furthermore, in Section VIII beginning on page 56, entitled General Plan Provisions, the plan provides that the "Company shall be the Plan Administrator . . . The Plan Administrator shall be a named fiduciary for purposes of Section 402(a)(1) of ERISA, shall administer the Plan in accordance with its terms, and shall have complete discretionary authority and all powers necessary to carry out its terms and to

control and manage the operation and administration of the Plan." The Plan reinforces that the employer, who is one of the plaintiffs in this case, is the Plan Administrator, expressly naming W.E. Aubuchon Co., Inc. as the Plan Administrator on page 78 of the Plan. On page 71 of the Plan document, BeneFirst, LLC is named as the contract administrator, "together with any other of its programs, units, or divisions that is designated to perform claims administration functions under the Plan . . . ." **Exhibit B.**

14.    The W.E. Aubuchon Co., Inc. Plan is governed by a written plan document applicable only to that company's employee benefits. **Exhibit C; Exhibit D.** The W.E. Aubuchon Co., Inc. Plan was revised once while in effect during the time that BeneFirst was the third party administrator. The initial version, **Exhibit C** to this filing, was dated "revised July 1, 2001" and then the subsequent version, **Exhibit D** to this filing, is dated "revised September 1, 2002." **Arel Tr. at 16-19.** The plan terms at issue in this lawsuit are identical in both versions. **Compare Exhibit C and Exhibit D.**

15.    The W.E. Aubuchon Co., Inc. Plan provides on page one that "The Plan is administered through the Benefits Manager of the Employer. The Employer has retained the services of an independent Contract Administrator to assist it in administering the Plan." This Plan, on page three, names W.E. Aubuchon Co., Inc.,  c/o M. Marcus Moran, Jr., as Plan Administrator. In addition, at page four, the plan provides that the "Plan is self-administered by the Employer, which is a 'named fiduciary' and the 'plan administrator' under ERISA. The Employer has delegated claims administration and other day-to-day functions for all benefits . . . to the following Contract Administrator as of July 1, 2001: BeneFirst." **Exhibit C; Exhibit D.**

16.    The W.E. Aubuchon Co., Inc. Plan further states in Section VIII, entitled General Plan Provisions, that the Plan Administrator, which is W.E. Aubuchon Co., Inc., "shall be a named fiduciary for purposes of Section 402(a)(1) of ERISA, shall administer the Plan in

accordance with its terms, and shall have complete discretionary authority and all powers necessary to carry out its terms and to control and manage the operation and administration of the Plan."[1] The W.E. Aubuchon Co., Inc. Plan further provides that BeneFirst is only the contract administrator, "together with any other of its programs, units, or divisions that is designated to perform claims administration functions under the Plan."[2]

17.    Paul Gatanti joined BeneFirst in August 2002 as the claim manager.  ***Gatanti Tr.* p. 13***. He testified that BeneFirst's sole authority was to pay claims as delineated in the applicable medical benefit plan; BeneFirst had no authority to vary from the terms of such plan.  *Id.* at 29.  Furthermore, the plaintiff Aubuchon companies had the final authority to decide whether to pay a disputed medical benefit claim.  ***Id.* at 30, 34-35***.  The applicable written medical plans could only be amended by the plaintiff companies, and the terms of such plan were then applied by BeneFirst in determining whether to pay medical claims.  ***Id.* at 34.***

18.    In processing medical benefit claims under the W.E. Aubuchon Co., Inc. Plan and the Aubuchon Distribution Inc. Plan, BeneFirst used a computerized claim processing system, which was built out to match and apply the terms of the written medical benefit plans. The computer build outs utilized by BeneFirst to process claims regarding the Aubuchon account accurately reflected the terms of the Aubuchon employee medical benefit plans. *Id.* at 82.  BeneFirst claims examiners would only authorize a claim for payment under that system if it fell within the coverage provided by the applicable plans.  ***Id.* at pp. 120, 124.*** Employees of Aubuchon itself, however, were extremely involved in the details of the plaintiffs' employee medical benefits plans, and would become involved in deciding whether

---

[1]The pagination of the two versions of the plan varies slightly, and this language can be found at page 58 of **Exhibit C**, the earlier July 1, 2001 version of the plan, and page 60 of Exhibit D, the subsequent September 1, 2002 version.  The actual plan terms are the same, however. **Compare Exhibit C at page 58 and Exhibit D at page 60.**

[2]At page 78 of **Exhibit C**, the pre-September 2002 version ,and page 74 of **Exhibit D**, the post-September 2002 version.

to authorize payment for medical benefit claims that were not covered under the express terms of the applicable plans. *Id.* **at 27-29, 97.** BeneFirst itself, however, could not authorize payment of medical benefit claims that were not actually covered under the written terms of the applicable Plans. *Id.* **at 32-33.**

19. When BeneFirst became the third-party administrator for W.E. Aubuchon Co. and for Aubuchon Distribution Inc., BeneFirst was provided with the plan documents for both companies that had been utilized by the previous third-party administrator. ***Arel Tr.* p. 5, 10-12.** BeneFirst was not involved in drafting the terms of either Plan when it became the third-party administrator for W.E. Aubuchon Co. and for Aubuchon Distribution, Inc., or the terms of any subsequent revisions. *Id.* **at 21.** The F.R.C.P. 30(b0(6) designee of the plaintiffs has admitted that under the terms of the Administrative Services Agreement, BeneFirst had no authority to pay claims that were not covered pursuant to the terms of the applicable Plan. *Id.* **at 36-37.** Only M. Marcus Moran, president and treasurer of W.E. Aubuchon Co., Inc. had authority to overrule any claim denials by BeneFirst. *Id.* **at 145-146; Deposition of Kim McMahon at 11-12.**

20. Carrie Reddie began working at BeneFirst in March 2001**,** and held the position as plan-builder intermittently during her employment at BeneFirst. **Deposition of Carrie Reddie (*"Reddie Tr."*) at pp. 6-10.** This work consisted of "building out" the computer system to properly process claims in a manner that matched the plan document for a particular company's plan. *Id.* **at 12-15.** Each BeneFirst account had its own computer plan build out, based on plan documents, for claims processing. *Id.* **at 13-14.** The BeneFirst computer build out was based accurately on the relevant Aubuchon plan documents; there were no major discrepancies between the build out and the plan. *Id.* **at 91.**

21. Carrie Reddie also served as a claim adjuster processing claims submitted under the plaintiffs' medical benefit plans. Ms. Reddie would pay claims approved by the computer

as covered under the terms of the plaintiffs' plans, but did not have any authority to – and would not – pay an Aubuchon claim that BeneFirst's computer system deemed denied, based on plan documents. *Id.* **at 20-21.**   The plan documents, and directives from Aubuchon regarding particular claims, dictated the processing of Aubuchon claims by BeneFirst.  *Id.*   Only Aubuchon had authority to direct that a denied benefit claim should, instead, be paid despite not being covered under the actual terms of the plan documents; BeneFirst had no such authority.  *Id.* **at 23.**   Ms. Reddie would only pay a claim that was denied under the plan terms if she was specifically instructed to do so by Aubuchon.  *Id.* **at 22-25.**

22.   BeneFirst claims examiners, when working on Aubuchon accounts, processed claims based on information included in the relevant plan document as well as the computer build out; whenever there was an issue that was unclear, the claims examiner would defer to Aubuchon for a determination. *Id.* **at 85.**  When Ms. Reddie, while employed with BeneFirst, could not determine from the appropriate Aubuchon plan document whether a claim was covered, it was Ms. Reddie's practice to speak directly with appropriate Aubuchon representatives and obtain a definitive answer in writing.  *Id.* **at 86-87.**  Ms. Reddie erred on the side of caution when processing claims and in designing the BeneFirst computer build out for the Aubuchon account; she did so by generating denials regarding questionable claims because neither she nor BeneFirst had the discretion to decide to pay questionable claims.  *Id.*

23.   M. Marcus Moran, president and treasurer of W.E. Aubuchon Co., Inc., has the sole authority to amend the terms of the Aubuchon employee medical benefit plans.  Deposition of **M. Marcus Moran, Jr. ("*Moran Tr.*") at p. 20, 30.**  Mr. Moran, who was essentially the controlling executive for the plaintiffs, testified that BeneFirst had no authority to deviate from the Aubuchon plan documents.  *Id.* **at 83.**  He further testified that BeneFirst only had

the authority to pay a claim that was not covered under the Aubuchon medical plans if Mr. Moran himself authorized such a payment; absent such authorization from him, BeneFirst did not have the discretion to pay a claim that was not covered under the actual terms of the medical benefit plans. *Id.* **at 84.** He further testified that BeneFirst determined eligibility for coverage based solely on the terms of the various Aubuchon plan documents, *Id.* **at 90-91**, that BeneFirst's authority to deny a claim rested only with the Aubuchon plan documents, and that BeneFirst was accountable for paying claims only in accordance with plan documents, *Id.* **at 92.**

24.    Written communications from Sarah Arel and Kim McMahon of Aubuchon to BeneFirst employees, including Carrie Reddie, instructed BeneFirst to pay particular claims that had been denied or were otherwise not covered. **Exhibit E.** These documents instruct BeneFirst to pay certain medical bills "outside the loss fund," which testimony in the case documents meant that they were to be paid even though the claims at issue were not covered under the actual terms of the Plans. *Gatanti Tr.* **at 27;** *Reddie Tr.* **at 24.**

25.    The plaintiffs allege that BeneFirst committed multiple millions of dollars of claims processing errors by its decisions as to which medical claims to pay, which to deny, the amount to pay on particular claims, and the degree of investigation to pursue on particular claims. **Exhibit F**, **Aubuchon Distribution's Supplemental Interrogatory Answers at 5-9, 17; Exhibit G, Aubuchon Co., Inc. Employee Medical Benefit Plan's Supplemental Interrogatory Answers 5-9, 17.** The plaintiffs specifically seek these errors in paying claims under the plans' terms as their recovery from the defendant. **Exhibit F at 17; Exhibit G at 17.** Moreover, the plaintiffs' expert report in support of these claims specifically bases the claim of breach of contract on a comparison of the claims paid by BeneFirst with the applicable plan terms. **Exhibit H, Summary Report of Plaintiffs' Expert**.

Respectfully submitted,

**BeneFirst, LLC**, Defendant,

by its attorneys

/s/ Stephen D. Rosenberg
Stephen D. Rosenberg [BBO #558415]
Eric L. Brodie          [BBO #639833]
THE MCCORMACK FIRM, LLC
One International Place
Boston, MA    02110
**Ph:**    617•951•2929
**Fax:**    617•951•2672
srosenberg@mccormackfirm.com
ebrodie@mccormackfirm.com

112615.1

-10-

1

1          Volume:  I

2          Pages:  1 - 169

3     UNITED STATES DISTRICT COURT

4     DISTRICT OF MASSACHUSETTS

5               C.A. No. 05-40159 FDS

6

7  W.E. AUBUCHON CO., INC., AUBUCHON DISTRIBUTION,

8  INC., W.E. AUBUCHON CO., INC. EMPLOYEE MEDICAL

9  BENEFIT PLAN, and AUBUCHON DISTRIBUTION, INC.

10 EMPLOYEE MEDICAL BENEFIT PLAN,

11          Plaintiffs,

12     v.

13 BENEFIRST, LLC,

14          Defendant.

15

16          **********

17     DEPOSITION OF SARAH AREL

18     Wednesday, April 9, 2008

19      The McCormack Firm

20     One International Place

21     Boston, Massachusetts

22       10:06 - 3:28

23     Reporter:  Linda M. Grieco

24

Sarah Arel

5

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | STIPULATION |
| 3 | It is stipulated by and between counsel for the |
| 4 | respective parties that the deposition is to be read |
| 5 | and signed by the deponent under the pains and |
| 6 | penalties of perjury within 30 days of receipt of |
| 7 | the transcript; and that the sealing and filing |
| 8 | thereof are waived; and that all objections, except |
| 9 | as to form, and motions to strike are reserved to |
| 10 | the time of trial. |
| 11 | *   *   *   *   * |
| 12 | SARAH AREL, |
| 13 | a witness called by counsel for the Defendant, |
| 14 | having been satisfactorily identified by the |
| 15 | production of her driver's license, and duly sworn |
| 16 | by the Notary Public, was examined and testified as |
| 17 | follows: |
| 18 | DIRECT EXAMINATION |
| 19 | BY MR. ROSENBERG |
| 20 | Q.  Good morning, Ms. Arel. |
| 21 | A.  Hi. |
| 22 | Q.  Could you state your name for the record, |
| 23 | please? |
| 24 | A.  Sarah Q. Arel. |

10

1   what's been processed for that week, and we fund the

2   amount that they're asking for.

3       Q.   Currently when this takes place, do you do

4   any -- do you simply fund it or do you raise any

5   issues with it, confirm any of the information in

6   these reports?

7            MR. KILLMAN:   Objection.

8       A.   No.

9       Q.   Let me fix that question.   Do you simply

10  fund the amounts that they're requesting?

11      A.   Yes.

12      Q.   Can you explain to me the corporate

13  structure of the benefits department?   You're the

14  benefits manager.

15      A.   Uh-hum.

16      Q.   Who do you report to in that capacity?

17      A.   I report to M. Marcus Moran, Jr.

18      Q.   Are there people that report to you in that

19  capacity?

20      A.   I have one woman who is my co-worker, who

21  also is part of handling the medical plan.

22      Q.   Who is that?

23      A.   That's Kim McMahon.

24      Q.   Between 2001 and 2004, was the department

Sarah Arel

11

1    set up in the same manner as you just described?

2        A.   Yes, yes.

3        Q.   Now, you had mentioned the SPD.  That's a

4    Summary Plan Description?

5        A.   Yes.

6        Q.   Is there a separate SPD for the Distribution

7    medical benefit plan and for the Aubuchon medical

8    benefit plan?

9        A.   Yes.

10       Q.   Is that provided to the TPA?

11       A.   Yes.

12       Q.   Is the TPA expected to follow those

13   documents?

14       A.   Yes.

15       Q.   When you say the Summary Plan Description,

16   at Aubuchon is there a separate, more comprehensive

17   plan document detailing all the terms of the plan as

18   well as the Summary Plan Description?

19       A.   No, our Summary Plan Description is the

20   document.

21       Q.   So there's only one document --

22       A.   Yes.

23       Q.   -- that sets forth the plan terms?

24       A.   Yes.

Sarah Arel

12

1     Q.   And pardon me if I just asked this, but the

2    Aubuchon Company medical benefit plan has its own

3    SPD, correct?

4        A.   Yes.

5        Q.   And the Distribution Company benefit plan

6    has its own SPD?

7        A.   Yes.

8        Q.   So they're two separate ones?

9        A.   Yes.

10       Q.   In 2001 -- well, strike that.

11            Let's go back in chronology.

12            MR. KILLMAN:   If we could go off the

13   record for one second.

14            (Discussion off the record)

15       Q.   We've been referring to TPA.  Can you tell

16   me what that is?

17       A.   TPA stands for third-party administrator.

18       Q.   Is that the company that's hired to

19   administer the medical benefit plans?

20       A.   Yes.

21       Q.   Was BeneFirst a TPA for these two medical

22   plans?

23       A.   Yes.

24       Q.   When were they the TPA?

16

1   Distribution plant switching?

2       A.   Correct.

3                 MR. ROSENBERG:  Can we mark that as

4   Exhibit 2?

5                 (Exhibit 2 marked for identification)

6                 (Document exhibited to witness)

7       Q.  Can you identify what Exhibit 2 is for us,

8   please?

9       A.   This is the Aubuchon Hardware Medical Plan

10  Summary Plan Description.

11      Q.  Was that -- when did that -- was that in

12  effect at the time that -- well, strike that.

13                Are those the plan terms that were in

14  the SPD when BeneFirst took over?

15      A.   Yes.  Yes.

16      Q.   Is that the SPD for the Aubuchon Company,

17  Inc. benefit plan?

18      A.   For the W.E. Aubuchon Co., Inc., yes.

19      Q.  Would there be a separate one for the

20  Distribution Company?

21      A.   Yes.

22                MR. ROSENBERG:  Can we mark that as

23  Exhibit 3 and that as Exhibit 4?

24

Sarah Arel

17

1              (Exhibits 3 and 4 marked for

2    identification)

3              (Document exhibited to witness)

4        Q.   I'm showing you what's been marked as

5    Exhibit 3.  Can you identify that for us?

6        A.   This is the Aubuchon Distribution Center's

7    Medical Summary Plan Description.

8              MR. KILLMAN:  Could I just ask that she

9    has a second or a minute at least to just look

10   through it first?

11       Q.   Oh, whatever you need, certainly.

12       A.   This is the Aubuchon Distribution Center's

13   Medical Summary Plan Description.

14       Q.   Is that the version that would have been in

15   effect when BeneFirst first became the TPA?

16       A.   Yes.

17       Q.   Now, were either of the SPD's for either of

18   the two companies revised during the time that

19   BeneFirst was the administrator?

20       A.   On the Aubuchon Distribution Center Summary

21   Plan Description, no.  On the Aubuchon Hardware --

22   W.E. Aubuchon Co., Inc. Medical Summary Plan

23   Description, we did do a revision in September of

24   '02, as I notice this is July 1, '01 when we first

Sarah Arel

18

1   went with them.  But we did a revision in September

2   2002.

3       Q.  To your recollection, is that the only

4   revision that's occurred during the time BeneFirst

5   was the administrator?

6       A.  Yes.

7       Q.  Just to clarify, then.  We've marked as

8   Exhibit 4 this copy of the medical benefit plan

9   document.

10              (Document exhibited to witness)

11      Q.  Can you tell us what that is?

12      A.  This is the -- let me just take a look.

13              (Pause)

14      Q.  There's no need to rush.  Take your time.

15      A.  This is the Medical Summary Plan description

16  for the Aubuchon Distribution Co., Inc. plan when we

17  had GISC as our TPA.

18      Q.  Okay, thank you.

19              MR. ROSENBERG:  Go off the record for

20  one second.

21              (Discussion off the record)

22              (Exhibit 5 marked for identification)

23              (Document exhibited to witness)

24      Q.  I've shown you what's now been marked as

21

1    at the end of that.  Could you tell me how that came

2    to be, what was the process and why was it revised?

3        A.  I don't -- first of all, I don't recall what

4    the revision was without comparing book to book.  It

5    would have been a decision made by Aubuchon Hardware

6    that we wanted to incorporate something new into the

7    plan.

8        Q.  Let me just interrupt for one second.  When

9    you say Aubuchon Hardware, that's Aubuchon Company,

10   Inc.?

11       A.  W.E. Aubuchon Company, Inc.

12       Q.  Okay.

13       A.  Would you prefer me to say --

14       Q.  No, it's fine.  I just want to clarify so I

15   make sure I know who we're talking about.  So it

16   would have been a decision made by Aubuchon

17   Hardware?

18       A.  Yes.

19       Q.  To add something to the plan or to change

20   something?

21           MR. KILLMAN:  Objection.

22       A.  Yes.

23       Q.  The SPD then would have been changed in some

24   manner, correct?

Sarah Arel

32

1  Distribution had with BeneFirst for BeneFirst to

2  serve as the TPA for its medical benefit plan?

3      A.  Yes.

4      Q.  And you said a moment ago that Aubuchon

5  Distribution never signed this document.

6      A.  We do not have a signed copy of this

7  document.

8      Q.  Do you know whether --

9          MR. KILLMAN:  That wasn't the question.

10          MR. ROSENBERG:  Yes, I'm going to

11  clarify that.

12      A.  I'm sorry.

13      Q.  No, that's fine.  Do you know whether anyone

14  ever signed this agreement on behalf of Aubuchon

15  Distribution?

16      A.  No.

17      Q.  You don't know?

18      A.  I don't know.

19      Q.  Do you know if anyone ever signed this

20  agreement on behalf of BeneFirst?

21      A.  No.

22      Q.  Who would have had the authority to sign

23  this on behalf of Aubuchon Distribution?

24      A.  I would say Marcus Moran, Jr. in his title

Sarah Arel

33

1   as president and treasurer, and I most likely would

2   have witnessed that.

3       Q.  Do you have any recollection of witnessing

4   Mr. Moran signing that document?

5       A.  No, I don't.

6       Q.  Does Aubuchon or Aubuchon Distribution have

7   a signed copy of this agreement?

8       A.  No, we do not.

9       Q.  Who would have drafted this agreement?

10      A.  BeneFirst.

11      Q.  Then it would have been provided to Aubuchon

12  Distribution?

13      A.  Yes.

14      Q.  Do you know what Aubuchon Distribution did

15  with the document after receiving it from BeneFirst?

16      A.  I don't believe we were ever given one.

17      Q.  So, was there ever a signed agreement during

18  the time that BeneFirst served as the TPA for the

19  Distribution Center?

20      A.  No.

21      Q.  Was there a separate Administrative Services

22  Agreement between BeneFirst and the Aubuchon

23  Company, Inc.?

24      A.  Yes.

Sarah Arel

34

1    Q.  Does Aubuchon have a copy of that document?

2    A.  No.

3    Q.  Was that document ever signed by anyone on

4  behalf of Aubuchon?

5    A.  Yes.

6    Q.  Who signed that on behalf of Aubuchon?

7    A.  I don't recall.

8    Q.  But you recall the document actually being

9  signed by someone?

10    A.  Yes.

11    Q.  Was that done in 2001 when BeneFirst first

12  became the TPA?

13    A.  Yes.

14    Q.  Does Aubuchon currently have a copy of that

15  signed agreement?

16    A.  No.

17    Q.  Does Aubuchon have an unsigned copy of that

18  agreement?

19    A.  No.

20    Q.  What happened to the agreement after it was

21  signed on behalf of Aubuchon?

22    A.  It was sent to BeneFirst to have their

23  appropriate person sign it and then send it back --

24  send an original copy back to us.

Sarah Arel

35

1    Q.   Did Aubuchon then receive a copy that had

2    been signed by BeneFirst as well as Aubuchon?

3    A.   No.

4    Q.   Did anyone at Aubuchon ever follow up to

5    obtain a copy of the signed document?

6    A.   Yes.

7    Q.   Who was that?

8    A.   M. Marcus Moran, Jr.

9    Q.   How did he go about that?

10   A.   Several letters.

11   Q.   Who were they addressed to?

12   A.   Paul Sullivan.

13   Q.   Does Aubuchon currently have copies of those

14   letters?

15   A.   Yes.

16   Q.   What was the response you received from

17   Mr. Sullivan?

18   A.   It was mentioned that they would be bringing

19   it to our office, mailing it or bringing it to our

20   office.  And we never received it.

21   Q.   And it was Mr. Sullivan who mentioned that?

22   A.   I don't recall who told us that.

23   Q.   So eventually -- strike that.

24        So it was never received by Aubuchon?

Sarah Arel

36

1      A.   That's correct.

2      Q.   Was there a separate agreement for each year

3   that BeneFirst served as the TPA?

4      A.   No.

5      Q.   There was just an original contract, and

6   that stayed in force until the termination in 2004?

7      A.   Yes.

8      Q.   The agreement between Aubuchon Company and

9   BeneFirst, is that -- was that -- well, strike that.

10          In front of you is the agreement between

11  Aubuchon Company Distribution and BeneFirst,

12  correct?

13     A.   Yes.

14     Q.   Or at least an unsigned copy of it.

15     A.   Yes.

16     Q.   Was the agreement between Aubuchon Company,

17  Inc. and BeneFirst the same as that agreement?

18     A.   I believe it is, yes.

19     Q.   Were there negotiations with BeneFirst over

20  BeneFirst serving as the TPA for the two plans?

21     A.   Can you say that again, please?

22     Q.   Sure.  You had testified that was it GISC --

23     A.   Yes.

24     Q.   -- that had been serving as the TPA?

Sarah Arel

37

1      A.   Yes.

2      Q.   Then there were discussions between someone

3  on behalf of BeneFirst and someone at Aubuchon about

4  replacing GISC as the TPA, correct?

5      A.   We inquired with several different TPA's.

6      Q.   How did you come to inquire with BeneFirst?

7      A.   We were familiar with a couple of the folks

8  that started BeneFirst as a new TPA.  They were

9  brand new.

10     Q.   Who were those people?

11     A.   Paul Sullivan and Charles Dobbins.

12     Q.   How were you familiar with those two

13 individuals?

14     A.   Paul Sullivan used to work at Group

15 Insurance Service Center as one of the salesmen.

16     Q.   How are you familiar with Mr. Dobbins?

17     A.   He was a friend of Paul Sullivan.  I don't

18 believe he worked at GISC prior to that.

19     Q.   Who were the other TPA's that you inquired

20 of at the time?

21     A.   I don't recall.

22     Q.   Who at Aubuchon spoke with Mr. Sullivan and

23 Mr. Dobbins?

24     A.   That would have been Marcus Moran, Jr. and

Sarah Arel

145

1   responded they were unable to obtain written

2   verification from the employee and did not want to

3   pursue it, as the child is deceased.  We believe

4   that this claim should not be allowed until

5   eligibility status is verified.  Did Aubuchon expect

6   BeneFirst to pursue further -- well, strike that.

7           If BeneFirst was unable to obtain

8   written verification from an employee, was it

9   supposed to take any further steps under its

10  agreement with Aubuchon?

11      A.  I don't know.  I'd have to look in the SPD

12  or the agreement to see what --

13      Q.  Okay.  So, if they had any obligations to

14  take any further steps once they were unable to get

15  written verification from an employee, those

16  obligations would be in either the agreement between

17  Aubuchon and BeneFirst or in the SPD; is that

18  correct?

19          MR. KILLMAN:  Objection.

20      A.  I would think if BeneFirst had a question on

21  something, they would have contacted us, if they

22  tried several times to get information they needed.

23      Q.  What I'm asking, though, I want to make sure

24  I'm understanding your testimony correctly.  Any

Sarah Arel

146

1   requirements as to what BeneFirst was supposed to do

2   if it was unable to get written verification from

3   the employee I believe you testified would be

4   contained in either the agreement between BeneFirst

5   and Aubuchon or in the SPD itself?

6           MR. KILLMAN:  Objection.

7       Q.  Is that right?

8           MR. KILLMAN:  Objection.

9       A.  That was -- our responsibilities for

10  BeneFirst were outlined in those documents.

11      Q.  So would you agree with me, then, that if

12  neither of those documents say that BeneFirst is

13  supposed to take any further steps, that BeneFirst

14  didn't have an obligation to do anything further?

15  That that's as far as it was supposed to go?

16          MR. KILLMAN:  Objection.

17      A.  I don't know how to answer that question.

18      Q.  Well, what was BeneFirst's obligations if

19  they attempted to obtain written verification of

20  dependent status from an employee and were unable to

21  get it?

22      A.  As administrator of our plan acting on our

23  behalf, I would think they would notify us.

24      Q.  Were they supposed to have done anything

1

1                                              Volume:   I

2                                              Pages:  1 - 152

3             UNITED STATES DISTRICT COURT

4              DISTRICT OF MASSACHUSETTS

5                          C.A. No. 05-40159 FDS

6

7   W.E. AUBUCHON CO., INC., AUBUCHON DISTRIBUTION,

8   INC., W.E. AUBUCHON CO., INC. EMPLOYEE MEDICAL

9   BENEFIT PLAN, and AUBUCHON DISTRIBUTION, INC.

10  EMPLOYEE MEDICAL BENEFIT PLAN,

11               Plaintiffs,

12        v.

13  BENEFIRST, LLC,

14               Defendant.

15

16                  **********

17          DEPOSITION OF PAUL GATANTI, JR.

18              Monday, April 14, 2008

19               The McCormack Firm

20             One International Place

21             Boston, Massachusetts

22                 10:01 - 1:33

23           Reporter:  Linda M. Grieco

24

Paul Gatanti, Jr.

13

1  that involve?

2      A.  I basically approved the excess loss claims.

3  I was also responsible for interacting with the

4  reinsurance intermediaries in London and in New

5  York.  I had to be prepared for reinsurance audits

6  every so many months they would come in to audit us.

7  I interacted with underwriting, and I also

8  interacted with the TPA's that did business with

9  Starline Group.

10     Q.  And the reinsurance, what was the

11  reinsurance used for?

12     A.  To pay stop loss claims.  It was on Lloyds

13  of London paper and QBE Re paper.

14     Q.  Could you just define for us in plain

15  English what a stop loss claim is?

16     A.  A stop loss claim is a dollar amount that

17  exceeds the individual specific deductible or an

18  aggregate amount of money that exceeds the aggregate

19  attachment point.

20     Q.  So medical claims over those points would be

21  paid by the reinsurance?

22     A.  On the individuals.  For example, if a

23  specific deductible sold was 35 thousand dollars on

24  an individual, eligible claims paid in excess of the

27

1   bit?

2       Q.   Sure.   Are you aware whether with regard to

3   the Aubuchon Hardware account, any medical claims

4   were paid that should not have been covered under

5   the actual terms of the benefit plan?

6       A.   Yes.

7       Q.   Physically how would that happen?   How would

8   a claims examiner do that?

9       A.   The claims examiner would receive

10  instruction from the client that the client wished

11  to have certain medical benefits that were not

12  covered under the underlying plan to be overridden

13  and paid as an exception.   The term used is outside

14  the loss fund or an exception.   And Aubuchon

15  Hardware had many instances where they would have

16  their claims examiner make those overrides.

17      Q.   How would the claims examiner actually do

18  that?   How would it get the computer to override it

19  and authorize the payment?

20      A.   There was a benefit code that was built into

21  the system across the board, not just for Aubuchon,

22  that would stand for outside the loss fund.   I can't

23  recall what exactly it was.   And that would be the

24  code used.   If the request was to make adjustments

28

1    to a claim to pay say a c-pay that had originally

2    been taken correctly, depending upon how the

3    examiner made that adjustment, they may or may not

4    have used that code, depending upon who the person

5    was.  They should have used the code, but I would

6    have no way of knowing that.

7        Q.  So it would be possible for the claims

8    examiner in these instances to approve payment

9    without using that code?

10       A.  Possible, yes.

11       Q.  Now, what would be the process, aside from

12   this on the computer for the claims examiner to do

13   this, would they need further approvals?  How would

14   that proceed from there?

15       A.  The only way an examiner would be able to do

16   that is if they were given direct instructions from

17   the client to make those overrides.

18       Q.  And then that particular claims examiner

19   could do that?

20       A.  Correct.

21       Q.  And you said that you're aware of this

22   occurring with Aubuchon Hardware; am I right?

23       A.  Yes.

24       Q.  Who at Aubuchon -- well, do you know what

Paul Gatanti, Jr.

29

1    claims examiners would have received those

2    instructions?

3        A.   Carrie Reidy, Robin Bannaman are the two

4    that I can remember.

5        Q.   During your time there, they were handling

6    the Aubuchon Hardware account?

7        A.   Correct.

8        Q.   Do you know who at Aubuchon Hardware would

9    communicate those instructions to them?

10       A.   Sarah and Kim.

11       Q.   Would that be Sarah Arel?

12       A.   Yes.

13       Q.   And would the Kim be Kim McMahon?

14       A.   Yes.

15       Q.   Do you have any recollection of how often

16   this occurred?

17       A.   The best that I can recall is that -- as far

18   as I can remember, it seemed it would happen in

19   waves where you wouldn't have anything going on.

20   And then, for whatever reason, someone that was sick

21   on their plan started to incur, you know, a lot of

22   charges.  Then they would make those requests.

23       Q.   How would this be communicated to the

24   examiner by Ms. Arel or Ms. McMahon?

Paul Gatanti, Jr.

30

1    A.  Direct phone contact or sometimes it would

2  come in via Paul Sullivan.

3    Q.  When it would come in through Paul Sullivan,

4  that would be verbally instructed?

5    A.  Verbal.

6    Q.  Was this ever, aside from the code for the

7  computer, was documentation to this effect ever

8  received from Aubuchon Hardware?

9    A.  There may have been e-mails on certain

10  cases.  I don't have any personal knowledge, but

11  they may have been able to e-mail the claims

12  examiner.  But the claims examiner should have noted

13  the claim file on those people when those

14  adjustments were being made.

15    Q.  When you said noted the claim file, would

16  that just be the computer code or would that be

17  also --

18    A.  There would be a notation section in the

19  claims system, member notes, patient notes where you

20  would go in and put that in.

21    Q.  Do you know whether that was always done by

22  the claims examiners in those instances?

23    A.  It should have been, because that was their

24  procedural instructions that they had.  You know,

Paul Gatanti, Jr.

31

1   whether or not they did it on every single one, I

2   couldn't say.

3       Q.  Do you remember any specific claims in which

4   this occurred?

5       A.  I can't remember.  Aubuchon had some pretty

6   sick people.  And Aubuchon was very compassionate

7   about those people and always wanted to help them

8   out as much as possible by waiving co-pays or paying

9   over the limit in certain situations, but I can't

10  remember the names.

11      Q.  How would these payments outside of the plan

12  affect stop loss reimbursements?

13      A.  It wouldn't.

14      Q.  Would the amounts paid on those claims then

15  count towards stop loss reimbursement?

16      A.  No.

17      Q.  Would they just be kept out of any stop loss

18  calculations?

19      A.  Not necessarily.  It would again depend upon

20  how the examiner made the adjustment to the claim.

21  If it was processed with the outside the loss fund

22  benefit code, that code was built never to go

23  towards a report or paid claim report for stop loss.

24  You would only see it if you ran like a benefit code

32

1   report, you can see the -- I think it was OLF,

2   although I'm not positive.  I can't remember.  If

3   the claims examiner made an adjustment to pay the

4   co-insurance or the co-pay, if they just made a

5   simple adjustment without using that code, then,

6   yes, those dollar amounts could have contributed to

7   an aggregate report or something like that.

8        Q.  Do you have any recollection of this ever

9   occurring with regards to making an exception for

10  eligibility status for someone who may or may not

11  qualify as a covered individual under the plan?

12       A.  On Aubuchon?  No.

13       Q.  You don't -- well, okay.  So you don't

14  remember whether that happened or not?

15            MR. CIAVARRA:  Objection.  Asked and

16  answered.

17            MR. ROSENBERG:  I'm just trying to

18  clarify.

19       Q.  Do you remember whether or not it ever

20  happened?

21       A.  No.

22            MR. CIAVARRA:  Objection, asked and

23  answered.

24       Q.  Did BeneFirst have any authority to pay

Paul Gatanti, Jr.

33

1    claims that were not covered under the plan?

2              MR. CIAVARRA:  Objection.

3        Q.  You can answer.  That's just lawyer talk.

4              MR. CIAVARRA:  Yes, just for the record.

5        A.  Oh, no.

6        Q.  And BeneFirst's authority was to only pay

7    the claims as set forth in the client's medical

8    benefit plans; is that right?

9              MR. CIAVARRA:  Objection.

10       A.  Correct.

11       Q.  Did BeneFirst have any authority on its own

12   to vary from the terms of Aubuchon Hardware's

13   medical benefit plan?

14             MR. CIAVARRA:  Objection.

15       A.  No.

16       Q.  What was the scope of BeneFirst's authority

17   in processing claims under Aubuchon Hardware's

18   plans?

19             MR. CIAVARRA:  Objection.

20       A.  There wasn't -- the authority was only what

21   was given to BeneFirst via the ASA agreement that

22   said that basically BeneFirst would process claims

23   in accordance to the medical plan at a certain cost

24   to the client for those services.

34

1    Q.  Were you familiar with the Administrative

2  Services Agreement that BeneFirst had with Aubuchon

3  Hardware?

4    A.  No.

5    Q.  But that was your general understanding of

6  what your authority was with regard to the Aubuchon

7  account?

8              MR. CIAVARRA:  Objection.

9    A.  Correct.

10    Q.  What was the source of your understanding?

11    A.  I don't understand.

12    Q.  Sure.  You testified that it was your

13  understanding that under the Administrative Services

14  Agreement, BeneFirst was to only process the claims

15  in accordance with the medical benefit plan itself?

16    A.  Right.

17    Q.  What had lead you to believe that?

18    A.  Just industry norm.  Just experience working

19  on -- in the TPA business, that's how it works.

20    Q.  So across the industry, that's the general

21  standard?

22    A.  Correct.

23    Q.  If there were a dispute over a particular

24  medical benefit claim under the Aubuchon Hardware

Paul Gatanti, Jr.

35

1    account, who had the final authority to decide

2    whether or not to pay it?

3              MR. CIAVARRA:  I object.

4        A.  Aubuchon.

5        Q.  How do you know that Aubuchon had the final

6    authority?

7        A.  Because it was their practice that they were

8    very detailed in their review of the check edits,

9    and they would question anything on there that they

10   didn't understand or agree with, et cetera.

11       Q.  Could you explain this process with regard

12   to the check edits?

13       A.  I will.  Claims were processed on a daily

14   basis in date order across the board for the book of

15   business.  Clients could choose when they wanted to

16   fund their claims, either weekly, bimonthly or

17   monthly.  When that check edit would be calculated

18   by I believe her name was Kristen David, she

19   would -- depending on the time frame the client

20   chose, say it was once a month.  So she would run a

21   report that would basically detail out every single

22   claim that was processed in that time period.  And

23   those claims would total a dollar amount that the

24   client would have to fund.  And that money would be

Paul Gatanti, Jr.

58

1    A.  Yes.

2    Q.  When did that occur?  Do you recall specific

3  instances?

4    A.  In general, if we found an error during one

5  of the internal audits, Aubuchon always had the most

6  experienced claims examiner that BeneFirst had

7  employed.  Carrie and Robin were extremely

8  experienced examiners.  Their error ratios were

9  very, very small.  They were highly accurate claims

10 examiners.  And if an overpayment was discovered

11 either through a call from a provider, hey, you

12 overpaid or whatever, the claims examiner would have

13 sent a letter out and done the traditional follow-up

14 30, 60, 90-day follow-up.

15   Q.  When you were describing the two Aubuchon

16 claims examiners' error ratios, could you explain to

17 us what you mean by that?

18   A.  The error ratios, the standard at BeneFirst

19 that I put in place was the minimum of 98 percent

20 financial accuracy and a minimum of 98 percent

21 procedural accuracy.  So when those women had the

22 random audits, based on the claims that they

23 processed, and they were dedicated for the most part

24 to Aubuchon claims, procedurally and financially,

Paul Gatanti, Jr.

59

1  their accuracy was well above the 98 percent. And

2  quite often, it was a hundred percent.

3      Q.  Why did you pick those particular

4  percentages for the --

5      A.  Industry standard is 98 percent or higher.

6  In other words, that's your target to shoot for.

7      Q.  How did you just identify them, claim

8  accuracy?

9      A.  Procedural and financial accuracy.

10      Q.  And in your internal audits, you found that

11  they were both meeting those standards?

12      A.  Yes.  And the claims examiners that were

13  not, we took corrective action.

14      Q.  Were any of those claims examiners handling

15  the Aubuchon account?

16      A.  No.

17      Q.  Do you recall a medical benefit claim for an

18  Aubuchon Hardware employee named Samuel Bedard?

19      A.  The name vaguely rings a bell, but I

20  can't -- I don't remember any specifics.

21      Q.  What about with regard to an Aubuchon

22  Hardware employee named Herbert Nason, N-A-S-O-N?

23      A.  No.

24      Q.  The handling of specific individual medical

Paul Gatanti, Jr.

82

1    Q.   So to be good at claims examining, you need

2    to be more than simply a data input person; is that

3    fair to say?

4        A.   Correct.

5        Q.   There's some thought that goes into your

6    job?

7        A.   Correct.

8        Q.   You were describing for Mr. Rosenberg the

9    process of how to examine a claim as it came in the

10   door.  I think you said the first thing that happens

11   is a medical bill of one form or another is received

12   in your mailroom at BeneFirst?

13       A.   Correct.

14       Q.   I'm going to talk about your experience at

15   BeneFirst.  That's a bill that would come from the

16   client or come directly --

17       A.   The provider.

18       Q.   Just let me finish, because she can't take

19   us down.

20       A.   I'm sorry.

21       Q.   I know you're anxious to complete.  This is

22   a bill that would come from a provider or come from

23   the client?

24       A.   Provider.

Paul Gatanti, Jr.

97

1   BeneFirst to fund the payment of the bills.  But the

2   money, after it was transferred in from Aubuchon,

3   would actually come from BeneFirst to the providers.

4   That's not consistent with your memory?

5       A.  No, my knowledge was there was a claim

6   account.  The money goes in the claim account.  And

7   once the money's there, the outsource vendor, ABF

8   cuts the check and EOB's.

9       Q.  Who was the --

10      A.  ABF.

11      Q.  Do you know what that stands for?

12      A.  Advanced Business Fulfillment.

13      Q.  Who contracted with ABF?

14      A.  Charlie.

15      Q.  Mr. Dobbins?

16      A.  Yes.

17      Q.  BeneFirst?

18      A.  Charlie Dobbins.

19      Q.  So maybe I missed a step.  BeneFirst

20  contracted with ABF to actually make the payments?

21      A.  No, ABF is a vendor that provides the

22  service of printing and mailing checks and

23  explanation of benefits for a fee.  It's an

24  outsourced process as opposed to someone at

Paul Gatanti, Jr.

120

1    Q.   Who hired you at BeneFirst?

2    A.   Charlie Dobbins.

3    Q.   Did you know Mr. Dobbins before your first

4    interview?

5    A.   I had never met him before.

6    Q.   Where were they located at the time?

7    A.   Marshfield, Massachusetts.

8    Q.   You had worked in Pembroke before that,

9    right?

10   A.   Correct.

11   Q.   You had never heard of or knew of BeneFirst

12   when you were working for that company in Pembroke?

13   A.   When I was in Pembroke, he didn't exist.

14   Q.   What did you do to educate yourself on who

15   BeneFirst was and what they did?

16   A.   Other than just knowing that they were a

17   TPA, nothing.

18   Q.   Before you decided to accept the job, did

19   you meet anybody else from BeneFirst?

20   A.   No.

21   Q.   So your decision to change your position was

22   based solely upon what Mr. Dobbins told you?

23   A.   Correct.

24   Q.   Have you -- strike that.

124

1    Q.  So, again, without having the underlying

2    claim, you can't determine whether that was done

3    accurately?

4    A.  But that's only if you have a question as to

5    did the claim that came from the provider, did the

6    examiner change the code when they data entered the

7    claim.

8    Q.  Change it or enter it accurately?

9    A.  Well, if you suspect that there's no way

10   that, you know, this strep culture cost ten thousand

11   dollars, so let me see the claim that came in is one

12   aspect.  If you're auditing is the examiner or is

13   the office visit taking the appropriate discount, et

14   cetera, you can look at your electronic record.  So

15   the paper copy is an aspect of the audit.  If you

16   can understand what I'm trying to say.

17   Q.  I can.  There are some things, for example,

18   your appropriate co-pay is something you may not

19   need the underlying medical bill in order to do an

20   audit, correct?

21   A.  Right.

22   Q.  Because the system's going to tell you right

23   out front whether or not the co-pay was taken out or

24   not?

Page 1

1          UNITED STATES DISTRICT COURT

2            DISTRICT OF MASSACHUSETTS

3     ------------------------------------x

4     W.E. AUBOCHON CO., INC., AUBOCHON

5     DISTRIBUTION, INC., W.E.

6     AUBOCHON CO., INC. EMPLOYEE MEDICAL

7     BENEFIT PLAN, and AUBOCHON DISTRIBUTION, INC.

8     EMPLOYEE MEDICAL PLAN,

9          Plaintiff,

10     v.                    C.A. No. 05-40159 FDS

11     BENEFIRST, LLC,

                            **ORIGINAL**

12          Defendant.

13     ------------------------------------x

14     Volume I                  Pages 1 - 124

15

16          DEPOSITION of CARRIE REDDIE, a witness

17     called for examination by the Defendant, taken

18     pursuant to Rule 30 of the Massachusetts Rules

19     of Civil Procedure, before Laurie K. Langer,

20     Registered Professional Reporter and Notary

21     Public in and for the Commonwealth of

22     Massachusetts, at the McCormack Firm, One

23     International Place, Boston, Massachusetts, on

24     Friday, May 16, 2008, commencing at 10:30 a.m.

Page 6

1    Q.    We'll waive the notary so there's no requirement

2          that you sign it in front of a notary.  You can

3          just sign it yourself and send it back.

4    A.    Okay.

5    Q.    And the parties stipulate if it's not returned

6          within 30 days the requirement of a signature is

7          deemed waived.

8                Could you tell us your -- well, could you

9          state your name for the record.

10   A.    Carrie Reddie.

11   Q.    And what's your current address?

12   A.    51 Russell Street, Plymouth.

13   Q.    How long have you lived at that address?

14   A.    About a year and five months.

15   Q.    And where were you residing before that?

16   A.    Avon, Massachusetts.

17   Q.    And what was your address there?

18   A.    27 Pratt Street.

19   Q.    Okay.  And how long were you residing there?

20   A.    Let's see.  About five years, I think.  Four and

21         a half, five years.  Yeah, five years.

22   Q.    Okay.  And did you graduate from high school?

23   A.    Yes.

24   Q.    And where was that?

Page 7

1  A.  Avon High.

2  Q.  And when did you graduate?

3  A.  '90.

4  Q.  Okay.  Did you attend college after that?

5  A.  I just graduated.  Actually, I'm graduating this

6      month from Massosoit with an Associate's.

7  Q.  Degree?

8  A.  Yes.

9  Q.  Has that been the only school you've attended

10     since you graduated from high school?

11 A.  Pretty much, yes.

12 Q.  Were there others?

13 A.  Well, I took one course in Bridgewater in 1990,

14     just one course and that was it.  So I don't

15     really count that.

16 Q.  Fair enough.  What's the degree you're

17     graduating in?

18 A.  Business management.

19 Q.  And have you -- strike that.

20         What's your current job position?

21 A.  I work as a medical billing insurance -- medical

22     insurance biller at South Shore Medical Center.

23 Q.  And what are your responsibilities in that job?

24 A.  Just following up on accounts, you know,

Page 8

```
 1        accounts, the bills.  We send bills to the
 2        patients.  Just keep the -- I'm in charge of
 3        Blue Cross and Tufts Insurance so I just follow
 4        up, make sure the insurance pays, make sure that
 5        the patient pays, things like that.
 6   Q.   Okay.  And how long have you been at that
 7        position?
 8   A.   Let's see, one, two; two and a half years.
 9        Almost two and a half years, like two years and
10        five months.
11   Q.   So you started then in?
12   A.   January of '06.
13   Q.   January of '06.  Okay.  And prior to that what
14        were you doing?
15   A.   I was working at BeneFirst.
16   Q.   What -- when did you start working at BeneFirst?
17   A.   March of '01.
18   Q.   Okay.  And when did you finish working with
19        BeneFirst?
20   A.   December of '05.
21   Q.   Prior to going to BeneFirst in March of 2001
22        what were you doing?
23   A.   I was at Group Insurance Service Center.
24   Q.   And how long were you there?
```

Page 9

```
1    A.   Since, let's see, the end of '97 -- the end of

2         '97 until March of '01.

3    Q.   Okay.  What was your position there?

4    A.   Well, I started out in the mailroom and then I

5         was receptionist and then I was a claims

6         examiner.

7    Q.   A claims examiner?

8    A.   Yeah.

9    Q.   And what were your duties as a claims examiner?

10   A.   To process the claims for whatever group they

11        gave me.

12   Q.   And were those medical benefit group claims?

13   A.   Medical and dental.

14   Q.   Medical and dental.  And before you joined Group

15        Insurance Services what were you doing?

16   A.   I was a bartender for a brief period.

17   Q.   And did you have any other employment in the

18        health claims field before you --

19   A.   No.

20   Q.   -- started at Group Insurance?

21   A.   Not at all.

22   Q.   Okay.  Did you have any training to become a

23        claim examiner at Group Insurance Services?

24   A.   Yeah, I think Sue sat me down and trained me.
```

Page 10

1        One of the claims examiners that was already

2        there, she trained me.

3    Q.  And why did you leave Group Insurance Services?

4    A.  Because I hated that company, and I hated Karen

5        Sealand.  And we were all being treated very

6        unfairly as far as pay goes and recognition and

7        all of that, so.

8    Q.  And how did you find the position with

9        BeneFirst?

10   A.  I heard through Linda Hart who worked at Group

11       Insurance who was working at BeneFirst and her

12       and my mom are good friends, so she heard from

13       Linda that they needed somebody over there to do

14       COBRA and full-time student stuff.  So I applied

15       and they hired me.

16   Q.  Okay.  Who interviewed you there?

17   A.  Denise.  I forget her last name.

18   Q.  And when you first began at BeneFirst in March

19       of 2001 what was your job?

20   A.  I was doing the COBRA full-time student status.

21   Q.  And what were those duties?

22   A.  Taking the COBRA payments, you know, terminating

23       anyone who didn't send in their premiums,

24       sending out letters to students who are over

Page 11

1       aged to check their status.  Simple things like

2       that.

3   Q.  Okay.  And how long were those your

4       responsibilities there?

5   A.  Oh, God, I don't remember.  A couple of months.

6       A few months.  I honestly don't remember.

7   Q.  Okay.  That's fine.

8   A.  A few months.  I don't know.

9   Q.  Was that work on any particular accounts?

10  A.  No, just every, anyone they had on COBRA for all

11      the accounts they had.

12  Q.  What was your next position there?

13  A.  Then I think we took the claims

14      in-house -- actually, I think we became

15      customs -- he threw me in customer service and

16      then claims.  I can't remember if it was the

17      same time or not.  But he decided to start doing

18      the claims in-house, I think, before he had

19      Chicago processing them.  So he wanted me to do

20      that and he hired Donna from Group Insurance and

21      she came.  Me and her were doing the claims and

22      some customer service.

23  Q.  Okay.

24  A.  Answering the calls.

Page 12

1    Q.   And who was the "he" that you're referring to?

2    A.   Charlie.

3    Q.   Charlie Dobens?

4    A.   Yeah.

5    Q.   So around that time you were doing claims

6         processing?

7    A.   Yeah.  And customer service.

8    Q.   Were you and Donna the only people doing claims

9         processing at that time?

10   A.   I think so.  I'm not sure if Barbara Cope (ph.)

11        did any.  I don't know.  I think we were.

12   Q.   Okay.  When -- well, let's get the chronology.

13        How long were you doing claims processing?

14   A.   It would be a year or so.  Because I was

15        processing claims for a while.  I don't know.  A

16        year, year and a half.  I don't know, honestly.

17        And then he wanted me to be the plan builder so

18        he sent me to Chicago to train how to do that

19        and when I came back that was my job to be the

20        plan builder.

21   Q.   And it was Mr. Dobens who wanted you to become

22        the plan builder?

23   A.   Yeah.

24   Q.   When you say he sent you to Chicago, what did

Page 13

```
 1        that involve?
 2   A.   Just to train, to learn how to build plans in
 3        the system to process the claims and I had to
 4        learn how to do the CBX tables behind it and
 5        just how to set up the new groups so the claims
 6        processed the way the SOB said to pay the
 7        claims.
 8   Q.   And what's an SOB?
 9   A.   Schedule of Benefits.
10   Q.   So were you sent to any particular organization
11        in Chicago?
12   A.   Yeah, RIMS.  I don't know what the corporate,
13        big names.  RIMS is the system, whoever
14        they -- TriZetto.  That was it.  TriZetto.
15   Q.   And so you went there and received training on
16        plan build out?
17   A.   Yes.
18   Q.   And how long were you -- well, was your sole
19        responsibility then plan build out?
20   A.   Yes.
21   Q.   Okay.
22   A.   It was.
23   Q.   How long did you continue to have that solely as
24        your responsibility?
```

Page 14

```
 1   A.   Until Paul Gatanti came onto the scene.
 2        Honestly, again I can't remember the exact
 3        length of time.  A few months, maybe a year, I
 4        don't know.  But Paul Gatanti came in, hired all
 5        of his people and hired a plan builder, so he
 6        put me back on claims.
 7   Q.   Okay.  And at that point what was your position?
 8   A.   Then I was just a claims examiner.
 9   Q.   Okay.
10   A.   Again.
11   Q.   Did your position then change at all again?
12   A.   Yeah.  After the lady who was building the plans
13        left I became plan builder again.
14   Q.   When you became plan -- do you remember when
15        that was?
16   A.   No, I have no idea.
17   Q.   When you became plan builder again --
18   A.   Uh-huh.
19   Q.   -- were you still processing claims or only
20        doing plan build out?
21   A.   Mostly plan building.  But I think I was still
22        processing some claims.  Because I know that
23        they let me work from home one day a week and I
24        processed claims from home.  I remember that.
```

Page 20

```
 1   Q.   And that's where the claims adjuster would go to
 2        process a particular claim?
 3   A.   Uh-huh.
 4   Q.   Okay.  Do you recall if the Aubochon plan build
 5        out was changed at all after the first time it
 6        was set up there?
 7   A.   Yes.  Because when I became plan builder I
 8        noticed, you know, lots of mistakes and, you
 9        know, that, you know, it wasn't originally set
10        up exactly the way it should have been.  I
11        didn't think, anyway.  So I would go in and make
12        the changes.  But it wasn't just the Aubochon
13        plan, it was any plan that was set up.  I
14        didn't -- I didn't think it was set up right.
15        So I would, like, fix it, make sure that the
16        deductibles were working right and make sure,
17        all of that.  So I did go in and go through all
18        of their codes and make sure that it was as
19        close to the plan document as I could get it.
20   Q.   Okay.  Let me ask you a question to get the
21        chronology right.
22   A.   Uh-huh.
23   Q.   Was the Aubochon plan build out set up before
24        the first time you became the plan builder?
```

Page 21

```
 1   A.   Yes.
 2   Q.   Okay.  So when you say that you went back after
 3        you became the plan builder --
 4   A.   Uh-huh.
 5   Q.   -- that was during your first go-around as plan
 6        builder before you became a claims examiner?
 7   A.   Yeah.  Yeah.  I think.  What do you mean?
 8   Q.   Well, I think you had told me that you were the
 9        plan, you were first doing the COBRA and student
10        work?
11   A.   Yeah.  And then I became plan builder.  So when
12        I came back I would build the new plans for
13        whatever new accounts they had.  And if I had
14        time I would go and audit the existing accounts
15        and just see if I could make any improvements,
16        changes or whatever.
17   Q.   And I'm trying to place the chronology.  So the
18        Aubochon plan build out was already there --
19   A.   Uh-huh.
20   Q.   -- when you first became plan builder?
21   A.   Yes.  Yes.  Definitely.
22   Q.   Now, did all accounts have a plan build out on
23        the computer?
24   A.   Yeah.  They all had their own.
```

Page 22

1   Q.   Okay.  And you also worked there as a claims

2        examiner?

3   A.   Yes.

4   Q.   Okay.  Could you take me through the steps as to

5        how a claims examiner would process a claim on

6        any particular account?

7   A.   Yeah, you put in the Social Security number,

8        then their individual account would pop up.  You

9        would go into a screen where you put the diag

10       in, and the data of service, diag, some other

11       information, provider, or whatever and you hit

12       it and the actual claims processing screen would

13       come up.  You pick the provider, you punch in

14       the CPT codes and the diags, and, you know, I

15       guess when you hit enter it would process the

16       claim.  You could tell right there if it was

17       processing right.  But there were other things

18       the claims examiner had to do, like the fee

19       schedules were never up to date in our computers

20       so we would have a list of the current fee

21       schedules, we have to manually make sure that

22       it, you know, paid the right amount.  You know,

23       took the right discount.  And then hopefully it

24       would just process correctly if I built the plan

Page 23

```
 1            right or if the plan was built right.  And then

 2            you would hit enter and it would get paid or

 3            whatever.  Get processed.

 4     Q.     All right.  And were you ever the claims

 5            examiner -- well, when you were a claims

 6            examiner did you have particular accounts you

 7            were responsible for?

 8     A.     Yes.

 9     Q.     Okay.  Were you ever responsible for the

10            Aubochon account?

11     A.     Yes, I was.

12     Q.     Okay.  Were those claims processed in the manner

13            you just described?

14     A.     Yeah.

15     Q.     And so if I understand this correctly, it's

16            processed on the computer; --

17     A.     Uh-huh.

18     Q.     -- correct?  Okay.  And then the computer will

19            either approve or not approve?

20     A.     The claim, yeah.  Based on how the plan is set

21            up, yeah.

22     Q.     And the way the system is set up is the computer

23            is processing it based on the plan build out

24            information?
```

Page 24

1    A.   Uh-huh.

2    Q.   Okay.  And do you know -- well, strike that.

3         Well, do you know where -- strike that.

4            Did you ever -- I'm trying to get the

5         chronology straight.

6    A.   You sound like my professor, he's a lawyer,

7         "strike that, strike that."  He's such a lawyer.

8    Q.   A terrible habit in real life.  Did you ever see

9         the actual plan documents for the Aubochon

10       account?

11   A.   Yes.

12   Q.   And when did you see those?

13   A.   I guess when I took, when I started processing

14      the claims.  Because I processed the claims for

15      Aubochon before I became a plan builder so I

16      guess when I first started processing their

17      claims, I would say.

18   Q.   So you would use the plan documents as well

19      during the course of --

20   A.   Yeah.  Like I would have it open when I was

21      processing claims, whatever account I was

22      processing I would make sure I had the SOB or

23      plan document in front of me.  So I could make

24      sure that the system was doing it right and if

Page 25

```
 1              it wasn't then I either fix it myself, if I knew
 2              how, after I became a plan builder, or I would
 3              give it to the plan builder and say, "this isn't
 4              paying, fix it."
 5    Q.        So as the claims examiner you would make sure
 6              that what the computer was processing matched up
 7              with the plan documents themselves?
 8    A.        Yeah, you're supposed to.  Yeah.  I would.  Some
 9              of the other girls might not have, but I tried
10              my best.
11    Q.        Is that what you did with the Aubochon claims?
12    A.        Yes.
13    Q.        Would you ever authorize a claim for payment
14              that the computer rejected?
15    A.        If it rejected it incorrectly then, yes.  If
16              it's denied I would let it deny.  If it was a
17              benefit they didn't have, yeah, I would let it
18              deny.  If it was a benefit that's denied that I
19              knew, "no, that's not right, it shouldn't be
20              denied because it says right here" I would
21              either have it fixed or fix it myself to make it
22              pay.  But if it was a denied benefit I wouldn't
23              pay it unless Aubochon called me and told me to.
24    Q.        So this is how you would work on the Aubochon
```

Page 85

1   Q.   Do you recall whether Aubochon made any of these

2        changes?

3   A.   I have no idea.  I don't remember.

4   Q.   So in effect these suggestions were a way for

5        you to suggest ways to make the plan --

6             MR. ROSENBERG:   Objection.

7   Q.   -- stronger?

8   A.   No.  They were ways to clarify the benefits so I

9        could build it properly.

10  Q.   Can you explain that.

11  A.   Because if, if somebody came in, you know, got a

12       wig and sent it in for reimbursement, if it

13       didn't say how to pay that how would I know how

14       to set the plan up to process it correctly.  I

15       needed something in the plan document that said

16       how to pay the miscellaneous other covered

17       charges.

18  Q.   So given that these specific issues that are

19       raised in this e-mail, for example, were not

20       included in the plan, --

21  A.   Uh-huh.

22  Q.   -- at least at the time you wrote this

23       e-mail, --

24  A.   Yeah.

Page 86

```
 1   Q.   -- how would you make decisions with respect to
 2        these types of claims?
 3   A.   Well, we would either ask the sales and service
 4        rep to get it clarified from the client or ask
 5        the client themselves, like I did.  It looks
 6        like I just asked -- no, wait.  No, I sent it to
 7        Maureen Fitzgerald, so I asked her.
 8   Q.   That brings me to my next question.  Who is
 9        Maureen Fitzgerald?
10   A.   She was the service rep.  Yeah, I think she was
11        service, not sales.  But I could be wrong, she
12        might have been both.
13   Q.   And this Maureen Fitzmashpee, is that another
14        e-mail address for Maureen Fitzgerald?
15   A.   Yeah, it must be.
16   Q.   There's no person named Maureen Fitzmashpee?
17   A.   No.  That might have been her home, I don't
18        know.
19   Q.   And who is Bonnie Beals?
20   A.   She -- what did she do?  She was the one that
21        would -- she helped sales and service.  I think
22        she was their secretary.
23   Q.   So when a plan would come up for renewal did
24        BeneFirst have a role in changing any plan
```

Page 87

```
 1        terms?

 2              MR. ROSENBERG:  Objection.

 3   A.   They may have suggested things that, like, come

 4        up over the past year.  Like we had employees

 5        call asking if this was covered.  It wasn't

 6        specifically stated, but we had gotten a lot of

 7        requests, "do you want to add that to the plan."

 8        Sales and service might have asked them if they

 9        wanted to add certain things based on calls we

10        had gotten or whatever, like that.

11   Q.   Do you recall any instances where Aubochon would

12        change their plan as a result of recommendations

13        from BeneFirst?

14   A.   Specifically, --

15              MR. ROSENBERG:  Objection.

16   A.   -- I don't recall.  They probably did.  I don't

17        remember any specific examples.  Like this one

18        they might have changed it according to this.  I

19        don't know.  I honestly don't remember.

20   Q.   Do you recall if there was -- strike that.

21              Do you recall any instance where BeneFirst

22        overpaid claims related to the Aubochon account?

23   A.   Yeah.  Not like a specific instance, but I

24        remember when, I think it was in '05, we ran
```

Page 91

```
 1   A.   I don't know.

 2              MR. ROSENBERG:   Objection.

 3   A.   I don't know.  Because it wasn't just me doing

 4        them, so I honestly don't know.

 5   Q.   A little earlier you testified that occasionally

 6        you would have to tell the girls, and I imagine

 7        you're talking about the other claims

 8        examiners, --

 9   A.   Yes.

10   Q.   -- to check that they were paying claims right.

11        Would that be with respect to Aubochon, as well?

12   A.   Well, they would be included in it, yeah.

13   Q.   Okay.

14   A.   If -- yeah, when Jessica processes them.  You

15        know, I give the claims examiners, like, little,

16        you know, not cheat sheets, just things to look

17        for when you're processing claims, make sure you

18        check this or that or whatever.  But not

19        specifically.  I wouldn't specifically go and

20        say, "are you processing Aubochon correctly?"

21        Just every account.  Every client.

22   Q.   How often would you have to go and check for

23        these errors?

24   A.   Well, I wouldn't check for them.  I didn't check
```

1

1    Volume:  I

2    Pages:  1 - 32

3    UNITED STATES DISTRICT COURT

4    DISTRICT OF MASSACHUSETTS

5    C.A. No. 05-40159 FDS

6

7    W.E. AUBUCHON CO., INC., AUBUCHON DISTRIBUTION,

8    INC., W.E. AUBUCHON CO., INC. EMPLOYEE MEDICAL

9    BENEFIT PLAN AND AUBUCHON DISTRIBUTION, INC.

10    EMPLOYEE MEDICAL BENEFIT PLAN,

11    Plaintiffs,

12    v.

13    BENEFIRST, LLC,

14    Defendant.

15

16    **********

17    DEPOSITION OF KIM MCMAHON

18    Friday, April 11, 2008

19    The McCormack Firm

20    One International Place

21    Boston, Massachusetts

22    10:21 - 11:12

23    Reporter:  Linda M. Grieco

24

Kim McMahon

11

1    designated by the plaintiffs in this case to testify

2    on their behalf?

3        A.  Yes.

4        Q.  I'm going to show you what's been marked as

5    Exhibits 1A through 1D of Sarah Arel's deposition

6    on -- two days ago, since I can't remember what the

7    date is today, and just tell me if you've seen those

8    before.

9            (Documents exhibited to witness)

10       A.  No.

11       Q.  But it's your understanding that you are

12   here to testify on behalf of Aubuchon and its

13   Employee Benefit Plans?

14       A.  Yes.

15       Q.  Thank you.  Now I think you had testified

16   that the way your department worked is you report to

17   Ms. Arel, and then she reports to Mr. Moran; is that

18   correct?

19       A.  Correct.

20       Q.  Are those three individuals the only people

21   at Aubuchon involved with the administration of the

22   Employee Benefit Plans?

23       A.  Yes.

24       Q.  Now at Aubuchon, who makes the decisions

12

1  with regard to what type of a health plan to offer

2  to the employees?

3      A.  Marcus, Jr.  Marcus Moran, Jr.

4      Q.  What's his current title?

5      A.  President/treasurer.

6      Q.  Was that also the case when BeneFirst was

7  the administrator?

8      A.  Yes.

9      Q.  Who makes the decisions at the company as to

10  what third-party administrator to use?

11     A.  Marcus Moran.

12     Q.  Was that also the case when BeneFirst was

13  the administrator?

14     A.  Yes.

15     Q.  Do you ever become involved at Aubuchon in

16  particular individual's claims for medical benefits?

17     A.  No.

18     Q.  Do you know whether employees ever

19  complained directly to Aubuchon about whether or not

20  a particular medical treatment is covered?

21         MR. KILLMAN:  Objection.

22     A.  I don't recall.

23     Q.  If an employee has a problem with a medical

24  claim that you processed by the third-party

Page 1

1                                    VOLUME I
                                     PAGES 1-123
2                                    EXHIBITS 7

3

4

                    UNITED STATES DISTRICT COURT

5

                    DISTRICT OF MASSACHUSETTS

6

7

     W.E. AUBUCHON CO., INC.,              )
8    AUBUCHON DISTRIBUTION, IN,            )
     W.E. AUBUCHON CO., INC.               )
9    EMPLOYEE MEDICAL BENEFIT PLAN,        )   NO. 05-40159
     AND AUBUCHON DISTRIBUTION, INC.       )
10   EMPLOYEE MEDICAL BENEFIT PLAN,        )
          Plaintiffs                       )
11                                         )
     v.                                    )
12                                         )   ORIGINAL
     BENEFIRST, LLC,                       )
13        Defendants                       )

14

15

16                DEPOSITION OF M. Marcus Moran, Jr., a
17   deponent in the above-entitled cause, taken before
18   Tracy A. Coffman, Notary Public in and for
19   Commonwealth of Massachusetts, pursuant to the
20   Massachusetts Rules of Civil Procedure, at the Law
21   Offices of Bowditch & Dewey, 175 Crossing Boulevard,
22   Framingham, Massachusetts, on Thursday, May 22,
23   2008, commencing at 10:11 a.m.
24

1       understanding that it took place, we don't

2       know exactly when it happened, but what is

3       the process by way of amending the W.E.A.

4       Inc. plan to incorporate a change such as

5       adding the Aubuchon Quality Medical Program?

6    A.  At that time, I spoke initially to Group

7       Insurance Service Center, and I spoke to the

8       newly appointed president, and I brought to

9       him the problem, and I brought to him a

10      suggested solution.  The problem being

11      quality care, and would he help me identify

12      the serious illnesses, coupled with the

13      quality institutions, coupled with the

14      quality physicians at those institutions, and

15      the pricing, and the potential guarantee that

16      would go behind an operation.  And I sat with

17      him, he looked at me, he said, what are you

18      doing, this is fabulous, and we moved it on

19      from there.  He assisted me, in every one of

20      those critical operations, and the

21      institution, and then a second and third

22      choice for the institution, so the employee

23      would have choice.

24    Q.  Who was the president of GISC that you

Page 30

1    A.    No.

2    Q.    Does your third party administrator have the

3          authority to sign off on a change to the W.E.

4          Aubuchon Company Inc. group health plan?

5                MR. KILLMAN:  What time period are

6          you we talking about here, Eric?

7    Q.    At any time?

8    A.    No.

9    Q.    Why don't we mark this as Moran Exhibit 2,

10         please?

11               (Exhibit No. 2; so marked.)

12   Q.    Okay, Mr. Moran, I am going to show you what

13         we have just marked as Moran Exhibit 2, why

14         don't you take a look at that and let me know

15         when you're finished reviewing it.  For the

16         record, it's a two page document, with Bates

17         numbers AUB191 and AUB192, at the bottom.

18               THE WITNESS:  (Reviewing document.)

19         Can I speak to you?

20               MR. KILLMAN:  If you need to take a

21         break, we can take a break.

22               MR. BRODIE:  Sure.

23               ( A short break was taken.)

24         BY MR. BRODIE:

Page 83

1        address?

2    A.   Yes, it is.

3    Q.   And this is a letter addressed to Sarah Arel?

4    A.   Yes, it is.

5    Q.   Sent by Cheryl McLloyd, the reinsurance

6         coordinator from BeneFirst?

7    A.   Okay.

8    Q.   You read, that's what this appears to be?

9    A.   That's what it is.

10   Q.   Would you agree that in the text of it, it

11        says, please find enclosed the reimbursement

12        for the aggregate claim appeal from BP Inc.

13        in the amount of $43,455.65?

14   A.   Right, very clear.

15   Q.   And at the bottom, in handwriting, there's a

16        couple of numbers there, 155, underneath that

17        is 43, and then there is a line, and

18        underneath that is 198, and it appears to be

19        155 added to 43 adds up to 198, right?

20   A.   Right.

21   Q.   Does any of this refresh your memory as to

22        whether or not Aubuchon received a net

23        aggregate claim reimbursement from BPI Inc.

24        in excess of $198,000?

Page 84

1   A.   Yes, I don't remember the amount of money

2        thinking back.  I could never come up with

3        the amount of money, I just don't have that

4        kind of recollection.

5   Q.   That is fine, okay.  Let's mark this next

6        document as Moran Deposition Exhibit 7.

7                 (Exhibit No. 7; so marked.)

8   Q.   I am now handing you what we have marked as

9        Moran deposition exhibit number 7, for the

10       record, the lower right hand corner bears the

11       numbers AUB3972 to AUB3974, this is a three

12       page document, I'd as that you look it over

13       briefly and let me know when you have had a

14       chance to review it.

15  A.   (Reviewing document.)  Can we talk at all?

16            MR. KILLMAN:  Sure, there's no

17       question pending.

18            ( A short break was taken.)

19       BY MR. BRODIE:

20  Q.   Mr. Moran, have you had a chance to review

21       Moran Exhibit 7?

22  A.   Yes.

23  Q.   You mentioned earlier that there was an issue

24       that arose between June and November of 2004,

Page 90

1          Inc., on the aggregate claim?

2                    MR. KILLMAN:   Objection.

3     A.    I can't recall when that money was received,

4          I don't know what date, what year.   For what

5          policy year, I have no idea.

6     Q.    Was the $478,000 ever communicated to the

7          board, or was it just $200,000, in

8          August '04?

9     A.    I read this letter to the board of directors,

10         and assured them that we were being

11         conservative.   They were pleased to hear the

12         478 was going to be reimbursed.

13    Q.    Do you recall having any subsequent

14         conversations, with the board, as to the

15         ultimate treatment of the 478?

16                   MR. KILLMAN:   Objection.

17    A.    At either the November or the February board

18         meeting, I informed them that we left

19         BeneFirst, because we couldn't rely on their

20         recordkeeping, and we had a monstrous

21         disappointment.

22    Q.    What, specifically, did you say to the board,

23         with regard to the $478,000, if you said

24         anything?

Page 91

```
 1   A.   I could not explain to the board what had
 2        happened at that point, I just announced the
 3        disappointment.
 4   Q.   Do you have a recollection of advising the
 5        board, at any later date, of the amounts that
 6        were ultimately received, in connection with
 7        the aggregate claim?
 8   A.   No, I don't.  They didn't ask, I didn't bring
 9        anything up.
10   Q.   As you sit here today, do you have any reason
11        to disbelieve that W.E. Aubuchon Company Inc.
12        ultimately received $198,881.63 on it's
13        aggregate claim?
14             MR. KILLMAN:  Objection.
15   A.   I don't remember receiving that amount of
16        money.
17   Q.   So I think you have explained to us the
18        discrepancy between the 478, and the actual
19        amount, was the reason that BeneFirst was
20        ultimately terminated?
21             MR. KILLMAN:  Objection.
22   A.   Can you repeat that again?
23   Q.   Sure, I think you have explained to us that
24        the, actually, I will rephrase the question.
```

Page 92

1        The difference between the amount that is set

2        forth in this June 29, 2004 letter, and the

3        actual reimbursement amount, is one of the

4        factors that led to BeneFirst's termination,

5        is that correct?

6    A.   One of the factors.

7    Q.   Is there anything else?

8    A.   Yes.

9    Q.   What else?

10   A.   There was a service agreement, between the

11       two entities, I had signed a service

12       agreement, in a year, I don't remember the

13       year, definitely signed it, returned the

14       copies to them so they could countersign it,

15       and I didn't get them back.  I asked for

16       those service agreements several times, all

17       verbal, until, toward the end -- and that is

18       the summer of 2004, I wrote and asked for

19       them.  They were making a visit up to see me

20       in September, they were bringing it with

21       them.  So when I saw that person at our

22       product knowledge show, I said, jeez, do you

23       have the service agreement, oh, I forgot it.

24   Q.   Who is they, when you say, they?

COPY

# ADMINISTRATIVE SERVICES AGREEMENT

By and Between

## W.E. Aubuchon Co., Inc. Distribution Center

And

## BENEFIRST, LLC.



EXHIBIT
7
Axel
MG  4/9/08

This Agreement ("Agreement") between W.E. Aubuchon Co., Inc. Distribution Center ("Plan Sponsor") and BENEFIRST, LLC. ("Plan Administrator"), for the purpose of establishing the terms and conditions which the Plan Administrator agrees to provide administrative services to the Plan Sponsor under the Plan Sponsor's Benefit Plan ("Benefit Plan") in consideration for the payment by the Plan Sponsor of administration fees and the agreements set forth below:

## SECTION I.  CLAIMS ADMINISTRATION

A. The Plan Sponsor shall:

1. Retain the final authority and responsibility for he Benefit Plan and its operations. The Plan Sponsor gives the Plan Administrator the authority to act on behalf of the Plan Sponsor in connection with the Benefit Plan, but only expressly stated in this Agreement or as mutually agreed upon in writing by the Plan Sponsor and the Plan Administrator;

2. Pay the Plan Administrator as set forth in this Agreement;

3. Provide funds for the payment of plan benefits as set forth in this Agreement;

4. Furnish the information needed by the Plan Administrator to perform its functions under this Agreement. Information regarding the Benefit Plan includes any information concerning the eligibility and entitlement of persons to receive plan benefits;

5. Reimburse the Plan Administrator for the expense of any printed matter prepared especially for the Benefit Plan of the Plan Sponsor, except expenses specifically assumed by the Plan Administrator in the Schedule of Fees of Exhibit A;

6. Indemnify the Plan Administrator and hold it harmless from and against all loss, liability, damage, expense or other obligation resulting from or arising out of claims, demands or lawsuits against the Plan Administrator in connection with benefit payments or services performed under this Agreement; and,

7. Indemnify the Plan Administrator and hold it harmless against any liability, expenses, demand or other obligation resulting from or arising out of any tax or similar assessment (federal or state) which, (a) BeneFirst may incur with respect to plan benefits which are the obligation and liability of the Plan Sponsor, or (b) would have been levied on any charges or fees payable by the Plan Sponsor to the Plan Administrator under this Agreement.

B. The Plan Administrator, as Agent of the Plan Sponsor, shall:

1. Pay plan benefits in its usual and customary manner subject to and in accordance with this Agreement to or on behalf of persons entitled to receive plan benefits;

2. Notify any plan participant, whose request for plan benefits is denied, of the reasons for the denial, and of that plan participant's right to have the denial reviewed. The notification and review will be in a manner agreed upon by the Plan Sponsor and the Plan Administrator designed to satisfy the requirements of the Employee Retirement Income Security Act of 1974 (ERISA);

3. Maintain, for the duration of this Agreement and for two (2) years thereafter, adequate records of all transactions between Plan Sponsor, the Plan Administrator and plan participants. The records are the property of the Plan Sponsor. The Plan Sponsor has the right of continuing access to their records;

4. Refer to the Plan Sponsor for determination of: (a) any claim or class of claims the Plan Sponsor may specify, (b) any disputed claim, (c) any claim involving any question of eligibility or entitlement of the claimant for coverage under the Benefit Plan, (d) any question with respect to the amount of payment due, or, (e) any other question;

5. Provide the Plan Sponsor service and assistance in connection with the design and development of the Benefit Plan, initially and in connection with Benefit Plan revisions. Service and assistance includes; (a) underwriting and actuarial services, (b) estimates of initial plan costs, (c) cost projections of any proposed plan revisions, and (d) advice regarding the preparation of plan documents and summary plan description booklets;

6. Furnish the plan participants the items described in the following subsections;

    i.      an annual report of information available to the Plan Administrator which may be needed by the Plan Sponsor to satisfy plan requirements of ERISA.

    ii.     administrative forms including the initial supply of summary plan description booklets (but not any subsequent reprints) needed to facilitate the performance of BeneFirst's duties pursuant to this Agreement; and,

7. Indemnify the Plan Sponsor and hold it harmless from and against all claims, lawsuits, settlements, judgements, costs, penalties and expenses, including attorney fees, with respect to this Agreement resulting from or arising out of the gross negligence or the dishonest, fraudulent or criminal acts of the Plan Administrator or its employees, acting alone or in collusion with others.

## SECTION II.      PLAN FUNDING

A.    The Plan Sponsor shall establish and maintain a bank account ("Account") to be used solely for the purpose of funding claims due under the Benefit Plan.

B.    The Plan Sponsor shall fund the Account on a timely basis with funds sufficient to cover all amounts to be paid when due under the Benefit Plan and this Agreement.

C.    The Plan Sponsor shall expressly authorize the Plan Administrator to issue checks for benefit payments under the Benefit Plan on behalf of the Plan Sponsor.

D.    The Plan Sponsor shall adequately fund the Account so that all claims can be paid within twenty-one (21) days of processing. In the event that the Plan Sponsor fails to adequately fund the Account within 21 days of claim processing, the Plan Administrator shall notify the Plan Sponsor by certified mail that the Plan Sponsor has fourteen (14) days to fund the Account. If the Plan Sponsor fails to adequately fund the Account within the 14-day period, the Plan Sponsor will be in breach of the Agreement and the Plan Administrator shall have the power to terminate administrative services. In the event of such termination, the Plan Sponsor shall promptly notify all covered employees and dependents of such termination, however, the Plan Administrator reserves the right to so notify covered employees and dependents as well. Failure to terminate

services at the end of the 10-day period in no way prejudices the Plan Administrator from their right to do so at a later date.

E.    If the Plan Sponsor (a) commences a voluntary case under the federal bankruptcy laws or admits in writing its insolvency or its inability to pay its debts as they become due, or applies for consents to or acquiesces in the appointment of, or taking possession by, a trustee, receiver, custodian or similar official or agent for itself or any substantial part of its property or generally does not pay its debts as they become due; or (b) shall have an order or decree for relief in bankruptcy in any case under federal bankruptcy laws entered against it, or if a petition seeking reorganization, readjustment, arrangement, composition or other similar relief as to the Plan Sponsor under the federal bankruptcy laws or any similar law for the relief of debtors shall be brought against it and shall be consented to by it, or shall remain undismissed for sixty days; or (c) if a trustee, receiver, custodian or similar official or agent shall be appointed to take charge of all or any part of the Plan Sponsor's property; then in any of these cases, the Plan Administrator may, immediately or at any time thereafter while under such condition continues and without demand and without prejudice to any remedies which might otherwise be used for arrears of funds due to pay claims or administrative service fees, give notice of termination of this Agreement to the Plan Sponsor and, upon giving such notice, this Agreement shall terminate. The Plan Administrator may, at its option, allow this Agreement to continue on the condition that the Plan Sponsor give the Plan Administrator a security deposit equal to one month's estimated claims liability and one month of administrative services fees as protection against loss the Plan Administrator would sustain by virtue of the Plan Sponsor's default hereunder.

F.    The Plan Sponsor agrees to promptly reimburse participating Network providers within thirty (30) days from their receipt of the claim. The Plan Sponsor agrees that claims not reimbursed within thirty (30) days are payable at the full original billed amount and will not be eligible for the HCVM discount if requested by the participating provider.

## SECTION III.    PLAN SPONSOR LIABILITY

The Plan Administrator does not insure nor underwrite the liability of the Plan Sponsor under the Benefit Plan. The Plan Sponsor retains the ultimate responsibility for claims made pursuant to the Benefit Plan. The Plan Sponsor is responsible for all expenses incident to the Benefit Plan except expenses specifically assumed by the Plan Administrator in this Agreement.

## SECTION IV.    PLAN ADMINISTRATOR LIABILITY

A.    The Plan Administrator shall, to the extent possible, advise the Plan Sponsor as to matters which come to its attention involving potential legal actions involving the Benefit Plan and shall promptly advise the Plan Sponsor of legal actions commenced against the Plan Sponsor which comes to its attention. The defense of any legal action involving a claim for benefits under the Benefit Plan shall not be the obligation of the Plan Administrator under this Agreement, but it is understood and agreed that the Plan Administrator shall fully cooperate with the Plan Sponsor in the defense of any action arising out of matters related to this Agreement.

B.    The Plan Administrator will use reasonable care and due diligence in the exercise of its powers in the performance of its duties under this Agreement. The Plan Administrator will not be liable for any mistake of judgement or other actions taken in good faith.

C.    If it is determined that any payment has been made under this Agreement to an ineligible employee or dependent, or if it is determined that more or less than the correct amount has been paid by the Plan Administrator, the Plan Administrator will make a diligent effort to recover the payment made to an ineligible person but, the Plan Administrator will not be required to initiate court proceedings for any such recovery.

D.  The Plan Administrator does not insure nor underwrite the liability for medical stop loss under the Benefit Plan. The Plan Sponsor retains the ultimate responsibility for claims made under the Benefit Plan and all expenses incidental to the Benefit Plan. If the Plan Sponsor purchases stop loss coverage from any insurance carrier, any claims that the Plan Sponsor may want paid that are not covered by the terms and conditions of the Benefit Plan will not be included as covered expenses for the purposes of the stop loss contract. The Plan Sponsor understands the coverage provided under any stop loss coverage purchased, and agrees that the coverage is appropriate for the Benefit Plan.

E.  The Plan Sponsor agrees to indemnify, defend and hold the Plan Administrator safe and harmless from all liability, losses and expense, including reasonable attorneys fees arising from:

  1.  any claims or proceedings that may be made or brought by any third party against the Plan Administrator which claim or proceeding arises out of a benefit claim determination made in accordance with the Plan specifications incorporated into the Plan Document approved by the Plan Sponsor;
  2.  any breach of Plan Sponsor's duties of confidentiality;
  3.  any claims which are unrelated to the obligations of BeneFirst under this Agreement, including but not limited to, claim related to the provision of pharmacy services, "24/7" member access, quality assurance and utilization review;
  4.  any claims involving injuries incurred or suffered by members of the Benefit Plan which injuries are caused by the negligence or misconduct of providers under the Benefit Plan

In the event that the Plan Administrator claims a right of indemnification under this Agreement it shall give prompt written notice of such claim to the Plan Sponsor. The Plan Sponsor shall have the right to control the defense of any such action and the Plan Administrator agrees to cooperate with the Plan Sponsor and provide such assistance as is reasonably requested.

## SECTION V.    COMPENSATION OF THE PLAN ADMINISTRATOR

A.  For the Plan Administrator services provided pursuant to this Agreement, the Plan Sponsor will pay the Plan Administrator the charges set forth in the Schedule of Fees. Fees will be due and payable within thirty (30) days of invoicing.

B.  The Plan Sponsor shall reimburse the Plan Administrator for any expenses incurred by BeneFirst, including expenses for utilization review procedures, hospital audits and large case management reviews. The Plan Administrator may deduct and pay such expenses from the Plan Sponsor's benefits claims account subject to all the limits and conditions of this Agreement.

C.  The Plan Administrator has the right to change the monthly administration fee and other fees set forth in Exhibit A, Schedule of Fees. BeneFirst will give the Plan Sponsor no less than thirty (30) days written notice of the change. The notice will state the amount of the new monthly fee and the effective date of the change. The fees in use at the time of the notice must be in effect at least twelve (12) months before a change can be made unless:

  1.  the Plan Sponsor amends the Benefit Plan in such a way that the cost, nature, or extent of the claims administration of the Benefit Plan is materially altered,
  2.  the number of employees covered under the Benefit Plan changes by twenty-five percent (25%) or more since the date the then current charges were effective, or;
  3.  there exists a change in the scope of the services to be performed by the Plan Administrator under the Benefit Plan or this Agreement.

D.  The Plan Administrator shall have the option to engage the services of a third party vendor to handle the negotiations and settlement of non-network provider and facility claims. Plan Sponsor agrees to pay the third party vendor the billed negotiation fee plus agrees to pay the Plan Administrator a service fee equal to ten percent (10%) of the savings.

## SECTION VI.    PERFORMANCE STANDARDS

A.   The Plan Administrator warrants that the following claims processing times and restrictions will be maintained at all times possible:

1.   Claims Mail. Claims mail will be date stamped the day received. Claims will be inputted into the system within two days of the date of receipt.

2.   Non-Pended Claims. 80% of all non-pended claims and tracers will be processed within an average of 15 days after being entered into the system. 98% of all nonpended claims and tracers will be processed within an average of 30 days after being entered into the system.

3.   Pended Claims. All pended claims shall be resolved within an average of 90 days of receipt by BeneFirst of all necessary information required by BeneFirst unless this time period is otherwise extended by written and oral instruction by the Plan Sponsor.

4.   Adjustments. BeneFirst shall reprocess all claims on reprocessing forms within an average of five (5) days of receipt by BeneFirst of all required information unless this time period is otherwise extended by written and oral instruction of the Plan Sponsor.

5.   Member and Provider Data Input. Members who are added to the Plan Sponsor's Benefit Plan will be inputted within 48 hours of receipt of all required documentation.

6.   Claims Payments. The Plan Administrator will issue claims payments (using Plan Sponsor supplied funds) on a weekly basis.

B.   The Plan Administrator warrants that the following claims accuracy standards will be in place at all times:

1.   Claim Financial Accuracy. The Claim Accuracy Ratio shall average .98 or greater as indicated by the the Plan Administrator Claims Audit Reports (as measured year to date by the said monthly reports). Financial accuracy will be calculated by dividing the number of claims audited with no financial error by the total number of claims audited.

2.   Claims Payment Accuracy. The total number of claims audited accurately divided by the total number of claims audited shall average .95 or greater as indicated by the Plan Administrator Claims Audit Reports (as measured year-to-date by the said monthly reports).

3.   Claims Coding Accuracy. The total number of correct coding entries audited divided by total number of coding entries audited shall average .95 or greater as indicated by the Plan Administrator Claims Audit Reports (as measured year-to-date by the said monthly reports).

## SECTION VII.    PHARMACY BENEFIT MANAGEMENT PROGRAM

A.   BeneFirst shall issue dispensing cards to individuals covered under the Plan Sponsor's Benefit Plan pursuant to the Administrative Agreement between the Plan Administrator and the Pharmacy Benefit Manager (PBM).

B.   The Plan Sponsor agrees to pay the Plan Administrator the amount charged for all drugs dispensed on the pharmacy cards to individuals covered under the Plan Sponsor's Benefit Plan. Further, the Plan Sponsor agrees that they are responsible for the payment of all drugs dispensed under the PBM under the Plan Sponsor's Benefit Plan until the expiration date of each card.

Confidential       8/2/2005

The Plan Sponsor agrees that drugs dispensed after the termination of this Agreement with the Plan Administrator, or drugs dispensed to terminated employees and dependents that have retained possession of the PBM card will continue to be the responsibility of the Plan Sponsor.

**SECTION VIII.    CONFIDENTIALITY**

The Plan Administrator acknowledges that certain material and information which is or will come into its possession or knowledge in connection with this Agreement includes confidential proprietary information of the Plan Sponsor, disclosure of which to third parties may be damaging. Therefore, the Plan Administrator agrees to hold such material and information in confidence to be used only for the performance of this Agreement, and to be released only to permitted users and to those persons requiring access to the information for such performance or as required by law. For purposes of this Agreement, "permitted users" shall mean such persons as the Plan Sponsor identifies as permitted users.

**SECTION IX.    SEVERABILITY**

If any provision of this Agreement is held invalid by law or by a court of law, the invalidity will not affect any other provision of this Agreement. The provisions of this Agreement are severable. It is provided, however, that the basic purposes of this Agreement must be achieved through the remaining valid provisions.

**SECTION X.    CAPTIONS AND HEADINGS**

The captions and headings throughout this Agreement are for convenience and reference only. The words of the captions and hea Zings will in no way be held or deemed to define, describe, explain, modify or limit the meaning of an provision, or the scope or intent of this Agreement.

**SECTION XI.    CONTRACT COMPLIANCE - NONWAIVER**

Failure by the Plan Sponsor, the Plan Administrator or both to insist upon compliance with any term or provision of this Agreement at any time or under any set of circumstances will not operate to waive or modify that provision or render it unenforceable at any other time whether the circumstances are or are not the same. No waiver of any of the terms or provisions of this Agreement will be valid or of any force or effect unless each instance the waiver or modification is contained in a written memorandum expressing such alteration or modification and executed by the Plan Sponsor and the Plan Administrator

**SECTION XII.    ASSIGNMENT**

The rights, obligations and benefits established by this Agreement shall be nonassignable by the Plan Sponsor without the prior written consent of the Plan Administrator. The Plan Administrator may assign its rights and obligations hereunder with thirty(30) days written notice to the Plan Sponsor. For the purposes of this Agreement, a change in the controlling legal or beneficial ownership interest of the Plan Sponsor shall be deemed an assignment requiring the Plan Sponsor to request written consent from the Plan Administrator

**SECTION XIII. GOVERNING LAW**

This Agreement shall be subject to and governed by the laws of the Commonwealth of Massachusetts. Any and all proceedings relating to the subject matter thereof shall be maintained in the courts of the Commonwealth of Massachusetts or the Federal District Courts sitting in Massachusetts.

# SECTION XIV.   ENTIRE AGREEMENT

This Agreement constitutes the entire agreement between the parties pertaining to the subject matter and supersedes all prior and contemporary agreements, understandings, negotiations and discussions, whether oral or written, of the parties.

# SECTION XV.   TERMINATION

A. This Agreement may be terminated either by the Plan Sponsor or by the Plan Administrator at any time provided the terminating party gives the other party prior written notice. The written notice will state the effective date of the termination. The written notice will be given no less than thirty (30) days prior to the date of the termination.

B.    This Agreement will terminate automatically and immediately as of the date:

1.   the Plan Sponsor fails to pay any charges within thirty (30) days after charges are due and payable as provided in this Agreement, or;

2.   the Plan Sponsor fails to perform its obligations regarding the plan benefit payments, in accordance with this Agreement. Termination will not relieve the Plan Sponsor of its obligations to the Plan Administrator for payment of compensation due under this Agreement, or;

3.   the Plan Sponsor amends the Benefit Plan regarding plan benefits subject to this Agreement without prior written acknowledgement or approval by the Plan Administrator, or;

4.   the Benefit Plan subject to this Agreement is terminated, or;

5.   the Plan Sponsor becomes insolvent or bankrupt or subject to liquidation, receivership or conservatorship as described in Sect. II, (E).

C. If the Benefit Plan subject to this Agreement is terminated, the Plan Sponsor and the Plan Administrator may mutually agree that the provisions of this Agreement will continue in effect for the purposes of payment of plan benefit expense claims incurred before the date of termination but not paid on or before the date of termination.

D. If this Agreement is terminated while the Benefit Plan continues in effect, the Plan Sponsor and the Plan Administrator may mutually agree that the provisions of this Agreement will continue in effect for the purpose of payment of any claims for which proofs of loss have been received by BeneFirst, before the date of termination.

E. If provisions of this Agreement are continued in effect in accordance with subsection (C.) or (D.) of this section, the Plan Sponsor will pay the Plan Administrator an amount equal to the monthly administrative fee of the renewal proposal for the number of months the Plan Sponsor during the period the provisions of this Agreement are continued.

F.    Termination of this Agreement will not terminate the rights or obligations of either party arising out of the period during which this Agreement was in effect.

In WITNESS WHEREOF, the Plan Sponsor and the Plan Administrator have caused this Agreement to be executed in their names by their undersigned officers, the same being duly authorized to do so.

W. E. Aubuchon Co., Inc. Distribution Center     BENEFIRST, LLC

By: _____     By: _____

Title: _____     Title: _____

Date: _____          Date:

Witness: _____          Witness:

EXHIBIT A

Schedule of Fees

Plan Year 2001-2002

## Set-Up Fee of $4,500.00

This is an annual fee and covers the preparation of Enrollment Kits and I.D. Cards needed for the initial group enrollment, and employee meetings at up to three locations. Subsequent printings will be billed to the client at cost. This fee also covers the building of the Plan in the claim system.

## Monthly Fixed Costs

A Monthly Fixed Cost of $91.05 per Single and $150.81 per Family will be charged. The Monthly fixed cost provides administrative services and excess loss coverage as follows:

- Excess Loss premiums for coverage previously agreed upon.
- Maintaining a claims account for participant contributions, if appropriate.
- Invoicing and funding of Benefit Plan benefits.
- Recordkeeping and invoicing of fixed costs.
- Benefit administration, including cost containment programs.
- Plan amendments as required.
- Monthly benefit analyses, /
- Annual financial report on the Benefit Plan to the Plan sponsor, where appropriate.
- Routine-type consulting and assistance.
- Precertification of hospital admissions.
- COBRA premium invoicing, collection, and recordkeeping (where elected).
- Risk Management services, where appropriate.
- Recordkeeping, invoicing, and claim filing of life insurance benefits.
- Annual re-quoting of excess loss terms on a "best terms" basis.

## Additional Service Fees

- Booklet Reprints: Booklet reprints are charged at cost.
- IRS/DOL 5500 or 5500-C: $150.00 annual fee to compile data necessary to prepare the 5500/55000.
- HIPAA Certificates: HIPAA Certificates provided with $.75 per Employee per month fee as listed on the Plan Administrator sales proposal.
- Additional Fees: Any additional fees (medical records, medical fees, legal fees, Health Resources pre-certification charges.) needed to process Benefit Plan benefits will appear on the claims invoice as a non-benefit Plan expense. Closed Plan Year expenses by the Plan Administrator occasioned by a Medicare or Medicaid audit by the Health Care Financing Agency will be an additional fee but with an advance notice by the Plan Administrator to the Plan Sponsor.

## Miscellaneous

- Compensations: The broker of record receives a commission of 10% of the excess loss premium.
- The Plan Administrator encourages the Plan Sponsor to have all Plan documents reviewed by its attorney.

# EXHIBIT B

## COBRA SERVICE AGREEMENT

This COBRA Service Agreement ("Agreement") is between BeneFirst, LLC and W.E. Aubuchon Co., Inc. Distribution Center ("Plan Sponsor"). It is effective as of 28 Aug 01 (the "Effective Date"). This Agreement establishes the terms and conditions as recited below:

### SECTION I.    DUTIES OF PLAN SPONSOR

1. COBRA requires the Plan Sponsor to provide an initial notice of COBRA rights to covered employees and covered spouses at the time COBRA first applies to Plan Sponsor's Medical Plan(s) and at the time an individual first becomes a covered employee or covered spouse. The Plan Sponsor shall provide these initial notices of COBRA rights and BeneFirst will have no obligation with respect to them.

2. Whenever a qualifying event as defined in the COBRA law occurs, the Plan Sponsor shall promptly notify BeneFirst's COBRA Department via a completed BeneFirst provided notification form with the following information:

    (i)     the type of qualifying event incurred;

    (ii)    the date of the qualifying event;

    (iii)   the names, addresses, telephone numbers and birthdates of all the qualified beneficiaries;

    (iv)    the Plan Sponsor's Medical Plan(s) in which the qualified beneficiaries had coverage.

3. If Plan Sponsor so: us a notification form to BeneFirst via facsimile transmission, Plan Sponsor will also send the same notice via U.S. Mail.

### SECTION II.    DUTIES OF BENEFIRST

1. Within 14 days of receipt of a COBRA notification form from the Plan Sponsor, BeneFirst will send, a notice of right to continue coverage and an election form to the qualified beneficiary. Also, BeneFirst will alert its claims system to hold coverage pending the COBRA election of the qualified beneficiary.

2. BeneFirst will then track the qualified beneficiary's 60-day election period.

3. If a qualified beneficiary's election form is not received within the 60-day election period or if the coverage is declined on the election form, then the qualified beneficiary will be terminated from the Plan Sponsor's Medical Plan(s).

4. When an election form indicates a qualified beneficiary's intent to continue coverage, BeneFirst will immediately mail a confirmation letter with coupons for premium payments.

5. Grace Periods for COBRA premium payments will be monitored. If BeneFirst does not receive a premium payment for the qualified beneficiary by the end of any COBRA grace period, then the qualified beneficiary will be terminated from the Plan Sponsor's Medical Plan(s). However, BeneFirst will consult with the Plan Sponsor concerning any questionable late premium payments. All claims which are incurred after the qualified beneficiary's paid through date are held until the appropriate premium is received.

6. If applicable, BeneFirst will send a conversion notice to a qualified beneficiary plus an application for conversion six months prior to the qualified beneficiary's termination date.

7. Prior to a Plan Sponsor's Medical Plan(s) anniversary, BeneFirst will mail a COBRA renewal notice advising the qualified beneficiary of any upcoming premium changes. Subsequently, a renewal letter with new coupons will be sent to the qualified beneficiary.

## SECTION III.    ADDITIONAL PROVISIONS

1. BeneFirst will, to the extent possible, advise the Sponsor as to matters which come to BeneFirst's attention involving potential legal actions concerning the supervision of COBRA continuation rights. The defense of any legal action involving a claim for benefits under the supervision of COBRA continuation rights will not be the obligation of BeneFirst under this Agreement, but it is understood and agreed that BeneFirst will fully cooperate with Sponsor in the defense if any action arises out of matter related to this Agreement.

2. BeneFirst will advise Sponsor of any known changes to COBRA as they affect the Sponsor. In order to remain compliant, BeneFirst may implement required administrative procedures without notification to Sponsor.

3. BeneFirst will use ordinary care and due diligence in the exercise of its powers and the performance of its duties, but will not be liable for any mistake or judgment or other action taken in good faith or for any loss unless resulting from its gross negligence; provided that BeneFirst agrees to indemnify and hold harmless the Sponsor and its directors, officers and employees against any and all claims, lawsuits, settlements, judgments, costs penalties and expenses, including attorney's fees with respect to the Agreement resulting from or arising out of the dishonest, fraudulent, or criminal acts of BeneFirst or its employees, acting alone or in collusion with others.

4. The Sponsor agrees to indemnify and hold harmless BeneFirst and its directors, officers, and employees against any and all claims, lawsuits, settlements, judgments, costs, penalties, and expenses, including attorneys' fees, resulting from, or arising out of or in connection with any function of BeneFirst in connection with a claim for benefits under the administration of COBRA continuation rights unless it is determined that the liability therefore was the direct consequence of dishonest or criminal conduct, gross negligence or fraud on the part of BeneFirst or any of its directors, officers or employees.

## SECTION IV. COMPENSATION OF THE PLAN ADMINISTRATOR 1.

Sponsor agrees to pay BeneFirst as follows for COBRA Administration:

    (a)    Two percent (2%) of any collected premiums received from qualified beneficiaries.

    (b)    $.75 per Employee per Month

The Sponsor will be billed via a monthly invoice indicating the COBRA fees which are owed to BeneFirst for the previous month. This payment is due to BeneFirst the first day of the month following the billing date.

DATED AT _____ ON _____

PLAN SPONSOR _____

BY: _____    TITLE: _____

WITNESS: _____    SOLICITING AGENT: _____

EXHIBIT C
PLAN DISCLOSURE NOTICE

The Department of Labor requires full disclosure of all fees and commissions on the part of any entity receiving compensation from a qualified ERISA plan. BeneFirst, LLC is compensated through the fees and percentages specified in the preceding proposal through our subsidiary BeneFirst Insurance Agency, Inc. Arrangements between BeneFirst and any Broker regarding the sharing of fees or commission is reflected in the following schedule:

## COMPENSATION DISTRIBUTION

| Line of Coverage/Service | BeneFirst | Broker 1 | |
|---|---|---|---|
| Specific Excess Premium | 0 | 10% | |
| Aggregate Excess Premium | 0 | 10% | |
| Group Life | | | |
| Group AD&D | | | |
| Group Short Term Disability | | | |
| Administrative Fees | 100% | 0 | |
| Service Fee | | | |
| Medical Claim Fee | 100% | | |
| Dental Claim Fee | 100% | | |
| HIPAA Service Fee | 100% | | |
| COBRA Service Fee | 100% | | |
| Flex Fees | | | |
| PPO Fees (HCVM/NPPN, et al) | 0% | 0% | |
| Pre-Cert and/or Review Services | 100% | | |
| Prescription Program Compensation | | | |
| Interest on Custodial Accounts | 100% | | |

WITNESS:                                          SOLICITING AGENT:


DATED        AT_____ON_____

_____PLA_____

N SPONSOR BY:                          TITLE:_____

_____

EXHIBIT D

Preferred Provider Organizations

This Agreement made effective as of the 25th day of August, 2001 between HealthCare VALUE Management, Inc. ("HCVM") a Corporation organized under the Laws of Massachusetts and W.E. Aubuchon Co., Inc. Distribution Center a Client of BeneFirst, LLC.

The Client agrees with the terms of the Contract between HealthCare VALUE Management, Inc. and BeneFirst, LLC effective August 25, 2001.

Client Insurance and Indemnification. Client will indemnify and hold HCVM and its agents, staff and employees harmless from any and all liability, loss claims, demands, or expenses, including attorneys' fees, caused by the negligent or intentional acts or omission of Client, its agents or employees in carrying out their responsibilities under this Agreement. Client shall procure and maintain policies of comprehensive general liability, professional liability and other insurance as may be necessary to protect it against such claims.

HCVM Insurance and Indemnification. HCVM will indemnify and hold Client and its agents, staff and employees harmless from any and all liability, loss, claims, demands, or expenses, including attorneys' fees, caused by the negligent or intentional acts of omissions of HCVM, its agents or employees in carrying out their responsibilities under this Agreement. HCVM shall procure and maintain policies of comprehensive eineral liability, professional liability and other insurance as may be necessary to protect it against such claims.

This Agreement will be made part of the Plan Supervisory Agreement between W.E. Aubuchon Co., Inc. Distribution Center, and BeneFirst, LLC.

Signed By:


DATED AT _____

_____          ON

PLAN SPONSOR  W.E. Aubuchon Co., Inc. Distribution Center

BY: _____

TITLE: _____

WITNESS: _____  SOLICITING AGENT: _____

Confidential

8/2/2005

# W.E. AUBUCHON CO., INC.
## &
# AUBUCHON DISTRIBUTION, INC.

### Employee Medical Benefit Plan

### Revised August 25, 2001

EMPLOYEE MEDICAL BENEFIT PLAN

# I. INTRODUCTION

This Plan document describes the benefits available to you under the W.E. Aubuchon Co., Inc. Distribution Center & Aubuchon Distribution, Inc. Employee Medical Benefit Plan ("Plan"). Please read this document carefully, share it with your family, and keep it handy for future reference.

Every attempt has been made to be informative about the benefits available under the Plan and the circumstances in which a benefit may be lost or denied. For your convenience, the technical terms used in this booklet are capitalized and are explained in the Definitions Section beginning on page 70.

In any event where a question may arise as to a claim for benefits or denial of a claim for benefits, the Employer, Plan Administrator, Contract Administrator, and such other individuals as may be party to or associated with the Plan will be guided solely by this Plan Document, which is also the Summary Plan Description.

The Plan Administrator has full discretionary authority to interpret this Plan and its provisions and regulations with regard to eligibility, coverage, benefit entitlement, benefit determination and general administrative matters. The Plan Administrator's decisions will be binding on all Covered Employees and their beneficiaries and conclusive on all questions of coverage under this Plan.

This Plan Document is not a contract. Participation in the Plan does not give you the right to continued employment by W.E. Aubuchon Co., Inc. or Aubuchon Distribution, Inc. or any other right not specified in the Plan. Nothing in the Plan or this document prohibits the companies from changing the terms of your employment.

*The benefits described in this document are those in effect as of August 25, 2001, except as otherwise described in this Plan or as required by law.*

## Administration of the Plan

The Plan is administered through the Benefits Manager of the Company. The Company has retained the services of an independent Contract Administrator (contract administrator) to assist it in administering the Plan. Please refer to pages 57-59 for detailed information about Plan administration.

## Plan Amendment or Termination

The Company and the Union, through collective bargaining, may modify or amend the Plan in whole or in part, at any time and from time to time. The Plan may be modified or amended in any way that it is necessary or desirable, with or without retroactive effect, to the extent permitted by law. The Company may act by any means permitted under its by-laws.

EMPLOYEE MEDICAL BENEFIT PLAN

## II. SUMMARY PLAN INFORMATION

**Plan Sponsor**

> W.E. Aubuchon Co., Inc.
> 95 Aubuchon Drive
> Westminster, Massachusetts 01473-0473
> 978-874-0521

The Employer Identification Number (EIN) assigned to W.E. Aubuchon Co., Inc., by the IRS is 04-1050290.

**Participating Employer**

> Aubuchon Distribution, Inc.
> 95 Aubuchon Drive
> Westminster, Massachusetts 01473-0473
> 978-874-0521

**Plan Name and Number**

> W.E. Aubuchon Co., Inc. & Aubuchon Distribution, Inc. Employee Medical Benefit Plan
>
> The Plan Number is 502.

**Plan Effective Date**

> August 25, 1983 (revised August 25, 2001, except as otherwise specified in the Plan)

**Type of Plan**

> Group Health Benefits

**Plan Administrator**

> W.E. Aubuchon Co., Inc.
> Aubuchon Distribution, Inc.
> c/o M. Marcus Moran, Jr.
> President-Treasurer
> 95 Aubuchon Drive
> Westminster, Massachusetts 01473-0473
> 978-874-0521

**Agent for Service of Legal Process**

The Plan Administrator identified above.

**Type of Administration and Contract Administrator**

The Plan is self-administered by the Employer, which is a "named fiduciary" and the "plan administrator" under ERISA. The Employer has delegated claims administration and other day-to-day functions for all benefits except prescription drug benefits to the following Contract Administrator as of August 25, 2001:

> BeneFirst, LLC
> P.O. Box 1421
> Marshfield, MA  02050
> 877-823-6334 (Member Services)
> www.benefirst.com

The Contract Administrator for prescription drug benefits is:

> Express Scripts, Inc.
> 14000 Riverport Drive
> Maryland Heights, MO  63043
> 800-451-6245
> www.express-scripts.com

**Eligible Classes of Employees**

Full-Time Distribution Center Employees of the Employer who are members of the Truck Drivers Union, Local No. 170, affiliated with the International Brotherhood of Teamsters, working at least 45 hours per week.

Retired Employees described above who have completed fifteen (15) years of full-time employment with the Employer, and who elect to retire on or after age fifty-eight (58) and before age sixty-five (65), from the date of retirement to the earliest of the retiree's 65th birthday or his or her date of death, or the date on which the retiree becomes eligible either for Medicare or for group medical coverage with another employer.

*Note: Except in the parts of the Plan that discuss the rules for eligibility and coverage, including changes in coverage and termination of coverage, references to employees include references to retirees.  Covered Employees and retirees have the same benefits under the Plan.*

W.E. AUBUCHON CO., INC.
AUBUCHON DISTRIBUTION, INC.

EMPLOYEE MEDICAL BENEFIT PLAN

(g)    "Pre-Service Claim" means any claim for a benefit under the Plan with respect to which the terms of the Plan condition receipt of the benefit, in whole or in part, on approval of the benefit in advance of obtaining medical care.

(h)    "Relevant" means, with respect to a claim for benefits, that a document, record or other information –

    (i)    was relied upon in making the benefit determination;

    (ii)    was submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record or other information was relied upon in making the benefit determination;

    (iii)    demonstrates compliance with the administrative processes and safeguards required under ERISA and the applicable regulations in making the benefit determination; or

    (iv)    constitutes a statement of policy or guidance with respect to the Plan concerning the denied treatment option or benefit for the claimant's diagnosis, without regard to whether such advice or statement was relied upon in making the benefit determination.

(i)    "Urgent Care Claim" means a claim for medical care or treatment with respect to which the application of the time periods for making non-urgent care determinations –

    (i)    could seriously jeopardize the life or health of the claimant or the ability of the claimant to regain maximum function; or

    (ii)    in the opinion of a Physician with knowledge of the claimant's medical condition, would subject the claimant to severe pain that cannot be adequately managed without the care or treatment that is the subject of the claim.

The decision as to whether a claim is an Urgent Care Claim shall be determined by the Claims Administrator, applying the judgment of a prudent layperson who possesses an average knowledge of health and medicine. Furthermore, any claim that a Physician with knowledge of the claimant's medical condition determines is an Urgent Care Claim will be treated as such a claims for purposes of this Section.

## VIII. GENERAL PLAN PROVISIONS

A.    **Plan Administration**

1.    <u>Appointment of Plan Administrator</u>

W.E. AUBUCHON CO., INC.
AUBUCHON DISTRIBUTION, INC.

**Code.** The Internal Revenue Code of 1986, as amended from time to time.

**Company.** W.E. Aubuchon Co., Inc..

**Contract Administrator.** BeneFirst, LLC, together with any other of its programs, units, or divisions that is designated to perform claims administration functions under the Plan, provided that, for purposes of prescription drug benefits under the Plan, Express Scripts, Inc. is the Contract Administrator. The term Contract Administrator also means any other insurance company or organization that may be retained by the Employer or the Plan Administrator from time to time to perform claims administration functions under the Plan in addition to or as the successor to BeneFirst, LLC, and/or Express Scripts, Inc..

**Cosmetic Surgery.** A procedure performed solely for the improvement of a Covered Person's appearance and which is not Medically Necessary.

**Covered Dependent.** A child or spouse of a Covered Employee who has met all of the Dependent eligibility requirements and is enrolled for coverage under this Plan.

**Covered Employee.** An Eligible Employee who is enrolled for coverage under this Plan.

**Covered Expenses.** The Reasonable and Customary charges incurred for Medically Necessary services and supplies that are not specifically excluded from coverage in this Plan.

**Covered Person.** Any Covered Employee, Covered Dependent, covered Retiree or any Qualified Beneficiary receiving COBRA Coverage under this Plan.

**Covered Provider.**

(1)    Any one of the following health care personnel and facilities, provided the provider is licensed (and/or certified or accredited, as appropriate with respect to the particular type of provider) in the political jurisdiction in which he, she or it is located and is acting within the scope of that license:

| | |
|---|---|
| X | Ambulance |
| X | Ambulatory Surgical Center |
| X | Birthing Center |
| X | Chiropractor (D.C.) |
| X | Christian Scientist Practitioner |
| X | Certified Alcohol Counselor |
| X | Certified Mental Health Counselor |
| X | Certified Registered Nurse Anesthetist |
| X | Clinic |
| X | Dentist (D.D.S. or D.M.D.) |
| X | Detoxification Facility |

EMPLOYEE MEDICAL BENEFIT PLAN

and could not have been omitted without adversely affecting the patient's condition or the quality of medical care rendered. When the term Medically Necessary describes inpatient care in a Hospital, it means that the patient's medical symptoms and condition are such that the service or supply cannot safely be provided to the patient on an outpatient basis.

The fact that a Physician or other Covered Provider has furnished, prescribed or performed a service or supply does not necessarily mean that the service or supply is Medically Necessary. Whether services and supplies are Medically Necessary shall be determined by the Contract Administrator, in accordance with the foregoing standards based on consideration of competent medical evidence including the opinion of a qualified Physician.

**Medicare.**  The health insurance benefit program established under Title XVIII of the Social Security Act of 1965, as amended.

**Mental Health Clinic.**  A facility established for the purpose of providing consultation, diagnosis, and treatment in connection with a mental or nervous disorder, which is licensed or approved pursuant to state and local laws to provide such services.

**Physician.**  A doctor of medicine (M.D.), doctor of dentistry (D.M.D. or D.D.S.), osteopath (D.O. or O.D.), ophthalmologist (M.D.) or psychiatrist (M.D.) who is licensed to practice medicine in the jurisdiction in which he or she is located and is acting within the scope of that license. A Physician with respect to a Covered Person does not include the Covered Person, his or her spouse, children, brothers, sisters, or parents, or any other person residing in his or her household.

**Plan.**  The W.E. Aubuchon Co., Inc. & Aubuchon Distribution, Inc. Employee Medical Benefit Plan, as set forth herein and as amended from time to time.

**Plan Administrator.**  W.E. Aubuchon Co., Inc..  The term Plan Administrator also means any person or persons to whom the Plan Administrator delegates all or part of its authority under the Plan.

**Pre-admission Notification.**  The notification of the Contract Administrator of a Covered Person's admission to a Hospital that is required for the payment of full benefits under the Plan. Please refer to the Hospital Pre-admission Notification Section of this Plan.

**Pre-admission Testing.**  Medically Necessary laboratory tests and X-rays performed prior to a Hospital admission.

**Pre-existing Condition.**  A medical condition (whether physical or mental) for which medical advice, diagnosis, care, or treatment was recommended or received within the six (6) month period ending on a Covered Person's Enrollment Date, excluding pregnancy.

W.E. AUBUCHON CO., INC.
AUBUCHON DISTRIBUTION, INC.

# W.E. AUBUCHON CO., INC.

## Employee Medical Benefit Plan

### Revised July 1, 2001

AUB 4946

EMPLOYEE MEDICAL BENEFIT PLAN

# I. INTRODUCTION

This Plan document describes the benefits available to you under the W.E. Aubuchon Co., Inc. Employee Medical Benefit Plan ("Plan"). Please read this document carefully, share it with your family, and keep it handy for future reference.

Every attempt has been made to be informative about the benefits available under the Plan and the circumstances in which a benefit may be lost or denied. For your convenience, the technical terms used in this booklet are capitalized and are explained in the Definitions Section beginning on page 71.

In any event where a question may arise as to a claim for benefits or denial of a claim for benefits, the Employer, Plan Administrator, Contract Administrator, and such other individuals as may be party to or associated with the Plan will be guided solely by this Plan Document, which is also the Summary Plan Description.

The Plan Administrator has full discretionary authority to interpret this Plan and its provisions and regulations with regard to eligibility, coverage, benefit entitlement, benefit determination and general administrative matters. The Plan Administrator's decisions will be binding on all Covered Employees and their beneficiaries and conclusive on all questions of coverage under this Plan.

This Plan Document is not a contract. Participation in the Plan does not give you the right to continued employment by W.E. Aubuchon Co., Inc. or any other right not specified in the Plan. Nothing in the Plan or this document prohibits the Company from changing the terms of your employment.

> *The benefits described in this document are those in effect as of July 1, 2001, except as otherwise described in this Plan or as required by law.*

## Administration of the Plan

The Plan is administered through the Benefits Manager of the Employer. The Employer has retained the services of an independent Contract Administrator (contract administrator) to assist it in administering the Plan. Please refer to pages 58-60 for detailed information about Plan administration.

## Plan Amendment or Termination

The Employer, in its sole discretion, may modify or amend the Plan in whole or in part, at any time and from time to time. The Employer may make any modification or amendment that it deems necessary or desirable, with or without retroactive effect, to the extent permitted by law, and by any means permitted under the Employer's by-laws.

EMPLOYEE MEDICAL BENEFIT PLAN

## II. SUMMARY PLAN INFORMATION

**Employer and Plan Sponsor**

> W.E. Aubuchon Co., Inc.
> 95 Aubuchon Drive
> Westminster, Massachusetts 01473-0473
> 978-874-0521

> The Employer Identification Number (EIN) assigned to W.E. Aubuchon Co., Inc., by the IRS is 04-1050290.

**Plan Name and Number**

> W.E. Aubuchon Co., Inc. Employee Medical Benefit Plan

> The Plan Number is 501.

**Plan Effective Date**

> July 1, 1976 (revised July 1, 2001, except as otherwise specified in the Plan)

**Type of Plan**

> Group Health Benefits

**Plan Administrator**

> W.E. Aubuchon Co., Inc.
> c/o M. Marcus Moran, Jr.
> President-Treasurer
> 95 Aubuchon Drive
> Westminster, Massachusetts 01473-0473
> 978-874-0521

**Agent for Service of Legal Process**

> The Plan Administrator identified above.

EMPLOYEE MEDICAL BENEFIT PLAN

possesses an average knowledge of health and medicine. Furthermore, any claim that a Physician with knowledge of the claimant's medical condition determines is an Urgent Care Claim will be treated as such a claims for purposes of this Section.

## VIII. GENERAL PLAN PROVISIONS

### A. Plan Administration

1. <u>Appointment of Plan Administrator</u>

The Employer may appoint a person or persons to administer the Plan. If a Plan Administrator is not appointed, the Employer shall be the Plan Administrator. If more than one (1) person is appointed, they shall be known as the Administrative Committee. Any Administrative Committee shall act by a majority of its members either by a meeting or in a writing without a meeting. If an Administrative Committee is appointed, all references in the Plan to the Plan Administrator shall be deemed to refer to the Administrative Committee.

2. <u>Resignation and Removal</u>

The Plan Administrator, or any member of the Administrative Committee, may resign at any time by delivering to the Employer a written notice of resignation, to take effect at a date specified therein, which shall not be less than thirty (30) days after the delivery thereof, unless such notice shall, in writing, be waived by the Employer.

The Plan Administrator or any member of the Administrative Committee shall serve at the pleasure of the Employer and may be removed by delivery of written notice of removal, to take effect at a date specified therein.

The Employer, upon receipt of a written notice of resignation or delivery of a written notice of removal of the Plan Administrator or any member of the Administrative Committee, shall appoint a successor. In the event the Employer fails to appoint a successor Plan Administrator, the Employer shall serve as the Plan Administrator until a successor has been appointed. In the event the Employer fails to appoint a successor to serve as a member of the Administrative Committee, the remaining members of the Administrative Committee shall constitute the Administrative Committee, provided if there is only one remaining member such individual shall serve as the Plan Administrator.

3. <u>Powers and Duties</u>

The Plan Administrator shall be a named fiduciary for purposes of Section 402(a)(1) of ERISA, shall administer the Plan in accordance with its terms, and shall have complete discretionary authority and all powers necessary to carry out its terms and to control and manage the operation and administration of the Plan, including, but not limited to the following:

AUB 5006

EMPLOYEE MEDICAL BENEFIT PLAN

The term Hospital shall also include institutions licensed for the treatment of psychiatric problems, chemical dependency, substance abuse or tuberculosis that do not have surgical facilities and/or are not approved by Medicare, provided that such institution satisfies the definition of Hospital in all other respects.

**Human Organ or Tissue Transplant.** The taking of a living organ or tissue from a human body and placing it in another human body.

**Illness.** A sickness or disease, including mental and nervous disorders, chemical dependency, and substance abuse, that requires treatment by a Physician or Covered Provider. For purposes of determining benefits payable by the Plan, the term Illness shall include pregnancy, childbirth, miscarriage, or complications thereof. A recurrent Illness will be considered one Illness. Concurrent Illnesses are totally unrelated.

**In-Hospital Miscellaneous Expenses.** The actual charges made by a Hospital on its own behalf for services and supplies rendered to a Covered Person which are Medically Necessary for the treatment of such Covered Person. In-Hospital Miscellaneous Expenses also include professional charges for radiology, pathology and anesthesiology services rendered and ambulance transfer from one facility to another while an inpatient.

**Injury.** A physical condition which is the result of an accident caused by an external force, or a condition caused as the result of an incident which is precipitated by an act of unusual circumstances likely to result in unexpected consequences. The condition must be an instantaneous one, rather than one which continues, progresses or develops.

**Late Enrollee.** Any Eligible Employee or Dependent who enrolls in the Plan at any time other than during the first period in which he or she is eligible to enroll or on account of a Special Enrollment Event.

**Licensed Practical Nurse.** An individual who has received specialized nursing training and practical nursing experience, is duly licensed to perform such nursing services by the state or regulatory agency responsible for such licensing in the state in which that individual performs such services, and is acting within the scope of his or her license.

**Lifetime Maximum Benefit.** The total amount of benefits that the Plan will pay for each Covered Person under the Plan with respect to a service or supply, as set out in the Schedule of Benefits, during his or her lifetime. The Lifetime Maximum Benefit applies to all periods of coverage under the Plan as if such periods of coverage were one continuous period of coverage.

**Medically Necessary.** Services or supplies furnished or prescribed by a Physician or other Covered Provider to identify or treat a diagnosed or reasonably suspected Illness or Injury, the furnishing of which is appropriate and consistent with the diagnosis and treatment of the patient's condition, in accordance with generally accepted medical standards recognized by the American Medical Association in the geographical area in which the patient is located,

# W.E. AUBUCHON CO., INC.

## Employee Medical Benefit Plan

### Revised September 1, 2002

EMPLOYEE MEDICAL BENEFIT PLAN

# I. INTRODUCTION

This Plan document describes the benefits available to you under the W.E. Aubuchon Co., Inc. Employee Medical Benefit Plan ("Plan"). Please read this document carefully, share it with your family, and keep it handy for future reference.

Every attempt has been made to be informative about the benefits available under the Plan and the circumstances in which a benefit may be lost or denied. For your convenience, the technical terms used in this booklet are capitalized and are explained in the Definitions Section beginning on page 73.

In any event where a question may arise as to a claim for benefits or denial of a claim for benefits, the Employer, Plan Administrator, Contract Administrator, and such other individuals as may be party to or associated with the Plan will be guided solely by this Plan Document, which is also the Summary Plan Description.

The Plan Administrator has full discretionary authority to interpret this Plan and its provisions and regulations with regard to eligibility, coverage, benefit entitlement, benefit determination and general administrative matters. The Plan Administrator's decisions will be binding on all Covered Employees and their beneficiaries and conclusive on all questions of coverage under this Plan.

This Plan Document is not a contract. Participation in the Plan does not give you the right to continued employment by W.E. Aubuchon Co., Inc. or any other right not specified in the Plan. Nothing in the Plan or this document prohibits the Company from changing the terms of your employment.

*The benefits described in this document are those in effect as of September 1, 2002, except as otherwise described in this Plan or as required by law.*

## Administration of the Plan

The Plan is administered through the Benefits Manager of the Employer. The Employer has retained the services of an independent Contract Administrator to assist it in administering the Plan. Please refer to pages 59-61 for detailed information about Plan administration.

## Plan Amendment or Termination

The Employer, in its sole discretion, may modify or amend the Plan in whole or in part, at any time and from time to time. The Employer may make any modification or amendment that it deems necessary or desirable, with or without retroactive effect, to the extent permitted by law, and by any means permitted under the Employer's by-laws.

The Employer expects to continue the Plan indefinitely, but reserves the right to terminate the Plan at any time. Employee contributions will cease as of the date termination occurs. Upon termination, the rights of all Covered Persons to benefits are limited to claims incurred and due up to the date of Plan termination.

EMPLOYEE MEDICAL BENEFIT PLAN

## II. SUMMARY PLAN INFORMATION

**Employer and Plan Sponsor**

> W.E. Aubuchon Co., Inc.
> 95 Aubuchon Drive
> Westminster, Massachusetts 01473-0473
> 978-874-0521

The Employer Identification Number (EIN) assigned to W.E. Aubuchon Co., Inc., by the IRS is 04-1050290.

**Plan Name and Number**

> W.E. Aubuchon Co., Inc. Employee Medical Benefit Plan

> The Plan Number is 501.

**Plan Effective Date**

> July 1, 1976 (revised September 1, 2002, except as otherwise specified in the Plan)

**Type of Plan**

> Group Health Benefits

**Plan Administrator**

> W.E. Aubuchon Co., Inc.
> c/o M. Marcus Moran, Jr.
> President-Treasurer
> 95 Aubuchon Drive
> Westminster, Massachusetts 01473-0473
> 978-874-0521

**Agent for Service of Legal Process**

> The Plan Administrator identified above.

therein, which shall not be less than thirty (30) days after the delivery thereof, unless such notice shall, in writing, be waived by the Employer.

The Plan Administrator or any member of the Administrative Committee shall serve at the pleasure of the Employer and may be removed by delivery of written notice of removal, to take effect at a date specified therein.

The Employer, upon receipt of a written notice of resignation or delivery of a written notice of removal of the Plan Administrator or any member of the Administrative Committee, shall appoint a successor. In the event the Employer fails to appoint a successor Plan Administrator, the Employer shall serve as the Plan Administrator until a successor has been appointed. In the event the Employer fails to appoint a successor to serve as a member of the Administrative Committee, the remaining members of the Administrative Committee shall constitute the Administrative Committee, provided if there is only one remaining member such individual shall serve as the Plan Administrator.

3. <u>Powers and Duties</u>

The Plan Administrator shall be a named fiduciary for purposes of Section 402(a)(1) of ERISA, shall administer the Plan in accordance with its terms, and shall have complete discretionary authority and all powers necessary to carry out its terms and to control and manage the operation and administration of the Plan, including, but not limited to the following:

(a)    to determine all questions concerning the eligibility of Employees to participate in and receive benefits under the Plan;

(b)    to compute the amount of benefits payable to any Covered Person;

(c)    to authorize and direct the Employer with respect to payment of premiums and benefits;

(d)    to furnish the Employer with such information, statements and reports as will enable the Employer to comply with the reporting and disclosure requirements under ERISA and the Code;

(e)    to interpret the provisions of the Plan and to make rules and regulations for the administration of the Plan;

(f)    to maintain all the necessary records for the administration of the Plan;

(g)    to employ or retain counsel, accountants, third-party administrators, actuaries or such other consultants as may be required to assist in administering the Plan; and

(h)    to act as agent for service of legal process.

**Code.** The Internal Revenue Code of 1986, as amended from time to time.

**Contract Administrator.** BeneFirst, LLC, together with any other of its programs, units, or divisions that is designated to perform claims administration functions under the Plan., provided that, for purposes of prescription drug and certain vision care benefits under the Plan, Express Scripts, Inc. is the Contract Administrator. The term Contract Administrator also means any other insurance company or organization that may be retained by the Employer or the Plan Administrator from time to time to perform claims administration functions under the Plan in addition to or as the successor to BeneFirst, LLC, and/or Express Scripts, Inc..

**Cosmetic Surgery.** A procedure performed solely for the improvement of a Covered Person's appearance and which is not Medically Necessary.

**Covered Dependent.** A child or spouse of a Covered Employee who has met all of the Dependent eligibility requirements and is enrolled for coverage under this Plan.

**Covered Employee.** An Eligible Employee who is enrolled for coverage under this Plan.

**Covered Expenses.** The Reasonable and Customary charges incurred for Medically Necessary services and supplies that are not specifically excluded from coverage in this Plan.

**Covered Person.** Any Covered Employee, Covered Dependent, covered Retiree or any Qualified Beneficiary receiving COBRA Coverage under this Plan.

**Covered Provider.**

(1)    Any one of the following health care personnel and facilities, provided the provider is licensed (and/or certified or accredited, as appropriate with respect to the particular type of provider) in the political jurisdiction in which he, she or it is located and is acting within the scope of that license:

- Ambulance
- Ambulatory Surgical Center
- Birthing Center
- Chiropractor (D.C.)
- Christian Scientist Practitioner
- Certified Alcohol Counselor
- Certified Mental Health Counselor
- Certified Registered Nurse Anesthetist
- Clinic
- Dentist (D.D.S. or D.M.D.)
- Detoxification Facility
- Hospice
- Hospital
- Laboratory

W.E. AUBUCHON CO., INC.

*Bowditch*
*&Dewey*
ATTORNEYS

Ryan T. Killman
Direct telephone: (508) 926-3497
Direct facsimile: (508) 929-3197
Email: rkillman@bowditch.com

May 27, 2008

Stephen D. Rosenberg, Esq.
The McCormack Firm, LLC
One International Place - 7th Floor
Boston, MA 02110

Re:    **W.E. Aubuchon Co., Inc., et al. v. Benefirst, LLC**
       Civil Action No. 05-cv-40159-FDS

Dear Attorney Rosenberg:

Enclosed please find supplemental document production bates numbered AUB 7595 – AUB 7634. These documents were recently discovered and are being produced to you in accordance with Federal Rule of Civil Procedure 26(e).

Very truly yours,

Ryan T. Killman

RTK/cdh
Enclosure

cc:    Louis M. Ciavarra, Esq.



**W.E. Aubuchon Co., Inc.**
95 Aubuchon Drive
Westminster, MA 01473
P: 978.874.0521
F: 801.912.3353

## FAX COVER SHEET

| To: | Carrie Reddie |
|---|---|
| From: | Sarah Mahoney |
| Date: | 2/12/03 |
| Fax: | 781-837-4403 |
| Phone: | |
| Subject: | Outstanding med. bill |
| Pages (includes cover): | 3 |

*We'll fix you right up.*

Retail Hardware
Since 1908.

FEB 1 2003

"FAXED"

**Comments:** _____

Dear Carrie –

Attached is an EOG and medical bill on an outstanding bill for one of our D.C. employees from 2001.

Can this be paid please – if necessary, please pay outside the Loss Fund.

Thanks –

Sarah

**aubuchon.com**
Over 70,000 Products & Solutions On-line.

AUB 7596

**BENEFIRST**
P.O. Box 1421
Marshfield MA 02050

**BeneFirst**
The First Choice in Benefits Administration

Forwarding Service Requested

If you have questions, please call
customer service at
(877) 823-6334

152434 0.3840 SP 0.370

SINGLE PIECE

591

WESTMINSTER, MA 01473

| | |
|---|---|
| Enrollee: | ████████████ |
| Patient: | |
| Soc Sec #: | ██████ |
| Group: | W.E.AUBUCHON CO., INC. |
| Group #: | 010701 |
| Claim #: | 20128384-01 |
| Patient #: | |
| Date Paid: | 12/23/2002 |

## Explanation of Benefits for Services Provided By:
## WACHUSETT RADIOLOGY INC

| Dates of Service | Service Code | Total Charge | Ineligible | Reason Code | Discount Amount | Covered By Plan | Deductible Amount | Co-Pay Amount | Balance | Paid At | Payment Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 07.09-07.09-2001 | 32 | 128.00 | 128.00 | 19 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0.00 |
| TOTAL | | 128.00 | 128.00 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 |

| | |
|---|---|
| Other Credits or Adjustments | 0.00 |
| Total Net Payment | 0.00 |
| Patient Responsibility | 128.00 |

| Service Code | | Reason Code Description | |
|---|---|---|---|
| 32 | NON-COVERED SERVICES | 19 | CLAIM SUBMITTED AFTER ELIGIBLE TIME FOR PROCESSING |

Messages
Surcharge has been deducted from the
providers payment.

AUB 7597

MAKE CHECKS PAYABLE TO:

**WACHUSETT RADIOLOGY, INC.**
29 UNION SQUARE
GARDNER MA 01440

IF PAYING BY MASTERCARD OR VISA, FILL OUT BELOW

☐ MASTERCARD    ☐ VISA

CARD NUMBER

AMOUNT

SIGNATURE

EXP. DATE

FORWARDING SERVICE REQUESTED
PHONE NO.: (978) 632-7383
FED. I.D. #:
PATIENT:
PROVIDER:

| STATEMENT DATE | PAY THIS AMOUNT | ACCT. # |
|---|---|---|
| 01/02/03 | $128.00 | 94354 |

☐ Please check box if your address
has changed and indicate change(s) on reverse side.

PLEASE INDICATE CHANGE OF INSURANCE information

**PAGE NO. 1**

**SHOW AMOUNT**
PAID HERE  $

ADDRESSEE:

REMIT TO:

WESTMINSTER MA 01473-0551

**WACHUSETT RADIOLOGY, INC.**
29 UNION SQUARE
GARDNER MA 01440

05490375 MY87

---

PLEASE DETACH AT PERF. AND RETURN TOP PORTION WITH YOUR PAYMENT    **STATEMENT**

| DIAG. CODE | SERVICE DATE | PROCEDURE REFERENCE | PATIENT NAME | LOC | DESCRIPTION | CHARGES/PAYMENTS/ADJ. PATIENT | INSURANCE |
|---|---|---|---|---|---|---|---|
| 723.1 | 07/09/01 | 72050 | KEITH | OU | CERVICAL SPINE MINIMUM 4 VIEWS | 83.00 | |
| 724.5 | 07/09/01 | 72070 | KEITH | OU | THORACIC DORSAL SPINE | 45.00 | |
| | 11/07/01 | UNPD CL RPT | | | REBILL | | |
| | 12/31/01 | UNPD CL RPT | | | REBILL | | |
| | 09/05/02 | | | | REBILL | | |

A CLAIM WAS SUBMITTED TO YOUR INS.CO.,OR YOU WERE ASKED TO SUBMIT IT. WE HAVE NOT HEARD FROM THEM. PLEASE REMIT.

*Still working at this time — did not go on    Work Comp until the 29th*

SMALL WEEKLY PAYMENTS WOULD BE APPRECIATED. THANK YOU.

| CURRENT | 30 - 60 | 60 - 90 | 90 - 120 | OVER 120 | PLEASE PAY THIS AMOUNT >>> | PATIENT | INSURANCE |
|---|---|---|---|---|---|---|---|
| .00 | 128.00 | .00 | .00 | .00 | | $128.00 | .00 |

ANALYSIS OF PATIENT NEW BALANCE

| STATEMENT DATE | PATIENT PAID YTD | ACCOUNT NUMBER | |
|---|---|---|---|
| 01/02/03 | .00 | 94354 | WACHUSETT RADIOLOGY, INC. |

AUB 7598

## COVER

## SHEET

| | |
|---|---|
| **To:** | Carrie Reddie |
| **Fax #:** | 1-781-735-0468 |
| **Subject:** | Medical Bills |
| **Date:** | April 16, 2003 |
| **Pages:** | 3 |

_FAXED_
APR 16 2003

## COMMENTS:

Hi Carrie,

I have attached two medical bills. The first one is for ▮▮▮▮▮▮▮▮ in the DC for his son ▮▮▮. Please pay this out of the Loss Fund, as it is very old. It is amazing how these bills just all of a sudden turn up....

The second bill is for ▮▮▮▮▮▮▮▮ from UMass Memorial (this is the bill we spoke about this morning).

If you have any questions, please call me.

Thank you...

*Kim*

Kim

From the desk of:
**Kim R. McMahon**
Benefits Department
W.E. Aubuchon Co., Inc.
95 Aubuchon Drive
Westminster, MA 01473
1-978-874-0521 x 1179
**Fax: 1-801-912-3353**
E-Mail Kimm@aubuchon.com

AUB 7599

AUB 7600



**HealthAlliance**
Diversified Medical Equipment Services
143 Mill Street
Leominster, MA 01453
978-537-8707

ACCOUNT NO.   10543          INVOICE     03/31/03     APR 1 6 2003

LOC:   1

INVOICE # C212891

FITCHBURG     MA 01420          FITCHBURG     MA 01420

PLEASE DETACH AND RETURN WITH YOUR REMITTANCE          $_____
                                                        AMOUNT ENCLOSED

| DATE | DESCRIPTION | | CHARGE | CREDIT |
|------|-------------|--|--------|--------|
| 03/16/01 | NEBULIZER, TREAT COMPRESSOR (PATIENT SHARE) | E0570 | 150.00 | |

PAYMENT DUE UPON RECEIPT OF THIS INVOICE

| INVOICE DATE | PREVIOUS BALANCE | FINANCE CHARGE | TOTAL CHARGE | TOTAL CREDITS | NEW BALANCE |
|--------------|------------------|----------------|--------------|---------------|-------------|
| 03/31/03 | .00 | 0.00 | 150.00 | 0.00 | $150.00 |

THIS STATEMENT IS FOR HOSPITAL SERVICES ONLY

PO Box 15492
Worcester, MA 01615-0492
(508)334-1840/1-800-225-8885

STATEMENT DATE
04/05/03

APR 1 4 2003

| ACCOUNT NO. | BALANCE DUE |
|---|---|
| 00011276820 | 397.00 |

5100526

FITCHBURG MA   01420

| AMOUNT ENCLOSED | TOTAL DUE |
|---|---|
| $ | 397.00 |

DETACH AND RETURN THIS PORTION WITH PAYMENT

UMass Memorial Med Ctr
PO Box 15492
Worcester, MA 01615-0492
(508)334-1840/1-800-225-8885

STATEMENT DATE
04/05/03

| PATIENT NAME DATE | ACCOUNT NO. DESCRIPTION | PRIMARY INSURANCE ADM/SVC DATE | AMOUNT | BALANCE |
|---|---|---|---|---|
| | | T-HVAL      01/15/03 | 464.00 | |
| 03/06/03 | Total Charges: | | -67.00 | |
| 01/25/03 | HEALTH VALUE MANAGEMENT CREDIT | | | |
| | | | | 397.00 |
| | Total due for account: | | | |

This is our final notice.  Full payment must be received
within 14 days of this notice, or your account will be sent
to our collection agency. Payment arrangements and financial
assistance may be obtained by calling (508) 334-1840.

* SEE THE REVERSE SIDE FOR INFORMATION ON FREE CARE AND
INSURANCE PLANS.

* CREDIT CARDS: FOR YOUR CONVENIENCE SEE THE REVERSE SIDE
FOR PAYMENT BY CREDIT CARD.

| | |
|---|---|
| TOTAL DUE | 397.00 |
| DUE FROM INSURANCE | 0.00 |
| BALANCE DUE | 397.00 |
| PLEASE PAY THIS AMOUNT | 397.00 |

000043

AUB 7601

## McMahon, Kim

**To:**         Carrie Reddie (E-mail)
**Subject:**    DC employee ███████████        APR    2003

Hi Carrie,

I have an EOB claim# 30038518-01 that was denied for timely filing.  Could you please re-process and pay out of the "Loss Fund".  This invoice was from ██████████'s office for $2,007.00.

If you have any questions, please call me.
Thank you...
Kim

*Kim R. McMahon*
Benefits Department
W.E. Aubuchon Co., Inc.
95 Aubuchon Drive
Westminster, MA 01473
1-978-874-0521x1179
1-801-912-3353 Fax

1

AUB 7602

BENEFIRST
P.O. Box 1421
Marshfield MA 02050

**BENEFIRST**
The Next Dimension In Health Administration

Forwarding Service Requested

| If you have questions, please call |
| customer service at |
| (877) 823-6334 |

3-DIGIT 014

4AA5 0.3840 AT 0.392

27

105 MONADNOCK ST
GARDNER, MA 01440-2103

| Enrollee: ▓▓▓▓ |
| Patient: ▓▓▓▓▓▓▓▓ |
| Soc Sec #: |
| Group: W.E.AUBUCHON DISTRIBUTION C |
| Group #: 010825 |
| Claim #: 30038518-01 |
| Patient #: ▓▓▓▓▓ |
| Date Paid: 04/24/2003 |

Explanation of Benefits for Services Provided By:
▓▓▓▓▓ MD

| Dates of Service | Service Code | Total Charge | Ineligible | Reason Code | Discount Amount | Covered By Plan | Deductible Amount | Co-Pay Amount | Balance | Paid At | Payment Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/19-11/19/2001 | 41 | 1,507.00 | 1,507.00 | 19 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100% | 0.00 |
| 11/19-11/19/2001 | 35 | 500.00 | 500.00 | 19 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100% | 0.00 |
| TOTAL | | 2,007.00 | 2,007.00 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 |

| | |
|---|---|
| Other Credits or Adjustments | 0.00 |
| Total Net Payment | 0.00 |
| Patient Responsibility | 2,007.00 |

| Service Code | |
|---|---|
| 35 | OFFICE: ANESTHESIA |
| 41 | OFFICE: SURGEON |

| Reason Code Description | |
|---|---|
| 19 | CLAIM SUBMITTED AFTER ELIGIBLE TIME FOR PROCESSING |



978-630-5122- EXT. 102 W
978-632-7134- H

AUB 7603

E.I.C Inc/SABA University School of Medicine
P.O. Box 386, 63 Walnut Street
Gardner, MA 01440
Ph: 978-630-5122 * Fax 978-632-2168

# facsimile transmittal

To: *Sarah & Kim*            Fax: 801-912-3353

From: ██████████████████     Date: 4/29/03

Re: ████████████████████     Pages: 2 -including cover

CC:

☐ Urgent   ☐ For Review   ☐ Please   ☐ Please   ☐ Please Recycle
                              Comment      Reply

*COVER*

*SHEET*

| To: | Carrie Reddie |
| --- | --- |
| Fax #: | 1-781-735-0468 |
| Subject: | ███████████ |
| Date: | May 8, 2003 |
| Pages: | 3 |



## COMMENTS:

Hi Carrie,

How was Bermuda??? It must be nice!

I have attached a bill from Southern NH Radiology that was not paid apparently. Could you please process this claim "Outside of the Loss Fund". It's the same old story it went everywhere but where it was suppose to go.

If you have any questions, please call me.

Thank you...

*Kim*

Kim

From the desk of:
**Kim R. McMahon**
Benefits Department
W.E. Aubuchon Co., Inc.
95 Aubuchon Drive
Westminster, MA  01473
1-978-874-0521 x 1179
Fax: 1-801-912-3353
E-Mail Kimm@aubuchon.com

AUB 7605

Credit Bureau Services-16

2 Executive Park Drive, Suite 14
P.O. Box 127
Manchester, NH 03105-0127

MAY 0 8 2003

#BWNDVFW * * * 5-DIGIT 03052

April 25, 2003

Litchfield, NH 03052-1049

627/661

SOUTHERN NH RADIOLOGY CONSULTANTS                    193.00

BEDFO1∩

Total Balance:          $193.00

Haven't you stalled long enough on this past due account(s)?
Isn't it about time you paid?

Please remit payment in full!

This communication from a debt collector is an attempt to collect
a debt, and any information obtained will be used for that purpose.

MS. LAVENTURE
(800) 240-1195                                         16

781 829 85 59

---

RETURN THIS PORTION IN THE ENCLOSED ENVELOPE WITH YOUR PAYMENT

Make payment to:

Account:
Balance:    $193.00

Credit Bureau Services-16
P.O. Box 127                                          16
Manchester, NH  03105-012

AUB 7606

SOUTHERN NH RADIOLOGY CNSLT PC
705 RIVERWAY PLACE
BEDFORD NH 03110

TEL: 603 627-1661   EIN ▇▇▇▇▇

SUMMARY OF ACCOUNT - 04/30/03

MAY 0 8 2003

*ATTN Kim*

*ATTN Kerri*

▇▇▇▇▇▇▇

LITCHFIELD NH 03052

---

04-30-2003

SOUTHERN NH RADIOLOGY CNSLT PC
ACCOUNT DETAIL INQUIRY
ALL DATES    PATIENT ITEMS    OPEN ITEMS

PAGE 1

| | | | | CURRENT | 31-60 | 61-90 | OVER 90 | BALANCE |
|---|---|---|---|---|---|---|---|---|
| PATIENT..: 289249 ▇▇▇▇▇▇ | | | SELF-PAY: | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| GUARANTOR: 289249 | | | INSURANCE: | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | HOME: ▇▇ WORK: ▇▇ | | OTHER: | 0.00 | 0.00 | 0.00 | 193.00 | 193.00 |
| | SSN: ▇▇ TYPE: 00 | | UNAPPLIED PMTS: | 0.00 | | TOTAL BALANCE: | | 193.00 |

| LINE | DATE | VOUCHER | PATIENT NAME | PRV LOC POS | CHARGE | PMTS/ADJS | BALANCE | INSUR. | CLAIM | BILLED | AGE MSG |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 09/09/99 | 365741 | ▇▇▇▇▇▇ | NDM 2 ENE | 20.00 | 0.00 | 20.00 | CBS | | 365741 05/23/00 1072 68 | |

PLEASE CONTACT OUR OFFICE WE NEED YOUR CIGNA POLICY NUMBER TO SUBMIT.

| 09/09/99 | PROCEDURE: 73090-26LT | FOREARM LT | DIAG: 959.3 | UNITS: 1 | CHARGE: 20.00 |
| 10/15/99 | REFERENCE: 09/24/99 | INSURANCE: HSPOS | REBILL CLAIM | | AMOUNT: 0.00 |
| 12/16/99 | REFERENCE: HSPOS | INSURANCE: CIGNA TRANSFER | TRANSF TO: SELF-PAY |
| 05/23/00 | REFERENCE: 12/16/99 | INSURANCE: SELF-PAY TRANSFER | TRANSF TO: CBS |

| 2 | 09/10/99 | 365738 | ▇▇▇▇▇▇ | ESL 2 ENO | 173.00 | 0.00 | 173.00 | CBS | | 365738 05/23/00 1072 68 | |

PLEASE CONTACT OUR OFFICE WE NEED YOUR CIGNA POLICY NUMBER TO SUBMIT.

| 09/10/99 | PROCEDURE: 70486-26 | CT SCAN MAXILLOFACIAL W/O CON DIAG: 473.9 | UNITS: 1 | CHARGE: 173.00 |
| 10/15/99 | REFERENCE: 09/24/99 | INSURANCE: HSPOS | REBILL CLAIM | | AMOUNT: 0.00 |
| 12/16/99 | REFERENCE: HSPOS | INSURANCE: HSPOS CIGNA TRANSFER | TRANSF TO: SELF-PAY |
| 05/23/00 | REFERENCE: 12/16/99 | INSURANCE: SELF-PAY TRANSFER | TRANSF TO: CBS |

AUB 7607



# AUBUCHON HARDWARE

*We'll fix you right up.*

## FAX COVER SHEET

W.E. Aubuchon Co., Inc.
95 Aubuchon Drive
Westminster, MA 01473
P: 978.874.0521
F: 978.874.2096

| | |
|---|---|
| **To:** | Carrie Reddie |
| **From:** | Sarah Arel |
| **Date:** | 5/14/03 |
| **Fax:** | 781-857-4403 |
| **Phone:** | |
| **Subject:** | ████████████ |
| **Pages** *(includes cover):* | 3 |



FAXED FG/14/03

**Comments:**

Hi Carrie –

Our employee ████████████ received the attached. He does not recall ever seeing an EAS — so maybe it was never received at benefirst.

Please process.
Thanks.

Sarah Arel

**AubuchonHardware.com**
Over 70,000 Products & Solutions On-line.

AUB 7608

MAY-13-03 02:36 PM   AUTOCHOM026



## ACTION COLLECTION AGENCY
*of Boston*

P.O. Box 902
Middleboro, MA 02346–0902
www.actioncollection.com

MA LIC# CA0012   NYC LIC# 1066117

Office Hours:
M–Th 8am–8pm
F     8am–5pm
SAT   8am–12pm

Office Location:
422 W. Grove St. Rt 28
Middleboro, MA 02346–0902

800–478–7421
508–923–0310

5/03/03

RE- ▮▮▮▮▮▮▮
AMOUNT DUE  250.00
REF- 300511
ASK FOR:MR NELSON   EXT 36

Our records show you have made no attempt to pay this overdue balance.

Your account is now in a very serious state of delinquency.

Something must be done immediately.

If you cannot send the balance in full at this time, forward a partial payment along with a statement telling us how the remaining balance will be paid.

This is an attempt to collect a debt. Any information obtained will be used for that purpose.

This collection agency is licensed by the Collection Service Board, State Department of Commerce and Insurance, 500 James Robertson Parkway, Nashville, Tennessee 37243

** Detach lower portion and return with payment **

IF PAYING BY VISA, MASTERCARD OR AMERICAN EXPRESS FILL OUT BELOW

☐ VISA   ☐ MASTERCARD   ☐ AMERICAN EXPRESS

CARD NUMBER _____   AMOUNT _____

SIGNATURE _____   EXP DATE _____

P.O. BOX 902
Middleboro, MA 02346–0902

J73556          26
▮▮▮▮▮▮▮▮▮▮▮▮

FOXBORO, MA 02035–1352

‖l‖..,.l.lll...,.l..l..l..l..l..l.l..l.l.l.l..l..l.l.l.l

RE- ▮▮▮▮▮▮▮
AMOUNT DUE  250.00
REF- 300511
ASK FOR:MR NELSON   EXT 36

Action Collection Agency of Boston
P.O. BOX 902
Middleboro, MA 02346–0902

‖l‖...,.l.l.ll.l.l.l.ll.ll.l.l.l.l.ll...l.ll‖...l.l.l.ll

AUB 7609

009068 906801                    0019546R

████ MD, PC
1426 MAIN ST, SUITE 5
WALPOLE, MA 02081

| STATEMENT DATE | PAY THIS AMOUNT | ACCT. # |
|---|---|---|
| 05/07/2003 | $ 101.00 | ████ |

FOR ACCOUNT QUESTIONS CALL:
508-660-8874

ACCOUNT BALANCE: $ 101.00

SHOW AMOUNT
PAID HERE  $

ADDRESSEE:                          REMIT TO:

████                                ████ , MD, PC
FOXBORO, MA 2035         595        1426 MAIN ST, SUITE 5
                                    WALPOLE, MA 02081

|||..||.||||..||.|.|||.||.||.||.|..|||||..|          |||....||.||.||.|..||..|||.|..|||..||.|||.|

**STATEMENT**

PATIENT: ████
PROVIDER: ████

| DATE | DESCRIPTION | CHGS/CREDITS | OUTSTANDING |
|---|---|---|---|
| 02/06/2003 | OFFICE VISIT EST MOD | $ 75.00 | |
| 02/06/2003 | CREDIT PATIENT PAYMENT - THANK YOU | $ -15.00 | |
| | PATIENT BALANCE DUE - DEDUCTIBLE | | $ 60.00 |
| | | | |
| 02/06/2003 | EKG | $ 50.00 | |
| 04/07/2003 | CREDIT INSURANCE PAYMENT | $ -9.00 | |
| | PATIENT BALANCE DUE - DEDUCTIBLE | | $ 41.00 |

| CURRENT | OVER 30 DAYS | OVER 60 DAYS | OVER 90 DAYS | OVER 120 DAYS | TOTAL ACCOUNT BALANCE | INSURANCE PENDING | CURRENT BALANCE DUE |
|---|---|---|---|---|---|---|---|
| 101.00 | 0.00 | 0.00 | 0.00 | 0.00 | 101.00 | 0.00 | 101.00 |

CLOSING DATE   05/07/2003      ACCOUNT NUMBER ████         455

AUB 7610

*COVER*

*SHEET*

| | |
|---|---|
| To: | Carrie Reddie |
| Fax #: | 1-781-735-0468 |
| Subject: | Bills for ███ and ████████ |
| Date: | May 12, 2003 |
| Pages: | 4 |

FAXED
MAY 1 2 2003

## COMMENTS:

Hi Carrie,

Per our phone conversation please process the following bills. ████████ ██ from Wachusett Emergency Physicians for ████████ This will be processed "Outside of the Loss Fund".

On ████████ it looks like this was paid by the employee, please process accordingly.

If you have any questions, please call me.

Thank you...

*Kim*

Kim

From the desk of:
**Kim R. McMahon**
Benefits Department
W.E. Aubuchon Co., Inc.
95 Aubuchon Drive
Westminster, MA 01473
1-978-874-0521 x 1179
Fax: 1-801-912-3353
E-Mail Kimm@aubuchon.com

AUB 7611



6511 Springbrook Avenue
P.O. Box 5002
Rhinebeck, NY 12572
(845) 876-3001
Fax: (845) 876-7195



Northern
Dutchess
H O S P I T A L

# Fax

| To: | Sarah Mahoney | From: | ▇▇▇▇▇▇▇ |
| Fax: | 801-912-3353 | Pages: | 2 |
| Phone: | | Date: | 5/12/03 |
| Re: | | CC: | |

☐ Urgent    ☐ For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

● Comments: This message is for the use of the individual or entity to which it is addressed and may contain information that is provided, confidential and exempt from disclosure. If the reader of this message is not the intended recipient or an employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this message is strictly prohibited. If you received this communication in error, please notify us immediately and return the original message to us by mail. Thank you.

If you have any questions, you can reach me at 845-871-3122.

Thank you.

5/12/03    Carrol —
Looks like the
Employer paid out of pocket
Can you please prove to (if any?)
reimbursement (if any?)
Thanks
Sarah

AUB 7612

361 Broadway
Kingston, New York 12401

NY Lic. 168520

Employer I.D.

Telephone (845) 331-2677

PATIENT NAME:

ACCOUNT NO: 17806, B

DATE 05/05/03

INSURANCE: Multiplan Ins.

CO-PAY:

| ICD-9 CODE | DIAGNOSES |
|---|---|
| 682.9 | ABSCESS |
| 706.1 | ACNE |
| 216.9 | ACROCHORDON |
| 704.0 | ALOPECIA |
| 704.01 | ALOPECIA AREATA |
| 691.8 | ATOPIC DERMATITIS |
| 173 | BASAL CELL CA |
| 232 | BOWENS DISEASE |
| 112.3 | CANDIDIASIS |
| 682.9 | CELLULITIS |
| 692.9 | CONTACT DERMATITIS |
| 700 | CORN / CALLUS |
| 706.2 | CYST |
| 216.9 | DERMATOFIBROMA |
| 110.9 | DERMATOPHYTOSIS |
| 693.0 | DRUG ERUPTION |
| 705.81 | DYSHIDROSIS |
| 692.79 | ELASTOSIS, SOLAR |
| 695.2 | ERYTHEMA NODOSUM |
| 704.8 | FOLLICULITIS |
| 910.6 | FOREIGN BODY |
| 695.8 | GRAN ANNULAR / INTERTRIGO |
| 228.01 | HEMANGIOMA |
| 054.9 | HERPES SIMPLEX |
| 053.9 | HERPES ZOSTER |
| 705.83 | HIDRADEN SUPPUR |
| 757.1 | ICHTHYOSIS, CONGEN |
| 684 | IMPETIGO |
| 919.4 | INSECT BITE |
| 701.4 | KELOID |
| 701.1 | KERATODERMA, ACQ |
| 702.0 | KERATOSIS, ACTINIC |
| 702.19 | KERATOSIS, SEBORRHEIC |
| 709.09 | LENTIGO |
| 697.0 | LICHEN PLANUS |
| 698.3 | LICHEN SIMPLEX CHR. |
| 695.4 | LE, DISCOID |
| 710.0 | LE, SYSTEMIC |
| 172 | MELANOMA |
| 706.2 | MILIA |
| 078.0 | MOLLUSCUM |
| 701.0 | MORPHEA |
| 703.9 | NAIL DISEASE |
| 216 | NEVUS / NEVI |
| 681.02 | PARONYCHIA |
| 694.5 | PEMPHIGOID |
| 709.09 | PIGMENTARY DISEASE |
| 696.3 | PITYRIASIS ROSEA |
| 692.6 | POISON IVY |
| 698.9 | PRURITUS |
| 696.1 | PSORIASIS |
| 686.1 | PYOGENIC GRANULOMA |
| 287.2 | PURPURA |
| 695.3 | ROSACEA / PERIORAL DERM |
| 133.0 | SCABIES |
| 710.1 | SCLERODERMA |
| 690.10 | SEBORRHEIC DERM |
| 173 | SQUAMOUS CELL CA |
| 454.1 | STASIS DERM |
| 448.9 | TELANGIECTASIA |
| 111.0 | TINEA VERSICOLOR |
| 707.9 | ULCER, SKIN |
| 708.9 | URTICARIA |
| 447.6 | VASCULITIS |
| 078.1 | VERRUCA |
| 057.9 | VIRAL EXANTHEM |
| 709.01 | VITILIGO |
| 709.9 | XEROSIS |
| V10.8 | PERSONAL HX MALIGNANT |

| CPT CODE | SURGERY |
|---|---|
| *10040 | ACNE SURGERY |
| 11100 | BIOPSY: 1ST |
| 11101 | EA ADD'L # |
| 67810 | EYELID |
| 40490 | LIP |
| 54100 | PENIS |
| 41100 | TONGUE |
| *56605 | VULVA / PERINEUM |
| 69100 | EAR |
| *17250 | CHEM CAUT OF GRANULATION |
| 11750 | TRIM NAILS |
| *11720 | DEBRIDE NAILS 1-5 |
| 11040 | DEBRIDE SKIN, PART THICK |
| 11041 | DEBRIDE SKIN, FULL THICK |
| *17000 | DESTROY FACIAL OR PREMALIG |
| 17003 | 2-14 |
| 17004 | 15 + |
| *17110 | DESTROY MILIA / MOLLUSC / W TO 14 |
| 17111 | 15+ |
| 69110 | EXCISION EAR: SIMPLE REPAIR |
| *11200 | EXCISION FCT TO 15 |
| 11201 | EA ADD'L 10 |
| *10120 | FOREIGN BODY, SIMPLE |
| *10140 | HEMATOMA I&D |
| 10180 | I&D INFECTION, POSTOP WOUND |
| *10060 | I&D, CYST / PARONYCHIA / ABSCESS |
| 10061 | MULT OR COMPLEX |
| *11900 | INJECTION, INTRALES 1-7 |
| 11901 | 8+ |
| 11055 | PARING / CURETT 1 |
| 11056 | 2-4 |
| 11057 | 5+ |
| 99070 | SURGICAL TRAY |
| 99024 | POST-OP, F/U GLOBAL |
| V65.9 | ELECTIVE SURGERY UNSPECIFIED |
| A9270 | NON-COVERED SERVICE |
| J3302 | INJECTION TMC |
| 87220 | KOH |
| 95044 | PATCH / APP'L TEST ×24 |

**DX LOCATION CODES**

| .0 LIP | .3 FACE | .6 UPPER LIMB |
|---|---|---|
| .1 EYELID | .4 SCALP / NECK | .7 LOWER LIMB |
| .2 EAR | .5 TRUNK | |

**MODIFIERS**

| -24 | UNRELATED E/M DURING POSTOP |
|---|---|
| -25 | SEPARATE E/M ON PROCEDURE DAY |
| -59 | 2 DIFF PROCEDURES, SAME DAY |
| -76 | RPT PROCEDURE, SAME M.D. |
| -77 | RPT PROCEDURE, DIFF. M.D. |
| -78 | RETURN TO OR DURING POSTOP PERIOD |
| -79 | UNRELATED PROCEDURE DURING POSTOP |

**NEXT APPOINTMENT**

_____ DAYS   3-4 WEEKS _____ MONTHS

REASON: ☐ OFFICE VISIT ☐ SURGERY ☐ POST-OP

ALLOW: 1   2   3

Wendy R. Parish, M.D.

| | EXCISION MALIG | EXCISION BENIGN | DESTR MALIG | |
|---|---|---|---|---|
| **TRUNK / ARM / LEG** | | | | |
| Up to 0.5cm | 11600 | 11400 | 17260 | |
| .6 to 1.0cm | 11601 | 11401 | 17261 | |
| 1.1 to 2.0cm | 11602 | 11402 | 17262 | |
| 2.1 to 3.0cm | 11603 | 11403 | 17263 | |
| 3.1 to 4.0cm | 11604 | 11404 | 17264 | |
| **SCALP / NECK / HAND / FOOT / GENITAL** | | | | |
| Up to 0.5cm | 11620 | 11420 | 17270 | |
| .6 to 1.0 cm | 11621 | 11421 | 17271 | |
| 1.1 to 2.0cm | 11622 | 11422 | 17272 | |
| 2.1 to 3.0cm | 11623 | 11423 | 17273 | |
| **FACE / EARS / MUCOSA** | | | | |
| Up to 0.5cm | 11640 | 11440 | 17280 | |
| .6 to 1.0cm | 11641 | 11441 | 17281 | |
| 1.1 to 2.0cm | 11642 | 11442 | 17282 | |
| 2.1 to 3.0cm | 11643 | 11443 | 17283 | |

**REPAIR**

| 12031 | SCALP / TRUNK / EXTREM 2.5CM |
|---|---|
| *12032 | 2.6 to 7.5CM |
| 12034 | 7.6 to 12.5CM |
| *12041 | NECK / HAND / FOOT / GENITAL 2.5CM |
| 12042 | 2.6 to 7.5CM |
| *12051 | FACE / EARS / MUCOSA 2.5CM |
| 12052 | 2.6-5.0CM |
| 12053 | 5.1-7.5CM |
| 13100 | COMPLEX TRUNK 1.1-2.5CM |
| 13101 | COMPLEX TRUNK 2.6-7.5CM |
| 13120 | COMPLEX SCALP / ARMS / LEGS 1-2.5CM |
| 13121 | COMPLEX LEG / HAND 2.6-7.5CM |
| 13131 | COMPLEX HEAD 2.6CM |
| 13132 | COMPL HEAD / NECK / HANDS / FEET 2.6-7.5CM |
| 13160 | 2nd CLOSURE OF SURG. WOUND |
| 13300 | COMPLEX ANY AREA OVER 7.5CM |

**DESTRUCTION**

| *46900 | ANAL: SIMPLE; CHEM |
|---|---|
| 46922 | EXCISION |
| 46916 | CRYOSURGERY |
| 46924 | EXTENSIVE |
| *54050 | PENILE: SIMPLE; CHEM |
| 54060 | EXCISION |
| 54056 | CRYOSURGERY |
| 54065 | EXTENSIVE |
| 56501 | VULVAR: SIMPLE; ANY |
| 56515 | EXTENSIVE |

**CONSULTATION**

REFERRING DOCTOR: _____

| | OFFICE / OUTPT | 2ND OPINION | INPT INITIAL |
|---|---|---|---|
| | 99241 | 99271 | 99251 |
| | 99242 | 99272 | 99252 |
| | 99243 | 99273 | 99253 |
| | 99244 | 99274 | 99254 |
| | 99245 | 99275 | 99255 |

**MEDICAL SERVICES**

| NEW | | ESTABLISHED | |
|---|---|---|---|
| 99201 | | 99211 | |
| 99202 | | 99212 | 90 |
| 99203 | | 99213 | |
| 99204 | | 99214 | |
| 99205 | | 99215 | |

| | PATIENT BALANCE | TODAY'S CHARGE | TOTAL DUE | PAYMENT CASH CHECK | NEW BALANCE |
|---|---|---|---|---|---|
| | 00 | 90 | | | 00 |

TOTAL P.02

AUB 7613

**ACA**

### ACTION COLLECTION AGENCY
*of Boston*

P.O. Box 902
Middleboro, MA 02346–0902
www.actioncollection.com

MA LIC# CA0012    NYC LIC# 1066117

Office Hours:
M–Th  8am–8pm
F       8am–5pm
SAT   8am–12pm

Office Location:
422 W. Grove St. Rt 28
Middleboro, MA 02346–0902

800–478–7421
508–923–0310

4/29/03

RE– WACHUSETT EMER.PHYS.,P.C.
AMOUNT DUE   117.00
REF–  432486
ASK FOR:MRS ENOS EXT 29

Although we have given you every opportunity to both acknowledge and pay this
past–due account, you continue to ignore this office.

You must realize that your continued silence will only result in further action being taken.

Do not delay any further.

Please forward the balance in full or call this office immediately so we can discuss a
repayment plan.
This is an attempt to collect a debt. Any information obtained will be used for that purpose.

This collection agency is licensed by the Collection Service Board, State Department of
Commerce and Insurance, 500 James Robertson Parkway, Nashville, Tennessee 37243



** Detach lower portion and return with payment **

P.O. BOX 902
Middleboro, MA 02346–0902

** IF PAYING BY VISA, MASTERCARD OR AMERICAN EXPRESS, FILL OUT BELOW **

| ☐ VISA | ☐ MASTERCARD | ☐ AMERICAN EXPRESS |
|---|---|---|
| CARD NUMBER | | AMOUNT |
| SIGNATURE | | EXP. DATE |

RE– WACHUSETT EMER.PHYS.,P.C.
AMOUNT DUE   117.00
REF–  432486
ASK FOR:MRS ENOS  EXT 29

J26585          23

WESTMINSTER, MA  01473–1422
III....II..II..I..II....II.I..I..I.I..I..II..I.I..II

Action Collection Agency of Boston
P.O. BOX 902
Middleboro, MA 02346–0902

III....I.I..II..I.I..I.I.I..II..II.I..I..I.I..I..I.I.II

ACA–<25>–1212

AUB 7614

# COVER

# SHEET

| | |
|---|---|
| **To:** | Carrie Reddie |
| **Fax #:** | 1-781-735-0468 |
| **Subject:** | Bills, bills, bills.... |
| **Date:** | May 14, 2003 |
| **Pages:** | 7 |

FAXED
5/14/03

## COMMENTS:

Hi Carrie,

Per our phone conversation please process the following bills "Outside of the Loss Fund" for ███████████ and ███████████

If you have any questions, please call me.

Thank you...

*Kim*

Kim

From the desk of:
**Kim R. McMahon**
Benefits Department
W.E. Aubuchon Co., Inc.
95 Aubuchon Drive
Westminster, MA 01473
1-978-874-0521 x 1179
Fax: 1-801-912-3353
E-Mail Kimm@aubuchon.com

AUB 7615

05/12/03  12:00  TEL 518 583 8386        SARATOGA-FINS        001

SARATOGA HOSPITAL    PATIENT FINANCIAL SERVICES
PO BOX 5178    211 CHURCH ST    SARATOGA SPRINGS NY 12866

********** ANY PROBLEMS WITH FAX, PLEASE CALL (518) 583-8343  ***********

FACSIMILE TRANSMITTAL

TO:  AUBUCHON HARDWARE.COM                    FAX#:  801-912-3353
*****************                             *********************
ATTENTION: KIM              PHONE#:

FROM: GENNY              SARATOGA HOSPITAL            DATE:  05/12/03
                      PATIENT FINANCIAL SERVICES

RE:  UNPAID CLAIM
     ████████████████████████

PATIENT:  ████████████████            PAGES:  3
ID#:      ███████
DOS:      11/22/00
HOSP.ACCT#:  ███████

TOTAL CHARGES:  $ 292.00

URGENT_XXXX_____          FOR REVIEW_____      PLEASE REPLY_XXXX_____

KIM- PER OUR TELEPHONE CONVERSATION TODAY, 05/12/03, I AM FAXING TO YOU ONE (1)
UB92 TOGETHER WITH NOTES SHOWING TIMELY FILING.  PLEASE PROCESS CLAIM FOR
PAYMENT.

SARATOGA HOSPITAL DOES NOT HAVE A CONTRACT WITH  GROUP SERVICE CENTER INC.,
AND IS THEREFORE NOT HELD TO ANY INTERNAL POLICIES REGARDING TIMELY FILING.
PLEASE REVIEW THE RATE AGREEMENT TO VERIFY THIS ISSUE.

THANK YOU VERY MUCH FOR YOUR TIME WITH REGARDS TO THIS MATTER.

PHONE NUMBER: 518 583-8688      FAX NUMBER:  518-583-8386

GENNY RICHUTE
FOLLOW-UP SPECIALIST
PATIENT FINANCIAL SERVICES

Note: The documents accompanying this telecopy transmission contain confidential
information, belonging to the sender that is legally privileged.  This information
is intended only for the use of the individual named above.  If you are not the
intended recipient you are hereby notified that any disclosure,copying,distribution
or the taking of any action in reliance of the contents of this telecopy information
is strickly prohibited.  If you have received this telecopy in error, please notify us
by telephone immediately to arrange for the return of the original documents to us.

AUB 7616



AUB 7617

```
X011476520 ████████████

ACCT: ████████████                          GUAR: ████████████

MECHANICVILLE, NY 12118                     MECHANICVILLE, NY 12118
(518)899-9142/XXX                           (518)899-9142 (H)


20 F            ADM/SER:   (11/22/00)       UR CHG:          0 COE          248.20  11/22/00
WMAUS           DISCHARGE:                  AR CHG:     292.00 SELF               0
FB 11/26/00     LST STMT:                   BALANCE:    248.20

--------------------                                        --------------------

BCH DATE  BCH  SER DATE  USER       PROCEDURE  BL# DESCRIPTION              AMOUNT    BALANCE
11/27/00   17  11/26/00  MIS.VBM    FINAL BILL  1  CUT                      292.00     292.00
11/27/00   17  11/26/00  MIS.VBM    ACOE        1  CONTRACTUAL COMMERCIAL INS -43.80   248.20
11/27/00   17  11/26/00  MIS.VBM    FINAL BILL  1  POSTED (292.00)                     248.20
11/27/00                MIS.VBM    CLAIM       1  COE UB92COOB $292.00                248.20
12/01/00       12/01/00  ADM.GR     C-6            UB92 TO GROUP INS SERVICE           248.20
                                                   CTR INC.
                                                   GR

01/04/01       01/04/01  ADM.GR     C-7            CALLED INS FOR STATUS               248.20
                                                   REPORT 800 242-4472
                                                   LEFT DETAILED VM MSG FOR
                                                   PEGGY
                                                   I REQ A CALL BACK W/STATUS
                                                   GR

10/31/01       10/31/01  PA.CWF     C-8                                                248.20
                                                   ACCOUNT ASSIGNED TO ORD
                                                   PROJECT
11/26/01       11/26/01  PA.CWF     C-9                                                248.20
                                                   ACCOUNT ASSIGNED TO ORD
                                                   PROJECT
02/25/02       02/25/02  ORD.CD     C-10           ORD PRIMARY COMMERCIAL INS         248.20
                                                   CLAIM BILLED
                                                   REBILLED WITH DOC TIMELY
                                                   FILING
02/25/02                ORD.CD     CLAIM (D)   1  COE UB92COOE $292.00               248.20
                                                      Date Sent 02/25/02
02/25/02 for 04/11/02  ORD.CD     R-12           COE $248.20                        248.20
                                   CAROL:         **OPEN**
05/12/03       05/12/03  ADM.GR     C-13           STATUS CLAIM                       248.20
                                                   PER KIM AT AUBUCHON
                                                   HARDWARE.COM
                                                   800-282-4393 X1179  THEY
                                                   HAVE NOT BEEN WITH GROUP
                                                   INS SERV CTR SINCE JULY 01.
                                                   KIM REQUESTED I FAX CLAIM
                                                   TO HER ATTENTION AT
                                                   801 912 3353.
                                                   GR
05/12/03                ADM.GR     CLAIM (D)   1  COE UB92COOE $292.00               248.20
```

AUB 7618

 DPM
32 Birch Acres Road
New London, NH 03257
(603)526-4618

| Statement Date |
| --- |
| 2/26/2003 |

| Page |
| --- |
| 1 |

MAY 1 4 2003



E. Lempster, NH 03605

| Chart Number |
| --- |
| BARFR000 |

| Date | Document | Description | Case Number | Amount |
| --- | --- | --- | --- | --- |
| -- Last Payment Received: 12/10/2002  Amount: -72.00 | | | Previous Balance: | 0.00 |
| Patient: ▇▇▇ | | Chart #: ▇▇▇ | Case Description: 707.15 | |
| 2/28/2001 | 0103080000 | Debridement of skin | 122 | 72.00 |
| 12/27/2000 | 0104100000 | Office visit/EP/Level III | 122 | 70.00 |
| 4/18/2001 | 0105110000 | Debridement of skin | 122 | 72.00 |
| 4/18/2001 | 0105110000 | Debridement of skin | 122 | 72.00 |
| 6/20/2001 | 0107080000 | Debridement of skin | 122 | 72.00 |
| Patient: ▇▇▇ | | Chart #: ▇▇▇ | Case Description: 735.4 | |
| 5/23/2001 | 0106170000 | Office visit/EP/Level III | 1392 | 70.00 |
| Patient: ▇▇▇ | | Chart #: ▇▇▇ | Case Description: 213.8 756.4 | |
| 5/23/2001 | 0106170000 | Partial removal of toe | 1393 | 498.00 |
| 5/23/2001 | 0106170000 | A4550 | 1393 | 110.00 |



4 of 5

| Total Charges | Total Payments | Total Adjustments | Balance Due |
| --- | --- | --- | --- |
| $1036.00 | $0.00 | $0.00 | 1,036.00 |

AUB 7619

5/12/3                         FAX 781 837 4403

To/ Bene First, LLC
   Att: Cerrie

From/ ███████████████████
      ███████████████████
      Member No. ████████████
      Group No.  01-0701

I thought this problem had been
resolved over a year ago, as I
advised Dr ██████ that my medical
coverage was through Aubuchon and/or
medicare with CIGNA being last in
line.
    The enclosed itemized "bill" that
is dated 2-26-03 came in an
envelope that is postmarked ███
Apr 24, 2003.
    I have advised CAY by phone that
CIGNA is not involved in the treatment
I've received from Dr ███████
    I would appreciate your HELP!

Carrie- Cheryl
   gave me your
   name ███████         ████████████

                                    2 of 5

AUB 7620

CAY Medical Management, Inc.
5406 Trade Winds Road
New Bern, North Carolina 28560

252-634-2900 (fax 252-634-2920)

February 26, 2003

████████████

E. Lempster, New Hampshire 03605

Dear ████████

We have tried, unsuccessfully, to get the attached dates of service paid by your insurance carrier.

After speaking again with Cigna today, they asked that you call them @ 888-992-4462 and tell them what insurance you have.

Any help in expediting payment on these claims is appreciated. Should you have any questions, please do not hesitate to contact me at 800-221-0488.

Sincerely,

Claudia A. Yalden

AUB 7621

**BENEFIRST**
P.O. Box 1421
Marshfield MA 02050

**BENEFIRST**
The First Choice In Benefits Administration

**Forwarding Service Requested**

If you have questions, please call
customer service at
(877) 823-6334

4846 0.3640 AT 0.292        3-DIGIT 014

|||||||||||||||||||||||||||||||||||||||||||||||||||||||

LEOMINSTER, MA  01453-5149        27

Enrollee:
Patient:
Soc Sec #:
Group: W.E. AUBUCHON CO., INC.
Group #: 010701
Claim #:
Patient #:
Date Paid: 04/24/2003

### Explanation of Benefits for Services Provided By:
MD        53-77552

| Dates of Service | Service Code | Total Charge | Ineligible | Reason Code | Discount Amount | Covered By Plan | Deductible Amount | Co-Pay Amount | Balance | Paid At | Payment Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 02-20-02/20/2002 | 41 | 1,155.00 | 1,155.00 | 19 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100% | 0.00 |
| 02-20-02/20/2002 | 35 | 500.00 | 500.00 | 19 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100% | 0.00 |
| TOTAL | | 1,655.00 | 1,655.00 | | 0.00 | 0.00 | 0.00 | | 0.00 | | 0.00 |

Other Credits or Adjustments  0.00
Total Net Payment  0.00
Patient Responsibility  1,655.00

| Service Code | | Reason Code Description |
|---|---|---|
| 35 | OFFICE ANESTHESIA | 19   CLAIM SUBMITTED AFTER ELIGIBLE TIME FOR PROCESSING |
| 41 | OFFICE SURGEON | |

**Messages**
Surcharge has been deducted from the
providers payment.

*Benefirst rec'd 3/24/03 — 1st time*

*"Outside of Loss Fund"*   pay regular

*Sent electronically (4) times
through Stat Link*

2/20/02
2/22/02
4/02
7/02

*Fax to Carrie
1-781-735-0468*

AUB 7622

McMahon, Kim

From:
Sent:        McMahon, Kim
To:          Monday, August 11, 2003 12:30 PM
Subject:     'Carrie Reddie'
             RE: QUEST

It is so amazing that these bills are so late! I have never seen mine before this date.

Yes, it is O.K. to pay ████ "Outside of the Loss Fund" per Sarah.

If you have any questions, please give me let me know.

Thanks,
Kim

Kim R. McMahon
Personnel Assistant
W.E. Aubuchon Co., Inc.
95 Aubuchon Drive
Westminster, MA 01473
978-874-0521 ext. 1179
801-912-3353 fax
kimm@aubuchon.com

-----Original Message-----
From: Carrie Reddie [mailto:creddie@benefirst.com]
Sent: Monday, August 11, 2003 11:50 AM
To: McMahon, Kim
Subject: QUEST

Hi,

I don't have any of those bills in the system. I can process the ones for ████ but the ones for ████ are over a year old. If you authorize them to be paid off, then I could pay them.

Carrie Reddie
BeneFirst LLC
1-781-837-4402 x212
1-781-735-0468 fax

CONFIDENTIALITY NOTICE: This email message, including any attachments, is for the sole use of intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies in the original message.

1

AUB 7623

# Quest Diagnostics ®

**Laboratory Invoice**
For services not included in your physician's bill.

Tax ID # ████████  Page 1

3060 ALTR CAM 36379797    -424

LEOMINSTER, MA 01453-2117

||||...........|||||.||.....||||||||

**Important Notice**
YOUR INSURANCE HAS DENIED PAYMENT BECAUSE
YOU WERE NOT COVERED ON THE DATE OF
SERVICE. YOUR PROMPT PAYMENT IS
APPRECIATED. THANK YOU. BALANCE IS DUE UPON
RECEIPT OF STATEMENT

| LABORATORY SERVICE | CPT CODE / DATE RECEIVED | AMOUNT |
|---|---|---|
| CBC WITHOUT DIFFERENTIAL | 85027 | $24.25 |
| ELECTROLYTES PROFILE | 80051 | $9.22 |
| QP LIPID PROFILE | 80061 | $60.90 |
| HEPATIC FUNCTION PANEL 2000 | 80076 | $40.25 |
| BUN | 84520 | $6.90 |
| CREATININE | 82565 | $2.31 |

AUG 1 1 2003

| | |
|---|---|
| Patient Name | ████████ |
| Amount Due | $143.83 |
| Payment Due Date | 08/23/2003 |
| Invoice Number | ████████ |
| Lab Code | CAM |
| Date of Service | July 1, 2002 |
| Responsible Party | ████████ |
| Requested by: | ████████ MD (3060) |
| Invoice Date | August 1, 2003 |

Services Performed by: Quest Diagnostics Incorporated Cambridge, MA

For billing inquiries or to pay by phone, call
1-800-253-2743
Weekdays 8:30AM - 5 PM EST
Fax: 1-617-520-7711
Or visit our website at
www.questdiagnostics.com
Please have your invoice available for reference.

**PATIENT AMOUNT DUE    $143.83**

ICD-9 Codes: 272.4
If you have Medicare, Railroad Medicare or Medicaid as your primary or secondary insurance,
please send us the information - see reverse side.

The CPT codes provided are based on AMA guidelines and without regard
to specific payor requirements.

▼ *Please fold and tear payment coupon along perforation and remit with payment in the envelope provided.* ▼

# Quest Diagnostics

## Payment Coupon
Please make check payable to:
Quest Diagnostics Incorporated. Please include invoice number on
your check. Quest Diagnostics Incorporated also accepts
MasterCard & Visa.

| Amount Due | $143.83 | |
|---|---|---|
| Payment Due Date | 08/23/2003 | |
| Invoice Number 136379797 | | Lab Code CAM |
| Patient Name ████████ | | |
| Amount Enclosed | | |

Please complete credit card information on reverse or visit our
website at www.questdiagnostics.com.

☐ Check here if address has changed. Indicate change on back.
Quest Diagnostics Incorporated reserves the right to assign this receivable to any of its
affiliates.

Mail payments only to:
QUEST DIAGNOSTICS INCORPORATED
PO BOX 64363
BALTIMORE MD 21264-4363

|.|.|.|.||.||.|.||.|.||.|.||.|.||..||.|.||..|.||.||.|.|

AUB 7624

## Quest Diagnostics

**Laboratory Invoice**

For services not included in your physician's bill.

Tax ID # [redacted]    Page 1

LEOMINSTER MA 01453-2117

**Important Notice**

YOUR INSURANCE HAS DENIED PAYMENT BECAUSE YOU WERE NOT COVERED ON THE DATE OF SERVICE. YOUR PROMPT PAYMENT IS APPRECIATED. THANK YOU. BALANCE IS DUE UPON RECEIPT OF STATEMENT.

| LABORATORY SERVICE | CPT CODE / DATE RECEIVED | AMOUNT |
|---|---|---|
| GLUCOSE | 82947 | $2.31 |
| LACTIC ACID DEHYDROGENASE | 83615 | $2.31 |
| GAMMA GLUTAMYL TRANSPEPTIDASE | 82977 | $2.31 |
| PHLEBOTOMY FEE | 36415 | $8.75 |

AUG 1 1 2003

| | |
|---|---|
| Patient Name | [redacted] |
| Amount Due | $15.68 |
| Payment Due Date | 08/23/2003 |
| Invoice Number | [redacted] |
| Lab Code | CAM |
| Date of Service | July 1, 2002 |
| Responsible Party | [redacted] |
| Requested by: | [redacted] MD (3060) |
| Invoice Date | August 1, 2003 |

Services Performed by: Quest Diagnostics Incorporated Cambridge, MA

For billing inquiries or to pay by phone, call
**1-800-253-2743**
Weekdays 8:30AM - 8 PM EST
Fax: 1-617-520-7711
Or visit our website at
**www.questdiagnostics.com**
Please have your invoice available for reference.

PATIENT AMOUNT DUE        $15.68

ICD-9 Codes: 272.4

If you have Medicare, Railroad Medicare or Medicaid as your primary or secondary insurance, please send us this information - see reverse side.

The CPT codes provided are based on AMA guidelines and without regard to specific payor requirements.

▼ Please fold and tear payment coupon along perforation and remit with payment in the envelope provided  ▼

## Quest Diagnostics

### Payment Coupon

Please make check payable to:
Quest Diagnostics Incorporated. Please include invoice number on your check. Quest Diagnostics Incorporated also accepts MasterCard & Visa

| Amount Due | $15.68 | |
|---|---|---|
| Payment Due Date | 08/23/2003 | |
| Invoice Number 136379798 | | Lab Code CAM |
| Patient Name | [redacted] | |
| Amount Enclosed | | |

Please complete credit card information on reverse or visit our website at **www.questdiagnostics.com**

☐ Check here if address has changed. Indicate change on back
Quest Diagnostics Incorporated reserves the right to assign this receivable to any of its affiliates.

Mail payments only to:
QUEST DIAGNOSTICS INCORPORATED
PO BOX 64363
BALTIMORE MD 21264-4363

AUB 7625

Faxes Mailed Seem to disappear

Faxes mailed to Jessica on 12/3/02, Still
not processed on 1/8/03  why??

Invoices not being paid in 30-days. why)

██████ Hospital ██████████████████
██████████████████
→ Bills not paid within 30 days, therefore
Benefirst in violation of their contract w/
████████ — Hospital will no longer
regconize our PPO discount — and wants
Employee to pay the discount amt. Hospitals
Stated that (2) letters of this violation
were sent to Benefirst.

AUB 7626

# COVER

## SHEET

| | |
|---|---|
| To: | Carrie Reddie |
| Fax #: | 1-781-837-4403 |
| Subject: | DC - bill fo ███████ |
| Date: | October 29, 2003 |
| Pages: | 2 |

*OCT 2 9 2003*
*"FAXED"*

## COMMENTS:

Hi Carrie,

I have attached a bill for ███████ with a date of service of 8/8/02. This invoice states that this was billed electronically twice. Unfortunately, this is a victim of GISC. Therefore, could you pay this "Outside of the Loss Fund". When did we cancel the DC Plan? I believe it was on 8/25/02.

If you have any questions or concern, please let me know.

Thanks,


Kim


P.S. I have also attached a bill from
███████████

From the desk of:
**Kim R. McMahon**
Benefits Department
W.E. Aubuchon Co., Inc.
95 Aubuchon Drive
Westminster, MA  01473
1-978-874-0521 x 1179
Fax; 1-801-912-3353
E-Mail Kimm@aubuchon.com

AUB 7627

## *HealthAlliance Hospital Inc.*

60 HOSPITAL ROAD
LEOMINSTER, MA. 01453-2205

978-665-6711

| | |
|---|---|
| Service Date: | 08/08/02 |
| Service End: | |
| Last Statement Date: | |
| Account No: | |

For Account Information, Please Call 978-665-6711

### *Statement of Account    10/20/03*

| Transaction Date | Description | Amount |
|---|---|---|
| | ACCOUNT BALANCE | .00 |
| 08/08/02 | 1 XR CHEST PA & LAT | 121.00 |
| 08/16/02 | BILLED ELECTRONICALLY | .00 |
| 08/11/03 | BILLED ELECTRONICALLY | .00 |
| 10/20/03 | MEMBER INELIGIBLE FOR D.O.S. | .00 |

| Estimated Insurance Due: | .00 | Total Patient Credits: | | Account Balance: | 121.00 |
|---|---|---|---|---|---|

THE AMOUNT DUE IS YOUR RESPONSIBILITY.

E97 HCVM BENEFIRS          .00

MASTER CHARGE/VISA ACCEPTED   FEI#042103555
FREE CARE-PUBLIC ASSIST. CALL 466-2200 FOR ELIGIBILITY

Please detach and return with your payment

| For Hospital Use Only | Account Number: | Please Pay This Amount: 121.00 |
|---|---|---|
| AT:O | | |
| PT:O | Patient Name: | Due By: 11/04/03 |
| FC:P | | |

☐ Visa   ☐ Mastercard   ☐ Discover

HEALTHALLIANCE HOSPITAL INC.
60 HOSPITAL ROAD
LEOMINSTER, MA. 01453-2205

| Card Number: | Exp. Date: |
|---|---|
| Signature: | Amount Paid: |

ADDRESS SERVICE REQUESTED

Make Check Payable To HEALTHALLIANCE HOSPITAL INC.

00001368   1 AT   0.292   01

LEOMINSTER MA 01453

HEALTHALLIANCE HOSPITAL INC
DEPT 5204
PO BOX 30000
HARTFORD CT  06150-5204

☐ Please check this box if your address or insurance information has changed and record the changes on the back of this statement

AUB 7628



**BENEFIRST**
The First Choice in Benefits Administration

PO BOX 1421
Marshfield, MA 02050
Telephone: (781) 837-4402
Fax: (781) 837-4403

*daughter*     APR 2⁓ 2002

# FAX

| To: | Kim McMahon | From: | Carrie Reddie |
|-----|-------------|-------|---------------|
| **Fax:** | 801-912-3353 | **Date:** | April 24, 2002 |
| **Phone:** | | **Pages:** | 6 |
| **Re:** | ▮▮▮▮▮▮ | **CC:** | |

☐ Urgent   **For Review**   ☐ Please Comment   ☐ Please Reply   ☐ Please Recycle

**Comments:**

Attached is the letter from ▮▮▮▮ doctor requesting her tests be covered. Then there is documentation from my supervisor denying the tests as, genetic testing not covered. Then there is the letter of appeal from the doctor stating that this test would determine if she has mitochondrial disease. We asked Med-Value for their opinion & they said they would have to do a physician's review to see if the tests were considered "genetic testing" or if they would fall under diagnostic testing (which would be covered). Med-Value charges something like $125.00/hr to do a review & they would request all the additional information needed from the physician themselves.

So I guess my question to you is, do you want us to proceed with the review, or should we just deny the tests again? If you want us to do the review & it turns out that they do find it is genetic testing, would you like us to pay for it anyways outside the loss fund?

I have also included the plan language concerning genetic testing & developmental delay.

Thank you,

-Carrie Reddie

*Marian — 5/4/02*

*follow up (Kim Can you assist us on this*
*matter!*           *— good — from e-mail*

*Sarah ....*
*we can not cover*           *Thanks —*
*marias,)*           *Sarah/Kim*

AUB 7629

750 East Adams Street
Syracuse, NY 13210

Department of Pediatrics
Pediatric Endocrinology



Tel 315.464.6064
Fax 315.464.6065

www.upstate.edu

February 5, 2002

State University of New York

# Upstate Medical University

PATIENT: ██████████
BD: ████████
Hospital#: 956651

Benefirst
Fax: 718-837-4403
Attn: Kim Lobello

Dear Ms. Lobello:

I am writing to request authorization for testing on ████████████ is a 2 year old girl with severe hypotonia and marked developmental delay. Previous testing has suggested a disorder of the mitochondria as a cause for ████████ problems. The next step in her evaluation should be an examination of the mitochondrial chromosome to document any deletions or mutations.

I have recommended that ██████ have this test done at the Georgetown University Medical Center under the direction of Dr ████████. Georgetown offers an excellent service with the most comprehensive evaluation at the lowest available price. This type of test is not available within New York State. The cost of the entire study is $1200 plus a small charge for shipping the sample to Georgetown University.

Identification of a specific mutation or deletion is very important in cases such as ██████ This may allow a more specific approach to treatment and will assist in counseling the family on risk for other affected children. I can provide any other information, please call.

Sincerely,

████████████ M.D.
Division of Diabetes, Endocrinology and Metabolism

Colleges of: Medicine • Graduate Studies • Health Professions • Nursing • University Hospital

*Improving the health of the communities we serve through education, biomedical research, and health care*

AUB 7630

```
                              Claim Header Inquiry                    hi
Claim/worksht .. 20011420-01  Group .. 010701  W.E.AUBUCHON CO., INC.
Enrollee .......
Member .........                                      Rec'd ... 02/07/2002
Adjuster ....... CA      Inc .. 01/28/2002-01/28/2002 Proc'd .. 02/12/2002
Diagnosis ...... OTH CONVULSIONS                      Paid .... 02/27/2002
Benefit Type.... M                                    Statuses.  f  f
Referring Phys .

                              Claimant Notes to file
                              Category      :      CN
        Page: 00             Pages:  0-99 available/00 used    Operator  Date
01REC'D LETTER OF MEDICAL NEC FOR MITOCHONDRIAL CHROMSOME      KL    03292002
02TESTING AT GEORGETOWN UNIVERSAY HOSPITAL.  THIS SERVICE      KL    03292002
03IS NOT COVERED DUE TO GENETIC TESTING IS NOT COVERED         KL    03292002
04UNDER THIS PLAN..SPOKE TO KIM AT NY HOSPITAL TO LET HER      KL    03292002
05KNOW.  SCANNED TO DESKTOP SEE 07866285599                    KL    03292002
06
07
08
09
10
              Return to continue or (n)ext
```

AUB 7631

750 East Adams Street
Syracuse, NY 13210

Department of Pediatrics
Pediatric Endocrinology



Tel 315.464.6064
Fax 315.464.6065

www.upstate.edu

State University of New York

# Upstate Medical University

March 27, 2002

PATIENT ████████
BD: ████████
Hospital#: 956651

~~RECD APR 1 2 200~~

Benefirst
Attention: Appeals
1020 Plain Street
Marshfield, Massachusetts 02050

To whom it may concern:

████████ is a 2 year old girl with marked developmental delay and hypotonia. Her evaluation to date is strongly suggested of a mitochondrial disorder. Although mitochondrial disease is not curable, treatments are available which may decrease symptoms and improve outcome.

The next step in ████ evaluation should be an examination of her mitochondrial chromosome to document any mutations or deletions. Identifying a specific lesion on the mitochondrial chromosome may help us in planning for ████ future care, anticipating and treating problems based on the history of other children with a similar mutation.

I have recommended that ████ have DNA testing done (please see the attached letter). However, I have been told our request for approval to do this test has been denied. I am requesting a review of this request and an outside review if this appeal is denied.

If I can provide any further information, please call.

Sincerely,



Division of Diabetes, Endocrinology and Metabolism

Colleges of: Medicine · Graduate Studies · Health Professions · Nursing · University Hospital

*Improving the health of the communities we serve through education, biomedical research, and health care*

AUB 7632

EMPLOYEE MEDICAL BENEFIT PLAN

*Not Covered Expenses*

29. Expenses for orthopedic shoes, arch-supports, or for the examination, prescription or fitting thereof for splints or braces, when the primary purpose is for use in sports participation or similar physical activities;

30. Expenses for failure to keep a scheduled visit, or charges for completion of a claim form;

31. Expenses for concurrent inpatient services of Physicians, unless there is a clinical necessity for supplemental skills or the two or more Physicians attend the patient for separate conditions during the same Hospital admission;

32. Expenses for periodontal splinting, appliance insertion or restoration when used to increase vertical dimension, and expenses for precision attachments;

33. Expenses for any medical services or supplies related to surrogate parenting;

34. Expenses for court-ordered treatment or any treatment not initiated by a Physician or Covered Provider of any kind;

35. Expenses for myofunctional therapy or correction of harmful habits, other than treatment for chemical dependency or substance abuse;

36. Expenses for medical services rendered outside of the United States if treatment is available within the United States and the sole purpose of traveling is to obtain such services;

37. Expenses for health, swim club and tanning club memberships for any reason;

38. Expenses for genetic counseling, testing and related services;

39. Expenses for massage therapy;

40. Expenses for treatment and/or placement in a residential facility;

41. Expenses for Friday, Saturday, and Sunday admissions, unless for an Emergency admission, or a Sunday admission that occurs less than twenty-four (24) hours prior a scheduled surgical procedure;

42. Expenses for hearing devices;

43. Expenses related to artificial insemination, reverse sterilization, in vitro fertilization (IVF) or gamete intrafallopian transfer (GIFT);

44. Expenses for medications to restore or enhance fertility;

45. Expenses for services and supplies related to sexual dysfunctions or inadequacies regardless of the cause, except where specifically covered by the Plan;

W.E. AUBUCHON CO., INC.

AUB 7633

EMPLOYEE MEDICAL BENEFIT PLAN

15. Expenses for services and supplies (including but not limited to prescription drugs) for Experimental/Investigational Treatment or for any services or supplies not considered legal in the United States.

16. Expenses for over-the-counter drugs and medicines or those not approved for general use by the Federal Drug Administration, including expenses for investigational tests of drugs and medicines, even if prescribed, except injectable insulin;

17. Expenses for sex therapy, or for transsexual surgery and related pre-operative and post-operative procedures or complications, which, as their objective, change the person's sex;

18. Expenses for treatment, services, or supplies provided by a Physician or Covered Provider who ordinarily resides with the Covered Person or is the Covered Person, including, but not limited to, his or her spouse, children, brother, sister or parent;

19. Expenses for services or treatment of behavioral problems, learning disabilities, or developmental delays when received without a medical diagnosis;

20. Expenses for the treatment of the physical symptoms related to attempted suicide or intentionally self-inflicted Injury while sane or insane;

21. Expenses for services rendered in a Veterans Administration Hospital for any Illness or Injury related to military service;

22. Expenses for any treatment, service, or supply for nicotine use or nicotine addiction;

23. Expenses for surgery or supplies for correction of refractive errors, including radial kerato-tomy and refractive keratoplasty;

24. Expenses incurred for Injuries sustained by the Covered Person during the commission of or attempt to commit a felony, or while engaged in an illegal activity or aggravated assault;

25. Expenses for chelation therapy;

26. Expenses for purchase or rental of common-use supplies, such as exercise cycles, air purifiers, air conditioners, water purifiers, hypo-allergenic pillows or mattresses or waterbeds;

27. Expenses for tax or shipping expenses charged with respect to Durable Medical Equipment or drugs; or for interest charged by a Covered Provider;

28. Expenses for which the Covered Person, in the absence of this Plan, is not legally obligated to pay or for which a charge would not ordinarily be made in the absence of this Plan;

AUB 7634

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| W.E. AUBUCHON CO., INC., AUBUCHON DISTRIBUTION, INC., W.E. AUBUCHON CO. INC. EMPLOYEE MEDICAL BENEFIT PLAN, and AUBUCHON DISTRIBUTION, INC. EMPLOYEE MEDICAL BENEFIT PLAN<br>　　　　Plaintiffs,<br><br>v.<br><br>BENEFIRST, LLC,<br>　　　　Defendant. | C.A. No. 05-40159FDS<br>(Louis M. Ciavarra. BBO# 546481)<br>(Ryan T. Killman BBO# 654562)<br>(Colleen E. Cushing BBO# 663498) |

## PLAINTIFF AUBUCHON DISTRIBUTION, INC.'S SUPPLEMENTAL ANSWERS TO INTERROGATORIES

### GENERAL OBJECTIONS

1.     Plaintiff Aubuchon Distribution, Inc. ("Plaintiff"), objects to each and every Interrogatory to the extent that it seeks information and/or materials privileged from discovery by the attorney-client privilege and/or the attorney work-product doctrine.

2.     Plaintiff objects to each and every Interrogatory to the extent that it seeks information which is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

3.     Plaintiff objects to each and every Interrogatory to the extent that it is overly broad and/or unduly burdensome.

4.     Plaintiff objects to each and every Interrogatory to the extent that it is vague and ambiguous.

5.     Plaintiff objects to each and every interrogatory to the extent that it purports to

Interrogatory No. 5

Do you contend that the defendant improperly paid claims for **ineligible procedures, services, or benefits**? If so, for each such claim, identify each such claim by claimant, date of claim, claim number, amount paid, and description of procedure/service/benefit, and state why you contend the procedure/service/benefit was ineligible.

Answer No. 5

Yes. Plaintiff alleges that BeneFirst, LLC, through its negligent acts and omissions failed to properly investigate and pay plan participants' claims in violation of the Agreement, the express provisions of the respective plans, industry-wide third party administrator processing guidelines, and BeneFirst, LLC's own policies and procedures. Further answering, Plaintiff states that discovery is ongoing and Plaintiff has been delayed in conducting a full audit of all claims under the Plans by BeneFirst, LLC's failure to provide Plaintiff with all relevant data, Plaintiff reserves the right to supplement this Answer after it conducts an audit of claims handled by BeneFirst in connection with the Aubuchon Distribution, Inc. Employee Medical Benefit Plan and if and when it discovers other wrongful or negligent acts in the administration of the above-referenced Plans by BeneFirst, LLC.

Supplemental Answer No. 5

**OBJECTION:** Plaintiff objects to this Interrogatory to the extent that it is limited to "improperly paid claims for ineligible procedures, services, or benefits" where BeneFirst, LLC's improper claims adjudication falls outside the scope of that specific category. Further, BeneFirst, LLC has failed to comply with the Court's (Hillman, J.) February 6, 2007 Order which required BeneFirst, LLC to "produce the Medical Bills and Claims Forms for the approximately 3,000 claims as specified by the Plaintiffs . . . ." BeneFirst, LLC has only produced claims records relating to 1,882 of the 2,991 claims subject to the Court's Order.

5

{Client Files\lit\302508\0002\PLD\01031480.DOC:1}

BeneFirst, LLC's failure to comply with the Court's Order of February 6, 2007, has resulted in Plaintiff having insufficient documentation to conduct a full audit and therefore Plaintiff is unable to provide a complete Answer to this Interrogatory. Plaintiff refers to Exhibit I attached hereto which reflects all of the claims for which BeneFirst, LLC has failed to provide supporting records, which include "provider bills." Because the provider bill is the document that initiates and supports the request for reimbursement consideration, if this key document is missing, it is impossible to affirm that adjudication of eligible benefits occurred correctly. Such undocumented claims represent claim errors since BeneFirst, LLC cannot produce the provider bills that would allow affirmation of accurate adjudication. Notwithstanding and without waiving the foregoing objections, Plaintiff provides the following Answer:

Yes, BeneFirst, LLC has improperly paid claims for ineligible procedures, services, or benefits and refers to Exhibit I and Exhibit II (No. 18).[1]

Further answering, Plaintiff states that while discovery is ongoing and where BeneFirst, LLC has failed to comply with the Court's Order of February 6, 2007, Plaintiff reserves the right to supplement this Answer if and when it discovers other wrongful or negligent acts in the administration of the above-referenced Plans by BeneFirst, LLC.

Interrogatory No. 6

Do you contend that the defendant improperly paid claims for **persons ineligible to receive benefits**? If so, for each such claim, identify each such claim by claimant, date of claim, claim number, amount paid, and description of procedure/service/benefit, and state why you contend the claimant was ineligible.

---

[1] It should be noted that when reviewing Exhibit II, "Processing Errors" indicate instances where BeneFirst, LLC failed to properly investigate a claim or claims. The failure to sufficiently investigate a claim constitutes an improper adjudication of that claim. "Payment Errors" are those where BeneFirst, LLC made improper payments.

6

<u>Answer No. 6</u>

Yes. Please refer to Plaintiff's Answer to Interrogatory No. 5.

<u>Supplemental Answer No. 6</u>

**OBJECTION:** Plaintiff objects to this Interrogatory to the extent that it is limited to "improperly paid claims for persons ineligible to receive benefits" where BeneFirst, LLC's improper claims adjudication falls outside the scope of that specific category. Further, BeneFirst, LLC has failed to comply with the Court's (Hillman, J.) February 6, 2007 Order which required BeneFirst, LLC to "produce the Medical Bills and Claims Forms for the approximately 3,000 claims as specified by the Plaintiffs . . . ." BeneFirst, LLC has only produced claims records relating to 1,882 of the 2,991 claims subject to the Court's Order.

BeneFirst, LLC's failure to comply with the Court's Order of February 6, 2007, has resulted in Plaintiff having insufficient documentation to conduct a full audit and therefore Plaintiff is unable to provide a complete Answer to this Interrogatory. Plaintiff refers to <u>Exhibit I</u> attached hereto which reflects all of the claims for which BeneFirst, LLC has failed to provide supporting records, which include "provider bills." Because the provider bill is the document that initiates and supports the request for reimbursement consideration, if this key document is missing, it is impossible to affirm that adjudication of eligible benefits occurred correctly. Such undocumented claims represent claim errors since BeneFirst, LLC cannot produce the provider bills that would allow affirmation of accurate adjudication. Notwithstanding and without waiving the foregoing objections, Plaintiff provides the following Answer:

Yes, BeneFirst, LLC has improperly paid claims for persons ineligible to receive benefits and refers to <u>Exhibit I</u> and <u>Exhibit II</u> (Nos. 2-7).

Further answering, Plaintiff states that while discovery is ongoing and where BeneFirst, LLC has failed to comply with the Court's Order of February 6, 2007, Plaintiff reserves the right

7

to supplement this Answer if and when it discovers other wrongful or negligent acts in the administration of the above-referenced Plans by BeneFirst, LLC.

Interrogatory No. 7

Do you contend that the defendant paid **duplicate** claims? If so, identify each such claim by claimant, claim number, amount paid, and description of procedure/service/benefit, and the date(s) such payments were made, and state why you believe the payment(s) were duplicates.

Answer No. 7

Yes. Please refer to Plaintiff's Answer to Interrogatory No. 5.

Supplemental Answer No. 7

**OBJECTION:** Plaintiff objects to this Interrogatory to the extent that it is limited to instances where BeneFirst "paid duplicate claims" where BeneFirst, LLC's improper claims adjudication falls outside the scope of that specific category. Further, BeneFirst, LLC has failed to comply with the Court's (Hillman, J.) February 6, 2007 Order which required BeneFirst, LLC to "produce the Medical Bills and Claims Forms for the approximately 3,000 claims as specified by the Plaintiffs . . . ." BeneFirst, LLC has only produced claims records relating to 1,882 of the 2,991 claims subject to the Court's Order.

BeneFirst, LLC's failure to comply with the Court's Order of February 6, 2007, has resulted in Plaintiff having insufficient documentation to conduct a full audit and therefore Plaintiff is unable to provide a complete Answer to this Interrogatory. Plaintiff refers to Exhibit I attached hereto which reflects all of the claims for which BeneFirst, LLC has failed to provide supporting records, which include "provider bills." Because the provider bill is the document that initiates and supports the request for reimbursement consideration, if this key document is missing, it is impossible to affirm that adjudication of eligible benefits occurred correctly. Such undocumented claims represent claim errors since BeneFirst, LLC cannot produce the provider

8

bills that would allow affirmation of accurate adjudication. Notwithstanding and without waiving the foregoing objections, Plaintiff provides the following Answer:

BeneFirst, LLC may have paid duplicate claim s. Plaintiff refers to Exhibit I, which references 61 claims for which BeneFirst, LLC has failed to produce supporting documentation.

Further answering, Plaintiff states that while discovery is ongoing and where BeneFirst, LLC has failed to comply with the Court's Order of February 6, 2007, Plaintiff reserves the right to supplement this Answer if and when it discovers other wrongful or negligent acts in the administration of the above-referenced Plans by BeneFirst, LLC.

Interrogatory No. 8

Do you contend that the defendant paid **improper amounts** for claims? If so, identify each such claim by claimant, date of claim, claim number, amount paid, and description of procedure/service/benefit, and state the amount you believe should have been paid and the basis for your contention.

Answer No. 8

Yes. Please refer to Plaintiff's Answer to Interrogatory No. 5.

Supplemental Answer No. 8

**OBJECTION:** Plaintiff objects to this Interrogatory to the extent that it is limited to instances where BeneFirst "paid improper amounts for claims" where BeneFirst, LLC's improper claims adjudication falls outside the scope of that specific category. Further, BeneFirst, LLC has failed to comply with the Court's (Hillman, J.) February 6, 2007 Order which required BeneFirst, LLC to "produce the Medical Bills and Claims Forms for the approximately 3,000 claims as specified by the Plaintiffs . . . ." BeneFirst, LLC has only produced claims records relating to 1,882 of the 2,991 claims subject to the Court's Order.

BeneFirst, LLC's failure to comply with the Court's Order of February 6, 2007, has

9

Summary Plan Descriptions.

c.    Please refer to Plaintiff's Answer to Interrogatory No. 5.

d.    Please refer to Plaintiff's Answer to Interrogatory No. 5.

Supplemental Answer No. 14

Yes.

a.    2001 - 2002.

b.    The aspects of the Plan's management, operation or administration for which BeneFirst was a fiduciary are outlined in the parties' Agreement and the respective Summary Plan Descriptions.

c.    Please refer to Plaintiff's Supplemental Answers to Interrogatory Nos. 5-9 and 17 and Exhibits I -II.

d.    Please refer to Plaintiff's Supplemental Answers to Interrogatory Nos. 5-9 and 17 and Exhibits I -II.

Interrogatory No. 15

Do you claim that BeneFirst committed breaches of fiduciary duty with respect to the Plan for the given year identified in your response to interrogatory number 4? If so, please state:

a.    the year or years;

b.    the exact acts by BeneFirst which constituted such breaches;

c.    the damages you allegedly suffered as a result; and

d.    the factual basis for these assertions.

Answer No. 15

Yes.

a.    2001-2002.

b.    BeneFirst breached its fiduciary duty to Plaintiff by improperly performing its

17

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| W.E. AUBUCHON CO., INC., AUBUCHON DISTRIBUTION, INC., W.E. AUBUCHON CO. INC. EMPLOYEE MEDICAL BENEFIT PLAN, and AUBUCHON DISTRIBUTION, INC. EMPLOYEE MEDICAL BENEFIT PLAN<br>Plaintiffs,<br><br>v.<br><br>BENEFIRST, LLC,<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 05-40159FDS<br>(Louis M. Ciavarra. BBO# 546481)<br>(Ryan T. Killman BBO# 654562)<br>(Colleen E. Cushing BBO# 663498) |

## PLAINTIFF W.E. AUBUCHON CO., INC. EMPLOYEE MEDICAL BENEFIT PLAN'S SUPPLEMENTAL ANSWERS TO INTERROGATORIES

### GENERAL OBJECTIONS

1.     Plaintiff W.E. Aubuchon Co., Inc. Employee Medical Benefit Plan ("Plaintiff"), objects to each and every Interrogatory to the extent that it seeks information and/or materials privileged from discovery by the attorney-client privilege and/or the attorney work-product doctrine.

2.     Plaintiff objects to each and every Interrogatory to the extent that it seeks information which is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

3.     Plaintiff objects to each and every Interrogatory to the extent that it is overly broad and/or unduly burdensome.

4.     Plaintiff objects to each and every Interrogatory to the extent that it is vague and ambiguous.

5.     Plaintiff objects to each and every interrogatory to the extent that it purports to establish a continuing duty to supplement, or seeks to impose a duty beyond those imposed by the

Interrogatory No. 5

Do you contend that the defendant improperly paid claims for **ineligible procedures, services, or benefits**? If so, for each such claim, identify each such claim by claimant, date of claim, claim number, amount paid, and description of procedure/service/benefit, and state why you contend the procedure/service/benefit was ineligible.

Answer No. 5

Yes. Plaintiff alleges that BeneFirst, LLC, through its negligent acts and omissions failed to properly investigate and pay plan participants' claims in violation of the Agreement, the express provisions of the respective plans, industry-wide third party administrator processing guidelines, and BeneFirst, LLC's own policies and procedures. Further answering, Plaintiff states that while discovery is ongoing and Plaintiff has been delayed in conducting a full audit of all claims under the Plans by BeneFirst, LLC's failure to provide Plaintiff with all relevant data, Plaintiff reserves the right to supplement this Answer if and when it discovers other wrongful or negligent acts in the administration of the above-referenced Plans by BeneFirst, LLC.

Further answering, Plaintiff refers to Exhibit 1 attached hereto which provides a summary of claims mishandled by BeneFirst, LLC based on an initial audit. Exhibit 1 categorizes errors as "Potential Errors" and "Actual Errors." "Actual Errors" include claims which were improperly paid by BeneFirst, LLC while "Potential Errors" include claims where it appears that BeneFirst, LLC improperly paid claims due to BeneFirst, LLC's failure to utilize the requisite due diligence in handling the claim and further investigation is necessary.

Supplemental Answer No. 5

**OBJECTION:** Plaintiff objects to this Interrogatory to the extent that it is limited to "improperly paid claims for ineligible procedures, services, or benefits" where BeneFirst, LLC's improper claims adjudication falls outside the scope of that specific category. Further, BeneFirst, LLC has failed to comply with the Court's (Hillman, J.) February 6, 2007 Order which required

BeneFirst, LLC to "produce the Medical Bills and Claims Forms for the approximately 3,000 claims as specified by the Plaintiffs . . . ." BeneFirst, LLC has only produced claims records relating to 1,882 of the 2,991 claims subject to the Court's Order.

BeneFirst, LLC's failure to comply with the Court's Order of February 6, 2007, has resulted in Plaintiff having insufficient documentation to conduct a full audit and therefore Plaintiff is unable to provide a complete Answer to this Interrogatory. Plaintiff refers to <u>Exhibit I</u> attached hereto which reflects all of the claims for which BeneFirst, LLC has failed to provide supporting records, which include "provider bills." Because the provider bill is the document that initiates and supports the request for reimbursement consideration, if this key document is missing, it is impossible to affirm that adjudication of eligible benefits occurred correctly. Such undocumented claims represent claim errors since BeneFirst, LLC cannot produce the provider bills that would allow affirmation of accurate adjudication.

In addition, pursuant to Section I(B)(3) of the Agreement, BeneFirst, LLC was obligated to maintain all claims records for two years from the date of termination of the Agreement. The Agreement was terminated on or about December 31, 2004. Plaintiff's Complaint was filed less than one year later, on or about September 12, 2005. BeneFirst, LLC was contractually obligated to maintain all claims records and failed to do so. Further, once BeneFirst, LLC was aware of the likelihood of litigation, it was obligated to maintain all claims records and refrain from destroying them. Plaintiff reserves the right to move the Court for sanctions against BeneFirst, LLC for its clear spoliation of evidence. Notwithstanding and without waiving the foregoing objections, Plaintiff provides the following Answer:

Yes, BeneFirst, LLC has improperly paid claims for ineligible procedures, services, or benefits and refers to <u>Exhibit I</u>, <u>Exhibit II</u> (Nos. 71-76, 116), and <u>Exhibit III</u> (Nos. 11, 12, 31, 32,

35 and 47).[1] In addition, BeneFirst, LLC failed to fully investigate claims referenced in Exhibit II (Nos. 1-20, 64-67 and 77), and Exhibit III (Nos. 1-3, 5, 6, 13, 23, 34, 41-43 and 53).

Further answering, Plaintiff states that while discovery is ongoing and, as a result of BeneFirst, LLC's failure to comply with the Court's Order of February 6, 2007, Plaintiff has been unable to conduct a full audit of all claims under the Plans, Plaintiff reserves the right to supplement this Answer if and when it discovers other wrongful or negligent acts in the administration of the above-referenced Plans by BeneFirst, LLC.

Interrogatory No. 6

Do you contend that the defendant improperly paid claims for **persons ineligible to receive benefits**? If so, for each such claim, identify each such claim by claimant, date of claim, claim number, amount paid, and description of procedure/service/benefit, and state why you contend the claimant was ineligible.

Answer No. 6

Yes. Please refer to Plaintiff's Answer to Interrogatory No. 5.

Supplemental Answer No. 6

**OBJECTION:** Plaintiff objects to this Interrogatory to the extent that it is limited to "improperly paid claims for persons ineligible to receive benefits" where BeneFirst, LLC's improper claims adjudication falls outside the scope of that specific category. Further, BeneFirst, LLC has failed to comply with the Court's (Hillman, J.) February 6, 2007 Order which required BeneFirst, LLC to "produce the Medical Bills and Claims Forms for the approximately 3,000 claims as specified by the Plaintiffs . . . ." BeneFirst, LLC has only produced claims records relating to 1,882 of the 2,991 claims subject to the Court's Order.

---

[1] It should be noted that when reviewing Exhibits II and III, "Procedural Errors" indicate instances where BeneFirst, LLC failed to properly investigate a claim or claims. The failure to sufficiently investigate a claim constitutes an improper adjudication of that claim. "Payment Errors" are those where BeneFirst, LLC made improper payments.

BeneFirst, LLC's failure to comply with the Court's Order of February 6, 2007, has resulted in Plaintiff having insufficient documentation to conduct a full audit and therefore Plaintiff is unable to provide a complete Answer to this Interrogatory. Plaintiff refers to Exhibit I attached hereto which reflects all of the claims for which BeneFirst, LLC has failed to provide supporting records, which include "provider bills." Because the provider bill is the document that initiates and supports the request for reimbursement consideration, if this key document is missing, it is impossible to affirm that adjudication of eligible benefits occurred correctly. Such undocumented claims represent claim errors since BeneFirst, LLC cannot produce the provider bills that would allow affirmation of accurate adjudication.

In addition, pursuant to Section I(B)(3) of the Agreement, BeneFirst, LLC was obligated to maintain all claims records for two years from the date of termination of the Agreement. The Agreement was terminated on or about December 31, 2004. Plaintiff's Complaint was filed less than one year later, on or about September 12, 2005. BeneFirst, LLC was contractually obligated to maintain all claims records and failed to do so. Further, once BeneFirst, LLC was aware of the likelihood of litigation, it was obligated to maintain all claims records and refrain from destroying them. Plaintiff reserves the right to move the Court for sanctions against BeneFirst, LLC for its clear spoliation of evidence. Notwithstanding and without waiving the foregoing objections, Plaintiff provides the following Answer:

Yes, BeneFirst, LLC has improperly paid claims for persons ineligible to receive benefits and refers to Exhibit I, Exhibit II (Nos. 35-46, 64-67, 71-76 and 115), and Exhibit III (Nos. 2, 3, 6, 7, 17, 20, 41, 47 and 49). In addition, BeneFirst, LLC failed to fully investigate claims referenced in Exhibit II (Nos. 1-20, 64-67 and 77), and Exhibit III (Nos. 1-3, 5, 6, 13, 23, 34, 41-43 and 53).

Further answering, Plaintiff states that while discovery is ongoing and, as a result of BeneFirst, LLC's failure to comply with the Court's Order of February 6, 2007, Plaintiff has been unable to conduct a full audit of all claims under the Plans, Plaintiff reserves the right to

supplement this Answer if and when it discovers other wrongful or negligent acts in the administration of the above-referenced Plans by BeneFirst, LLC.

Interrogatory No. 7

Do you contend that the defendant paid **duplicate** claims? If so, identify each such claim by claimant, claim number, amount paid, and description of procedure/service/benefit, and the date(s) such payments were made, and state why you believe the payment(s) were duplicates.

Answer No. 7

Yes. Please refer to Plaintiff's Answer to Interrogatory No. 5.

Supplemental Answer No. 7

**OBJECTION:** Plaintiff objects to this Interrogatory to the extent that it is limited to instances where BeneFirst "paid duplicate claims" where BeneFirst, LLC's improper claims adjudication falls outside the scope of that specific category. Further, BeneFirst, LLC has failed to comply with the Court's (Hillman, J.) February 6, 2007 Order which required BeneFirst, LLC to "produce the Medical Bills and Claims Forms for the approximately 3,000 claims as specified by the Plaintiffs . . . ." BeneFirst, LLC has only produced claims records relating to 1,882 of the 2,991 claims subject to the Court's Order.

BeneFirst, LLC's failure to comply with the Court's Order of February 6, 2007, has resulted in Plaintiff having insufficient documentation to conduct a full audit and therefore Plaintiff is unable to provide a complete Answer to this Interrogatory. Plaintiff refers to Exhibit I attached hereto which reflects all of the claims for which BeneFirst, LLC has failed to provide supporting records, which include "provider bills." Because the provider bill is the document that initiates and supports the request for reimbursement consideration, if this key document is missing, it is impossible to affirm that adjudication of eligible benefits occurred correctly. Such undocumented claims represent claim errors since BeneFirst, LLC cannot produce the provider bills that would allow affirmation of accurate adjudication.

them.  Plaintiff reserves the right to move the Court for sanctions against BeneFirst, LLC for its clear spoliation of evidence.  Notwithstanding and without waiving the foregoing objections, Plaintiff provides the following Answer:

Plaintiff is unaware of any damages by any other act, error, or omission on the part of BeneFirst, LLC other than those referenced in Plaintiff's Supplemental Answers to Interrogatory Nos. 5-10.  Further answering, Plaintiff states that since discovery is ongoing, Plaintiff reserves the right to supplement this Answer if and when it discovers any other act, error, or omission on the part of BeneFirst, LLC that has not been described in Plaintiff's Answers to these interrogatories.

Interrogatory No. 12

If you contend that any act, error or omission by BeneFirst constituted a breach of contract, identify the contract at issue, the specific language of the contract you contend was breached, and how BeneFirst breached that contractual language.

Answer No. 12

Plaintiff claims that BeneFirst, LLC breached the Agreement.  Plaintiff states that BeneFirst, LLC breached Section I(B)(1) which provides that "the Plan Administrator, as Agent of the Plan Sponsor, shall:... [p]ay plan benefits in its usual and customary manner subject to and in accordance with this Agreement to or on behalf of persons entitled to receive plan benefits..." Further answering, Plaintiff states that since discovery is ongoing, Plaintiff reserves the right to supplement this Answer if and when it discovers other contract provisions which were breached as a result of the acts or omissions of  BeneFirst, LLC in connection with its administration of the above-referenced Plans.  In further response to this Interrogatory, Plaintiff refers to its Answer to Interrogatory No. 5.

Supplemental Answer No. 12

Plaintiff claims that BeneFirst, LLC breached the Agreement.  Plaintiff states that BeneFirst, LLC has breached the following provisions of the Agreement:



**NORTHSHORE**

April 8, 2008

Louis M. Ciavarra, Esq.
Ryan T. Killman, Esq.
Bowditch & Dewey, LLP
311 Main Street
P.O. Box 15156
Worcester, Massachusetts  01615-0156

Re:  W.E. Aubuchon Co., Inc. et al. v. BeneFirst, LLC
     <u>Civil Action No. 05-40159-FDS</u>
     **Claims Audit**
     Employer:     W.E. Aubuchon Co., Inc.
                       Aubuchon Distribution, Inc.
     Administrator:  BeneFirst, LLC
     Our Reference:  J-05-249-1142

SUMMARY REPORT

Dear Mr. Ciavarra and Mr. Killman:

## A.   <u>EXHIBITS</u>:

     **Exhibit I**   -     Undocumented Claims, W.E. Aubuchon Co, Inc.;

     **Exhibit II**   -     Undocumented Claims, Aubuchon Distribution, Inc.

     **Exhibit III**   -     Procedural and Financial Claim Errors, W.E. Aubuchon Co., Inc.

     **Exhibit IV**   -     Procedural and Financial Claim Errors, Aubuchon Distribution, Inc.

NORTHSHORE INTERNATIONAL INSURANCE SERVICES, INC.

199 Rosewood Drive ● Danvers, Massachusetts 01923
Tel 978-745-6655 ● Fax 978-741-1642
www.niis.com

Louis M. Ciavarra, Esq.
Ryan T. Killman, Esq.
**Claims Audit**
Employer:   W.E. Aubuchon Co., Inc.
                 Aubuchon Distribution, Inc.
April 8, 2008
Page 2

## B.   BACKGROUND:

In February 2005, Northshore International Insurance Services, Inc. ["Northshore"] was engaged by a stop loss managing general underwriter, BP Inc., to complete an audit of a selection of 208 claim transactions processed by BeneFirst, LLC ["BeneFirst"] for enrollees of W.E. Aubuchon Co., Inc. ["Aubuchon"]. This audit addressed claims inuring to the July 1, 2003, through June 30, 2004, aggregate stop loss policy period. The claims to be audited were selected by BP Inc., and our findings pursuant to this audit were detailed in our report to BP Inc. dated April 8, 2005.

Subsequently, Aubuchon engaged Northshore to complete an audit of a selection of 122 claim transactions processed by BeneFirst for enrollees of Aubuchon from July 1, 2002, through June 30, 2003, and 138 claim transactions processed by BeneFirst from July 1, 2004, through December 31, 2004. The claims to be audited were selected from claim reports provided by BeneFirst, and represented high dollar transactions. Our findings pursuant to this audit were detailed in our report to Aubuchon dated July 22, 2005.

As a result of these claims audits, Northshore identified $172,632.42 in Procedural claim errors, and $189,182.37 in Financial claim errors. Procedural errors are those where we do not believe that BeneFirst utilized diligent claim investigation protocols, and the results of further investigation could reveal a Financial error. Financial errors are those where an overpayment or underpayment occurred. Please note that these figures do not consider issues applicable only to the stop loss coverage.

Although the claims selected for review in these audits were not chosen on the basis of statistically valid sampling techniques, and, thus, the findings cannot be extrapolated, it is important to note that the errors identified were agreed by BeneFirst and do reflect a financial impact to Aubuchon.

As we understand it, the pattern of errors identified in these audits led Aubuchon to question BeneFirst's overall competency and, ultimately, to engage Northshore to perform further review activities.

## C.   AUDIT SAMPLE:

Pursuant to the captioned civil action, Northshore was asked to conduct an audit of additional claim transactions. For Aubuchon, we were provided with an Excel

Louis M. Ciavarra, Esq.
Ryan T. Killman, Esq.
**Claims Audit**
Employer:   W.E. Aubuchon Co., Inc.
            Aubuchon Distribution, Inc.
April 8, 2008
Page 3

spreadsheet entitled *BeneFirst RPC 097351* containing paid claim data for the period that BeneFirst had processed claims for Aubuchon, July 1, 2001, through December 31, 2004.  This spreadsheet contains 39,078 transactions with paid amounts totaling $11,612,522.80.  Please note that one claim can consist of one or more transactions lines.

For Aubuchon, we eliminated all claim payments of $499.99 and less, which represents payments totaling $3,255,083.01; all claim transactions previously reviewed in the audit conducted for BP, which represent payments totaling $1,161,549.01; all claim transactions previously reviewed in the audit conducted for Aubuchon, which represent payments totaling $1,735,195.91; and all claims with a description of "Expense E", which we knew from prior audits were claims for prescription drugs, which represents payments totaling $488,974.35.  The remaining 2,991 transactions were identified as the current audit population, with payments totaling $4,971,720.52.

Typically, the next audit step would be to select a statistically valid sample from the audit population, which most often is a sample of 300 to 350 claims.  Instead, to increase the statistical validity of this audit, it was decided to audit the entire population.

We understand that, in addition to medical claims, BeneFirst processed dental claims for Aubuchon, and that, therefore, dental claims were included in the Excel spreadsheet provided.  Unfortunately, there was no code or identifier shown in the spreadsheet that allowed us to differentiate between a dental claim and a medical claim.  As such, we knew that the claim audit sample would include dental claims, which were not intended to be included in this audit.  Pursuant to our review of the documents provided, we identified 124 dental claims with paid amounts totaling $98,771.40.  Thus, the net audit sample for Aubuchon was 2,867 transactions with payments totaling $4,872,949.12.

For Aubuchon Distribution, Inc. ["Distribution"], we were provided with an Excel spreadsheet entitled *BeneFirst Aubuchon Distribution RPC 097352* containing paid claim data for the period that BeneFirst had processed claims for Distribution, July 1, 2001, through August 24, 2002.  This spreadsheet contains 2,048 transactions with paid amounts totaling $444,079.27.  Please note that one claim can consist of one or more transactions lines.

For Distribution, from the total of claims all claims listed in the Excel spreadsheet provided, we eliminated all claim payments of $499.99 and less.  The remaining 166 claims were identified as the audit population, with payments totaling

Louis M. Ciavarra, Esq.
Ryan T. Killman, Esq.
**Claims Audit**
Employer:   W.E. Aubuchon Co., Inc.
            Aubuchon Distribution, Inc.
April 8, 2008
Page 4

$279,149.30.  There were no dental claims for Distribution.  Since a statistically valid audit sample typically contains 300 to 350 claims, in this instance the entire population of 166 claims was identified as the audit sample.

**D.    FINDINGS:**

The purpose of a claim audit is to affirm and verify that accurate reimbursement was made to the provider submitting the claim, according to the benefits available from the employer Plan.  The first step in this verification or audit process is a review of the actual provider bill.  As such, we requested a copy of the bills submitted by the providers for each claim selected for audit.

We were advised that, of the 2,991 claims included in the audit selection for Aubuchon, only 1,777 or 60 percent of the provider bills could be located, and of the 166 claims selected for Distribution, only 105 or 64 percent could be located, indicating that there were 1,214 undocumented claims for Aubuchon and 61 undocumented claims for Distribution.

Because the provider bill is the document that initiates and supports the request for reimbursement consideration, if this key document is missing, it is impossible to affirm that adjudication of eligible benefits occurred correctly.  In order to support its activities, an administrator *must* retain the source document upon which the decision to release funds was based.  The lack of a comprehensive system to catalog and store these key source documents is unacceptable claims administration practice and protocol.

We have listed the 1,214 undocumented claims for Aubuchon and the 61 undocumented claims for Distribution in the attached **Exhibits I** and **II**, respectively.  As shown, payment amounts for undocumented Aubuchon claims total $2,555,922.38, and the 61 for Distribution total $116,485.86.  Being that the provider bill is the key document that initiates the process of claim adjudication, if the provider bill cannot be produced, there is no way to confirm that the claim payment was accurate, or even that the claim payment should have occurred at all.  Therefore, an undocumented claim is a claim paid in error.

Each documented claim transaction was examined to determine adjudication accuracy, including the following:

- Claimant eligibility verification;
- Detection of duplicate claim payments;

Louis M. Ciavarra, Esq.
Ryan T. Killman, Esq.
**Claims Audit**
Employer:   W.E. Aubuchon Co., Inc.
                  Aubuchon Distribution, Inc.
April 8, 2008
Page 5

- Verification of creditable coverage or application of preexisting conditions limitations, if applicable;
- Recognition of negotiated provider discounts;
- Detection of other insurance coverage;
- Application of coordination of benefits provisions;
- Application of Plan design provisions;
- Calculation of benefit payments amounts; and
- Completeness of file documentation and information to process claims.

An identified error is classified as either Procedural, also known as Potential, or Financial, also known as Actual. A Financial error is one where there is an identifiable overpayment or underpayment. A Procedural error occurs when a claim is identified which contains an error for which the exact financial effect cannot be determined (failure to pursue coordination of benefits or investigate student status, for example); thus, the entire payment is suspect in the absence of correct claims handling protocol.

Pursuant to our audit, for Aubuchon, we identified Procedural errors in the amount of $654,445.65, and Financial errors in the amount of $141,350.21, as shown in **Exhibit III**. For Distribution, we identified Procedural errors of $48,044.88 and Financial errors of $17,196.84, as shown in **Exhibit IV**. These are in addition to the totals shown in **Exhibits I** and **II**, respectively, for undocumented claims identified for Aubuchon of $2,555,922.38 and Distribution of $116,485.86.

The industry standard for Financial accuracy is at least 99.0 percent; that is, only one percent or less of claims should have a financial error. As shown in the following tables, even considering just the Financial claim errors, BeneFirst did not meet this metric. As shown, for Aubuchon, 2.9 percent of all claims were paid incorrectly, and for Distribution, 6.2 percent of all claims were paid incorrectly.

When the undocumented claims are added, less than half of the Aubuchon claims and only slightly more than half of the Distribution claims were paid accurately. Again referring to the following tables, including Financial errors and undocumented claims, for Aubuchon, 55.4 percent of all claims were paid incorrectly, and for Distribution, 47.9 percent of all claims were paid incorrectly.

Louis M. Ciavarra, Esq.
Ryan T. Killman, Esq.
**Claims Audit**
Employer:   W.E. Aubuchon Co., Inc.
            Aubuchon Distribution, Inc.
April 8, 2008
Page 6

When the Procedural claim errors are taken into consideration, the results are unacceptable, with errors in 68.8 percent of all claims for Aubuchon, and errors in 65.1 percent of all claims for Distribution.

| | *Audit Results*<br>*W. E. Aubuchon Co., Inc.* | |
|---|---|---|
| a | Total number of claims in audit population | 39,078 |
| b | Total dollars paid for audit population | $11,612,522.80 |
| c | Total number of claims audited | 2,867 |
| d | Total dollar amount of claim payments audited | $4,872,949.12 |
| e | Total Financial errors (overpayments and underpayments) | $141,350.21 |
| f | Total undocumented claims | $2,555,922.38 |
| g | Total Procedural errors | $654,445.65 |
| h | Financial Accuracy -- Financial errors only [d-e÷d] | 97.1% |
| i | Value of errors extrapolated against total population b x [100% - (d-e÷d)] | $336,763.16 |
| j | Financial Accuracy -- Financial and undocumented only [d-(e+f)÷d] | 44.6% |
| k | Value of errors extrapolated against total population b x [100% - (d-(e+f)÷d)] | $6,433,337.63 |
| l | Financial Accuracy -- Financial, undocumented and Procedural [d-(e+f+g)÷d] | 31.2% |
| m | Value of errors extrapolated against total population b x  [100% - (d-(e+f+g)÷d)] | $7,989,415.69 |

Louis M. Ciavarra, Esq.
Ryan T. Killman, Esq.
**Claims Audit**
Employer:   W.E. Aubuchon Co., Inc.
                   Aubuchon Distribution, Inc.
April 8, 2008
Page 7

| | *Audit Results* *Aubuchon Distribution, Inc.* | |
|---|---|---:|
| a | Total number of claims in audit population | 2,048 |
| b | Total dollars paid for audit population | $444,079.27 |
| c | Total number of claims audited | 166 |
| d | Total dollar amount of claim payments audited | $279,149.30 |
| e | Total Financial errors (overpayments and underpayments) | $17,196.84 |
| f | Total undocumented claims | $116,485.86 |
| g | Total Procedural errors | $48,044.88 |
| h | Financial Accuracy -- Financial errors only $[d-e \div d]$ | 93.8% |
| i | Value of errors extrapolated against total population b x $[100\% - (d-e \div d)]$ | $27,532.92 |
| j | Financial Accuracy -- Financial and undocumented only $[d-(e+f) \div d]$ | 52.1% |
| k | Value of errors extrapolated against total population b x $[100\% - (d-(e+f) \div d)]$ | $212,713.97 |
| l | Financial Accuracy – Financial, undocumented and  Procedural $[d-(e+f+g) \div d]$ | 34.9% |
| m | Value of errors extrapolated against total population b x $[100\% - (d-(e+f+g) \div d)]$ | $289,095.56 |

Louis M. Ciavarra, Esq.
Ryan T. Killman, Esq.
**Claims Audit**
Employer:   W.E. Aubuchon Co., Inc.
            Aubuchon Distribution, Inc.
April 8, 2008
Page 8

Clearly, when the extrapolations are considered, the value of the identified errors represents a significant monetary impact against Aubuchon's claims funds.

Thank you for this opportunity to be of service.  Should you have any questions or comments, we would be pleased to respond.

Very truly yours,

Adria L. Garneau, CEBS

ALG/mh