UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| W.E. AUBUCHON CO., INC., AUBUCHON | ) | |
| DISTRIBUTION, INC., W.E. AUBUCHON | ) | |
| CO. INC. EMPLOYEE MEDICAL | ) | C.A. No. 05-40159FDS |
| BENEFIT PLAN, and AUBUCHON | ) | (Louis M. Ciavarra BBO# 546481) |
| DISTRIBUTION, INC. EMPLOYEE | ) | (James P. Hoban BBO #633929) |
| MEDICAL BENEFIT PLAN | ) | (Colleen E. Cushing BBO# 663498) |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| BENEFIRST, LLC, | ) | |
| Defendant. | ) | |

## PLAINTIFFS' LOCAL RULE 56.1 STATEMENT

I.     Depositions and Documentation In Support of L.R. 56.1 Statement.

*Deposition Excerpts Appended:*

- Fed. R. Civ. P. 30(b)(6) Deposition of BeneFirst, LLC ("BeneFirst") by and through Charles T. Dobens ("Dobens"), dated April 15, 2008 ("BF 30(b)(6) dep. (4/15/08 - Dobens)") . . . . . . . . . . . . . . . . . . . . . . . . . . Tab 1

- Deposition of M. Marcus Moran, Jr. dated May 22, 2008 ("Moran dep.") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Tab 2

- Deposition of Sarah Arel dated April 9, 2008 ("Arel dep.") . . . . . . Tab 3

- Deposition of Paul Gatanti, Jr. dated April 14, 2008 ("Gatanti dep.") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Tab 4

- Deposition of Carrie Reddie dated May 16, 2008 ("Reddie dep.") . Tab 5

- Deposition of Charles Lord dated May 22, 2008 ("Lord dep.") . . . .Tab 6

- Fed. R. Civ. P. 30(b)(6) deposition of BeneFirst, by and through Dobens dated September 7, 2006 ("BF 30(b)(6) dep. (9/7/06 - Dobens)") . . Tab 7

*Exhibits Appended:*

- BeneFirst's Responses to Plaintiff's Requests for Admissions dated April 14, 2008 ("Adm. Resp.") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Tab 8

- W.E. Aubuchon's Supplemental Answers to Interrogatories dated November 14, 2007 ("WEA Supp. Ans. Ints.") . . . . . . . . . . . . . . . .Tab 9

- Aubuchon Distribution's Supplemental Answers to Interrogatories dated November 14, 2007 ("Distrib. Supp. Ans. Ints.") . . . . . . . . . . . . . .Tab 10

- Unsigned Administrative Services Agreement ("ASA") . . . . . . . . . Tab 11

- Correspondence from S. Rosenberg to L Ciavarra dated August 31, 2007 ("8/31/07 Letter") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Tab 12

- Email from C. MacLeod to S. Arel dated May 17, 2008 ("5/17/05 Email") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Tab 13

- Correspondence from BeneFirst (P. Sullivan) to W.E. Aubuchon (M. Moran) dated June 29, 2004 ("6/29/04 Letter") . . . . . . . . . . . . .Tab 14

- Report of Northshore International Insurance Services dated April 8, 2005 ("4/8/05 NIIS Report") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Tab 15

- Report of NIIS dated July 22, 2005 ("7/22/05 NIIS Report") . . . . . .Tab 16

- Report of NIIS dated April 8, 2008 ("4/8/08 NIIS Report") . . . . . . .Tab 17

- Order on BeneFirst's Motion for Reconsideration Of Court's Discovery Order Related to Medical Bills dated February 6, 2007 ("Order") . .Tab 18

- Affidavit of Sarah Arel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Tab 19

II.     Statement of Material Facts.

1.      W.E. Aubuchon and Aubuchon Distribution are Massachusetts corporations and were the plan sponsors for the Plans, which provided medical benefits to their respective qualifying employees. It is not disputed that the Plans are covered by ERISA. The Plans are self-insured. (See W.E.A.S.P.D. (7/1/01), p. 3; W.E.A.S.P.D. (9/1/02), p. 3; A.D.S.P.D., p. 3.) The Aubuchon Companies have never administered their own Plans, but rather have always retained the services of a third-party administrator ("TPA"). (See Moran dep., p. 40.) In or around 2001, the Aubuchon Companies reached agreement with BeneFirst to act as administrators for both Plans. (See BF 30(b)(6) dep. (4/15/08 – Dobens), pp. 64, 66.)

2.      The Aubuchon Distribution Plan terminated at the end of the 2002 Plan year when that company's employees became covered under a union medical benefit plan. (See BF 30(b)(6) dep. (4/15/08 – Dobens, p. 66.)) As such, BeneFirst was the TPA for a single Plan year, July 1, 2001 to June 30, 2002, with respect to the Plan. (See Aubuchon Distribution's Supp. Ans. Ints., No. 4; BF 30(b)(6) dep. (4/15/08 – Dobens), p. 31.) BeneFirst served as the TPA for the W.E. Aubuchon plan from July 1, 2001 until December 31, 2004, at which time it was terminated by W.E. Aubuchon in the middle of the Plan year. (See Aubuchon Supp. Ans. Ints., No. 4; BF 30(b)(6) dep. (4/15/08 – Dobens), p. 31.)

3.      Although no signed copies of the Administrative Services Agreements ("ASA") for the Plans have been located; the parties do not dispute that the unsigned copy which is included in these papers embodies the essential terms of the agreements between BeneFirst and W.E. Aubuchon and between BeneFirst and Aubuchon

Distribution. (See BF 30(b)(6)(4/15/08 – Dobens), pp. 65-68, 73, 77, 80, 117-18; Moran dep., p. 107; Arel dep., pp. 31-36; ASA.) In this regard, BeneFirst has testified that they had a standard form ASA, that it was BeneFirst's practice to obtain a signed ASA for each client, and that, despite its inability to locate a signed copy, BeneFirst would look to the terms of the unsigned ASA which has been produced in discovery for the terms of the agreement between the parties. (See BF 30(b)(6) dep. (4/15/08 - Dobens), pp. 65-68, 73, 77, 80, 117-18.) Similarly, employees of the Aubuchon Companies have testified that the unsigned ASA contains the terms of the agreements by and between them and BeneFirst. (See Moran dep., p. 107; Arel dep., pp. 31-36, Ex. 7.)

4.    The Administrative Services Agreements provide, among other things, that BeneFirst will: (1) pay Plan benefits "in its usual and customary manner," (2) notify beneficiaries of any claims denials, the basis for the denials, and their appellate rights under the Plan; (3) "[m]aintain, for the duration of this Agreement and for two (2) years thereafter, adequate records of all transactions between the Plan Sponsor, the Plan Administrator and plan participants;" (4) refer to the Plan sponsor for determinations of (a) any class of claims specified by the sponsor, (b) disputed claims, (c) questions or eligibility and entitlement to coverage, (d) questions as to the amount of benefits due, and (e) "any other question; "(5) provide the Plan sponsor with "service and assistance in connection with the design and development of the Benefit Plan, initially and in connection with Benefit Plan Revisions;"[1] (6) furnish required annual reports and administrative forms to the plan participants; (7) make diligent efforts to correct any over payment or under payment made by it; (8) "issue claims payments (using Plan Sponsor

---

[1] "Service and assistance" is defined to include: actuarial and underwriting services; estimating initial plan costs; estimating costs projections for any proposed plan revisions; and advice regarding the preparation of plan documents and summary plan descriptions.

supplied funds) on a weekly basis;" (9) send COBRA notices of right to continue coverage and election forms to qualified beneficiaries, track the beneficiaries during the election period, confirm election and provide premium payment coupons to electing beneficiaries, and to collect COBRA premiums from those electing coverage. (See ASA, pp. 1-2, 5.)[2] In addition, BeneFirst authorized to and did pay itself its commissions from COBRA premiums it collected prior to paying the net premiums over to the Aubuchon Companies. (See ASA, pp. 4, 11; BF 30(B)(6)(4/15/08 – Dobens), pp. 126-27; 131-32.)

5.    The Aubuchon Companies agreed to, among other things, open, maintain, and fund, as directed, a bank account on which BeneFirst was a signatory for claims payments purposes, and pay specified fees in return for these services. (See ASA, pp. 2, 9, 11.)

6.    It is not disputed that BeneFirst did, in fact, perform all of these functions with respect to the Plans. Under the ASAs, BeneFirst provided advice as to the contents of the Plans, subcontracted out the build out of a computerized claims processing systems and corrected perceived payment errors in the computerized claims process systems as they were identified. (See BF 30(b)(6) dep. (4/15/08-Dobens), pp. 77-80; Gatanti dep., pp. 139-40; Reddie dep., pp. 71-72, 74-75, 105-06.)

7.    BeneFirst's claims examiners would on a daily basis, make determinations as to whether something was within or without the Plans. (See BF 30(b)(6) Dep.

---

[2] It is also not disputed that for at least a portion of times that BeneFirst acted as TPA, that it expressly warranted that it would have a claims accuracy average of 98% or better. (See ASA, p. 5.) BeneFirst's managing member testified that it was his recollection that the standards were dropped from the ASA when the Health Insurance Portability and Accountability Act of 1996 (HIPAA) became effective and imposed even more stringent standards than those contained in the Agreement (See BF 30(6)(6) dep. (4/15/08 - Dobens), pp. 74-77.) As such, it is undisputed that BeneFirst was obligated to have a claims accuracy average at least 98% during its entire tenure as TPA.

(4/15/08 - Dobens), p. 86.) It is conceded that not all such decisions were black and white and that claims examining is not just data entry. (See Gatanti dep., pp. 46-47, 82, 91-92, 104-109, 136-37.) Claims adjudication involves some thought on the part of the examiner and there is some interpretation of the plan in certain cases. (See Gatanti dep., pp. 82, 91-92, 104-109, 136-37; Reddie dep. 38-40, 59, 99, 116-17.) If a claims examiner determined that a certain claim could be paid, but the system denied the claim the claims examiner could and did override the system or "finagle the claim to pay how they wanted it to pay." (See Gatanti dep., pp. 24-25; Reddie dep. 25-26.) BeneFirst's claims examiner also were responsible to determine whether there was other available insurance to pay a claim, to determine whether there was subrogation claim, to conduct investigations in connection with making those determinations, and to pursue other insurance and subrogation where it deemed appropriate. (See BF 30(b)(6) dep. (4/15/08 - Dobens), p. 92-94; Arel Aff., pp. 1-2.) As a practical matter, the Aubuchon Companies had no involvement in the claims adjudication process, unless approached by an employee regarding a denial of benefits by BeneFirst. (See Reddie dep. p. 82; Lord Dep., pp. 42-45, Arel dep., pp. 165-67; Arel Aff., pp. 1-2.) W.E. Aubuchon deferred to and relied upon BeneFirst's interpretation of the Plan. (See Reddie dep., pp. 111-12; Arel Aff., pp. 1-2..) BeneFirst does not deny that claims were paid in error. (See BF 30(b)(6) dep. (Dobens), pp. 102-04; Reddie dep., pp. 91-92, 96; 5/17/08 Email.)

9.    BeneFirst did, in fact, maintain claims records. (Gatanti dep., pp 86-88, Reddie dep., 63-67.)

10.    It is undisputed that BeneFirst had authority and control over the collection and disposition of Plan Assets. BeneFirst determined, on a weekly basis, the

number and dollar amounts of the claims to be paid and reported that figure to the Aubuchon Companies in a "Check Edit Report." (See BF 30(b)(6) dep. (4/15/08 - Dobens), p. 40-42; Gatanti Dep., pp. 35-36, 96-99; Reddie Dep. 62-63; ASA, pp. 1, 2, 5.) Upon receipt of that report, the Aubuchon Companies funded the account upon which BeneFirst was a signatory in the requested amount. (See BF 30(b)(6) dep. (4/15/08 - Dobens), p. 42-45; Gatanti dep., pp. 35-36, 96-99; ASA, pp. 1, 2, 5.). After the funding was received, BeneFirst would send a file a vendor who actually printed and mailed the checks to the care providers. (See BF 30(b)(6) dep. (4/15/08 - Dobens), pp. 44-45, 47; Reddie dep., pp. 62-63; ASA, pp. 1, 2, 5.)

11. BeneFirst also sent out coupon books for, collected, and paid itself its two-percent commission off the top of the COBRA premiums it collected prior to remitting the balance to the Aubuchon Companies. (See BF 30(b)(6) Dep. (4/15/08-Dobens), p. 126-27, 131-132; ASA, pp. 4, 11.)

12. BeneFirst was aware that there was no one within the Aubuchon Companies that was trained in claims administration and that they were relying upon BeneFirst for claims adjudication. (See BF 30(b)(6) Dep. (4/15/08 - Dobens), p. 84. Compare Arel Aff., pp. 1-2.) Despite this, BeneFirst contends that it was "just a record keeper for the plan" and "nothing more than a vendor to a plan sponsor or a fiduciary of a plan." (See BF 30(b)(6) dep. (4/15/08 - Dobens), pp. 81, 97.) BeneFirst contends that it did not have discretion over the plan, could not decide what benefits to provide to participants, and solely paid claims according to the plan document. (See BF 30(b)(6) dep. (4/15/08 - Dobens), pp. 80-82.) BeneFirst contends that while it had a fiduciary

responsibility to its clients, it did not had such a responsibility to the plans. (See BF 30(b)(6) dep. (4/15/08 - Dobens), pp. 82-83.)

13.    W.E. Aubuchon terminated BeneFirst effective December 31, 2004 because it no longer had confidence in their oversight of the Plan. (See BF 30(b)(6) dep. (4/15/08-Dobens), p. 31; Arel dep., pp. 52-53; Moran dep., 73.) In this regard, the W.E. Aubuchon had a number of very large claims during the 2003-2004 Plan year. (See Arel dep., p. 54.) In a letter dated June 29, 2004 from the president of BeneFirst to the President of W.E. Aubuchon, BeneFirst represented that the W.E. Aubuchon could expect to receive a $478,000 reimbursement from their aggregate stop loss carrier for the period July 1, 2003, through June 30, 2004, based on their claims history for that period. (See BF 30(b)(6) dep. (4/15/08 - Dobens), pp. 25-26,; Arel dep., pp. 53-55; 6/29/04 Letter, p. 1.) BeneFirst further represented that "BeneFirst has gone through a few aggregate reimbursement audits. I am proud to report the results were flawless on each one." (See BF 30(b)(6) Dep. (4/15/08 - Dobens), pp. 25-26, 6/29/04 Letter, p. 1). However, when the aggregate stop loss insurer audited the claims, the figure BeneFirst had previously reported to W.E. Aubuchon was not substantiated. (See Arel dep., p. 55; 5/17/05 Email.) This occurred because there was an error in a report generated by BeneFirst which overstated the aggregate claims. (See Gatanti dep., pp. 69-75.) Rather than report the error in the report or adverse results of the stop loss insurer's audit of the reimbursement claim, BeneFirst, in apparent fear of the potential consequences, sat on that information for months. (See Gatanti dep., pp. 69-75, 149, Ex. 1; Reddie dep., pp. 78-79; Arel dep., p. 55.) Between June and November, W.E. Aubuchon made repeated inquires as to the status of the stop loss reimbursement. (See Arel dep., p. 55.) After

W.E. Aubuchon's president, Marcus Moran, advised BeneFirst of his intention to report the stop loss anticipated reimbursement in a November 2, 2004 letter, the issue came to a head in a November 5, 2004 meeting involving representatives of both BeneFirst and W.E. Aubuchon. In that meeting, BeneFirst first advised that the reimbursement would not be in the amount previously anticipated. (See Arel dep., pp. 55-56, 95.) The information was not well received and BeneFirst was terminated in a follow-up telephone conference call several days later. (See BF 30(b)(6) dep. (4/15/08 - Dobens), pp. 21-26; Arel dep., p. 62.) BeneFirst was terminated because of a lack of confidence in their administration of the W.E. Aubuchon Plan and because W.E. Aubuchon had not been able to get accurate information from them. (See Gatanti dep., p. 61; Reddie dep., pp. 96-97; Arel dep., pp. 52-53; Moran dep., p. 73; W.E. Aubuchon's Supp. Ans. Ints., No. 20.)

14.    It is not disputed that the only plan document for each of the Aubuchon Companies' Plans was the Summary Plan Description ("SPD"). (See BF 30(b)(6) dep. (4/15/08 - Dobens), pp. 63-64.)

15.    The Introduction in Section I of each of the relevant SPD provides in pertinent part as follows:

> The Plan Administrator has full discretionary *authority to interpret this Plan and its provisions and regulations with regard to eligibility, coverage, benefit entitlement, benefit determination and general administrative matters*. The Plan Administrator's decisions will be binding on all Covered Employees and their beneficiaries and conclusive on all questions of coverage under this Plan. (emphasis added)

(See W.E.A.S.P.D. (7/1/01), p. 1; W.E.A.S.P.D. (9/1/02), p.1; A.D.S.P.D., p. 1.)

16.    The SPD further provides in its General Plan Provisions at VIII. A.3. that:

> The Plan Administrator *shall be a named fiduciary for purposes of Section 402(a)(1) of ERISA*, shall administer the Plan in

accordance with its terms, and shall have complete discretionary authority and all powers necessary to carry out its terms and to control and manage the operation and administration of the Plan, including, but not limited to the following:

...

(g)    to employ or retain counsel, accountants, *third party administrators*, actuaries or such other consultants as may be required to assist in administering the Plan;...(emphasis added)

(See W.E.A.S.P.D. (7/1/01), pp. 58-59; W.E.A.S.P.D. (9/1/02), p. 60; A.D.S.P.D. (8/25/01), pp. 57-58.)

17.    The SPDs' Definitions provides, in pertinent part, the following:

**Contract Administrator.** BeneFirst, LLC together with any other of its programs, units, or divisions that is designed to perform claims administration functions under the Plan ...

...

**Plan Administrator.** W.E. Aubuchon Co., Inc. [or W.E. Aubuchon Distribution Co., Inc.]. *The term Plan Administrator also means any person or persons to whom the Plan Administrator delegates all or part of its authority under the Plan.* (emphasis added)

(See W.E.A.S.P.D. (7/1/01), pp. 72, 79; W.E.A.S.P.D. (9/1/02), pp. 74, 81; A.D.S.P.D. pp. 71, 78.)

18.    The Summary Plan Description further provides in its SPD in Section II as

follows:

The Plan is self administered by the Employer, which is a "named fiduciary" and the "plan administrator" under ERISA. The Employer has *delegated claims administration and other day-to-day functions* for all benefits except prescription drug benefits and certain vision care benefits to the following Contract Administrator:

> BeneFirst, LLC
> P.O. Box 1421
> Marshfield, MA 020250-877
> 823-6334 (Member Services)
> www.BeneFirst.com

(See W.E.A.S.P.D. (7/1/01), p. 4; W.E.A.S.P.D. (9/01/02), p. 3; A.D.S.P.D., p. 4.)(emphasis added).

19.    Less than a year after the commencement of this lawsuit, BeneFirst sold all or substantially all of its assets to America's Choice Health Plans, including most of its computers, and ceased active business operations. (See BF 30(b)(6) dep. (9/7/06 - Dobens), pp. 7-9. See also Order on BeneFirst's Motion for Reconsideration of Court's Discovery Order Related to Medical Bills, dated February 6, 2007, p. 3 (Document #40)).

20.    An audit of 208 claims transactions processed by BeneFirst under the W.E. Aubuchon Plan for the July 1, 2003, through June 30, 2004, aggregate stop loss period was performed by Northshore International Insurance Services, Inc. ("NIIS") at the request of BP, Inc., a stop loss general managing underwriter for the W.E. Aubuchon Plan. (See 4/8/05 NIIS Report, p. 1. The findings of the audit were memorialized in a report to BP, Inc. dated April 8, 2005. (See Id.) The audit recommended a deduction of $107,057.90 from the aggregate claim.

21.    Thereafter, W.E. Aubuchon engaged NIIS to conduct an audit of 122 claims transactions processed by BeneFirst under the W.E. Aubuchon Plan for the period July 1, 2002, through June 30, 2003, and 138 claims transactions processed by BeneFirst under the W.E. Aubuchon Plan for the period July 1, 2004, through December 31, 2004. The findings of this audit were memorialized in a report to W.E. Aubuchon dated July 22, 2005. (See 7/22/05 NIIS Report; 4/8/08 NIIS Report, p. 2.)

22. In discovery, the Aubuchon Companies served requests for production seeking, among other things, claims records for the W.E. Aubuchon and Aubuchon Distribution Plans. BeneFirst objected to producing the requested materials and motion practice ensued which culminated in an Order dated February 6, 2007, in which the Court (Hillman, M.J.) denied BeneFirst's Motion for Reconsideration and ordered BeneFirst to "produce the Medical Bills and Claims Forms for the approximately 3,000 claims as specified by the Plaintiff's at their own [BeneFirst's] expense. (See Order. P. 12).

23. BeneFirst, however, only produced documents pertaining to 1,777 of the 2,991 W.E. Aubuchon Plan claims which it was ordered to produce by the Court. (See 8/31/07 Letter, p. 1; Adm. Resp., Nos. 10-12.)[3]

24. Similarly, BeneFirst has only produced documents pertaining to 105 of the 166. Aubuchon Distribution Plan claims which it was ordered to produce by the Court. (See 8/31/07 Letter, p. 1.)

25. BeneFirst admits that "it produced all claims images in its possession, custody or control in complying with Judge Hillman's order." (See Adm. Resp., Nos. 10-12.)

26. It is cannot be disputed that the claims images which BeneFirst has failed to produce are relevant to its liability, including without limitation its failure to maintain claims records as required by the ASA and to the Aubuchon Companies damages. (See Order, pp. 10, 12.)

27. BeneFirst's failure to maintain the claims records at issue was a breach of the ASA. (See ASA, p. 2.)

---

W.E. AUBUCHON CO., INC.,
AUBUCHON DISTRIBUTION, INC., W.E.
AUBUCHON CO. INC. EMPLOYEE
MEDICAL BENEFIT PLAN, and
AUBUCHON DISTRIBUTION, INC.
EMPLOYEE MEDICAL BENEFIT PLAN
By their attorneys,

Louis M. Ciavarra (BBO #546481)
James P. Hoban (BBO #633929)
Colleen E. Cushing (BBO #663498)
Bowditch & Dewey, LLP
311 Main Street, P.O. Box 15156
Worcester, MA 01615-0156
(508) 791-3511

Date:    August 27, 2008

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing
(NEF) and paper copies will be sent to those indicated as non-registered participants on
August 27, 2008.

James P. Hoban

**1**

{}

1

Exhibits:  1-7

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CA No. 05-40159FDS

W.E. AUBUCHON CO., INC.,
AUBUCHON DISTRIBUTION, INC.,
W.E. AUBUCHON CO.,INC. EMPLOYEE
MEDICAL BENEFIT PLAN,
and AUBUCHON DISTRIBUTION, INC.
EMPLOYEE MEDICAL BENEFIT PLAN,

                    Plaintiffs

v.

BENEFIRST, LLC,

                    Defendant


        30(b)(6) DEPOSITION OF BENEFIRST,
LLC, through its Designee, CHARLES T.
DOBENS, and CHARLES T. DOBENS, Individually
taken at the request of the Plaintiffs,
pursuant to Rule 30 of the Massachusetts
Rules of Civil Procedure before Kathleen M.
Bradley, Notary Public and Registered
Professional Reporter in and for the
Commonwealth of Massachusetts, on Tuesday,
April 15, 2008, commencing at 10 a.m. at
the offices of Bowditch & Dewey, 311 Main
Street, Worcester, Massachusetts.


        BAY STATE REPORTING AGENCY
        76 MILL STREET (At Park Avenue)
        WORCESTER, MASSACHUSETTS   01603
                (508)753-4121

**Page 1**

1

2    UNITED STATES DISTRICT COURT
     DISTRICT OF MASSACHUSETTS

3

4         CA No. 05-40159FDS

5

6    W.E. AUBUCHON CO., INC.,
     AUBUCHON DISTRIBUTION, INC.,
     W.E. AUBUCHON CO.,INC. EMPLOYEE
     MEDICAL BENEFIT PLAN,
7    and AUBUCHON DISTRIBUTION, INC.
     EMPLOYEE MEDICAL BENEFIT PLAN,

8

9         Plaintiffs

     v.

10   BENEFIRST, LLC,

11        Defendant

12

13

14        30(b)(6) DEPOSITION OF BENEFIRST,
     LLC, through its Designee, CHARLES T.
15   DOBENS, and CHARLES T. DOBENS, Individually
     taken at the request of the Plaintiffs,
16   pursuant to Rule 30 of the Massachusetts
     Rules of Civil Procedure before Kathleen M.
17   Bradley, Notary Public and Registered
     Professional Reporter in and for the
18   Commonwealth of Massachusetts, on Tuesday,
     April 15, 2008, commencing at 10 a.m. at
19   the offices of Bowditch & Dewey, 311 Main
     Street, Worcester, Massachusetts.

20

21

22        BAY STATE REPORTING AGENCY
          76 MILL STREET (At Park Avenue)
23        WORCESTER, MASSACHUSETTS 01603
          (508)753-4121

24

---

**Page 2**

1   APPEARANCES:

2   FOR THE PLAINTIFF:

3   BOWDITCH & DEWEY
    311 Main Street
4   Worcester, Massachusetts 01615
         BY: LOUIS M. CIAVARRA, ESQ.

5

6   FOR THE DEFENDANT:

7   THE MCCORMACK FIRM, LLC
    One International Place
8   7th Floor
    Boston, Massachusetts 02110
9       BY: ERIC L. BRODIE, ESQ.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

---

**Page 3**

2   WITNESS     DIRECT CROSS REDIRECT RECROSS

3   CHARLES T. DOBENS

4   MR. CIAVARRA:  4        130

5   MR. BRODIE:      122

6         EXHIBITS

7   1   ReNotice of Deposition       5

8

9   2   6/29/04 Letter from        25
        Mr. Sullivan to Mr. Moran

10

11  3   11/2/04 Letter to          28
        Mr. Sullivan from Mr. Moran

12

13  4   8/2/05 Letter from C. Dobens  70
        to Atty. Gelinas with ASA

14

15  5   EMail 5/17/05             104

16  6   4/8/05 Letter from         106
        NorthShore

17

18  7   Sales Proposal            116
        AUB 417-427

19

20

21

22

23

24

---

**Page 4**

1         PROCEEDINGS

2         CHARLES T. DOBENS, having been

3   satisfactorily identified by the production

4   of his driver's license, and duly sworn,

5   was examined and testified as follows:

6         MR. CIAVARRA:  We will continue

7   with the usual stipulations that we've had.

8   Reserve all objections except as to form

9   and motions to strike until the time of

10  trial.

11        The witness will read and sign

12  his transcript, no requirement of

13  notarization.

14        MR. BRODIE:  For the record I

15  agree.  So stipulated.

16        MR. CIAVARRA:  Thank you.

17        DIRECT EXAMINATION

18  BY MR. CIAVARRA:

19  Q.   Mr. Dobens, you understand you're

20  here for your deposition today, right?

21  A.   Yes.

22  Q.   And you and I have done this one once

23  before?

24  A.   Yes.

**5**

Q.  And you recall that?

A.  I think you were a little heavier before.

(Discussion off the record)

Q.  The rules haven't changed.  I'm here to ask you questions about this case and she will be taking down my questions and your answers.  And it's really not more complicated than that.

As far as the only other thing that's changed you're also here on behalf of the company to testify on certain topics.  Do you understand that?

A.  Yes.

Q.  And you've seen that notice?

A.  Yes.

MR. CIAVARRA:  Just for the record we'll mark this as Exhibit 1.

(Exhibit 1, Notice of Deposition, marked)

Q.  The notice that listed, you can share it with Eric.

A.  Yes, this is the one I looked at yesterday, yes.

**6**

Q.  So you understand you are here to testify individually as Charles Dobens, but also a representative of the company?

A.  Sure.

Q.  And you've taken a look at this list of 23 topics?

A.  Yes.

Q.  And done whatever you think is necessary to be able to answer questions on those topics?

A.  Yes.

Q.  And just for the record does BeneFirst still exist as an entity?

A.  No.

Q.  And what happened?  Has the company been dissolved?

A.  The assets were sold to America's Choice Health Plans out of Houston, Texas.

Q.  And then what happened to the legal entity,  the LLC, after the asset sale?

A.  You know, you'd have to check with them because they took the name.  It's my understanding that they took the name as well.

**7**

Q.  You may not know the answer to this, so if you don't, feel free to tell me.  But you did not sell the stock, you sold the assets?

A.  That's correct.  There was no stock.

Q.  I'll ask you the same question I asked you last time, because it's an LLC.  But the LLC itself was not sold, the assets were sold?

A.  Yes, that's correct.

Q.  So you continued as the sole member of that LLC?

A.  No, I was not the sole member.  There still were other members existing.

Q.  So what happened to the entity?

A.  You know, I think it's just defunct right now, although I think that's the legal and non-legal status.

Q.  It has no assets?

A.  It has nothing, no.

Q.  So the only ability it has to pay a judgment in this case is if there's insurance?

A.  Exactly, yes.

**8**

Q.  When the assets were sold was there any distribution to any of the members?

A.  No, it was essentially a break-even.

Q.  You paid off debts?

A.  Yes.

Q.  And what are you doing now for a living?

A.  I'm a real estate investor.

Q.  Not involved in the health insurance business currently?

A.  No.

Q.  And what's your home address?

A.  30 Parkers Grove Lane in Duxbury.

Q.  Do you know where is Mr. Sullivan now, Paul Sullivan?

A.  You know, I haven't spoken to him since probably about 2005, 2006.  I would believe he's still down in Mashpee.  He had two homes in Mashpee.

Q.  And do you know what he's doing professionally?

A.  I believe he's an insurance broker, benefits broker.  I mean this is all -- you know, I may be totally wrong so --

9

1   Q.   Okay.  You've just got to give me
2   your best information.  And Maureen
3   FitzGerald, where is she now?
    A.   I'm assuming she's with him doing the
5   same thing.
6            MR. BRODIE:  Meaning Paul
7   Sullivan?
8   A.   Paul Sullivan, yes.
9   Q.   And you've have had no contact with
10  him?
11  A.   None whatsoever.
12  Q.   When is the last time you spoke to
13  Paul Gatanti?
14  A.   Oh brother -- I think the last time I
15  spoke to him was at his father's funeral,
16  which was shortly after the time he left
17  BeneFirst.  I really don't think I've had
18  any communication with him since then.
19  Q.   And Carrie Reddi, when is the last
20  time you spoke with her?
21  A.   I've got to think that the last time
22  I spoke to her was maybe like one of her
23  last days at BeneFirst.
    Q.   When was that?

10

1   A.   Oh brother -- 2006, some time in
2   2006.  I haven't spoken to anyone at
3   BeneFirst about anything really since the
4   company dissolved, especially not about
5   this case whatsoever.  So I have had no
6   communications.
7   Q.   So if I can shortcut it then is the
8   only conversations you've had with anyone
9   about this case or about Aubuchon is with
10  your lawyers?
11  A.   Exactly, yes.
12  Q.   Have you reviewed the audit reports
13  that were completed by Northshore in this
14  case?
15  A.   No.  I believe there are two audit
16  reports.  I just want to make sure we're
17  talking about the right one.
18  Q.   We'll go through them all.
    A.   Okay.
20  Q.   So let's break it down if that's
21  easier for you.
22            While Aubuchon was still a
23  client of BeneFirst there was an audit
24  completed by Northshore for the excess

11

1   carrier.  Do you recall that?
2   A.   Yes.
3   Q.   And that was back in 2005 I believe?
4   A.   Right.
5   Q.   Did you review that at the time?
6   A.   Yes, that one I reviewed.
7   Q.   Subsequent to the separation between
8   Aubuchon and BeneFirst, Aubuchon engaged
9   Northshore to do an audit back in, again,
10  in 2005.  Have you reviewed that audit?
11  A.   I don't believe I have.  I believe
12  we had asked for that and never received it
13  because they claimed it was their property,
14  they paid for it, so they kept it to
15  themselves.
16  Q.   And in connection with this lawsuit
17  Northshore has done additional audit work,
18  copies of which the reports were provided
19  as attachments to Answers to
20  Interrogatories.  And I'll get to the
21  actual paper, but have you reviewed those?
22  A.   I don't think I have.  I don't think
23  I've seen that yet.
24  Q.   We'll get to them specifically.  In

12

1   order to prepare for the deposition today
2   what documents, if any, did you look at?
3   A.   I went through Sarah Arel's
4   deposition.  I briefly looked at the draft
5   of Paul Gatanti's deposition.  We obviously
6   went through my answers to responses or
7   questions.
8   Q.   Interrogatories?
9   A.   Interrogatories.  And then I
10  reviewed, and this kind of is, you know, a
11  good little Cliff Notes version of what
12  things I needed to remember and what the
13  case is all about.
14            So I think in preparation for
15  today's visit I think that is a pretty
16  extensive list of what I've done.
17  Q.   Okay.  So Paul Gatanti's deposition,
18  which was just yesterday, you got a copy of
19  that transcript?
20  A.   Yes, I looked at a draft of that.
21  Q.   And did you notice anything that he
22  stated that was incorrect?
23  A.   I was not able to go through the
24  whole thing.

1 Q. But from whatever you saw, did you
2 see anything that struck you as being
3 wrong?
   A. No, I think everything that he said
5 that I looked at was right on the mark.
6 Q. And how much of it did you get
7 through?
8 A. I would say about ten to 15 pages
9 pages.
10 Q. And when you reviewed Sarah Arel's
11 transcript, did you see anything in there
12 that you disagreed with?
13 A. I didn't go entirely through her
14 transcript. And I didn't see -- I didn't
15 see in there anything that I had an issue
16 with, but I did not review the entire
17 document.
18 Q. How much of that did you get through?
19 A. Oh geeze, I probably went through, I
20 think it was like 168 pages. I think I did
21 about 30 to 40 pages of it, just briefly
22 skimmed through it.
23 Q. But nothing stuck out at you?
   A. No, nothing that I saw in the papers

14

1 stuck out at me.
2 Q. That's okay. And Kim McMann's
3 deposition was taken as well. Have you
4 seen her deposition?
5 A. No, I did not know that she was
6 deposed.
7 Q. I'm not going to mark these right
8 now, but these are Plaintiff's, that's
9 Aubuchon, Plaintiff's Answers to
10 Interrogatories, which are the written
11 questions submitted by your lawyers.
12 A. Okay.
13 Q. And I just want to know if you've
14 seen those before.
15 A. No, I have not seen these.
16 Q. Before I was asking you about audit
17 work that had been done by Northshore and
18 if you just look at Exhibits, I'm not going
   to ask you detailed questions, but just to
20 see if you've seen Tabs 1, 2 or 3 before.
21 A. Well, you know, you see, I can't
22 answer that specifically just because this
23 Exhibit 1 does not look familiar to me, but
24 Exhibits 2 and 3, the form looks familiar,

1 but I did see their original format for the
2 first one. So I can't say whether this is
3 for the first audit or the second audit.
4 Q. So the format looks familiar?
5 A. Yes.
6 Q. You're just not sure if the substance
7 is the same stuff.
8 A. Yes, exactly.
9 Q. We'll come back to that specifically.
10 You understand that in this case there's a
11 claim by Aubuchon that BeneFirst overpaid
12 certain medical claims that were due to be
13 paid under their insurance, right?
14 A. So they were eligible claims, but the
15 amounts were overpaid.
16 Q. This is not just that. There could
17 be, I'm not trying to limit the reasons why
18 there were over-payments. It could be a
19 variety of reasons.
20     My question isn't directed to
21 the causation there.
22 A. Okay.
23 Q. I'm just trying to get a sense of
24 30,000 feet now and come down to it.

16

1 A. Okay.
2 Q. You understand that Aubuchon claims
3 it was damaged because it paid more in
4 medical claims than it should have had
5 BeneFirst done their job properly?
6 A. Yes, I understand that.
7 Q. What have you done, if anything, to
8 determine whether or not that allegation is
9 accurate?
10 A. As a company, or me personally or --
11 Q. I'll ask you personally, and if it's
12 different as a company let me know.
13 A. Oh, me personally as Charles Dobens,
14 I don't think I did anything. I think as
15 BeneFirst, what we did, obviously, is when
16 we processed the claims and then we filed,
17 they exceeded their attachment point and
18 then we filed that claim with the stop loss
19 carrier.
20     The stop loss carrier comes in
21 or sends an auditor in to look at the
22 claims and they do an audit.
23     So whatever the results come
24 back as, I mean that's pretty much, Hey,

1  you paid this wrong, you didn't pay this
2  one wrong.
3        So I think at the time, and my
   numbers may be off.  I think we originally
5  filed for $73,000 aggregate, and after the
6  audit it came down to $71,000.
7        My numbers may be off.  That's
8  what I remember, is that after the audit
9  they knocked off a nominal amount from what
10 we originally filed a claim for.
11 Q.  Okay.  I'm going to come back to my
12 first question, but go ahead.
13 A.  So I hope that answers your question,
14 that that's what we would have done.  We
15 laid ourselves bare to the auditor to come
16 in and tell us whether we paid the claims
17 correctly or not.
18 Q.  And this is obviously pre-lawsuit
19 you're talking about, the audit that was
20 done for the excess carrier?
21 A.  Yes.
22 Q.  And when that audit came in, did you
23 review that?  You already said you did.
   You took a look at that?

1  off of the RCR report.  And everybody knew
2  that that number was prior to everything
3  being cleaned out and flushed out.
4        So within -- I believe a stop
5  loss claim has to be filed within 30 days
6  of the end of the policy year.  And when we
7  filed a claim we knew it was 70-some-odd
8  thousand dollars.
9  Q.  When you say "we knew," you mean
10 BeneFirst knew?
11 A.  Benefirst, yes.
12 Q.  You're not suggesting that Aubuchon
13 knew?
14 A.  No, I'm not suggesting that Aubuchon
15 knew at that time that it was only
16 70-some-odd-thousand dollars.
17 Q.  In fact, up until the report came
18 from the stop loss carrier BeneFirst as a
19 company was telling Aubuchon that the
20 number was $475,000, right?
21      MR. BRODIE:  Objection to form.
22 You can answer.
23 A.  Okay.  BeneFirst had told Marcus
24 Moran -- Paul Gatanti had told Marcus that

18

1  A.  Yes, I took a look at it, yes.
2  Q.  And did you see any errors in that
3  audit that you disagreed with?
4  A.  Oh, I think there were some.  You
5  always get some errors you disagree with
6  the stop loss carrier on, what they came
7  back with.
8        And so then you sit down with
9  the auditor and say, Now you're wrong here,
10 this is how we do it.
11      And if they accept your
12 explanation, then they'll bring the claim
13 back in.
14 Q.  Who did that on behalf of BeneFirst?
15 A.  Paul Gatanti.  Paul Gatanti oversaw
16 that department.  Cheryl MacCloud I think
17 was the one that was actually responsible
18 for filing the stop loss claims.
19 Q.  Do you recall though that the
20 original amount estimated by BeneFirst was
21 actually $478,000?
22 A.  Okay.  Now when you say that, it's
23 just important that you understand that
24 number.  That was a gross unaudited number

20

1  that $400,000 number was an unaudited
2  number and don't go by that.
3        Marcus said, Well, what should
4  I expect?  And Paul Gatanti said you can
5  expect probably around $200,000.  And this
6  was prior to the account final claim being
7  filed.
8        And so that was BeneFirst had
9  told Marcus Moran about $200,000.
10 Q.  And you didn't say that?
11 A.  No, I wouldn't have known that
12 information.
13 Q.  And where do you get this information
14 that Gatanti?  Because that was not in his
15 testimony yesterday.
16 A.  Okay.  Well, that's my recollection
17 as to how the conversation went.
18 Q.  And this is something that you think
19 Gatanti told you that he told Marcus Moran?
20 A.  I actually think I was in the room
21 when it was said.
22 Q.  So tell me about that meeting.
23 Because what's important here today is for
24 us to know what your specific memory is,

1 not assumptions, not guesses, what you
2 recall happening.
3 A.   Right.  I recall happening that early
4 on when the claim was first filed or prior
5 to the claim being filed there was a big
6 discussion about the RCR report showing a
7 $400,000 aggregate reimbursement.
8        We knew that the RCR report was
9 a gross unaudited report that included
10 everything including the kitchen sink and
11 the number.
12        And I remember there was some
13 meeting with Marcus, Paul Gatanti, and
14 myself.  I don't remember who else was
15 present.
16        But I remember Marcus being
17 told that it was not 400.  And he said, How
18 much should I expect?  And Paul Gatanti
19 said about 50 percent or about $200,000.
20        And I remember that coming back
21 to roost at a later meeting with Aubuchon
22 and Marcus Moran, and everybody was there,
23 Paul Sullivan, Maurie FitzGerald, Sarah
Arel, Kim McMann, Aubuchon Jr., I don't

1 We told you at the time 200.  It wasn't
2 about to grow any larger.  Why did you make
3 it 400?"
4        So that's -- I remember through
5 the whole course of events that the
6 original time we told Mark is $200,000 was
7 way back in July before we had finalized
8 the aggregate claim.  So --
9 Q.   Let me try and be specific on some
10 things.   First of all, this meeting that
11 you have a memory of in which you clam Paul
12 Gatanti told Marcus that the number was
13 $200,000, not $478,000, when do you believe
14 that meeting occurred?
15 A.   That meeting would have occurred at
16 the end of July, beginning of, end of June,
17 beginning of July of the year in question
18 for the aggregate filing.
19 Q.   And the year you're talking about,
20 just for the record, is 2004?
21 A.   Okay, 2004.
22 Q.   And the meeting in which Mark
23 indicated he had conveyed the $478,000 to
24 his Board, when did that occur?

1 remember his name.
2 Q.   William?
3 A.   William Jr.?
4 Q.   Is that who was there?
5 A.   Yes, it was a young guy.  I never met
6 him before.  And I just remember he was an
7 Aubuchon and it was a Junior, and he was
8 getting more involved in the Benefits side.
9 Paul Gatanti, myself.
10        And in that meeting that's when
11 the amount, the total amount of the
12 aggregate came out as being
13 70-some-odd-thousand.
14        And I'll never forget, I was
15 sitting like sideways Marcus.  And Marcus
16 is like, "Oh, this is not good.  This is in
17 not good."
18        And I said, "Why?"  That's
19 actually good news that it's a smaller
claim than you expected."
21        And he says, "No, I told my
22 Board of Directors that it was going to be
23 $400,000."
24        I said, "Why would you do that?

1 A.   That occurred like end of October,
2 beginning of November.
3 Q.   In the middle of 2004 Paul Sullivan
4 was your President of the company, right?
5 A.   Yes.
6 Q.   And he had full authority to speak on
7 behalf of the company?
8 A.   Yes.
9 Q.   And let me show you a letter dated
10 June 29, 2004 from Mr. Sullivan to Mr.
11 Moran and ask you if you recall that.
12 A.   (Reading document)
13        MR. BRODIE:  You can read
14 through the whole letter.
15        THE WITNESS:  Sure.
16 A.   (Reading document.) Okay.
17 Q.   First question, you're not cc'd on
18 that letter, right?
19 A.   No.
20 Q.   Do you recall that letter?
21 A.   I think I recall having an issue with
22 this letter.
23        MR. CIAVARRA:  Why don't we
24 mark this as Exhibit 2.

25

1    (Exhibit 2, 6/29/04 Letter from
2    Mr. Sullivan to Mr. Moran,
3    marked)
4    Q.   Okay.  So let's start off first.
5    This is a letter from the President of
6    BeneFirst to the President of Aubuchon,
7    right?
8    A.   Yes.
9    Q.   Dated June 29, 2004?
10   A.   Correct.
11   Q.   And you have a memory of seeing a
12   letter, this letter, on or about that time?
13   A.   Yes.
14   Q.   And in this letter Mr. Sullivan is
15   representing to Aubuchon that the aggregate
16   number that he could expect to get from the
17   excess carrier based upon their claims
18   history for that time period was $478,000,
19   right?
20        MR. BRODIE:  Objection.
21   Q.   Is that what he's representing in the
22   letter?
23   A.   Yes.
     Q.   And he's also representing in the

26

1    last paragraph that, I'm sorry, the last
2    paragraph on the first page, "That while
3    this is subject to an audit, we've been
4    through several audits, and he's proud to
5    say they have gone through them cleanly,"
6    isn't that what he's saying?
7    A.   Yes.
8    Q.   And as the recipient of that letter
9    would it be fair to assume that you could
10   expect to get $478,000?
11        MR. BRODIE:  Objection.
12   Q.   Would you agree with that?
13   A.   Except for this letter, the last
14   phrase of the report it is an unaudited
15   report.
16   Q.   Then read the next paragraph.  Why
17   don't you read the next paragraph after
18   that into the record, please.
19   A.   "BeneFirst LLC has gone through a few
20   aggregate reimbursement audits.  I am proud
21   to report the results were flawless on each
22   one."  I think that's maybe --
23        MR. BRODIE:  He just asked you
24   to read it.

27

1        MR. CIAVARRA:  He can finish.
2    A.   No --
3    Q.   What were you going to say?
4    A.   I think that you're talking about two
5    different things really.  You're talking
6    about what the RCR says versus what a
7    Northshore audit, a Northshore audit
8    company would come in and do.
9        And I can tell you that based
10   upon what we filed and what was audited,
11   that last statement is still a correct
12   statement.
13   Q.   By the way, I have not seen what you
14   filed.  Do you have that?
15   A.   No, I don't have that.  I think my
16   recollection is that they kicked out
17   approximately $2,000 of the reimbursement
18   that we had filed for.
19   Q.   But the actual filing, do you have a
20   copy of that record anywhere?
21   A.   I do not, no.
22   Q.   I've never seen it.  Okay.  When you
23   saw this letter did you pick up the phone
24   and call Mr. Moran and say I want to talk

28

1    about what's in here?
2    A.   I didn't call Mr. Moran.  Paul
3    Sullivan had the direct relationship with
4    Marcus.
5    Q.   Did you instruct Mr. Sullivan to
6    follow up with Mr. Moran after this letter
7    was sent?
8    A.   Oh yes.
9    Q.   And do you know if he did?
10   A.   I know that he did not.
11   Q.   Let me show you a letter dated
12   November 2, 2004 from Mr. Moran back to Mr.
13   Sullivan and ask you to read that first.
14   A.   (Reading document) Okay.
15   Q.   Did you see a copy of that letter in
16   or about November of 2004?
17   A.   I don't believe so.
18        MR. CIAVARRA:  Have this marked
19   as Exhibit 3.
20        (Exhibit 3, Letter from Mr.
21        Moran to Mr. Sullivan,
22        11/2/04, marked)
23   Q.   Have you seen this letter before at
24   any time?

29

1   A.   I can't recall seeing this.

2   Q.   In that letter Mr. Moran is

3   indicating to Mr. Sullivan, to the

4   President of your company, that he intends

5   to report to the Board the $478,000 number,

6   right?

7   A.   Yes.

8   Q.   That's what it says?

9   A.   Yes.

10  Q.   Okay.  And what action, if any, did

11  BeneFirst take at that time to indicate or

12  to tell Mr. Moran he shouldn't do that,

13  that you know of?

14  A.   Well, at that time I don't know what

15  we did.

16  Q.   If you don't know, you don't know.

17  A.   Yah.

18  Q.   The meeting that you told us about in

19  which Mr. Moran appeared, I don't know if

20  upset or concerned is the right word, but

21  not happy with the fact that the number was

22  not 478, does this help you place this

23  meeting at some time after this date?

24  A.   Okay.  See, that's why I answered the

30

1   question the first time like that.  I

2   wasn't quite sure when because I don't

3   remember exactly the chronology of events

4   here.

5          I don't know whether this

6   letter came before that meeting, I don't

7   remember getting it.

8          If this went to my partner,

9   Paul Sullivan, this is the type of thing he

10  would hide from me or wouldn't show me.

11         And so I don't know whether

12  this letter --

13  Q.   If you don't remember --

14  A.   All I remember, end of October,

15  beginning of November is the timeframe that

16  I remember that meeting occurring.

17  Q.   Well, what types of stuff did Paul

18  Sullivan hide from you?

19  A.   You know, bad news.

20  Q.   What was Paul's responsibilities at

21  the company in this 2004 timeframe?

22  A.   You know, his title was President.

23  He was a member of the LLC.  His primary

24  role was in sales.

31

1   Q.   How long after this letter did

2   Aubuchon terminate the relationship with

3   BeneFirst?

4   A.   Well, I think getting ready for this,

5   they terminated on January 1 of 2005, so

6   obviously there's a two-month window.

7   Q.   Who communicated that termination to

8   you first?

9   A.   Paul Sullivan.

10  Q.   So you didn't hear that directly from

11  Aubuchon?

12  A.   No.

13  Q.   From Mr. Gatanti's deposition

14  yesterday, and I think you said it this

15  morning, the $478,000 number that we've

16  seen referenced in Exhibits 2 and 3, that

17  number comes off of the RCR report?

18  A.   Yes.

19  Q.   Mr. Gatanti spoke yesterday about an

20  error in the RCR report that would

21  overstate the aggregate.  Do you know what

22  I'm talking about?

23  A.   I wouldn't call it an error.  You

24  have to understand how to use the report,

32

1   what it can be used for and what it can't

2   be used for.

3          So I don't think that the

4   report generated erroneous information.

5   You had to understand that that information

6   was unaudited and it included more detail

7   than was needed.

8   Q.   But the RCR report would indicate

9   what the aggregate number would be or could

10  be expected to be.  It would tell you what

11  the total amount of payments had been for

12  you to reach that threshold before your

13  excess coverage would kick in?

14  A.   It could.  If it was, you know, as I

15  said, unaudited.  If somebody went in there

16  and cleaned out all those claims that were

17  ineligible --

18  Q.   I'm just talking about the reader of

19  the document.

20  A.   Yes, the reader of the document would

21  not be able to know exactly what the

22  reinsurance stop loss claim would be by

23  looking at this RCR report.

24  Q.   But, tell me if I'm wrong, but the

33

1  $478,000 number that was referenced in 2
2  and 3, you understood came from the RCR
3  report?
   A.  Yes, absolutely.
5  Q.  And I think what you told me is
6  internally at BeneFirst you guys certainly
7  knew that you couldn't translate that 478
8  directly to what would be expected from the
9  stop loss carrier?
10 A.  That's right.
11 Q.  Had you known that throughout the
12 entire time of period that that fact, that
13 you guys were creating the RCR reports?
14 A.  Since --
15 Q.  Going back for years.
16 A.  Oh, years.  I think early on when we
17 first started using the RIMS system we
18 discovered that there was that discrepancy
19 with the actual stop loss limit and the RCR
20 report.
21 Q.  Do you know what caused that --
22 A.  The RCR report --
23 Q.  Let me finish the question.
   A.  Sorry.

34

1  Q.  That's okay.  Do you know what caused
2  the RCR report to indicate $478,000 as
3  opposed to what the actual claim was for?
4  A.  Yes.  The RCR would include pretty
5  much all the claims that we paid for that
6  client.  It also could include specific
7  reimbursements, which are claims that are
8  ineligible to the aggregate, but claims
9  that went through their plan system.
10        It would include claims that
11 were paid outside the loss fund or
12 exceptions that would be kicked out in an
13 audit.  So --
14 Q.  And the people, when I say "the
15 people," you and Mr. Sullivan, Mr. Gatanti
16 were aware of that certainly throughout
17 2004?
18 A.  Oh yah, yah.
   Q.  As the client, was the RCR report the
   only report that you received from
21 BeneFirst?
22 A.  Oh no.
23 Q.  Let me finish the question.
24 A.  I'm sorry.

35

1  Q.  I know it's not the only report.  Is
2  it the only report you received from
3  BeneFirst from which you could calculate or
4  even have any guesstimate as to what your
5  stop loss coverage would be?
6        MR. BRODIE:  "You" meaning the
7  receiving -- the client --
8  A.  Yah, the client, the client.
9  Q.  Let me restate the whole question.
10 As a client, is the RCR report the only one
11 I received from BeneFirst which would
12 indicate to me what my stop loss insurance
13 might be?
14 A.  I don't believe so.
15 Q.  What other reports?
16 A.  I believe that we did our own
17 in-house RLR, which is a Loss Ratio Report,
18 which would show a more accurate figure
19 because that would show a column for
20 specific reimbursements and you could net
21 that out.
22 Q.  Let me stop you right there for a
23 second.  First of all, do you know -- I'm
24 going to take them each one by one -- the

36

1  Loss Ratio Report, do you know if that was
2  provided to the clients, and if so, how
3  often?
4  A.  It would have been done on a monthly
5  basis.  And the report, if I remember
6  correctly, Maurie FitzGerald was their
7  service rep, and had been their service rep
8  for 20 years, and had continually provided
9  Aubuchon with her own report that they
10 liked to get that showed exactly where they
11 were throughout the course of the year.
12 Q.  When you say "how they were," how
13 they were --
14 A.  How the plan was running.
15 Q.  And how they were moving towards the
16 excess coverage?
17 A.  Yes.
18 Q.  So you think -- this is a second
19 report now?
20 A.  Yes, I mean it was very similar to
21 what we would typically do, but I think
22 Aubuchon had their own style of doing it
23 that she continued to do for them when she
24 came over to BeneFirst.

37

1  Q.  We are going awfully fast here, so
2  let's you and I try to slow down.
3        The Loss Ratio Report, my first
   question was do you know that was provided
5  to Aubuchon?
6  A.  Through the normal course of business
7  it should have been provided to Aubuchon
8  every month.
9  Q.  And you believe that Maurie
10 FitzGerald provided a separate report?
11 A.  Yes.
12 Q.  Any other reports from which the
13 client could make a determination of where
14 they stood for their stop loss coverage?
15 A.  You know, essentially every report
16 would provide them with the information
17 that they would need to determine where
18 they are regarding their stop loss
19 insurance.
20 Q.  How would it do that?
21 A.  Every report shows exactly what was
22 paid that particular month or how much was
23 paid in a particular year.  And they would
   be able to look at that and say, Geez, this

39

1  Q.  What does "ISA" stand for?
2  A.  That's an Individual Specific
3  Analysis.
4  Q.  And your testimony is that those
5  dollars are not included in the aggregate
6  amount or should not be?
7  A.  They should not be included in the
8  aggregate amount.
9  Q.  This is you who I'm asking.  Did you,
10 Charles Dobens, ever inform Aubuchon of
11 that fact?
12 A.  Oh I believe -- to say me I would say
13 no, just because I didn't have that type of
14 relationship with Aubuchon.
15 Q.  And what other information of these
16 other subsidiary reports, or these other
17 reports I should say, would I look at to
18 determine that the -- I have too many
19 reports in my head--
20 A.  The RCR.
21 Q.  -- the RCR does not or may not
22 accurately reflect my aggregate claim?
23 A.  You know, I think another report that
24 would show it would be the -- well, the

38

1  is what we've paid, and they could look at
2  their bank account and figure it out.
3        I mean it's not Rocket Science.
4  It's a checking account is really what it
5  is.  And they could look to see what they
6  were paying out, what their cap was and how
7  it was running.
8  Q.  Doesn't the RCR report, though, just
9  aggregate all of those reports into one
10 place?
11 A.  Yes and no.  I mean there's a lot of
12 information that's not included in the RCR,
13 but the information in the RCR is included
14 in all the other reports.
15 Q.  I guess my point is that the numbers
16 that I would see as a client in the RCR
17 report would also be reflected in all these
18 other reports that we are talking about,
   were they not?
_9 A.  Yes.
21 Q.  So what in those other reports would
22 indicate to me that the RCR report was not
23 accurate?
24 A.  A specific reimbursement in the ISA.

40

1  easy one is the check register.
2        I mean they get that every
3  month, they look to see what comes in, what
4  goes out.  And that clearly would show you
5  an actual net number.
6        And as a matter of fact, I do
7  remember in that meeting when we talked
8  about the $400,000 claim with Marcus being
9  upset, Marcus looks at it and says, "But we
10 paid out this much money according to your
11 report."
12        And Kim MacMann said, "No,
13 actually Marcus, we didn't.  If you look at
14 the check register you'll see we did only
15 pay exactly what BeneFirst is showing right
16 there. " But that's not what Marcus wanted
17 to hear.
18 Q.  Let's talk about the check register
19 for a minute and how, you know, bills got
20 paid.  You're familiar with that process,
21 right?
22 A.  Yes.
23 Q.  My understanding, you know, and as I
24 said, we have the benefit of Paul's

1  testimony yesterday, was that on a monthly
2  basis BeneFirst would send to Aubuchon
3  something called a "Check Edit Report" that
4  would show exactly what was due to be paid
5  on claims for that month, is that correct?
6  A.    I don't believe it was monthly.
7  Q.    Okay. How often do you think it was?
8  A.    For a company the size of Aubuchon it
9  was either weekly or biweekly.
10  Q.    My concern about that answer is that
11  you're working through it logically as
12  opposed to your memory.
13  A.    Yes. But --
14  Q.    Let me finish my question.
15  A.    I'm sorry.
16  Q.    And the reason is because you said
17  for a company the size of Aubuchon. What
18  we're talking about is specifically
19  Aubuchon.
20        And my question is specifically
21  do you know how often they received their
22  Check Edit Reports?
23  A.    Specifically Aubuchon, no.
24  Q.    Then you should say that just so we

42

1  have a clean record.
2  A.    But you were asking another question
3  that included the word "monthly," and I
4  couldn't answer that question because I
5  don't believe it to be monthly.
6  Q.    My next question would be regardless
7  of how often it went, you would know
8  periodically BeneFirst sent that Check Edit
9  Report to Aubuchon?
10  A.    Yes.
11  Q.    And that report would show the amount
12  of money that Aubuchon needed to transfer
13  into an account so that the claims could be
14  paid?
15  A.    Correct.
16  Q.    And BeneFirst calculated that amount
17  and communicated it to Aubuchon in this
18  report, right?
     A.    Yes.
20  Q.    And it calculated that amount based
21  upon the claims it had received during that
22  period of time, however long that was?
23  A.    Correct.
24  Q.    Then the next step in the process is

43

1  Aubuchon would then put that amount of
2  money into an account either by check or by
3  wire transfer?
4  A.    Correct.
5  Q.    Do you recall how they did it?
6  A.    I do not.
7  Q.    And that account was, the account
8  that the money was transferred into, in
9  whose name did that account stand?
10  A.    I don't recall.
11  Q.    At BeneFirst are there occasions in
12  which that account is in BeneFirst's name
13  and sometimes it's in the client's name?
14  Is it joint names, is it neither, if you
15  know?
16  A.    You know, it was -- I don't recall.
17  I think it was every client had a different
18  setup. It really was based upon how the
19  client wanted it set up.
20  Q.    So in this case, there was an
21  account. You don't remember whose name was
22  on the account?
23  A.    That's correct.
24  Q.    And from that account the claims were

44

1  then paid?
2  A.    Yes.
3  Q.    And what was the process for paying
4  those claims, how did that happen?
5  A.    I guess I'm kind of confused by
6  your --
7  Q.    I'm pretty sure you didn't sit down
8  and write the checks, right?
9  A.    Right.
10  Q.    Was it automated?
11  A.    Oh, everything was automated, yes.
12  Q.    And so somebody at BeneFirst would
13  key in a payee and then amount and a check
14  would then be cut from that account?
15  That's what I'm trying to understand, the
16  process of paying the doctors.
17  A.    It was very, very automated where the
18  Claims Examiner would get a claim in the
19  door, adjudicate the claim, it would be put
20  in the list, the line of claims to be paid.
21        At the end of that period when
22  we needed to get them the Check Edit Report
23  they would FAX it over, say we processed
24  $20,000 worth of claims for this you week,

1  this month, whatever; fund your account.
2      They would say, Okay, our
3  account is funded; go ahead and release the
   checks.
5      We would send a file to ABF,
6  ABF was the name of the company. And all
7  they did was print the checks, stuff them
8  in an envelope and mail them out the door.
9      We never touched a check. We
10 never had any checks docked in our office
11 and we never mailed any of them.
12 Q. ABF was a company that BeneFirst
13 contracted with for this service?
14 A. Yes.
15 Q. ABF had no direction relationship
16 with Aubuchon, correct?
17 A. No.
18 Q. How was ABF paid?
19 A. Per check I believe.
20     MR. BRODIE: I'm sorry, just so
21 we have a clean record, you said no to the
22 question there is no relationship between
23 ABF and Aubuchon. I think the answer is
   yes, there's no relationship. It was a

1  preferred vendor of Trizetto.
2  Q. Did your relationship, BeneFirst's
3  relationship with ABF precede your
4  relationship with Aubuchon?
5  A. I believe, yes.
6  Q. Was ABF a party you used for other
7  clients or just Aubuchon?
8  A. On, every one, every one.
9  Q. So they were cutting the checks for
10 all of your clients?
11 A. Yes, we never touched a check, we
12 never mailed a check. It was all done
13 out-sourced.
14 Q. And again, was there some type of
15 monthly report that you would then get back
16 from ABF showing what they had done?
17 A. Oh, yes, we would get a file that we
18 would download off the system, store on our
19 server, and show exactly what claims-- we'd
20 get a picture of the claim, of the check
21 that went out and store that on our server
22 I believe.
23 Q. And who, if anybody, at BeneFirst was
24 doing this kind of check review to make

1  negative question.
2      THE WITNESS: Okay. I'm sorry.
3  A. There is no relationship between ABF
4  and Aubuchon, no.
5      MR. BRODIE: No, there is not?
6  A. No, there is no relationship.
7  Aubuchon wouldn't even know who ABF is.
8  Q. Because you never told Aubuchon that
9  that's how you were paying the bills?
10 A. Right, yes.
11 Q. And as far as Aubuchon knew,
12 BeneFirst was doing it directly?
13 A. Yes.
14 Q. What type of quality control did you
15 have in place to be sure that ABF was doing
16 their job accurately?
17 A. ABF -- well, when we started the
18 relationship with ABF it was through our
19 relationship with Trizetto and RIMS, where
20 they were actually the ones doing the
21 processing.
22     I don't recall exactly what the
23 Quality Control was for ABF, but a lot of
24 it was handled through Trizetto. ABF was a

1  sure that the right amounts were being
2  paid?
3  A. Paul Gatanti. And then on the other
4  side would have been someone in the Billing
5  Department. I cannot recall their name.
6  Q. I don't think I went through this
7  with you at that first deposition, so let
8  me just ask you a couple questions about
9  your experience pre-BeneFirst. When did
10 you start BeneFirst?
11 A. August of '99.
12 Q. And what were you doing just before
13 that?
14 A. I was working for Health Plans, Inc.
15 Q. And what did they do?
16 A. They were a TPA also.
17 Q. What did you do for Health Plans?
18 A. I was in sales for them. I think you
19 did ask me that.
20 Q. I'm sorry if I did. Did you know
21 Paul Gatanti then?
22 A. No, I did not, no. Our paths just
23 missed each other.
24 Q. How long were you with Health Plans?

49

1  A.  Oh, I think about six or seven years.
2  Q.  What was your first position with
3  them?
   A.  Sales the whole time.
5  Q.  What did you do before Health Plans,
6  Inc.?
7  A.  I worked for Penn General Service
8  Corporation.
9  Q.  And what did they do?
10 A.  They were a TPA
11 Q.  And what did you do for Penn?
12 A.  Sales.
13 Q.  What did you do before that company?
14 A.  I worked for Excess Health, which is
15 a stop loss insurance carrier.
16 Q.  And again, what did you do for them?
17 A.  Sales.
18 Q.  Before that, Excess Health?
19 A.  It was New York Life.
20 Q.  Sales position?
21 A.  Yes.
22 Q.  And before that?
23 A.  School.
   Q.  Where was school?

50

1  A.  Boston College.
2  Q.  When did you get out of BC?
3  A.  '86.
4  Q.  Have you ever functioned
5  professionally as a claims adjustor?
6  A.  No.
7  Q.  Or claims examiner?
8  A.  No.
9  Q.  Have you ever had any training in
10 that area?
11 A.  Nope.
12 Q.  Did you have any supervisory
13 responsibility for any examiners in any of
14 your jobs pre-BeneFirst?
15 A.  No.
16 Q.  Did you take on any of that
17 responsibility at BeneFirst?
18 A.  I supervised the supervisor.  They
   always had someone that oversaw the claims
   examiner.
21 Q.  Before Mr. Gatanti who was that?
22 A.  I think her name was Barbara.  I
23 can't remember her last name.  And then
24 prior to that it was done in-house at

51

1  Trizetto.
2  Q.  I just want to spend a couple minutes
3  on that.  Let me just make sure I have my
4  chronology right.  Trizetto, to my
5  understanding, had a product call RIMS?
6  A.  Yes.
7  Q.  And there was a time in which
8  BeneFirst contracted with Trizetto to do
9  the claims examination for them?
10 A.  Right.
11 Q.  So you basically out-sourced all the
12 claims examination?
13 A.  That's correct.
14 Q.  And is that how you started the
15 company in '99?
16 A.  Yes.
17 Q.  Were you familiar with Trizetto at
18 Health Plans?
19 A.  No, because at the time I don't think
20 Trizetto existed.
21 Q.  So this was a new relationship for
22 you professionally?
23 A.  Okay, just from a chronology, when
24 you say Trizetto, at the time it was RIMS.

52

1  Trizetto came along later on.
2         So to answer your question,
3  RIMS was the name known in the industry
4  back in '99, and not Trizetto.
5  Q.  So 1999 when you formed BeneFirst you
6  contracted with RIMS to do the claims
7  examination and adjudication?
8  A.  Right.
9  Q.  And so you have didn't have then any
10 on-staff claims examiners?
11 A.  Correct.
12 Q.  At some point in time you terminated
13 that relationship and brought the claims
14 examination in-house?
15 A.  That's right.
16 Q.  When did that occur?
17 A.  I want to say -- I want to say
18 September of '01.
19 Q.  Do you recall first meeting the folks
20 from Aubuchon?
21 A.  I don't recall the first meeting.
22 Q.  Who was the salesperson responsible
23 for bringing Aubuchon into BeneFirst?
24 A.  Paul Sullivan.

1  Q.  And did you understand that Mr.
2  Sullivan had a prior relationship with the
3  Aubuchon folks?
   A.  Yes.
5  Q.  And that was a relationship that
6  arose out of their prior TPA?
7  A.  Yes.
8  Q.  And Mr. Sullivan, was he a member of
9  the LLC at that time?
10 A.  What time?
11 Q.  When he brought in Aubuchon.
12 A.  Yes.
13 Q.  Did he form BeneFirst with you?
14 A.  He was there at the beginning.
15 Q.  Who was there at the beginning?
16 A.  It was really just myself.  And Paul
17 came on a month or so later, so --
18 Q.  And did Maureen FitzGerald join you
19 shortly after that time?
20 A.  No, no, no.  She did not join us
21 until -- you see, I can't even recall when
22 she joined us.
23        Like, for instance, this
   meeting that we're talking about, this

1  A.  Yes.  I knew that meeting took place.
2  To be honest with you, I don't remember if
3  I was there at that time for that meeting.
4  Q.  But whether you were physically there
5  at that meeting or not, you'd agree with me
6  that initially BeneFirst was telling
7  Aubuchon that the claims examination
8  adjudication process was out-sourced to
9  Trizetto?
10 A.  Right, correct.
11 Q.  And that was the plan at that time?
12 A.  Right.
13 Q.  At BeneFirst, right?
14 A.  Right.
15 Q.  And you believe within several months
16 after that time period BeneFirst brought it
17 in-house?
18 A.  That's correct.
19 Q.  Did you, personally I'm asking you
20 this as Charles Dobens, did you have any
21 discussion with anybody at Aubuchon about
22 that change in process?
23 A.  You know, that -- I believe I did.  I
24 believe I spoke to Marcus Moran about that,

54

1  October surprise meeting we will call it, I
2  can't remember whether Maureen was an
3  employee of BeneFirst at that time or
4  whether she was acting as a
5  broker/consultant for Aubuchon, because she
6  had all of those types of roles there,
7  so --
8  Q.  So Mr. Sullivan had the relationship
9  with Aubuchon, correct?
10 A.  Yes.
11 Q.  Do you recall when the relationship
12 with Aubuchon started, the month or year?
13 A.  I think it was July '01.
14 Q.  My understanding is that when
15 BeneFirst was first attempting to get
16 Aubuchon as a client BeneFirst still had a
17 relationship with RIMS and/or Trizetto at
18 that time?
19 A.  Yes.
20 Q.  And I don't know if you were present
21 or not, but do you recall a meeting at
22 which folks from BeneFirst and Aubuchon
23 actually went out to RIMS and Trizetto?
24 And I believe it was in Chicago.

56

1  which makes me kind of, you know, remember
2  the chronology of events for the
3  termination of Chicago and bringing it
4  in-house to Marshfield as being in
5  September of that year that we took
6  Aubuchon on.
7        So I had to kind of go explain
8  to Marcus, I know you went and saw them,
9  they told you a great story.  We've decided
10 to bring everything in-house.
11       We're still using their system,
12 it's a great system, but now we've grown to
13 a certain level that it makes more sense
14 for us economically to bring everything
15 in-house and adjudicate the claims from
16 Marshfield.
17 Q.  At this time prior to bringing it
18 in-house you had no claims examiners on
19 staff though, right?
20 A.  That's correct.
21 Q.  So who was responsible for going out
22 and hiring the claims examiners?
23 A.  It was Denise Lynch and myself.
24 Q.  Who was Denise Lynch?

1    A.   She was really the first employee.
2    She was the client service rep/account
3    manager type of position.
     Q.   Was she a claims examiner by
5    training?
6    A.   She had, yes, she was.
7    Q.   Do you know for who?
8    A.   G.I.C.
9    Q.   So Denise is somebody that would have
10   been known to Aubuchon?
11   A.   No, no.
12   Q.   Okay.  And who was the first claims
13   examiner you hired?
14   A.   All right.  Let me just go back.  She
15   would have been known to Aubuchon.
16   Q.   Do you know if Aubuchon knew Denise
17   Lynch before they became a client of
18   BeneFirst?
19   A.   No, I don't believe they did.
20   Q.   So my next question was who was the
21   first claims examiner you had?
22   A.   I tell you, I can't remember.  I
23   really don't remember.
     Q.   What did you do to qualify them as

58

1    candidates and employees?
2    A.   Really a lot of it had to do with
3    references, their understanding of RIMS,
4    giving them some sample claims to process
5    on the system and see how they did doing
6    that.  Those are typically the things.
7         In that particular geographical
8    area, there were a lot of claims examiners,
9    a lot of TPA's, and a lot of people on the
10   RIMS system.
11        And if you had been working on
12   another vendors paying TPA you probably had
13   the knowledge we needed and the expertise
14   to come over and pay claims off of our
15   system.
16   Q.   You said geographic area, the South
17   Shore?
18   A.   Yes.  TPA capital of the world.
     Q.   Why is that?
20   A.   Because two guys, Gerry Anderson and
21   Herb Hokinson started GIC back in 1975.
22        And from that one TPA grew
23   about five or six other TPA's.
24   Q.   Plus it's a nice place to live.

1    A.   Yah, I don't mind it.  That was a
2    good thing to come out of it.
3    Q.   Was Aubuchon your largest client in
4    terms of employees at that time in 2001?
5    A.   Yes, I believe it was.
6    Q.   Before you started BeneFirst did you
7    have some concerns about your ability to
8    transfer all of this work from a large
9    employer like Aubuchon directly in-house?
10   A.   No, I had full confidence in the
11   systems that we had in place and we had --
12   everyone in there had enough experience to
13   be able to do something like that.
14   Q.   Who built the Aubuchon plan at
15   BeneFirst?
16   A.   Built it -- I don't recall.  Barbara
17   Cope I think was her last name.
18   Q.   What was her position?
19   A.   She was our Claims Manager/Claims
20   Supervisor.
21   Q.   Do you know where she is today?
22   A.   No idea.
23   Q.   And what happened to her employment
24   relationship?

60

1    A.   She was terminated.
2    Q.   And when was that?
3    A.   I don't remember.
4    Q.   Why?
5    A.   Why don't I remember?
6    Q.   Why was she terminated?
7    A.   She was a very sloppy worker I guess
8    is the best way to describe it.
9    Q.   Who terminated her?
10   A.   I think Denise Lynch terminated her.
11   Q.   Have you ever reviewed the Aubuchon
12   Medical Plan?
13   A.   Yes.
14   Q.   As part of the case or during the
15   relationship?
16   A.   Do you mean that book right over
17   there essentially?
18   A.   Yes.
19   A.   Oh, as part of the relationship.
20   Actually I was there at the law firm up in
21   Portland when they were designing the plan.
22   Q.   Do you recall the law firm of Verril
23   & Dana being involved?
24   A.   Yes.

1  Q.  I just want to talk a little bit
2  about the development of the medical plan.
3  A.  Okay.
   Q.  What role did BeneFirst have in that?
5  A.  I guess it could be called an
6  advisory role.  We just kind of sat in the
7  meetings, and you know, listened to what
8  they were trying to do.
9        I mean their old plan document
10  was atrocious and just needed to be totally
11  thrown out and started all over again.
12        They hired this firm up in
13  Portland.  She drafted a beautiful
14  document, it's a very nice, well-done
15  document.
16  Q.  Had you worked with Verril & Dana
17  before?
18  A.  No, never.
19  Q.  When you took on any new client at
20  BeneFirst did there always have to be a
21  rewrite of the medical plan?
22  A.  No.  And typically we wouldn't do
23  that.
   Q.  Had you gone through a process like

62

1  the one you did with Aubuchon with any
2  other clients before?
3  A.  I would venture to say no.
4  Q.  And at the time I meant.
5  A.  No.
6  Q.  So it was the first time you had gone
7  through the restructuring of a medical
8  insurance plan?
9  A.  To that extent, yes.
10  Q.  And who else at BeneFirst was
11  involved in these initial meetings and
12  discussions about building the medical plan
13  other than you?
14  A.  I'm thinking that Paul Sullivan was
15  in the meeting.
16  Q.  Did you have comments and suggestions
17  on some of the provisions and language?
18  A.  Yes, I think we advised and discussed
    from a claims processing standpoint how
20  some things should be worded in the plan
21  document.
22        But it was strictly for a
23  systems procedure so that if a claim came
24  in we could process that claim easily

63

1  without having to think about it and it
2  goes right out the door.
3        They had a provision in their
4  old document that required, it enabled-- it
5  required the claims examiner to think too
6  much.
7  Q.  The way Mr. Gatanti explained it
8  yesterday was that the Medical Summary Plan
9  Descriptions are really the, I think you'd
10  use the term "the Bible" that the claims
11  examiner would utilize in determining
12  whether to approve, reject or further
13  investigate a claim.  Do you agree with
14  that?
15  A.  Let me just see if I can rephrase
16  what you said.
17  Q.  Sure.
18  A.  The plan document is the Bible.  The
19  Summary Plan Description doesn't
20  necessarily include everything that a Plan
21  Document does, but in that particular case
22  they used the plan document as the Summary
23  Plan Description.
24        So in their case, that Summary

64

1  Plan Description is also the plan document
2  and it is used as like the Bible.
3  Q.  So that's why it was important for
4  the people at BeneFirst to be familiar with
5  it?
6  A.  Yes.
7  Q.  And you recall, we'll get into the
8  actual document in a little bit, but the
9  document has references to BeneFirst within
10  the document, does it not?
11  A.  Yes, it does.
12  Q.  At the time the plan document was
13  prepared it was already agreed to that
14  BeneFirst was going to be the third-party
15  administrator?
16  A.  I believe so, yes.
17  Q.  Were you involved in the negotiations
18  over the contractual relationship between
19  BeneFirst and Aubuchon?
20  A.  Very little, if at all.  I really
21  didn't -- I mean it was Paul Sullivan that
22  would handle all that.
23  Q.  And he had the authority on behalf of
24  BeneFirst to negotiate those terms?

1 A. Yes.

2 Q. And was it BeneFirst's practice to
3 execute written agreements with its
clients?

5 A. Yes.

6 Q. Did you have just oral agreements or
7 were they all reduced to writing?

8 A. No, it was all in writing.

9 Q. And did you have a standard form
10 document that you used?

11 A. Sorry?

12 Q. A standard form contract that
13 BeneFirst used.

14 A. For?

15 Q. For its engagements with its clients.

16 A. Yes.

17 Q. Do you know prepared that?

18 A. I think I prepared it early on and it
19 became our standard form.

20 Q. Do you recall that actually for
21 Aubuchon there were actually two plans,
22 one for the distribution center and one for
23 the hardware chain?

A. Yes.

66

1 Q. And BeneFirst was to be the TPA for
2 both plans?

3 A. Yes.

4 Q. And do you have a memory at one point
5 the distribution company's plan went away?

6 A. Yes.

7 Q. And do you recall why?

8 A. It was a Union issue. They went with
9 the Union plan. I don't think we could
10 touch the numbers.

11 Q. So they stopped providing the plan,
12 and therefore the TPA contract ended?

13 A. Right.

14 Q. And I'm sure you know this, that
15 nobody has been able to put their hand on a
16 signed TPA Agreement, are you aware of
17 that?

18 A. Probably, yes. Through the
discussions I've heard that, yes.

20 MR. BRODIE: Excuse me, off the
21 record.

22 (Discussion off the record)

23 Q. We haven't been able to find a signed
24 agreement. You would believe based upon

1 your memory and your experience that at one
2 point in time there was a signed agreement
3 with Aubuchon, is that correct?

4 A. Yes.

5 Q. You would find it highly unlikely
6 that this relationship would have gone on
7 for several years without a signed
8 agreement?

9 A. Based upon the relationships
10 involved, you know, I don't -- I wouldn't
11 say that. I think, you know, these guys
12 would operate on a handshake, Paul Sullivan
13 and Marcus Moran and that crew.

14 It doesn't mean that we would
15 at BeneFirst. But I mean that was our
16 contract and that's what we provided
17 services based upon.

18 Q. So let me say it to you another way.
19 As the representative of BeneFirst, frankly
20 the only party that can represent BeneFirst
21 here today, if somebody asked you what were
22 terms of the relationship between BeneFirst
23 and Aubuchon, you would look at that
24 written contract whether it was signed or

68

1 not, is that fair to say?

2 A. That's correct.

3 Q. Stated another way, BeneFirst didn't
4 have any oral terms of an agreement with
5 Aubuchon different than the written
6 document?

7 A. Not to my knowledge.

8 Q. Do you recall in 2005, so after the
9 termination, and I think while you guys
10 were probably doing the run-out, several
11 requests coming from Aubuchon looking for a
12 copy of the signed agreement?

13 A. I don't recall.

14 Q. I'm going to show you a letter dated
15 August 2, 2005 that purports, at least it
16 says on its face, that it is from you to a
17 lawyer named Charlie Gelinas. I'm just
18 going to ask if you sent that letter and
19 you recall it.

20 A. (Reading document)

21 MR. BRODIE: Off the record for
22 a second.

23 (Discussion off the record)

24 Q. My question is do you recall sending

1  that letter?
2  A.  I don't recall sending this letter,
3  no.  And I have issues with this letter.
4  I'd like to -- if you had an original,
5  there's just certain things in here that
6  just kind of send up a red flag to me.
7  Q.  Like what?
8  A.  No signature.  This first Duke,
9  Mrs.-- I mean it it's scanning, I mean we
10 have done scanning before, and I know Eric
11 said that scanning can do these things.
12        I just see so many things in
13 here -- when I was looking at this, you
14 know, a typo in the first section of
15 Section 1 of the contract.
16        I'm just -- I mean these are
17 just some of the things that I look at, and
18 I think, Jesus, this didn't look right.
19        I mean it did essentially
20 inform, it's a similar-looking document to
21 our Administrative Services Agreement.
22        And this is-- you know, this
23 was a DC, so this didn't last very long.
24 So maybe this is a subsequent -- revisions

70

1  of the A.S.A. would look differently.
2        But I don't remember writing
3  this letter.  So --
4        But I mean this does looks like
5  our A.S.A. with a few things in here that I
6  have issues with so --
7  Q.  Let's take them one step at a time.
8        MR. CIAVARRA:  First of all,
9  let's mark this so we know what we're
10 talking about, as Exhibit 4.
11        (Exhibit 4, Letter to Atty.
12        Gelinas 8/2/05 with
13        Administrative Services
14        Agreement, marked)
15 Q.  So my first question to you is, (1),
16 do you deny sending that letter?
17        MR. BRODIE:  I guess I would
18 object.  "That letter," meaning, is the
19 question here is this an accurate copy of
20 whatever was sent?
21        MR. CIAVARRA:  I can break it
22 down in many ways.
23 Q.  So my first question is, that
24 document in that form, do you deny sending

1  that?
2  A.  Yes.
3  Q.  Okay.  Then we'll take it piece by
4  piece.
5  A.  Okay.
6  Q.  Do you deny sending a letter on or
7  about August 2, 2005 to Attorney Charlie
8  Gelinas attaching a copy of an A.S.A.?
9  A.  Can I neither admit nor deny just
10 because I just don't recall?
11 Q.  Do you recall ever receiving a
12 request from Attorney Gelinas for such a
13 document?
14 A.  I believe I did.
15 Q.  Did you ever send him a copy of the
16 A.S.A. you had on file?
17 A.  If he had asked for one, I would have
18 done that.
19 Q.  Okay.  And what you can't tell us
20 today is whether or not that's actually the
21 letter and actually the document you sent,
22 is that fair to say?
23 A.  That's correct.
24 Q.  Okay.  Now I'd like you to just turn

72

1  to the actual agreement that's attached to
2  it.  If you turn that to the first page.
3  A.  Hold on one second.  Do you have a
4  copy of his letter dated July 19?
5        MR. BRODIE:  I'll look.
6  Q.  We will just keep going.  I'll come
7  back to it.
8  A.  Okay.
9  Q.  So turn to the agreement.  Now during
10 the course of Sarah Arel's deposition your
11 attorney marked a document which he
12 indicated was an A.S.A. which they were
13 able to locate.
14        Let me show you that document.
15 It was marked as Exhibit 7 during the
16 deposition of Sarah Arel.
17        MR. BRODIE:  I'll object to the
18 characterizaton of what representations
19 were made.
20        MR. CIAVARRA:  Did I
21 mischaracterize it?
22        MR. BRODIE:  I know we marked
23 it, but I don't know if we represented this
24 was anything more than what it was.

73

1  MR. CIAVARRA: I'll represent
2  for the record, you correct me if I'm wrong
3  here, that you guys have not produced any
4  other version of an A.S.A. Can we agree on
5  that?
6  MR. BRODIE: Maybe we should go
7  off the record on this.
8  MR. CIAVARRA: Sure.
9  (Discussion off the record)
10  MR. CIAVARRA: Back on the
11  record. I think we can agree, Counsel can
12  agree that the version of the A.S.A. that
13  I've put in front of the witness, Exhibit 7
14  to the deposition of Sarah Arel, is the
15  only A.S.A. that we have been able to find
16  that has Aubuchon's name on it. That's
17  correct, isn't it?
18  MR. BRODIE: "We" meaning?
19  MR. CIAVARRA: That anybody.
20  MR. BRODIE: Any party?
21  MR. CIAVARRA: That anybody has
22  produced in this case.
23  MR. BRODIE: I can agree to
24  that.

74

1  Q.  So my question to you is, let's go
2  back to the witness now.
3  A.  Keep it up, boy.
4  Q.  Are you aware of any other agreement
5  other than the one that's been put in front
6  of you, either as attached to Exhibit 4 or
7  as in reference in Exhibit 7 to the Sarah
8  Arel deposition, between Aubuchon or
9  Aubuchon Distribution and BeneFirst?
10  A.  Yes, there would have been another
11  document. Maybe two other ones.
12  Q.  Do you have any memory, actual memory
13  of the terms of that written document being
14  in any way different than the exhibits put
15  in front of you now?
16  A.  Yes.
17  Q.  And what is your memory?
18  A.  Well, the one for the hardware store
19  would not have said Distribution Center.
20  So that would have been another agreement.
21  Q.  Right.
22  A.  And then, which was brought to my
23  attention, which was Section 6, Performance
24  Standards.

75

1  In the early Administrative
2  Service Agreements that we used we had
3  built in Performance Standards into the
4  Administrative Services Agreement.  These
5  were the same Performance Standards that we
6  received from RIMS when they were
7  processing the claims. So we provided
8  those same standards to our clients.
9  As time went on and the HIPPA
10  laws came about, to be compliant with
11  HIPPA, these Performace Standards really
12  became null and void.
13  Essentially, if we lived up to
14  them, we would be violating HIPPA, meaning
15  because HIPPA was more stringent than what
16  our Performance Standards were.
17  So we just took them out.
18  So in subsequent A.S.A.'s you
19  would not see that Performance Standards
20  section. That's the most blaring one that
21  I see.
22  Q.  And you believe it's in Section?
23  A.  Section 6, page 5. The whole
24  section.

76

1  Q.  Exhibit 7 to Sarah Arel's deposition
2  in 6(b), it still has Performance
3  Standards, does it not? Does your copy
4  have that as well?
5  A.  This one does, yes.
6  Q.  Okay. And this document has a date
7  on it of August 2, 2005?
8  A.  Yes, that would have been when it was
9  printed off.
10  Q.  Okay. Because again, this is for the
11  Distribution Center, which we know ended
12  several years earlier.
13  A.  Right, right.
14  Q.  I guess what I'm trying to understand
15  is the Performance Standards that are set
16  forth in the two documents that we are
17  looking at in 6(b), you're telling me that
18  these were in the document in its initial
19  form or in its later form?
20  A.  In its initial form.
21  Q.  And do you know when they were
22  removed?
23  A.  I do not know when they were removed.
24  Q.  So there was a time in which these

1  Performance Standards were in place in the
2  relationship between BeneFirst and the two
3  Aubuchon companies?
   A.   Yes, correct.
5  Q.   And you believe at some point if
6  another document were signed, that it would
7  eliminate that language?
8  A.   Yes.
9  Q.   And again, do you know whether or not
10 new agreements were signed every year?
11 A.   They -- we wanted them signed every
12 year.   They did not need to be signed
13 every year.   There's no termination date on
14 the A.S.A.
15         And Paul and Maureen weren't
16 necessarily always stringent in getting
17 things signed.
18 Q.   Okay.   We had started talking a
19 little bit about the plan built for
20 Aubuchon, which you told me was Barbara
21 Cope was the person who was initially
22 involved in doing that?
23 A.   Initially, yes.   No, actually, I take
   that back.   If this plan came over from

1  program was necessary for the computer
2  system to be able to work and to do the
3  claims examination was built by Trizetto?
4  A.   Correct.
5  Q.   And then when you brought the claims
6  examination in-house did you enter some
7  type of a license agreement with Trizetto?
8  A.   Yes.
9  Q.   And for that you got access to their
10 software?
11 A.   Yes.
12 Q.   And also all of the plan build
13 documents?
14 A.   Yes.
15 Q.   So that after that transaction you
16 were able to do in-house what Trizetto was
17 doing in Chicago?
18 A.   Correct.
19 Q.   What training, if any, did your
20 claims examiners get from Trizetto when you
21 hired them?
22 A.   We had a staff of three people come
23 in from Chicago.   And before they would
24 allow us to take over the system, we had to

78

1  Trizetto, Trizetto would have done the plan
2  build.
3  Q.   What makes you think the plan came
4  from Trizetto?
5  A.   It doesn't come from Trizetto.   What
6  I mean is that when we took it over, took
7  it away from them, Aubuchon was already a
8  client.   We were already processing claims
9  on Aubuchon's plan.   And that was in July.
10 And we were still with Trizetto and they
11 were doing all the plan billing out in
12 Chicago.
13 Q.   I guess what I want to know is, is
14 that your memory of how the plan was built
15 or are you working your way through it
16 logically?
17 A.   Oh, well, I know that we would not--
18 under those circumstances at that timeframe
   no one was in our office to be able to bill
19 the plan.
21         So logically, yah, I mean I
22 can't say that Barbara Cope did it
23 because --
24 Q.   So your best memory is that whatever

80

1  buy their training program.   It was like
2  $16,000.
3         And we had three people come in
4  for a week and just go through a whole
5  entire training program for all of our
6  staff on how to do every aspect of the
7  system.
8  Q.   All right.   Turning your attention to
9  the agreement referenced on Exhibit 4.
10 Okay?
11         This Administrative Services
12 Agreement is a form that was created by you
13 and by BeneFirst?
14 A.   Yes.
15 Q.   And there would be whatever changes
16 done on a per client basis made within the
17 document?
18 A.   Yes.
19 Q.   Let me ask you in the years that you
20 worked in this field did you become
21 familiar with a concept of a fiduciary
22 within health care plans?
23 A.   Yes.
24 Q.   And what's your understanding about

81

1 what is a fiduciary?

2 A.   Well, I mean the way we always talked

3 about it, you have a big F and little F

4 fiduciary.

5       And the big F was really the

6 plan sponsor, the one who was in charge of

7 everything.  They're the ones that had to

8 follow the ERISA guidelines and the ERISA

9 laws.  That's their responsibility.

10      We were a claims administrator

11 or benefits administrator.  We were nothing

12 more than a vendor to a plan sponsor or a

13 fiduciary of a plan.

14      We did not have discretion over

15 the plan, we couldn't make decisions as to

16 what benefits were provided to people.

17      We just had to follow that

18 Bible, that plan document, and make sure

19 that we paid claims accordingly.

20 Q.   So that would be a little F?

21 A.   That would be a little F, yes.

22 Q.   And the little F standing for

23 fiduciary?

24    A.   Yes.

82

1 Q.   When you were operating BeneFirst did

2 you consider that you had a fiduciary duty

3 to the plan?

4 A.   We had, as a provider of services to

5 a client, a fiduciary responsibility to

6 that client.  We did not have a fiduciary

7 role to the plan.

8 Q.   And who was the client?

9 A.   The Plan Administrator.

10 Q.   The reason I said that, I'm looking

11 at the document that you guys prepared and

12 it identifies BeneFirst as the plan

13 administrator, does it not?

14 A.   Yes, it does.  But in subsequent

15 documents we changed that to Claims

16 Administrator.

17      But for all intents and

18 purposes, if you look at the definition of

19 what we performed for them, it was the same

20 thing as a Claims Administrator.

21      If you look at the plan

22 document, I think one of the reasons why we

23 changed that was because I believe the plan

24 document for Aubuchon said use both plan

83

1 sponsor and plan administrator, meaning

2 Aubuchon, and not BeneFirst.

3 Q.   As I look at the Plan Document and

4 identify it, and we can agree or disagree

5 with this, the plan administrator is

6 Aubuchon, for example, on the Aubuchon

7 plan, but then said that all the

8 responsibilities and duties of plan

9 administrator would be contracted with

10 BeneFirst.  Is that how you read it?

11      MR. BRODIE:  Objection.

12 A.   Yes.

13 Q.   And that certainly was the intention?

14 A.   Right, that's how they, right, that's

15 how everyone understood it.

16      But as I said, just by your

17 description, it was an out-sourced service

18 to a third party, but they would never pass

19 on that fiduciary role by doing that to us.

20 We would have never accepted it.

21 Q.   You're not suggesting there was any

22 discussion about that, are you, or are you?

23 A.   Well, I think we always had to bring

24 it back to the clients to say, Hey, guys,

84

1 it's your plan.  You tell us how you want

2 to administer it.

3      You know, those, we would get

4 questions from Marcus all the time as to

5 Hey, can I do this, can I do that.

6      And we'd always advise him,

7 like, we'll do whatever you want, you're in

8 charge of the plan.  But I mean we have to

9 go by what the plan document says.

10 Q.   You knew Aubuchon was not, there was

11 nobody at Aubuchon trained in claims

12 administration, was there?

13 A.   No, not that I am aware of.

14 Q.   You knew that they were relying on

15 BeneFirst to do that?

16 A.   For claims processing.

17      MR. BRODIE:  Note my objection.

18 Q.   Claims processing?

19 A.   Yes.

20 Q.   You knew that they were relying on

21 BeneFirst to do the claims adjudication?

22 A.   Exactly, yes.

23 Q.   And to the extent there were

24 decisions that had to be made in connection

**85**

1 with that adjudication, they were
2 depending on BeneFirst to make those
3 decisions?
    MR. BRODIE: Objection.
5 A. When you say decisions, I just want
6 to make sure we are on the same page here.
7        I mean there are tens of
8 thousands of decisions that are made on a
9 monthly basis when adjudicating claims for
10 the size of a company of Aubuchon.
11        I mean those decisions are just
12 simple snap-snap, you know, a lot of times
13 a computer is the one that makes that
14 decision and that's it.
15        Things outside of the system
16 are decisions that we would never have
17 made. We would always have asked for
18 permission from the client or given advice
19 to the client and wait for their response.
20        We would never have adjudicated
21 claims outside of the terms of the plan
22 document without the permission of the
23 client.
    Q. But whether or not something was

**86**

1 within or without the plan document, it's
2 something that a claims examiner would have
3 to consider on a daily basis, isn't that
4 true?
5 A. Yes, absolutely.
6 Q. And they would, you're not
7 suggesting, are you, that on a daily basis
8 your claims examiners were calling somebody
9 at Aubuchon and asking Aubuchon, somebody
10 at Aubuchon, whether something was within
11 or out of the document?
12 A. On a daily basis, no, I wouldn't say
13 it's on a daily basis.
14 Q. But on a daily basis the claims
15 examiners were making those decisions of
16 whether or not a particular claim fell
17 within or without the plan?
18 A. Within or without, outside of the
    parameters of the plan that the fiduciary
    had given to us to adjudicate based on.
21 Q. And who was relying on you to
22 adjudicate?
23 A. Exactly.
24 Q. Can you think of any instance as you

**87**

1 sit here today where Aubuchon asked you for
2 advice in connection with something on the
3 plan and BeneFirst provided that advice and
4 Aubuchon didn't follow it?
5        MR. BRODIE: Note my objection.
6 A. You know, it's been so long. I can
7 think of one that comes to mind that Marcus
8 wanted to do. The story was that he wanted
9 to pay for Gerry Archambeault's handicapped
10 van through the plan.
11        And you know, that was the type
12 of request we would get from Marcus. I
13 mean there was a lot of other exceptions,
14 too, that we had to make for Aubuchon as
15 well.
16        And you know, we would always
17 say that we'll do whatever you want, but
18 it's not going to be covered by the plan,
19 I mean it's not going to be covered by the
20 stop loss carrier. And they knew it. You
21 know, they were very interactive in their
22 plan.
23 Q. So I'm going to talk about, my
24 question to you is was there a situation in

**88**

1 which BeneFirst provided advice concerning
2 the plan to Aubuchon and Aubuchon didn't
3 follow it.
4        Is it your testimony that
5 somebody at BeneFirst told Aubuchon that
6 this handicapped van was not covered by the
7 terms of the plan?
8 A. Yes.
9 Q. And who did that, if you know?
10 A. I don't know, but it's not, it
11 wouldn't have come down the way you've just
12 described it. It wouldn't have been
13 presented as a claim.
14        It would have been presented to
15 us by Marcus or Sarah saying, "Hey, Gerry
16 needs a handicapped van. Marcus really
17 wants to do it for him. Can we pay it
18 through the system?"
19        I mean that's an extreme
20 example that I always remember as the type
21 of employer that Marcus was.
22        There were other cases. I
23 can't recall, I'm sure if we started going
24 through names and stuff, I'd start

1  recalling some of the situations,
2  individual situations.
3  Q.  But I think we are mixing up
   situations.  What I hear you describing to
5  me is something that Paul Gatanti talked
6  about, which is the payment of benefits
7  outside of the loss, the aggregate loss?
8  A.  The stop loss contract?
9  Q.  Right.
10 A.  Yes.
11 Q.  Because ultimately all this money in
12 the plan is Aubuchon's money?
13 A.  Yes.
14 Q.  It's a self-funded plan
15 A.  Right.
16 Q.  And the only issue becomes whether or
17 not it's going to be utilized to trigger
18 the excess coverage, right?
19        MR. BRODIE:  Objection.  You
20 can answer.
21 Q.  In terms of whether or not a claim
22 gets paid or not?
23 A.  Right, okay.
   Q.  So what Paul described, Paul Gatanti

1        And I understand it was years
2  ago.
3  A.  Yah, I can't recall specifically.
4        MR. BRODIE:  I will just object
5  to the lack of foundation on that.  I'm not
6  sure that that's been established.
7  Q.  Okay.  You understood that part of
8  the responsibilities of the claims examiner
9  was to take a look at the claims that came
10 across the desk and to determine whether or
11 not there might be other people responsible
12 to help pay for that claim?
13 A.  Oh, yah, yah.
14 Q.  And that might be other insurance?
15 A.  Yes.
16 Q.  It might be somebody who caused an
17 injury that there be a subrogation claim
18 against?
19 A.  Yes.
20 Q.  And you understood that your people,
21 your claims examiners, would have to make
22 that determination in the first instance?
23 A.  Yes.
24 Q.  And for example, that might require

90

1  described was that from time to time there
2  would be benefits Aubuchon wanted to
3  provide to its employees that would be paid
4  outside of the loss funds.  Do you recall
5  that?
6  A.  Oh, yah, yah.
7  Q.  And that was okay because it wouldn't
8  capture it in a way that couldn't be used
9  to trigger the stop loss insurance, right?
10 A.  Yes.
11 Q.  And for example, this handicapped van
12 situation you're talking about would be one
13 such situation?
14 A.  Exactly.
15 Q.  And I hear those and I heard about
16 those yesterday.  And what I'm asking is
17 something different than that.
18        Is there a situation in which
   BeneFirst provided some advice with respect
20 to the plan with respect to whether
21 something was covered or not covered with
22 respect to administration of the plan, or
23 any function that BeneFirst was involved
24 in, that Aubuchon did not follow.

92

1  some investigation on their part, right?
2  A.  Yes.
3  Q.  Did you believe that your people in
4  2004, your claims examiners, had sufficient
5  training in order to make those decisions?
6  A.  Yes.
7  Q.  Now those decisions of whether or not
8  to investigate co-insurance or to
9  investigate maybe a third-party who caused
10 the injury, there's nothing in the plan
11 that tells you how to do that, is there?
12 A.  How to do it?
13 Q.  Or I should say whether and when to
14 do it.
15        MR. BRODIE:  Note the
16 objection.
17 A.  Yes, there's wording in the plan, I
18 believe, that would talk about those types
19 of things.  I mean that's why we did it.
20 Q.  Go ahead.
21 A.  There are some plans that don't have
22 a coordination of benefits provision.
23        There are some plans that don't
24 have a subrogation provision.

1  So would we search for
2  subrogation?  No.  Why would we?  The plan
3  doesn't require us to search out
4  subrogation.
5        So if we looked for those
6  things, the reason why we looked for them
7  was because the plan document required they
8  were investigated.
9  Q.  Let me be more specific.  The plan
10  would tell the claims examiners to look for
11  those things because they're covered in the
12  plan, whether there's a right to offset
13  because of co-insurance, reduction in
14  benefits, for whatever reason.
15        But the actual mental process
16  that the claims examiner would go through
17  to figure out who do I call, where do I
18  look, you know, what investigation do I
19  undertake, that's not described in the
20  plan.  Would you agree with that?
21  A.  That's correct.
22  Q.  Did you have at BeneFirst any other
23  written materials or, you know, procedures
   or guidelines for your claims examiners to

1  Q.  Yes.
2  A.  It would be noted in the system as to
3  whether that person, where that person
4  falls in the category, you know, eligible
5  or ineligible.  So the system would tell
6  the claims examiner.
7        The claims examiner does not
8  have the ability to change eligibility.
9  Q.  So they would plug in, I think Paul
10  said typically the Social Security Number
11  into the computer.  Is that your
12  understanding?
13  A.  Yes.
14  Q.  And then that person's name and
15  profile would pop up if they were an
16  eligible person.  Is that your
17  understanding?
18  A.  Yes.
19  Q.  And presumably if there was no
20  records of that person, then there would be
21  no claim process for that person?
22  A.  Or no record, or if they had a
23  terminate date prior to the date of the
24  service in the claim, we wouldn't

94

1  follow either in pursuing subrogation
2  claims or co-insurance?
3  A.  Well, I believe that Paul Gatanti was
4  working on and created a policy manual for
5  the employees, for the claims examiners.
6  Q.  Do you know if that ever got to the
7  point of being finished and used?
8  A.  I don't believe it was.  But I
9  believe that Paul trained everyone when
10  they came on board and to how he wanted
11  things.
12  Q.  There's, you may recall this from
13  your review of the initial audit that was
14  done for the excess carrier, that some of
15  the over-payments were attributed to
16  ineligible participants.   Do you recall
17  seeing that?
18  A.  I believe I saw that, yes.
   Q.  And questions of eligibility.  When a
   claims examiner receives a claim for any
21  particular individual, how would they know
22  whether or not that person is eligible for
23  coverage?
24  A.  The claims examiner?

96

1  adjudicate the claim.
2  Q.  What was the responsibility of a
3  claims examiner when they would receive a
4  claim and there would be no records of a
5  person being an eligible participant?
6  A.  The claim would be denied.
7  Q.  They wouldn't check with somebody
8  else to find out if there's a pending
9  eligibility form?
10  A.  No, because by the time a claim got
11  to an examiner, I mean that person should
12  be in the system somehow.
13  Q.  In connection with administering the
14  Aubuchon plan, if BeneFirst authorized
15  payments for claims that it shouldn't have
16  that were not proper payments, they were
17  not covered claims, do you believe that
18  BeneFirst is responsible for that
19  financially back to Aubuchon?
20        MR. BRODIE:  Objection.
21  A.  No.
22  Q.  Why not?
23  A.  It's not our money.  If it was paid
24  out incorrectly, typically a doctor's

1   office would send it back to us and it
2   would go back in as a refund to the plan.
3   You have to understand why the claim was
4   paid incorrectly.
5           We're not the insurance
6   company. We're just a record keeper for
7   the plan.
8           And with any plan you're always
9   going to have claims that were paid
10  incorrectly. Should we be responsible for
11  those financially? Absolutely not.
12  Q.  So who should be responsible for
13  those inappropriate payments?
14          MR. BRODIE: Objection.
15  Q.  Is it your position that the plan has
16  to absorb those costs?
17  A.  No. The plan should not absorb those
18  costs. If a claim was paid incorrectly to
19  a provider --
20  Q.  "If a claim was paid incorrectly?"
21  You said "claim." You meant a claim,
22  right?
23  A.  The plan should not. I spoke
    correctly. Initially I was talking about a

1   money and say "Yippie-yah-hoo, Aubuchon
2   paid more than what they were supposed to;"
3   they send the money back.
4           That's why on every one of
5   those Check Edits we sent to Aubuchon you
6   you can go back there and see refunds. It
7   happened every month.
8           When you're sending out that
9   many checks, you're going to pay some
10  things incorrectly. And you can go back
11  and look at the Check Edits form and see
12  that yes, every single month we got
13  refunds.
14          Now you're claiming that
15  there's so much more out there, millions of
16  dollars of claims paid incorrectly that
17  some doctor's offices are sitting on.
18          We didn't take the money. All
19  those claims were paid out to a provider.
20          They're not sitting on that
21  money thinking that they've got a windfall.
22  I mean that money would have come back and
23  would have been returned back to Aubuchon.
24          So you know, to think that it's

1   plan.
2           Now I'm saying if a claim was
3   paid incorrectly, we just go back and get
4   the money back from the provider.
5   Q.  Has BeneFirst done that on behalf of
6   Aubuchon for any of the claims that were
7   paid inappropriately?
8   A.  Yes.
9   Q.  Do you believe you've done it for all
10  claims that were paid incorrectly?
11  A.  I don't believe that -- I believe
12  that the extent, from what I see from your
13  audits, to think that we paid that much out
14  incorrectly is -- I mean it just goes to
15  show you.
16          Doctors' offices do not keep
17  money that is not theirs. If they get an
18  over-payment or something was paid
19  incorrectly, they turn around and they send
20  it back.
21          I mean if they get audited by
22  Medicare or Medicaid, and they've got this
23  money on the books, they're in big trouble.
24          Doctors' offices do not collect

1   our responsibility, yes, we can go out and
2   help find that money, but the money isn't
3   there. The money was paid correctly.
4   Q.  Where would the money be refunded
5   back to if the money had been billed
6   incorrectly?
7   A.  Back to BeneFirst.
8   Q.  And after BeneFirst was terminated in
9   January of '05, what record-keeping --
10  January of '05 when Aubuchon terminated
11  BeneFirst--
12  A.  Yes.
13  Q.  When refunds would come in what did
14  BeneFirst do with those funds?
15  A.  We would have deposited them either
16  into the Aubuchon if it was still active or
17  we would have just turned around and cut
18  them a check and sent it back to them.
19  Q.  And who was responsible for doing
20  that?
21  A.  Linda Hart and that woman whose name
22  I couldn't remember before.
23  Q.  And how about after the runoff period
24  of time when the relationship was totally

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

W.E. AUBUCHON CO., INC., AUBUCHON )
DISTRIBUTION, INC., W.E. AUBUCHON )
CO. INC. EMPLOYEE MEDICAL )    C.A. No. 05-40159FDS
BENEFIT PLAN, and AUBUCHON )    (Louis M. Ciavarra BBO# 546481)
DISTRIBUTION, INC. EMPLOYEE )    (James P. Hoban BBO #633929)
MEDICAL BENEFIT PLAN )    (Colleen E. Cushing BBO# 663498)
Plaintiffs, )
 )
v. )
 )
 )
BENEFIRST, LLC, )
Defendant. )

## PLAINTIFFS' LOCAL RULE 56.1 STATEMENT

I.    Depositions and Documentation In Support of L.R. 56.1 Statement.

### *Deposition Excerpts Appended:*

- Fed. R. Civ. P. 30(b)(6) Deposition of BeneFirst, LLC ("BeneFirst") by and through Charles T. Dobens ("Dobens"), dated April 15, 2008 ("BF 30(b)(6) dep. (4/15/08 - Dobens)") . . . . . . . . . . . . . . . . . . . . . . . . . Tab 1

- Deposition of M. Marcus Moran, Jr. dated May 22, 2008 ("Moran dep.") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Tab 2

- Deposition of Sarah Arel dated April 9, 2008 ("Arel dep.") . . . . . . Tab 3

- Deposition of Paul Gatanti, Jr. dated April 14, 2008 ("Gatanti dep.") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Tab 4

- Deposition of Carrie Reddie dated May 16, 2008 ("Reddie dep.") . Tab 5

- Deposition of Charles Lord dated May 22, 2008 ("Lord dep.") . . . .Tab 6

- Fed. R. Civ. P. 30(b)(6) deposition of BeneFirst, by and through Dobens dated September 7, 2006 ("BF 30(b)(6) dep. (9/7/06 - Dobens)") . . Tab 7

*Exhibits Appended:*

- BeneFirst's Responses to Plaintiff's Requests for Admissions dated April

  14, 2008 ("Adm. Resp.") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Tab 8

- W.E. Aubuchon's Supplemental Answers to Interrogatories dated

  November 14, 2007 ("WEA Supp. Ans. Ints.") . . . . . . . . . . . . . . . .Tab 9

- Aubuchon Distribution's Supplemental Answers to Interrogatories dated

  November 14, 2007 ("Distrib. Supp. Ans. Ints.") . . . . . . . . . . . . . .Tab 10

- Unsigned Administrative Services Agreement ("ASA") . . . . . . . . . Tab 11

- Correspondence from S. Rosenberg to L Ciavarra dated August 31, 2007

  ("8/31/07 Letter") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Tab 12

- Email from C. MacLeod to S. Arel dated May 17, 2008

  ("5/17/05 Email") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Tab 13

- Correspondence from BeneFirst (P. Sullivan) to W.E. Aubuchon

  (M. Moran) dated June 29, 2004 ("6/29/04 Letter") . . . . . . . . . . . .Tab 14

- Report of Northshore International Insurance Services dated April 8, 2005

  ("4/8/05 NIIS Report") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Tab 15

- Report of NIIS dated July 22, 2005 ("7/22/05 NIIS Report") . . . . . .Tab 16

- Report of NIIS dated April 8, 2008 ("4/8/08 NIIS Report") . . . . . . .Tab 17

- Order on BeneFirst's Motion for Reconsideration Of Court's Discovery

  Order Related to Medical Bills dated February 6, 2007 ("Order") . .Tab 18

- Affidavit of Sarah Arel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Tab 19

II.    Statement of Material Facts.

1.    W.E. Aubuchon and Aubuchon Distribution are Massachusetts corporations and were the plan sponsors for the Plans, which provided medical benefits to their respective qualifying employees. It is not disputed that the Plans are covered by ERISA. The Plans are self-insured. (See W.E.A.S.P.D. (7/1/01), p. 3; W.E.A.S.P.D. (9/1/02), p. 3; A.D.S.P.D., p. 3.) The Aubuchon Companies have never administered their own Plans, but rather have always retained the services of a third-party administrator ("TPA"). (See Moran dep., p. 40.) In or around 2001, the Aubuchon Companies reached agreement with BeneFirst to act as administrators for both Plans. (See BF 30(b)(6) dep. (4/15/08 – Dobens), pp. 64, 66.)

2.    The Aubuchon Distribution Plan terminated at the end of the 2002 Plan year when that company's employees became covered under a union medical benefit plan. (See BF 30(b)(6) dep. (4/15/08 – Dobens, p. 66.)) As such, BeneFirst was the TPA for a single Plan year, July 1, 2001 to June 30, 2002, with respect to the Plan. (See Aubuchon Distribution's Supp. Ans. Ints., No. 4; BF 30(b)(6) dep. (4/15/08 – Dobens), p. 31.) BeneFirst served as the TPA for the W.E. Aubuchon plan from July 1, 2001 until December 31, 2004, at which time it was terminated by W.E. Aubuchon in the middle of the Plan year. (See Aubuchon Supp. Ans. Ints., No. 4; BF 30(b)(6) dep. (4/15/08 – Dobens), p. 31.)

3.    Although no signed copies of the Administrative Services Agreements ("ASA") for the Plans have been located; the parties do not dispute that the unsigned copy which is included in these papers embodies the essential terms of the agreements between BeneFirst and W.E. Aubuchon and between BeneFirst and Aubuchon

Distribution.  (See BF 30(b)(6)(4/15/08 – Dobens), pp. 65-68, 73, 77, 80, 117-18;  Moran dep., p. 107; Arel dep., pp. 31-36; ASA.)  In this regard, BeneFirst has testified that they had a standard form ASA, that it was BeneFirst's practice to obtain a signed ASA for each client, and that, despite its inability to locate a signed copy, BeneFirst would look to the terms of the unsigned ASA which has been produced in discovery for the terms of the agreement between the parties.  (See BF 30(b)(6) dep. (4/15/08 - Dobens), pp. 65-68, 73, 77, 80, 117-18.)  Similarly, employees of the Aubuchon Companies have testified that the unsigned ASA contains the terms of the agreements by and between them and BeneFirst. (See Moran dep., p. 107; Arel dep., pp. 31-36, Ex. 7.)

      4.    The Administrative Services Agreements provide, among other things, that BeneFirst will: (1)  pay Plan benefits "in its usual and customary manner," (2) notify beneficiaries of any claims denials, the basis for the denials, and their appellate rights under the Plan; (3) "[m]aintain, for the duration of this Agreement and for two (2) years thereafter, adequate records of all transactions between the Plan Sponsor, the Plan Administrator and plan participants;" (4) refer to the Plan sponsor for determinations of (a) any class of claims specified by the sponsor, (b) disputed claims, (c) questions or eligibility and entitlement to coverage, (d) questions as to the amount of benefits due, and (e) "any other question; "(5) provide the Plan sponsor with "service and assistance in connection with the design and development of the Benefit Plan, initially and in connection with Benefit Plan Revisions;"[1] (6) furnish required annual reports and administrative forms to the plan participants; (7) make diligent efforts to correct any over payment or under payment made by it; (8) "issue claims payments (using Plan Sponsor

---

[1] "Service and assistance" is defined to include: actuarial and underwriting services; estimating initial plan costs; estimating costs projections for any proposed plan revisions; and advice  regarding the preparation of plan documents and summary plan descriptions.

supplied funds) on a weekly basis;" (9) send COBRA notices of right to continue coverage and election forms to qualified beneficiaries, track the beneficiaries during the election period, confirm election and provide premium payment coupons to electing beneficiaries, and to collect COBRA premiums from those electing coverage. (See ASA, pp. 1-2, 5.)[2] In addition, BeneFirst authorized to and did pay itself its commissions from COBRA premiums it collected prior to paying the net premiums over to the Aubuchon Companies. (See ASA, pp. 4, 11; BF 30(B)(6)(4/15/08 – Dobens), pp. 126-27; 131-32.)

5.    The Aubuchon Companies agreed to, among other things, open, maintain, and fund, as directed, a bank account on which BeneFirst was a signatory for claims payments purposes, and pay specified fees in return for these services. (See ASA, pp. 2, 9, 11.)

6.    It is not disputed that BeneFirst did, in fact, perform all of these functions with respect to the Plans. Under the ASAs, BeneFirst provided advice as to the contents of the Plans, subcontracted out the build out of a computerized claims processing systems and corrected perceived payment errors in the computerized claims process systems as they were identified. (See BF 30(b)(6) dep. (4/15/08-Dobens), pp. 77-80; Gatanti dep., pp. 139-40; Reddie dep., pp. 71-72, 74-75, 105-06.)

7.    BeneFirst's claims examiners would on a daily basis, make determinations as to whether something was within or without the Plans. (See BF 30(b)(6) Dep.

---

[2] It is also not disputed that for at least a portion of times that BeneFirst acted as TPA, that it expressly warranted that it would have a claims accuracy average of 98% or better. (See ASA, p. 5.) BeneFirst's managing member testified that it was his recollection that the standards were dropped from the ASA when the Health Insurance Portability and Accountability Act of 1996 (HIPAA) became effective and imposed even more stringent standards than those contained in the Agreement (See BF 30(6)(6) dep. (4/15/08 - Dobens), pp. 74-77.) As such, it is undisputed that BeneFirst was obligated to have a claims accuracy average at least 98% during its entire tenure as TPA.

(4/15/08 - Dobens), p. 86.) It is conceded that not all such decisions were black and white and that claims examining is not just data entry. (See Gatanti dep., pp. 46-47, 82, 91-92, 104-109, 136-37.) Claims adjudication involves some thought on the part of the examiner and there is some interpretation of the plan in certain cases. (See Gatanti dep., pp. 82, 91-92, 104-109, 136-37; Reddie dep. 38-40, 59, 99, 116-17.) If a claims examiner determined that a certain claim could be paid, but the system denied the claim the claims examiner could and did override the system or "finagle the claim to pay how they wanted it to pay." (See Gatanti dep., pp. 24-25; Reddie dep. 25-26.) BeneFirst's claims examiner also were responsible to determine whether there was other available insurance to pay a claim, to determine whether there was subrogation claim, to conduct investigations in connection with making those determinations, and to pursue other insurance and subrogation where it deemed appropriate. (See BF 30(b)(6) dep. (4/15/08 - Dobens), p. 92-94; Arel Aff., pp. 1-2.) As a practical matter, the Aubuchon Companies had no involvement in the claims adjudication process, unless approached by an employee regarding a denial of benefits by BeneFirst. (See Reddie dep. p. 82; Lord Dep., pp. 42-45, Arel dep., pp. 165-67; Arel Aff., pp. 1-2.) W.E. Aubuchon deferred to and relied upon BeneFirst's interpretation of the Plan. (See Reddie dep., pp. 111-12; Arel Aff., pp. 1-2..) BeneFirst does not deny that claims were paid in error. (See BF 30(b)(6) dep. (Dobens), pp. 102-04; Reddie dep., pp. 91-92, 96; 5/17/08 Email.)

9.    BeneFirst did, in fact, maintain claims records. (Gatanti dep., pp 86-88, Reddie dep., 63-67.)

10.    It is undisputed that BeneFirst had authority and control over the collection and disposition of Plan Assets. BeneFirst determined, on a weekly basis, the

number and dollar amounts of the claims to be paid and reported that figure to the Aubuchon Companies in a "Check Edit Report." (See BF 30(b)(6) dep. (4/15/08-Dobens), p. 40-42; Gatanti Dep., pp. 35-36, 96-99; Reddie Dep. 62-63; ASA, pp. 1, 2, 5.) Upon receipt of that report, the Aubuchon Companies funded the account upon which BeneFirst was a signatory in the requested amount. (See BF 30(b)(6) dep. (4/15/08-Dobens), p. 42-45; Gatanti dep., pp. 35-36, 96-99; ASA, pp. 1, 2, 5.). After the funding was received, BeneFirst would send a file a vendor who actually printed and mailed the checks to the care providers. (See BF 30(b)(6) dep. (4/15/08 - Dobens), pp. 44-45, 47; Reddie dep., pp. 62-63; ASA, pp. 1, 2, 5.)

11.    BeneFirst also sent out coupon books for, collected, and paid itself its two-percent commission off the top of the COBRA premiums it collected prior to remitting the balance to the Aubuchon Companies. (See BF 30(b)(6) Dep. (4/15/08-Dobens), p. 126-27, 131-132; ASA, pp. 4, 11.)

12.    BeneFirst was aware that there was no one within the Aubuchon Companies that was trained in claims administration and that they were relying upon BeneFirst for claims adjudication. (See BF 30(b)(6) Dep. (4/15/08 - Dobens), p. 84. Compare Arel Aff., pp. 1-2.) Despite this, BeneFirst contends that it was "just a record keeper for the plan" and "nothing more than a vendor to a plan sponsor or a fiduciary of a plan." (See BF 30(b)(6) dep. (4/15/08 - Dobens), pp. 81, 97.) BeneFirst contends that it did not have discretion over the plan, could not decide what benefits to provide to participants, and solely paid claims according to the plan document. (See BF 30(b)(6) dep. (4/15/08 - Dobens), pp. 80-82.) BeneFirst contends that while it had a fiduciary

responsibility to its clients, it did not had such a responsibility to the plans. (See BF 30(b)(6) dep. (4/15/08 - Dobens), pp. 82-83.)

13.    W.E. Aubuchon terminated BeneFirst effective December 31, 2004 because it no longer had confidence in their oversight of the Plan. (See BF 30(b)(6) dep. (4/15/08-Dobens), p. 31; Arel dep., pp. 52-53; Moran dep., 73.) In this regard, the W.E. Aubuchon had a number of very large claims during the 2003-2004 Plan year. (See Arel dep., p. 54.) In a letter dated June 29, 2004 from the president of BeneFirst to the President of W.E. Aubuchon, BeneFirst represented that the W.E. Aubuchon could expect to receive a $478,000 reimbursement from their aggregate stop loss carrier for the period July 1, 2003, through June 30, 2004, based on their claims history for that period. (See BF 30(b)(6) dep. (4/15/08 - Dobens), pp. 25-26,; Arel dep., pp. 53-55; 6/29/04 Letter, p. 1.) BeneFirst further represented that "BeneFirst has gone through a few aggregate reimbursement audits. I am proud to report the results were flawless on each one." (See BF 30(b)(6) Dep. (4/15/08 - Dobens), pp. 25-26, 6/29/04 Letter, p. 1). However, when the aggregate stop loss insurer audited the claims, the figure BeneFirst had previously reported to W.E. Aubuchon was not substantiated. (See Arel dep., p. 55; 5/17/05 Email.) This occurred because there was an error in a report generated by BeneFirst which overstated the aggregate claims. (See Gatanti dep., pp. 69-75.) Rather than report the error in the report or adverse results of the stop loss insurer's audit of the reimbursement claim, BeneFirst, in apparent fear of the potential consequences, sat on that information for months. (See Gatanti dep., pp. 69-75, 149, Ex. 1; Reddie dep., pp. 78-79; Arel dep., p. 55.) Between June and November, W.E. Aubuchon made repeated inquires as to the status of the stop loss reimbursement. (See Arel dep., p. 55.) After

W.E. Aubuchon's president, Marcus Moran, advised BeneFirst of his intention to report the stop loss anticipated reimbursement in a November 2, 2004 letter, the issue came to a head in a November 5, 2004 meeting involving representatives of both BeneFirst and W.E. Aubuchon. In that meeting, BeneFirst first advised that the reimbursement would not be in the amount previously anticipated. (See Arel dep., pp. 55-56, 95.) The information was not well received and BeneFirst was terminated in a follow-up telephone conference call several days later. (See BF 30(b)(6) dep. (4/15/08 - Dobens), pp. 21-26; Arel dep., p. 62.) BeneFirst was terminated because of a lack of confidence in their administration of the W.E. Aubuchon Plan and because W.E. Aubuchon had not been able to get accurate information from them. (See Gatanti dep., p. 61; Reddie dep., pp. 96-97; Arel dep., pp. 52-53; Moran dep., p. 73; W.E. Aubuchon's Supp. Ans. Ints., No. 20.)

14.    It is not disputed that the only plan document for each of the Aubuchon Companies' Plans was the Summary Plan Description ("SPD"). (See BF 30(b)(6) dep. (4/15/08 - Dobens), pp. 63-64.)

15.    The Introduction in Section I of each of the relevant SPD provides in pertinent part as follows:

> The Plan Administrator has full discretionary *authority to interpret this Plan and its provisions and regulations with regard to eligibility, coverage, benefit entitlement, benefit determination and general administrative matters*. The Plan Administrator's decisions will be binding on all Covered Employees and their beneficiaries and conclusive on all questions of coverage under this Plan. (emphasis added)

(See W.E.A.S.P.D. (7/1/01), p. 1; W.E.A.S.P.D. (9/1/02), p.1; A.D.S.P.D., p. 1.)

16.    The SPD further provides in its General Plan Provisions at VIII. A.3. that:

> The Plan Administrator *shall be a named fiduciary for purposes of Section 402(a)(1) of ERISA*, shall administer the Plan in

accordance with its terms, and shall have complete discretionary authority and all powers necessary to carry out its terms and to control and manage the operation and administration of the Plan, including, but not limited to the following:

...

(g)     to employ or retain counsel, accountants, *third party administrators*, actuaries or such other consultants as may be required to assist in administering the Plan;...(emphasis added)

(See W.E.A.S.P.D. (7/1/01), pp. 58-59; W.E.A.S.P.D. (9/1/02), p. 60; A.D.S.P.D. (8/25/01), pp. 57-58.)

17.     The SPDs' Definitions provides, in pertinent part, the following:

**Contract Administrator.** BeneFirst, LLC together with any other of its programs, units, or divisions that is designed to perform claims administration functions under the Plan ...

...

**Plan Administrator.** W.E. Aubuchon Co., Inc. [or W.E. Aubuchon Distribution Co., Inc.]. *The term Plan Administrator also means any person or persons to whom the Plan Administrator delegates all or part of its authority under the Plan.* (emphasis added)

(See W.E.A.S.P.D. (7/1/01), pp. 72, 79; W.E.A.S.P.D. (9/1/02), pp. 74, 81; A.D.S.P.D. pp. 71, 78.)

18.     The Summary Plan Description further provides in its SPD in Section II as

follows:

The Plan is self administered by the Employer, which is a "named fiduciary" and the "plan administrator" under ERISA. The Employer has *delegated claims administration and other day-to-day functions* for all benefits except prescription drug benefits and certain vision care benefits to the following Contract Administrator:

> BeneFirst, LLC
> P.O. Box 1421
> Marshfield, MA 020250-877
> 823-6334 (Member Services)
> www.BeneFirst.com

(See W.E.A.S.P.D. (7/1/01), p. 4; W.E.A.S.P.D. (9/01/02), p. 3; A.D.S.P.D., p. 4.)(emphasis added).

19.     Less than a year after the commencement of this lawsuit, BeneFirst sold all or substantially all of its assets to America's Choice Health Plans, including most of its computers, and ceased active business operations. (See BF 30(b)(6) dep. (9/7/06 - Dobens), pp. 7-9. See also Order on BeneFirst's Motion for Reconsideration of Court's Discovery Order Related to Medical Bills, dated February 6, 2007, p. 3 (Document #40)).

20.     An audit of 208 claims transactions processed by BeneFirst under the W.E. Aubuchon Plan for the July 1, 2003, through June 30, 2004, aggregate stop loss period was performed by Northshore International Insurance Services, Inc. ("NIIS") at the request of BP, Inc., a stop loss general managing underwriter for the W.E. Aubuchon Plan. (See 4/8/05 NIIS Report, p. 1. The findings of the audit were memorialized in a report to BP, Inc. dated April 8, 2005. (See Id.) The audit recommended a deduction of $107,057.90 from the aggregate claim.

21.     Thereafter, W.E. Aubuchon engaged NIIS to conduct an audit of 122 claims transactions processed by BeneFirst under the W.E. Aubuchon Plan for the period July 1, 2002, through June 30, 2003, and 138 claims transactions processed by BeneFirst under the W.E. Aubuchon Plan for the period July 1, 2004, through December 31, 2004. The findings of this audit were memorialized in a report to W.E. Aubuchon dated July 22, 2005. (See 7/22/05 NIIS Report; 4/8/08 NIIS Report, p. 2.)

22. In discovery, the Aubuchon Companies served requests for production seeking, among other things, claims records for the W.E. Aubuchon and Aubuchon Distribution Plans. BeneFirst objected to producing the requested materials and motion practice ensued which culminated in an Order dated February 6, 2007, in which the Court (Hillman, M.J.) denied BeneFirst's Motion for Reconsideration and ordered BeneFirst to "produce the Medical Bills and Claims Forms for the approximately 3,000 claims as specified by the Plaintiff's at their own [BeneFirst's] expense. (See Order. P. 12).

23. BeneFirst, however, only produced documents pertaining to 1,777 of the 2,991 W.E. Aubuchon Plan claims which it was ordered to produce by the Court. (See 8/31/07 Letter, p. 1; Adm. Resp., Nos. 10-12.)[3]

24. Similarly, BeneFirst has only produced documents pertaining to 105 of the 166. Aubuchon Distribution Plan claims which it was ordered to produce by the Court. (See 8/31/07 Letter, p. 1.)

25. BeneFirst admits that "it produced all claims images in its possession, custody or control in complying with Judge Hillman's order." (See Adm. Resp., Nos. 10-12.)

26. It is cannot be disputed that the claims images which BeneFirst has failed to produce are relevant to its liability, including without limitation its failure to maintain claims records as required by the ASA and to the Aubuchon Companies damages. (See Order, pp. 10, 12.)

27. BeneFirst's failure to maintain the claims records at issue was a breach of the ASA. (See ASA, p. 2.)

---

W.E. AUBUCHON CO., INC.,
AUBUCHON DISTRIBUTION, INC., W.E.
AUBUCHON CO. INC. EMPLOYEE
MEDICAL BENEFIT PLAN, and
AUBUCHON DISTRIBUTION, INC.
EMPLOYEE MEDICAL BENEFIT PLAN
By their attorneys,

Louis M. Ciavarra (BBO #546481)
James P. Hoban (BBO #633929)
Colleen E. Cushing (BBO #663498)
Bowditch & Dewey, LLP
311 Main Street, P.O. Box 15156
Worcester, MA 01615-0156
(508) 791-3511

Date:    August 27, 2008

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing
(NEF) and paper copies will be sent to those indicated as non-registered participants on
August 27, 2008.

James P. Hoban

**1**

{}

1

1              Exhibits:   1-7

2        UNITED STATES DISTRICT COURT
          DISTRICT OF MASSACHUSETTS

3
                    CA No. 05-40159FDS

4

5     W.E. AUBUCHON CO., INC.,
       AUBUCHON DISTRIBUTION, INC.,

6     W.E. AUBUCHON CO.,INC. EMPLOYEE
       MEDICAL BENEFIT PLAN,

7     and AUBUCHON DISTRIBUTION, INC.
       EMPLOYEE MEDICAL BENEFIT PLAN,

8
                         Plaintiffs

9     v.

10    BENEFIRST, LLC,

11                       Defendant

12

13

           30(b)(6) DEPOSITION OF BENEFIRST,

14    LLC, through its Designee, CHARLES T.
       DOBENS, and CHARLES T. DOBENS, Individually

15    taken at the request of the Plaintiffs,
       pursuant to Rule 30 of the Massachusetts

16    Rules of Civil Procedure before Kathleen M.
       Bradley, Notary Public and Registered

17    Professional Reporter in and for the
       Commonwealth of Massachusetts, on Tuesday,

18    April 15, 2008, commencing at 10 a.m. at
       the offices of Bowditch & Dewey, 311 Main

19    Street, Worcester, Massachusetts.

20

21

22          BAY STATE REPORTING AGENCY
           76 MILL STREET (At Park Avenue)

23        WORCESTER, MASSACHUSETTS   01603
               (508)753-4121

24

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CA No. 05-40159FDS

W.E. AUBUCHON CO., INC.,
AUBUCHON DISTRIBUTION, INC.,
W.E. AUBUCHON CO.,INC. EMPLOYEE
MEDICAL BENEFIT PLAN,
and AUBUCHON DISTRIBUTION, INC.
EMPLOYEE MEDICAL BENEFIT PLAN,

Plaintiffs

v.

BENEFIRST, LLC,

Defendant

30(b)(6) DEPOSITION OF BENEFIRST,
LLC, through its Designee, CHARLES T.
DOBENS, and CHARLES T. DOBENS, Individually
taken at the request of the Plaintiffs,
pursuant to Rule 30 of the Massachusetts
Rules of Civil Procedure before Kathleen M.
Bradley, Notary Public and Registered
Professional Reporter in and for the
Commonwealth of Massachusetts, on Tuesday,
April 15, 2008, commencing at 10 a.m. at
the offices of Bowditch & Dewey, 311 Main
Street, Worcester, Massachusetts.

BAY STATE REPORTING AGENCY
76 MILL STREET (At Park Avenue)
WORCESTER, MASSACHUSETTS 01603
(508)753-4121

---

**2**

APPEARANCES:

FOR THE PLAINTIFF:

BOWDITCH & DEWEY
311 Main Street
Worcester, Massachusetts 01615
    BY: LOUIS M. CIAVARRA, ESQ.

FOR THE DEFENDANT:

THE MCCORMACK FIRM, LLC
One International Place
7th Floor
Boston, Massachusetts 02110
  BY: ERIC L. BRODIE, ESQ.

---

**3**

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| CHARLES T. DOBENS | | | | |
| MR. CIAVARRA: | 4 | 130 | | |
| MR. BRODIE: | 122 | | | |

EXHIBITS

| 1 | ReNotice of Deposition | 5 |
|---|---|---|
| 2 | 6/29/04 Letter from Mr. Sullivan to Mr. Moran | 25 |
| 3 | 11/2/04 Letter to Mr. Sullivan from Mr. Moran | 28 |
| 4 | 8/2/05 Letter from C. Dobens to Atty. Gelinas with ASA | 70 |
| 5 | EMail 5/17/05 | 104 |
| 6 | 4/8/05 Letter from NorthShore | 106 |
| 7 | Sales Proposal AUB 417-427 | 116 |

---

**4**

PROCEEDINGS

CHARLES T. DOBENS, having been
satisfactorily identified by the production
of his driver's license, and duly sworn,
was examined and testified as follows:

        MR. CIAVARRA: We will continue
with the usual stipulations that we've had.
Reserve all objections except as to form
and motions to strike until the time of
trial.

        The witness will read and sign
his transcript, no requirement of
notarization.

        MR. BRODIE: For the record I
agree. So stipulated.

        MR. CIAVARRA: Thank you.

        DIRECT EXAMINATION

BY MR. CIAVARRA:

Q.    Mr. Dobens, you understand you're
here for your deposition today, right?

A.    Yes.

Q.    And you and I have done this one once
before?

A.    Yes.

1 **Q.** And you recall that?

2 **A.** I think you were a little heavier

3 before.

(Discussion off the record)

5 **Q.** The rules haven't changed. I'm here

6 to ask you questions about this case and

7 she will be taking down my questions and

8 your answers. And it's really not more

9 complicated than that.

10 As far as the only other thing

11 that's changed you're also here on behalf

12 of the company to testify on certain

13 topics. Do you understand that?

14 **A.** Yes.

15 **Q.** And you've seen that notice?

16 **A.** Yes.

17 MR. CIAVARRA: Just for the

18 record we'll mark this as Exhibit 1.

19 (Exhibit 1, Notice of

20 Deposition, marked)

21 **Q.** The notice that listed, you can share

22 it with Eric.

23 **A.** Yes, this is the one I looked at

yesterday, yes.

---

**6**

1 **Q.** So you understand you are here to

2 testify individually as Charles Dobens, but

3 also a representative of the company?

4 **A.** Sure.

5 **Q.** And you've taken a look at this list

6 of 23 topics?

7 **A.** Yes.

8 **Q.** And done whatever you think is

9 necessary to be able to answer questions on

10 those topics?

11 **A.** Yes.

12 **Q.** And just for the record does

13 BeneFirst still exist as an entity?

14 **A.** No.

15 **Q.** And what happened? Has the company

16 been dissolved?

17 **A.** The assets were sold to America's

18 Choice Health Plans out of Houston, Texas.

**Q.** And then what happened to the legal

entity, the LLC, after the asset sale?

21 **A.** You know, you'd have to check with

22 them because they took the name. It's my

23 understanding that they took the name as

24 well.

---

1 **Q.** You may not know the answer to this,

2 so if you don't, feel free to tell me. But

3 you did not sell the stock, you sold the

4 assets?

5 **A.** That's correct. There was no stock.

6 **Q.** I'll ask you the same question I

7 asked you last time, because it's an LLC.

8 But the LLC itself was not sold, the assets

9 were sold?

10 **A.** Yes, that's correct.

11 **Q.** So you continued as the sole member

12 of that LLC?

13 **A.** No, I was not the sole member. There

14 still were other members existing.

15 **Q.** So what happened to the entity?

16 **A.** You know, I think it's just defunct

17 right now, although I think that's the

18 legal and non-legal status.

19 **Q.** It has no assets?

20 **A.** It has nothing, no.

21 **Q.** So the only ability it has to pay a

22 judgment in this case is if there's

23 insurance?

24 **A.** Exactly, yes.

---

**8**

1 **Q.** When the assets were sold was there

2 any distribution to any of the members?

3 **A.** No, it was essentially a break-even.

4 **Q.** You paid off debts?

5 **A.** Yes.

6 **Q.** And what are you doing now for a

7 living?

8 **A.** I'm a real estate investor.

9 **Q.** Not involved in the health insurance

10 business currently?

11 **A.** No.

12 **Q.** And what's your home address?

13 **A.** 30 Parkers Grove Lane in Duxbury.

14 **Q.** Do you know where is Mr. Sullivan

15 now, Paul Sullivan?

16 **A.** You know, I haven't spoken to him

17 since probably about 2005, 2006. I would

18 believe he's still down in Mashpee. He

19 had two homes in Mashpee.

20 **Q.** And do you know what he's doing

21 professionally?

22 **A.** I believe he's an insurance broker,

23 benefits broker. I mean this is all -- you

24 know, I may be totally wrong so --

9

1  Q.  Okay.  You've just got to give me
2  your best information.  And Maureen
3  FitzGerald, where is she now?
   A.  I'm assuming she's with him doing the
5  same thing.
6        MR. BRODIE:  Meaning Paul
7  Sullivan?
8  A.  Paul Sullivan, yes.
9  Q.  And you've have had no contact with
10 him?
11 A.  None whatsoever.
12 Q.  When is the last time you spoke to
13 Paul Gatanti?
14 A.  Oh brother -- I think the last time I
15 spoke to him was at his father's funeral,
16 which was shortly after the time he left
17 BeneFirst.  I really don't think I've had
18 any communication with him since then.
19 Q.  And Carrie Reddi, when is the last
20 time you spoke with her?
21 A.  I've got to think that the last time
22 I spoke to her was maybe like one of her
23 last days at BeneFirst.
   Q.  When was that?

10

1  A.  Oh brother -- 2006, some time in
2  2006.  I haven't spoken to anyone at
3  BeneFirst about anything really since the
4  company dissolved, especially not about
5  this case whatsoever.  So I have had no
6  communications.
7  Q.  So if I can shortcut it then is the
8  only conversations you've had with anyone
9  about this case or about Aubuchon is with
10 your lawyers?
11 A.  Exactly, yes.
12 Q.  Have you reviewed the audit reports
13 that were completed by Northshore in this
14 case?
15 A.  No.  I believe there are two audit
16 reports.  I just want to make sure we're
17 talking about the right one.
18 Q.  We'll go through them all.
   A.  Okay.
   Q.  So let's break it down if that's
21 easier for you.
22        While Aubuchon was still a
23 client of BeneFirst there was an audit
24 completed by Northshore for the excess

11

1  carrier.  Do you recall that?
2  A.  Yes.
3  Q.  And that was back in 2005 I believe?
4  A.  Right.
5  Q.  Did you review that at the time?
6  A.  Yes, that one I reviewed.
7  Q.  Subsequent to the separation between
8  Aubuchon and BeneFirst, Aubuchon engaged
9  Northshore to do an audit back in, again,
10 in 2005.  Have you reviewed that audit?
11 A.  I don't believe I have.  I believe
12 we had asked for that and never received it
13 because they claimed it was their property,
14 they paid for it, so they kept it to
15 themselves.
16 Q.  And in connection with this lawsuit
17 Northshore has done additional audit work,
18 copies of which the reports were provided
19 as attachments to Answers to
20 Interrogatories.  And I'll get to the
21 actual paper, but have you reviewed those?
22 A.  I don't think I have.  I don't think
23 I've seen that yet.
24 Q.  We'll get to them specifically.  In

12

1  order to prepare for the deposition today
2  what documents, if any, did you look at?
3  A.  I went through Sarah Arel's
4  deposition.  I briefly looked at the draft
5  of Paul Gatanti's deposition.  We obviously
6  went through my answers to responses or
7  questions.
8  Q.  Interrogatories?
9  A.  Interrogatories.  And then I
10 reviewed, and this kind of is, you know, a
11 good little Cliff Notes version of what
12 things I needed to remember and what the
13 case is all about.
14        So I think in preparation for
15 today's visit I think that is a pretty
16 extensive list of what I've done.
17 Q.  Okay.  So Paul Gatanti's deposition,
18 which was just yesterday, you got a copy of
19 that transcript?
20 A.  Yes, I looked at a draft of that.
21 Q.  And did you notice anything that he
22 stated that was incorrect?
23 A.  I was not able to go through the
24 whole thing.

**13**

1 Q. But from whatever you saw, did you
2 see anything that struck you as being
3 wrong?
   A. No, I think everything that he said
5 that I looked at was right on the mark.
6 Q. And how much of it did you get
7 through?
8 A. I would say about ten to 15 pages
9 pages.
10 Q. And when you reviewed Sarah Arel's
11 transcript, did you see anything in there
12 that you disagreed with?
13 A. I didn't go entirely through her
14 transcript. And I didn't see -- I didn't
15 see in there anything that I had an issue
16 with, but I did not review the entire
17 document.
18 Q. How much of that did you get through?
19 A. Oh geeze, I probably went through, I
20 think it was like 168 pages. I think I did
21 about 30 to 40 pages of it, just briefly
22 skimmed through it.
23 Q. But nothing stuck out at you?
   A. No, nothing that I saw in the papers

**14**

1 stuck out at me.
2 Q. That's okay. And Kim McMann's
3 deposition was taken as well. Have you
4 seen her deposition?
5 A. No, I did not know that she was
6 deposed.
7 Q. I'm not going to mark these right
8 now, but these are Plaintiff's, that's
9 Aubuchon, Plaintiff's Answers to
10 Interrogatories, which are the written
11 questions submitted by your lawyers.
12 A. Okay.
13 Q. And I just want to know if you've
14 seen those before.
15 A. No, I have not seen these.
16 Q. Before I was asking you about audit
17 work that had been done by Northshore and
18 if you just look at Exhibits, I'm not going
   to ask you detailed questions, but just to
20 see if you've seen Tabs 1, 2 or 3 before.
21 A. Well, you know, you see, I can't
22 answer that specifically just because this
23 Exhibit 1 does not look familiar to me, but
24 Exhibits 2 and 3, the form looks familiar,

**15**

1 but I did see their original format for the
2 first one. So I can't say whether this is
3 for the first audit or the second audit.
4 Q. So the format looks familiar?
5 A. Yes.
6 Q. You're just not sure if the substance
7 is the same stuff.
8 A. Yes, exactly.
9 Q. We'll come back to that specifically.
10 You understand that in this case there's a
11 claim by Aubuchon that BeneFirst overpaid
12 certain medical claims that were due to be
13 paid under their insurance, right?
14 A. So they were eligible claims, but the
15 amounts were overpaid.
16 Q. This is not just that. There could
17 be, I'm not trying to limit the reasons why
18 there were over-payments. It could be a
19 variety of reasons.
20       My question isn't directed to
21 the causation there.
22 A. Okay.
23 Q. I'm just trying to get a sense of
24 30,000 feet now and come down to it.

**16**

1 A. Okay.
2 Q. You understand that Aubuchon claims
3 it was damaged because it paid more in
4 medical claims than it should have had
5 BeneFirst done their job properly?
6 A. Yes, I understand that.
7 Q. What have you done, if anything, to
8 determine whether or not that allegation is
9 accurate?
10 A. As a company, or me personally or --
11 Q. I'll ask you personally, and if it's
12 different as a company let me know.
13 A. Oh, me personally as Charles Dobens,
14 I don't think I did anything. I think as
15 BeneFirst, what we did, obviously, is when
16 we processed the claims and then we filed,
17 they exceeded their attachment point and
18 then we filed that claim with the stop loss
19 carrier.
20       The stop loss carrier comes in
21 or sends an auditor in to look at the
22 claims and they do an audit.
23       So whatever the results come
24 back as, I mean that's pretty much, Hey,

1   you paid this wrong, you didn't pay this
2   one wrong.
3          So I think at the time, and my
    numbers may be off.  I think we originally
5   filed for $73,000 aggregate, and after the
6   audit it came down to $71,000.
7          My numbers may be off.  That's
8   what I remember, is that after the audit
9   they knocked off a nominal amount from what
10  we originally filed a claim for.
11  Q.   Okay.  I'm going to come back to my
12  first question, but go ahead.
13  A.   So I hope that answers your question,
14  that that's what we would have done.  We
15  laid ourselves bare to the auditor to come
16  in and tell us whether we paid the claims
17  correctly or not.
18  Q.   And this is obviously pre-lawsuit
19  you're talking about, the audit that was
20  done for the excess carrier?
21  A.   Yes.
22  Q.   And when that audit came in, did you
23  review that?  You already said you did.
    You took a look at that?

18

1   A.   Yes, I took a look at it, yes.
2   Q.   And did you see any errors in that
3   audit that you disagreed with?
4   A.   Oh, I think there were some.  You
5   always get some errors you disagree with
6   the stop loss carrier on, what they came
7   back with.
8          And so then you sit down with
9   the auditor and say, Now you're wrong here,
10  this is how we do it.
11         And if they accept your
12  explanation, then they'll bring the claim
13  back in.
14  Q.   Who did that on behalf of BeneFirst?
15  A.   Paul Gatanti.  Paul Gatanti oversaw
16  that department.  Cheryl MacCloud I think
17  was the one that was actually responsible
18  for filing the stop loss claims.
        Q.   Do you recall though that the
20  original amount estimated by BeneFirst was
21  actually $478,000?
22  A.   Okay.  Now when you say that, it's
23  just important that you understand that
24  number.  That was a gross unaudited number

19

1   off of the RCR report.  And everybody knew
2   that that number was prior to everything
3   being cleaned out and flushed out.
4          So within -- I believe a stop
5   loss claim has to be filed within 30 days
6   of the end of the policy year.  And when we
7   filed a claim we knew it was 70-some-odd
8   thousand dollars.
9   Q.   When you say "we knew," you mean
10  BeneFirst knew?
11  A.   Benefirst, yes.
12  Q.   You're not suggesting that Aubuchon
13  knew?
14  A.   No, I'm not suggesting that Aubuchon
15  knew at that time that it was only
16  70-some-odd-thousand dollars.
17  Q.   In fact, up until the report came
18  from the stop loss carrier BeneFirst as a
19  company was telling Aubuchon that the
20  number was $475,000, right?
21         MR. BRODIE:  Objection to form.
22  You can answer.
23  A.   Okay.  BeneFirst had told Marcus
24  Moran -- Paul Gatanti had told Marcus that

20

1   that $400,000 number was an unaudited
2   number and don't go by that.
3          Marcus said, Well, what should
4   I expect?  And Paul Gatanti said you can
5   expect probably around $200,000.  And this
6   was prior to the account final claim being
7   filed.
8          And so that was BeneFirst had
9   told Marcus Moran about $200,000.
10  Q.   And you didn't say that?
11  A.   No, I wouldn't have known that
12  information.
13  Q.   And where do you get this information
14  that Gatanti?  Because that was not in his
15  testimony yesterday.
16  A.   Okay.  Well, that's my recollection
17  as to how the conversation went.
18  Q.   And this is something that you think
19  Gatanti told you that he told Marcus Moran?
20  A.   I actually think I was in the room
21  when it was said.
22  Q.   So tell me about that meeting.
23  Because what's important here today is for
24  us to know what your specific memory is,

1 not assumptions, not guesses, what you
2 recall happening.
3 A. Right. I recall happening that early
4 on when the claim was first filed or prior
5 to the claim being filed there was a big
6 discussion about the RCR report showing a
7 $400,000 aggregate reimbursement.
8     We knew that the RCR report was
9 a gross unaudited report that included
10 everything including the kitchen sink and
11 the number.
12     And I remember there was some
13 meeting with Marcus, Paul Gatanti, and
14 myself. I don't remember who else was
15 present.
16     But I remember Marcus being
17 told that it was not 400. And he said, How
18 much should I expect? And Paul Gatanti
19 said about 50 percent or about $200,000.
20     And I remember that coming back
21 to roost at a later meeting with Aubuchon
22 and Marcus Moran, and everybody was there,
23 Paul Sullivan, Maurie FitzGerald, Sarah
24 Arel, Kim McMann, Aubuchon Jr., I don't

1 We told you at the time 200. It wasn't
2 about to grow any larger. Why did you make
3 it 400?"
4     So that's -- I remember through
5 the whole course of events that the
6 original time we told Mark is $200,000 was
7 way back in July before we had finalized
8 the aggregate claim. So --
9 Q. Let me try and be specific on some
10 things. First of all, this meeting that
11 you have a memory of in which you clam Paul
12 Gatanti told Marcus that the number was
13 $200,000, not $478,000, when do you believe
14 that meeting occurred?
15 A. That meeting would have occurred at
16 the end of July, beginning of, end of June,
17 beginning of July of the year in question
18 for the aggregate filing.
19 Q. And the year you're talking about,
20 just for the record, is 2004?
21 A. Okay, 2004.
22 Q. And the meeting in which Mark
23 indicated he had conveyed the $478,000 to
24 his Board, when did that occur?

22

1 remember his name.
2 Q. William?
3 A. William Jr.?
4 Q. Is that who was there?
5 A. Yes, it was a young guy. I never met
6 him before. And I just remember he was an
7 Aubuchon and it was a Junior, and he was
8 getting more involved in the Benefits side.
9 Paul Gatanti, myself.
10     And in that meeting that's when
11 the amount, the total amount of the
12 aggregate came out as being
13 70-some-odd-thousand.
14     And I'll never forget, I was
15 sitting like sideways Marcus. And Marcus
16 is like, "Oh, this is not good. This is in
17 not good."
18     And I said, "Why?" That's
19 actually good news that it's a smaller
20 claim than you expected."
21     And he says, "No, I told my
22 Board of Directors that it was going to be
23 $400,000."
24     I said, "Why would you do that?

24

1 A. That occurred like end of October,
2 beginning of November.
3 Q. In the middle of 2004 Paul Sullivan
4 was your President of the company, right?
5 A. Yes.
6 Q. And he had full authority to speak on
7 behalf of the company?
8 A. Yes.
9 Q. And let me show you a letter dated
10 June 29, 2004 from Mr. Sullivan to Mr.
11 Moran and ask you if you recall that.
12 A. (Reading document)
13     MR. BRODIE: You can read
14 through the whole letter.
15     THE WITNESS: Sure.
16 A. (Reading document.) Okay.
17 Q. First question, you're not cc'd on
18 that letter, right?
19 A. No.
20 Q. Do you recall that letter?
21 A. I think I recall having an issue with
22 this letter.
23     MR. CIAVARRA: Why don't we
24 mark this as Exhibit 2.

25

1   (Exhibit 2, 6/29/04 Letter from
2   Mr. Sullivan to Mr. Moran,
3   marked)
4   Q.   Okay.  So let's start off first.
5   This is a letter from the President of
6   BeneFirst to the President of Aubuchon,
7   right?
8   A.   Yes.
9   Q.   Dated June 29, 2004?
10  A.   Correct.
11  Q.   And you have a memory of seeing a
12  letter, this letter, on or about that time?
13  A.   Yes.
14  Q.   And in this letter Mr. Sullivan is
15  representing to Aubuchon that the aggregate
16  number that he could expect to get from the
17  excess carrier based upon their claims
18  history for that time period was $478,000,
19  right?
20      MR. BRODIE:  Objection.
21  Q.   Is that what he's representing in the
22  letter?
23  A.   Yes.
24  Q.   And he's also representing in the

26

1   last paragraph that, I'm sorry, the last
2   paragraph on the first page, "That while
3   this is subject to an audit, we've been
4   through several audits, and he's proud to
5   say they have gone through them cleanly,"
6   isn't that what he's saying?
7   A.   Yes.
8   Q.   And as the recipient of that letter
9   would it be fair to assume that you could
10  expect to get $478,000?
11      MR. BRODIE:  Objection.
12  Q.   Would you agree with that?
13  A.   Except for this letter, the last
14  phrase of the report it is an unaudited
15  report.
16  Q.   Then read the next paragraph.  Why
17  don't you read the next paragraph after
18  that into the record, please.
19  A.   "BeneFirst LLC has gone through a few
20  aggregate reimbursement audits.  I am proud
21  to report the results were flawless on each
22  one."  I think that's maybe --
23      MR. BRODIE:  He just asked you
24  to read it.

27

1       MR. CIAVARRA:  He can finish.
2   A.   No --
3   Q.   What were you going to say?
4   A.   I think that you're talking about two
5   different things really.  You're talking
6   about what the RCR says versus what a
7   Northshore audit, a Northshore audit
8   company would come in and do.
9        And I can tell you that based
10  upon what we filed and what was audited,
11  that last statement is still a correct
12  statement.
13  Q.   By the way, I have not seen what you
14  filed.  Do you have that?
15  A.   No, I don't have that.  I think my
16  recollection is that they kicked out
17  approximately $2,000 of the reimbursement
18  that we had filed for.
19  Q.   But the actual filing, do you have a
20  copy of that record anywhere?
21  A.   I do not, no.
22  Q.   I've never seen it.  Okay.  When you
23  saw this letter did you pick up the phone
24  and call Mr. Moran and say I want to talk

28

1   about what's in here?
2   A.   I didn't call Mr. Moran.  Paul
3   Sullivan had the direct relationship with
4   Marcus.
5   Q.   Did you instruct Mr. Sullivan to
6   follow up with Mr. Moran after this letter
7   was sent?
8   A.   Oh yes.
9   Q.   And do you know if he did?
10  A.   I know that he did not.
11  Q.   Let me show you a letter dated
12  November 2, 2004 from Mr. Moran back to Mr.
13  Sullivan and ask you to read that first.
14  A.   (Reading document) Okay.
15  Q.   Did you see a copy of that letter in
16  or about November of 2004?
17  A.   I don't believe so.
18      MR. CIAVARRA:  Have this marked
19  as Exhibit 3.
20      (Exhibit 3, Letter from Mr.
21      Moran to Mr. Sullivan,
22      11/2/04, marked)
23  Q.   Have you seen this letter before at
24  any time?

29

1   A.   I can't recall seeing this.

2   Q.   In that letter Mr. Moran is

3   indicating to Mr. Sullivan, to the

4   President of your company, that he intends

5   to report to the Board the $478,000 number,

6   right?

7   A.   Yes.

8   Q.   That's what it says?

9   A.   Yes.

10  Q.   Okay.  And what action, if any, did

11  BeneFirst take at that time to indicate or

12  to tell Mr. Moran he shouldn't do that,

13  that you know of?

14  A.   Well, at that time I don't know what

15  we did.

16  Q.   If you don't know, you don't know.

17  A.   Yah.

18  Q.   The meeting that you told us about in

19  which Mr. Moran appeared, I don't know if

20  upset or concerned is the right word, but

21  not happy with the fact that the number was

22  not 478, does this help you place this

23  meeting at some time after this date?

24  A.   Okay.  See, that's why I answered the

30

1   question the first time like that.  I

2   wasn't quite sure when because I don't

3   remember exactly the chronology of events

4   here.

5           I don't know whether this

6   letter came before that meeting, I don't

7   remember getting it.

8           If this went to my partner,

9   Paul Sullivan, this is the type of thing he

10  would hide from me or wouldn't show me.

11          And so I don't know whether

12  this letter --

13  Q.   If you don't remember --

14  A.   All I remember, end of October,

15  beginning of November is the timeframe that

16  I remember that meeting occurring.

17  Q.   Well, what types of stuff did Paul

18  Sullivan hide from you?

19  A.   You know, bad news.

20  Q.   What was Paul's responsibilities at

21  the company in this 2004 timeframe?

22  A.   You know, his title was President.

23  He was a member of the LLC.  His primary

24  role was in sales.

31

1   Q.   How long after this letter did

2   Aubuchon terminate the relationship with

3   BeneFirst?

4   A.   Well, I think getting ready for this,

5   they terminated on January 1 of 2005, so

6   obviously there's a two-month window.

7   Q.   Who communicated that termination to

8   you first?

9   A.   Paul Sullivan.

10  Q.   So you didn't hear that directly from

11  Aubuchon?

12  A.   No.

13  Q.   From Mr. Gatanti's deposition

14  yesterday, and I think you said it this

15  morning, the $478,000 number that we've

16  seen referenced in Exhibits 2 and 3, that

17  number comes off of the RCR report?

18  A.   Yes.

19  Q.   Mr. Gatanti spoke yesterday about an

20  error in the RCR report that would

21  overstate the aggregate.  Do you know what

22  I'm talking about?

23  A.   I wouldn't call it an error.  You

24  have to understand how to use the report,

32

1   what it can be used for and what it can't

2   be used for.

3           So I don't think that the

4   report generated erroneous information.

5   You had to understand that that information

6   was unaudited and it included more detail

7   than was needed.

8   Q.   But the RCR report would indicate

9   what the aggregate number would be or could

10  be expected to be.  It would tell you what

11  the total amount of payments had been for

12  you to reach that threshold before your

13  excess coverage would kick in?

14  A.   It could.  If it was, you know, as I

15  said, unaudited.  If somebody went in there

16  and cleaned out all those claims that were

17  ineligible --

18  Q.   I'm just talking about the reader of

19  the document.

20  A.   Yes, the reader of the document would

21  not be able to know exactly what the

22  reinsurance stop loss claim would be by

23  looking at this RCR report.

24  Q.   But, tell me if I'm wrong, but the

33

1 $478,000 number that was referenced in 2
2 and 3, you understood came from the RCR
3 report?
   A. Yes, absolutely.
5 Q. And I think what you told me is
6 internally at BeneFirst you guys certainly
7 knew that you couldn't translate that 478
8 directly to what would be expected from the
9 stop loss carrier?
10 A. That's right.
11 Q. Had you known that throughout the
12 entire time of period that that fact, that
13 you guys were creating the RCR reports?
14 A. Since --
15 Q. Going back for years.
16 A. Oh, years. I think early on when we
17 first started using the RIMS system we
18 discovered that there was that discrepancy
19 with the actual stop loss limit and the RCR
20 report.
21 Q. Do you know what caused that --
22 A. The RCR report --
23 Q. Let me finish the question.
   A. Sorry.

34

1 Q. That's okay. Do you know what caused
2 the RCR report to indicate $478,000 as
3 opposed to what the actual claim was for?
4 A. Yes. The RCR would include pretty
5 much all the claims that we paid for that
6 client. It also could include specific
7 reimbursements, which are claims that are
8 ineligible to the aggregate, but claims
9 that went through their plan system.
10       It would include claims that
11 were paid outside the loss fund or
12 exceptions that would be kicked out in an
13 audit. So --
14 Q. And the people, when I say "the
15 people," you and Mr. Sullivan, Mr. Gatanti
16 were aware of that certainly throughout
17 2004?
18 A. Oh yah, yah.
19 Q. As the client, was the RCR report the
20 only report that you received from
21 BeneFirst?
22 A. Oh no.
23 Q. Let me finish the question.
24 A. I'm sorry.

35

1 Q. I know it's not the only report. Is
2 it the only report you received from
3 BeneFirst from which you could calculate or
4 even have any guesstimate as to what your
5 stop loss coverage would be?
6       MR. BRODIE: "You" meaning the
7 receiving -- the client --
8 A. Yah, the client, the client.
9 Q. Let me restate the whole question.
10 As a client, is the RCR report the only one
11 I received from BeneFirst which would
12 indicate to me what my stop loss insurance
13 might be?
14 A. I don't believe so.
15 Q. What other reports?
16 A. I believe that we did our own
17 in-house RLR, which is a Loss Ratio Report,
18 which would show a more accurate figure
19 because that would show a column for
20 specific reimbursements and you could net
21 that out.
22 Q. Let me stop you right there for a
23 second. First of all, do you know -- I'm
24 going to take them each one by one -- the

36

1 Loss Ratio Report, do you know if that was
2 provided to the clients, and if so, how
3 often?
4 A. It would have been done on a monthly
5 basis. And the report, if I remember
6 correctly, Maurie FitzGerald was their
7 service rep, and had been their service rep
8 for 20 years, and had continually provided
9 Aubuchon with her own report that they
10 liked to get that showed exactly where they
11 were throughout the course of the year.
12 Q. When you say "how they were," how
13 they were --
14 A. How the plan was running.
15 Q. And how they were moving towards the
16 excess coverage?
17 A. Yes.
18 Q. So you think -- this is a second
19 report now?
20 A. Yes, I mean it was very similar to
21 what we would typically do, but I think
22 Aubuchon had their own style of doing it
23 that she continued to do for them when she
24 came over to BeneFirst.

37

1  Q.  We are going awfully fast here, so
2  let's you and I try to slow down.
3        The Loss Ratio Report, my first
   question was do you know that was provided
5  to Aubuchon?
6  A.  Through the normal course of business
7  it should have been provided to Aubuchon
8  every month.
9  Q.  And you believe that Maurie
10 FitzGerald provided a separate report?
11 A.  Yes.
12 Q.  Any other reports from which the
13 client could make a determination of where
14 they stood for their stop loss coverage?
15 A.  You know, essentially every report
16 would provide them with the information
17 that they would need to determine where
18 they are regarding their stop loss
19 insurance.
20 Q.  How would it do that?
21 A.  Every report shows exactly what was
22 paid that particular month or how much was
23 paid in a particular year.  And they would
   be able to look at that and say, Geez, this

39

1  Q.  What does "ISA" stand for?
2  A.  That's an Individual Specific
3  Analysis.
4  Q.  And your testimony is that those
5  dollars are not included in the aggregate
6  amount or should not be?
7  A.  They should not be included in the
8  aggregate amount.
9  Q.  This is you who I'm asking.  Did you,
10 Charles Dobens, ever inform Aubuchon of
11 that fact?
12 A.  Oh I believe -- to say me I would say
13 no, just because I didn't have that type of
14 relationship with Aubuchon.
15 Q.  And what other information of these
16 other subsidiary reports, or these other
17 reports I should say, would I look at to
18 determine that the -- I have too many
19 reports in my head--
20 A.  The RCR.
21 Q.  -- the RCR does not or may not
22 accurately reflect my aggregate claim?
23 A.  You know, I think another report that
24 would show it would be the -- well, the

38

1  is what we've paid, and they could look at
2  their bank account and figure it out.
3        I mean it's not Rocket Science.
4  It's a checking account is really what it
5  is.  And they could look to see what they
6  were paying out, what their cap was and how
7  it was running.
8  Q.  Doesn't the RCR report, though, just
9  aggregate all of those reports into one
10 place?
11 A.  Yes and no.  I mean there's a lot of
12 information that's not included in the RCR,
13 but the information in the RCR is included
14 in all the other reports.
15 Q.  I guess my point is that the numbers
16 that I would see as a client in the RCR
17 report would also be reflected in all these
18 other reports that we are talking about,
19 were they not?
20 A.  Yes.
21 Q.  So what in those other reports would
22 indicate to me that the RCR report was not
23 accurate?
24 A.  A specific reimbursement in the ISA.

40

1  easy one is the check register.
2        I mean they get that every
3  month, they look to see what comes in, what
4  goes out.  And that clearly would show you
5  an actual net number.
6        And as a matter of fact, I do
7  remember in that meeting when we talked
8  about the $400,000 claim with Marcus being
9  upset, Marcus looks at it and says, "But we
10 paid out this much money according to your
11 report."
12        And Kim MacMann said, "No,
13 actually Marcus, we didn't.  If you look at
14 the check register you'll see we did only
15 pay exactly what BeneFirst is showing right
16 there. " But that's not what Marcus wanted
17 to hear.
18 Q.  Let's talk about the check register
19 for a minute and how, you know, bills got
20 paid.  You're familiar with that process,
21 right?
22 A.  Yes.
23 Q.  My understanding, you know, and as I
24 said, we have the benefit of Paul's

**41**

1  testimony yesterday, was that on a monthly
2  basis BeneFirst would send to Aubuchon
3  something called a "Check Edit Report" that
4  would show exactly what was due to be paid
5  on claims for that month, is that correct?
6  A.    I don't believe it was monthly.
7  Q.    Okay.  How often do you think it was?
8  A.    For a company the size of Aubuchon it
9  was either weekly or biweekly.
10 Q.    My concern about that answer is that
11 you're working through it logically as
12 opposed to your memory.
13 A.    Yes.  But --
14 Q.    Let me finish my question.
15 A.    I'm sorry.
16 Q.    And the reason is because you said
17 for a company the size of Aubuchon.  What
18 we're talking about is specifically
19 Aubuchon.
20        And my question is specifically
21 do you know how often they received their
22 Check Edit Reports?
23 A.    Specifically Aubuchon, no.
24 Q.    Then you should say that just so we

**42**

1  have a clean record.
2  A.    But you were asking another question
3  that included the word "monthly," and I
4  couldn't answer that question because I
5  don't believe it to be monthly.
6  Q.    My next question would be regardless
7  of how often it went, you do know
8  periodically BeneFirst sent that Check Edit
9  Report to Aubuchon?
10 A.    Yes.
11 Q.    And that report would show the amount
12 of money that Aubuchon needed to transfer
13 into an account so that the claims could be
14 paid?
15 A.    Correct.
16 Q.    And BeneFirst calculated that amount
17 and communicated it to Aubuchon in this
18 report, right?
   A.    Yes.
20 Q.    And it calculated that amount based
21 upon the claims it had received during that
22 period of time, however long that was?
23 A.    Correct.
24 Q.    Then the next step in the process is

**43**

1  Aubuchon would then put that amount of
2  money into an account either by check or by
3  wire transfer?
4  A.    Correct.
5  Q.    Do you recall how they did it?
6  A.    I do not.
7  Q.    And that account was, the account
8  that the money was transferred into, in
9  whose name did that account stand?
10 A.    I don't recall.
11 Q.    At BeneFirst are there occasions in
12 which that account is in BeneFirst's name
13 and sometimes it's in the client's name?
14 Is it joint names, is it neither, if you
15 know?
16 A.    You know, it was -- I don't recall.
17 I think it was every client had a different
18 setup.  It really was based upon how the
19 client wanted it set up.
20 Q.    So in this case, there was an
21 account.  You don't remember whose name was
22 on the account?
23 A.    That's correct.
24 Q.    And from that account the claims were

**44**

1  then paid?
2  A.    Yes.
3  Q.    And what was the process for paying
4  those claims, how did that happen?
5  A.    I guess I'm kind of confused by
6  your --
7  Q.    I'm pretty sure you didn't sit down
8  and write the checks, right?
9  A.    Right.
10 Q.    Was it automated?
11 A.    Oh, everything was automated, yes.
12 Q.    And so somebody at BeneFirst would
13 key in a payee and then amount and a check
14 would then be cut from that account?
15 That's what I'm trying to understand, the
16 process of paying the doctors.
17 A.    It was very, very automated where the
18 Claims Examiner would get a claim in the
19 door, adjudicate the claim, it would be put
20 in the list, the line of claims to be paid.
21        At the end of that period when
22 we needed to get them the Check Edit Report
23 they would FAX it over, say we processed
24 $20,000 worth of claims for this you week,

45

1  this month, whatever; fund your account.
2       They would say, Okay, our
3  account is funded; go ahead and release the
   checks.
5       We would send a file to ABF,
6  ABF was the name of the company.  And all
7  they did was print the checks, stuff them
8  in an envelope and mail them out the door.
9       We never touched a check.   We
10 never had any checks docked in our office
11 and we never mailed any of them.
12 Q.  ABF was a company that BeneFirst
13 contracted with for this service?
14 A.  Yes.
15 Q.  ABF had no direction relationship
16 with Aubuchon, correct?
17 A.  No.
18 Q.  How was ABF paid?
19 A.  Per check I believe.
20      MR. BRODIE:  I'm sorry, just so
21 we have a clean record, you said no to the
22 question there is no relationship between
23 ABF and Aubuchon.  I think the answer is
24 yes, there's no relationship.  It was a

46

1  negative question.
2       THE WITNESS:  Okay.  I'm sorry.
3  A.  There is no relationship between ABF
4  and Aubuchon, no.
5       MR. BRODIE:  No, there is not?
6  A.  No, there is no relationship.
7  Aubuchon wouldn't even know who ABF is.
8  Q.  Because you never told Aubuchon that
9  that's how you were paying the bills?
10 A.  Right, yes.
11 Q.  And as far as Aubuchon knew,
12 BeneFirst was doing it directly?
13 A.  Yes.
14 Q.  What type of quality control did you
15 have in place to be sure that ABF was doing
16 their job accurately?
17 A.  ABF -- well, when we started the
18 relationship with ABF it was through our
19 relationship with Trizetto and RIMS, where
20 they were actually the ones doing the
21 processing.
22      I don't recall exactly what the
23 Quality Control was for ABF, but a lot of
24 it was handled through Trizetto.  ABF was a

47

1  preferred vendor of Trizetto.
2  Q.  Did your relationship, BeneFirst's
3  relationship with ABF precede your
4  relationship with Aubuchon?
5  A.  I believe, yes.
6  Q.  Was ABF a party you used for other
7  clients or just Aubuchon?
8  A.  On, every one, every one.
9  Q.  So they were cutting the checks for
10 all of your clients?
11 A.  Yes, we never touched a check, we
12 never mailed a check.  It was all done
13 out-sourced.
14 Q.  And again, was there some type of
15 monthly report that you would then get back
16 from ABF showing what they had done?
17 A.  Oh, yes, we would get a file that we
18 would download off the system, store on our
19 server, and show exactly what claims-- we'd
20 get a picture of the claim, of the check
21 that went out and store that on our server
22 I believe.
23 Q.  And who, if anybody, at BeneFirst was
24 doing this kind of check review to make

48

1  sure that the right amounts were being
2  paid?
3  A.  Paul Gatanti.  And then on the other
4  side would have been someone in the Billing
5  Department.   I cannot recall their name.
6  Q.  I don't think I went through this
7  with you at that first deposition, so let
8  me just ask you a couple questions about
9  your experience pre-BeneFirst.  When did
10 you start BeneFirst?
11 A.  August of '99.
12 Q.  And what were you doing just before
13 that?
14 A.  I was working for Health Plans, Inc.
15 Q.  And what did they do?
16 A.  They were a TPA also.
17 Q.  What did you do for Health Plans?
18 A.  I was in sales for them.  I think you
19 did ask me that.
20 Q.  I'm sorry if I did.  Did you know
21 Paul Gatanti then?
22 A.  No, I did not, no.  Our paths just
23 missed each other.
24 Q.  How long were you with Health Plans?

49

1  A.  Oh, I think about six or seven years.
2  Q.  What was your first position with
3  them?
   A.  Sales the whole time.
5  Q.  What did you do before Health Plans,
6  Inc.?
7  A.  I worked for Penn General Service
8  Corporation.
9  Q.  And what did they do?
10  A.  They were a TPA
11  Q.  And what did you do for Penn?
12  A.  Sales.
13  Q.  What did you do before that company?
14  A.  I worked for Excess Health, which is
15  a stop loss insurance carrier.
16  Q.  And again, what did you do for them?
17  A.  Sales.
18  Q.  Before that, Excess Health?
19  A.  It was New York Life.
20  Q.  Sales position?
21  A.  Yes.
22  Q.  And before that?
23  A.  School.
   Q.  Where was school?

50

1  A.  Boston College.
2  Q.  When did you get out of BC?
3  A.  '86.
4  Q.  Have you ever functioned
5  professionally as a claims adjustor?
6  A.  No.
7  Q.  Or claims examiner?
8  A.  No.
9  Q.  Have you ever had any training in
10  that area?
11  A.  Nope.
12  Q.  Did you have any supervisory
13  responsibility for any examiners in any of
14  your jobs pre-BeneFirst?
15  A.  No.
16  Q.  Did you take on any of that
17  responsibility at BeneFirst?
18  A.  I supervised the supervisor.  They
19  always had someone that oversaw the claims
   examiner.
21  Q.  Before Mr. Gatanti who was that?
22  A.  I think her name was Barbara.  I
23  can't remember her last name.  And then
24  prior to that it was done in-house at

51

1  Trizetto.
2  Q.  I just want to spend a couple minutes
3  on that.  Let me just make sure I have my
4  chronology right.  Trizetto, to my
5  understanding, had a product call RIMS?
6  A.  Yes.
7  Q.  And there was a time in which
8  BeneFirst contracted with Trizetto to do
9  the claims examination for them?
10  A.  Right.
11  Q.  So you basically out-sourced all the
12  claims examination?
13  A.  That's correct.
14  Q.  And is that how you started the
15  company in '99?
16  A.  Yes.
17  Q.  Were you familiar with Trizetto at
18  Health Plans?
19  A.  No, because at the time I don't think
20  Trizetto existed.
21  Q.  So this was a new relationship for
22  you professionally?
23  A.  Okay, just from a chronology, when
24  you say Trizetto, at the time it was RIMS.

52

1  Trizetto came along later on.
2        So to answer your question,
3  RIMS was the name known in the industry
4  back in '99, and not Trizetto.
5  Q.  So 1999 when you formed BeneFirst you
6  contracted with RIMS to do the claims
7  examination and adjudication?
8  A.  Right.
9  Q.  And so you have didn't have then any
10  on-staff claims examiners?
11  A.  Correct.
12  Q.  At some point in time you terminated
13  that relationship and brought the claims
14  examination in-house?
15  A.  That's right.
16  Q.  When did that occur?
17  A.  I want to say -- I want to say
18  September of '01.
19  Q.  Do you recall first meeting the folks
20  from Aubuchon?
21  A.  I don't recall the first meeting.
22  Q.  Who was the salesperson responsible
23  for bringing Aubuchon into BeneFirst?
24  A.  Paul Sullivan.

1  Q.  And did you understand that Mr.
2  Sullivan had a prior relationship with the
3  Aubuchon folks?
   A.   Yes.
5  Q.  And that was a relationship that
6  arose out of their prior TPA?
7  A.   Yes.
8  Q.  And Mr. Sullivan, was he a member of
9  the LLC at that time?
10 A.   What time?
11 Q.  When he brought in Aubuchon.
12 A.   Yes.
13 Q.  Did he form BeneFirst with you?
14 A.   He was there at the beginning.
15 Q.  Who was there at the beginning?
16 A.   It was really just myself.  And Paul
17 came on a month or so later, so --
18 Q.  And did Maureen FitzGerald join you
19 shortly after that time?
20 A.   No, no, no.  She did not join us
21 until -- you see, I can't even recall when
22 she joined us.
23        Like, for instance, this
   meeting that we're talking about, this

1  A.   Yes.  I knew that meeting took place.
2  To be honest with you, I don't remember if
3  I was there at that time for that meeting.
4  Q.  But whether you were physically there
5  at that meeting or not, you'd agree with me
6  that initially BeneFirst was telling
7  Aubuchon that the claims examination
8  adjudication process was out-sourced to
9  Trizetto?
10 A.   Right, correct.
11 Q.  And that was the plan at that time?
12 A.   Right.
13 Q.  At BeneFirst, right?
14 A.   Right.
15 Q.  And you believe within several months
16 after that time period BeneFirst brought it
17 in-house?
18 A.   That's correct.
19 Q.  Did you, personally I'm asking you
20 this as Charles Dobens, did you have any
21 discussion with anybody at Aubuchon about
22 that change in process?
23 A.   You know, that -- I believe I did.  I
24 believe I spoke to Marcus Moran about that,

1  October surprise meeting we will call it, I
2  can't remember whether Maureen was an
3  employee of BeneFirst at that time or
4  whether she was acting as a
5  broker/consultant for Aubuchon, because she
6  had all of those types of roles there,
7  so --
8  Q.  So Mr. Sullivan had the relationship
9  with Aubuchon, correct?
10 A.   Yes.
11 Q.  Do you recall when the relationship
12 with Aubuchon started, the month or year?
13 A.   I think it was July '01.
14 Q.  My understanding is that when
15 BeneFirst was first attempting to get
16 Aubuchon as a client BeneFirst still had a
17 relationship with RIMS and/or Trizetto at
18 that time?
   A.   Yes.
20 Q.  And I don't know if you were present
21 or not, but do you recall a meeting at
22 which folks from BeneFirst and Aubuchon
23 actually went out to RIMS and Trizetto?
24 And I believe it was in Chicago.

1  which makes me kind of, you know, remember
2  the chronology of events for the
3  termination of Chicago and bringing it
4  in-house to Marshfield as being in
5  September of that year that we took
6  Aubuchon on.
7        So I had to kind of go explain
8  to Marcus, I know you went and saw them,
9  they told you a great story.  We've decided
10 to bring everything in-house.
11       We're still using their system,
12 it's a great system, but now we've grown to
13 a certain level that it makes more sense
14 for us economically to bring everything
15 in-house and adjudicate the claims from
16 Marshfield.
17 Q.  At this time prior to bringing it
18 in-house you had no claims examiners on
19 staff though, right?
20 A.   That's correct.
21 Q.  So who was responsible for going out
22 and hiring the claims examiners?
23 A.   It was Denise Lynch and myself.
24 Q.  Who was Denise Lynch?

57

1  A.   She was really the first employee.
2  She was the client service rep/account
3  manager type of position.
   Q.   Was she a claims examiner by
5  training?
6  A.   She had, yes, she was.
7  Q.   Do you know for who?
8  A.   G.I.C.
9  Q.   So Denise is somebody that would have
10 been known to Aubuchon?
11 A.   No, no.
12 Q.   Okay.  And who was the first claims
13 examiner you hired?
14 A.   All right.  Let me just go back.  She
15 would have been known to Aubuchon.
16 Q.   Do you know if Aubuchon knew Denise
17 Lynch before they became a client of
18 BeneFirst?
19 A.   No, I don't believe they did.
20 Q.   So my next question was who was the
21 first claims examiner you had?
22 A.   I tell you, I can't remember.  I
23 really don't remember.
   Q.   What did you do to qualify them as

58

1  candidates and employees?
2  A.   Really a lot of it had to do with
3  references, their understanding of RIMS,
4  giving them some sample claims to process
5  on the system and see how they did doing
6  that.  Those are typically the things.
7        In that particular geographical
8  area, there were a lot of claims examiners,
9  a lot of TPA's, and a lot of people on the
10 RIMS system.
11       And if you had been working on
12 another vendors paying TPA you probably had
13 the knowledge we needed and the expertise
14 to come over and pay claims off of our
15 system.
16 Q.   You said geographic area, the South
17 Shore?
18 A.   Yes.  TPA capital of the world.
   Q.   Why is that?
20 A.   Because two guys, Gerry Anderson and
21 Herb Hokinson started GIC back in 1975.
22       And from that one TPA grew
23 about five or six other TPA's.
24 Q.   Plus it's a nice place to live.

59

1  A.   Yah, I don't mind it.  That was a
2  good thing to come out of it.
3  Q.   Was Aubuchon your largest client in
4  terms of employees at that time in 2001?
5  A.   Yes, I believe it was.
6  Q.   Before you started BeneFirst did you
7  have some concerns about your ability to
8  transfer all of this work from a large
9  employer like Aubuchon directly in-house?
10 A.   No, I had full confidence in the
11 systems that we had in place and we had --
12 everyone in there had enough experience to
13 be able to do something like that.
14 Q.   Who built the Aubuchon plan at
15 BeneFirst?
16 A.   Built it -- I don't recall.  Barbara
17 Cope I think was her last name.
18 Q.   What was her position?
19 A.   She was our Claims Manager/Claims
20 Supervisor.
21 Q.   Do you know where she is today?
22 A.   No idea.
23 Q.   And what happened to her employment
24 relationship?

60

1  A.   She was terminated.
2  Q.   And when was that?
3  A.   I don't remember.
4  Q.   Why?
5  A.   Why don't I remember?
6  Q.   Why was she terminated?
7  A.   She was a very sloppy worker I guess
8  is the best way to describe it.
9  Q.   Who terminated her?
10 A.   I think Denise Lynch terminated her.
11 Q.   Have you ever reviewed the Aubuchon
12 Medical Plan?
13 A.   Yes.
14 Q.   As part of the case or during the
15 relationship?
16 A.   Do you mean that book right over
17 there essentially?
18 Q.   Yes.
19 A.   Oh, as part of the relationship.
20 Actually I was there at the law firm up in
21 Portland when they were designing the plan.
22 Q.   Do you recall the law firm of Verril
23 & Dana being involved?
24 A.   Yes.

61

1  Q.  I just want to talk a little bit
2  about the development of the medical plan.
3  A.  Okay.
   Q.  What role did BeneFirst have in that?
5  A.  I guess it could be called an
6  advisory role.  We just kind of sat in the
7  meetings, and you know, listened to what
8  they were trying to do.
9        I mean their old plan document
10 was atrocious and just needed to be totally
11 thrown out and started all over again.
12       They hired this firm up in
13 Portland.  She drafted a beautiful
14 document, it's a very nice, well-done
15 document.
16 Q.  Had you worked with Verril & Dana
17 before?
18 A.  No, never.
19 Q.  When you took on any new client at
20 BeneFirst did there always have to be a
21 rewrite of the medical plan?
22 A.  No.  And typically we wouldn't do
23 that.
   Q.  Had you gone through a process like

62

1  the one you did with Aubuchon with any
2  other clients before?
3  A.  I would venture to say no.
4  Q.  And at the time I meant.
5  A.  No.
6  Q.  So it was the first time you had gone
7  through the restructuring of a medical
8  insurance plan?
9  A.  To that extent, yes.
10 Q.  And who else at BeneFirst was
11 involved in these initial meetings and
12 discussions about building the medical plan
13 other than you?
14 A.  I'm thinking that Paul Sullivan was
15 in the meeting.
16 Q.  Did you have comments and suggestions
17 on some of the provisions and language?
18 A.  Yes, I think we advised and discussed
   from a claims processing standpoint how
20 some things should be worded in the plan
21 document.
22       But it was strictly for a
23 systems procedure so that if a claim came
24 in we could process that claim easily

63

1  without having to think about it and it
2  goes right out the door.
3        They had a provision in their
4  old document that required, it enabled-- it
5  required the claims examiner to think too
6  much.
7  Q.  The way Mr. Gatanti explained it
8  yesterday was that the Medical Summary Plan
9  Descriptions are really the, I think you'd
10 use the term "the Bible" that the claims
11 examiner would utilize in determining
12 whether to approve, reject or further
13 investigate a claim.  Do you agree with
14 that?
15 A.  Let me just see if I can rephrase
16 what you said.
17 Q.  Sure.
18 A.  The plan document is the Bible.  The
19 Summary Plan Description doesn't
20 necessarily include everything that a Plan
21 Document does, but in that particular case
22 they used the plan document as the Summary
23 Plan Description.
24       So in their case, that Summary

64

1  Plan Description is also the plan document
2  and it is used as like the Bible.
3  Q.  So that's why it was important for
4  the people at BeneFirst to be familiar with
5  it?
6  A.  Yes.
7  Q.  And you recall, we'll get into the
8  actual document in a little bit, but the
9  document has references to BeneFirst within
10 the document, does it not?
11 A.  Yes, it does.
12 Q.  At the time the plan document was
13 prepared it was already agreed to that
14 BeneFirst was going to be the third-party
15 administrator?
16 A.  I believe so, yes.
17 Q.  Were you involved in the negotiations
18 over the contractual relationship between
19 BeneFirst and Aubuchon?
20 A.  Very little, if at all.  I really
21 didn't -- I mean it was Paul Sullivan that
22 would handle all that.
23 Q.  And he had the authority on behalf of
24 BeneFirst to negotiate those terms?

65

1  A.   Yes.

2  Q.   And was it BeneFirst's practice to

3  execute written agreements with its

   clients?

5  A.   Yes.

6  Q.   Did you have just oral agreements or

7  were they all reduced to writing?

8  A.   No, it was all in writing.

9  Q.   And did you have a standard form

10  document that you used?

11  A.   Sorry?

12  Q.   A standard form contract that

13  BeneFirst used.

14  A.   For?

15  Q.   For its engagements with its clients.

16  A.   Yes.

17  Q.   Do you know prepared that?

18  A.   I think I prepared it early on and it

19  became our standard form.

20  Q.   Do you recall that actually for

21  Aubuchon there were actually two plans,

22  one for the distribution center and one for

23  the hardware chain?

   A.   Yes.

66

1  Q.   And BeneFirst was to be the TPA for

2  both plans?

3  A.   Yes.

4  Q.   And do you have a memory at one point

5  the distribution company's plan went away?

6  A.   Yes.

7  Q.   And do you recall why?

8  A.   It was a Union issue.  They went with

9  the Union plan.   I don't think we could

10  touch the numbers.

11  Q.   So they stopped providing the plan,

12  and therefore the TPA contract ended?

13  A.   Right.

14  Q.   And I'm sure you know this, that

15  nobody has been able to put their hand on a

16  signed TPA Agreement, are you aware of

17  that?

18  A.   Probably, yes.  Through the

   discussions I've heard that, yes.

20          MR. BRODIE:  Excuse me, off the

21  record.

22          (Discussion off the record)

23  Q.   We haven't been able to find a signed

24  agreement.  You would believe based upon

67

1  your memory and your experience that at one

2  point in time there was a signed agreement

3  with Aubuchon, is that correct?

4  A.   Yes.

5  Q.   You would find it highly unlikely

6  that this relationship would have gone on

7  for several years without a signed

8  agreement?

9  A.   Based upon the relationships

10  involved, you know, I don't -- I wouldn't

11  say that.  I think, you know, these guys

12  would operate on a handshake, Paul Sullivan

13  and Marcus Moran and that crew.

14          It doesn't mean that we would

15  at BeneFirst.  But I mean that was our

16  contract and that's what we provided

17  services based upon.

18  Q.   So let me say it to you another way.

19  As the representative of BeneFirst, frankly

20  the only party that can represent BeneFirst

21  here today, if somebody asked you what were

22  terms of the relationship between BeneFirst

23  and Aubuchon, you would look at that

24  written contract whether it was signed or

68

1  not, is that fair to say?

2  A.   That's correct.

3  Q.   Stated another way, BeneFirst didn't

4  have any oral terms of an agreement with

5  Aubuchon different than the written

6  document?

7  A.   Not to my knowledge.

8  Q.   Do you recall in 2005, so after the

9  termination, and I think while you guys

10  were probably doing the run-out, several

11  requests coming from Aubuchon looking for a

12  copy of the signed agreement?

13  A.   I don't recall.

14  Q.   I'm going to show you a letter dated

15  August 2, 2005 that purports, at least it

16  says on its face, that it is from you to a

17  lawyer named Charlie Gelinas.  I'm just

18  going to ask if you sent that letter and

19  you recall it.

20  A.   (Reading document)

21          MR. BRODIE:  Off the record for

22  a second.

23          (Discussion off the record)

24  Q.   My question is do you recall sending

69

1 that letter?
2 A. I don't recall sending this letter,
3 no. And I have issues with this letter.
4 I'd like to -- if you had an original,
5 there's just certain things in here that
6 just kind of send up a red flag to me.
7 Q. Like what?
8 A. No signature. This first Duke,
9 Mrs.-- I mean it it's scanning, I mean we
10 have done scanning before, and I know Eric
11 said that scanning can do these things.
12     I just see so many things in
13 here -- when I was looking at this, you
14 know, a typo in the first section of
15 Section 1 of the contract.
16     I'm just -- I mean these are
17 just some of the things that I look at, and
18 I think, Jesus, this doesn't look right.
19     I mean it did essentially
20 inform, it's a similar-looking document to
21 our Administrative Services Agreement.
22     And this is-- you know, this
23 was a DC, so this didn't last very long.
24 So maybe this is a subsequent -- revisions

70

1 of the A.S.A. would look differently.
2     But I don't remember writing
3 this letter. So --
4     But I mean this does looks like
5 our A.S.A. with a few things in here that I
6 have issues with so --
7 Q. Let's take them one step at a time.
8     MR. CIAVARRA: First of all,
9 let's mark this so we know what we're
10 talking about, as Exhibit 4.
11     (Exhibit 4, Letter to Atty.
12     Gelinas 8/2/05 with
13     Administrative Services
14     Agreement, marked)
15 Q. So my first question to you is, (1),
16 do you deny sending that letter?
17     MR. BRODIE: I guess I would
18 object. "That letter," meaning, is the
19 question here is this an accurate copy of
20 whatever was sent?
21     MR. CIAVARRA: I can break it
22 down in many ways.
23 Q. So my first question is, that
24 document in that form, do you deny sending

71

1 that?
2 A. Yes.
3 Q. Okay. Then we'll take it piece by
4 piece.
5 A. Okay.
6 Q. Do you deny sending a letter on or
7 about August 2, 2005 to Attorney Charlie
8 Gelinas attaching a copy of an A.S.A.?
9 A. Can I neither admit nor deny just
10 because I just don't recall?
11 Q. Do you recall ever receiving a
12 request from Attorney Gelinas for such a
13 document?
14 A. I believe I did.
15 Q. Did you ever send him a copy of the
16 A.S.A. you had on file?
17 A. If he had asked for one, I would have
18 done that.
19 Q. Okay. And what you can't tell us
20 today is whether or not that's actually the
21 letter and actually the document you sent,
22 is that fair to say?
23 A. That's correct.
24 Q. Okay. Now I'd like you to just turn

72

1 to the actual agreement that's attached to
2 it. If you turn that to the first page.
3 A. Hold on one second. Do you have a
4 copy of his letter dated July 19?
5     MR. BRODIE: I'll look.
6 Q. We will just keep going. I'll come
7 back to it.
8 A. Okay.
9 Q. So turn to the agreement. Now during
10 the course of Sarah Arel's deposition your
11 attorney marked a document which he
12 indicated was an A.S.A. which they were
13 able to locate.
14     Let me show you that document.
15 It was marked as Exhibit 7 during the
16 deposition of Sarah Arel.
17     MR. BRODIE: I'll object to the
18 characterizaton of what representations
19 were made.
20     MR. CIAVARRA: Did I
21 mischaracterize it?
22     MR. BRODIE: I know we marked
23 it, but I don't know if we represented this
24 was anything more than what it was.

73

1    MR. CIAVARRA: I'll represent
2  for the record, you correct me if I'm wrong
3  here, that you guys have not produced any
4  other version of an A.S.A. Can we agree on
5  that?
6    MR. BRODIE: Maybe we should go
7  off the record on this.
8    MR. CIAVARRA: Sure.
9    (Discussion off the record)
10    MR. CIAVARRA: Back on the
11  record. I think we can agree, Counsel can
12  agree that the version of the A.S.A. that
13  I've put in front of the witness, Exhibit 7
14  to the deposition of Sarah Arel, is the
15  only A.S.A. that we have been able to find
16  that has Aubuchon's name on it. That's
17  correct, isn't it?
18    MR. BRODIE: "We" meaning?
19    MR. CIAVARRA: That anybody.
20    MR. BRODIE: Any party?
21    MR. CIAVARRA: That anybody has
22  produced in this case.
23    MR. BRODIE: I can agree to
   that.

75

1    In the early Administrative
2  Service Agreements that we used we had
3  built in Performance Standards into the
4  Administrative Services Agreement.  These
5  were the same Performance Standards that we
6  received from RIMS when they were
7  processing the claims.  So we provided
8  those same standards to our clients.
9    As time went on and the HIPPA
10  laws came about, to be compliant with
11  HIPPA, these Performace Standards really
12  became null and void.
13    Essentially, if we lived up to
14  them, we would be violating HIPPA, meaning
15  because HIPPA was more stringent than what
16  our Performance Standards were.
17    So we just took them out.
18    So in subsequent A.S.A.'s you
19  would not see that Performance Standards
20  section. That's the most blaring one that
21  I see.
22  Q. And you believe it's in Section?
23  A. Section 6, page 5. The whole
24  section.

74

1  Q. So my question to you is, let's go
2  back to the witness now.
3  A. Keep it up, boy.
4  Q. Are you aware of any other agreement
5  other than the one that's been put in front
6  of you, either as attached to Exhibit 4 or
7  as in reference in Exhibit 7 to the Sarah
8  Arel deposition, between Aubuchon or
9  Aubuchon Distribution and BeneFirst?
10  A. Yes, there would have been another
11  document. Maybe two other ones.
12  Q. Do you have any memory, actual memory
13  of the terms of that written document being
14  in any way different than the exhibits put
15  in front of you now?
16  A. Yes.
17  Q. And what is your memory?
18  A. Well, the one for the hardware store
   would not have said Distribution Center.
   So that would have been another agreement.
21  Q. Right.
22  A. And then, which was brought to my
23  attention, which was Section 6, Performance
24  Standards.

76

1  Q. Exhibit 7 to Sarah Arel's deposition
2  in 6(b), it still has Performance
3  Standards, does it not? Does your copy
4  have that as well?
5  A. This one does, yes.
6  Q. Okay. And this document has a date
7  on it of August 2, 2005?
8  A. Yes, that would have been when it was
9  printed off.
10  Q. Okay. Because again, this is for the
11  Distribution Center, which we know ended
12  several years earlier.
13  A. Right, right.
14  Q. I guess what I'm trying to understand
15  is the Performance Standards that are set
16  forth in the two documents that we are
17  looking at in 6(b), you're telling me that
18  these were in the document in its initial
19  form or in its later form?
20  A. In its initial form.
21  Q. And do you know when they were
22  removed?
23  A. I do not know when they were removed.
24  Q. So there was a time in which these

77

1  Performance Standards were in place in the
2  relationship between BeneFirst and the two
3  Aubuchon companies?
   A.  Yes, correct.
5  Q.  And you believe at some point if
6  another document were signed, that it would
7  eliminate that language?
8  A.  Yes.
9  Q.  And again, do you know whether or not
10 new agreements were signed every year?
11 A.  They -- we wanted them signed every
12 year.  They did not need to be signed
13 every year.  There's no termination date on
14 the A.S.A.
15         And Paul and Maureen weren't
16 necessarily always stringent in getting
17 things signed.
18 Q.  Okay.  We had started talking a
19 little bit about the plan built for
20 Aubuchon, which you told me was Barbara
21 Cope was the person who was initially
22 involved in doing that?
23 A.  Initially, yes.  No, actually, I take
   that back.  If this plan came over from

78

1  Trizetto, Trizetto would have done the plan
2  build.
3  Q.  What makes you think the plan came
4  from Trizetto?
5  A.  It doesn't come from Trizetto.  What
6  I mean is that when we took it over, took
7  it away from them, Aubuchon was already a
8  client.  We were already processing claims
9  on Aubuchon's plan.  And that was in July.
10 And we were still with Trizetto and they
11 were doing all the plan billing out in
12 Chicago.
13 Q.  I guess what I want to know is, is
14 that your memory of how the plan was built
15 or are you working your way through it
16 logically?
17 A.  Oh, well, I know that we would not--
18 under those circumstances at that timeframe
   no one was in our office to be able to bill
19 the plan.
21         So logically, yah, I mean I
22 can't say that Barbara Cope did it
23 because --
24 Q.  So your best memory is that whatever

79

1  program was necessary for the computer
2  system to be able to work and to do the
3  claims examination was built by Trizetto?
4  A.  Correct.
5  Q.  And then when you brought the claims
6  examination in-house did you enter some
7  type of a license agreement with Trizetto?
8  A.  Yes.
9  Q.  And for that you got access to their
10 software?
11 A.  Yes.
12 Q.  And also all of the plan build
13 documents?
14 A.  Yes.
15 Q.  So that after that transaction you
16 were able to do in-house what Trizetto was
17 doing in Chicago?
18 A.  Correct.
19 Q.  What training, if any, did your
20 claims examiners get from Trizetto when you
21 hired them?
22 A.  We had a staff of three people come
23 in from Chicago.  And before they would
24 allow us to take over the system, we had to

80

1  buy their training program.  It was like
2  $16,000.
3         And we had three people come in
4  for a week and just go through a whole
5  entire training program for all of our
6  staff on how to do every aspect of the
7  system.
8  Q.  All right.  Turning your attention to
9  the agreement referenced on Exhibit 4.
10 Okay?
11         This Administrative Services
12 Agreement is a form that was created by you
13 and by BeneFirst?
14 A.  Yes.
15 Q.  And there would be whatever changes
16 done on a per client basis made within the
17 document?
18 A.  Yes.
19 Q.  Let me ask you in the years that you
20 worked in this field did you become
21 familiar with a concept of a fiduciary
22 within health care plans?
23 A.  Yes.
24 Q.  And what's your understanding about

**81**

1  what is a fiduciary?

2  A.   Well, I mean the way we always talked

3  about it, you have a big F and little F

fiduciary.

5         And the big F was really the

6  plan sponsor, the one who was in charge of

7  everything.  They're the ones that had to

8  follow the ERISA guidelines and the ERISA

9  laws.  That's their responsibility.

10        We were a claims administrator

11  or benefits administrator.  We were nothing

12  more than a vendor to a plan sponsor or a

13  fiduciary of a plan.

14        We did not have discretion over

15  the plan, we couldn't make decisions as to

16  what benefits were provided to people.

17        We just had to follow that

18  Bible, that plan document, and make sure

19  that we paid claims accordingly.

20  Q.   So that would be a little F?

21  A.   That would be a little F, yes.

22  Q.   And the little F standing for

23  fiduciary?

A.   Yes.

**82**

1  Q.   When you were operating BeneFirst did

2  you consider that you had a fiduciary duty

3  to the plan?

4  A.   We had, as a provider of services to

5  a client, a fiduciary responsibility to

6  that client.  We did not have a fiduciary

7  role to the plan.

8  Q.   And who was the client?

9  A.   The Plan Administrator.

10  Q.   The reason I said that, I'm looking

11  at the document that you guys prepared and

12  it identifies BeneFirst as the plan

13  administrator, does it not?

14  A.   Yes, it does.  But in subsequent

15  documents we changed that to Claims

16  Administrator.

17        But for all intents and

18  purposes, if you look at the definition of

what we performed for them, it was the same

thing as a Claims Administrator.

21        If you look at the plan

22  document, I think one of the reasons why we

23  changed that was because I believe the plan

24  document for Aubuchon said use both plan

**83**

1  sponsor and plan administrator, meaning

2  Aubuchon, and not BeneFirst.

3  Q.   As I look at the Plan Document and

4  identify it, and we can agree or disagree

5  with this, the plan administrator is

6  Aubuchon, for example, on the Aubuchon

7  plan, but then said that all the

8  responsibilities and duties of plan

9  administrator would be contracted with

10  BeneFirst.  Is that how you read it?

11        MR. BRODIE:  Objection.

12  A.   Yes.

13  Q.   And that certainly was the intention?

14  A.   Right, that's how they, right, that's

15  how everyone understood it. ·

16        But as I said, just by your

17  description, it was an out-sourced service

18  to a third party, but they would never pass

19  on that fiduciary role by doing that to us.

20  We would have never accepted it.

21  Q.   You're not suggesting there was any

22  discussion about that, are you, or are you?

23  A.   Well, I think we always had to bring

24  it back to the clients to say, Hey, guys,

**84**

1  it's your plan.  You tell us how you want

2  to administer it.

3         You know, those, we would get

4  questions from Marcus all the time as to

5  Hey, can I do this, can I do that.

6         And we'd always advise him,

7  like, we'll do whatever you want, you're in

8  charge of the plan.  But I mean we have to

9  go by what the plan document says.

10  Q.   You knew Aubuchon was not, there was

11  nobody at Aubuchon trained in claims

12  administration, was there?

13  A.   No, not that I am aware of.

14  Q.   You knew that they were relying on

15  BeneFirst to do that?

16  A.   For claims processing.

17        MR. BRODIE:  Note my objection.

18  Q.   Claims processing?

19  A.   Yes.

20  Q.   You knew that they were relying on

21  BeneFirst to do the claims adjudication?

22  A.   Exactly, yes.

23  Q.   And to the extent there were

24  decisions that had to be made in connection

85

1  with that adjudication, they were
2  depending on BeneFirst to make those
3  decisions?
   MR. BRODIE:  Objection.
5  A.   When you say decisions, I just want
6  to make sure we are on the same page here.
7        I mean there are tens of
8  thousands of decisions that are made on a
9  monthly basis when adjudicating claims for
10 the size of a company of Aubuchon.
11       I mean those decisions are just
12 simple snap-snap, you know, a lot of times
13 a computer is the one that makes that
14 decision and that's it.
15       Things outside of the system
16 are decisions that we would never have
17 made.  We would always have asked for
18 permission from the client or given advice
19 to the client and wait for their response.
20       We would never have adjudicated
21 claims outside of the terms of the plan
22 document without the permission of the
23 client.
   Q.   But whether or not something was

86

1  within or without the plan document, it's
2  something that a claims examiner would have
3  to consider on a daily basis, isn't that
4  true?
5  A.   Yes, absolutely.
6  Q.   And they would, you're not
7  suggesting, are you, that on a daily basis
8  your claims examiners were calling somebody
9  at Aubuchon and asking Aubuchon, somebody
10 at Aubuchon, whether something was within
11 or out of the document?
12 A.   On a daily basis, no, I wouldn't say
13 it's on a daily basis.
14 Q.   But on a daily basis the claims
15 examiners were making those decisions of
16 whether or not a particular claim fell
17 within or without the plan?
18 A.   Within or without, outside of the
   parameters of the plan that the fiduciary
   had given to us to adjudicate based on.
21 Q.   And who was relying on you to
22 adjudicate?
23 A.   Exactly.
24 Q.   Can you think of any instance as you

87

1  sit here today where Aubuchon asked you for
2  advice in connection with something on the
3  plan and BeneFirst provided that advice and
4  Aubuchon didn't follow it?
5        MR. BRODIE:  Note my objection.
6  A.   You know, it's been so long.  I can
7  think of one that comes to mind that Marcus
8  wanted to do.  The story was that he wanted
9  to pay for Gerry Archambeault's handicapped
10 van through the plan.
11       And you know, that was the type
12 of request we would get from Marcus.  I
13 mean there was a lot of other exceptions,
14 too, that we had to make for Aubuchon as
15 well.
16       And you know, we would always
17 say that we'll do whatever you want, but
18 it's not going to be covered by the plan,
19 I mean it's not going to be covered by the
20 stop loss carrier.  And they knew it.  You
21 know, they were very interactive in their
22 plan.
23 Q.   So I'm going to talk about, my
24 question to you is was there a situation in

88

1  which BeneFirst provided advice concerning
2  the plan to Aubuchon and Aubuchon didn't
3  follow it.
4        Is it your testimony that
5  somebody at BeneFirst told Aubuchon that
6  this handicapped van was not covered by the
7  terms of the plan?
8  A.   Yes.
9  Q.   And who did that, if you know?
10 A.   I don't know, but it's not, it
11 wouldn't have come down the way you've just
12 described it.  It wouldn't have been
13 presented as a claim.
14       It would have been presented to
15 us by Marcus or Sarah saying, "Hey, Gerry
16 needs a handicapped van.  Marcus really
17 wants to do it for him.  Can we pay it
18 through the system?"
19       I mean that's an extreme
20 example that I always remember as the type
21 of employer that Marcus was.
22       There were other cases.  I
23 can't recall, I'm sure if we started going
24 through names and stuff, I'd start

88

1 recalling some of the situations,
2 individual situations.
3 Q.  But I think we are mixing up
4 situations.  What I hear you describing to
5 me is something that Paul Gatanti talked
6 about, which is the payment of benefits
7 outside of the loss, the aggregate loss?
8 A.  The stop loss contract?
9 Q.  Right.
10 A.  Yes.
11 Q.  Because ultimately all this money in
12 the plan is Aubuchon's money?
13 A.  Yes.
14 Q.  It's a self-funded plan?
15 A.  Right.
16 Q.  And the only issue becomes whether or
17 not it's going to be utilized to trigger
18 the excess coverage, right?
19      MR. BRODIE:  Objection.  You
20 can answer.
21 Q.  In terms of whether or not a claim
22 gets paid or not?
23 A.  Right, okay.
24 Q.  So what Paul described, Paul Gatanti

90

1 described was that from time to time there
2 would be benefits Aubuchon wanted to
3 provide to its employees that would be paid
4 outside of the loss funds.  Do you recall
5 that?
6 A.  Oh, yah, yah.
7 Q.  And that was okay because it wouldn't
8 capture it in a way that couldn't be used
9 to trigger the stop loss insurance, right?
10 A.  Yes.
11 Q.  And for example, this handicapped van
12 situation you're talking about would be one
13 such situation?
14 A.  Exactly.
15 Q.  And I hear those and I heard about
16 those yesterday.  And what I'm asking is
17 something different than that.
18      Is there a situation in which
19 BeneFirst provided some advice with respect
20 to the plan with respect to whether
21 something was covered or not covered with
22 respect to administration of the plan, or
23 any function that BeneFirst was involved
24 in, that Aubuchon did not follow.

91

1      And I understand it was years
2 ago.
3 A.  Yah, I can't recall specifically.
4      MR. BRODIE:  I will just object
5 to the lack of foundation on that.  I'm not
6 sure that that's been established.
7 Q.  Okay.  You understood that part of
8 the responsibilities of the claims examiner
9 was to take a look at the claims that came
10 across the desk and to determine whether or
11 not there might be other people responsible
12 to help pay for that claim?
13 A.  Oh, yah, yah.
14 Q.  And that might be other insurance?
15 A.  Yes.
16 Q.  It might be somebody who caused an
17 injury that there be a subrogation claim
18 against?
19 A.  Yes.
20 Q.  And you understood that your people,
21 your claims examiners, would have to make
22 that determination in the first instance?
23 A.  Yes.
24 Q.  And for example, that might require

92

1 some investigation on their part, right?
2 A.  Yes.
3 Q.  Did you believe that your people in
4 2004, your claims examiners, had sufficient
5 training in order to make those decisions?
6 A.  Yes.
7 Q.  Now those decisions of whether or not
8 to investigate co-insurance or to
9 investigate maybe a third-party who caused
10 the injury, there's nothing in the plan
11 that tells you how to do that, is there?
12 A.  How to do it?
13 Q.  Or I should say whether and when to
14 do it.
15      MR. BRODIE:  Note the
16 objection.
17 A.  Yes, there's wording in the plan, I
18 believe, that would talk about those types
19 of things.  I mean that's why we did it.
20 Q.  Go ahead.
21 A.  There are some plans that don't have
22 a coordination of benefits provision.
23      There are some plans that don't
24 have a subrogation provision.

93

1  So would we search for
2  subrogation? No. Why would we? The plan
3  doesn't require us to search out
4  subrogation.
5      So if we looked for those
6  things, the reason why we looked for them
7  was because the plan document required they
8  were investigated.
9  Q.  Let me be more specific. The plan
10  would tell the claims examiners to look for
11  those things because they're covered in the
12  plan, whether there's a right to offset
13  because of co-insurance, reduction in
14  benefits, for whatever reason.
15      But the actual mental process
16  that the claims examiner would go through
17  to figure out who do I call, where do I
18  look, you know, what investigation do I
19  undertake, that's not described in the
20  plan. Would you agree with that?
21  A.  That's correct.
22  Q.  Did you have at BeneFirst any other
23  written materials or, you know, procedures
    or guidelines for your claims examiners to

94

1  follow either in pursuing subrogation
2  claims or co-insurance?
3  A.  Well, I believe that Paul Gatanti was
4  working on and created a policy manual for
5  the employees, for the claims examiners.
6  Q.  Do you know if that ever got to the
7  point of being finished and used?
8  A.  I don't believe it was. But I
9  believe that Paul trained everyone when
10  they came on board and to how he wanted
11  things done.
12  Q.  There's, you may recall this from
13  your review of the initial audit that was
14  done for the excess carrier, that some of
15  the over-payments were attributed to
16  ineligible participants.  Do you recall
17  seeing that?
18  A.  I believe I saw that, yes.
19  Q.  And questions of eligibility. When a
20  claims examiner receives a claim for any
21  particular individual, how would they know
22  whether or not that person is eligible for
23  coverage?
24  A.  The claims examiner?

95

1  Q.  Yes.
2  A.  It would be noted in the system as to
3  whether that person, where that person
4  falls in the category, you know, eligible
5  or ineligible. So the system would tell
6  the claims examiner.
7      The claims examiner does not
8  have the ability to change eligibility.
9  Q.  So they would plug in, I think Paul
10  said typically the Social Security Number
11  into the computer.  Is that your
12  understanding?
13  A.  Yes.
14  Q.  And then that person's name and
15  profile would pop up if they were an
16  eligible person.  Is that your
17  understanding?
18  A.  Yes.
19  Q.  And presumably if there was no
20  records of that person, then there would be
21  no claim process for that person?
22  A.  Or no record, or if they had a
23  terminate date prior to the date of the
24  service in the claim, we wouldn't

96

1  adjudicate the claim.
2  Q.  What was the responsibility of a
3  claims examiner when they would receive a
4  claim and there would be no records of a
5  person being an eligible participant?
6  A.  The claim would be denied.
7  Q.  They wouldn't check with somebody
8  else to find out if there's a pending
9  eligibility form?
10  A.  No, because by the time a claim got
11  to an examiner, I mean that person should
12  be in the system somehow.
13  Q.  In connection with administering the
14  Aubuchon plan, if BeneFirst authorized
15  payments for claims that it shouldn't have
16  that were not proper payments, they were
17  not covered claims, do you believe that
18  BeneFirst is responsible for that
19  financially back to Aubuchon?
20      MR. BRODIE:  Objection.
21  A.  No.
22  Q.  Why not?
23  A.  It's not our money. If it was paid
24  out incorrectly, typically a doctor's

**97**

1   office would send it back to us and it
2   would go back in as a refund to the plan.
3   You have to understand why the claim was
4   paid incorrectly.
5         We're not the insurance
6   company. We're just a record keeper for
7   the plan.
8         And with any plan you're always
9   going to have claims that were paid
10  incorrectly. Should we be responsible for
11  those financially? Absolutely not.
12  **Q.** So who should be responsible for
13  those inappropriate payments?
14        MR. BRODIE: Objection.
15  **Q.** Is it your position that the plan has
16  to absorb those costs?
17  **A.** No. The plan should not absorb those
18  costs. If a claim was paid incorrectly to
19  a provider --
20  **Q.** "If a claim was paid incorrectly?"
21  You said "claim." You meant a claim,
22  right?
23  **A.** The plan should not. I spoke
24  correctly. Initially I was talking about a

**98**

1   plan.
2         Now I'm saying if a claim was
3   paid incorrectly, we just go back and get
4   the money back from the provider.
5   **Q.** Has BeneFirst done that on behalf of
6   Aubuchon for any of the claims that were
7   paid inappropriately?
8   **A.** Yes.
9   **Q.** Do you believe you've done it for all
10  claims that were paid incorrectly?
11  **A.** I don't believe that -- I believe
12  that the extent, from what I see from your
13  audits, to think that we paid that much out
14  incorrectly is -- I mean it just goes to
15  show you.
16        Doctors' offices do not keep
17  money that is not theirs. If they get an
18  over-payment or something was paid
19  incorrectly, they turn around and they send
20  it back.
21        I mean if they get audited by
22  Medicare or Medicaid, and they've got this
23  money on the books, they're in big trouble.
24        Doctors' offices do not collect

**99**

1   money and say "Yippie-yah-hoo, Aubuchon
2   paid more than what they were supposed to;"
3   they send the money back.
4         That's why on every one of
5   those Check Edits we sent to Aubuchon you
6   you can go back there and see refunds. It
7   happened every month.
8         When you're sending out that
9   many checks, you're going to pay some
10  things incorrectly. And you can go back
11  and look at the Check Edits form and see
12  that yes, every single month we got
13  refunds.
14        Now you're claiming that
15  there's so much more out there, millions of
16  dollars of claims paid incorrectly that
17  some doctor's offices are sitting on.
18        We didn't take the money. All
19  those claims were paid out to a provider.
20        They're not sitting on that
21  money thinking that they've got a windfall.
22  I mean that money would have come back and
23  would have been returned back to Aubuchon.
24        So you know, to think that it's

**100**

1   our responsibility, yes, we can go out and
2   help find that money, but the money isn't
3   there. The money was paid correctly.
4   **Q.** Where would the money be refunded
5   back to if the money had been billed
6   incorrectly?
7   **A.** Back to BeneFirst.
8   **Q.** And after BeneFirst was terminated in
9   January of '05, what record-keeping --
10  January of '05 when Aubuchon terminated
11  BeneFirst--
12  **A.** Yes.
13  **Q.** When refunds would come in what did
14  BeneFirst do with those funds?
15  **A.** We would have deposited them either
16  into the Aubuchon if it was still active or
17  we would have just turned around and cut
18  them a check and sent it back to them.
19  **Q.** And who was responsible for doing
20  that?
21  **A.** Linda Hart and that woman whose name
22  I couldn't remember before.
23  **Q.** And how about after the runoff period
24  of time when the relationship was totally

1 over between BeneFirst and Aubuchon, what
2 would happen then if any refunds came in?
3 A. Everything would have gone back to
Aubuchon. We did not hold on to anyone's
5 money.
6 Q. Do you personally have any
7 explanation, therefore, for the audit which
8 indicates that, like you said, millions of
9 dollars was overpaid?
10 A. Yes, it's hogwash. I look at the
11 first audit with Northshore, and that's
12 more indicative of exactly what a typical
13 claims-paying process was.
14 They came in, they sat in our
15 offices, we gave them everything they
16 wanted. They adjudicated, they audited the
17 claim, and it came back and kicked out
18 about $2,000 of claims on the aggregate
19 report.
20 Then they come back and say,
21 Well, you guys want to see 3,000 claims we
22 couldn't find because of the shutting down
23 of BeneFirst and the change of the systems,
we couldn't find so many claims, that does

1 A. I don't know what you're referring
2 to.
3 Q. I'm going to show you. If she came
4 to that conclusion, your first reaction is
5 that that's a credible position?
6 A. No, I do not hold that to be a
7 credible position.
8 Q. And what about her would lead you to
9 believe that she would not be credible in
10 that regard?
11 A. I don't know exactly the context of
12 what you're reading from so --
13 Q. There's a different question. My
14 question is what about her would lead you
15 to believe that she could be wrong about
16 that? Is it her training, her education,
17 her experience?
18 MR. BRODIE: Objection.
19 A. No. I think it's the way that you're
20 reading that Email and maybe the way she
21 worded it was not properly descriptive of
22 the situation.
23 Q. Maybe. We're going to get to it.
24 A. Okay.

1 not mean that those claims were paid
2 incorrectly.
3 If they were paid incorrectly
4 there would be a flood of money coming back
5 from providers' offices, or in the
6 contrary, there would be providers' offices
7 screaming at Aubuchon saying, "Hey, you
8 paid this claim incorrectly. Pay it
9 right." And those calls never came in.
10 So there's an arbiter here,
11 third-party arbiter here, that being the
12 providers' offices and the doctors' offices
13 saying, Hey, you guys screwed up.
14 And they're not making the
15 calls to us or they weren't, and I don't
16 think Aubuchon has gotten any either.
17 Q. Who is Cheryl MacCloud?
18 A. She was the stop loss -- claims
adjustor or claims examiner for BeneFirst.
20 Q. Was she competent at her job?
21 A. Yes, she was good, yup.
22 Q. So if Cheryl was to indicate that
23 there were $230,885 of ineligible charges
24 that were paid, you'd find that credible?

1 Q. My question was different than that.
2 My question was if she said there was
3 $230,885 of ineligible charges that were
4 paid, is there anything about that
5 statement or her that would lead you to
6 believe that not to be credible?
7 A. On her, no, no.
8 Q. Okay. So let's get to the statement.
9 MR. CIAVARRA: Okay. Mark
10 this. This is an Email from Cheryl to
11 Sarah Arel May 17, 2005.
12 (Exhibit 5, Email, marked)
13 Q. And feel free to read as much as you
14 want. I'm not going to ask you about
15 specific entries, but read as much as you
16 want.
17 A. (Reading document.) Okay.
18 Q. So the document we've marked as 5,
19 which is a copy of an Email with an
20 attachment, have you seen that before?
21 A. Have I seen this?
22 Q. Yes.
23 A. No, never.
24 Q. In May of 2005, that's the time

1 period in which Northshore was doing the
2 audit for the excess carrier, right, the
3 stop loss carrier?
4 A. What was the -- give me the year
5 again, Lou, for the end of -- they
6 terminated January 1, 2005?
7 Q. Yes.
8 A. Okay.
9 Q. So my question was this Email is
10 being written at the time in which
11 Northshore is conducting its audit for the
12 stop loss carrier, do you recall that?
13 A. No, I don't recall this.
14 Q. No, no. Okay. But do you recall--
15 I'm not being clear, I'm sorry.
16          After January of 2005, so after
17 Aubuchon terminated BeneFirst Northshore
18 came in and conducted an audit, right?
19 A. Okay.
20 Q. Well, do you recall that?
21 A. I did not know that they did it on
22 site. I just don't recall that. But it's
23 neither here nor there so --
24 Q. Let me show you a letter dated April

1 8, 2005 from Northshore to Schnabel, and
2 see if you recognize that.
3 A. (Reading document) Okay.
4 Q. Just for completeness, mark that as
5 Exhibit 6.
6          (Exhibit 6, Letter from
7          Northshore, 4/8/05, marked)
8 Q. All right. First question on Exhibit
9 6, do you recall seeing a copy of that?
10 A. Yes, I believe I have seen a copy of
11 this.
12 Q. Before when I was asking you about
13 whether you had seen the audit that was
14 done by Northshore in connection with the
15 stop loss carrier when they were auditing
16 the prior year period of time you said you
17 had seen the audit you thought.
18 A. Right.
19 Q. Is this the document you had seen?
20 A. Yes, I believe it is.
21 Q. Just go to the first page again. So
22 what, if any, do you understand the
23 relationship is between the comments,
24 between Cheryl's comments on Exhibit 5 and

1 the Northshore audit reference in Exhibit
2 6?
3 A. (Reading document.)
4          MR. BRODIE: Read back the
5 question.
6          (The Reporter read record back
7          as requested)
8 A. I think that her comments are
9 referring to this.
10 Q. And the reason I'm going about all
11 this is because at one point you said in
12 response, it wasn't in response to a
13 question, you said that the Northshore
14 audit only indicated about a $2,000
15 difference.
16          And as I read these documents,
17 it's hundreds of thousands of dollars.
18 A. Well, as I read these documents, I
19 obviously read them differently than you
20 do, this is, as it says right here in her
21 comments, that --
22 Q. Just so we know for the record,
23 you're referring to Exhibit 6?
24 A. Exhibit 6, yes. Let me see.

1 "Although BeneFirst agreed with our
2 deductions for the most part, we welcome
3 the opportunity to review any additional
4 documentation that might be provided
5 regarding claims issues we have raised."
6          Then when you go back and you
7 look at the Worksheet Summary as to the
8 documentation and comments as to why these
9 claims are ineligible, I mean this is just
10 typical Aubuchon stuff.
11          I mean you look to see that,
12 case in point, like we were talking about
13 before, Gerry Archambeault, okay, $11,000
14 or $10,000 for a lift, a stair lift
15 elevator.
16          Of course that's going to be
17 denied, that claim.
18          But that $10,000 gets added to
19 that 43 and makes us looks like the bad
20 guy.
21          You look at Dennis
22 Archambeault. And his address is different
23 than the employer's.
24          I mean Dennis Archambeault is

109

1   an eligible employee to the plan, always
2   has been. They know him. I personally
3   know Dennis Archambeault. I mean Sarah
    Arel, Marcus Moran know Dennis. They all
˙   know he's eligible for the plan.
6          We paid $11,000 in claims
7   because they said this guy is eligible to
8   the plan.
9          An auditor steps in and says,
10  "Hey, you know, shame on you guys. You
11  should never have paid that claim."
12         Yah, that's an eligible claim
13  to the plan, but the stop loss carrier
14  coming in from their 30,000-foot viewpoint
15  looks at this and says, "That's not
16  covered. That gets tallied up into this
17  big number of claims that we paid
18  incorrectly. "
19         You know, look at this one up
20  here, I love this one, $25,000 for Harley
21  Maples Holland. Coordination of Benefits
22  Notes -- Coordination of Benefits indicates
23  that this individual is the great niece of
    the employee's wife.

110

1          Well, yah, any auditor is going
2   to come in and say, "Hey, that person is
3   not eligible for the plan."
4          But Aubuchon is responsible for
5   the eligibility of the plan.  It's their
6   responsibility.
7          So if they've given us
8   paperwork to make this person eligible to
9   the plan, that's their resonsibility,
10  they're the fiduciary of all this money.
11         So if we cut a check for-- let
12  me just tell you, we cut a check for this
13  person for $25,000, Marcus is going to know
14  about it. And he saw that and says yup,
15  yup, that's covered, that's fine.
16         But when you all go back and
17  look at it, yah, we look like we've done a
18  lousy job processing the claims, when
˙˙  that's not the case at all.
        I mean there were tons of
21  exceptions for Aubuchon. That's the way it
22  always had been. There was when they were
23  with G.I.C. They were with BeneFirst as
24  well.

111

1   Q.  I just want to talk about the
2   eligibility issue for a second.  The great
3   niece, Harley Holland Maples?
4   A.  Yes, Harley Holland Maples.
5   Q.  Yes.  Is it your memory, if you have
6   any memory at all, of whether that person
7   was or was not an eligible participant in
8   the plan?
9   A.  I have no personal knowledge
10  whatsoever.
11  Q.  But I'm trying to put what you just
12  said into context.  The determination up
13  front of who was an eligible participant
14  comes to BeneFirst from Aubuchon, correct?
15  A.  Correct, yes.
16  Q.  Okay.  So you get eligibility forms
17  on a regular basis as people come and go
18  from the employee records, correct?
19  A.  Yes.
20  Q.  And you would, BeneFirst would get
21  any changes in that on a regular basis from
22  Aubuchon, correct?
23  A.  Correct.
24  Q.  If an employee gets married or has

112

1   children?
2   A.  Yes.
3   Q.  There were forms that would be
4   provided to BeneFirst to update that
5   information, correct?
6   A.  Yes.
7   Q.  And you'd get that form from Aubuchon
8   and then BeneFirst would update the records
9   to reflect those changes?
10  A.  That's right.
11  Q.  What I heard you saying is
12  determining on the front end who is an
13  eligible participant begins with the
14  employer, right, and is communicating that
15  to you, the third-party administrator?
16  A.  Correct.
17  Q.  But when the third-party
18  administrator gets a claim for somebody who
19  who's not been listed as an eligible
20  participant, the third-party administrator
21  is the party in place of evaluating whether
22  that person's claim should be paid or not
23  in the first instance, it that correct?
24  A.  That's correct. And to take --

113

1  Q.  Well, you've answered my question.
2  A.  Well, I can elaborate on it as well.
3  Q.  I'm good right there.
4      MR. BRODIE:  For the record,
5  there's more to that answer.
6  Q.  That's why your lawyer is here to ask
7  you questions on cross if you want.
8      THE WITNESS:  If I'm getting
9  crossed today, make note of that one.
10 BY MR. CIAVARRA:
11 Q.  Had you, other than in connection
12 with Aubuchon, ever worked with the folks
13 at Northshore?
14 A.  Yes.
15 Q.  Had they done audits for other
16 clients?
17 A.  I think one, maybe two other audits
18 for us.
19 Q.  Did you have issues with those
20 audits?
21 A.  Nope, nope.
22 Q.  Did BeneFirst utilize the services of
23 any outside vendor or firm to assist in the
24 claims administration process?

114

1  A.  I guess the answer to that would be
2  yes, such as ABF.  That was that
3  third-party.
4  Q.  How about in the claims adjudication
5  process?
6  A.  No.
7  Q.  Earlier in the case we had this issue
8  with respect to getting documents and you
9  supplied some affidavits in connection with
10 document retention policy and search for
11 medical records, et cetera, that situation?
12 A.  Yes.
13 Q.  Can you explain or tell me why it is
14 that there were a number of the medical
15 records that everybody thought was going to
16 exist in electronic form stored somewhere
17 that BeneFirst hasn't been able to locate?
18     MR. BRODIE:  Objection to the
19 form.
20 A.  I can't recall.  I can't answer
21 that.  I don't know why that happened.  It
22 was not obviously planned so --
23 Q.  You testified the first time we met,
24 and Gatanti testified yesterday, that the

115

1  process was the paper medical records,
2  sorry, the claims, the bills that would
3  come in, would be retained for a period of
4  time and then scanned to be stored
5  electronically, right?
6  A.  Right.
7  Q.  And so that one would expect that all
8  the medical claims that came in on Aubuchon
9  would exist electronically somewhere,
10 right?
11 A.  Yes.
12 Q.  And I think when we first met you
13 expected them to be there?
14 A.  Yes.
15 Q.  And when you went back and searched
16 you found they were not?
17 A.  We found some of them, but not all of
18 them.
19 Q.  And you don't know why there were
20 missing records?
21 A.  No, I do not.
22 Q.  Let me show you a document Bates
23 stamped AUB-417 through 427 and ask you if
24 you recognize that.

116

1  A.  Yes, I do.
2  Q.  Can you tell us what is that?
3  A.  This is the sales proposal for
4  BeneFirst.
5  Q.  So it's a standard brochure, so to
6  speak, that you would have available to the
7  prospects?
8  A.  Well, standard with some of the
9  wording, but very client-specific,
10 prospect-specific for things like this.
11 Q.  Is this the one for Aubuchon?
12 A.  That's what it says.  Yes, it
13 looks to be the one for Aubuchon for a
14 particular year.
15 Q.  Who at BeneFirst would have prepared
16 this?
17 A.  This would have been Paul Sullivan.
18 Because it's his client, he would have put
19 this together.
20     MR. CIAVARRA:  We'll mark this.
21     (Exhibit 7, AUB 417-427, Sales
22     Proposal, marked)
23 Q.  I'm not going to ask you any more
24 questions about that one.

1 A.  Thank you.

2      MR. CIAVARRA:  Let's take a

3 two-minute break.

      (Recessed)

5 Q.  I'm going to ask you some questions

6 about Exhibit 1.

7 A.  Okay.

8 Q.  Which is the Notice of Deposition and

9 the topics to testify today.  If you go to

10 Schedule A.

11 A.  Yes.

12 Q.  Item Number 1, the terms of any and

13 all contracts or agreements between the

14 Plaintiffs and BeneFirst.

15      Other than the two exhibits

16 that we saw that had a written A.S.A.

17 attached to it, do you have any other

18 information for us relevant to any

19 contracts or agreements between the

20 parties?

21 A.  I think the only one that hasn't been

22 discussed that probably exists, but we

23 don't have it, is a Pharmacy Benefit

24 Manager contract, like typically a client

1 concerning insurance that may be available

2 in this case.  Do you see that?

3 A.  Yes.

4 Q.  Okay.  Do you know how much insurance

5 BeneFirst has available to it for coverage

6 in this case?

7 A.  It's either $1 million per claim and

8 $3 million aggregate I believe.

9 Q.  Does BeneFirst have other claims

10 against it right now now other than

11 Aubuchon?

12 A.  No.

13 Q.  So to the best of your knowledge,

14 Aubuchon's claims are the only claims

15 against that coverage?

16 A.  Yes.

17 Q.  Has BeneFirst settled any claims by

18 any clients in the past two years?

19 A.  I want to say in that timeframe, no.

20 Q.  How about any made in the three

21 years?

22 A.  Yes, there was one claim --

23      MR. BRODIE:  If there are any

24 confidentiality agreements or anything like

---

1 would have a direct contract with the

2 Pharmacy Benefit Manager, the PBM on that.

3 Q.  Well, is BeneFirst a party to that?

4 A.  It would have been a three-party

5 contract.

6 Q.  Other than, that anything else?

7 A.  No.

8 Q.  Number 2 is any and all facts

9 concerning the negotiation of contracts or

10 agreements between the parties.  Did you

11 participate in those negotiations?

12 A.  I really didn't.

13 Q.  So do you have any information or

14 evidence for us on those negotiations?

15 A.  I think you kind of nailed it with

16 that last sales item.

17 Q.  That would have been the proposal

18 that came from BeneFirst that would have

19 led to the A.S.A.?

20 A.  Correct.

21 Q.  Just so we know what we're talking

22 about, that's Exhibit 7 I believe?

23 A.  Yes.

24 Q.  Okay.  Number 9 asked for information

1 that in place, I just want to caution you

2 to that.

3 A.  I do not recall if there are any

4 confidentiality agreements in place.  So

5 with that being said --

6 Q.  Was there a lawsuit filed?

7 A.  Yes.

8 Q.  Who was the Plaintiff?

9 A.  Northern Kingdom/Northern Kare.  And

10 Kare is with a K.

11 Q.  Were you the third-party

12 administrator for that?

13 A.  Yes.

14 Q.  And just in case there was a

15 confidentiality, so I won't ask you

16 specifics, did that settlement result in a

17 payment of money by BeneFirst?

18 A.  Yes.

19 Q.  Do you believe this was before the

20 sale of assets?

21 A.  Geeze, I can't remember exactly when

22 it ended.  It was pretty simultaneous with

23 the sale.  Like I'm trying to picture where

24 I was working at the time, so I can't

1 recall.

2 Q. It's okay. Number 12 asks for facts
3 concerning contracts or agreements between
4 BeneFirst and third parties concerning
5 services to the Plaintiff.

6 Is the only third-party
7 contract we'd be looking for is the one
8 with ABF?

9 A. Well, there would be the one with
10 PBM.

11 Q. That's the Pharmacy Benefit?

12 A. Yes. That would be pretty much it.
13 And obviously the Trizetto contract.

14 MR. BRODIE: Off the record a
15 second.

16 (Discussion off the record)

17 Q. I was asking a question about
18 third-party contracts in connection with
19 services for Aubuchon. Is there another
20 one you wanted to add to that?

21 A. Yes. Another company is called
22 eclaimsscan, all one word, lower "e."

23 Q. And what did they do for you?

24 A. They scanned HCFA's, H-C-F-A, and

122

1 UB's, U-B, and those are all caps, claim
2 forms, and put them in an electronic format
3 for us.

4 Q. H-C-F-A?

5 A. Yes.

6 Q. At some point did you start doing
7 that in-house, the scanning?

8 A. Yes.

9 Q. So this is at a time period before
10 you had the capability to do it in-house?

11 A. Yes, that's correct.

12 MR. CIAVARRA: I'm all set.
13 Thanks. Do you have any?

14 MR. BRODIE: Yes.

15 CROSS-EXAMINATION

16 BY MR. BRODIE:

17 Q. I'm going to ask some questions about
18 Exhibit Number 10 from Sarah Arel's
19 deposition.

20 So could you take a look at
21 what I'm handing you now, which has
22 previously been marked as Exhibit 10 from
23 the deposition of Sarah Arel.

24 Would you just flip that over

1 and when you finish looking it through
2 I'll ask you some questions about that.

3 A. (Reading document) Okay. All right.

4 Q. Just generally speaking what are
5 these documents?

6 A. These are COBRA Activity Notices,
7 monthly notices that we would send out to
8 Aubuchon telling them exactly where people
9 are in their process that we have on COBRA.

10 Q. How are these reports generated?

11 A. Pam Furlong would have this on her
12 EXCEL spread sheet and once every month she
13 would get changes to update these people
14 and she would make the changes for the next
15 month's claim, next month's report, and
16 then ship it off to Aubuchon, but also
17 update our system as well based upon the
18 person's status or change in status.

19 Q. Okay. Well, why don't we take a look
20 at an example on one of these reports with
21 the COBRA activity for September 2004. At
22 the lower right-hand corner of the page
23 it's marked AUB 4066.

24 Let's start at the top of that

124

1 report. There's a section there that says
2 Notification Letters. Do you see that?

3 A. Yes.

4 Q. What does that tell us with regard to
5 Notification Letters?

6 A. That tells us that we received --

7 MR. CIAVARRA: Just one second.
8 What page are you on?

9 Witness: I'm on 4066.

10 MR. BRODIE: Yes. September
11 2004.

12 MR. CIAVARRA: 4066?

13 MR. BRODIE: Yes.

14 A. What this shows is that we sent out
15 in that particular month Notification
16 Letters of COBRA eligibility or COBRA
17 rights to these employees and it tells them
18 what their qualifying date is, meaning the
19 date that they became eligible for COBRA,
20 which could be a birth date, reaching age
21 21, could be a termination date, it could
22 be a couple other things as well in there.

23 Then the next column is the
24 Expiration Date. It says exactly at what

125

1  point their COBRA election period expires,
2  election period ends -- oh, I'm sorry,
3  Election Period Ends details what I just
   described.
5       The expiration date is the
6  length of time that they have eligible to
7  be on COBRA, and typically it's 18 months.
8  But there are some circumstances when
9  someone's period could be longer than 18
10 months.
11 Q.  What about that next section
12 underneath it, Coupon Letter?  What's a
13 "Coupon Letter?"
14 A.  Coupon Letters are the ones where
15 someone would have sent back a Notification
16 Letter accepting COBRA, and once they did
17 that we would then send them a coupon
18 letter saying okay, here are your 18
19 coupons.
20      This is the amount you have to
21 pay, send them in every month.
22      And then in that particular
23 month no one elected COBRA.
   Q.  When you say "send them in every

126

1  month," what do you mean by "them?"
2  A.  We gave them a sheet, eight and a
3  half by 11 page, with coupons for each
4  month that they're eligible for COBRA and
5  the amount of money that they would have to
6  pay.  They would just tear off that
7  particular month with a check and mail it
8  to us.
9  Q.  And "they" is who?
10 A.  The terminated employee, the
11 COBRA-eligible employee or their
12 responsible party.
13 Q.  So these are checks that were to be
14 sent to whom?
15 A.  They would be sent to us.  We would
16 receive them and deposit them, take our two
17 percent off the top, and then remit back to
18 Aubuchon the amount.
   Q.  That brings me to the next, actually
   the bottom section of that where it says
   COBRA Payments.
22 A.  Yes.
23 Q.  So this report for September 2004
24 what does it tell you with regard to COBRA

127

1  payments on that last section of this
2  report?
3  A.  Well, that we received probably about
4  ten employees' payments and we did a whole
5  tally here, put down the gross premium,
6  took out our cut and then come up with a
7  net premium and then would have remitted
8  that net premium back to Aubuchon.  Kim
9  McMann or Sarah typically handled this.
10      And it tells you exactly what
11 that particular employee did during that
12 month.
13 Q.  So for example, under the Coverage
14 Continued column at that bottom part where
15 it says COBRA Payments, and it looks like
16 some examples of Single Medical and others,
17 Single Med/Dental.
18 A.  That's right.
19 Q.  And another one that says Family
20 Med/Dental and then finally there's a
21 Family Dental example, and a Single Dental
22 example.
23      Could you through and tell us
24 what those coverages are indicating?

128

1  A.  Well, this identifies for us
2  exactly -- first off, the left-hand column
3  shows the employee's name and their Social
4  Security number.
5       The Coverage Continued column
6  shows what the Single Medical.  It says
7  that, for instance, S. Bedard has Single
8  Medical Coverage elected for his COBRA
9  continuation.
10      Then it goes through and says
11 he's got until, he's now paid up, he has
12 until the end of October before his
13 coverage expires.  He's paid through 8/31.
14      So the gross premium, he owes
15 $341 per month.   We take our cut from that
16 premium that's the way it is across the
17 board.
18      So anyone with anything
19 differing would tell you that they have
20 different types of coverage for family or
21 they've opted to choose dental as well.
22 Q.  Okay.  The section right above that
23 says "Terminated COBRA."  What is in that
24 section over there?

129

1 A. That tells us that in our system
2 these people, over the course of this month
3 these people have been terminated in the
4 system.
5 So in this case, Sam, I think
6 his name is Sam Bedard, we last received
7 his premium on August 31 and he's now
8 terminated in the system. This is a report
9 for September.
10 And as you can see, the next
11 section down, which shows what the COBRA
12 payments, it confirms that exactly. On
13 8/31 he's done.
14 Q. Now I'm going to ask you to take a
15 look at -- let's go back to a different
16 report dated April/02, which is AUB 4123.
17 I'm going to ask you to take a
18 look at that report, and when you're done
19 looking at it, let me know.
20 A. Okay. (Reading document)
21 Q. Is this the same kind of report? It
22 looks different than the one we were
23 looking at previously on AUB 4066.
24 A. Yes, essentially the same report.

131

1 get into earlier.
2 That the client was very well
3 aware of who was on COBRA, who was being
4 termed, and we sent them a notification
5 every month as to, you know, what each
6 person's status was.
7 So I mean to that extent,
8 that's what I'm believing it would be.
9 Q. Nothing else in your understanding?
10 A. No. I mean that's really what it's
11 there for.
12 Q. Let me ask you about the flow of this
13 money. You said that, for example, on the
14 premiums that would come in?
15 A. Yes.
16 Q. That the money would go to BeneFirst?
17 A. Yes.
18 Q. Who were the checks payable to?
19 A. The checks would have been payable to
20 BeneFirst.
21 Q. And that's the direction, when you
22 send out the notification letter it tells
23 the insured to make the checks payable to
24 BeneFirst?

130

1 This looks like it was done on WORD, and
2 then we have an EXCEL document we created
3 to handle the same information.
4 Q. These reports, are they created in
5 the normal course of BeneFirst's business?
6 A. Oh yes, every month we do this for
7 all of our clients.
8 Q. What did you do with those reports
9 after they were created?
10 A. They were sent to the client, along
11 with the amount of the check. So they know
12 exactly what the check was there for.
13 MR. BRODIE: All right. Thank
14 you very much.
15 MR. CIAVARRA: A couple
16 follow-ups.
17 REDIRECT EXAMINATION
18 BY MR. CIAVARRA:
19 Q. It may be me, so help me understand
20 something. What's your understanding as to
21 the relevance of this document to this
22 dispute?
23 A. It kind of tells, once again, the
24 eligibility issue that we didn't want to

132

1 A. Right.
2 Q. And BeneFirst would then deposit
3 those checks?
4 A. Into the COBRA escrow account.
5 Q. And then cut checks from that
6 account, which is a BeneFirst account,
7 right?
8 A. Yes.
9 Q. To Aubuchon?
10 A. Right.
11 Q. Okay. And send that check out to
12 Aubuchon?
13 A. That's right.
14 MR. CIAVARRA: No further
15 questions.
16 (Whereupon the deposition was
17 concluded)
18
19
20
21
22
23
24

133

1    Excerpt from Rule 30 (e):

2    Submission to Witness; Changes; Signing.
When the testimony is fully transcribed,
3    the deposition shall be submitted to the
witness for examination and shall be read
4    to, or by him/her, unless such examination
and reading are waived by the witness and
5    by the parties.    Any changes in form or
substance which the witness desires to make
6    shall be entered upon the deposition by the
officer with a statement of the reasons
7    given by the witness for making them.
This procedure must be accomplished within
8    30 days of receipt of the transcript.

9    ****************************************

10    I have read the foregoing, and it is a

11    true transcript of the testimony given by

12    me at the taking of the subject deposition.

13

14

15

16

17    _____
                    Charles T. Dobens

18            DATE

19

20

21

22    CASE NAME:  W.B. AUBUCHON CO., INC.,
AUBUCHON DISTRIBUTION, INC., et al v.
23    BeneFirst, LLC

24    DATE TAKEN:   April 15, 2008

134

1  ## ERRATA SHEET

2     In accordance with the rules of procedure
   governing depositions, you are entitled to
3  read and correct your deposition.
   Accordingly, please carefully read your
4  deposition and, on this errata sheet, make
   any changes or corrections in form or
5  substance to your deposition that you feel
   should be made.    PLEASE DO NOT MARK THE
6  TRANSCRIPT.    After completing this
   procedure, sign at the conclusion of such
7  changes/corrections (if any) and return it
   in accordance with your instructions.

8

9

10  **PAGE    LINE    CHANGE            REASON**

11

12

13

14

15

16

17

18

19

20

21

22

23  _____
                Charles T. Dobens
24

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| W.E. AUBUCHON CO., INC., AUBUCHON DISTRIBUTION, INC., W.E. AUBUCHON CO. INC. EMPLOYEE MEDICAL BENEFIT PLAN, and AUBUCHON DISTRIBUTION, INC. EMPLOYEE MEDICAL BENEFIT PLAN<br>　　　　Plaintiffs.<br><br>v.<br><br>BENEFIRST, LLC,<br>　　　　Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 05-40159FDS<br>(Louis M. Ciavarra. BBO# 546481)<br>(Ryan T. Killman BBO# 654562)<br>(Colleen E. Cushing BBO# 663498) |



To:　Stephen D. Rosenberg, Esquire
　　　Eric L. Brodie, Esquire
　　　The McCormack Firm
　　　1 International Place – 7th Floor
　　　Boston, MA 02110

## RE-NOTICE OF TAKING DEPOSITION OF BENEFIRST, LLC

　　　Please take notice, that the deposition by oral examination of **Benefirst, LLC** with regard

to the topics specified in the attached **Schedule A**, will be taken pursuant to Rule 30(b)(6) of the

Federal Rules of Civil Procedure before a qualified court reporter at the offices of Bowditch &

Dewey, LLP, 311 Main Street, Worcester Massachusetts, at 10:00 a.m. on March 12, 2008 and

thereafter by adjournment until the same shall be completed.  Benefirst, LLC shall designate one

or more officers, agents or other persons who can testify on its behalf with respect to the specific

matters set forth in **Schedule A**.

　　　You are invited to attend and cross examine.

Respectfully submitted,

W.E. AUBUCHON CO., INC.,
AUBUCHON DISTRIBUTION, INC.,
W.E. AUBUCHON CO., INC.
EMPLOYEE MEDICAL BENEFIT PLAN, and
AUBUCHON DISTRIBUTION, INC.
EMPLOYEE MEDICAL BENEFIT PLAN
(collectively "Plaintiffs"),

By Their Attorneys,

Louis M. Ciavarra  (BBO#546481)
Ryan T. Killman  (BBO#654562)
Colleen E. Cushing  (BBO# 663498)
Bowditch & Dewey, LLP
311 Main Street
P.O. Box 15156
Worcester, MA 01615-0156
Telephone:  (508) 926-3408
Facsimile:   (508) 929-3011

Dated: February _20_ , 2008

## CERTIFICATE OF SERVICE

I, Ryan T. Killman, hereby certify that on this _20th_ day of February, 2008 I have served the foregoing by mailing a copy thereof, postage prepaid, to the following:

Stephen D. Rosenberg, Esquire
Eric L. Brodie, Esquire
The McCormack Firm
1 International Place – 7th Floor
Boston, MA 02110

Ryan T. Killman

2

## SCHEDULE A

1.    The terms of any and all contracts or agreements between Plaintiffs and Benefirst.

2.    Any and all facts concerning the negotiation of contracts or agreements between Plaintiffs and Benefirst.

3.    The process of providing reports provided by Benefirst to Plaintiffs.

4.    Any and all facts concerning data or information provided by Plaintiffs to Benefirst.

5.    Any and all facts concerning communications between Benefirst and any third-parties regarding services provided by Benefirst to Plaintiffs.

6.    Any and all facts concerning methodologies or processes utilized by Benefirst to provide service to Plaintiffs.

7.    Any and all facts concerning the contents of any and all communications, reports, or other documents that were communicated between Benefirst and any providers of medical services concerning or relating to Plaintiffs.

8.    Any and all facts concerning audits conducted by third-parties of the services provided by Benefirst to Plaintiffs.

9.    Any and all facts concerning all policies of insurance potentially providing coverage for Plaintiffs' claims.

10.    Any and all facts concerning internal communications between and amongst agents of Benefirst relating to services provided to Plaintiffs by Benefirst.

11.    Any and all facts concerning client complaints, comments, correspondence, and/or feedback that Benefirst received between January 1, 2000 and the present.

12.    Any and all facts concerning contracts or agreements between Benefirst and any third-parties concerning services provided to Plaintiffs.

13.    Any and all facts concerning the work experience and/or performance of any and all agents of Benefirst who provided services to Plaintiffs.

14.    Any and all facts concerning the RIMS System used by Benefirst in connection with services it provided to Plaintiffs.

15.    Any and all facts concerning the development and creation of an employee health benefits plan for Plaintiffs.

16.    Any and all facts concerning the RPC reports created in connection with services provided to Plaintiffs.

3

17.    Any and all facts concerning the claims files maintained by Benefirst relating to services it provided to Plaintiffs.

18.    Any and all facts concerning claims processing errors committed by Benefirst in connection with its administration of Plaintiffs' claims.

19.    Any and all facts concerning claims adjudication errors committed by Benefirst in connection with its administration of Plaintiffs' claims.

20.    Any and all facts concerning overpayment of claims by Benefirst in connection with its administration of Plaintiffs' claims.

21.    Any and all facts concerning underpayment of claims by Benefirst in connection with its administration of Plaintiffs' claims.

22.    Any and all facts concerning the allegations in Plaintiffs' Complaint.

23.    Any and all facts concerning the affirmative defenses alleged in Benefirst's Answer.

{Client Files\lit\302508\0002\PLD\01100109.DOC;1}

**2**

{}

Page 1

1                                    VOLUME I
                                     PAGES 1-123
2                                    EXHIBITS 7

3

4

                 UNITED STATES DISTRICT COURT
5
                   DISTRICT OF MASSACHUSETTS
6

7

  W.E. AUBUCHON CO., INC.,              )
8 AUBUCHON DISTRIBUTION, IN,            )
  W.E. AUBUCHON CO., INC.               )
9 EMPLOYEE MEDICAL BENEFIT PLAN,        )   NO. 05-40159
  AND AUBUCHON DISTRIBUTION, INC.       )
10 EMPLOYEE MEDICAL BENEFIT PLAN,       )
       Plaintiffs                       )
11                                      )
  v.                                    )
12                                      )
  BENEFIRST, LLC,                       )
13     Defendants                       )

14

15

16              DEPOSITION OF M. Marcus Moran, Jr., a
17 deponent in the above-entitled cause, taken before
18 Tracy A. Coffman, Notary Public in and for
19 Commonwealth of Massachusetts, pursuant to the
20 Massachusetts Rules of Civil Procedure, at the Law
21 Offices of Bowditch & Dewey, 175 Crossing Boulevard,
22 Framingham, Massachusetts, on Thursday, May 22,
23 2008, commencing at 10:11 a.m.
24

Page 2

1 APPEARANCES
2
   Ryan T. Killman, Esquire
3    BOWDITCH & DEWEY
     311 Main Street
4    Worcester, MA 01615
     508-926-3497
5    Counsel on behalf of Plaintiff.
6
7 Eric L. Brodie, Esquire
     THE MCCORMACK FIRM, LLC
8    One International Place
     Boston, MA 02110
9    617-951-2929
     Counsel on behalf of Defendant.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1            INDEX
2
   EXAMINATION:     DIRECT CROSS REDIRECT
3
   By Mr. Brodie      4
4
5
6
7
8
9
10            EXHIBITS
11 No.      Description       Page
   No. 1 Two Page Document Bates AUB189 - AUB190   25
12 No. 2 Two Page Document Bates AUB191 - AUB192   30
   No. 3 One Page Document Bates AUB412      59
13 No. 4 One Page Document Bates AUB057      74
   No. 5 Multipage Document Bates AUB063 - AUB072  78
14 No. 6 One Page Document Bates AUB090      81
   No. 7 Multipage Document Bates AUB3972 - AUB3974 84
15
16   * Exhibits were retained by Attorney Brodie *
17
18
19
20
21
22
23
24

Page 4

1              PROCEEDINGS
2
3       M. MARCUS MORAN, JR., first having
4    been duly identified and sworn on oath,
5    testifies as follows:
6
7    DIRECT EXAMINATION BY MR. BRODIE:
8 Q.  Good morning, Mr. Moran, my name Eric Brodie,
9    I represent BeneFirst in this matter entitled
10   W.E. Aubuchon Inc., et al., verses BeneFirst,
11   LLC. You're here pursuant to a Notice of
12   Deposition that our office issued, is that
13   right?
14 A.  Yes.
15       MR. KILLMAN:  Eric, before we get
16   started, can we agree upon the usual
17   stipulations?
18       MR. BRODIE:  Yes, why don't we do
19   that, before we get going.  So the usual
20   stipulations, we will reserve all objections
21   until the time of trial?
22       MR. KILLMAN:  Except to form.
23       MR. BRODIE:  Except as to form, and
24   how do you want to handle?

Page 5

1       MR. KILLMAN:  30 days, read and
2    sign, waive the notary.
3       MR. BRODIE:  Okay, that sounds good
4    to me.
5    BY MR. BRODIE:
6 Q.  Could you please state your full name,
7    please?
8 A.  M. Marcus Moran, Jr.
9 Q.  And your current address?
10 A.  15 Battles Road, Westminster, Massachusetts.
11 Q.  What is your current occupation, sir?
12 A.  Retail hardware.
13 Q.  And what is your job title?
14 A.  President and treasurer.
15 Q.  And that is of what company?
16 A.  W.E. Aubuchon Co. Inc.
17 Q.  Do you hold any positions with regard to any
18   other companies?
19 A.  I am chairman of the board of the Federal IC
20   Credit Union.
21 Q.  Okay?
22 A.  Two related companies to Aubuchon would be
23   Westminster Realty Company.
24 Q.  Is there another?

2 (Pages 2 to 5)

Page 38

1  employees, keep it as cost effective as you
2  can, and that is all part of the decision
3  making process.
4 Q.  And again, without getting into the substance
5      of the conversations between Attorney Meeker
6      and yourself, or anybody else that was part
7      of your team, is it fair to say that at some
8      point, both parties, or both people who have
9      a role in creating this, come to some
10     agreement as to what the plan should be in
11     it's final form?
12         MR. KILLMAN: Objection.
13 A.  You have to say that again, I didn't catch
14     it.
15 Q.  Why don't I just strike the whole question.
16     This document, that you have in front of you,
17     that was updated from time to time, is that
18     right?
19         MR. KILLMAN: Objection.
20 A.  Yes, it was.
21 Q.  So there's versions that precede it, there
22     are preceding versions, is that correct?
23 A.  This is the 12th version.
24 Q.  What are you referring to, sir?

Page 39

1 A.  Volume 12.
2 Q.  All right, so for the record, you're looking
3      at the back cover of what is marked as Arel
4      Exhibit 6, is that right?
5 A.  Yes.
6 Q.  And on the bottom right-hand corner, volume
7      number 12, and then it says, 9/01/02?
8 A.  Right.
9 Q.  So by referring to that, you now understand
10     there were 11 preceding versions of the --
11 A.  11 preceding versions.
12 Q.  -- of the W.E. Aubuchon Company Inc. employee
13     medical benefit plan?
14         MR. KILLMAN: Objection.
15 A.  Yes.
16 Q.  Have there been other versions, since number
17     12?
18 A.  Yes.
19 Q.  What are you up to currently?
20 A.  I don't know, I might add that history
21     started in 1976, July 1, plan year.
22 Q.  That is the date that is referred to on page
23     3 of the summary plan information, if you
24     want to take a look?

Page 40

1 A.  Yes.
2 Q.  Now at any time, and again, I'm still
3      confining this to W.E. Aubuchon Company Inc.,
4      at any time has W.E. Aubuchon Company Inc.
5      administered it's own employee medical
6      benefit plan?
7 A.  Never.
8 Q.  What have you done, or what has W.E. Aubuchon
9      Company Inc. done, by way of administering
10     it's employee medical benefit plan over the
11     years?
12 A.  We don't administer the plan, we hire a TPA.
13 Q.  That has been true from the start of the
14     plan?
15 A.  Yes.
16 Q.  Now BeneFirst was one of the TPAs that you
17     hired, is that correct?
18 A.  Yes.
19 Q.  Who preceded BeneFirst, if you recall, for
20     the W.E. Aubuchon group health plan?
21 A.  Group Insurance Service Center, otherwise
22     known as GISC.
23 Q.  Why did you decide to change from GISC to
24     BeneFirst?

Page 41

1          MR. KILLMAN: Objection.
2 A.  Software reasons, administrative software
3      reasons, the electronic conversion under the
4      HIPA rules, through paperless administration.
5 Q.  Can you be more specific with regard to how
6      that informed your decision to switch?
7 A.  My history with GISC was 25 full years.
8      Their software was old, it was not yet HIPA
9      compliant, it was going to be HIPA compliant,
10     they were struggling with it, I couldn't take
11     a chance in having poor software
12     administration. That was a sad day.
13 Q.  Why did you switch to BeneFirst?
14         MR. KILLMAN: Objection.
15 A.  They approached us. We also had quotes from
16     four or five other TPAs, and I knew a
17     gentleman who was leaving GISC to start
18     BeneFirst.
19 Q.  Who was that, sir?
20 A.  Paul Sullivan, having faith in him, we
21     accepted a quote.
22 Q.  Now you mentioned that there were four or
23     five other proposals, is that right?
24 A.  Yes, at least four.

11 (Pages 38 to 41)

Page 70

1  increase, in your stop loss policy premiums,
2  as a result of anything done by BeneFirst?
3 A.  There is a date that I have in mind.
4      MR. KILLMAN:  Just answer the
5  question that was asked.
6 Q.  The question is, are you aware of anything
7  done by BeneFirst -- I'll re-ask it a
8  different way, as you sit here today, are you
9  aware of anything that was done by BeneFirst,
10  that resulted in an increase in stop loss
11  policy premiums payable by, in this case,
12  W.E. Aubuchon?
13 A.  Depending upon what date we're talking about,
14  it's either yes or no, depending upon this.
15  I have something in mind that would effect
16  the premiums, for sure, but I don't know
17  where this thing lands.  Is this before what
18  I have in mind or after what I have in mind?
19 Q.  Well, how about this you, you don't even need
20  to worry about this, set this aside.  Let me
21  just explore your recollection.  Without
22  necessarily referring to anything in the
23  document, you have something in mind with
24  regard to, I assume some conduct that was

Page 71

1  done by BeneFirst that effected your stop
2  loss premium, so let me ask you, what are you
3  thinking about when you say that?
4 A.  In 1974, in a time period of June that
5  extended to December --
6 Q.  1974, did you say?
7 A.  No, 1994, I'm sorry, 1994, for a period of
8  time, maybe beginning in June, plus or minus,
9  to -- we'll say the end of November, there's
10  a lot of questions about what had happened
11  and what was happening with the adjudicating
12  of claims, anticipated checks that were to
13  come from stop loss carriers --
14      MR. KILLMAN:  I just want to be
15  clear, I think there's a discrepancy in the
16  date, do you mean 1994?
17      THE WITNESS:  1994.
18      MR. KILLMAN:  Or would it be 2004?
19      THE WITNESS:  Excuse me, 2004, I'm
20  tired, I guess.
21      MR. KILLMAN:  Do you want to take a
22  break?
23      THE WITNESS:  No, I'm all right,
24  that was bad.  But it was June 2004 to

Page 72

1  November, late November 2004, there was a
2  back and forth communication, verbal and in
3  writing, that was very unpleasant and
4  personally damaging to my ability to report
5  to my board of directors.
6      MR. KILLMAN:  Let's take a one
7  minute break.
8      ( A short break was taken.)
9  BY MR. BRODIE:
10 Q.  All right, you were telling us about
11  something that happened between June of 2004
12  and November of 2004?
13 A.  Yes.
14 Q.  What exactly was it that effected your
15  ability to report to the board?
16 A.  The end of the plan year is June 30th.  There
17  were some bills that we had to get in, get
18  them paid, which would effectuate a
19  reimbursement from the stop loss carrier.
20  The amount of the reimbursement was
21  determined by BeneFirst and the underwriters,
22  if they were involved, was communicated to
23  me, verbally.  I wanted it in writing.  I had
24  to give it to, at that time, a CFO in the

Page 73

1  company.  He booked it as an accrual, which
2  reduced our health care costs, which reduced
3  the total expenses, which obviously gave you
4  a better bottom line.
5 Q.  What was the amount it was booked at, do you
6  recall?
7 A.  No, but big bucks, big bucks.  The check
8  never came in that amount, there was a mix
9  up.  Our bills were paid, no reimbursement,
10  had a meeting in November, that was the last
11  decent meeting before their termination in
12  midyear.  I had to protect the plan and get
13  away from BeneFirst.
14 Q.  Why exactly did you feel you had to terminate
15  BeneFirst?
16 A.  Record keeping, couldn't get straight
17  answers, was a moving target.  At the end,
18  couldn't get it reduced to writing.  There
19  was a lot of money involved, that went
20  backwards, that we're not going to get.  All
21  this raises the possibility that we're going
22  to have to probably start charging the
23  employee more money for the plan.  The plan
24  was getting out of control, recordkeeping

19 (Pages 70 to 73)

1   contract between either W.E. Aubuchon Company
2   Inc. or Aubuchon Distribution Inc. and
3   BeneFirst, who would the plan administrator
4   be?
5 A.   Aubuchon Distribution Inc.
6 Q.   The plan administrator would be Aubuchon
7   distribution Inc.?
8         MR. KILLMAN:  Can I just ask for a
9   minute, just to take a look at that document?
10 Q.  If you want, I can even direct you, take a
11   look at the very first paragraph?
12 A.  I don't know, I am not a lawyer.
13 Q.  We won't hold that against you.  All right,
14   would you agree that the first paragraph of
15   this document that we're referring to defines
16   in this contract, W.E. Aubuchon Company Inc.
17   Distribution Center to be the "plan sponsor"?
18 A.  I would have to look at the book, I would
19   have to look at the plan document.
20        MR. KILLMAN:  Can we just take a
21   minute break, it might streamline things.
22        MR. BRODIE:  Sure.
23        MR. KILLMAN:  Thank you.
24   BY MR. BRODIE:

1 Q.   Okay, I think we were still focusing on the
2   very first line, the first line of the first
3   paragraph in this document.  The question I
4   asked previously was, do you agree that,
5   according to this document, the term, plan
6   sponsor, refers to W.E. Aubuchon Company Inc.
7   Distribution Center?
8 A.   Yes.
9 Q.   Now if we were actually talking about a
10   correctly drafted document, it would either
11   be W.E. Aubuchon Company Inc., as a plan
12   sponsor, right?
13        MR. KILLMAN:  Objection.
14 A.  Right.
15 Q.  Or it would be Aubuchon Distribution Center
16   Inc. as a plan sponsor, correct?
17        MR. KILLMAN:  Objection.
18 A.  Yes.
19 Q.  Do you agree that on the second line,
20   BeneFirst, LLC is defined to be the plan
21   administrator?
22 A.  That's what it says, yes.
23 Q.  Again, I am going to refer you back to the
24   bottom of the first page, where it says, the

1   plan administrator as agent of the plan
2   sponsor, in that phrase right there, would
3   you agree that the plan administrator would
4   be BeneFirst, as agent of the plan sponsor,
5   and the plan sponsor would either be W.E.A.
6   or Aubuchon Distribution?
7 A.   Yes.
8 Q.   Okay, now I would like to ask you to turn to
9   the second page of this document, keeping in
10   mind that we're still under subsection B,
11   focusing your attention on paragraph 4, I am
12   going to incorporate the terms from the
13   previous 4.  It says, B. The plan
14   administrator as agent of the plan sponsor
15   shall, 4. Refer to the planned sponsor for
16   determination of A. Any claim or class of
17   claims the plan sponsor may specify, B. Any
18   disputed claim, C. Any claim involving any
19   question of eligibility or entitlement of the
20   claimant for coverage under the benefit plan,
21   D. Any question with respect to the amount
22   of payment due, or E. Any other question,
23   have I read paragraph 4 correctly?
24 A.  Yes.

1 Q.   Is it your understanding that, referring to
2   the plan sponsor means either referring to
3   W.E. Aubuchon Inc. or Aubuchon Distribution
4   Inc., that very first phrase after paragraph
5   4?
6         MR. KILLMAN:  Objection.
7 A.   I don't agree that this is correct, this
8   number 4 is correct.
9 Q.   What do you disagree with?
10 A.  We don't determine eligibility.
11 Q.  Who determines eligibility, as far as you're
12   concerned?
13 A.  The third party administrator.
14 Q.  How would they determine eligibility, if you
15   know?
16 A.  Well, when we joined them, we reenrolled
17   everybody, they had a form they asked us to
18   fill out, we reenrolled everybody, they had
19   all the data, age of the person, the
20   relationship, anything to do with divorce or
21   decrees, anything to do with adoption,
22   anything to do with a natural child, anything
23   to do with a person that turned 19, and is a
24   full-time student that is determined by the

28 (Pages 106 to 109)

Page 122

1     ERRATA SHEET DISTRIBUTION INFORMATION

2     DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS

3

4         ERRATA SHEET DISTRIBUTION INFORMATION

5 The original of the Errata Sheet has been delivered

6 to Mr. Killman, Esquire.

7

8 When the Errata Sheet has been completed by the

9 deponent and signed, a copy thereof should be

10 delivered to each part of record and the ORIGINAL

11 forwarded to Mr. Brodie, Esquire, to whom the

12 original deposition transcript was delivered.

13

14         INSTRUCTIONS TO DEPONENT

15 After reading this volume of your deposition, please

16 indicate any corrections or changes to your

17 testimony and the reasons therefore on the Errata

18 Sheet supplied to you and sign it.  DO NOT make

19 marks or notations on the transcript volume itself.

20 Add additional sheets if necessary.  Please refer to

21 the above instructions for errata sheet distribution

22 information.

23

24

Page 123

1 PLEASE ATTACH TO DEPOSITION OF M. Marcus Moran, Jr.

2 CASE:  05-40159

3 DATE TAKEN:  May 22, 2008

4 Please refer to page 122 for errata sheet

5 instructions and distribution instructions.  PAGE

6 LINE    CHANGE       REASON

7

8

9

10

11

12

13

14

15

16     I have read the foregoing transcript of my

17 deposition and except for any corrections or changes

18 noted above, I hereby subscribe to the transcript as

19 an accurate record of the statements made by me.

20

     Executed this    day of      , 20  .

21

22

23         (M. Marcus Moran, Jr.)

24

32 (Pages 122 to 123)

**3**

{}

# W.E.  Aubuchon Co., et al.
## vs.
## Benefirst

# Sarah Arel

## Volume 1

April 9, 2008
pp. 1-169

**Jones Reporting**
*COMPANY*

Two Oliver Street, Suite 804
Boston, MA  02109
617-451-8900
info@jonesreporters.com
www.jonesreporters.com

Page 1

1                                    Volume:   I

2                                    Pages:   1 - 169

3                   UNITED STATES DISTRICT COURT

4                   DISTRICT OF MASSACHUSETTS

5                            C.A. No. 05-40159 FDS

6

7    W.E. AUBUCHON CO., INC., AUBUCHON DISTRIBUTION,

8    INC., W.E. AUBUCHON CO., INC. EMPLOYEE MEDICAL

9    BENEFIT PLAN, and AUBUCHON DISTRIBUTION, INC.

10   EMPLOYEE MEDICAL BENEFIT PLAN,

11             Plaintiffs,

12        v.

13   BENEFIRST, LLC,

14             Defendant.

15

16             * * * * * * * * * *

17             DEPOSITION OF SARAH AREL

18             Wednesday, April 9, 2008

19             The McCormack Firm

20             One International Place

21             Boston, Massachusetts

22                  10:06 - 3:28

23             Reporter:   Linda M. Grieco

24

Sarah Arel

Page 30

1    A. As benefits administrator, I would say
2   myself.
3       Q. Do you have any documentation from that
4   transmission or, excuse me, from that transition
5   that would show whether the necessary information
6   that EBPA needed was given to it by BeneFirst?
7       A. I don't recall.
8       Q. TPA's often talk about what they call the
9   build out. Are you familiar with that terminology?
10      A. The build out?
11      Q. Yes.
12      A. I don't -- I've not heard that term.
13      Q. Are you familiar with BeneFirst's work after
14  it became the TPA to set up its computer system to
15  process claims consistent with the terms of the
16  Aubuchon benefit plans?
17      A. Can you please repeat that?
18      Q. Sure. When BeneFirst took over as the
19  administrator, they would have set up their system
20  so that they could process medical claims of
21  Aubuchon employees in a way that matches up with the
22  SPD.
23          MR. KILLMAN: Objection.
24      Q. Are you aware of that?

Page 31

1       A. No.
2           MR. ROSENBERG: Can we mark this as the
3   next exhibit?
4           (Exhibit 7 marked for identification)
5           (Document exhibited to witness)
6       Q. Could you take a look at Exhibit 7, please.
7   After you have an opportunity to, if you could just
8   tell us what that is.
9           (Pause)
10      Q. Have you seen that document before?
11      A. I have seen this document, yes.
12      Q. Can you tell us what that is?
13      A. It's the Administrative Services Agreement
14  between the Aubuchon Distribution, Inc. and
15  BeneFirst.
16      Q. Now, if you'll look at page eight, please.
17  Do you see that it is not signed?
18      A. Yes.
19      Q. Was a signed copy of this agreement ever --
20  well, was a copy of this agreement ever signed by
21  Aubuchon?
22      A. No.
23      Q. No, okay. Why not? Well, let's back up.
24          Is this the agreement that Aubuchon

Page 32

1   Distribution had with BeneFirst for BeneFirst to
2   serve as the TPA for its medical benefit plan?
3       A. Yes.
4       Q. And you said a moment ago that Aubuchon
5   Distribution never signed this document.
6       A. We do not have a signed copy of this
7   document.
8       Q. Do you know whether --
9           MR. KILLMAN: That wasn't the question.
10          MR. ROSENBERG: Yes, I'm going to
11  clarify that.
12      A. I'm sorry.
13      Q. No, that's fine. Do you know whether anyone
14  ever signed this agreement on behalf of Aubuchon
15  Distribution?
16      A. No.
17      Q. You don't know?
18      A. I don't know.
19      Q. Do you know if anyone ever signed this
20  agreement on behalf of BeneFirst?
21      A. No.
22      Q. Who would have had the authority to sign
23  this on behalf of Aubuchon Distribution?
24      A. I would say Marcus Moran, Jr. in his title

Page 33

1   as president and treasurer, and I most likely would
2   have witnessed that.
3       Q. Do you have any recollection of witnessing
4   Mr. Moran signing that document?
5       A. No, I don't.
6       Q. Does Aubuchon or Aubuchon Distribution have
7   a signed copy of this agreement?
8       A. No, we do not.
9       Q. Who would have drafted this agreement?
10      A. BeneFirst.
11      Q. Then it would have been provided to Aubuchon
12  Distribution?
13      A. Yes.
14      Q. Do you know what Aubuchon Distribution did
15  with the document after receiving it from BeneFirst?
16      A. I don't believe we were ever given one.
17      Q. So, was there ever a signed agreement during
18  the time that BeneFirst served as the TPA for the
19  Distribution Center?
20      A. No.
21      Q. Was there a separate Administrative Services
22  Agreement between BeneFirst and the Aubuchon
23  Company, Inc.?
24      A. Yes.

9 (Pages 30 to 33)

Page 34

1    Q. Does Aubuchon have a copy of that document?
2    A. No.
3    Q. Was that document ever signed by anyone on
4    behalf of Aubuchon?
5    A. Yes.
6    Q. Who signed that on behalf of Aubuchon?
7    A. I don't recall.
8    Q. But you recall the document actually being
9    signed by someone?
10   A. Yes.
11   Q. Was that done in 2001 when BeneFirst first
12   became the TPA?
13   A. Yes.
14   Q. Does Aubuchon currently have a copy of that
15   signed agreement?
16   A. No.
17   Q. Does Aubuchon have an unsigned copy of that
18   agreement?
19   A. No.
20   Q. What happened to the agreement after it was
21   signed on behalf of Aubuchon?
22   A. It was sent to BeneFirst to have their
23   appropriate person sign it and then send it back --
24   send an original copy back to us.

Page 35

1    Q. Did Aubuchon then receive a copy that had
2    been signed by BeneFirst as well as Aubuchon?
3    A. No.
4    Q. Did anyone at Aubuchon ever follow up to
5    obtain a copy of the signed document?
6    A. Yes.
7    Q. Who was that?
8    A. M. Marcus Moran, Jr.
9    Q. How did he go about that?
10   A. Several letters.
11   Q. Who were they addressed to?
12   A. Paul Sullivan.
13   Q. Does Aubuchon currently have copies of those
14   letters?
15   A. Yes.
16   Q. What was the response you received from
17   Mr. Sullivan?
18   A. It was mentioned that they would be bringing
19   it to our office, mailing it or bringing it to our
20   office. And we never received it.
21   Q. And it was Mr. Sullivan who mentioned that?
22   A. I don't recall who told us that.
23   Q. So eventually -- strike that.
24   So it was never received by Aubuchon?

Page 36

1    A. That's correct.
2    Q. Was there a separate agreement for each year
3    that BeneFirst served as the TPA?
4    A. No.
5    Q. There was just an original contract, and
6    that stayed in force until the termination in 2004?
7    A. Yes.
8    Q. The agreement between Aubuchon Company and
9    BeneFirst, is that -- was that -- well, strike that.
10   In front of you is the agreement between
11   Aubuchon Company Distribution and BeneFirst,
12   correct?
13   A. Yes.
14   Q. Or at least an unsigned copy of it.
15   A. Yes.
16   Q. Was the agreement between Aubuchon Company,
17   Inc. and BeneFirst the same as that agreement?
18   A. I believe it is, yes.
19   Q. Were there negotiations with BeneFirst over
20   BeneFirst serving as the TPA for the two plans?
21   A. Can you say that again, please?
22   Q. Sure. You had testified that was it GISC --
23   A. Yes.
24   Q. -- that had been serving as the TPA?

Page 37

1    A. Yes.
2    Q. Then there were discussions between someone
3    on behalf of BeneFirst and someone at Aubuchon about
4    replacing GISC as the TPA, correct?
5    A. We inquired with several different TPA's.
6    Q. How did you come to inquire with BeneFirst?
7    A. We were familiar with a couple of the folks
8    that started BeneFirst as a new TPA. They were
9    brand new.
10   Q. Who were those people?
11   A. Paul Sullivan and Charles Dobbins.
12   Q. How were you familiar with those two
13   individuals?
14   A. Paul Sullivan used to work at Group
15   Insurance Service Center as one of the salesmen.
16   Q. How are you familiar with Mr. Dobbins?
17   A. He was a friend of Paul Sullivan. I don't
18   believe he worked at GISC prior to that.
19   Q. Who were the other TPA's that you inquired
20   of at the time?
21   A. I don't recall.
22   Q. Who at Aubuchon spoke with Mr. Sullivan and
23   Mr. Dobbins?
24   A. That would have been Marcus Moran, Jr. and

10 (Pages 34 to 37)

Page 50

1 that provision required of the plan administrator?
2 **A. Yes.**
3 Q. What was that understanding?
4 **A. That BeneFirst, as our plan administrator,**
5 **would process claims. And if they made any error,**
6 **that they would take action to correct it.**
7 Q. What was that action they were agreeing to
8 take to correct?
9 MR. KILLMAN: Objection.
10 **A. It would depend upon what the error was.**
11 Q. Do you see that the paragraph states that
12 the administrator will make efforts to recover the
13 payment made to an ineligible person, correct?
14 **A. I see that.**
15 Q. Is that the only remedial step that Aubuchon
16 understood that phrase of the agreement to impose on
17 BeneFirst?
18 MR. KILLMAN: Objection.
19 **A. No.**
20 Q. What other obligations were imposed on it by
21 that provision?
22 **A. If -- I mean -- we had faith in BeneFirst to**
23 **process the claims according to the plan. If they**
24 **made an error, no matter what the error was, they**

Page 51

1 **were to obtain that money back if it was overpaid**
2 **or -- whatever the error was.**
3 Q. And your testimony is that the
4 Administrative Services Agreement between BeneFirst
5 and W.E. Aubuchon Company, Inc. with regard to the
6 Hardware Company benefit plan was the same as this
7 agreement?
8 **A. Yes.**
9 MR. KILLMAN: Is now a good time to take
10 just a short break?
11 MR. ROSENBERG: Oh, sure. Let's take a
12 break here.
13 (Whereupon, a recess was taken)
14 Q. Let's jump topics. You had testified that
15 BeneFirst was terminated as the TPA of Aubuchon
16 Hardware mid term; is that right?
17 **A. Yes.**
18 Q. Who decided to terminate them?
19 **A. M. Marcus Moran, Jr.**
20 Q. Did he consult with anybody else at the
21 company?
22 **A. At our company?**
23 Q. Yes.
24 **A. Kim McMahon and myself were involved in a**

Page 52

1 **meeting together, but he ultimately made that**
2 **decision.**
3 Q. Was there only one meeting in which you
4 participated that, that topic was discussed?
5 **A. I don't recall.**
6 Q. What was the substance of the discussions at
7 Aubuchon Hardware with regard to whether or not to
8 terminate BeneFirst as the TPA?
9 **A. Since I don't recall how many meetings we**
10 **may have had, I don't recall exactly what the**
11 **conversation was.**
12 Q. Well, in general, without limiting it to any
13 particular meeting, what were the discussions?
14 MR. KILLMAN: Objection.
15 Q. Or what was the substance of the
16 discussions?
17 MR. KILLMAN: Objection.
18 **A. Some of it was based on an audit that we had**
19 **done. Not we had done. That was done. And some**
20 **reimbursement of a loss fund that we were expecting**
21 **that did not occur.**
22 Q. Why was the decision made at Aubuchon
23 Hardware to terminate BeneFirst?
24 **A. We didn't have faith that they were**

Page 53

1 **processing claims according to our SPD.**
2 Q. Why did Aubuchon believe that?
3 **A. Because we were told by BeneFirst that we**
4 **would be receiving a reimbursement, pretty large**
5 **reimbursement from the loss, excess loss carrier,**
6 **and that did not come to pass.**
7 Q. Prior to that event, did Aubuchon Hardware
8 have any questions about whether the claims were
9 being processed properly?
10 **A. No.**
11 Q. When did this issue first arise?
12 **A. In the late summer of '04.**
13 Q. How did it arise?
14 MR. KILLMAN: Just to clarify, what
15 issue are we talking about?
16 Q. The issue you referred to about the excess
17 insurer and the reimbursement.
18 **A. Okay.**
19 Q. When did this first arise?
20 **A. I don't have a specific date, but I know it**
21 **was in roughly July of '04.**
22 Q. Were these two linked? You talked about the
23 excess insurer issue and the reimbursement issue.
24 Were they part of the same thing that came up or

14 (Pages 50 to 53)

Sarah Arel

Page 54

1  were they two different issues?
2    A. The same.
3    Q. Could you describe it in more detail what
4  that issue was? What those two pieces are?
5    A. Our plan for that particular plan year, '03,
6  '04, we had many shock claims, very large claims. A
7  lot of money paid out. And with the aggregate, how
8  the aggregate loss fund was calculated, again I
9  don't know if I'm saying the right terms.
10    Q. No, no, no, that's fine.
11    A. But we were told by BeneFirst that we would
12  be expecting a reimbursement above the loss fund on
13  claims that had been paid by us from the excess
14  carrier.
15    Q. So the Aubuchon Hardware medical benefit
16  plan had an excess insurer?
17    A. Correct.
18    Q. And the excess insurer was to reimburse
19  Aubuchon Hardware for medical benefit payments above
20  a certain aggregate amount paid by Aubuchon?
21      MR. KILLMAN: Objection.
22    A. Yes.
23    Q. Was it just your testimony that BeneFirst
24  had informed Aubuchon that they could expect a

Page 55

1  certain payment from the excess insurer?
2    A. Yes, they did mention that we had money that
3  would be coming back to us.
4    Q. Now, what happened with regard to obtaining
5  reimbursement from this excess insurer?
6    A. Because it was a fairly large amount, the
7  excess insurer always conducts an audit to verify
8  that, that is the correct figure. And when they did
9  the audit, it was not correct.
10    Q. Was that then brought to Aubuchon's
11  attention at that point?
12    A. It was not brought to our attention right
13  away, no.
14    Q. How did it get from that issue -- how did it
15  come to Aubuchon's attention, let's try it that way?
16    A. We made -- we, Marcus Moran, Jr., made
17  several inquiries to BeneFirst on the status of that
18  refund, that reimbursement.
19    Q. The reimbursement being from the excess
20  insurer?
21    A. Yes, because it was going to be brought to
22  the board, the Aubuchon board. And the matter was
23  said that the -- BeneFirst told us that it was being
24  worked on, being worked on. Then a meeting in

Page 56

1  November was set up by Marcus to find out exactly
2  what was going on. And we were informed that the
3  amount was not the amount that he was anticipating.
4    Q. Why did that turn out not to be the amount
5  that he was anticipating?
6      MR. KILLMAN: Objection.
7    A. It was based on the audit findings from the
8  company -- from BP, Inc., which is the excess
9  carrier, from the audit that they had done.
10    Q. Do you know who performed the audit for BP?
11    A. It was North Shore, North Shore something.
12    Q. Were those audit results provided to
13  Aubuchon?
14    A. Not right away. But eventually, yes.
15    Q. When were they provided to Aubuchon?
16    A. I don't recall the exact date.
17    Q. Was it before BeneFirst was terminated or
18  was it before the date that the termination took
19  place, before the end of '04?
20    A. I don't recall.
21    Q. Now, what took place after Aubuchon learned
22  that the amount of the reimbursement would not be as
23  much as it was expecting? How did it go from there
24  to a decision to terminate BeneFirst?

Page 57

1    A. We had a meeting on November 5, '04, which
2  we found out that, that amount was not correct.
3    Q. Who was at this meeting?
4    A. A number of BeneFirst people, Charles Lord,
5  Marcus Moran, Jr., Kim McMahon and myself. Shortly
6  thereafter, whether it be the next day or a few days
7  later, we made a phone call. Charles Lord and
8  Marcus Moran, Jr. made a phone call to BeneFirst to
9  terminate services.
10    Q. Before that meeting, did you have an exact
11  date, November --
12    A. I think the meeting was November 5th.
13    Q. Was November 5th the first time that there
14  was concern because of these issues as to whether
15  BeneFirst was administering the claims correctly?
16    A. Say that again, please.
17    Q. Yes, let me make that a better question.
18  You had testified before that because of these
19  issues with the excess reimbursement, a concern
20  arose on the part of Aubuchon that BeneFirst may not
21  be administering claims in accordance with the SPD.
22  Am I right about that?
23    A. Yes.
24    Q. Was it at that meeting on November 5th that

15 (Pages 54 to 57)

Sarah Arel

Page 62

1    Q. Were there communications or discussions
2  with EBPA -- well, strike that.
3       When were they first approached by
4  Aubuchon about taking over as the TPA?
5       MR. KILLMAN: It's EBPA you're talking
6  about?
7       MR. ROSENBERG: EBPA.
8    A. When was EBPA approached?
9    Q. Yes.
10    A. After November 5th, 6th or 7th, after we
11  made the phone call to BeneFirst that we were
12  terminating their services, we had to scramble
13  because we were terminating them as of 1/1/05.
14    Q. And they were able to pick up the
15  administration up and running within a short window
16  of notice?
17    A. Yes.
18    Q. Why were they selected?
19    A. We had similar meetings like we did when we
20  first took on BeneFirst with other TPA's as well,
21  and they were the ones that came out the best that
22  could handle the situation at hand for us.
23    Q. How were they selected? How did they first
24  come to Aubuchon's attention as a possibility?

Page 63

1    A. Our broker Charles Lord recommended them
2  among other TPA's for us to look at.
3    Q. Can you identify for me the issues with
4  regards to BeneFirst's administration that Aubuchon
5  was concerned with when it chose to terminate them?
6  Were there any specific types of errors that you
7  believe were going on?
8    A. We were unaware of any errors until the
9  issue with the reimbursement that we didn't get.
10    Q. When that issue arose, though, were there
11  specific types of errors by BeneFirst that Aubuchon
12  became concerned about?
13    A. When that issue arose?
14    Q. Yes.
15    A. Nothing that was -- stuck out ahead of time
16  from that issue, no. I don't think I answered that
17  correctly.
18    Q. Once the issue arose, though, I understand
19  there was a general concern as to whether they were
20  administering the plan correctly; is that right?
21    A. Yes.
22    Q. Were there specific types of errors by
23  BeneFirst that Aubuchon became concerned about at
24  that point?

Page 64

1    A. Just in general if they were processing
2  claims according to how our SPD is written.
3    Q. See if I can find the right plan I want to
4  take a look at.
5       MR. KILLMAN: Off the record for a
6  second.
7       (Discussion off the record)
8    Q. I'm going to show you -- well, if you'll
9  take a look at Exhibit 6, which is the SPD for
10  Aubuchon Hardware at page seven of the schedule of
11  benefits.
12       (Document exhibited to witness)
13    Q. Can you explain for us what that section of
14  the medical plan is discussing?
15    A. This section is called a schedule of
16  benefits and is one of the most important sections
17  of the book -- of the plan. It addresses how the
18  different medical expenses that are covered and how
19  they're covered, whether they're -- if an employee
20  goes to in-network provider, then the coverages are
21  listed accordingly. If the employee goes to an
22  out-of-network provider, then the deductibles and
23  the coverage is described accordingly.
24    Q. Who wrote this page? The information on

Page 65

1  this page, who wrote this?
2    A. Again, the SPD came from the prior TPA, and
3  it was reviewed by our counsel for accuracy and
4  content. But this is something that we're always
5  looking at, Aubuchon's always looking at in terms of
6  if we need to make changes, increase a co-pay or
7  increase the waiting period or things like that.
8    Q. So the schedule of benefits page was in the
9  SPD when it was provided to BeneFirst, it came from
10  the prior TPA?
11    A. Yes.
12    Q. Was this schedule of benefits page ever
13  revised during the time that BeneFirst was the TPA?
14    A. We made that one revision on September 1,
15  '02.
16    Q. So the only change that could have taken
17  place would have been a variation from the original
18  August 25, '01 version to the September 25, '02
19  version, right?
20    A. No. This document, August 25, '01, is for
21  the Distribution Center.
22    Q. Oh, okay.
23    A. This document, which is July 1, '01.
24    Q. So when BeneFirst takes over, the original

17 (Pages 62 to 65)

Page 94

1    Q. Yes.
2    A. In the interrogatories? Yes, they were
3    right there.
4    Q. What is Aubuchon's basis for these numbers
5    that it included in there?
6    A. The basis, it was based on the audits that
7    were done.
8    Q. So those calculations come solely from North
9    Shore's audits?
10    A. Yes.
11    Q. In the next paragraph, it provides that
12    BeneFirst's claim errors total 289,095 dollars and
13    56 cents and describes the methodology for
14    determining that. Do you see that?
15    A. Yes, I do.
16    Q. Where did that information come from?
17    A. That was also based on the audit.
18    Q. So all of this information comes from the
19    audits performed by North Shore?
20    MR. KILLMAN: Objection.
21    A. Yes.
22    Q. Is Aubuchon -- does Aubuchon have any other
23    reason -- strike that.
24    Does Aubuchon have any other basis for

Page 95

1    totalling up the errors to this amount, other than
2    what was provided by North Shore?
3    A. No.
4    Q. If you'll turn to page -- well, let me ask
5    you this. In the November 2004 meeting, were the
6    discussions with BeneFirst -- was BeneFirst a party
7    to that meeting? Did they attend the meeting?
8    A. Yes.
9    Q. That's what I thought. Was the Aubuchon
10    Distribution Plan discussed at that meeting or only
11    the Aubuchon Company, Inc. Plan?
12    A. Only the W.E. Aubuchon Co., Inc. Plan.
13    Q. And that was I assume because the
14    Distribution Company Plan had been terminated
15    sometime before, it was no longer in effect?
16    A. Yes, it didn't pertain to the reason for
17    that meeting, right.
18    Q. If you'll take a look at these interrogatory
19    answers at exhibit one, at tab one to it. We may
20    have covered this already, but I just want to make
21    sure. It's your understanding that the information
22    on this exhibit one was provided by North Shore
23    through its audits?
24    A. Yes.

Page 96

1    Q. Is that also true with regard to the exhibit
2    at tab two?
3    A. Yes.
4    Q. With regard to the information detailed on
5    these two exhibits, the audits from North Shore are
6    the only sources that Aubuchon has for this
7    information?
8    A. Yes.
9    MR. ROSENBERG: Off the record for a
10    minute.
11    (Discussion off the record)
12    (Whereupon, a lunch recess was taken)
13    Q. We had left off discussing Aubuchon
14    Distribution's Plans or Aubuchon Distribution
15    Supplemental Answers to Interrogatories. I'd like
16    you to take a look at Exhibit 8, which is Aubuchon
17    Company, Inc. employee Medical Benefit Plan's
18    Supplemental Answers to Interrogatories.
19    (Document exhibited to witness)
20    Q. And again, just to confirm, that's your
21    signature on the last page on behalf of the company?
22    A. Yes, it is.
23    Q. On page three, much like the distribution
24    interrogatories, it states that you have knowledge

Page 97

1    of BeneFirst's wrongful acts and omissions
2    consisting of breach of the agreement and the
3    negligent delivery of services under the plans. Is
4    the information that you know that you're describing
5    here the same as the information you told us when I
6    asked you about the Distribution answers?
7    A. Yes.
8    Q. And then likewise throughout these
9    interrogatory answers on behalf of W.E. Aubuchon
10    Company's employee benefit plan, you describe a
11    variety of errors that allegedly were committed by
12    BeneFirst in processing claims. For instance, they
13    paid duplicate claims or they paid claims without
14    sufficient investigation, things of that nature. Is
15    all of the information that Aubuchon has in that
16    regard what was told to it by North Shore in its
17    audits?
18    MR. KILLMAN: Objection.
19    A. Yes.
20    Q. Does Aubuchon have any other source of
21    information showing that there were errors made by
22    BeneFirst in processing claims?
23    A. We have no other information. Just the
24    audits.

Sarah Arel

Page 162

1  benefits under the health care plan at the same
2  time?
3      A. With our store managers, it's a 30-day
4  waiting period where they remain on the payroll,
5  yes. They would have been still on our plan.
6      Q. So even after the 30-day waiting period
7  while he's receiving the short-term disability
8  benefits, he would still be covered under the health
9  plan?
10      A. Yes.
11      Q. Even though obviously he wouldn't actually
12  be working 40 or 47 hours per week at that time?
13          MR. KILLMAN: Objection.
14      A. Yes, up to the six-month window.
15      Q. Do you know whether he was out on short-term
16  disability during this period of July 1, 2004 to the
17  end of 2004?
18      A. I don't recall. I'd have to look back.
19      Q. Who would have records on the short-term
20  disability? Is that your department?
21      A. My department or I would need to contact the
22  short-term disability carrier.
23      Q. Can you explain to me what Charles Lord's
24  role was with Aubuchon during the time that

Page 163

1  BeneFirst was the administrator?
2      A. Charles Lord was our broker of record. He
3  had been a broker of record for over 30 years. He
4  would be the person that we would go to if we had an
5  issue with BeneFirst. Didn't really occur until
6  that whole issue we've already talked about. He
7  would keep us attuned to any current trends in the
8  industry where, you know, if a medical condition was
9  now being covered, he would address it to us, and
10  we'd discuss whether we wanted to add it to the
11  plan, those kinds of things. He would keep us --
12  he'd also be involved in all the reinsurance, all
13  the quoting. He would initiate all the quoting.
14      Q. Was he involved in the negotiation of the
15  Administrative Services Agreements between BeneFirst
16  and Aubuchon?
17      A. He would have been part of the meeting of
18  any renewal with any -- whatever TPA we had, yes.
19          MR. ROSENBERG: Could you mark this as
20  Exhibit 14, please?
21          (Exhibit 14 marked for identification)
22          (Document exhibited to witness)
23      Q. Could you take a look at this document for a
24  moment, please?

Page 164

1      A. Yes.
2      Q. Can you tell me what that is?
3      A. This is a document we would receive every
4  Friday. I don't recall whether it came by fax or
5  whether it was -- we didn't do too much with e-mail
6  back then. But I believe it was a fax. And this
7  was called a weekly funding report. It would tell
8  us at the end of each week -- or claimed funding
9  request. It would tell us at the end of each week
10  how much in dollar amount the claims were processed
11  for that week, medical or dental or prescription or
12  vision, and what we would owe -- what we would owe
13  to fund to BeneFirst so they can release these
14  claims for payment.
15      Q. At the bottom, there's a spec credit for
16  Steven Valeski and again for Wayne Strong. What is
17  that?
18      A. These particular, as I had mentioned before,
19  we had a lot of large case claims during the time
20  with BeneFirst, very sick people. And these
21  particular individuals, their total claim dollars
22  over the plan period were above and beyond the spec
23  limit, spec deductible, which was 125, 125 thousand.
24  So they were -- we made payments on them, but really

Page 165

1  the reinsurer should have at that point made the
2  payment. So it was refunded back to us.
3      Q. So the credit reflects money coming in from
4  a reinsurer from these high volume losses?
5      A. Yes.
6      Q. What happens if an employee has a complaint
7  about a denial of benefits or the calculation of a
8  co-pay or something of that nature? How would they
9  raise that with the company?
10      A. Normally if an employee called our office,
11  it was with a concern about a medical claim. It was
12  either that they received a bill at home and they
13  assumed that it had not been processed at all or
14  they received the EOB from BeneFirst stating that
15  they owed such and such and they were questioning
16  why, why do I owe that.
17      Q. And that would happen --
18      A. So they would --
19      Q. I'm sorry.
20      A. I'm sorry. They would either call our
21  office or write a letter.
22      Q. And this is during the time that BeneFirst
23  was the administrator?
24      A. Yes.

42 (Pages 162 to 165)

Sarah Arel

Page 166

1    Q. Do you recall these events occurring during
2  that time?
3    **A. Occasionally. A lot of -- majority of the**
4  **times they contact BeneFirst directly. They had a**
5  **customer service department.**
6    Q. And then what would happen when an employee
7  contacted your office?
8    **A. We would instruct -- Kim or I would instruct**
9  **them to contact the BeneFirst customer service**
10 **department, because they had all the records on how**
11 **the claim was processed. Generally we didn't have**
12 **any information in front of us as to what they were**
13 **talking about. So we asked that they contact**
14 **BeneFirst directly first so get the claim resolved**
15 **or the issue resolved.**
16   Q. What would happen if they weren't satisfied
17 after speaking with BeneFirst?
18   **A. Then they may call back and say, you know, I**
19 **couldn't get through or I, you know, I still don't**
20 **understand. At that point, we may -- we would have**
21 **asked them to send the bill or send us in writing**
22 **what your concern is. Then we would forward that to**
23 **BeneFirst.**
24   Q. Are there times that claims were denied that

Page 167

1  you would intervene with BeneFirst?
2    **A. Only to find out why, you know, how was it**
3  **processed. Why was it denied.**
4    Q. Did Aubuchon ever respond by overruling
5  BeneFirst's determination?
6    **A. I don't recall.**
7    Q. Who at your office would have had the
8  authority to do that?
9    **A. Marcus Moran, Jr. made all those decisions**
10 **that directly affected our checkbook. He was**
11 **treasurer.**
12   Q. Would anybody else have authority do that?
13   **A. No, not to make that decision.**
14   Q. Do you have any recollection of him ever
15 doing that when BeneFirst was the administrator?
16     MR. KILLMAN: Objection.
17   **A. I don't recall.**
18     MR. ROSENBERG: Why don't we go off the
19 record for five minutes.
20     (Off the record)
21     MR. ROSENBERG: All right, I think we're
22 all set. Thank you very much.
23     (Whereupon, at 3:28 the deposition
24 concluded)

Page 168

1       C E R T I F I C A T E
2      I, SARAH AREL, do hereby certify
3  that I have read the foregoing transcript of my
4  testimony, and further certify that it is a true and
5  accurate record of my testimony (with the exception
6  of the corrections listed below):
7  Page  Line     Correction
8  ____  ____  _____
9  ____  ____  _____
10 ____  ____  _____
11 ____  ____  _____
12 ____  ____  _____
13 ____  ____  _____
14 ____  ____  _____
15 ____  ____  _____
16 ____  ____  _____
17 ____  ____  _____
18
19 Signed under the pains and penalties of perjury this
20 ____ day of _____, 2008.
21
22
23         _____
24         SARAH AREL

Page 169

1  COMMONWEALTH OF MASSACHUSETTS)
2  SUFFOLK, SS.         )
3      I, Linda M. Grieco, Professional Shorthand
4  Reporter and Notary Public in and for the
5  Commonwealth of Massachusetts, do hereby certify
6  that SARAH AREL, the witness whose deposition is
7  hereinbefore set forth, was duly sworn by me and
8  that such deposition is a true record of the
9  testimony given by the witness.
10     I further certify that I am neither related to
11 or employed by any of the parties in or counsel to
12 this action, nor am I financially interested in the
13 outcome of this action.
14     In witness whereof, I have hereunto set my hand
15 and seal this 17th day of April, 2008.
16
17
18
19
20
21         Linda M. Grieco
22         Notary Public
23         My commission expires
24         December 15, 2011

43 (Pages 166 to 169)

**4**

{}

W.E.  Aubuchon Co., et al.
vs.
Benefirst

Paul Gatanti, Jr.

Volume 1

April 14, 2008
pp. 1-152

**Jones Reporting**
COMPANY

Two Oliver Street, Suite 804
Boston, MA  02109
617-451-8900
info@jonesreporters.com
www.jonesreporters.com

Page 1

1                                  Volume:  I

2                                  Pages:  1 - 152

3              UNITED STATES DISTRICT COURT

4              DISTRICT OF MASSACHUSETTS

5                        C.A. No. 05-40159 FDS

6

7    W.E. AUBUCHON CO., INC., AUBUCHON DISTRIBUTION,

8    INC., W.E. AUBUCHON CO., INC. EMPLOYEE MEDICAL

9    BENEFIT PLAN, and AUBUCHON DISTRIBUTION, INC.

10   EMPLOYEE MEDICAL BENEFIT PLAN,

11              Plaintiffs,

12        v.

13   BENEFIRST, LLC,

14              Defendant.

15

16              * * * * * * * * * *

17        DEPOSITION OF PAUL GATANTI, JR.

18           Monday, April 14, 2008

19            The McCormack Firm

20          One International Place

21          Boston, Massachusetts

22             10:01 - 1:33

23        Reporter:  Linda M. Grieco

24

Paul Gatanti, Jr.

Page 22

1  A. Yes.
2  Q. When the claims person would process it on
3  the computer, was the computer built out to -- well,
4  strike that.
5      You were talking about plan build out.
6  When the claims examiner would process a particular
7  claim, was the computer set up to make
8  determinations as to whether a claim was within the
9  medical benefit plan or not?
10  A. I'm not sure if I understand exactly the
11  question.
12  Q. Sure. Were there controls in the computer
13  system to govern whether an examiner could approve
14  payment for a particular claim or not?
15  A. There are authority levels where an
16  examiner had a certain authority. Then if a claim
17  exceeded their authority, it would have to go to the
18  next level for release, like a supervisor could
19  release it. That's one part. The other part is
20  plan building would have built the plan in
21  accordance to what was sold. So, in other words,
22  office visit would have been reimbursed in that work
23  at say a hundred percent minus the applicable
24  co-pay. So the plan builder would have built the

Page 23

1  system to take the ten dollar co-pay and to pay at
2  network level of say a hundred percent. Another
3  client may have an in-network benefit of 80 percent.
4  So that would be built to pay at 80 percent.
5  Q. And that information would be on the
6  computer when the claims examiner was processing it?
7  A. That information is already in the system.
8  So the claims examiner would have their file where
9  they'd have a copy of the summary of benefits. So
10  when they were processing claims, if a client had a
11  unique benefit that paid differently than say norm,
12  say they had a very -- a limitation on surgery of
13  ten thousand dollars. If they were processing a
14  surgery claim and they saw it cap out and they said,
15  oh, that's a little bit unusual. They'd look and
16  say, oh, this client only has a limited benefit.
17  But all of the data is already pre-built into the
18  system by plan building. And that information is
19  what is obtained from the salesperson when they sell
20  the client for the administration. And every year
21  the client comes up for renewal, if they change
22  their benefits or change anything to do with it,
23  then that information has to be communicated via a
24  sales transmittal to the plan building.

Page 24

1  Q. When you were at BeneFirst, how would the
2  people in charge of the plan building obtain their
3  information about what the plan's terms and
4  restrictions were?
5  A. They would obtain that information from the
6  direct salesperson.
7  Q. And at BeneFirst, where would they get that
8  information?
9  A. Charlie Dobbins and Paul Sullivan.
10  Q. Do you know where they would get the plan
11  documents from?
12  A. Directly from the client.
13  Q. Did the computer system impose any
14  restrictions on what a particular claims adjuster or
15  examiner could decide to pay?
16  A. I don't understand.
17  Q. Let's say that a claims examiner determined
18  that a certain claim could be paid but it didn't
19  actually match up to the plan build out, would the
20  computer let them process the payment?
21  A. No, they would -- no, they would either have
22  to do some type of override or kind of -- try to
23  finagle the claim to pay how they wanted it to pay.
24  But, no, it would be -- that would be very rare

Page 25

1  instance.
2  Q. Was there any sort of quality control in
3  place to test whether examiners were properly
4  processing claims?
5  A. I put a quality process in place towards the
6  end of my first year, and it was a random audit.
7  And each examiner was audited, I think initially I
8  started with probably 20 to 25 claims a month
9  randomly. Then whatever errors were found in the
10  audit, the claims examiner had to go in and fix
11  those errors and make the necessary adjustments and
12  corrections. Prior to that, there was nothing in
13  place ever.
14  Q. What you've just described is how -- well,
15  strike that.
16      Were you familiar with the accounts
17  BeneFirst had with Aubuchon Distribution and
18  Aubuchon, Inc.?
19  A. No. The only group I became familiar with
20  over time was Aubuchon Hardware.
21  Q. Aubuchon Hardware, okay. Was the claims
22  processing you just described also what was done
23  with regard to Aubuchon Hardware?
24  A. During my time at BeneFirst, yes.

7 (Pages 22 to 25)

Paul Gatanti, Jr.

Page 34

1    Q. Were you familiar with the Administrative
2  Services Agreement that BeneFirst had with Aubuchon
3  Hardware?
4    **A. No.**
5    Q. But that was your general understanding of
6  what your authority was with regard to the Aubuchon
7  account?
8        MR. CIAVARRA: Objection.
9    **A. Correct.**
10    Q. What was the source of your understanding?
11    **A. I don't understand.**
12    Q. Sure. You testified that it was your
13  understanding that under the Administrative Services
14  Agreement, BeneFirst was to only process the claims
15  in accordance with the medical benefit plan itself?
16    **A. Right.**
17    Q. What had lead you to believe that?
18    **A. Just industry norm. Just experience working**
19  **on -- in the TPA business, that's how it works.**
20    Q. So across the industry, that's the general
21  standard?
22    **A. Correct.**
23    Q. If there were a dispute over a particular
24  medical benefit claim under the Aubuchon Hardware

Page 35

1  account, who had the final authority to decide
2  whether or not to pay it?
3        MR. CIAVARRA: I object.
4    **A. Aubuchon.**
5    Q. How do you know that Aubuchon had the final
6  authority?
7    **A. Because it was their practice that they were**
8  **very detailed in their review of the check edits,**
9  **and they would question anything on there that they**
10  **didn't understand or agree with, et cetera.**
11    Q. Could you explain this process with regard
12  to the check edits?
13    **A. I will. Claims were processed on a daily**
14  **basis in date order across the board for the book of**
15  **business. Clients could choose when they wanted to**
16  **fund their claims, either weekly, bimonthly or**
17  **monthly. When that check edit would be calculated**
18  **by I believe her name was Kristen David, she**
19  **would -- depending on the time frame the client**
20  **chose, say it was once a month. So she would run a**
21  **report that would basically detail out every single**
22  **claim that was processed in that time period. And**
23  **those claims would total a dollar amount that the**
24  **client would have to fund. And that money would be**

Page 36

1  **deposited in the claim account so that they would**
2  **run the checks and EOB's to pay the claims.**
3    Q. What's an EOB?
4    **A. Explanation of benefits.**
5    Q. And you were explaining Aubuchon's
6  involvement in that.
7    **A. Right. The check edit would be sent to a**
8  **contact, a main contact. In this particular case,**
9  **Sarah and Kim would review the check edit, and they**
10  **would look at it to basically, you know, do a**
11  **double-check to see, if they were going to pay a**
12  **hundred grand, they understood what they were paying**
13  **a hundred grand for. If they had any questions,**
14  **they would normally contact the claims examiner.**
15    Q. And they would have to then fund the account
16  before that claim could actually be paid?
17        MR. CIAVARRA: Objection.
18    **A. Correct.**
19    Q. Otherwise there would be no money in the
20  account to pay it?
21        MR. CIAVARRA: Objection.
22    **A. That's correct.**
23    Q. Do you know who wrote the -- well, strike
24  that.

Page 37

1        Were you familiar with the Aubuchon
2  Hardware medical benefit plan itself?
3    **A. Not until my very last couple of months,**
4  **because we were involved in a project Marcus had us**
5  **work on to enhance his plan that would drive his**
6  **population to the Boston hospitals versus the**
7  **regional hospitals.**
8    Q. Prior to that time, you hadn't seen their
9  actual plan?
10    **A. No, that would have been the claim examiner.**
11  **The only time I would ever go to look at any**
12  **client's plan is if there was a problem that was**
13  **brought to my attention.**
14    Q. Prior to this project for Marcus, was there
15  any problems with the Aubuchon Hardware account
16  brought to your attention?
17    **A. Nothing of any major issue that I can**
18  **remember.**
19    Q. When you say Marcus, who are you referring
20  to?
21    **A. Marcus Moran.**
22    Q. Would you explain what that project was that
23  you were working on?
24    **A. Basically because Aubuchon had a history of**

10 (Pages 34 to 37)

Paul Gatanti, Jr.

Page 46

1  with it at all.
2      Q.  What about were there particular practices
3  with regard to injuries to children who were covered
4  under the plan?
5      A.  Yes, accident details were not required on a
6  child unless there were codes on the claims that
7  indicated an auto accident or if the claims examiner
8  knew the family was involved in some type of event.
9  But industry norm is under 16, you don't ask for
10  details.
11      Q.  Why is that?
12      A.  Because kids fall down and get hurt quite
13  frequently, and there's a lot of negative push back
14  when you request accident details on a ten-year-old
15  that has a bruised knee.
16      Q.  Are you familiar with the idea in processing
17  claims or with the issue of the application of
18  multiple surgery rules?
19      A.  Can you say that one more time?
20      Q.  Sure.  When you were at BeneFirst, was it
21  necessary to apply what have been referred to as
22  multiple surgery rules?
23      A.  The claims examiner should have applied the
24  multiple surgery rules.  And whether or not they did

Page 47

1  so, I, you know, there were occasions where they
2  didn't and there were occasions where they did.
3  There would be certain ones that would come up on
4  audits, internal audits where we would say, oh, you
5  didn't do it right.  And other cases they did it.
6  So it was pretty much an experience.  It
7  was complicated by the fact that the PPO fee
8  schedule wasn't indicative of the multiple surgery
9  rules.  Again, it was something that the claims
10  examiner would have had to have done by their own
11  fruition.  The system wouldn't have done it on its
12  own.
13      Q.  In your past experience in medical benefit
14  claims, did you find that the multiple surgery rules
15  were consistently applied correctly?
16      MR. CIAVARRA:  Objection.
17      A.  Multiple surgery rules are an area that are
18  often not appropriately applied in most cases
19  because of the PPO fee schedule complication, unless
20  the claim system is sophisticated enough and has the
21  logic built into it where it will automatically make
22  those calculations.
23      Q.  The claims that were processed for Aubuchon
24  when you were at BeneFirst, was it necessary for

Page 48

1  your department at times to calculate multi-plan
2  discounts?
3      A.  No.
4      Q.  Are you familiar with the term "multi-plan"?
5      A.  Yes.
6      Q.  What is that?
7      A.  That is a preferred provider organization
8  network.
9      Q.  Did the multi-plan preferred provider
10  organization allow for a reduced rate?
11      A.  Yes.
12      Q.  So they would have a reduced fee schedule?
13      A.  They would re-price the claim, and then they
14  would attach a sheet to the claim that would say
15  what the correct amount was to pay.
16      Q.  Would that re-pricing be done by the claims
17  examiner?
18      A.  No, that was done by the multi-plan.  And
19  then, I believe at some point BeneFirst had access
20  via the internet to do that.  I believe the
21  provider, one of the provider ladies I think did
22  that internally.
23      Q.  Now, were you familiar with how COBRA was
24  processed at BeneFirst?

Page 49

1      A.  Just on a high level basis, not the details.
2      Q.  When you say "a high level basis," were you
3  supervising the people who did that?
4      A.  They were under me, but it wasn't really
5  a -- there wasn't really a function that was managed
6  by me, because there was -- she was pretty
7  self-sufficient, and she had a lot of interactions
8  with Charlie and Paul.  Occasionally she would come
9  to me, but it would be more on like a full-time
10  student issue versus a COBRA.
11      Q.  When you say "she," who was that?
12      A.  Pam Furlong.
13      Q.  And she was in charge of the COBRA work?
14      A.  Correct.
15      Q.  Let me show you what was marked as Exhibit
16  10 at Sarah Arel's deposition.
17      (Document exhibited to witness)
18      Q.  I just ask you to take a look at that and
19  tell me if you're familiar with that?
20      A.  No, I'm not familiar with this.
21      Q.  Okay.  I'm going to show you what was marked
22  as Exhibit 8 at Sarah Arel's deposition.
23      (Document exhibited to witness)
24      Q.  Now, if you'll just take a look, you'll see

13 (Pages 46 to 49)

Page 58

1    A. Yes.
2    Q. When did that occur? Do you recall specific
3    instances?
4    A. In general, if we found an error during one
5    of the internal audits, Aubuchon always had the most
6    experienced claims examiner that BeneFirst had
7    employed. Carrie and Robin were extremely
8    experienced examiners. Their error ratios were
9    very, very small. They were highly accurate claims
10   examiners. And if an overpayment was discovered
11   either through a call from a provider, hey, you
12   overpaid or whatever, the claims examiner would have
13   sent a letter out and done the traditional follow-up
14   30, 60, 90-day follow-up.
15   Q. When you were describing the two Aubuchon
16   claims examiners' error ratios, could you explain to
17   us what you mean by that?
18   A. The error ratios, the standard at BeneFirst
19   that I put in place was the minimum of 98 percent
20   financial accuracy and a minimum of 98 percent
21   procedural accuracy. So when those women had the
22   random audits, based on the claims that they
23   processed, and they were dedicated for the most part
24   to Aubuchon claims, procedurally and financially,

Page 59

1    their accuracy was well above the 98 percent. And
2    quite often, it was a hundred percent.
3    Q. Why did you pick those particular
4    percentages for the --
5    A. Industry standard is 98 percent or higher.
6    In other words, that's your target to shoot for.
7    Q. How did you just identify them, claim
8    accuracy?
9    A. Procedural and financial accuracy.
10   Q. And in your internal audits, you found that
11   they were both meeting those standards?
12   A. Yes. And the claims examiners that were
13   not, we took corrective action.
14   Q. Were any of those claims examiners handling
15   the Aubuchon account?
16   A. No.
17   Q. Do you recall a medical benefit claim for an
18   Aubuchon Hardware employee named Samuel Bedard?
19   A. The name vaguely rings a bell, but I
20   can't -- I don't remember any specifics.
21   Q. What about with regard to an Aubuchon
22   Hardware employee named Herbert Nason, N-A-S-O-N?
23   A. No.
24   Q. The handling of specific individual medical

Page 60

1    claims like that would be the primary responsibility
2    of the claims examiner?
3    A. Correct.
4    Q. Under what circumstances would a particular
5    medical benefit claim be brought up to your
6    attention?
7    A. Usually when the proverbial crap was hitting
8    the fan on a particular issue, either with a
9    provider or with a client, then I would get
10   involved. Again, where the Aubuchon claims people
11   were so -- were very, very experienced, it was very,
12   very rare that anything ever came to my level.
13   Q. Do you recall any issues related to an
14   Aubuchon Hardware employee named Wayne Strong?
15   A. It sounds familiar to me, but not -- I --
16   not any direct recollection.
17   Q. And do you remember any issues arising with
18   regard to a particular Aubuchon Hardware employee
19   named Steven Valeski?
20   A. Again, I know he had a bunch of stuff, but I
21   don't remember specifics.
22   Q. Did you leave employment at BeneFirst after
23   BeneFirst was terminated as the TPA for the Aubuchon
24   accounts?

Page 61

1    A. Yes. I was there when Aubuchon terminated
2    with BeneFirst.
3    Q. Were you involved in any internal
4    discussions over the termination?
5    A. Can you clarify?
6    Q. Sure. Do you know why BeneFirst was
7    terminated?
8    A. Yes.
9    Q. Why was it terminated?
10   A. Marcus had no faith in Charlie, and there
11   was an on-going issue with New York surcharge being
12   correctly paid and calculated that had been on-going
13   for long before I ever arrived at BeneFirst. Those
14   were the two -- those were the two reasons that
15   Marcus listed on his call -- conference call.
16   Q. So you participated in the conference call?
17   A. I was in the room.
18   Q. Was there one or more conference calls?
19   A. That was the only call regarding the
20   termination.
21   Q. Can you explain to us what the New York
22   surcharge issue was?
23   A. New York State, there's a surcharge that is
24   applied to medical claims that the State of New York

16 (Pages 58 to 61)

Paul Gatanti, Jr.

Page 66

1  **A. Not at all.**
2  Q. How about Mr. Sullivan?
3  **A. Not at all.**
4  Q. How about Carrie Reidy?
5  **A. Not at all.**
6  Q. Have you spoken to anybody about this case
7  or the claims in this case since you left?
8  **A. I have no knowledge of it.**
9  Q. When did you first learn that a case had
10 been filed?
11 **A. I think I may have seen it on an Ernie**
12 **Clevenger website or something like that. They do**
13 **like stop loss law updates and stuff, and there was**
14 **a blurb about the Aubuchon BeneFirst case awhile**
15 **back.**
16 Q. Did that surprise you?
17 **A. No.**
18 Q. Why not?
19 **A. Because Marcus was pretty ticked off at**
20 **Charlie.**
21 Q. And you knew that from that conference call
22 you listened to?
23 **A. Correct.**
24 Q. And in particular he was ticked off about

Page 67

1  what?
2  **A. The New York surcharge and that he had -- he**
3  **didn't have any faith in Charlie.**
4  Q. Do you remember when this conference call
5  took place?
6  **A. It would have been sometime right around**
7  **July of when they were up for renewal. I think they**
8  **were a July 1st case.**
9  Q. Of 2004?
10 **A. Just before they left. It would have**
11 **been -- it would have been '04.**
12 Q. Because you left in January of '05.
13 **A. So it could have been '04.**
14 Q. But in January of '05, wasn't Aubuchon still
15 a client when you left?
16 **A. I thought they -- I can't remember. I**
17 **thought they had left.**
18 Q. Do you recall that North Shore conducted an
19 audit on behalf of the excess insurance carrier,
20 stop loss carrier?
21 **A. I was gone by that point, I believe.**
22 Q. Were you aware that in connection with that
23 audit, that North Shore found a number of errors
24 committed by BeneFirst in the claims administration

Page 68

1  process?
2  **A. Aware when?**
3  Q. At any time.
4  **A. Just recently.**
5  Q. This conference call that you participated
6  in, was there any discussion about an audit done by
7  North Shore?
8  **A. No, the call was simply about that they were**
9  **notifying BeneFirst that they were going to leave.**
10 Q. Just trying to get a sense, was it a
11 discussion that they were going to leave or that
12 they were terminating their relationship then?
13 **A. That they were done with BeneFirst. That**
14 **they were moving on.**
15 Q. Do you know who became the third-party
16 administrator?
17 **A. I believe it was CBA up in New Hampshire.**
18 Q. So if you left in January of '05 and your
19 memory was that conference call was in the summer of
20 '04, six months before you left, do I have that
21 chronology right?
22 **A. I believe so.**
23 Q. During that last six months, is it your
24 testimony that Aubuchon was not doing any business

Page 69

1  with BeneFirst?
2  **A. I don't know if there was run-out or what**
3  **was going on.**
4  Q. You had no personal involvement in that
5  account for the next six months, is that your
6  testimony?
7      MR. ROSENBERG: I object.
8  **A. I don't recall anything.**
9  Q. Whether there was or there wasn't, you have
10 no memory?
11 **A. I can't recall the specifics.**
12 Q. Part of what I'm trying to do is trying to
13 distinguish what you have a specific memory of and
14 what you have no memory of.
15 **A. Right.**
16 Q. The topic that you were discussing with
17 Mr. Rosenberg on this reimbursement on the aggregate
18 loss fund, do you remember that testimony?
19 **A. Uh-hum.**
20 Q. As I understand your testimony, one of the
21 reports that was provided by BeneFirst contained an
22 error in it; is that correct?
23 **A. Correct.**
24 Q. Which report was that?

18 (Pages 66 to 69)

Paul Gatanti, Jr.

1    A. It would have been a report called the RCR.
2    Q. Without getting too deep into the details,
3  as I understand your testimony, the RCR report
4  overstated the amount of reimbursement that the
5  client would expect to receive?
6    A. Didn't overstate the reimbursements. What
7  it did is it overstated the aggregate claims.
8    Q. How does that translate into an anticipated
9  reimbursement?
10    A. It doesn't. What happens was that because
11  the RCR was overstated, Aubuchon thought they had an
12  aggregate breach without first waiting for an actual
13  audit to actually occur.
14    Q. So based upon the report, the client would
15  expect --
16    A. Would assume, yes.
17    Q. -- that their stop loss coverage was going
18  to kick in?
19    A. That there would have been an aggregate
20  claim filed, that BeneFirst would have filed an
21  aggregate claim.
22    Q. Do you recall receiving any correspondence
23  from Mr. Moran on that topic when you were still at
24  BeneFirst?

1    A. I know there was a flurry of activity
2  regarding that issue, but I don't remember any
3  specifics, other than that, you know, again, that
4  Paul or Charlie were informed that there was --
5    Q. I'm going to show you a letter that was
6  produced in this case, and it's been stamped for the
7  record Aubuchon 058.
8      (Document exhibited to witness)
9    Q. So, I ask you if you recognize that?
10      MR. ROSENBERG: Before you answer, just
11  tell him whether you recognize it or not.
12      MR. CIAVARRA: Excuse me, you shouldn't
13  be directing the client how to answer.
14      MR. ROSENBERG: Actually, I'm not. What
15  we're going to do or what I'd like to do --
16      MR. CIAVARRA: Excuse me, Steve, that's
17  exactly what you just did.
18      MR. ROSENBERG: What I'd like to do,
19  Lou, since you didn't bring a copy for him, I'd like
20  to get it on the record and get it marked as an
21  exhibit. And if you want me to, I'll go make a copy
22  so we can --
23      MR. CIAVARRA: My point is very simple,
24  please, do not again during the course of this

1  deposition instruct the witness how to answer a
2  question. You can object --
3      MR. ROSENBERG: I didn't instruct him
4  how to answer a question.
5      MR. CIAVARRA: Do you want me to read
6  back what you said?
7      MR. ROSENBERG: If you would enjoy it,
8  be my guest.
9      MR. CIAVARRA: No. Steve, you know you
10  can't do that. So just don't do that.
11      MR. ROSENBERG: That's not what I said,
12  and that's not what I'm doing.
13      MR. CIAVARRA: Don't do it again.
14    A. So, what's your question again?
15    Q. My question is do you recall this document?
16  Have you ever seen it before?
17    A. I have very vague recollection of it, but
18  not -- I mean, that was a long time ago.
19    Q. Actually, you can keep it in front of you.
20  I've got a copy of it. It's a different Bates stamp
21  but the same letter. Do you recall whether you
22  responded to Mr. Moran?
23    A. No idea. Again, this would have been all --
24  this would have been Paul Sullivan and Maureen and

1  those guys dealing with this.
2    Q. Except for the fact here's a letter from
3  Mr. Moran to you, correct?
4    A. Right.
5    Q. The letter references, and I understand you
6  don't have a memory of it, but it references
7  anticipated reimbursement of 468,000; do you see
8  that?
9    A. Yes.
10    Q. Does that number ring a bell with you?
11    A. No.
12    Q. How about the order of magnitude, does that
13  sound familiar to you?
14    A. Yeah.
15    Q. That Aubuchon --
16    A. Yeah, they had this -- that they thought
17  they had this agg claim.
18    Q. Did you ever inform Mr. Moran that, that
19  anticipated reimbursement was in error?
20    A. Not until we had a meeting in their office.
21    Q. When was that? Sometime after September 20,
22  2004?
23    A. Yeah, there was a meeting where basically,
24  you know, basically everyone decided that it was

19 (Pages 70 to 73)

Paul Gatanti, Jr.

Page 74

1  time to tell them that it wasn't a claim.
2      Q.  And you had talked earlier before, this
3  error was well known within BeneFirst?
4      A.  Absolutely.
5      Q.  And somebody made the decision not to tell
6  the clients?
7      A.  I have no idea.
8      Q.  Well, did you tell the clients?
9      A.  We didn't -- no, that was all communicated
10  up to Charlie and Paul, because it was Paul's --
11  that was Paul's relationship and his client.
12      Q.  But to the best of your knowledge, that
13  information, that error as contained in the RCR
14  report was not communicated to Aubuchon before this
15  meeting --
16      A.  That's correct.
17      Q.  -- that you attended?  Do you recall when
18  that meeting took place?
19      A.  No.
20      Q.  Who was there from Aubuchon?
21      A.  Marcus, the broker.
22      Q.  Is that Charlie Lord?
23      A.  I believe so.  Sarah, one of the Aubuchon
24  kids, and then Charlie, Paul and myself.  I believe

Page 75

1  that was all.
2      Q.  Do you recall what Mr. Moran's response was
3  when you provided that information at the meeting?
4      A.  I vaguely remember he wasn't too happy.
5      Q.  And it's your testimony that at the time of
6  that meeting, Aubuchon had already communicated its
7  termination?
8      A.  Again, I don't recall specifically.  All I
9  recall from that meeting is that he had -- I believe
10  he had booked whatever amount he thought was the agg
11  claim.  And his issue was that he had to go back and
12  tell him that, that money wasn't -- he couldn't book
13  it.
14      Q.  And you have no memory at the time of this
15  meeting, the one you told us about, of whether or
16  not there was any audit done by North Shore at that
17  time?
18      A.  I don't believe there was.
19      Q.  In your experience with North Shore, did you
20  find them to be a competent auditor?
21      A.  Yes.
22      Q.  Do you have any reason to believe that any
23  audit they completed would not be accurate?
24      A.  Again, I have, you know, I have no -- I

Page 76

1  don't really know how to answer that conclusively,
2  other than it would be based on whatever information
3  they were auditing.
4      Q.  I'm saying based upon your experience, do
5  you have any reason to believe that an audit
6  completed by North Shore would not be accurate?
7      A.  No.
8      Q.  Why did you terminate -- did you quit or
9  were you terminated?
10      A.  I left.  I quit.
11      Q.  Why?
12      A.  Because I had received a better job offer.
13      Q.  Better in terms of compensation or
14  responsibilities?
15      A.  Compensation and opportunity.
16      Q.  Do you recall when you notified BeneFirst of
17  that decision?
18      A.  December of '04.
19      Q.  You told Mr. Rosenberg that for the claims
20  examiners that were not performing at the level that
21  you found satisfactory, action was taken.  What
22  action was taken?
23      A.  They had to correct their mistakes on the
24  audit.  They had to improve their audit scores or,

Page 77

1  you know, they would be written up and either
2  terminated eventually or try to find another
3  position for them that more suited them.
4      Q.  While you were at BeneFirst, were any of the
5  examiners terminated for failure to maintain the
6  appropriate accuracy levels?
7      A.  No, not that I can recall.
8      Q.  While you were there and it was your
9  responsibility to review them, who was not operating
10  at their sufficient level, names if you can recall?
11      A.  I can't remember.
12      Q.  When you did your internal audits, did you
13  keep any written records of those?
14      A.  Yes.
15      Q.  Did you do a written report?
16      A.  It was on a spread sheet.
17      Q.  What did you do with those spread sheets
18  after the audit was completed?
19      A.  I printed them off and included copies of
20  the claims that were audited.  And then the examiner
21  had the opportunity to review the errors or if there
22  were no errors, there's nothing to review.  And they
23  could appeal if there was an error found.  Then we
24  would go through the appeal process, and the claims

20 (Pages 74 to 77)

Paul Gatanti, Jr.

Page 82

1     Q. So to be good at claims examining, you need
2  to be more than simply a data input person; is that
3  fair to say?
4     **A. Correct.**
5     Q. There's some thought that goes into your
6  job?
7     **A. Correct.**
8     Q. You were describing for Mr. Rosenberg the
9  process of how to examine a claim as it came in the
10 door. I think you said the first thing that happens
11 is a medical bill of one form or another is received
12 in your mailroom at BeneFirst?
13    **A. Correct.**
14    Q. I'm going to talk about your experience at
15 BeneFirst. That's a bill that would come from the
16 client or come directly --
17    **A. The provider.**
18    Q. Just let me finish, because she can't take
19 us down.
20    **A. I'm sorry.**
21    Q. I know you're anxious to complete. This is
22 a bill that would come from a provider or come from
23 the client?
24    **A. Provider.**

Page 83

1     Q. So at some point would the clients tell the
2  providers who to send the bills to or how does that
3  work?
4     **A. The provider would take the address off of**
5  **the back of your medical ID card, enter it into**
6  **their database and they would send -- then they**
7  **would send the claim directly to the TPA. If a**
8  **client is moving from one TPA to another, there's**
9  **generally at least a year period of this crossover**
10 **effect. So the prior TPA is getting all of your**
11 **claims. And there's a lag. But generally it's the**
12 **ID card that is the driver of where it goes.**
13    Q. So how did BeneFirst decide which claims
14 went to which examiner? Because claims were just
15 coming to the mailroom, right?
16    **A. It was done by group.**
17    Q. Tell me what you mean by that.
18    **A. You had X amount of groups. Each group was**
19 **a certain size. And each group had a certain volume**
20 **of claims. So, the heavier the volume of claims on**
21 **a particular group, the less number of groups a**
22 **claim examiner would be able to effectively manage.**
23 **So, for example, Aubuchon was one of the very**
24 **highest claim volume clients at BeneFirst. And**

Page 84

1  **because of their claim volume, we had to dedicate an**
2  **experienced person, not only because of the volume,**
3  **but because Aubuchon was a very high profile account**
4  **that was very favorably thought of, you know, by**
5  **Paul and et cetera. So they wanted to make sure**
6  **that they did a very, very good job for them.**
7     Q. So the way you would organize it internally
8  is there would be certain clients assigned to
9  certain claims examiners?
10    **A. Right.**
11    Q. Whenever a medical bill came in on that
12 plan, it would go to whoever that assigned examiner
13 was?
14    **A. Correct. Rule of thumb was one examiner per**
15 **thousand lives, 15 hundred lives. But, again, if**
16 **you had some cases that were very, very clean or**
17 **very, very healthy, you may have someone that has**
18 **two thousand lives. It depended.**
19    Q. So there's somebody in the mailroom that's
20 sorting the claims and deciding which administrator
21 they go to?
22    **A. No, they're sorting by date order and by**
23 **group, and then I decided who got what groups.**
24    Q. So then if I'm a claims examiner, in the

Page 85

1  morning I get a pile of claims on my desk?
2     **A. No, we had a file cabinet. So if you had**
3  **seven groups that you were the claims examiner for,**
4  **you would go into the file cabinet and you would**
5  **grab XYZ company's claims for March 1st, because**
6  **those would be the oldest claims, and you would**
7  **process those claims that were received on that**
8  **date. Once you were done with those claims, you'd**
9  **go and grab the next group that you had. You'd**
10 **process those claims in date order. Then you go to**
11 **the next group until you got all of the, you know,**
12 **April 1st dates done. Then you went on to April 2nd**
13 **and April 3rd.**
14    Q. When I went to the file cabinet, though, all
15 the medical claims were sorted by client?
16    **A. By group.**
17    Q. When you say group, is that different than
18 client?
19    **A. Same thing.**
20    Q. That's what I want to make sure we're
21 talking about the same thing. So, if I'm the
22 examiner, Karen Reidy, is that her name?
23    **A. Carrie Reidy.**
24    Q. In the morning I would get to work, and I

22 (Pages 82 to 85)

Paul Gatanti, Jr.

Page 86

1  would go to the file cabinet. And the date is not
2  important, but I grab the Aubuchon file for March
3  1st?
4    A. Correct.
5    Q. And I would process those claims?
6    A. Correct.
7    Q. And then I would move to the next date or
8  would I move to the next group on that same date?
9    A. Depending upon if -- I believe Aubuchon was
10  her only account, because of the volume. So it
11  would have gone to the next date.
12    Q. To the extent, though, that any examiner had
13  other groups they were responsible for, they would
14  finish a date before they moved to the next date,
15  regardless of the number of clients involved?
16    A. Exactly.
17    Q. Then would those medical claims -- when I
18  say medical claims, this is a bill, correct, from a
19  doctor or hospital or something like that?
20    A. Correct.
21    Q. What did they then do with that physical
22  bill after they processed it?
23    A. They would write the claim number on the
24  top. Then they would put it in their, what we call

Page 87

1  the batch for that date. Then when they were done
2  for the day, they would have a cover sheet, and they
3  would write the date, their name and then their
4  approver number. Then they would go into the
5  mailroom, and they would scan their claims into the
6  scanning system that Charlie had. And they would
7  then take their paper file, the batch file and stick
8  it up on the shelf.
9    Q. At that point, if I was working for two
10  clients in one day, they would all be grouped
11  together at that point?
12    A. Correct.
13    Q. No longer segregated by client, by group?
14    A. Correct.
15    Q. But they would have then been sorted into
16  the computer system so they exist electronically?
17    A. Right, in date processed order, right.
18    Q. Then you told Mr. Rosenberg, then the
19  practice was to retain those physical copies for 120
20  days?
21    A. Approximately.
22    Q. Who was responsible for going in and
23  cleaning out the files as those 120 days kept
24  getting hit?

Page 88

1    A. That would have been the people in the
2  mailroom.
3    Q. I'm going to go back to the claims
4  administration process. So I'm the examiner, and I
5  get the medical bill. And I see that there's a
6  doctor's charge for XYZ company and employee Smith.
7  What do I then do with it? Do I begin to log data
8  into the computer?
9    A. You would go into -- you would enter in
10  their social. Then you would pick who the claimant
11  was, whether it be the employer, the dependent.
12  Then you would go in and you would -- depending upon
13  the claim you had, you would start to process the
14  claim or you may have to go into the notes to look
15  at different notes, depending upon what you were
16  dealing with.
17    Q. When I go into the computer system, is the
18  computer system set up, do I search for employee or
19  for the group or provider or what do I look into?
20    A. You could do anything. You could look at
21  provider files, you could look at group by group,
22  and you could also go in just with the patient's
23  social.
24    Q. As the person doing the examination, how

Page 89

1  would I decide which way to begin, whether I looked
2  under the employee, whether I looked at the provider
3  or I looked at the employer?
4    A. It would depend on what you have. If
5  you're, you know, processing claims, you're going to
6  be going into the individual file first. If you're
7  a plan builder, you're going to go into the group
8  record.
9    Q. I'm talking about the claims examiner right
10  now.
11    A. You're going to go into the individual.
12    Q. The claims examiner has the option of where
13  to start?
14    A. They have the option of where they may want
15  to look for information, but they have to start at
16  the individual screen of the social.
17    Q. So the first thing they would -- the first
18  thing they should do is enter the social security
19  number?
20    A. Correct.
21    Q. And presumably that's somebody who's in the
22  system because they're an eligible employee?
23    A. Correct.
24    Q. And then a screen would pop up, correct?

23 (Pages 86 to 89)

Paul Gatanti, Jr.

Page 90

1   **A. Correct.**
2   Q.  Now, the way the computer system worked,
3   would all of the parameters of the plan already be
4   reflected in the information contained for that
5   individual?
6   **A. It would have already been programmed, yes.**
7   Q.  If the claims examiner wanted to make a
8   determination about whether or not a particular
9   service or product was covered, did they always have
10  a copy of the plans available to them?
11  **A. Yes, they did.**
12  Q.  How did they have those, in what form?
13  **A. Manual file.**
14  Q.  They would have at their desk?
15  **A. Correct.**
16  Q.  It should contain a copy of the then current
17  summary plan?
18  **A. Correct.**
19  Q.  Was that part of their job, which would be
20  to take a look at that plan from time to time?
21  **A. Correct.**
22  Q.  Would it be unusual for a claim examiner to
23  come to you as the supervisor to ask for help on
24  interpretation of plan benefits?

Page 91

1   **A. Would it be unusual?**
2   Q.  Right.
3   **A. No.**
4   Q.  So that did happen from time to time?
5   **A. Yes.**
6   Q.  Is that correct?
7   **A. Yes.**
8   Q.  Would it be fair to say there is some
9   interpretation involved in reviewing the summary
10  plans and looking at claims?
11  **A. Not in every case, no.**
12  Q.  You say not in every case, not in every
13  plan?
14  **A. It depends on what you're talking about with**
15  **the plan. I mean, there's no interpretation to**
16  **office visit. It is what it is. The**
17  **interpretations come in with experimental, medical**
18  **necessity, those types of issues. That's where it**
19  **can get a little gray.**
20  Q.  And is that an area in which you can
21  distinguish people who are good at claims examining
22  and maybe others who aren't as experienced or as
23  good?
24  **A. The more experience you have, the more**

Page 92

1   **intelligent you are with knowing what to do with**
2   **those situations, correct.**
3   Q.  When the information about the medical
4   claim, the bill is put into the computer system by
5   the claims examiner, to my understanding based upon
6   your earlier testimony, that the computer system
7   will take care of a lot of the basics with respect
8   to the appropriate payment; is that correct?
9       MR. ROSENBERG: Objection.
10  **A. Correct.**
11  Q.  For example, it should, if it's built
12  correctly, reflect the appropriate co-pay?
13  **A. Correct.**
14  Q.  And that should be built into the system
15  right up front?
16  **A. It will be built into the system based on**
17  **whatever the summary of benefits and transmittal**
18  **information was provided to the plan builder at the**
19  **time of sale or at the time of renewal.**
20  Q.  The plan builder we've talked about, I think
21  you told Attorney Rosenberg that Carrie Reidy did
22  the plan build for Aubuchon?
23  **A. In the later stages, yes. Prior to that,**
24  **there was a whole bunch of people in there that were**

Page 93

1   **before my time.**
2   Q.  How do you know that?
3   **A. Just from what I was told.**
4   Q.  You couldn't go into the system and see who
5   built it?
6   **A. No.**
7   Q.  This is information you received from people
8   at BeneFirst?
9   **A. Correct.**
10  Q.  Do you know who did the first plan build?
11  **A. The first plan build, to my knowledge and**
12  **recollection, would have been done to this**
13  **outsourced company down in New Jersey somewhere.**
14  **When BeneFirst first opened, they outsourced all of**
15  **their operations to this Rims Associated Company. I**
16  **believe they're in New Jersey.**
17  Q.  Do you know, just from your own discussions
18  with people at BeneFirst, who at BeneFirst worked
19  with Aubuchon to build their specific plan?
20  **A. I don't have any knowledge, other than when**
21  **the deal with New Jersey terminated and they brought**
22  **all of the stuff up to the Marshfield location. I**
23  **don't know who would have been responsible for**
24  **taking over that responsibility of plan building at**

24 (Pages 90 to 93)

Paul Gatanti, Jr.

Page 94

1  that stage.
2      Q. While you were working at BeneFirst, did you
3  become aware of any errors in the underlying plan
4  build for Aubuchon that caused it not to reflect the
5  terms of the medical plan?
6      A. No, not that I'm aware of. And, again, the
7  reason I say that is because Aubuchon was so
8  involved overall with their medical plan and also
9  reviewing the check edits, that it would have been
10  highly unlikely that claim errors would not have
11  been recognized by Aubuchon themselves.
12      Q. On that topic, I'm going to get the term
13  right, you said the check edit?
14      A. Edit.
15      Q. Check edit. As I understand the process, on
16  a monthly basis, BeneFirst would send a report to
17  Aubuchon basically telling them this is the amount
18  of the claims out there. We need you to fund the
19  account in X dollars?
20      A. Yes, and it would also list all of the
21  people, their names, the claim numbers, et cetera.
22      Q. I believe you told Attorney Rosenberg that
23  you did not personally have that interaction with
24  Sarah or Kim; isn't that correct?

Page 95

1      A. That's correct.
2      Q. So to the extent that Aubuchon reviewed it
3  or not, you have no personal knowledge of that at
4  all?
5      A. Nope.
6      Q. So when you say Aubuchon being involved,
7  that's an assumption you're making based upon things
8  that people at BeneFirst told you?
9      A. Well, it's based on what I was told,
10  correct.
11      Q. Yes, people at BeneFirst.
12      A. Correct.
13      Q. Not your own personal interaction with
14  Aubuchon at all?
15      A. Correct.
16      Q. So you really have no personal knowledge of
17  whether or not anybody at Aubuchon ever reviewed
18  that check edit report?
19      A. Correct.
20      Q. Then Aubuchon would then wire transfer money
21  to BeneFirst?
22      A. I'm not sure what their method was.
23      Q. You weren't involved in that part?
24      A. No.

Page 96

1      Q. The actual medical bills would be paid by
2  BeneFirst, right?
3      A. No.
4      Q. Who paid those?
5      A. Aubuchon.
6      Q. Is it your testimony that the check payable
7  to doctor X or hospital Y came from Aubuchon?
8      A. Yes, because the funds had to be received
9  before those checks and EOB's go out the door.
10      Q. And again, whatever you have a memory of is
11  your testimony. But isn't it true that Aubuchon
12  would wire transfer the money to BeneFirst, who
13  would then make the payments on Aubuchon's behalf?
14      A. The checks and the EOB's were already, it
15  would have already -- it was already processed prior
16  to the funding. That's what the whole check edit is
17  all about is for them to review here's everything
18  that's going to go out.
19      Q. I understand. I'm just trying to trace the
20  flow of money.
21      A. Yeah.
22      Q. If this isn't your memory or your memory is
23  different, you tell me. But my understanding is
24  that Aubuchon would wire transfer the money to

Page 97

1  BeneFirst to fund the payment of the bills. But the
2  money, after it was transferred in from Aubuchon,
3  would actually come from BeneFirst to the providers.
4  That's not consistent with your memory?
5      A. No, my knowledge was there was a claim
6  account. The money goes in the claim account. And
7  once the money's there, the outsource vendor, ABF
8  cuts the check and EOB's.
9      Q. Who was the --
10      A. ABF.
11      Q. Do you know what that stands for?
12      A. Advanced Business Fulfillment.
13      Q. Who contracted with ABF?
14      A. Charlie.
15      Q. Mr. Dobbins?
16      A. Yes.
17      Q. BeneFirst?
18      A. Charlie Dobbins.
19      Q. So maybe I missed a step. BeneFirst
20  contracted with ABF to actually make the payments?
21      A. No, ABF is a vendor that provides the
22  service of printing and mailing checks and
23  explanation of benefits for a fee. It's an
24  outsourced process as opposed to someone at

25 (Pages 94 to 97)

Paul Gatanti, Jr.

Page 98

1   BeneFirst printing them out in the mailroom.
2      Q. In your experience, do some third-party
3   administrators do that themselves?
4      A. Some, but very rare.
5      Q. Mostly they contract out?
6      A. They're outsourced, yeah.
7      Q. But that was a decision made by BeneFirst as
8   to whether to do it internally or outsource it?
9      A. I would assume so, yes.
10     Q. Because you understood that part of
11  BeneFirst's responsibilities was to send those bills
12  and EOB's out, right?
13     A. Correct.
14     Q. Was it on a monthly basis that BeneFirst
15  would instruct ABF on who to pay and how much?
16     A. No.
17     Q. How often did that happen?
18     A. Depended on the client and how they were set
19  up to fund.
20     Q. Do you know how it worked on Aubuchon?
21     A. I don't remember.
22     Q. Whatever the agreement was with the client,
23  that's how often it would happen?
24     A. Yeah, whatever Aubuchon wanted, however they

Page 99

1   wanted to fund, whether they wanted to fund once a
2   month or twice a month or three times a month,
3   whatever it was is how they would have been set up.
4      Q. You talked a little bit this morning about
5   efforts to collect overpayments.
6      A. Uh-hum.
7      Q. Did you personally get involved in those
8   efforts on behalf of the Aubuchon account?
9      A. No.
10     Q. Who would have done that at BeneFirst?
11     A. Again, very broad topic, but it would have
12  been the claims examiner would have been the main
13  person involved with that.
14     Q. The way you had it structured when you were
15  at BeneFirst was that the claims examiner would be
16  the person to determine whether to seek collection
17  of an overpayment?
18     A. Correct. If we were informed say via
19  customer service message that a claim was paid
20  duplicate or overpaid for whatever reason, the
21  claims examiner would send out the request and the
22  letter.
23     Q. They wouldn't go to you for the authority to
24  do that, that's something they had the authority to

Page 100

1   do?
2      A. Yes.
3      Q. Do you know whether or not as part of the
4   process the client was informed of that activity?
5      A. I have no idea. I don't remember.
6      Q. You're not aware of any system that was in
7   place that would notify the client any time there
8   was an overpayment and an effort to recover it?
9      A. No, I don't -- I mean, the only time that
10  would happen is if there was a specific question
11  posed by, you know, a client. If there was a
12  situation with somebody and, you know, we notified
13  the client we were requesting the money back. But I
14  mean, there's a gajillion scenarios.
15     Q. But from the client's perspective, the
16  client -- seeking repayment of an overpayment would
17  happen oftentimes without the client's knowledge?
18     A. That's correct.
19     Q. You talked a little bit about eligibility,
20  determining eligibility to receive benefits. As I
21  understand your testimony, BeneFirst would receive
22  information from a client, including Aubuchon, with
23  respect to who was eligible and not, right?
24     A. Correct.

Page 101

1      Q. And that information would be put into the
2   computer system?
3      A. Correct.
4      Q. If you received a medical bill or when you
5   received a medical bill and you took a look at the
6   name and it wasn't in the system, what would the
7   claims examiner do with that?
8      A. They normally would go to Pam Furlong, and
9   Pam would look to see if she had an enrollment form
10  for that person waiting to be data entered. If not,
11  then the examiner or Pam or a combination thereof
12  would go back to the client and say we've got a bill
13  on Mr. Smith, and we don't have Mr. Smith. They
14  would, you know, resolve the issue.
15     Q. And if it was a situation in which there was
16  a dependent, I think you told us for example it's an
17  older teen, the examiner would ask the appropriate
18  questions, at least that was the process that was
19  supposed to be undertaken?
20     A. Right. At BeneFirst if there was a child
21  that was of college age, Pam Furlong managed that
22  process of going out and getting updated
23  information. And that information would be put into
24  the eligibility files so that the examiner would

26 (Pages 98 to 101)

Paul Gatanti, Jr.

1  know that, yes, we received documentation from U.
2  Mass. that they were enrolled through whatever year.
3     Q. Pam Furlong was an employee benefits person?
4     A. Correct.
5     Q. So she would be -- part of her job was to
6  get that information from the college/university?
7     A. Correct.
8     Q. How about a situation in which a child had a
9  different last name than the employee, is that
10 something that somebody from BeneFirst would look
11 into?
12    A. It would have resided in Pam's area. If she
13 saw a different last name, to verify why is there a
14 different last name.
15    Q. For example, might have been a situation
16 where there was a remarriage after divorce?
17    A. Correct, yup.
18    Q. Is that correct?
19    A. Adoption, remarriage, all kinds of
20 scenarios.
21    Q. So whoever the claims examiner is at
22 BeneFirst when they see that, part of their
23 responsibility would be to follow up to find out
24 why; is that fair to say?

1     A. I would say that eligibility -- Pam's area
2  had the primary responsibility over that. The
3  examiner, when they went into the system to pay a
4  claim on the different last name, they wouldn't do
5  any action unless they had reason to themselves.
6     Q. So if they saw -- claims examiner would
7  notice a different last name, you're saying their
8  first phone call was to Pam?
9     A. If they had a question about that, yes.
10    Q. Well, if it's a different last name, they
11 should have a question, shouldn't they?
12    A. Again, it depends on the situation. If
13 they're already in the system as an eligible
14 dependent with a different last name, then the
15 verification process has already happened.
16    Q. In a situation, though, in which there
17 hasn't been a prior claim paid for the individual, I
18 think what you're telling me is that the examiner
19 would not go back to the client, but would first go
20 to Pam?
21    A. If they had -- right, if they had reason to,
22 yeah.
23    Q. Then it would be up to Pam to do the
24 appropriate research to determine --

1     A. Documentation, correct.
2     Q. -- whether or not the person's eligible?
3     A. Correct.
4     Q. There was some testimony on I think it was
5  multiple plan discounts, do you recall those
6  questions?
7     A. Multiple surgery.
8     Q. No, there was something on multi-plan.
9     A. Oh, multi-plan.
10    Q. Multi-plan?
11    A. Yeah.
12    Q. What was multi-plan?
13    A. They're a PPO network, repricing company.
14    Q. Would it be apparent on the bill of whether
15 or not this was something that would fall within the
16 multi-plan discount?
17    A. On the bill? No.
18    Q. What would the examiner do? What would he
19 look at?
20    A. The examiner would look at the transmittal
21 and the plan doc, and you would see what employees
22 in what locations were accessing multi-plan. Then
23 when you received a bill in on those people and the
24 provider was from those states or areas, then the

1  claim would be pended to go have the multi-plan
2  reprice. And multi-plan I believe, I can't remember
3  specifically, but I believe that they were mailed
4  out for repricing. Then I think at some point we
5  had access to do some things on line, but I can't
6  remember specifics.
7     Q. And all those activities you just described
8  would occur at the claims examiner level?
9     A. Yes.
10    Q. So they had to make some judgment of when to
11 access that information or not?
12    A. Correct.
13    Q. You did talk about the multiple surgery
14 rules as well. What I wrote down is that it was a
15 complicated process. Is that fair to say?
16    A. Yes.
17    Q. Is this an area in which being experienced
18 and having a good background assisted in being an
19 effective claims examiner?
20    A. It helps, yes.
21    Q. Did it require the exercise of some judgment
22 and skill in knowing how and when to apply those
23 rules?
24    A. It would have required the judgment to go to

27 (Pages 102 to 105)

Paul Gatanti, Jr.

| Page 106 | Page 108 |
|---|---|

**Page 106**

1  the plan to see how it addressed multiple surgeries
2  and to follow what it said.
3      Q.  In your experience in this industry, are
4  there areas typically within most plans that are
5  gray about what's covered or not or is it always
6  black and white?
7      A.  Pretty black and white.
8      Q.  Are there any areas, though, in which
9  there's some interpretation necessary, in your
10  experience?
11      A.  Just areas again around, you know,
12  experimental, investigational, you know, the
13  instances where you have someone with a lot of
14  complications where they're looking to have some
15  type of treatment that maybe is cutting edge
16  treatment and you need to go out for an independent
17  opinion.  But for the most part, the plan is the
18  plan.
19      Q.  In those instances that you described where
20  there's some complexity to it, in the first instance
21  the claims examiner would make that determination?
22      A.  The claims examiner would make the
23  determination if something needed to go out for
24  review, yes.  But prior to the bills being dropped

**Page 108**

1  examiner in the first instance?
2      A.  Correct.
3      Q.  I would think that would require some level
4  of judgment in making that determination; is that
5  correct?
6      A.  Correct.
7      Q.  That's not always obvious, is it?
8      A.  No.
9      Q.  You also asked some questions about the
10  coordination of benefits, do you recall that
11  examination?
12      A.  Yes.
13      Q.  Oftentimes that involved when there were
14  multiple insurance companies available to provide
15  for coverage, right?
16      A.  The most common were auto and if the spouse
17  was fully employed with other insurance.
18      Q.  Again, the claims examiner would be the
19  first person that would take a look at that issue
20  and make some determinations of whether or not there
21  should be a coordination of benefits?
22      A.  Correct.
23      Q.  And clearly as Aubuchon would expect and
24  rely upon its third-party administrator BeneFirst to

**Page 107**

1  is usually when we run into those situations.  It
2  happens at the pre-certification level.  So very
3  rarely would you run into a situation where a couple
4  hundred thousand in claims have already been
5  dropped.  It happens at a much earlier stage.
6      Q.  Do you have any memory personally on the
7  Aubuchon account of any situations in which a claims
8  examiner ever had to send something for review after
9  the bill had come in?
10      A.  Not off the top of my head.
11      Q.  You were asked some questions about pursuing
12  subrogation rights, do you recall those questions?
13      A.  (Witness nodded)
14      Q.  You have to say -- I know you're saying yes.
15      A.  Yes, sorry, getting lulled in.
16      Q.  If you want to take a break, just let me
17  know.
18      A.  That's okay.
19      Q.  At least as the first line of attack, the
20  claims examiner would receive some information on
21  the bill which would indicate to them whether or not
22  that's an area they should look into or not?
23      A.  Correct.
24      Q.  That was the responsibility of the claims

**Page 109**

1  undertake that charge, right?
2          MR. ROSENBERG:  Objection.
3      A.  Correct.
4      Q.  That wouldn't surprise you if that was their
5  expectation, right?
6      A.  It would not surprise me.
7      Q.  And as the person responsible for the claims
8  administration process at BeneFirst, you expected
9  that your claims examiners were doing that?
10      A.  Correct.
11      Q.  Based upon your personal experience as
12  opposed to what people at BeneFirst may have told
13  you, did you have any personal experience going to
14  Aubuchon to seek their input on the resolution of
15  any subrogation claims or coordination of benefits?
16      A.  No.
17      Q.  Putting aside the conference call you told
18  us about and that meeting towards the end of 2004
19  that you told us about, do you recall any specific
20  exchanges that you had with anybody at Aubuchon
21  dealing with payment of benefits?
22      A.  I had conversations periodically with Sarah,
23  with Kim.  But as far as specifics go --
24      Q.  I know it's a number of years ago.  But do

28 (Pages 106 to 109)

Paul Gatanti, Jr.

Page 134

1    A. Yes.
2    Q. What's the difference between the two?
3    A. Well, the difference is that the aggregate
4    report, whether it be system based or a report that
5    someone puts together, is based on unaudited and
6    unreviewed findings. In other words, it's just
7    based on the information that is being pulled from
8    the claim system. That is a benchmark as to what
9    you could possibly have as an aggregate claim. But
10    the actual financial audit of that aggregate in the
11    contract period is where you will actually come up
12    with if there indeed was a breach; and if so, how
13    much was the actual dollar amount.
14    Q. And the stop loss reinsurer is going to
15    reimburse only on the basis of the actual numbers,
16    correct?
17    A. That is correct.
18    Q. Do you know whether the estimate was
19    communicated to Aubuchon?
20    A. I believe the amount that was communicated
21    to Aubuchon was that large amount, and I believe it
22    was communicated via Paul.
23    Q. I'm going to show you what was marked as
24    Exhibit 1.

Page 135

1    (Document exhibited to witness)
2    Q. Does that reflect the estimate that was
3    provided to Aubuchon?
4    A. I can't recall -- I'm assuming that, yes, it
5    would reflect it.
6    Q. This letter was addressed to you, correct?
7    A. Yes.
8    Q. In it does it discuss the estimate being
9    provided for the reimbursement?
10    A. Yes.
11    Q. And do you see where it further states that
12    we are hopeful that the audit will support that. In
13    your experience, then, there's a difference between
14    the estimated amount and what will actually be paid?
15    A. Correct.
16    Q. What will actually be paid is dependent on
17    the audit?
18    A. Correct.
19    Q. You were talking about how the claims
20    examiner working with a particular claim will begin
21    with the information on the individual screen, do
22    you remember that?
23    A. Yes.
24    Q. And you had testified that when the claims

Page 136

1    examiner sits down to do that, the information on
2    that screen is already programmed for that group?
3    A. Correct.
4    Q. How is that programmed in there for that
5    group?
6    A. It would be programmed via the plan building
7    process.
8    Q. And the plan building process would get that
9    information for the group from where?
10    A. From the salesperson.
11    Q. In doing the plan build out, what
12    information would they get from the salesperson?
13    A. Any changes to the plan document or the
14    summary of benefits and what is the renewal stop
15    loss policy conditions, what is the basis, what is
16    the spec deductible, those types of things.
17    Q. Is the person doing the plan build out
18    expected to follow the client's written medical
19    benefit plan?
20    A. The plan builder is going to go by what
21    they're being told is what the client wants.
22    Q. Now, you had testified about this fact that
23    the claims examiner has to engage in some
24    interpretation when it's processing a claim.

Page 137

1    A. Correct.
2    Q. Now, even in doing that interpretation --
3    well, in doing that interpretation, are they to take
4    into account the written plan terms of the client?
5    A. Yes.
6    Q. In engaging in this type of interpretation,
7    are they only to authorize a claim for payment if
8    it's within the coverage of the plan?
9    A. Yes.
10    Q. Now, you had talked about the check edit
11    report phase. Was this a process that was in place
12    with other accounts as well as Aubuchon?
13    A. It would have been in place for every
14    client.
15    Q. Because every client pays and funds in the
16    same manner?
17    A. Correct. It's just a mechanism whether it's
18    a transfer or physical check, but they would all get
19    check edits.
20    Q. At BeneFirst, in the normal course of
21    business if there were complaints from a client
22    during the check audit review or at the check edit
23    review, in normal course of operation, would that
24    eventually come to your attention?

35 (Pages 134 to 137)

Paul Gatanti, Jr.

Page 138

1    A. In some cases, but they were rare.
2    Q. Why would they come to your attention?
3    A. If the funding department or if the claims
4  examiner either didn't know how to answer the
5  question or what to say or if there was confusion,
6  something of that nature.
7    Q. Did any issues arising from Aubuchon in its
8  check edit review ever make its way up the ladder to
9  you?
10    A. Not that I can recall. The only things that
11 I can recall again were just in regard to these
12 exceptions.
13    Q. If an issue arose with regard to a check
14 edit review, who was the person at BeneFirst who
15 would deal with those issues?
16    A. It would start with Kristen David, who
17 handled all of the funding and the check edit
18 process. And if there was a claim question coming
19 from the client, she would bring it to the claims
20 examiner's attention, she may bring it to my
21 attention, she may go to Charlie Dobbins or Paul
22 Sullivan, depending on the situation.
23    Q. In the normal course of business, would the
24 claims examiner often resolve it him or herself?

Page 139

1    A. As best I can remember, yes.
2    Q. Would it come to your attention in the
3  normal course of business if any of these check edit
4  review processes resulted in a change in the plan
5  build out?
6    A. Not necessarily. I'm not really
7  understanding.
8    Q. If a check edit review raised a problem that
9  required a change to how the plan was built out in
10 the BeneFirst system, would that come to your
11 attention?
12    A. If the check edit review identified a
13 benefit being built incorrectly, say a co-pay is
14 being taken wrong or paid, then the normal course of
15 business would be that the claims examiner would
16 fill out a, I believe we called it like a plan
17 building problem sheet. And that sheet would go to
18 the plan builder to fix the issue.
19    Q. Would it come to you?
20    A. Not necessarily. Only if, you know, someone
21 was like really, really upset or if no one else was
22 around, sometimes it came to me. But as a
23 general rule, the process was that, you know, plan
24 building had this error sheet or this little,

Page 140

1  however you want to call it, but that they would use
2  that as okay, we have a claim that's taking the
3  wrong co-pay, we have a claim that's taking the
4  wrong co-insurance, and they would fix it.
5    Q. Do you recall any issues of that nature with
6  regard to the Aubuchon account ever coming to your
7  attention?
8    A. None that I can recall.
9    Q. During the time that you were there, who was
10 the plan builder responsible for making any such
11 changes to the Aubuchon account?
12    A. Carrie Reidy, and then there was a woman for
13 a short period of time, maybe six months or so. But
14 I can't remember her name. She's an older woman.
15 Then it went back to Carrie.
16    Q. And that covered the whole time period you
17 were there?
18    A. Yes.
19    Q. You testified about what would be done with
20 regard to certain questions about the eligibility
21 for coverage of dependents; do you recall that?
22    A. Yes.
23    Q. And you had talked about the need to, what
24 would be done to verify if a dependent had a

Page 141

1  different last name than the employee; do you recall
2  that?
3    A. Yes.
4    Q. How would that be verified?
5    A. That would be verified by the eligibility,
6  Pam Furlong going back to the employer group to ask
7  for clarification and/or possible documentation as
8  to why this person with a different last name was a
9  legitimate dependent.
10    Q. Then you had also talked about I guess
11 procedurally how this would work if a dependent --
12 if there was no prior claim for a dependent, do you
13 recall talking about that?
14    A. Uh-hum, yes.
15    Q. When the process begins, the employee and
16 its dependent information is forwarded to BeneFirst,
17 correct?
18    A. Correct.
19    Q. Are those individuals set up on the system
20 at that point or are they not set up until there's a
21 first medical claim?
22    A. They are set up as soon as the enrollment
23 form is received and processed.
24    Q. So at that point, even before there was any

Paul Gatanti, Jr.

Page 146

1    Q. When you say you were paying, Starline --
2    **A. On behalf of the reinsurers.**
3    Q. So Starline was authorized to pay stop loss
4    claims on behalf of the reinsurers?
5    **A. That's correct.**
6    Q. Can you tell us how many audits you were
7    involved with at Starline?
8    **A. Many.**
9    Q. More than a hundred?
10   **A. Probably, yeah, probably.**
11   Q. For any of those edits, was there ever one
12   in which every single medical claim in the plan was
13   audited for the relevant time period?
14   **A. No.**
15   Q. What was the normal process?
16   **A. Are you talking specific claim or aggregate**
17   **claim?**
18   Q. Let's start with aggregate claim, what would
19   be the process?
20   **A. Aggregate claim would be just a random**
21   **sampling.**
22   Q. Was there any standard number or percentage
23   that you saw?
24   **A. You know, a hundred claims. If it was a**

Page 147

1    **really big breach, maybe you want to look at one**
2    **hundred and -- two hundred claims. But I would say**
3    **right around a hundred to two hundred would probably**
4    **have been the norm.**
5    Q. Now, you were talking before about this
6    question of auditing the information on an
7    electronic system versus the actual hard copies.
8    When you were talking about the information on the
9    hard copy -- I mean, strike that, on the electronic
10   system, you were identifying the information that
11   would be on there, correct?
12   **A. Correct.**
13   Q. What is that information that you described
14   in the electronic screen that you would be looking
15   at?
16   **A. That information is all of the data fields**
17   **that appear on a UB or an HCFA.**
18   Q. So that should be taken from that and
19   entered on the electronic system?
20   **A. Yes. So it would be data entered from the**
21   **paper onto the electronic system.**
22   Q. In your experience with Starline for
23   auditing on behalf of the reinsurers, what was the
24   normal practice? Did they audit from that

Page 148

1    electronic information?
2    **A. We audited from the paper files, because at**
3    **that particular time, electronic was still kind of**
4    **new. So a lot of my work was still copies of the**
5    **bills. But, again, that's all changed in today's**
6    **world.**
7    Q. What's done today?
8    **A. It's more and more looking at paid claim**
9    **reports and electronic files, especially where now a**
10   **lot of providers are only submitting electronic data**
11   **sets. There's still some paper out there. But back**
12   **when I was at Starline, the electronic was still**
13   **pretty small.**
14   Q. Do you recall any stop loss audits of
15   BeneFirst while you were at BeneFirst for any
16   account?
17   **A. I believe there was, but I can't recall the**
18   **specifics.**
19   Q. So as you sit here, do you remember whether
20   those audits were of the electronic information or
21   the hard copy information?
22   **A. I want to say hard copy.**
23         MR. ROSENBERG: That's all I have.
24         MR. CIAVARRA: I have a couple

Page 149

1    questions.
2               RECROSS EXAMINATION
3              BY MR. CIAVARRA
4    Q. Exhibit 1, I'm not -- you recall the letter
5    that you saw?
6    **A. Yes.**
7    Q. The letter is dated September 20, 2004. By
8    the time this letter was written, the folks at
9    BeneFirst had been aware for how long about the
10   errors in the RCR report?
11   **A. Months.**
12   Q. Who was the most senior claims examiner at
13   BeneFirst when you were there?
14   **A. Beginning, end, middle?**
15   Q. At the time you left, who did you consider
16   to be the senior claims examiner?
17   **A. Robin Bannaman.**
18   Q. Robin, is that a woman?
19   **A. Yes.**
20   Q. How much was she being paid?
21   **A. I think she was probably right around 38**
22   **thousand.**
23   Q. Was that the typical pay rate for the
24   examiners or is that high?

38 (Pages 146 to 149)

Paul Gatanti, Jr.

Page 150

1    A. It ranged anywhere from, you know, the mid
2  20's to the high 30's, depending on their
3  background.
4    Q. Last question or last follow-up, anyway.
5  When a medical bill would come and the claims
6  examiner would see it and it would reference an
7  accident, the determination of whether to
8  investigate that accident as to whether there was a
9  cost if somebody might be responsible for that in
10  the first instance resided with the examiner, right?
11    A. Correct.
12    Q. And if the claims examiner just didn't
13  follow up on that, that would be an error by the
14  claims examiner, right?
15    A. Procedural error, correct.
16        MR. CIAVARRA:  Thank you, no further
17  questions.
18        MR. ROSENBERG:  I have no further
19  questions.
20        (Whereupon, at 1:33 the deposition
21  concluded)
22
23
24

Page 151

1        C E R T I F I C A T E
2        I, PAUL GATANTI, JR., do hereby certify
3  that I have read the foregoing transcript of my
4  testimony, and further certify that it is a true and
5  accurate record of my testimony (with the exception
6  of the corrections listed below):
7  Page  Line      Correction
8  _____  _____  _____
9  _____  _____  _____
10  _____  _____  _____
11  _____  _____  _____
12  _____  _____  _____
13  _____  _____  _____
14  _____  _____  _____
15  _____  _____  _____
16  _____  _____  _____
17  _____  _____  _____
18
19  Signed under the pains and penalties of perjury this
20  _____ day of _____, 2008.
21
22
23        _____
24        PAUL GATANTI, JR.

Page 152

1  COMMONWEALTH OF MASSACHUSETTS)
2  SUFFOLK, SS.            )
3        I, Linda M. Grieco, Professional Shorthand
4  Reporter and Notary Public in and for the
5  Commonwealth of Massachusetts, do hereby certify
6  that PAUL GATANTI, JR., the witness whose deposition
7  is hereinbefore set forth, was duly sworn by me and
8  that such deposition is a true record of the
9  testimony given by the witness.
10        I further certify that I am neither related to
11  or employed by any of the parties in or counsel to
12  this action, nor am I financially interested in the
13  outcome of this action.
14        In witness whereof, I have hereunto set my hand
15  and seal this 17th day of April, 2008.
16
17
18
19
20
21        Linda M. Grieco
22        Notary Public
23        My commission expires
24        December 15, 2011

39 (Pages 150 to 152)

**5**

{}

Page 1

1       UNITED STATES DISTRICT COURT

2        DISTRICT OF MASSACHUSETTS

3  ------------------------------------x

4 W.E. AUBOCHON CO., INC., AUBOCHON

5 DISTRIBUTION, INC., W.E.

6 AUBOCHON CO., INC. EMPLOYEE MEDICAL

7 BENEFIT PLAN, and AUBOCHON DISTRIBUTION, INC.

8 EMPLOYEE MEDICAL PLAN,

9          Plaintiff,

10    v.                    C.A. No. 05-40159 FDS

11 BENEFIRST, LLC,

12          Defendant.

13  ------------------------------------x

14 Volume I                  Pages 1 - 124

15

16    DEPOSITION of CARRIE REDDIE, a witness

17 called for examination by the Defendant, taken

18 pursuant to Rule 30 of the Massachusetts Rules

19 of Civil Procedure, before Laurie K. Langer,

20 Registered Professional Reporter and Notary

21 Public in and for the Commonwealth of

22 Massachusetts, at the McCormack Firm, One

23 International Place, Boston, Massachusetts, on

24 Friday, May 16, 2008, commencing at 10:30 a.m.

1 APPEARANCES
2
3    BOWDITCH & DEWEY
4    By Ryan T. Killman, Esq.
5    311 Main Street
6    P.O. Box 15156
7    Worcester, Massachusetts 01615-0156
8    (508) 926-3497
9    For the Plaintiff
10
11   THE MCCORMACK FIRM, LLC
12   By Stephen D. Rosenberg, Esq.
13   One International Place
14   Boston, Massachusetts 02110
15   (617) 951-2929
16   For the Defendant
17
18
19
20
21
22
23
24

1              INDEX
2 ATTORNEY    EXAMINATION  CROSS    REDIRECT
3 Mr. Rosenberg    4      97, 117, 121
4 Mr. Killman        47, 115, 119
5
6 EXHIBIT              PAGE
7 1  7/2/04 E-mail to Maureen FitzGerald
8 from Carrie Reddie          83
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1              PROCEEDINGS
2
3    MR. ROSENBERG:  Usual stipulations?
4    MR. KILLMAN:  That's fine.
5
6         CARRIE REDDIE,
7    having been satisfactorily identified by the
8    production of her driver's license, and duly
9    sworn by the Notary Public, was examined and
10   testified as follows:
11
12         EXAMINATION
13
14   BY MR. ROSENBERG:
15 Q.  Good morning, Miss Reddie.
16 A.  Hi.
17 Q.  My name is Steve Rosenberg, I represent
18   BeneFirst, Inc.  The first question I had for
19   you, have you ever been deposed before?
20 A.  Huh-uh.
21 Q.  Okay.  Let me just give you some ground rules to
22   understand what's going on.  I'm going to ask
23   you a series of questions, the court reporter
24   will take down my questions and your answers.

1    You need to answer verbally, she can't put onto
2    the record nods or shakes of the head, so forth.
3    And in addition, if any of my questions you
4    don't understand just tell me and I'll be happy
5    to clarify them.  If you need a break at anytime
6    just let me know and we'll take a break.
7         The stipulations that the parties have
8    agreed to is that all objections except as to
9    form and all motions to strike are reserved
10   until the time of trial.
11        Miss Reddie, you have the option, if you
12   want, to read the transcript of the deposition
13   afterwords to see if there's anything in it that
14   you think is incorrect and note any changes and
15   sign it and send it back.
16 A.  Okay.
17 Q.  Would you like to do that?
18 A.  Yeah, actually I would.
19 Q.  Would 30 days be long enough?
20 A.  Yeah, that's fine.
21 Q.  Okay.
22   MR. ROSENBERG:  Do you want to waive the
23   notary?
24   MR. KILLMAN:  We can waive the notary.

2 (Pages 2 to 5)

Page 22

1 Q. Okay. And you also worked there as a claims
2    examiner?
3 A. Yes.
4 Q. Okay. Could you take me through the steps as to
5    how a claims examiner would process a claim on
6    any particular account?
7 A. Yeah, you put in the Social Security number,
8    then their individual account would pop up. You
9    would go into a screen where you put the diag
10   in, and the data of service, diag, some other
11   information, provider, or whatever and you hit
12   it and the actual claims processing screen would
13   come up. You pick the provider, you punch in
14   the CPT codes and the diags, and, you know, I
15   guess when you hit enter it would process the
16   claim. You could tell right there if it was
17   processing right. But there were other things
18   the claims examiner had to do, like the fee
19   schedules were never up to date in our computers
20   so we would have a list of the current fee
21   schedules, we have to manually make sure that
22   it, you know, paid the right amount. You know,
23   took the right discount. And then hopefully it
24   would just process correctly if I built the plan

Page 23

1    right or if the plan was built right. And then
2    you would hit enter and it would get paid or
3    whatever. Get processed.
4 Q. All right. And were you ever the claims
5    examiner -- well, when you were a claims
6    examiner did you have particular accounts you
7    were responsible for?
8 A. Yes.
9 Q. Okay. Were you ever responsible for the
10   Aubochon account?
11 A. Yes, I was.
12 Q. Okay. Were those claims processed in the manner
13   you just described?
14 A. Yeah.
15 Q. And so if I understand this correctly, it's
16   processed on the computer; --
17 A. Uh-huh.
18 Q. -- correct? Okay. And then the computer will
19   either approve or not approve?
20 A. The claim, yeah. Based on how the plan is set
21   up, yeah.
22 Q. And the way the system is set up is the computer
23   is processing it based on the plan build out
24   information?

Page 24

1 A. Uh-huh.
2 Q. Okay. And do you know -- well, strike that.
3    Well, do you know where -- strike that.
4        Did you ever -- I'm trying to get the
5    chronology straight.
6 A. You sound like my professor, he's a lawyer,
7    "strike that, strike that." He's such a lawyer.
8 Q. A terrible habit in real life. Did you ever see
9    the actual plan documents for the Aubochon
10   account?
11 A. Yes.
12 Q. And when did you see those?
13 A. I guess when I took, when I started processing
14   the claims. Because I processed the claims for
15   Aubochon before I became a plan builder so I
16   guess when I first started processing their
17   claims, I would say.
18 Q. So you would use the plan documents as well
19   during the course of --
20 A. Yeah. Like I would have it open when I was
21   processing claims, whatever account I was
22   processing I would make sure I had the SOB or
23   plan document in front of me. So I could make
24   sure that the system was doing it right and if

Page 25

1    it wasn't then I either fix it myself, if I knew
2    how, after I became a plan builder, or I would
3    give it to the plan builder and say, "this isn't
4    paying, fix it."
5 Q. So as the claims examiner you would make sure
6    that what the computer was processing matched up
7    with the plan documents themselves?
8 A. Yeah, you're supposed to. Yeah. I would. Some
9    of the other girls might not have, but I tried
10   my best.
11 Q. Is that what you did with the Aubochon claims?
12 A. Yes.
13 Q. Would you ever authorize a claim for payment
14   that the computer rejected?
15 A. If it rejected it incorrectly then, yes. If
16   it's denied I would let it deny. If it was a
17   benefit they didn't have, yeah, I would let it
18   deny. If it was a benefit that's denied that I
19   knew, "no, that's not right, it shouldn't be
20   denied because it says right here" I would
21   either have it fixed or fix it myself to make it
22   pay. But if it was a denied benefit I wouldn't
23   pay it unless Aubochon called me and told me to.
24 Q. So this is how you would work on the Aubochon

7 (Pages 22 to 25)

Page 26

1    accounts when you were processing the claims?
2 A.   Uh-huh.
3 Q.   When you say if the computer was wrong, you
4      would determine that by matching it up to the
5      plan document?
6 A.   Yeah.
7 Q.   And you would let the written plan document tell
8      you what the answer should be?
9 A.   Yeah. Uh-huh.
10 Q.  And would you -- on the Aubochon account would
11     you ever pay a claim that the computer rejected
12     that wasn't covered under the written plan
13     terms?
14 A.  Not on my own, no.
15 Q.  Were there ever times where, in your experience,
16     Aubochon claims were authorized for payment that
17     weren't covered under the plan terms?
18 A.  Did I -- repeat the question.
19 Q.  Okay. You said that not on your own, --
20 A.  Yeah.
21 Q.  -- you wouldn't do that?
22 A.  I wouldn't.
23 Q.  Were there ever times where claims for the
24     Aubochon account were paid that should not have

Page 27

1      been covered under the terms of the plan?
2 A.   Possibly. I -- possibly. I don't know.
3      Because I wasn't the only one that touched it so
4      I can't tell you 100 percent. I don't know.
5 Q.   Well, did you ever authorize any claims to be
6      paid on the Aubochon account that were not
7      covered under the plan's terms?
8 A.   No.
9 Q.   Did anyone ever instruct you to?
10 A.  Sometimes Aubochon would, yeah. They would tell
11     me to pay it outside the loss fund or something.
12 Q.  Okay. And who at Aubochon would tell you that?
13 A.  Either Sara or -- let's see. Sara and Kim. Kim
14     McMahon.
15 Q.  And how often did this occur in your experience?
16 A.  Oh, frequently. Often to frequently. It would
17     seem like every time somebody would call up
18     screaming because we denied their claim she
19     would call and say, "just pay it outside the
20     loss fund."
21 Q.  When you say someone would call up screaming,
22     would this be an Aubochon employee?
23 A.  Yeah. If we denied their claims we would tell
24     them it's not a covered benefit and they would

Page 28

1      go to their H.R., if they want it paid they
2      would go, "it's okay, pay it outside of the loss
3      fund."
4 Q.   "They" being the people at Aubochon?
5 A.   Yeah.
6 Q.   How frequently were you in contact with people
7      from Aubochon in general?
8 A.   Once a week or once every two weeks. Maybe.
9 Q.   And were you in regular contact with Sarah Orell
10     (ph.) or Kim McMahon?
11 A.  Kim, yeah.
12 Q.  What --
13 A.  Like e-mails, like, you know, if there was an
14     issue, whatever, they would e-mail me or I would
15     call them. They would call me, whatever.
16 Q.  How would they, when they would instruct you to
17     pay a claim outside of the loss fund, would they
18     do that over the phone or by e-mail; how would
19     that occur?
20     MR. KILLMAN: Objection.
21 A.  Both. I usually like to get it in writing so I
22     would say e-mail it to me or, you know. But
23     sometimes it was verbally, I think. I'm not 100
24     percent sure, but maybe sometimes it might have

Page 29

1      been verbal, yeah.
2 Q.   Okay. And did anyone in your experience at
3      BeneFirst have the authority to decide to pay
4      something outside of the loss fund?
5 A.   Nobody should have, no.
6 Q.   That solely was Aubochon?
7 A.   Yeah, that was their call, not us.
8      MR. KILLMAN: Objection.
9 Q.   Now, take me through the process. If a person
10     from Aubochon told you to pay something outside
11     the loss fund, --
12 A.  Uh-huh.
13 Q.  -- that means that that's a medical claim that
14     is not covered under the actual plan terms?
15     MR. KILLMAN: Objection.
16 A.  Yeah.
17 Q.  And then what would you do as a claims examiner,
18     how would you then actually physically get the
19     system to process it? Authorize it.
20 A.  We had, like, exception codes we could put in to
21     make it pay. Yeah.
22 Q.  Do you remember what the, what the code would
23     actually be that you put in?
24 A.  It would -- it was an exception code, I forget

8 (Pages 26 to 29)

Page 38

1  Donna might have worked on some of them. I know
2  Jessica had it for a time. I had it. And other
3  people might have helped out and processed them.
4  Donna at times might have processed them. I'm
5  trying to think who else. I think Stephanie
6  Uzinkonis (ph.), whatever her name is. She
7  might have processed some too.
8 Q.  As a claims examiner did issues arise in terms
9     of coordinating coverage that someone might have
10    with another health insurer such as a spouse's
11    insurer, things of that nature?
12 A.  Yeah, we would have coordination of benefits.
13 Q.  How would you process that? How would you
14    handle that issue?
15 A.  I forget. It was manual, I know that. We would
16    have to have the EOB. I can't remember. I
17    think there were lines that you put in for other
18    insurance payments, deductibles and stuff. And
19    the system would do it. You would put in, you
20    would take the EOB from the primary, you would
21    put in the information and then the system would
22    process the rest. Like, pay the deductible or
23    the co-pay, whatever it was.
24 Q.  So that was built into the plan build out?

Page 39

1 A.  Yeah.
2 Q.  Okay. Are you familiar as a claims examiner
3     with multiple surgery rules?
4 A.  Yeah. Uh-huh.
5 Q.  Was that something that was also built into the
6     plan build out?
7 A.  That -- I think, like, the first line, like, you
8     do the surgery and the second line was only
9     supposed to be, like, 50 percent or whatever. I
10    know we did a lot of those manually. But it may
11    have been automatically the first line. It may
12    have been set up -- I honestly don't remember.
13    I think it may have had the capacity to do that,
14    but it wasn't. I can't remember if it did it or
15    not or we had to do it manually all the time.
16 Q.  When you say "manually" what would that entail?
17 A.  Like, if it tried to pay, like, the second or
18    third 100 percent we would have to manually,
19    like, do a discount, you know what I mean, to
20    make it only pay at 50 percent or 80 percent or
21    whatever it was.
22 Q.  So when you're changing that manually and you're
23    making those changes are you doing it so that it
24    will pay consistent with the plan terms?

Page 40

1 A.  Yes. Yeah.
2 Q.  Okay.
3 A.  Because I think -- yeah. I think on some of the
4     plans I remember having to tell the girls when
5     I, you know, I would see that they weren't doing
6     that or whatever I would have to tell them. I
7     think it was mostly manual that we had to do
8     that, though. Because I seem to remember having
9     to tell them you're supposed to pay -- if you
10    look in the plan document it says on page blah,
11    blah, blah, it's supposed to be paid this way,
12    so make sure you're checking that when you're
13    processing claims to make sure it pays right. I
14    want to say it's manual but some could be
15    automatic too.
16 Q.  And automatic would mean it was built into the
17    computer?
18 A.  Yeah, it would automatically pay the second one
19    at 50 percent. But I want to say it was mostly
20    manual.
21 Q.  And that that was the process with the Aubochon
22    claims, as well?
23 A.  Yeah. I mean, it wouldn't be any different.
24 Q.  As a claims examiner, would the claims examiner

Page 41

1     get involved at all in whether a particular
2     individual who was no longer employed at
3     Aubochon had coverage under COBRA?
4 A.  No. Because if they had -- like, if they
5     terminated and they hadn't paid their first
6     premium yet they would stay terminated and the
7     processor wouldn't, they would just let the
8     claim ride and let it deny. And it wasn't up to
9     them, it was up to eligibility. Once the COBRA
10    premium was sent in or whatever we would give it
11    to the eligibility girl Pam and she would
12    reinstate the person up to the, you know, if
13    they paid through May she would put May 31st in
14    there or whatever. So it wasn't up to the
15    claims examiner.
16 Q.  It would already be built into the computer --
17 A.  Yeah.
18 Q.  -- system that this person is a terminated or
19    covered individual?
20    MR. KILLMAN:  Object.
21 A.  Uh-huh.
22 Q.  Okay. So as a claims examiner you didn't have
23    to go out and separately look into that?
24    MR. KILLMAN:  Objection.

11 (Pages 38 to 41)

Page 54

1 those because she knew we were supposed to be
2 asking for treatment notes and stuff and if that
3 wasn't done she would mark it wrong or whatever.
4 Q. And what would be done with the results of these
5    internal audits?
6 A. I think they were shown to the girls every
7    month, you know -- the audit would come back and
8    she would give the results to the, the examiner
9    and say "these are the mistakes you made.
10    Either go and fix the claim or, you know, if it
11    was processed wrong, or don't do it again" or, I
12    don't know. Resolve it somehow.
13 Q. When you reference "the girls" who are you
14    speaking of?
15 A. The claims examiners.
16 Q. Were you also included in this group?
17 A. Yes.
18 Q. So certain audits that were being done by
19    Miss Gatanti would be brought to your attention?
20 A. Uh-huh.
21 Q. And if errors were pointed out by Miss Gatanti
22    what would be done by the examiner?
23 A. They would either, you know, try to fix the
24    claim, if it was, like, a processing error they

Page 55

1 would fix the claim or, you know, if they
2 shouldn't have paid it ask for the money back
3 from the provider. Whatever the situation
4 called for, you know. We would try to fix it.
5 Q. Do you recall whether errors were pointed out by
6    Miss Gatanti with respect to Aubochon claims?
7 A. I honestly don't remember if any of my errors
8    were ever specific to Aubochon or not. I
9    usually got like 100 or 99 on mine. So I very
10    rarely had to go and fix them.
11 Q. When you're referencing 100 or 99 what are you
12    referencing?
13 A. Like the score. The score of the audit or
14    whatever. So you had to try to get like a 98
15    percent, I think was what they wanted, or better
16    or something like that. So I always got 100 or
17    99.
18 Q. So there was a level of accuracy that was
19    required?
20 A. Yes. Uh-huh.
21 Q. And that was 98 percent?
22 A. I think. I don't remember the exact number.
23    But, yeah.
24 Q. I think a little earlier you referenced that you

Page 56

1 had been trained to be a plan builder?
2 A. Uh-huh.
3 Q. And that was in Chicago?
4 A. Yes.
5 Q. What type of training did you receive?
6 A. Training on how to set up the codes in the
7    system for, you know, each type of visit. The
8    CBX tables which drove the codes, like it
9    was -- it's very complicated.
10 Q. Actually, let me be more specific. How many
11    days did you receive training?
12 A. Five days.
13 Q. Were they eight-hour days?
14 A. Yes.
15 Q. And who provided the training?
16 A. TriZetto.
17 Q. And this was specifically with respect to the
18    RIMS system?
19 A. Yes.
20 Q. Was any of it tailored to specific providers?
21 A. No, not really. Like certain providers if they
22    were in, like, the HCVM network would be set up
23    or we chose that provider to take the right
24    discount. But again the discounts and stuff

Page 57

1 weren't always updated in the system so we would
2 have to do some of that manually.
3 Q. Now, I know with Mr. Rosenberg you had taken us
4    through the steps of processing claims.
5 A. Uh-huh.
6 Q. I'm hopefully not going to be covering too much
7    of the same thing, I'm going to do my best to
8    narrow this down. But forgive me if I do repeat
9    some things. Now, what information did you have
10    at your disposal to process the claims?
11 A. As a processor we would have the schedule of
12    benefits and the plan document. Ideally we
13    would have that. You know, if the books were
14    ready, if it was a new account sometimes the
15    plan document itself wasn't ready we would just
16    have the SOB to go by. And we had that. If we
17    needed to look something else up, like if a
18    particular injection was covered or something we
19    would have to go into their prescription
20    benefits or whatever online, some of the stuff,
21    their benefits and stuff were online and we
22    could look it up. Not online, on the computer.
23    So if there was a question about, you know, if
24    this drug is covered we could go and look and

15 (Pages 54 to 57)

1  more specific.

2      Who actually wrote the check?

3 A.  Wrote the check that paid the claims?

4 Q.  Exactly.

5 A.  I think it was Aubochon would write the check.

6    That wasn't my end of it so I'm -- but, I mean,

7    it would be Aubochon. We would send them a

8    check edit telling them how much they would need

9    to send us to cover the claims and they would

10   send a check.

11 Q.  Let me be specific. I think that was a bad

12   question. From my understanding of how the

13   process worked is that you would send check edit

14   forms to Aubochon, they, and those check edit

15   forms would request a certain amount to be

16   funded into a certain account?

17 A.  Yes.

18 Q.  And then the claims would be paid out of that

19   account; is that correct?

20 A.  Yeah.

21 Q.  Who would be responsible for paying the claims

22   out of that account? Let me ask it a different

23   way. Once the account was funded by Aubochon --

24 A.  Yeah.

1 Q.  -- who disbursed those funds?

2 A.  Oh. Well, the checks, we had a separate company

3    I think that actually printed the checks and

4    mailed them out. I know we didn't do it. It

5    was, an off-site company would do that.

6 Q.  Was that company hired by BeneFirst?

7 A.  I assume so.

8 Q.  Could you tell me how the claims records that

9    you had in your possession at BeneFirst, how

10   were they stored?

11 A.  Claims records? What do you mean by claims

12   records?

13 Q.  Any documents you received that you used to

14   process claims.

15 A.  Like claims themselves?

16 Q.  (Nods in the affirmative.)

17 A.  We would -- after the claims examiners would

18   finish with a batch, processing a batch, we

19   would put a cover sheet on it and then we would

20   scan it through the scanner and it would go on

21   our F drive at work, so. And then they would

22   store it on the F drive.

23 Q.  So what happened to the hard copies?

24 A.  The hard copies I believe -- you know, I don't

1    really know. Either stored or shredded, I'm not

2    sure.

3 Q.  Do you know how long the scanned versions were

4    kept on the F drive?

5 A.  Forever. I know we kept them in boxes for a

6    while, the finished batches were kept in boxes

7    and then they were taken off site. I think

8    that's what happened to them.

9 Q.  But once they were scanned they stayed on the F

10   drive forever?

11 A.  Yeah. They should have, yeah.

12 Q.  Were you aware of a specific document retention

13   policy at BeneFirst?

14 A.  Not like a formal policy. Not that I'm aware

15   of, no.

16 Q.  Do you know of a document destruction policy?

17 A.  Well, we did have boxes for shredders. We would

18   put anything, like, HIPAA related, anything with

19   personal, personal information we would put it

20   in these shredders and the company would come

21   once a week and shred it on site and then take

22   care of it.

23 Q.  And was there a policy at BeneFirst for the

24   amount of time before you would shred something?

1 A.  I don't know. I honestly don't know.

2 Q.  Could you explain to me the scenario where you

3    would shred a document?

4 A.  Like, if I had an extra copy of something or,

5    I'm trying to think what did we do. Faxes that

6    we got duplicates of, we would shred those.

7    Duplicate claims, we would shred. We wouldn't

8    waste our time processing, we would just shred

9    them.

10 Q.  Would there ever be a scenario where you would

11   shred a document that was not already scanned to

12   the F drive?

13 A.  Yeah. Like, again, like duplicate claims we

14   wouldn't bother scanning anything we're not

15   going to process. We would just throw in the

16   shredding bins or whatever.

17 Q.  But is it accurate to say that every document

18   that was used during the claims process was

19   scanned to the F drive?

20 A.  Yeah. It should have been, yeah.

21 Q.  Who is responsible for the scanning?

22 A.  The individual girls when they were done with

23   their batches were supposed to scan their own

24   batches.

17 (Pages 62 to 65)

1 Q.  So the claims examiners --

2 A.  Yes.

3 Q.  -- were responsible for scanning the documents?

4 A.  Yes.

5 Q.  Did you have a practice of always scanning the

6      documents in the F drive?

7 A.  I always did, yes.  Sometimes if we were busy

8      the girl, the girl who did the mailroom she

9      would scan them for us.  We would leave them and

10     say, "Jean, would you scan this."  So it wasn't

11     always personal.

12 Q.  Do you know the policy of scanning the documents

13     in the F drive, was that a written policy?

14 A.  I don't think so.  I honestly don't know.  I

15     never saw any written policy.  But that was just

16     the, what we did.  Because we needed to be able

17     to pull them up if we needed them.  So we needed

18     a way of recalling them without going through

19     mounds of paper so we scanned them.

20 Q.  That brings me to my next question.  How would

21     you pull a document once it was already scanned?

22     In other words, what sort of search criteria

23     would you need to find the document?

24 A.  You're making me think.  How did we do that?  I

1      think when we looked up a claim on RIMS, we

2      could look up a claim in an individual's file

3      and if we needed that document there was a date,

4      date processed, I believe, it was called date

5      processed.  And it would have the examiner's

6      initials.  So we could go to that examiner's and

7      we could go to the batch that was scanned with

8      her initials and that process date.  Like the

9      batches would have the cover sheet, it would

10     have her initials and the date it was scanned.

11     Or the date it was processed.  And that's how we

12     looked it up.  Because we could look in RIMS,

13     see the name, the date and then we could find

14     that batch.  Like the batches on the F drive

15     after we scanned them they would be sorted, I

16     think, by girl, by examiner.  So we could go

17     into Jessica's batch, month of March, March

18     18th, and we would have to flip through every

19     claim to find it.  We could usually go by the

20     claim number.

21 Q.  So could you or could you not search by client?

22 A.  No.  The claim?  No.  No.  Usually not, no.

23 Q.  During claims processing did you ever have to

24     determine eligibility?

1 A.  As a claims examiner, no.  That was up to

2      eligibility to make sure that that was working

3      right.

4 Q.  And if you're aware what did eligibility do to

5      determine eligibility?

6 A.  Depending on, you know, if they, they would get

7      something from the client stating this person

8      termed on this date and we would put the term

9      date in and send out the COBRA paperwork.  Or

10     the, the Cobra/full-time student person would go

11     through the full-time student list and determine

12     if somebody should be canceled and sent out a

13     notice to determine their eligibility for

14     full-time student status.

15 Q.  So someone would be responsible for inputting

16     this eligibility data into the system?

17 A.  Uh-huh.

18 Q.  Who would be responsible for that?

19 A.  That I believe was Pam Furlong.

20 Q.  Was she an eligibility person or a plan builder?

21 A.  Eligibility person.

22 Q.  If you know what did she base eligibility on?

23 A.  It would be, you know, when the client would

24     send in an enrollment form or a termination

1      form.  That's how she would base it, you know.

2      They would tell her whether to term the employee

3      or not, or whatever.

4 Q.  So the information provided by the employer --

5 A.  Uh-huh.

6 Q.  -- with respect to enrollment, --

7 A.  Yeah.

8 Q.  -- that would be stored somewhere at BeneFirst?

9 A.  Yeah.  I think she had those scanned too, she

10     was scanning enrollment forms too.

11 Q.  So all the enrollment forms would have been

12     scanned into?

13 A.  The F drive.

14 Q.  Into the F drive?

15 A.  Yeah.

16 Q.  And do you know what happened to the hard copies

17     of those documents once they were scanned?

18 A.  I don't.  She would put them in a box and then I

19     don't know what happened to them after that.  I

20     don't know if they took then off site for

21     storage, I don't know.

22 Q.  During the claims processing process did you

23     keep notes?

24 A.  Like for each account or whatever?  How to

18 (Pages 66 to 69)

1    process a claim and stuff?

2 Q.  **You tell me.**

3 A.   Yeah, I would keep, like, because I knew that

4      the fee schedules weren't right, so I had a

5      little list of the CPT codes most commonly used

6      and the correct fee schedules to make sure if it

7      came up wrong I would manually change it and

8      make sure it was paying right.

9 Q.  **Were these personal notes?**

10 A.   Yeah. Just my personal. I just jotted down on

11      a sticky, whatever.

12 Q.  **Now, forgive me for my ignorance with these**

13      **processing software and computer systems, but**

14      **was there also a place in the RIMS system for**

15      **you to keep notes with respect to claims?**

16 A.   For -- yeah, for individual people. We'd

17      go into that, we put in their social and their,

18      you know, file would come up and we can put

19      notes in there.

20 Q.  **I believe a little earlier you testified that**

21      **there would be certain circumstances where you**

22      **would be instructed by people at Aubochon to pay**

23      **claims that may not otherwise have been paid?**

24 A.   Uh-huh.

1 Q.  **Would that instruction have been noted on the**

2      **system?**

3 A.   Usually. I usually like to do it. I can't

4      swear for the other girls if they did or not,

5      but I usually did. Yeah.

6 Q.  **If you didn't note it, why wouldn't you note it?**

7 A.   Just forgot to or they, or if the other girl

8      didn't, you know. I don't know, I couldn't say.

9      But, you know. If it was a verbal and I didn't

10      have the backup with the claim I would always

11      note the screen.

12 Q.  **Okay. So when you did receive documentation --**

13 A.   Uh-huh.

14 Q.  **-- what would you do with those documents?**

15 A.   I would keep it with the claim, usually. So

16      like --

17 Q.  **And that would be scanned to the F drive as**

18      **well?**

19 A.   Yes. Yes.

20 Q.  **I believe you testified that you didn't actually**

21      **do the plan build for the Aubochon plan?**

22 A.   Yeah, that's correct.

23 Q.  **Was there a way that BeneFirst would check the**

24      **accuracy of the plan build out?**

1 A.   Yeah, I would. Like I would, if I had time, if

2      I wasn't building new accounts I would go

3      through the existing accounts and just kind of

4      go through them and make sure they were -- if

5      there was, like, a particularly problem account

6      where the girls were saying "this is always

7      paying wrong" I would go in and fix it and see

8      what I could do. And when I wasn't, you know,

9      doing that then I would just go through and do

10      my own little audit to go through the existing

11      ones and make sure, that weren't built by me

12      already, and just make sure that it was set up

13      the way it should be set up.

14 Q.  **Was this part of your job duty?**

15 A.   Yeah.

16 Q.  **Now, you mentioned there were certain problem**

17      **accounts, was Aubochon a problem account?**

18 A.   No. I wouldn't say so. And by problem account

19      I only mean like somebody else had set it up

20      and, you know, we found out it keeps paying this

21      code wrong and I would have to go in and after I

22      learned how to do it, "well, I can fix it like

23      this" or whatever.

24 Q.  **Is it true to say that the accuracy of claims**

1      **processing would depend on whether the plan was**

2      **built correctly?**

3 A.   Oh, yeah. That's a good part of it. Not 100

4      percent of it, but that's a good part of it,

5      yeah.

6 Q.  **So if there was an error in the original plan**

7      **build and you didn't catch it --**

8 A.   Yeah.

9 Q.  **-- then the claims processing could be erroneous**

10      **as well, couldn't it?**

11 A.   Yeah, it could be. Yeah.

12 Q.  **Did you only check for plan build errors in the**

13      **plans that you were dealing with?**

14 A.   No. If -- when I was the plan builder, no, I

15      checked, I checked -- I had a list of all of our

16      clients and I would just go through, "this one

17      hasn't been checked in a while, I'll check this

18      one."

19 Q.  **So do I understand correctly that you would only**

20      **do these plan build audits while you were in the**

21      **plan building position?**

22 A.   Yes.

23 Q.  **Okay. So while you were just a claims**

24      **examiner -- forgive me, I shouldn't say just a**

19 (Pages 70 to 73)

Page 74

1  claims examiner.

2 A.  Don't worry about it.

3 Q.  **When you were a claims examiner did you conduct**

4  **any of these plan build audits?**

5 A.  No, I didn't have time.  Only if there was,

6  like, I would -- if there was a specific benefit

7  that was paying wrong and they're like, the

8  girls would come over and say, "Kathy is

9  stumped, can you fix this for me."  Yeah, I

10  would fix a problem.  But I wouldn't go in and

11  audit, no.  Because I just didn't have the time.

12 Q.  **I believe you had testified earlier that the**

13  **Aubochon plan build out had lots of mistakes; is**

14  **that correct?**

15 A.  No.  It didn't have lots of mistakes, no.  But

16  there were some things I found when I became a

17  plan builder that weren't paying right, or I had

18  to tweak this or that.  I had to go -- it wasn't

19  the actual plan built, it was, it was the CBX

20  table that was tied with the plan.  And you can

21  only, you can only, like, if a benefit had an

22  age limit, it wasn't in the actual, like, coding

23  that you could fix that with the CBX table.

24  When I first got there the CBX table, they were

Page 75

1  only using one or two CBX tables for however

2  many accounts, 20 something.  When each account

3  had different age limits and you needed a

4  different CBX table to accommodate the age

5  limit.  So I would say, "we're using this one

6  CBX table that has one set of ages on it when

7  each plan is different, so they should have

8  different CBXs."  So I would have to go in and

9  build all of these new CBX tables to make sure

10  that each plan was paying it the way it should.

11  That was a problem I found when I became plan

12  builder and, you know.  So I just, well....

13 Q.  **And again I apologize for my ignorance, can you**

14  **explain what a CBX table is.**

15 A.  I'll try.  I can't remember really.  But it's,

16  it's all -- the procedure codes and diagnosis --

17  I forget what they're called.  I may sound like

18  an idiot now.

19 Q.  **Do the best you can.**

20 A.  The CBX tables were, like, driven by diagnosis,

21  I want to say.  Like, if it was an organ

22  transplant benefit and that was the diagnosis it

23  would go to a set of codes for, instead of

24  regular office visit it would go towards the

Page 76

1  transplant office visit, so it would go towards

2  the max, if they had a dollar max on there.  And

3  the CBX table would pick up that code instead of

4  the regular office code, because of the diag.

5  We had like -- for infertility there were a

6  bunch of diag codes for infertility.  I'm not

7  really explaining this very well.  But it, it,

8  but mostly the biggest difference in the claims

9  processing being, like, wrong would be because

10  it would, the code would go to the wrong

11  age -- the wrong age group will be down there.

12  You only get five visits between age one and

13  two, whatever.  And one plan might have five

14  between one and seven and you can only put one

15  age, in the CBX table you can only put the one

16  age range in there.  So if it had a different

17  age range you had to have a whole other CBX

18  table because you can't just change -- if you

19  change it for one, you change it for all.

20 Q.  **Would it be safe to say that the CBX table would**

21  **be specific to a plan?**

22 A.  It can be.  It didn't necessarily have to be,

23  though.  If they all had the same age ranges you

24  could use the same CBX table for two or three

Page 77

1  different groups.  If they had the same ages in

2  there.

3 Q.  **Do you remember if there were issues with the**

4  **Aubochon CBX table?**

5 A.  I don't recall specifically.  But -- I don't

6  have any of my old Excel -- I had, like, a whole

7  spreadsheet of each client and each CBX table,

8  it was, you know, linked with.  So I had -- I

9  don't have it anymore, but.  Otherwise I could

10  explain it a little better for you.

11 Q.  **You're doing fine.  I believe you used the term**

12  **that Aubochon would instruct at certain times to**

13  **pay outside the loss fund?**

14 A.  Uh-huh.

15 Q.  **Can you explain to me what that means?**

16 A.  It means instead of like the claim, like if the

17  specific patient hit their specific deductible

18  that claim would not be counted.  The claim that

19  got paid outside the loss fund would not be

20  counted in that max or that specific maximum

21  that they would hit.  Like, they have a specific

22  deductible of, you know, X amount of dollars and

23  if Aubochon or whatever client paid out that

24  much amount then I guess the reinsurance

20 (Pages 74 to 77)

1  carriers would pay the rest, but any claims that
2  were paid outside of the loss fund didn't count
3  towards that max, towards that specific
4  deductible.
5 Q.  You said this would be reflected in certain
6    reports but not reflected in other reports.  Do
7    you happen to know which reports that would be
8    reflected in?
9 A.  I have no idea.  I have no idea.
10 Q.  During the time you were at BeneFirst do you
11    recall there being an issue with respect to
12    Aubochon anticipating an aggregate reimbursement
13    in a certain amount and then not receiving it?
14 A.  Yes.
15 Q.  What do you recall about that?
16 A.  I recall -- I don't remember, like, the specific
17    numbers.  But they were supposed to get -- a
18    report was ran, and I don't know who ran it, but
19    I want to say Paul Sullivan.  And instead of
20    bringing it to the reinsurance girl who handled
21    that, Donna Ryan, and saying, "is this the right
22    figure for the aggregate reimbursement" or
23    whatever, he just brought it to Aubochon.  This
24    is what I believe, I don't know if it's the

1  truth.  This I believe is what happened.  He
2  brought them the figure without checking it with
3  Donna first.  And so they thought they were
4  getting this X amount and after Donna looked at
5  the report and said, "no, you have to take this
6  out and this out and blah, blah, blah and this
7  is actually the figure."  And that's when the
8  shit hit the fan.
9 Q.  Were you involved with any meetings --
10 A.  No, --
11 Q.  -- in connection with this issue?
12 A.  -- I was not.
13 Q.  Any conference calls?
14 A.  I don't think so.
15 Q.  What's your overall impression of BeneFirst as a
16    third-party administrator?
17 A.  I don't know.  We did the best we could, I
18    guess.
19 Q.  Did you find them to be organized?
20 A.  I would say on a scale of 1 to 10, about a 6 or
21    a 7.
22 Q.  Did you find that other BeneFirst employees were
23    knowledgeable?
24 A.  Yes, some of them were, yeah.  Yeah.  Donna was.

1  And Linda, she knew her stuff.  Some of the
2  claims processors, I don't know.  They just kind
3  of earned a paycheck, I think.  You know.
4 Q.  Do you remember any claims processor
5    specifically that you thought were
6    knowledgeable?
7 A.  That I thought were knowledgeable?
8 Q.  Were not.
9 A.  Were not?  No.  Because they all had their
10    certain amount of experience.  I don't want to
11    say that.  I mean, they all had prior claims
12    processing experience, to my knowledge, anyway,
13    so.  I mean, some were more conscientious than
14    others.  Some would really look at the fees to
15    make sure; some would just let them fly, you
16    know.
17 Q.  Now, we spoke about the internal audits that
18    Kathy Gatanti did.
19 A.  Uh-huh.
20 Q.  And there was that, I believe you said there was
21    one audit done on behalf of a stop loss insurer?
22 A.  Uh-huh.
23 Q.  Do you recall any other examples of BeneFirst
24    ensuring that the claims processing was being

1  done accurately?  Strike that.  That was a bad
2    question.
3       Who or what ensured that claims were being
4    processed correctly at BeneFirst?
5 A.  I assume Paul and his wife.  That's the only
6    thing I can think of.  Or, like, if we took our
7    customer service call and, you know, we got a
8    lot of complaints about one, one issue they were
9    having, or, I'm trying to think if a deductible
10    was set up wrong, we were getting a bunch of
11    calls, people saying, "we met our deductible,
12    why is it taking it again?"  That might be a
13    system flaw.  And I might go in, fix that on the
14    plan building side and then we would do, like,
15    an audit of the claims for that group and just,
16    you know, go, do a deductible report and go
17    through and make sure we didn't take two
18    deductibles or whatever.  And repay any claims
19    we made an error on.  Something like that would
20    come to our attention.
21 Q.  Was there a systematic process for checking
22    yourselves?
23 A.  Ourselves?  Not really, no.  I don't think so.
24 Q.  Was there anyone responsible for quality

21 (Pages 78 to 81)

Page 82

1  control, for lack of a better term?

2 A.  I would assume the manager, Paul, yeah.

3 Q.  **How involved was Aubochon with the processing of**

4  **claims?**

5 A.  Well, they would get their check edit and look

6  them over, I guess, you know, just to see, maybe

7  they knew of an employee who had a lot of, you

8  know, stuff done and maybe they would look at

9  their claims. I don't know. I'm assuming. I

10  don't know.

11 Q.  **But on a day-to-day basis, Aubochon wasn't**

12  **processing claims or making any decision?**

13 A.  No, no, not unless we asked them or if they got

14  a complaint from an employee who claimed they

15  didn't get paid or something, whatever. Yeah.

16 Q.  **Did you ever discuss any claims processing**

17  **errors with anyone at Aubochon?**

18 A.  I don't believe so. I don't remember any. I

19  don't really remember any.

20 Q.  **Were you involved in any way with the drafting**

21  **or revising of Aubochon plan documents?**

22 A.  No.

23 Q.  **Actually, let me, I have an e-mail that was**

24  **produced by BeneFirst and we can mark it.**

Page 83

1        (Deposition Exhibit 1 marked for

2    identification.)

3 Q.  **Take a minute, take a look at it. I just have a**

4  **couple of questions for you.**

5 A.  (Witness reviewing.)

6 Q.  **Do you remember the context -- well, strike**

7  **that.**

8        **Do you remember sending this e-mail?**

9 A.  No.

10 Q.  **Do you remember what the context of this e-mail**

11  **was? In other words, can you just explain to me**

12  **what the e-mail is regarding?**

13 A.  It looks like, let's see, July 2nd, I know their

14  renewals were in July so this must have been up

15  for renewal. And when clients come up for

16  renewal I kind of look over the SOB and if we

17  had any issues like any interpretation issues

18  with the benefits, you know, I would bring them

19  up at renewal just to say, "do you want to

20  clarify this in an SOB, just so it's clear."

21  This routine thing, this routine thing, yeah, I

22  didn't know if they wanted to include the actual

23  labs in that max or was that just the opposite.

24  I would ask clients things like that. And say

Page 84

1  they should probably clarify it in an SOB so

2  it's clear to me and the patient so they know.

3 Q.  **So when you would give these suggestions --**

4 A.  Uh-huh.

5 Q.  **-- would the client then change the SOB to**

6  **reflect these changes?**

7        MR. ROSENBERG:  Objection.

8 A.  Sometimes if they wanted them, yeah. Or they

9  would tell me, "no, leave it the way it is," or

10  whatever. But, yeah, this brings up other

11  things. They didn't have, like, an other,

12  covered miscellaneous. They didn't have that on

13  the SOB and how we were supposed to pay that,

14  things like wigs and chemo and all of that.

15  Because I know the exclusions in a lot of the

16  plan documents said if it's not listed as

17  covered it's not covered. So I wanted to

18  clarify that. You know, if it's not

19  listed -- if it's covered then it's not covered

20  then I'm going to make the system deny it, so

21  can we please clarify that. It would say it

22  would cover wigs and stuff but under the SOB it

23  didn't say how it should pay. So I would say,

24  "you should have one that is miscellaneous."

Page 85

1 Q.  **Do you recall whether Aubochon made any of these**

2  **changes?**

3 A.  I have no idea. I don't remember.

4 Q.  **So in effect these suggestions were a way for**

5  **you to suggest ways to make the plan --**

6        MR. ROSENBERG:  Objection.

7 Q.  **-- stronger?**

8 A.  No. They were ways to clarify the benefits so I

9  could build it properly.

10 Q.  **Can you explain that.**

11 A.  Because if, if somebody came in, you know, got a

12  wig and sent it in for reimbursement, if it

13  didn't say how to pay that how would I know how

14  to set the plan up to process it correctly. I

15  needed something in the plan document that said

16  how to pay the miscellaneous other covered

17  charges.

18 Q.  **So given that these specific issues that are**

19  **raised in this e-mail, for example, were not**

20  **included in the plan, --**

21 A.  Uh-huh.

22 Q.  **-- at least at the time you wrote this**

23  **e-mail, --**

24 A.  Yeah.

22 (Pages 82 to 85)

1 A. Not specifically. But I want to say it was in
2    the area of $8,000.
3 Q. Do you recall any attempts to collect the
4    overpayments?
5 A. As a result of that audit, no. Because we, they
6    weren't our client anymore, so we couldn't do
7    anything about it. Before that? If we found a
8    claim that we did overpay or if I found I
9    overpaid a claim, yeah, we would send a refund
10   request to the providers to get the money back,
11   yeah.
12 Q. That actually goes to my next question. So how
13   would you do it, you would send a refund
14   request?
15 A. Yes, a letter to the provider. And say, give
16   them the reason, like it should have gone to the
17   deductible or it wasn't a covered benefit or
18   whatever. Whatever the case was.
19 Q. Did they usually return the money?
20 A. Some did. Some didn't.
21 Q. So not every overpayment would be collected?
22 A. No. No. You know, even after third and fourth
23   requests, no, not every one, no.
24 Q. About what percentage weren't refunded?

1 A. I don't know.
2       MR. ROSENBERG: Objection.
3 A. I don't know. Because it wasn't just me doing
4    them, so I honestly don't know.
5 Q. A little earlier you testified that occasionally
6    you would have to tell the girls, and I imagine
7    you're talking about the other claims
8    examiners, --
9 A. Yes.
10 Q. -- to check that they were paying claims right.
11   Would that be with respect to Aubochon, as well?
12 A. Well, they would be included in it, yeah.
13 Q. Okay.
14 A. If -- yeah, when Jessica processes them. You
15   know, I give the claims examiners, like, little,
16   you know, not cheat sheets, just things to look
17   for when you're processing claims, make sure you
18   check this or that or whatever. But not
19   specifically. I wouldn't specifically go and
20   say, "are you processing Aubochon correctly?"
21   Just every account. Every client.
22 Q. How often would you have to go and check for
23   these errors?
24 A. Well, I wouldn't check for them. I didn't check

1    for errors. I would give them helpful hints on
2    how to process the claims correctly and make
3    sure you're doing this and this. I wouldn't
4    specifically go, "I went through your claims
5    yesterday and you paid this wrong," but, no,
6    that wasn't my job.
7 Q. Did you do these -- strike that.
8       Did you help these claims examiners in the
9    way that you just described because you thought
10   that they were making mistakes?
11 A. Yeah. Yeah.
12 Q. You stated a little earlier that you, I believe
13   the word you used was hated Paul Gatanti?
14 A. Uh-huh.
15 Q. I have to ask why.
16 A. Because he's an arrogant, arrogant bastard. I
17   hated him.
18 Q. Is this based on experiences from working with
19   him?
20 A. From working with him.
21 Q. Could you explain.
22 A. Well, when he came in to be the manager, when
23   Charlie hired him, he got rid of a lot of people
24   that existed there that worked there and brought

1    in his own people. He brought in two for
2    customer service. He brought in, let's see,
3    like, five more claims examiners that were all
4    his friends that he all worked with before.
5    And, you know, got rid of two claims examiners
6    and brought in his own plan builder. I mean,
7    without even seeing -- he did it right off the
8    bat. He didn't even give the other existing
9    people a chance. He just brought in his people
10   and just said, "we're going to use my people."
11 Q. What was your opinion of him as a person in the
12   claims processing industry?
13       MR. KILLMAN: Objection.
14 Q. That was a horrible question. It was really
15   bad.
16       Let me try to rephrase it. What position
17   did Mr. Gatanti have at BeneFirst?
18 A. He was the claims manager.
19 Q. Okay. In your opinion do you believe that he
20   was competent at his job?
21       MR. ROSENBERG: Objection.
22 A. Yeah.
23 Q. Did Kathy Gatanti work at BeneFirst?
24 A. She worked from home. She did hers from home.

24 (Pages 90 to 93)

Page 94

1    There was remote access into RIMS so she did it
2    from home.
3 Q.  If you know was she an employee?
4 A.  Part-time.
5 Q.  Do you know in what capacity?
6 A.  What do you mean?
7 Q.  What was her title?
8 A.  Auditor.
9 Q.  Back to the payment of the claims out of the
10    fund.
11 A.  Uh-huh.
12 Q.  You said you had hired -- strike that.
13      You stated that BeneFirst retained a third
14    party to, --
15 A.  I believe so.
16 Q.  -- to cut the checks?
17 A.  I believe so, yeah.
18 Q.  Did Aubochon know about this third party?
19 A.  I have no idea.  I assume they did.  I mean, I
20    don't know.
21 Q.  We're almost done.  Well, I am.
22      Forgive me, you may have already covered
23    this.  You stated that, instances where there
24    would be instruction to pay outside the loss

Page 95

1    fund there would be a certain exception code
2    entered into the system?
3 A.  Yeah.  Uh-huh.
4 Q.  Would that be reflected in the system somewhere?
5 A.  Yeah.  Like, if you -- like, if you went to look
6    that claim up in RIMS I believe when you, when
7    you actually looked into the actual lines of the
8    claims after it processed, the exception code
9    would cause it to use the procedure code of,
10    like, whatever I created, EXCM, or whatever the
11    code was, that let you know that was outside of
12    the loss fund.  It wasn't a regular code that I
13    built.  It was an easily recognizable exception
14    code that we could see.  Like, when we looked in
15    the claims we knew, "oh, that was paid outside
16    of the loss fund."
17 Q.  As a person who did audits internally for
18    BeneFirst -- well, strike that.
19      Is it safe to say you did do audits for
20    BeneFirst to a certain degree?
21      MR. ROSENBERG:  Objection.
22 Q.  Let me say it a different way.  You stated a
23    little earlier that you would review claims
24    processing to assist other claims examiners; is

Page 96

1    that correct?
2 A.  What I did for the other claims examiners was if
3    I -- like, I didn't go in and specifically -- I
4    personally didn't go in and specifically audit
5    the claims processors and what they did, but I
6    would come across claims, like if I get a phone
7    call and have to look in somebody's file, or
8    customer service and whatever and I would see
9    something was paid wrong.  If I got a lot of
10    calls where I would go into the claims and say,
11    "Jessica processed this, it was wrong."
12    So-and-so processed it, it was wrong."  I would
13    see the pattern, I would see where they were
14    making mistakes and I would go over to them and
15    say, "you're doing this wrong, you need to do it
16    this way," or whatever.  But I wouldn't, like,
17    go and grab their stack and physically audit it.
18    I wasn't out to, like, audit.  I would just see
19    mistakes and I would try to help them and say,
20    "you need to be doing this because you're doing
21    it wrong."
22 Q.  I understand.  Were you involved with any
23    meetings regarding Aubochon's termination of
24    BeneFirst as a third-party administrator?

Page 97

1 A.  Meetings like formally?  No, I don't think so.
2    I think they just told us Aubochon is terming,
3    or whatever, you know, as a claims examiner.
4    They would need to let us know so that
5    enrollment can go in and term people.  But I
6    wasn't in on any formal meetings, I don't
7    believe.
8 Q.  What was your understanding as to the reason of
9    the termination?
10 A.  Because they were upset about the money.  That's
11    what I was led to understand, was because of
12    that whole aggregate thing.  They thought they
13    were getting this money and then they weren't
14    and they got all suspicious and they termed.
15    And I believe it was off plan year, I believe
16    they termed in December or something.
17 Q.  That's everything I have.
18
19      EXAMINATION
20
21 BY MR. ROSENBERG:
22 Q.  I have a few more questions for you.
23 A.  Uh-huh.
24 Q.  When you're the claims examiner working on the

25 (Pages 94 to 97)

1  Aubochon accounts and you're processing claims,
2  the sources you're using are the plan document
3  and the computer build out; is that right?
4      MR. KILLMAN: Objection.
5 A. Uh-huh.
6 Q. And if you have any questions from referring to
7  those sources as to whether a particular claim
8  is covered, what do you do?
9 A. I would go to the service rep and ask them to
10  get it clarified. And if they couldn't or
11  whatever I would sometimes just ask the client
12  directly. It depends on the situation. But
13  usually I would go through the service people
14  and say, "this needs to be addressed. I don't
15  know how to, I don't know how to build this to
16  pay the right way. I don't know how this should
17  be paid, would you please clarify."
18 Q. Is this what you did on the Aubochon account
19  when you were examining?
20 A. Yeah, I guess.
21 Q. And your process for doing that, for asking the
22  service rep, you were expecting them to go to
23  Aubochon?
24 A. Yes.

---

Page 99

1 Q. And sometimes you would get the answer yourself
2  directly from Aubochon?
3 A. Yeah. Yeah.
4 Q. If you had a question would you just decide
5  yourself without checking with Aubochon?
6 A. Well, it would depend on the question.
7 Q. I guess if you have, if you can't tell from the
8  plan document what it's supposed to cover would
9  you decide yourself or would you ask Aubochon?
10 A. Oh, I would ask if I didn't know, or at the very
11  least I would set it up to deny. At the worse
12  case scenario they could come back and say, "no,
13  that's supposed to pay." I would error on the
14  side of building it to deny rather than pay.
15 Q. If you did that who would come back and tell you
16  it's supposed to cover that?
17 A. It would either be Aubochon or if Aubochon
18  asked, like, Paul or Maureen to tell me, they
19  would say something to them and they would tell
20  me or they would tell me directly.
21 Q. But the information would come back from
22  Aubochon --
23 A. Yeah.
24 Q. -- that you're supposed to cover this?

---

1 A. Usually, yeah.
2      MR. KILLMAN: Objection.
3 Q. Now, you spoke on a regular basis with Sara
4  Orell and Kim McMahon?
5 A. Yeah, pretty much. Yeah.
6 Q. Did you ask them whether the plan should cover
7  or not cover things you had questions about?
8 A. Sometimes I think I did, yeah. Yeah. Like, you
9  know, these types of questions, like, are the
10  labs supposed to be covered in the dollar max
11  for the physical and whatever.
12 Q. Just to be clear, you're referring to what's
13  been marked as Exhibit 1 to Maureen Fitzgerald.
14  So this e-mail to Maureen Fitzgerald, is this an
15  example of you asking for clarification from
16  Aubochon as to what they want to cover?
17 A. Yeah.
18      MR. KILLMAN: Objection.
19 Q. And by this e-mail are you asking for them to
20  change the documents to make clear to you what
21  Aubochon wants to cover?
22 A. Yes.
23 Q. Okay. To clarify the things that were uncertain
24  in their plan?

---

Page 101

1 A. Yeah. Yeah.
2 Q. Okay. I noticed in the first bullet point you
3  wrote, "I know I spoke to Kim McMahon before and
4  she told me that she wanted the labs and x-rays
5  to go towards that max, but we just need the SOB
6  to clearly state this"?
7 A. Yeah. So it would be in writing. I wanted
8  something in writing, you know.
9 Q. You wanted something in writing from Aubochon
10  that --
11 A. Yeah.
12 Q. -- they wanted to cover this?
13 A. Yeah.
14 Q. Why did you want that in writing?
15 A. So it wouldn't come back to bite me in the bum.
16  You know, I wanted to make sure it was paid
17  right. I want to, you know, and if it didn't
18  say it in the plan document, if it just said the
19  exam -- I just wanted it to be extra clear. I
20  wanted it to be clear to me and I wanted it to
21  be clear to their employees, you know.
22 Q. The Aubochon employees?
23 A. The Aubochon employees. So if I maxed
24  everything out at 225 and they said, "why did

26 (Pages 98 to 101)

1  you deny all of my labs?"  Well, it doesn't say
2  that in the SOB, I want clarification, I want it
3  in writing.
4 Q.  So you wanted clarification from Aubochon about
5  what they wanted you to do?
6 A.  Yeah.  Yeah.
7 Q.  And that's why you were making that request?
8      MR. KILLMAN:  Objection.
9 A.  Yes.
10 Q.  In the third bullet point you stated, "also, I
11  know they wanted to cover Depo-Provera shots
12  given at a doctor's office.  They might want to
13  put that on the SOB just so it's clear.  (But
14  they might not)"  Why were you forwarding that
15  information?
16 A.  Because a lot of people call us and say, "is the
17  Depo covered" and it's not addressed.
18 Q.  So it's not addressed in the plan itself?
19 A.  Yeah.
20 Q.  So you wanted Aubochon to answer that question?
21 A.  Yes.
22 Q.  So that you would know what Aubochon wanted you
23  to tell these people?
24 A.  Yeah.

Page 103

1 Q.  We were talking at different points about what
2  would happen with claims that employees
3  complained about or were denied.  And I believe
4  you had explained, and correct me if I'm wrong,
5  if a claim is denied and someone calls in
6  complaining you would refer them to the plan
7  terms?
8 A.  Uh-huh.
9 Q.  And then if they still had a complaint refer
10  them to Aubochon?
11 A.  Yes.
12 Q.  And then what would happen from there on a
13  typical example with the Aubochon account?
14 A.  Either nothing, either -- I don't know, they
15  would tell them "tough" or if they wanted to pay
16  it they would call me.  Or sometimes even if
17  they didn't they would just call me to let me
18  know, "no, it's not, we're not going to cover
19  it, we're not going to pay it."
20 Q.  Who is the "they"?
21 A.  Kim or Sarah.
22 Q.  At Aubochon?
23 A.  Yeah.
24 Q.  Now, were there ever -- when you were the claims

1  examiner were there ever instances in which a
2  claim was covered but someone called up
3  complaining for some reason it wasn't covered
4  enough, or it was late in being paid or anything
5  of that nature?
6 A.  They might have.  You know, just, if it was only
7  covered at like 90 percent they would call up
8  and complain.  But that's your benefit, it's
9  only 90 percent.
10 Q.  Were there ever instances of hospitals or
11  providers complaining about whether they had
12  been paid or not?
13 A.  For Aubochon?  Not that I can remember, no.
14  They were always very good on their funding.
15 Q.  Okay.  We talked about how, I believe, it was
16  the UB40, but some of the claims -- no, the
17  HCFAs -- some of the claims could be submitted
18  electronically on the Aubochon account?
19 A.  Yeah.
20 Q.  What would you print out, or would you print out
21  any documents related to that or would it simply
22  be maintained electronically?
23 A.  No, it was all in the computer already, so we
24  would go through the electronic, or the claims

Page 105

1  processing.  Like, you would go in through,
2  like, a different screen than you would a manual
3  claim.  You would start at a different screen.
4 Q.  But it would all take place electronically in
5  the computer?
6 A.  Yeah.
7 Q.  At the time that you were doing that was that
8  computer system operating on the RIMS network?
9 A.  Yeah.
10 Q.  Okay.  When you were the claims examiner and
11  you're handling claims for Aubochon was it your
12  experience that the plan build out matched up to
13  the Aubochon written plan document that you had?
14 A.  For the most part, yeah.  I don't recall any,
15  like, huge issues that it was originally built
16  wrong, really.  It might have been -- it was
17  probably a few things that might have been
18  wrong, but I don't remember anything
19  catastrophic.
20 Q.  Do you remember any specific examples?
21 A.  No.
22 Q.  Did any of the other examiners handling the
23  Aubochon account bring any specific examples to
24  your attention?

27 (Pages 102 to 105)

Page 106

1 A. Not that I can remember.

2 Q. If you were examining a claim for Aubochon and

3     you found a discrepancy between the plan build

4     out and the plan document, what would you do?

5 A. If -- I could fix it if I was already the, knew

6     how to plan build I would try to fix it myself

7     so future claims would pay right or I would give

8     it to Kathy O'Brien to fix it if it was paying

9     wrong.

10 Q. With regard to the particular claim that was in

11     front of you at that time, and you saw that

12     under the plan document itself it was

13     covered, --

14 A. Uh-huh.

15 Q. -- could you arrange for it to be paid?

16 A. Sometime, yes. Yeah. I could sometimes

17     manipulate the system to pay it the way I wanted

18     it to be paid, yeah.

19 Q. And the way you wanted it to be paid was what

20     was written in the Aubochon plan document?

21     MR. KILLMAN: Objection.

22 A. Yes.

23 Q. You talked about eligibility, and a separate

24     eligibility department, --

Page 107

1 A. Uh-huh.

2 Q. -- and you mentioned eligibility was based on

3     what they told the eligibility person at

4     BeneFirst?

5 A. Uh-huh.

6 Q. Who is "they"?

7 A. Aubochon, the client. Whoever. The client.

8 Q. So the client is the source of the

9     information --

10 A. Yeah.

11 Q. -- for eligibility?

12 A. For eligibility, yeah.

13 Q. Is that how accounts were handled?

14 A. Yep.

15 Q. You talked about the level of organization at

16     BeneFirst, you put it at a 6 or 7; is that

17     right?

18 A. Yeah, about.

19 Q. Have you worked for any other third-party

20     administrators?

21 A. Yes, Group Insurance.

22 Q. And how would you rate their level of

23     organization?

24 A. Pretty organized, actually. Like a 9.

Page 108

1 Q. Okay. And you talked about varying quality of

2     Aubochon examiners, I mean, of the examiners of

3     BeneFirst; is that fair to say?

4 A. Yes.

5 Q. Is it your experience that in the workplace

6     there are always some employees who are better

7     than others?

8     MR. KILLMAN: Objection.

9 A. Oh, yeah.

10 Q. And that was true at BeneFirst as well?

11 A. Uh-huh.

12 Q. And with regard to the examiners assigned to the

13     Aubochon account, how would you characterize the

14     quality of their work?

15 A. All right. Because it was me and I'm excellent.

16     So, I mean, my quality was just superb.

17 Q. Let's stop there for a second. Now that you

18     mention it, you had mentioned that the, was it

19     Kathy Gatanti, when she would do these testing

20     audits --

21 A. Yes.

22 Q. -- for the claims manager you would score 99

23     percent of 100 percent; correct?

24 A. Yeah.

Page 109

1 Q. Do you know what scores were received by the

2     other examiners assigned to the Aubochon

3     account?

4 A. No. I -- well, like I, I had seen them, I don't

5     think I was supposed to see them. But

6     maybe -- I don't know. Girls talk. But, yes,

7     some of them scored lower. Jessica, I know she

8     scored, you know, not 100 percent, but she

9     wasn't horrible either. She was always like 95

10     percent or whatever. I mean, she wasn't, like,

11     horrible or anything. But not as good as me,

12     though.

13 Q. So you would actually, given your scores, when

14     you talked about helping to train other

15     examiners or giving them information on how to

16     fix things, you were basically pointing out

17     things to them that you saw in the operations

18     that they could just do a better job with?

19 A. Yeah. Yeah.

20 Q. These were things that, would it be fair to

21     describe them as things as you process claims

22     areas of expertise you develop?

23     MR. KILLMAN: Objection.

24 A. Not that I develop, no. Just, just remembering

28 (Pages 106 to 109)

1 to do certain things. Like, they know the fee
2 schedule is not right, so I would notice they're
3 not using the right one, so I would say, "you've
4 just got to remember to do this."
5 Q. And were there any particular instances with
6 regard to the processing of Aubochon claims that
7 you did that for the other examiners?
8 A. Not -- I can't remember specifically. No. I
9 mean, there might have been, but I don't
10 remember specifically what they might have been.
11 Q. Okay. How frequently did you speak with Kim
12 McMahon or Sarah Orell?
13 A. I would say about maybe once a week or once
14 every two weeks. It depends.
15 Q. Did you ever speak to them about the claims
16 listed on the check edits they received?
17 A. Maybe. Like, if they would look over the check
18 edit and see, like, you know, somebody is paid
19 or didn't pay they might call me and just, they
20 might call and question it or ask about it, or
21 they might say, "is so-and-so going to be on
22 this check edit?" Not really too much. Not
23 about what was on the check edit really.
24 Q. What would they mostly call about? What

1 subjects would they most call about?
2 A. They mostly called if they got, you know, an
3 employee whose claim didn't get paid, they would
4 call and ask me to look it up, and say, "how did
5 you pay?" I would say, "I paid it this way
6 because," I said it or I would just explain it
7 to them if they had any questions. And then
8 they would make a determination on whether or
9 not they wanted us to pay them or reprocess it
10 or whatever. It usually was, you know, it was
11 usually them calling me about stuff like that.
12 Q. Okay.
13 A. It wasn't like I was calling them all the time
14 about little minutia, you know.
15 Q. And when they would call you and you discussed
16 how they wanted to process a particular claim,
17 what would you then do?
18 A. I would either pay it if they told me to pay it,
19 if they wanted me to pay it outside the loss
20 fund they would shoot me an e-mail telling me
21 that and I would do that.
22 Q. Would they tell you sometimes you should read
23 the plan to cover something?
24 A. No. They really didn't tell me that because

1 they knew that I knew it. So they would be
2 like, "oh, well," they might ask why I did it,
3 "well, because I'm reading it this way." Is
4 that -- and they would be like, "oh, okay." And
5 they might tell me that's fine or they might
6 say -- they usually took my word. Because I
7 always went by the plan document, I said, "it
8 reads this way and if, if you don't interpret it
9 that way you might want to clarify it. You
10 might want to, on your next renewal you might
11 want to clarify that a little better."
12 Q. And they would instruct you one way or the other
13 what to do with the claim?
14 A. Yeah.
15 Q. And then you would process it in whatever manner
16 they told you to do?
17 A. Yeah.
18 Q. Okay. In your conversations with them did they
19 ever complain about BeneFirst's processing of
20 Aubochon's claims?
21 A. I don't recall.
22 Q. And how long did you process claims for
23 Aubochon?
24 A. Oh, God. Again, maybe a year. I can't remember

1 when I became the plan builder. I don't
2 remember how long. I know I started when they
3 came on, it was, I believe they came on July of
4 '01 is when they signed on. I think that's when
5 they came on with us. And I know that Charlie
6 was like, "oh, you processed Aubochon over at
7 Group, so we're going to stick you on their
8 account." So I want to say a year. I don't
9 remember exactly when they made me plan build,
10 but I think it was a year later, ten months. I
11 don't know exactly.
12 Q. So it's fair to say, though, that during
13 whatever was the length of time you were
14 examining Aubochon claims, you were dealing with
15 Sarah Orell and Kim McMahon?
16 A. Yeah.
17 Q. You talked earlier about this question of, of
18 what deductibles were paid and whether they were
19 overpaid, underpaid, et cetera. Was there
20 deductible language in the Aubochon plan itself?
21 A. Yeah. Uh-huh.
22 Q. Was the -- do you recall what the deductible
23 language was?
24 A. No.

29 (Pages 110 to 113)

1 Q.  Do you recall if there was any question of how
2    to interpret that deductible language?
3 A.  No, I don't think there was any question about
4    it. It was pretty clear.
5 Q.  Did anyone raise with you any question of how
6    the deductible language should be applied?
7 A.  I don't remember. Maybe. I honestly don't
8    remember.
9 Q.  You mentioned seeking reimbursement at different
10   times on claims that were overpaid, --
11 A.  Uh-huh.
12 Q.  -- duplicate payments? Do you recall whether
13   you had to do that on the Aubochon account?
14 A.  Probably. Yeah.
15 Q.  Was this something that happened consistently to
16   at least some extent across accounts?
17 A.  Consistently?
18      MR. KILLMAN: Objection.
19 Q.  Strike that.
20      Is this -- are overpayments something that
21   just happen on all accounts?
22      MR. KILLMAN: Objection.
23 A.  Yeah. Yeah.
24 Q.  Was that your experience at GIC as well?

1 A.  Yes.
2      MR. ROSENBERG: Okay, now I'm done.
3
4          EXAMINATION
5
6 BY MR. KILLMAN:
7 Q.  I just have a couple. You had mentioned that
8    you processed Aubochon claims while you were at
9    Group Insurance; is that correct?
10 A.  Yes.
11 Q.  From your time at Group Insurance to your time
12   at BeneFirst did the Aubochon plan change?
13 A.  I don't remember.
14 Q.  Okay. Now, we touched upon this, and forgive
15   me, but do you recall what period of time you
16   were the plan builder --
17 A.  I don't.
18 Q.  -- at BeneFirst?
19 A.  I don't. I don't remember the exact year. I
20   don't. I honestly don't. I want to say maybe
21   sometime in 2002 I became plan builder. And
22   then I don't remember when Paul Gatanti started.
23   I mean, it's just so long ago, I don't remember.
24 Q.  But you're certain that once Mr. Gatanti started

1    you, your position as plan builder stopped?
2 A.  Yeah, once he hired Kathy O'Brien. It might
3    have been a week or two after he started. Yeah,
4    I don't know.
5 Q.  Now, a little earlier you talked about, around
6    2005, after the lawsuit had been filed --
7 A.  Uh-huh.
8 Q.  -- you had done some work reviewing claims for
9    overpayments; is that correct?
10 A.  For Aubochon, yeah.
11 Q.  Yes. Specifically for Aubochon; correct?
12 A.  Yes.
13 Q.  Now, at that time did any notices come out at
14   BeneFirst regarding this lawsuit?
15 A.  I don't remember any.
16 Q.  Okay. How were you made aware of this lawsuit?
17 A.  I think Charlie told me.
18 Q.  Were there any notices or memoranda circulated
19   around the office informing people to preserve
20   documentation?
21 A.  I don't remember any like that, no. I'm pretty
22   sure, no, but I could be wrong. But I don't
23   remember any, no.
24 Q.  I believe you testified just a little earlier

1    that you would sometimes seek clarification of
2    plan terms because it would be easier to
3    interpret the terms with these clarifications;
4    is that correct?
5 A.  Uh-huh. Uh-huh.
6 Q.  Now, would it be safe to say that even though
7    you have the plan there is still interpretation
8    that's required to process a claim?
9 A.  Yeah.
10 Q.  Not every scenario is addressed in the plan?
11 A.  Exactly. Yes.
12 Q.  That's all I have.
13
14          EXAMINATION
15
16 BY MR. ROSENBERG:
17 Q.  I have one final question.
18 A.  Back to you.
19 Q.  You said that -- you mentioned not every
20   scenario is addressed in a plan document itself?
21 A.  Yeah.
22 Q.  On the Aubochon account if a scenario comes in
23   that's not addressed in the plan document what
24   do you do?

30 (Pages 114 to 117)

Page 122

1  COMMONWEALTH OF MASSACHUSETTS)
2  SUFFOLK, ss.                )
3
4
5       I, Laurie Langer, Professional
   Reporter and Notary Public in and for the
6  Commonwealth of Massachusetts do hereby certify
   that there came before me on the 16th day of
7  May, 2008, at 10:30 o'clock a.m. the person
   hereinbefore named, who was by me duly sworn to
8  testify to the truth and nothing but the truth
   of her knowledge touching and concerning the
9  matters in controversy in this cause; that she
   was thereupon examined upon her oath, and that
10 examination reduced to typewriting under my
   direction; and that the deposition is a true
11 record of the testimony given by the witness.
12
13
        I further certify that I am neither
14 attorney or counsel for, nor related to or
   employed by, any of the parties to the action in
15 which this deposition is taken, and further that
   I am not a relative or employee of any attorney
16 or counsel employed by the parties hereto or
   financially interested in the action.
17
18      In witness whereof, I have hereunto
   set my hand and seal this 22nd day of May, 2008.
19
20
21
               NOTARY PUBLIC
22             Commission Expires
               9/13/09
23
24

Page 123

1  ERRATA SHEET DISTRIBUTION INFORMATION
2  DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS
3
4  ERRATA SHEET DISTRIBUTION INFORMATION
5      The original of the Errata Sheet has been
6  delivered to Mr. Rosenberg, Esquire.
7      When the Errata Sheet has been completed
8  by the deponent and signed, a copy thereof
9  should be delivered to each party of record.
10
11 INSTRUCTIONS TO DEPONENT
12 After reading this volume of your deposition,
13 please indicate any corrections or changes to
14 your testimony and the reasons therefor on the
15 Errata Sheet supplied to you and sign it.  DO
16 NOT make marks or notations on the transcript
17 volume itself.  Add additional sheets if
18 necessary.  Please refer to the above
19 instructions on the errata sheet distribution
20 information.
21
22
23
24

Page 124

1  ATTACH TO THE DEPOSITION OF CARRIE REDDIE
2  CASE: Aubochon v. BeneFirst  DATE TAKEN: 5/16/08
3       ERRATA SHEET
4  Please refer to page 123 for errata sheet
5  instructions and distribution instructions.
6  PAGE    LINE    CHANGE        REASON
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15      I have read the foregoing transcript
16 of my deposition and except for any corrections
17 or changes noted above, I hereby subscribe to
18 the transcript as an accurate record of the
19 statements made by me.
20
21      Executed this _____ day of_____, 2008
22
23      _____
           CARRIE REDDIE
24

32 (Pages 122 to 124)

**6**

{}

Page 1

1                                    VOLUME I

                                     PAGES 1-94

2                                    EXHIBITS 3

3

4

                    UNITED STATES DISTRICT COURT

5

                    DISTRICT OF MASSACHUSETTS

6

7

   W.E. AUBUCHON CO., INC.,              )

8  AUBUCHON DISTRIBUTION, IN,            )

   W.E. AUBUCHON CO., INC.               )

9  EMPLOYEE MEDICAL BENEFIT PLAN,        )   NO. 05-40159

   AND AUBUCHON DISTRIBUTION, INC.       )

10 EMPLOYEE MEDICAL BENEFIT PLAN,        )

        Plaintiffs                       )

11                                       )

   v.                                    )

12                                       )

   BENEFIRST, LLC,                       )

13      Defendants                       )

14

15

16            DEPOSITION OF CHARLES LORD, a deponent

17 in the above-entitled cause, taken before Tracy A.

18 Coffman, Notary Public in and for Commonwealth of

19 Massachusetts, pursuant to the Massachusetts Rules

20 of Civil Procedure, at the Law Offices of Bowditch &

21 Dewey, 175 Crossing Boulevard, Framingham,

22 Massachusetts, on Thursday, May 22, 2008, commencing

23 at 2:25 p.m.

24

Page 2

1 APPEARANCES
2
   Ryan T. Killman, Esquire
3  BOWDITCH & DEWEY
   311 Main Street
4  Worcester, MA 01615
   508-926-3497
5  Counsel on behalf of Plaintiff.
6
7 Eric L. Brodie, Esquire
   THE MCCORMACK FIRM, LLC
8  One International Place
   Boston, MA 02110
9  617-951-2929
   Counsel on behalf of Defendant.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1             INDEX
2
   EXAMINATION:      DIRECT CROSS REDIRECT
3
   By Mr. Brodie        4
4
5
6
7
8
9
10            EXHIBITS
11 No.       Description        Page
   No. 1 Multipage Document Bates AUB6742 - AUB6757 59
12 No. 2 Multipage Document Bates AUB115 - AUB136   62
   No. 3 Multipage Document Bates AUB462 - AUB481   67
13
14   * Exhibits were retained by Attorney Brodie *
15
16
17
18
19
20
21
22
23
24

Page 4

1         PROCEEDINGS
2
3        CHARLES LORD, first having been
4  duly identified and sworn on oath, testifies
5  as follows:
6
7    DIRECT EXAMINATION BY MR. BRODIE:
8 Q.  Good afternoon, Mr. Lord.
9 A.  Good afternoon.
10 Q.  My name is Eric Brodie, I represent
11    BeneFirst, Aubuchon verses BeneFirst, and
12    we'll go through all the Aubuchon entities.
13 A.  That's okay, I know who they are.
14       MR. KILLMAN:  Eric, before we get
15    started, do you want to agree upon the usual
16    stipulations?
17       MR. BRODIE:  Sure, for the record,
18    we're going to reserve all objections until
19    the time of trial, except objection as to the
20    form of the question, and with regard to
21    signature?
22       MR. KILLMAN:  30 days to read, and
23    review, and to sign, notary waived.  So you
24    just have to read the transcript within

Page 5

1  30 days of receipt.
2       THE WITNESS:  Yes, I can do that.
3  BY MR. BRODIE:
4 Q.  Just preliminarily, Mr. Lord, have you ever
5    had your deposition taken before?
6 A.  I have.
7 Q.  Well, presumably then, you've been instructed
8    with the ground rules?
9 A.  You can explain them, in case they're
10    different.
11 Q.  First of all, if I ask a question and you
12    don't understand it, by all means, let me
13    know, I am sure Ryan will let me know if I
14    ask a poorly worded question, and I'll be
15    happy to rephrase that.  The corollary to
16    that is, if you answer a question, I will
17    assume you understood it, fair enough?
18 A.  Fair enough.
19 Q.  Also, since everything is being taken down by
20    the stenographer, uh-huh or uh-uhs don't show
21    up very well, so I ask that your answer be
22    verbal, yes, or no, or whatever your answer
23    might be other than a grunt, fair enough?
24 A.  So done.

2 (Pages 2 to 5)

Page 42

1  read it, provides, starting at B, the plan
2  administrator, as agent of the plan sponsor
3  shall 4. Refer to the plan sponsor for
4  determination of A. Any claim or class of
5  claims the plan sponsor may specify B. Any
6  disputed claim C. Any claim involving any
7  question of eligibility or entitlement of the
8  claimant for coverage under the benefit plan
9  D. Any question with respect to the amount of
10 payment due or E. Any other question, have I
11 read paragraph 4 accurately?
12 A. Yes.
13 Q. Now we were talking before, with regard to,
14 you testified before, referenced before, to
15 confer with client in case of an ambiguity or
16 a question that arises under coverage of the
17 plan?
18     MR. KILLMAN: Objection.
19 Q. Is paragraph 4 here consistent with what your
20 understanding of how a TPA, like BeneFirst,
21 would interact with a plan sponsor, like W.E.
22 Aubuchon Company Inc. Or Aubuchon
23 Distribution Inc.?
24 A. I would say it's not the practical

Page 43

1  application of the document.
2  Q. How does that differ, I am going to ask you
3  to clarify that for me?
4  A. The practical application is that the plan
5  administrator obviously receives the claim,
6  and they make a determination as to whether
7  it's covered or uncovered, or whether there's
8  an amount issue in question here as to the
9  levels in the plan, all of that. They will
10 make a determination and they will inform the
11 employee of their determination. Basically,
12 the only time, in my experience, that the
13 plan sponsor gets involved is if the employee
14 takes some exception to their decision.
15 Then, normally speaking, the administrator
16 would come back to the plan sponsor and say,
17 employee X has taken an exception to our
18 interpretation of our contract, what do you
19 want to do about it.
20 Q. What is the next step after that gets
21 referred back to the plan sponsor?
22 A. Well, it gets referred back, either a direct
23 telephone conversation or e-mail, and they
24 say, here is the issue, what do you want to

Page 44

1  do about it, and the question is usually, do
2  we pay it or do we not. If we pay it, they
3  would say it would be paid outside the plan
4  as a matter of general business. All of
5  these issues in here don't come back to the
6  plan sponsor, they're normally just done by
7  the administrator.
8  Q. Am I correct that, for example, under 4C,
9  there's a reference here to the plan sponsor
10 for determination of, C. Any claim involving
11 any question of eligibility or entitlement of
12 the claimant for coverage under the benefit
13 plan. Now am I correct that typically, those
14 questions will be resolved by referring to
15 the plan documents?
16     MR. KILLMAN: Objection.
17 A. In theory, that decision, with respect to the
18 plan document, has already been made by the
19 administrator before it ever gets back, is
20 ever referred back, they make that decision
21 up front.
22 Q. By they?
23 A. The administrator, they make a decision as to
24 whether or not they believe the plan document

Page 45

1  covers the claim, and if the amount of
2  coverage is sufficient for the claim.
3  Q. And to add to that also whether or not the
4  person is even entitled to the coverage in
5  the first place, eligibility issues?
6      MR. KILLMAN: Objection.
7  A. It is practical matter. Again, eligibility
8  issues are usually clear enough. There are
9  rarely any eligibility questions that come
10 back to the plan sponsor, those are done by
11 the administrator. I can only think of one
12 or two, over all the years I've known about
13 one where there is an eligibility question,
14 that the sponsor takes any responsibility
15 for.
16     MR. KILLMAN: I just want to be
17 sure we're on the same page, when you make
18 reference to an administrator, who are we
19 making reference to?
20     THE WITNESS: BeneFirst.
21     MR. KILLMAN: I just want to be
22 clear, thank you.
23 BY MR. BRODIE:
24 Q. Questions arising under any of these

12 (Pages 42 to 45)

Page 90

1    engaged to deal with the wording in their
2    plan, and when the amendments were prepared,
3    they were obviously sent to me, to send along
4    to the carriers, and that was really my
5    participation. I did not participate in the
6    decision making as to what amendments were
7    made.
8  Q.  Is it your recollection that, at least in
9    Aubuchon's case, or Aubuchon Distribution, I
10    guess, as well, that their plans were amended
11    from time to time?
12  A.  Yes.
13  Q.  Do you recall who would have signed off on
14    those amendments?
15        MR. KILLMAN: Objection.
16  A.  For Aubuchon?
17  Q.  For Aubuchon?
18  A.  It would be Marcus Moran.
19  Q.  Is there anybody else who would have signed
20    off on them?
21  A.  It's possible, but I don't know this to be a
22    fact, that Sarah may have signed off on them.
23    But if she did, it was only with his specific
24    approval. He reserved that right for

Page 91

1    himself.
2  Q.  Is it your experience, do you recall
3    BeneFirst ever having a role in making any
4    changes to the plan, to either plan?
5  A.  Only if Marcus was contemplating a change.
6    He was the originator of the issues, he might
7    go to them, and say, is this standard in your
8    marketplace, you know, but they never had any
9    role in drawing the document or making the
10    decision. If they said, yes, it's regularly
11    done, then their role would more normally be
12    to tell him what the dollar impact on the
13    plan would be, if these amendments were
14    executed. But then, the amendments were
15    generated by the law firm that they engaged
16    for years to do those things, and then signed
17    off by Marcus.
18        MR. BRODIE: Okay, and with that, I
19    am finished, thank you very much.
20        MR. KILLMAN: No questions from me,
21    thank you very much.
22        (Whereupon, the deposition was
23    concluded at 4:57 p.m.)
24

Page 92

1  COMMONWEALTH OF MASSACHUSETTS
2
    Middlesex, SS.
3
4        I, Tracy Coffman, a Notary Public
    duly qualified in and for the Commonwealth of
5  Massachusetts, do hereby certify that the
    foregoing statement is a true and correct
6  transcript of my original stenographic notes.
7        I further certify that I am neither
    attorney or counsel for, nor related to or
8  employed by any of the parties to the action
    in which this deposition is taken; and
9  furthermore, that I am not a relative or
    employee of any attorney or counsel employed
10  by the parties thereto or financially
    interested in the action.
11
        IN WITNESS WHEREOF, I have hereunto
12  set my hand and affixed my Notarial seal this
    3rd day of June, 2008.
13
14
15        Tracy Coffman,
        Notary Public
16
17  My Commission Expires: August 31, 2012
18
19  THE FOREGOING CERTIFICATION OF THIS
    TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION
20  AND/OR DISTRIBUTION OF THE SAME BY ANY MEANS
    UNLESS UNDER THE DIRECT CONTROL AND/OR
21  SUPERVISION OF THE CERTIFYING COURT REPORTER.
22
23
24

Page 93

1  ERRATA SHEET DISTRIBUTION INFORMATION
2  DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS
3
4        ERRATA SHEET DISTRIBUTION INFORMATION
5  The original of the Errata Sheet has been delivered
6  to Mr. Killman, Esquire.
7
8  When the Errata Sheet has been completed by the
9  deponent and signed, a copy thereof should be
10  delivered to each part of record and the ORIGINAL
11  forwarded to Mr. Brodie, Esquire, to whom the
12  original deposition transcript was delivered.
13
14        INSTRUCTIONS TO DEPONENT
15  After reading this volume of your deposition, please
16  indicate any corrections or changes to your
17  testimony and the reasons therefore on the Errata
18  Sheet supplied to you and sign it. DO NOT make
19  marks or notations on the transcript volume itself.
20  Add additional sheets if necessary. Please refer to
21  the above instructions for errata sheet distribution
22  information.
23
24

24 (Pages 90 to 93)

**7**

{}

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
C.A. 05-40159 FDS

W.E. AUBUCHON CO., INC.,        )
AUBUCHON DISTRIBUTION, INC.,    )
W.E. AUBUCHON CO., INC.,        )
EMPLOYEE MEDICAL BENEFIT        )
PLAN, and AUBUCHON              )
DISTRIBUTION, INC., EMPLOYEE    )
MEDICAL BENEFIT PLAN,           )
        Plaintiffs,             )
                                )
        vs.                     )
                                )
BENEFIRST, LLC,                 )
        Defendant.              )

DEPOSITION OF CHARLES T. DOBENS, taken
at the request of the Plaintiffs, pursuant to
Rule 30(b)(6) of the Federal Rules of Civil
Procedure before Julie A. Bates, a Notary
Public in and for the Commonwealth of
Massachusetts, on September 7, 2006, at the
offices of Bowditch & Dewey, 311 Main Street,
Worcester, Massachusetts.

A P P E A R A N C E S :

FOR THE PLAINTIFFS:
BOWDITCH & DEWEY, LLP
311 Main Street
Worcester, MA  01615
(508) 791-3511
    BY:  LOUIS M. CIAVARRA, ESQ.

FOR THE DEFENDANT:
THE McCORMACK FIRM, LLC
One International Place
Boston, MA  02110
(617) 951-2929
    BY:  STEPHEN J. ROSENBERG, ESQ.

BAY STATE REPORTING AGENCY
76 MILL STREET, WORCESTER, MASSACHUSETTS  01603
(508) 753-4121

---

I N D E X

DEPONENT:  **CHARLES T. DOBENS**

PAGE

EXAMINATION BY MR. CIAVARRA          3

EXHIBITS

| NUMBER | | PAGE |
|---|---|---|
| 1 | Notice of Taking Deposition | 4 |
| 2 | Individual Payment Report | 49 |
| 3 | Reinsurance Census Report | 51 |
| 4 | Benefit Analysis | 53 |
| 5 | Claim Lag Study Analysis | 54 |
| 6 | Coverage Analysis | 55 |
| 7 | Account Statement | 56 |
| 8 | Monthly Check Register | 60 |
| 9 | Monthly Paid claims Register | 61 |
| 10 | Paid Claims Analysis | 61 |
| 11 | Specific Analysis | 62 |
| 12 | Loss Ratio Report | 63 |
| 13 | Eligibility Listing Report | 64 |

Certificate of Court Reporter          99

---

**STIPULATIONS**

MR. CIAVARRA:  Steve, usual stipulations with respect to reserving objections until the time of trial and motions to strike?

MR. ROSENBERG:  Yes.

MR. CIAVARRA:  I'd like to have the witness read and sign this transcript, but we'll, of course, waive notarization.

MR. ROSENBERG:  That's fine.

MR. CIAVARRA:  Okay?

**CHARLES T. DOBENS,** having been satisfactorily identified by the production of his driver's license and duly sworn, was examined and testified as follows:

EXAMINATION BY MR. CIAVARRA:

Q.    Sir, would you please state your name?

A.    Charles Dobens.

Q.    And where do you reside, sir?

A.    30 Parkers Grove Lane, Duxbury, Mass.

Q.    Do you have any immediate plans to move?

A.    No.

Q.    You understand you're here today for your deposition in the case of Aubuchon versus Benefirst?

A.    Yes.

Q.    And you've received a copy of the notice of taking deposition of Benefirst?

A.    Yes.

MR. CIAVARRA:  Steve, I'm just going to mark a copy of the notice as our first exhibit.

(Exhibit No. 1, Notice of Taking Deposition; so marked.)

Q.    I'm not going to ask you detailed questions about it, but this is the notice that you're here for today -- in response to, I should say?

(The witness reviewed the documents.)

A.    Yes.

Q.    By whom are you currently employed?

A.    I'm currently employed by America's Choice Health Plans.

Case 4:05-cv-40159-FDS    Document 63-5    Filed 08/27/2008    Page 3 of 40

**Column 1 (Page 97 - Errata Sheet):**

99

ERRATA SHEET

In accordance with the rules of procedure governing depositions, you are entitled to read and correct your deposition. Accordingly, please carefully read your deposition and, on this errata sheet, make any changes or corrections in form or substance to your deposition that you feel should be made. PLEASE DO NOT MARK THE TRANSCRIPT. After completing this procedure, sign at the conclusion of such changes/corrections (if any) and return it in accordance with your instructions.

PAGE LINE CHANGE          REASON

DATE: _____

**Column 2 (Page 99):**

COMMONWEALTH OF MASSACHUSETTS
WORCESTER, SS.

I, Julie A. Bates, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, do certify that pursuant to appropriate notice of taking deposition, there came before me the following-named person, to wit: **CHARLES T. DOBENS**, who was by me duly sworn; that he was thereupon examined upon his oath and his examination reduced to writing by me; and that the deposition is a true record of the testimony given by the witness.

I FURTHER CERTIFY that I am neither a relative nor employee of nor counsel for any of the parties, or a relative or employee of such counsel or attorney, nor am I financially or otherwise interested either directly or indirectly in the outcome of the action.

IN WITNESS WHEREOF, I have hereunto set my hand this 7th day of September, 2006.

_____
Julie A. Bates, RPR
and Notary Public

My Commission Expires:  April 11, 2008

THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION AND/OR DISTRIBUTION OF THE SAME IN ANY RESPECT UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE CERTIFYING REPORTER.

**Page 98:**

Excerpt from Rule 30 (e):

Submission to Witness; Changes; Signing. When the testimony is fully transcribed, the deposition shall be submitted to the witness for examination and shall be read to or by him/her, unless such examination and reading are waived by the witness and by the parties. Any changes in form or substance which the witness desires to make shall be entered upon the deposition by the officer with a statement of the reasons given by the witness for making them. This procedure must be accomplished within 30 days of receipt of the transcript.

*****************************************

I have read the foregoing, and it is a true transcript of the testimony given by me at the taking of the subject deposition.

_____
CHARLES T. DOBENS

_____
DATE

CASE NAME: Aubuchon vs. Benefirst
DATE TAKEN: September 7, 2006

**5**

1    Q.    And when did you begin work with
2 them?
3    A.    April 15th.
4    Q.    Of '06?
5    A.    Of this year, yes.
6    Q.    What's your title?
7    A.    No title.
8    Q.    What are your duties and
9 responsibilities?
10    A.    Essentially sales and service of a
11 self-funded and HRA block of health insurance
12 business.
13    Q.    This block of business includes a
14 number of different clients?
15    A.    Yes.
16    Q.    And were they -- was that block all
17 at one point a business that was at Benefirst?
18    A.    Not all.  There's new business since
19 April 15th.  So...
20    Q.    Is it -- at the time you became
21 employed by America's Choice, the business that
22 you were responsible for was old Benefirst
23 business?
24    A.    Yes, correct.

**6**

1    Q.    All right.  Where's your office?
2    A.    It is 31 Schoosett,
3 S-C-H-O-O-S-E-T-T, Street in Pembroke, Mass.
4    Q.    Is that where Benefirst's offices
5 were?
6    A.    No, no.
7    Q.    What's your educational background?
8    A.    College.  Boston College, Mass
9 School of Law.
10    Q.    When did you get out of BC?
11    A.    '86.
12    Q.    Have you ever practiced law?
13    A.    No.
14    Q.    The Defendant in this case,
15 Benefirst, LLC --
16    A.    Yes.
17    Q.    -- was there a time which you had
18 some relationship with that company?
19    A.    Yes.
20    Q.    And what was that relationship?
21    A.    I was the managing member.
22    Q.    Were there other managing members?
23    A.    Yes -- no.  No other managing
24 member.

**7**

1    Q.    When was Benefirst formed?
2    A.    August of 1999.  I don't know the
3 exact date.
4    Q.    Were you one of the original
5 members?
6    A.    Yes.
7    Q.    And you held that position as the
8 managing member until April 15th of 2006?
9    A.    That's correct.
10    Q.    What happened to Benefirst at that
11 time?
12    A.    It was sold.  The assets were
13 acquired by America's Choice Health Plans out
14 of Houston, Texas.
15    Q.    So it was an asset sale, not a stock
16 sale?
17    A.    There's no stock in an LLC, so...
18    Q.    Right.  Were all the assets of
19 Benefirst sold?
20    A.    Yes.
21    Q.    Did those assets include computers?
22    A.    Yes.
23    Q.    So whatever computers were owned by
24 Benefirst were sold to America's Choice?

**8**

1    A.    Yes.
2    Q.    Where are they physically located
3 now?
4    A.    Well, about four of them are still
5 left.  The other ones were taken over by a
6 company called Pembroke Computer as part of the
7 transaction for them to set up our new office.
8 As a form of compensation to them, ACH decided
9 that they didn't need all those computers, and
10 so they sold them -- you know, they reduced
11 their fee with Pembroke Computer by giving them
12 the computers.
13    Q.    These are stand-alone PCs?
14    A.    Yes.
15    Q.    How many -- Benefirst, how many PCs
16 did they have?
17    A.    I'd say -- Benefirst had about 15
18 PCs.
19    Q.    Of which now four are physically
20 where?
21    A.    Physically in Pembroke.
22    Q.    And that means about 11 were sold to
23 Pembroke Computer?
24    A.    That's correct.

**9**

1   Q.      Were the computers at Benefirst
2   networked?
3   A.      Yes.
4   Q.      On a server?
5   A.      Yes.
6   Q.      And where is, physically, the
7   server?
8   A.      The server is physically in
9   Pembroke.
10  Q.      Still in Pembroke.  Where was
11  Benefirst located?
12  A.      Marshfield.
13  Q.      So they had to be moved from
14  Marshfield to Pembroke?
15  A.      Right.  That's what Pembroke
16  Computer did.
17  Q.      Okay.  How many servers did
18  Benefirst have?
19  A.      Just one.
20  Q.      Who makes that server?
21  A.      Dell.  Dell Edge, I think is what
22  they are called.
23  Q.      Do you know when Benefirst first got
24  that server?

**10**

1   A.      Geez, I'm going to say around 2001,
2   2002.  I'm not exactly sure of the date.
3   Q.      Did Benefirst have an IT person
4   in-house that helped with this stuff?
5   A.      No.
6   Q.      Did you have some direct
7   involvement?
8   A.      Yeah.  Oh, sure.
9   Q.      So you're familiar with the computer
10  system.
11  A.      Exactly, yep.
12  Q.      Were all 15 -- I know 15 is probably
13  an estimate not necessarily an exact number.
14  A.      Yeah, because I think it got as high
15  as 19.  But I think when Pembroke took it over,
16  I think it was about 15.
17  Q.      Prior to the sale to America's
18  Choice, did you dispose of any of the PCs at
19  Benefirst?
20  A.      Dispose --
21  Q.      Did you throw any away?
22  A.      No.
23  Q.      Did you give any to any employees?
24  A.      Yeah.  I gave one to Linda Hart,

**11**

1   yep.  And I think I took one myself and gave it
2   to my kids.  The rest of them I -- we may have
3   given one to another employee.  I just don't
4   remember.
5   Q.      What did you do to -- when you gave
6   a computer whether to Linda Hart or your kids,
7   what did you do to take the data off it that
8   belonged to Benefirst?
9   A.      There really wasn't any data on it.
10  It was all networked.  So it didn't hold any --
11  if you go back and look at it, there's no data
12  on that computer.  They always drew down off of
13  the server.  Nothing was really saved on those
14  computers.
15  Q.      What e-mails -- wouldn't e-mails be
16  saved on the computers, each individual PC?
17  A.      Saved on the server.
18  Q.      But also on the PC for that day,
19  aren't they?  This is a question, I'm not --
20  A.      Yeah, you know?  I don't know the
21  answer.  I think it was all dependent upon how
22  the computer was set up.
23  Q.      And to the best of your knowledge,
24  all the computers, individual PCs, used at

**12**

1   Benefirst were networked into the server?
2   A.      Yes.  All of them were.
3   Q.      Did they all have e-mail access?
4   A.      Yes.
5   Q.      Okay.  And what e-mail system did
6   you use at Benefirst?
7   A.      Microsoft Exchange server.
8   Q.      So to the best of your knowledge,
9   any e-mails that were exchanged or -- at
10  Benefirst with anyone outside the company would
11  reside on the server?
12  A.      Exactly, yep.
13  Q.      And that server's still at -- well,
14  now it's at America's Choice.
15  A.      That's right.
16  Q.      Have you done anything to protect or
17  segregate that information -- the Benefirst
18  data from America's Choice, or is it pretty
19  seamless?
20  A.      It's totally separated.  The only
21  thing we're pulling off of the F drive --
22  that's the server, I call it the F drive -- is
23  files that we had on the server prior to ACH.
24  Everything after April 15th is ACH's business,

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| W.E. AUBUCHON CO., INC., AUBUCHON DISTRIBUTION, INC., W.E. AUBUCHON CO. INC. EMPLOYEE MEDICAL BENEFIT PLAN, and AUBUCHON DISTRIBUTION, INC. EMPLOYEE MEDICAL BENEFIT PLAN<br>      Plaintiffs.<br><br>v.<br><br>BENEFIRST, LLC,<br>      Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

C.A. No. 05-40159FDS
(Louis M. Ciavarra. BBO# 546481)
(Ryan T. Killman BBO# 654562)
(Colleen E. Cushing BBO# 663498)



To:    Stephen D. Rosenberg, Esquire
       Eric L. Brodie, Esquire
       The McCormack Firm
       1 International Place – 7th Floor
       Boston, MA 02110

## NOTICE OF TAKING DEPOSITION OF BENEFIRST, LLC

Please take notice, that the deposition by oral examination of **Benefirst, LLC** with regard to the topics specified in the attached **Schedule A**, will be taken pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure before a qualified court reporter at the offices of Bowditch & Dewey, LLP, 311 Main Street, Worcester Massachusetts, at 10:00 a.m. on August 31, 2006 and thereafter by adjournment until the same shall be completed. Benefirst, LLC shall designate one or more officers, agents or other persons who can testify on its behalf with respect to the specific matters set forth in **Schedule A**.

You are invited to attend and cross examine.

Respectfully submitted,

W.E. AUBUCHON CO., INC.,
AUBUCHON DISTRIBUTION, INC.,
W.E. AUBUCHON CO., INC.
EMPLOYEE MEDICAL BENEFIT PLAN, and
AUBUCHON DISTRIBUTION, INC.
EMPLOYEE MEDICAL BENEFIT PLAN
(collectively "Plaintiffs"),

By Their Attorneys,

Louis M. Ciavarra  (BBO#546481)
Ryan T. Killman (BBO#654562)
Colleen E. Cushing (BBO# 663498)
Bowditch & Dewey, LLP
311 Main Street
P.O. Box 15156
Worcester, MA 01615-0156
Telephone:  (508) 926-3408
Facsimile:   (508) 929-3011

Dated:  August _Z1_ , 2006

## CERTIFICATE OF SERVICE

I, Ryan T. Killman, hereby certify that on this _Z1st_ day of August, 2006 I have served the foregoing by mailing a copy thereof, postage prepaid, to the following:

Stephen D. Rosenberg, Esquire
Eric L. Brodie, Esquire
The McCormack Firm
1 International Place – 7th Floor
Boston, MA 02110

Ryan T. Killman

## SCHEDULE A

1.  Any and all facts concerning the keeping of files, documents (paper and electronic) or other papers by Benefirst, LLC ("Benefirst") in connection with services it provided to Plaintiffs.

2.  Any and all facts concerning the filing and retention of RPC reports by Benefirst.

3.  Any and all facts concerning Benefirst's document retention policy(s) between the time it began providing services to Plaintiffs and the present.

4.  Any and all facts concerning Benefirst's document destruction policy(s) between the time it began providing services to Plaintiffs and the present.

5.  Any and all facts concerning the current location of Benefirst's files.

6.  Any and all facts concerning the current format in which Benefirst's files are maintained.

7.  Any and all facts concerning Benefirst's use of computers, including the RIMS system, in connection with providing services to Plaintiffs.

8.  Any and all facts concerning the RIMS system used by Benefirst in connection with services it provided to Plaintiffs.

9.  Any and all facts concerning the current location of the RIMS system used by Benefirst in connection with services it provided to Plaintiffs.

10. Any and all facts concerning who or what currently controls the RIMS system used by Benefirst in connection with services it provided to Plaintiffs.

11. Any and all facts concerning the current accessibility of the RIMS system used by Benefirst in connection with services it provided to Plaintiffs.

12. Any and all facts concerning when Benefirst stopped having access to the RIMS system which it used in connection with services it provided to Plaintiffs.

13. Any and all facts concerning the leasing of the RIMS system by Benefirst.

**8**

{}

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**W.E. AUBUCHON CO., INC., AUBUCHON DISTRIBUTION, INC., W.E. AUBUCHON CO. INC. EMPLOYEE MEDICAL BENEFIT PLAN, and AUBUCHON DISTRIBUTION, INC. EMPLOYEE MEDICAL BENEFIT PLAN,**

**Plaintiffs,**

**v.**

**BENEFIRST, LLC,**

**Defendant.**

Civil Action No. 05-40159 FDS

## DEFENDANT BENEFIRST, LLC'S RESPONSE TO PLAINTIFF'S REQUESTS FOR ADMISSIONS

### Request No. 1

The provisions contained in the service agreement attached hereto as <u>Exhibit A</u> accurately reflect the agreement reached between BeneFirst and W.E. Aubuchon Co., Inc. and Aubuchon Distribution, Inc. in connection with its administration of the W.E. Aubuchon Co. Inc. Employee Medical Benefit Plan and Aubuchon Distribution, Inc. Employee Medical Benefit Plan for the entire period of the parties' respective relationships.

### Response No. 1

Objection. The request is not specific as to which provisions of Exhibit A are at issue, and fails to define "the entire period of the parties' respective relationships," thereby rendering the request vague. Moreover, this document appears to have been scanned and processed by OCR software. Without waiving the foregoing, BeneFirst denies Request No. 1.

## Request No. 2

BeneFirst exercised discretionary authority and/or control over the administration of the W.E. Aubuchon Co., Inc. Employee Medical Benefit Plan.

### Response No. 2

Denied.

## Request No. 3

BeneFirst exercised discretionary authority and/or control over the administration of the Aubuchon Distribution, Inc. Employee Medical Benefit Plan.

### Response No. 3

Denied.

## Request No. 4

BeneFirst was obligated to maintain, for the duration of its service agreement with Plaintiffs and for two years thereafter, adequate records of all transactions between the Plan Sponsor, the Plan Administrator and Plan Participants.

### Response No. 4

Objection. The request is not specific as to which plaintiffs this request applies, and therefore assumes facts not in evidence and is vague. Without waiving the foregoing objection, BeneFirst admits only that the contract terms as alleged by certain plaintiffs in this litigation stated that BeneFirst shall maintain, for the duration of any applicable service agreement with a Plan Sponsor and for two years thereafter, adequate records of all transactions.

## Request No. 5

Under ERISA, BeneFirst was obligated to maintain any and all records in its possession in connection with services it provided as Third Party Administrator for the plaintiffs for a period of not less than six years.

### Response No. 5

Objection. The request is not specific as to which plaintiffs this request applies, and therefore assumes facts not in evidence and is vague. Without waiving the foregoing objections, BeneFirst admits generally that ERISA has a six-year recordkeeping requirement, but denies that BeneFirst was obligated to maintain "any and all records in its possession."

## Request No. 6

This lawsuit was filed on September 12, 2005.

### Response No. 6

Admitted.

## Request No. 7

BeneFirst was served with the Complaint in this matter on September 13, 2005.

### Response No. 7

Admitted.

## Request No. 8

Claims records used by and/or created by BeneFirst in connection with services it provided to Plaintiffs as a Third Party Administrator between 2001 and 2004, evidence BeneFirst's administration of claims on behalf of Plaintiffs during that time period.

### Response No. 8

Objection. This request does not request the admission of a "fact, application of law to fact, or opinion about either," nor does it request the genuineness of any document. Rather, this request seeks a commentary regarding the evidentiary value of "claims records," an undefined term. As such, Request No. 8 is an inappropriate request under Rule 36. Finally, this request is not specific as to which plaintiffs this request applies, and therefore assumes facts not in evidence and is vague.

## Request No. 9

On February 6, 2007, the Court (Hillman, J.) issued an Order which required BeneFirst to "Produce the Medical Bills and Claims Forms for the approximately 3,000 claims as specified by the Plaintiffs...."

### Response No. 9

Objection. This request does not request the admission of a "fact, application of law to fact, or opinion about either," nor does it request the genuineness of any document, nor does it seek a matter that is relevant to any party's claim or defense, or nor is the request reasonably calculated to lead to the discovery of admissible evidence. As such, Request No. 9 is an inappropriate request under Rule 36. Without waiving the foregoing objections, BeneFirst admits only that the quoted language above is a part of the Order rendered by Judge Hillman on February 6, 2007, but further notes that the order recites that it is a denial of a motion to

reconsider a previous order requiring BeneFirst to produce "medical claims files, including actual bills in its possession, custody or control."

## Request No. 10

BeneFirst did not produce all of the Medical Bills and Claims Forms for the approximately 3,000 claims as specified by the Plaintiffs.

### Response No. 10

Objection. This request does not request the admission of a "fact, application of law to fact, or opinion about either," nor does it request the genuineness of any document, nor does it seek a matter that is relevant to any party's claim or defense, or nor is the request reasonably calculated to lead to the discovery of admissible evidence. As such, Request No. 10 is an inappropriate request under Rule 36. Without waiving the foregoing objections, BeneFirst admits only that it produced all claims images in its possession, custody or control in complying with Judge Hillman's order.

## Request No. 11

Of the 2,991 claims listed in the Aubuchon Employee Benefits Plan spreadsheet provided by Plaintiffs to BeneFirst, BeneFirst was only able to locate 1,777 of those claims.

### Response No. 11

Objection. This request does not request the admission of a "fact, application of law to fact, or opinion about either," nor does it request the genuineness of any document, nor does it seek a matter that is relevant to any party's claim or defense, or nor is the request reasonably calculated to lead to the discovery of admissible evidence. As such, Request No. 11 is an inappropriate request under Rule 36. Without waiving the foregoing objections, BeneFirst admits only that it produced all claims images in its possession, custody or control in complying with Judge Hillman's order.

## Request No. 12

Of the 166 claims listed in the Aubuchon Distribution Employee Benefits Plan spreadsheet provided by Plaintiffs to BeneFirst, BeneFirst was only able to locate 105 of those claims.

### Response No. 12

Objection. This request does not request the admission of a "fact, application of law to fact, or opinion about either," nor does it request the genuineness of any document, nor does it seek a matter that is relevant to any party's claim or defense, or nor is the request reasonably calculated to lead to the discovery of admissible evidence. As such, Request No. 12 is an inappropriate request under Rule 36. Without waiving the foregoing objections, BeneFirst

admits only that it produced all claims images in its possession, custody or control in complying with Judge Hillman's order.

## Request No. 13

Benefirst failed to maintain records relating to the W.E. Aubuchon Co., Inc., Employee Medical Benefit Plan in accordance with its obligations under its service contract with W.E. Aubuchon Co., Inc.

### Response No. 13

Denied.

## Request No. 14

Benefirst failed to maintain records relating to the W.E. Aubuchon Co., Inc., Employee Medical Benefit Plan in accordance with its obligations under ERISA.

### Response No. 14

Denied.

## Request No. 15

Benefirst failed to maintain records relating to the Aubuchon Distribution, Inc., Employee Medical Benefit Plan in accordance with its obligations under its service contract with Aubuchon Distribution, Inc.

### Response No. 15

Denied.

## Request No. 16

Benefirst failed to maintain records relating to the Aubuchon Distribution, Inc., Employee Medical Benefit Plan in accordance with its obligations under ERISA.

### Response No. 16

Denied.

**Request No. 17**

Exhibit 1 to W.E. Aubuchon Co., Inc. Employee Medical Benefit Plan's Supplemental Answers to Interrogatories accurately reflects claims for which BeneFirst has failed to provide documentation.

**Response No. 17**

Denied.

**Request No. 18**

Exhibit 2 to W.E. Aubuchon Co., Inc. Employee Medical Benefit Plan's Supplemental Answers to Interrogatories accurately reflects errors made by BeneFirst as Third Party Administrator for the W.E. Aubuchon Co., Inc. Employee Medical Benefit Plan.

**Response No. 18**

Denied.

**Request No. 19**

Exhibit 3 to W.E. Aubuchon Co., Inc. Employee Medical Benefit Plan's Supplemental Answers to Interrogatories accurately reflects errors made by BeneFirst as Third Party Administrator for the W.E. Aubuchon Co., Inc. Employee Medical Benefit Plan.

**Response No. 19**

Denied.

**Request No. 20**

Exhibit 1 to Aubuchon Distribution, Inc.'s Supplemental Answers to Interrogatories accurately reflects claims for which BeneFirst has failed to provide documentation.

**Response No. 20**

Denied.

### Request No. 21

Exhibit 2 to Aubuchon Distribution, Inc.'s Supplemental Answers to Interrogatories accurately reflects errors made by BeneFirst as Third Party Administrator for the Aubuchon Distribution, Inc. Employee Medical Benefit Plan.

#### Response No. 21

Denied.

### Request No. 22

BeneFirst improperly paid claims for ineligible procedures, services or benefits in connection with claims made under the Aubuchon Distribution, Inc. Employee Medical Benefit Plan.

#### Response No. 22

Objection. The request is not specific as to which claim or claims are at issue, and is therefore vague as to whether the request is directed at BeneFirst's claims payment practices as to specific claims or in general. Without waiving the foregoing objection, Benefirst denies the allegations in Request No. 22, as the evidence suggests that BeneFirst properly paid claims made under the Aubuchon Distribution, Inc. Employee Medical Benefit Plan.

### Request No. 23

BeneFirst improperly paid claims for ineligible procedures, services or benefits in connection with claims made under the W.E. Aubuchon Co., Inc. Employee Medical Benefit Plan.

#### Response No. 23

Objection. The request is not specific as to which claim or claims are at issue, and is therefore vague as to whether the request is directed at BeneFirst's claims payment practices as to specific claims or in general. Without waiving the foregoing objection, Benefirst denies Request No. 23, as the evidence suggests that BeneFirst properly paid claims made under the W.E. Aubuchon Co., Inc. Employee Medical Benefit Plan.

### Request No. 24

BeneFirst improperly paid claims for persons ineligible to receive benefits under the Aubuchon Distribution, Inc. Employee Medical Benefit Plan.

#### Response No. 24

Objection. The request is not specific as to which claim or claims are at issue, and is therefore vague as to whether the request is directed at BeneFirst's claims payment practices

as to specific claims or in general. Without waiving the foregoing objection, Benefirst denies the allegations in Request No. 24, as the evidence suggests that BeneFirst properly paid claims made under the Aubuchon Distribution, Inc. Employee Medical Benefit Plan.

**Request No. 25**

BeneFirst improperly paid claims for persons ineligible to receive benefits under the W.E. Aubuchon Co., Inc. Employee Medical Benefit Plan.

**Response No. 25**

Objection. The request is not specific as to which claim or claims are at issue, and is therefore vague as to whether the request is directed at BeneFirst's claims payment practices as to specific claims or in general. Without waiving the foregoing objection, Benefirst denies Request No. 25, as the evidence suggests that BeneFirst properly paid claims made under the W.E. Aubuchon Co., Inc. Employee Medical Benefit Plan.

**Request No. 26**

BeneFirst improperly paid duplicate claims in connection with claims made under the Aubuchon Distribution, Inc. Employee Medical Benefit Plan.

**Response No. 26**

Objection. The request is not specific as to which claim or claims are at issue, and is therefore vague as to whether the request is directed at BeneFirst's claims payment practices as to specific claims or in general. Without waiving the foregoing objection, Benefirst denies the allegations in Request No. 26, as the evidence suggests that BeneFirst properly paid claims made under the Aubuchon Distribution, Inc. Employee Medical Benefit Plan.

**Request No. 27**

BeneFirst improperly paid duplicate claims in connection with claims made under the W.E. Aubuchon Co., Inc. Employee Medical Benefit Plan.

**Response No. 27**

Objection. The request is not specific as to which claim or claims are at issue, and is therefore vague as to whether the request is directed at BeneFirst's claims payment practices as to specific claims or in general. Without waiving the foregoing objection, Benefirst denies Request No. 27, as the evidence suggests that BeneFirst properly paid claims made under the W.E. Aubuchon Co., Inc. Employee Medical Benefit Plan.

#### Request No. 28

BeneFirst paid improper amounts for claims made under the Aubuchon Distribution, Inc. Employee Medical Benefit Plan.

#### Response No. 28

Objection. The request is not specific as to which claim or claims are at issue, and is therefore vague as to whether the request is directed at BeneFirst's claims payment practices as to specific claims or in general. Without waiving the foregoing objection, Benefirst denies the allegations in Request No. 28, as the evidence suggests that BeneFirst properly paid claims made under the Aubuchon Distribution, Inc. Employee Medical Benefit Plan.

#### Request No. 29

BeneFirst paid improper amounts for claims made under the W.E. Aubuchon Co., Inc. Employee Medical Benefit Plan.

#### Response No. 29

Objection. The request is not specific as to which claim or claims are at issue, and is therefore vague as to whether the request is directed at BeneFirst's claims payment practices as to specific claims or in general. Without waiving the foregoing objection, Benefirst denies Request No. 29, as the evidence suggests that BeneFirst properly paid claims made under the W.E. Aubuchon Co., Inc. Employee Medical Benefit Plan.

#### Request No. 30

BeneFirst improperly calculated applicable deductibles in connection with claims made under the Aubuchon Distribution, Inc. Employee Medical Benefit Plan.

#### Response No. 30

Objection. The request is not specific as to which claim or claims are at issue, and is therefore vague as to whether the request is directed at BeneFirst's claims payment practices as to specific claims or in general. Without waiving the foregoing objection, Benefirst denies the allegations in Request No. 30, as the evidence suggests that BeneFirst properly paid claims made under the Aubuchon Distribution, Inc. Employee Medical Benefit Plan.

**Request No. 31**

BeneFirst improperly calculated deductibles in connection with claims made under the W.E. Aubuchon Co., Inc. Employee Medical Benefit Plan.

**Response No. 31**

Objection.  The request is not specific as to which claim or claims are at issue, and is therefore vague as to whether the request is directed at BeneFirst's claims payment practices as to specific claims or in general.  Without waiving the foregoing objection, Benefirst denies Request No. 31, as the evidence suggests that BeneFirst properly paid claims made under the W.E. Aubuchon Co., Inc. Employee Medical Benefit Plan.

**BeneFirst, LLC, Defendant**

By:

Charles T. Dobens

As to objections:

By:

Stephen D. Rosenberg        [BBO# 558415]
Eric L. Brodie        [BBO# 639833]
THE MCCORMACK FIRM, LLC
One International Place - 7th Floor
Boston, MA    02110
Ph:    617•951•2929
Fax:    617•951•2672

## CERTIFICATE OF SERVICE

The undersigned certifies that on April 14, 2008, a copy of the foregoing DEFENDANT BENEFIRST, LLC'S RESPONSE TOPLAINTIFF'S REQUESTS FOR ADMISSIONS was served by first class U.S. Mail, postage prepaid, and by a .pdf image of this document served electronically upon:

Louis M. Ciavarra, Esq.
Ryan T. Killman, Esq.  rkillman@bowditch.com
**Bowditch & Dewey, LLP**
311 Main Street
P.O. Box 15156
Worcester, MA  01615-0156

108802.3

DEFENDANT BENEFIRST, LLC'S RESPONSE TO
PLAINTIFF'S REQUESTS FOR ADMISSIONS
Page 11 of 11

**9**

{}

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| W.E. AUBUCHON CO., INC., AUBUCHON DISTRIBUTION, INC., W.E. AUBUCHON CO. INC. EMPLOYEE MEDICAL BENEFIT PLAN, and AUBUCHON DISTRIBUTION, INC. EMPLOYEE MEDICAL BENEFIT PLAN<br>       Plaintiffs,<br><br>v.<br><br><br>BENEFIRST, LLC,<br>       Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 05-40159FDS<br>(Louis M. Ciavarra. BBO# 546481)<br>(Ryan T. Killman BBO# 654562)<br>(Colleen E. Cushing BBO# 663498) |

## PLAINTIFF W.E. AUBUCHON CO., INC. EMPLOYEE MEDICAL BENEFIT PLAN'S SUPPLEMENTAL ANSWERS TO INTERROGATORIES

### GENERAL OBJECTIONS

1.      Plaintiff W.E. Aubuchon Co., Inc. Employee Medical Benefit Plan ("Plaintiff"), objects to each and every Interrogatory to the extent that it seeks information and/or materials privileged from discovery by the attorney-client privilege and/or the attorney work-product doctrine.

2.      Plaintiff objects to each and every Interrogatory to the extent that it seeks information which is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

3.      Plaintiff objects to each and every Interrogatory to the extent that it is overly broad and/or unduly burdensome.

4.      Plaintiff objects to each and every Interrogatory to the extent that it is vague and ambiguous.

5.      Plaintiff objects to each and every interrogatory to the extent that it purports to establish a continuing duty to supplement, or seeks to impose a duty beyond those imposed by the

Federal Rules of Civil Procedure.

6.    Each of the General Objections shall be deemed to apply to each of Defendant's separate Interrogatories.

## ANSWERS

### Interrogatory No. 1

Please identify the person answering and signing these interrogatories, including name, age, residence address, occupation, business address, job title, and the relationship and capacity of such person to the Plan.

### Answer No. 1

Sarah Q. Arel, Benefits Manager, W.E. Aubuchon Co., Inc., 95 Aubuchon Drive, Westminster, Massachusetts 01473-0473.

### Interrogatory No. 2

State the full name and current residence address for each person who has knowledge of any of the Plaintiffs' claims against BeneFirst, and for each such person, describe your understanding of the subject of their knowledge and what they know.

### Answer No. 2

**OBJECTION**: Plaintiff objects to this Interrogatory to the extent that it seeks information and/or materials which are privileged from discovery pursuant to the attorney-client privilege and/or the work product doctrine. Plaintiff further objects to this Interrogatory on the grounds that it is overly broad, vague and ambiguous. Notwithstanding and without waiving the foregoing objections, Plaintiff states as follows:

M. Marcus Moran, Jr., President and Treasurer of W.E. Aubuchon Co. Inc., 95 Aubuchon Street, Westminster, MA. 01473, has knowledge regarding the retention of BeneFirst, LLC as Third Party Administrator and BeneFirst, LLC's wrongful acts and omissions consisting of breach of the Administrative Services Agreement (the "Agreement") and the negligent delivery of

services under the W.E. Aubuchon Co. Inc. Employee Medical Benefit Plan and Aubuchon Distribution, Inc. Employee Medical Benefit Plan (the "Plans").

Sarah Q. Arel, Benefits Manager of W.E. Aubuchon Co. Inc., 95 Aubuchon Street, Westminster, MA 01473, has knowledge regarding the retention of BeneFirst, LLC as Third Party Administrator and BeneFirst, LLC's wrongful acts and omissions consisting of breach of the Agreement and the negligent delivery of services under the Plans.

Charles T. Dobens, 30 Parkers Grove Lane, Duxbury, MA, upon information and belief, has knowledge of the mishandling of plan participants' claims by BeneFirst, LLC.

Carrie Reddie, formerly of BeneFirst, LLC, upon information and belief, has knowledge of the mishandling of plan participants' claims by BeneFirst, LLC.

Maureen Fitzgerald, formerly of BeneFirst, LLC, upon information and belief, has knowledge of the mishandling of plan participants' claims by BeneFirst, LLC.

Paul Sullivan, formerly of BeneFirst, LLC, upon information and belief, has knowledge of the mishandling of plan participants' claims by BeneFirst, LLC.

Sandra Schnabel of BP, Inc., 6160 Summit Drive, Brooklyn Center, MN, upon information and belief, has knowledge regarding excess insurance coverage issues relating to the payment of claims made by plan participants and the effect of BeneFirst, LLC's mishandling of said claims on Plaintiff's excess insurance.

Adria L. Garneau, CEBS, of Northshore International Insurance Services, 199 Rosewood Drive, Danvers, MA 01923, has knowledge regarding the mishandling of plan participants' claims by BeneFirst, LLC.

Paul Gatanti, formerly of BeneFirst, LLC, upon information and belief, has knowledge of the mishandling of plan participants' claims by BeneFirst, LLC.

Charles S. Lord, of the Chittenden Insurance Group, Burlington, Vermont, upon information and belief, has knowledge regarding the retention of BeneFirst, LLC as Third Party

Administrator and BeneFirst, LLC's wrongful acts and omissions consisting of breach of the Agreement and the negligent delivery of services under the Plans.

Interrogatory No. 3

Identify and describe the role of:

a.    all persons who participated or played any role in negotiating the Plan's retention of BeneFirst as the plan's administrator;

b.    all persons who participated or played any role in the administration or management of the Plan during any year BeneFirst administered the Plan.

Answer No. 3

a.    Sarah Q. Arel, M. Marcus Moran, Jr., and Charles S. Lord participated in negotiating the retention of BeneFirst, LLC as Third Party Administrator.

b.    Sarah Q. Arel participated in the administration and/or management of the W.E. Aubuchon Co. Inc. Employee Medical Benefit Plan and Aubuchon Distribution Inc. Employee Medical Benefit Plan while BeneFirst, LLC served as Third Party Administrator of said Plans.

Interrogatory No. 4

Please identify the plan years that are at issue in your complaint.

Answer No. 4

Plaintiff states that its Complaint alleges damages relating to negligent acts and/or omissions by BeneFirst, LLC, as Third Party Administrator, during each year in which BeneFirst, LLC was Third Party Administrator, 2001-2004. However, whereas discovery is ongoing in this matter and Plaintiff has been delayed by Defendant's failure to provide it with data necessary to conduct a full audit of all claims administered by BeneFirst, LLC, Plaintiff reserves the right to supplement this Answer if and when it discovers other wrongful or negligent acts in the administration of the above-referenced Plans by BeneFirst, LLC.

Interrogatory No. 5

Do you contend that the defendant improperly paid claims for **ineligible procedures, services, or benefits**? If so, for each such claim, identify each such claim by claimant, date of claim, claim number, amount paid, and description of procedure/service/benefit, and state why you contend the procedure/service/benefit was ineligible.

Answer No. 5

Yes. Plaintiff alleges that BeneFirst, LLC, through its negligent acts and omissions failed to properly investigate and pay plan participants' claims in violation of the Agreement, the express provisions of the respective plans, industry-wide third party administrator processing guidelines, and BeneFirst, LLC's own policies and procedures. Further answering, Plaintiff states that while discovery is ongoing and Plaintiff has been delayed in conducting a full audit of all claims under the Plans by BeneFirst, LLC's failure to provide Plaintiff with all relevant data, Plaintiff reserves the right to supplement this Answer if and when it discovers other wrongful or negligent acts in the administration of the above-referenced Plans by BeneFirst, LLC.

Further answering, Plaintiff refers to Exhibit 1 attached hereto which provides a summary of claims mishandled by BeneFirst, LLC based on an initial audit. Exhibit 1 categorizes errors as "Potential Errors" and "Actual Errors." "Actual Errors" include claims which were improperly paid by BeneFirst, LLC while "Potential Errors" include claims where it appears that BeneFirst, LLC improperly paid claims due to BeneFirst, LLC's failure to utilize the requisite due diligence in handling the claim and further investigation is necessary.

Supplemental Answer No. 5

**OBJECTION:** Plaintiff objects to this Interrogatory to the extent that it is limited to "improperly paid claims for ineligible procedures, services, or benefits" where BeneFirst, LLC's improper claims adjudication falls outside the scope of that specific category. Further, BeneFirst, LLC has failed to comply with the Court's (Hillman, J.) February 6, 2007 Order which required

BeneFirst, LLC to "produce the Medical Bills and Claims Forms for the approximately 3,000 claims as specified by the Plaintiffs . . . ." BeneFirst, LLC has only produced claims records relating to 1,882 of the 2,991 claims subject to the Court's Order.

BeneFirst, LLC's failure to comply with the Court's Order of February 6, 2007, has resulted in Plaintiff having insufficient documentation to conduct a full audit and therefore Plaintiff is unable to provide a complete Answer to this Interrogatory. Plaintiff refers to Exhibit I attached hereto which reflects all of the claims for which BeneFirst, LLC has failed to provide supporting records, which include "provider bills." Because the provider bill is the document that initiates and supports the request for reimbursement consideration, if this key document is missing, it is impossible to affirm that adjudication of eligible benefits occurred correctly. Such undocumented claims represent claim errors since BeneFirst, LLC cannot produce the provider bills that would allow affirmation of accurate adjudication.

In addition, pursuant to Section I(B)(3) of the Agreement, BeneFirst, LLC was obligated to maintain all claims records for two years from the date of termination of the Agreement. The Agreement was terminated on or about December 31, 2004. Plaintiff's Complaint was filed less than one year later, on or about September 12, 2005. BeneFirst, LLC was contractually obligated to maintain all claims records and failed to do so. Further, once BeneFirst, LLC was aware of the likelihood of litigation, it was obligated to maintain all claims records and refrain from destroying them. Plaintiff reserves the right to move the Court for sanctions against BeneFirst, LLC for its clear spoliation of evidence. Notwithstanding and without waiving the foregoing objections, Plaintiff provides the following Answer:

Yes, BeneFirst, LLC has improperly paid claims for ineligible procedures, services, or benefits and refers to Exhibit I, Exhibit II (Nos.71-76, 116), and Exhibit III (Nos. 11, 12, 31, 32,

35 and 47).[1]  In addition, BeneFirst, LLC failed to fully investigate claims referenced in <u>Exhibit</u> <u>II</u> (Nos. 1-20, 64-67 and 77), and <u>Exhibit</u> <u>III</u> (Nos. 1-3, 5, 6, 13, 23, 34, 41-43 and 53).

Further answering, Plaintiff states that while discovery is ongoing and, as a result of BeneFirst, LLC's failure to comply with the Court's Order of February 6, 2007, Plaintiff has been unable to conduct a full audit of all claims under the Plans, Plaintiff reserves the right to supplement this Answer if and when it discovers other wrongful or negligent acts in the administration of the above-referenced Plans by BeneFirst, LLC.

<u>Interrogatory No. 6</u>

Do you contend that the defendant improperly paid claims for **persons ineligible to receive benefits**?  If so, for each such claim, identify each such claim by claimant, date of claim, claim number, amount paid, and description of procedure/service/benefit, and state why you contend the claimant was ineligible.

<u>Answer No. 6</u>

Yes.  Please refer to Plaintiff's Answer to Interrogatory No. 5.

<u>Supplemental Answer No. 6</u>

**OBJECTION**:  Plaintiff objects to this Interrogatory to the extent that it is limited to "improperly paid claims for persons ineligible to receive benefits" where BeneFirst, LLC's improper claims adjudication falls outside the scope of that specific category.  Further, BeneFirst, LLC has failed to comply with the Court's (Hillman, J.) February 6, 2007 Order which required BeneFirst, LLC to "produce the Medical Bills and Claims Forms for the approximately 3,000 claims as specified by the Plaintiffs . . . ."  BeneFirst, LLC has only produced claims records relating to 1,882 of the 2,991 claims subject to the Court's Order.

---

[1] It should be noted that when reviewing <u>Exhibits</u> <u>II</u> and <u>III</u>, "Procedural Errors" indicate instances where BeneFirst, LLC failed to properly investigate a claim or claims.  The failure to sufficiently investigate a claim constitutes an improper adjudication of that claim.  "Payment Errors" are those where BeneFirst, LLC made improper payments.

{Client Files\lit\302508\0002\01035216.DOC;1}

BeneFirst, LLC's failure to comply with the Court's Order of February 6, 2007, has resulted in Plaintiff having insufficient documentation to conduct a full audit and therefore Plaintiff is unable to provide a complete Answer to this Interrogatory. Plaintiff refers to Exhibit I attached hereto which reflects all of the claims for which BeneFirst, LLC has failed to provide supporting records, which include "provider bills." Because the provider bill is the document that initiates and supports the request for reimbursement consideration, if this key document is missing, it is impossible to affirm that adjudication of eligible benefits occurred correctly. Such undocumented claims represent claim errors since BeneFirst, LLC cannot produce the provider bills that would allow affirmation of accurate adjudication.

In addition, pursuant to Section I(B)(3) of the Agreement, BeneFirst, LLC was obligated to maintain all claims records for two years from the date of termination of the Agreement. The Agreement was terminated on or about December 31, 2004. Plaintiff's Complaint was filed less than one year later, on or about September 12, 2005. BeneFirst, LLC was contractually obligated to maintain all claims records and failed to do so. Further, once BeneFirst, LLC was aware of the likelihood of litigation, it was obligated to maintain all claims records and refrain from destroying them. Plaintiff reserves the right to move the Court for sanctions against BeneFirst, LLC for its clear spoliation of evidence. Notwithstanding and without waiving the foregoing objections, Plaintiff provides the following Answer:

Yes, BeneFirst, LLC has improperly paid claims for persons ineligible to receive benefits and refers to Exhibit I, Exhibit II (Nos. 35-46, 64-67, 71-76 and 115), and Exhibit III (Nos. 2, 3, 6, 7, 17, 20, 41, 47 and 49). In addition, BeneFirst, LLC failed to fully investigate claims referenced in Exhibit II (Nos. 1-20, 64-67 and 77), and Exhibit III (Nos. 1-3, 5, 6, 13, 23, 34, 41-43 and 53).

Further answering, Plaintiff states that while discovery is ongoing and, as a result of BeneFirst, LLC's failure to comply with the Court's Order of February 6, 2007, Plaintiff has been unable to conduct a full audit of all claims under the Plans, Plaintiff reserves the right to

supplement this Answer if and when it discovers other wrongful or negligent acts in the administration of the above-referenced Plans by BeneFirst, LLC.

Interrogatory No. 7

Do you contend that the defendant paid **duplicate** claims? If so, identify each such claim by claimant, claim number, amount paid, and description of procedure/service/benefit, and the date(s) such payments were made, and state why you believe the payment(s) were duplicates.

Answer No. 7

Yes. Please refer to Plaintiff's Answer to Interrogatory No. 5.

Supplemental Answer No. 7

**OBJECTION:** Plaintiff objects to this Interrogatory to the extent that it is limited to instances where BeneFirst "paid duplicate claims" where BeneFirst, LLC's improper claims adjudication falls outside the scope of that specific category. Further, BeneFirst, LLC has failed to comply with the Court's (Hillman, J.) February 6, 2007 Order which required BeneFirst, LLC to "produce the Medical Bills and Claims Forms for the approximately 3,000 claims as specified by the Plaintiffs . . . ." BeneFirst, LLC has only produced claims records relating to 1,882 of the 2,991 claims subject to the Court's Order.

BeneFirst, LLC's failure to comply with the Court's Order of February 6, 2007, has resulted in Plaintiff having insufficient documentation to conduct a full audit and therefore Plaintiff is unable to provide a complete Answer to this Interrogatory. Plaintiff refers to Exhibit I attached hereto which reflects all of the claims for which BeneFirst, LLC has failed to provide supporting records, which include "provider bills." Because the provider bill is the document that initiates and supports the request for reimbursement consideration, if this key document is missing, it is impossible to affirm that adjudication of eligible benefits occurred correctly. Such undocumented claims represent claim errors since BeneFirst, LLC cannot produce the provider bills that would allow affirmation of accurate adjudication.

In addition, pursuant to Section I(B)(3) of the Agreement, BeneFirst, LLC was obligated to maintain all claims records for two years from the date of termination of the Agreement. The Agreement was terminated on or about December 31, 2004. Plaintiff's Complaint was filed less than one year later, on or about September 12, 2005. BeneFirst, LLC was contractually obligated to maintain all claims records and failed to do so. Further, once BeneFirst, LLC was aware of the likelihood of litigation, it was obligated to maintain all claims records and refrain from destroying them. Plaintiff reserves the right to move the Court for sanctions against BeneFirst, LLC for its clear spoliation of evidence. Notwithstanding and without waiving the foregoing objections, Plaintiff provides the following Answer:

Yes, BeneFirst, LLC has paid duplicate claims and refers to <u>Exhibit I</u>, <u>Exhibit II</u> (Nos. 71-76), and <u>Exhibit III</u> (Nos. 1, 8, 13 and 47). In addition, BeneFirst, LLC failed to fully investigate claims referenced in <u>Exhibit II</u> (Nos. 1-20, 64-67 and 77), and <u>Exhibit III</u> (Nos. 1-3, 5, 6, 13, 23, 34, 41-43 and 53).

Further answering, Plaintiff states that while discovery is ongoing and, as a result of BeneFirst, LLC's failure to comply with the Court's Order of February 6, 2007, Plaintiff has been unable to conduct a full audit of all claims under the Plans, Plaintiff reserves the right to supplement this Answer if and when it discovers other wrongful or negligent acts in the administration of the above-referenced Plans by BeneFirst, LLC.

<u>Interrogatory No. 8</u>

Do you contend that the defendant paid **improper amounts** for claims? If so, identify each such claim by claimant, date of claim, claim number, amount paid, and description of procedure/service/benefit, and state the amount you believe should have been paid and the basis for your contention.

Answer No. 8

Yes. Please refer to Plaintiff's Answer to Interrogatory No. 5.

Supplemental Answer No. 8

**OBJECTION:** Plaintiff objects to this Interrogatory to the extent that it is limited to instances where BeneFirst "paid improper amounts for claims" where BeneFirst, LLC's improper claims adjudication falls outside the scope of that specific category. Further, BeneFirst, LLC has failed to comply with the Court's (Hillman, J.) February 6, 2007 Order which required BeneFirst, LLC to "produce the Medical Bills and Claims Forms for the approximately 3,000 claims as specified by the Plaintiffs . . . ." BeneFirst, LLC has only produced claims records relating to 1,882 of the 2,991 claims subject to the Court's Order.

BeneFirst, LLC's failure to comply with the Court's Order of February 6, 2007, has resulted in Plaintiff having insufficient documentation to conduct a full audit and therefore Plaintiff is unable to provide a complete Answer to this Interrogatory. Plaintiff refers to Exhibit I attached hereto which reflects all of the claims for which BeneFirst, LLC has failed to provide supporting records, which include "provider bills." Because the provider bill is the document that initiates and supports the request for reimbursement consideration, if this key document is missing, it is impossible to affirm that adjudication of eligible benefits occurred correctly. Such undocumented claims represent claim errors since BeneFirst, LLC cannot produce the provider bills that would allow affirmation of accurate adjudication.

In addition, pursuant to Section I(B)(3) of the Agreement, BeneFirst, LLC was obligated to maintain all claims records for two years from the date of termination of the Agreement. The Agreement was terminated on or about December 31, 2004. Plaintiff's Complaint was filed less than one year later, on or about September 12, 2005. BeneFirst, LLC was contractually obligated to maintain all claims records and failed to do so. Further, once BeneFirst, LLC was aware of the likelihood of litigation, it was obligated to maintain all claims records and refrain from destroying

them. Plaintiff reserves the right to move the Court for discovery against BeneFirst, LLC for its clear spoliation of evidence. Notwithstanding and without waiving the foregoing objections, Plaintiff provides the following Answer:

Yes, BeneFirst, LLC has paid improper amounts for claims and refers to Exhibit I, Exhibit II (Nos. 21-34, 38, 47-64, 68-76, 79-93, 100, 107-114 and 116), and Exhibit III (Nos. 1, 2, 4, 5, 9, 10, 13, 14, 15, 16, 18, 19, 21, 22, 24-30, 32, 33, 36-42, 44-49, 51 and 52). In addition, BeneFirst, LLC failed to fully investigate claims referenced in Exhibit II (Nos. 1-20, 64-67 and 77), and Exhibit III (Nos. 1-3, 5, 6, 13, 23, 34, 41-43 and 53).

Further answering, Plaintiff states that while discovery is ongoing and, as a result of BeneFirst, LLC's failure to comply with the Court's Order of February 6, 2007, Plaintiff has been unable to conduct a full audit of all claims under the Plans, Plaintiff reserves the right to supplement this Answer if and when it discovers other wrongful or negligent acts in the administration of the above-referenced Plans by BeneFirst, LLC.

Interrogatory No. 9

Do you contend that the defendant improperly calculated applicable **deductibles**? If so, identify relevant claims by claimant, date of claim, claim number, description of procedure/service/benefit, and the deductible that was applied, the deductible that you believe should have been applied and the basis for your contention.

Answer No. 9

Yes. Please refer to Plaintiff's Answer to Interrogatory No. 5.

Supplemental Answer No. 9

**OBJECTION:** Plaintiff objects to this Interrogatory to the extent that it is limited to instances where BeneFirst "improperly calculated applicable deductibles" where BeneFirst, LLC's improper claims adjudication falls outside the scope of that specific category. Further, BeneFirst, LLC has failed to comply with the Court's (Hillman, J.) February 6, 2007 Order which required

BeneFirst, LLC to "produce the Medical Bills and Claims Forms for the approximately 3,000 claims as specified by the Plaintiffs . . . ." BeneFirst, LLC has only produced claims records relating to 1,882 of the 2,991 claims subject to the Court's Order.

BeneFirst, LLC's failure to comply with the Court's Order of February 6, 2007, has resulted in Plaintiff having insufficient documentation to conduct a full audit and therefore Plaintiff is unable to provide a complete Answer to this Interrogatory. Plaintiff refers to Exhibit I attached hereto which reflects all of the claims for which BeneFirst, LLC has failed to provide supporting records, which include "provider bills." Because the provider bill is the document that initiates and supports the request for reimbursement consideration, if this key document is missing, it is impossible to affirm that adjudication of eligible benefits occurred correctly. Such undocumented claims represent claim errors since BeneFirst, LLC cannot produce the provider bills that would allow affirmation of accurate adjudication.

In addition, pursuant to Section I(B)(3) of the Agreement, BeneFirst, LLC was obligated to maintain all claims records for two years from the date of termination of the Agreement. The Agreement was terminated on or about December 31, 2004. Plaintiff's Complaint was filed less than one year later, on or about September 12, 2005. BeneFirst, LLC was contractually obligated to maintain all claims records and failed to do so. Further, once BeneFirst, LLC was aware of the likelihood of litigation, it was obligated to maintain all claims records and refrain from destroying them. Plaintiff reserves the right to move the Court for sanctions against BeneFirst, LLC for its clear spoliation of evidence. Notwithstanding and without waiving the foregoing objections, Plaintiff provides the following Answer:

Yes, BeneFirst, LLC has improperly calculated applicable deductibles and refers to Exhibit I, Exhibit II (Nos. 71-76), and Exhibit III (Nos. 16, 18, 22, 47 and 51). In addition BeneFirst, LLC failed to fully investigate claims referenced in Exhibit II (Nos. 1-20, 64-67 and 77), and Exhibit III (Nos. 1-3, 5, 6, 13, 23, 34, 41-43 and 53).

13

Further answering, Plaintiff states that while discovery is ongoing and, as a result of BeneFirst, LLC's failure to comply with the Court's Order of February 6, 2007, Plaintiff has been unable to conduct a full audit of all claims under the Plans, Plaintiff reserves the right to supplement this Answer if and when it discovers other wrongful or negligent acts in the administration of the above-referenced Plans by BeneFirst, LLC.

<u>Interrogatory No. 10</u>

Do you contend that your stop loss policy **premiums** were affected by anything done by the defendant? If so, describe the basis for your contention that your premiums were so affected and the amounts to which they were affected.

<u>Answer No. 10</u>

Yes. Because premiums are impacted by loss history, the fact that Plaintiff's losses appeared greater than they actually were increased Plaintiff's premium. Plaintiff does not know yet the extent of that loss. Whereas discovery is ongoing in this matter, Plaintiff reserves the right to supplement this Answer in the future.

<u>Supplemental Answer No. 10</u>

**OBJECTION**: Plaintiff objects to this Interrogatory on the grounds that BeneFirst, LLC has failed to comply with the Court's (Hillman, J.) February 6, 2007 Order which required BeneFirst, LLC to "produce the Medical Bills and Claims Forms for the approximately 3,000 claims as specified by the Plaintiffs . . . ." BeneFirst, LLC has only produced claims records relating to 1,882 of the 2,991 claims subject to the Court's Order.

BeneFirst, LLC's failure to comply with the Court's Order of February 6, 2007, has resulted in Plaintiff having insufficient documentation to conduct a full audit and therefore Plaintiff is unable to provide a complete Answer to this Interrogatory. Plaintiff refers to <u>Exhibit I</u> attached hereto which reflects all of Plaintiff's employees' claims for which BeneFirst, LLC has failed to provide supporting records, which includes "provider bills." Because the provider bill is

the document that initiates and supports the request for reimbursement consideration, if this key document is missing, it is impossible to affirm that adjudication of eligible benefits occurred correctly. Such undocumented claims represent claim errors since BeneFirst, LLC cannot produce the provider bills that would allow affirmation of accurate adjudication.

In addition, pursuant to Section I(B)(3) of the Agreement, BeneFirst, LLC was obligated to maintain all claims records for two years from the date of termination of the Agreement. The Agreement was terminated on or about December 31, 2004. Plaintiff's Complaint was filed less than one year later, on or about September 12, 2005. BeneFirst, LLC was contractually obligated to maintain all claims records and failed to do so. Further, once BeneFirst, LLC was aware of the likelihood of litigation, it was obligated to maintain all claims records and refrain from destroying them. Plaintiff reserves the right to move the Court for sanctions against BeneFirst, LLC for its clear spoliation of evidence. Notwithstanding and without waiving the foregoing objections, Plaintiff provides the following Answer:

Yes. Because premiums are impacted by loss history, the fact that Plaintiff's losses appeared greater than they actually were increased Plaintiff's premium. Plaintiff has estimated that its premiums increased by approximately $192,700.00. Further answering, Plaintiff states that since discovery is ongoing, Plaintiff reserves the right to supplement this Answer if and when it discovers further damages suffered as a result of BeneFirst, LLC's errors and omissions in connection with its administration of the above-referenced Plans.

Interrogatory No. 11

Do you contend that you have been damaged by any other act, error, or omission on the part of BeneFirst that has not been described in your response to a preceding interrogatory? If so, describe the nature of said act, error, or omission.

Answer No. 11

Plaintiff is unaware of any damages by any other act, error, or omission on the part of

BeneFirst, LLC other than those referenced in Plaintiff's Answer to Interrogatory No. 5. Further

answering, Plaintiff states that since discovery is ongoing, Plaintiff reserves the right to

supplement this Answer if and when it discovers any other act, error, or omission on the part of

BeneFirst that has not been described in Plaintiff's Answers to the preceding interrogatories.

Supplemental Answer No. 11

**OBJECTION**:  Plaintiff objects to this Interrogatory on the grounds that BeneFirst, LLC

has failed to comply with the Court's (Hillman, J.) February 6, 2007 Order which required

BeneFirst, LLC to "produce the Medical Bills and Claims Forms for the approximately 3,000

claims as specified by the Plaintiffs . . . ."  BeneFirst, LLC has only produced claims records

relating to 1,882 of the 2,991 claims subject to the Court's Order.  BeneFirst, LLC's failure to

comply with the Court's Order of February 6, 2007, has resulted in Plaintiff having insufficient

documentation to conduct a full audit and therefore Plaintiff is unable to provide a complete

Answer to this Interrogatory.  Plaintiff refers to <u>Exhibit I</u> attached hereto which reflects all of

Plaintiff's employees' claims for which BeneFirst, LLC has failed to provide supporting records,

including: "provider bills."  Because the provider bill is the document that initiates and supports

the request for reimbursement consideration, if this key document is missing, it is impossible to

affirm that adjudication of eligible benefits occurred correctly.   Such undocumented claims

represent claim errors since BeneFirst, LLC cannot produce the provider bills that would allow

affirmation of accurate adjudication.

In addition, pursuant to Section I(B)(3) of the Agreement, BeneFirst, LLC was obligated to

maintain all claims records for two years from the date of termination of the Agreement.   The

Agreement was terminated on or about December 31, 2004.  Plaintiff's Complaint was filed less

than one year later, on or about September 12, 2005. BeneFirst, LLC was contractually obligated

to maintain all claims records and failed to do so.  Further, once BeneFirst, LLC was aware of the

likelihood of litigation, it was obligated to maintain all claims records and refrain from destroying

{Client Files\lit\302508\0002\01035216.DOC;1}

them. Plaintiff reserves the right to move the Court for sanctions against BeneFirst, LLC for its clear spoliation of evidence. Notwithstanding and without waiving the foregoing objections, Plaintiff provides the following Answer:

Plaintiff is unaware of any damages by any other act, error, or omission on the part of BeneFirst, LLC other than those referenced in Plaintiff's Supplemental Answers to Interrogatory Nos. 5-10. Further answering, Plaintiff states that since discovery is ongoing, Plaintiff reserves the right to supplement this Answer if and when it discovers any other act, error, or omission on the part of BeneFirst, LLC that has not been described in Plaintiff's Answers to these interrogatories.

Interrogatory No. 12

If you contend that any act, error or omission by BeneFirst constituted a breach of contract, identify the contract at issue, the specific language of the contract you contend was breached, and how BeneFirst breached that contractual language.

Answer No. 12

Plaintiff claims that BeneFirst, LLC breached the Agreement. Plaintiff states that BeneFirst, LLC breached Section I(B)(1) which provides that "the Plan Administrator, as Agent of the Plan Sponsor, shall:... [p]ay plan benefits in its usual and customary manner subject to and in accordance with this Agreement to or on behalf of persons entitled to receive plan benefits..." Further answering, Plaintiff states that since discovery is ongoing, Plaintiff reserves the right to supplement this Answer if and when it discovers other contract provisions which were breached as a result of the acts or omissions of BeneFirst, LLC in connection with its administration of the above-referenced Plans. In further response to this Interrogatory, Plaintiff refers to its Answer to Interrogatory No. 5.

Supplemental Answer No. 12

Plaintiff claims that BeneFirst, LLC breached the Agreement. Plaintiff states that BeneFirst, LLC has breached the following provisions of the Agreement:

Section I(B)(1) which provides:

The Plan Administrator, as Agent of the Plan Sponsor, shall:... [p]ay plan benefits in its usual and customary manner subject to and in accordance with this Agreement to or on behalf of persons entitled to receive plan benefits....

Section I(B)(3): which provides:

The Plan Administrator, as Agent of Plan Sponsor, shall... [m]aintain, for the duration of this Agreement and for two (2) years thereafter, adequate records of all transactions between Plan Sponsor, the Plan Administrator and plan participants. The records are the property of the Plan Sponsor. The Plan Sponsor has the right to continuing access to their records.

Section IV(C) which provides:

If it is determined that any payment has been made under this Agreement to an ineligible employee or dependent, or if its determined that more or less than the correct amount has been paid by the Plan Administrator, the Plan Administrator will make a diligent effort to recover the payment made to an ineligible person but, the Plan Administrator will not be required to initiate court proceedings for any such recovery.

Further answering, Plaintiff states that since discovery is ongoing, Plaintiff reserves the right to supplement this Answer if and when it discovers other contract provisions which were breached as a result of the acts or omissions of BeneFirst, LLC in connection with its administration of the above-referenced Plans. In further response to this Interrogatory, Plaintiff refers to its Supplemental Answers to Interrogatory Nos. 5-9.

Interrogatory No. 13

Do you claim that BeneFirst was a fiduciary for purposes of ERISA with respect to the Plan for any given year identified in your response to interrogatory number 4? If so, please state:

a.      the year or years;

b.      the aspects of the Plan's management, operation or administration for which BeneFirst was a fiduciary;

c.      the damages you allegedly suffered as a result; and

d.      the factual basis for these assertions.

Answer No. 13

    Yes.

    a.    2001 - 2004.

    b.    The aspects of the Plan's management, operation or administration for which BeneFirst was a fiduciary are outlined in the parties' Agreement and the respective Summary Plan Descriptions.

    c.    Please refer to Plaintiff's Answer to Interrogatory No. 5.

    d.    Please refer to Plaintiff's Answer to Interrogatory No. 5.

Supplemental Answer No. 13

    Yes.

    a.    2001 - 2004.

    b.    The aspects of the Plan's management, operation or administration for which BeneFirst was a fiduciary are outlined in the parties' Agreement and the respective Summary Plan Descriptions.

    c.    Please refer to Plaintiff's Supplemental Answers to Interrogatory Nos. 5-10 and 17 and Exhibits I -III.

    d.    Please refer to Plaintiff's Supplemental Answers to Interrogatory Nos. 5-10 and 17 and Exhibits I -III.

Interrogatory No. 14

    Do you claim that BeneFirst had discretionary authority with respect to the Plan or any aspect of it for any given year identified in your response to interrogatory number 4? If so, please state:

    a.    the year or years;

    b.    the aspects of the Plan's management, operation or administration for which BeneFirst exercised discretionary authority;

19

c.    the damages you allegedly suffered as a result; and

d.    the factual basis for these assertions.

Answer No. 14

Yes.

a.    2001 - 2004.

b.    The aspects of the Plan's management, operation or administration for which BeneFirst was a fiduciary are outlined in the parties' Agreement and the respective Summary Plan Descriptions.

c.    Please refer to Plaintiff's Answer to Interrogatory No. 5.

d.    Please refer to Plaintiff's Answer to Interrogatory No. 5.

Supplemental Answer No. 14

Yes.

a.    2001 - 2004.

b.    The aspects of the Plan's management, operation or administration for which BeneFirst was a fiduciary are outlined in the parties' Agreement and the respective Summary Plan Descriptions.

c.    Please refer to Plaintiff's Supplemental Answers to Interrogatory Nos. 5-10 and 17 and Exhibits I -III.

d.    Please refer to Plaintiff's Supplemental Answers to Interrogatory Nos. 5-10 and 17 and Exhibits I -III.

Interrogatory No. 15

Do you claim that BeneFirst committed breaches of fiduciary duty with respect to the Plan for the given year identified in your response to interrogatory number 4? If so, please state:

a.    the year or years;

b.    the exact acts by BeneFirst which constituted such breaches;

c.    the damages you allegedly suffered as a result; and

d.    the factual basis for these assertions.

Answer No. 15

Yes.

a.    2001 - 2004.

b.    BeneFirst breached its fiduciary duty to Plaintiff by improperly performing its responsibilities as Third Party Administrator and erroneously paying claims as more specifically described in Plaintiff's Answer to Interrogatory No. 5.

c.    Please refer to Plaintiff's Answer to Interrogatory No. 5.

d.    Please refer to Plaintiff's Answer to Interrogatory No. 5.

Further answering, Plaintiff states that since discovery is ongoing, Plaintiff reserves the right to supplement this Answer if and when it discovers further breaches of fiduciary duty and/or other damages suffered as a result of BeneFirst, LLC's breaches of fiduciary duty in connection with its administration of the above-referenced Plans.

Supplemental Answer No. 15

Yes.

a.    2001 - 2004.

b.    BeneFirst breached its fiduciary duty to Plaintiff by improperly performing its responsibilities as Third Party Administrator and failing to investigate and/or erroneously paying claims as more specifically described in Plaintiff's Supplemental Answers to Interrogatory Nos. 5-9.

c.    Please refer to Plaintiff's Supplemental Answers to Interrogatory Nos. 5-10 and 17 and Exhibits I -III.

d.    Please refer to Plaintiff's Supplemental Answers to Interrogatory Nos. 5-10 and 17 and Exhibits I -III.

Further answering, Plaintiff states that since discovery is ongoing, Plaintiff reserves the right to supplement this Answer if and when it discovers further breaches of fiduciary duty and/or other damages suffered as a result of BeneFirst, LLC's breaches of fiduciary duty in connection with its administration of the above-referenced Plans.

Interrogatory No. 16

How and when did you first discover the acts, errors, or omissions previously discussed in your answers to the preceding interrogatories?

Answer No. 16

Plaintiff first discovered BeneFirst, LLC's acts, errors, and/or omissions after receiving a report from Plaintiff's excess insurance carrier on or about April 22, 2005.

Interrogatory No. 17

For each category of acts, errors or omissions you have discussed in your response to any of the preceding interrogatories, state the damages you claim to have sustained, and describe the method or basis used to calculate your damages.

Answer No. 17

Please refer to Plaintiff's Answer to Interrogatory No. 5. Further answering, Plaintiff states that since discovery is ongoing, Plaintiff reserves the right to supplement this Answer if and when it discovers further damages suffered as a result of BeneFirst, LLC's errors and omissions in connection with its administration of the above-referenced Plans.

Supplemental Answer No. 17

**OBJECTION:** Plaintiff objects to this Interrogatory on the grounds that BeneFirst, LLC has failed to comply with the Court's (Hillman, J.) February 6, 2007 Order which required BeneFirst, LLC to "produce the Medical Bills and Claims Forms for the approximately 3,000 claims as specified by the Plaintiffs . . . ." BeneFirst, LLC has only produced claims records relating to 1,882 of the 2,991 claims subject to the Court's Order.

BeneFirst, LLC's failure to comply with the Court's Order of February 6, 2007, has resulted in Plaintiff having insufficient documentation to conduct a full audit and therefore Plaintiff is unable to provide a complete Answer to this Interrogatory. Plaintiff refers to Exhibit I attached hereto which reflects all of Plaintiff's employees' claims for which BeneFirst, LLC has failed to provide supporting records, which includes "provider bills." Because the provider bill is the document that initiates and supports the request for reimbursement consideration, if this key document is missing, it is impossible to affirm that adjudication of eligible benefits occurred correctly. Such undocumented claims represent claim errors since BeneFirst, LLC cannot produce the provider bills that would allow affirmation of accurate adjudication.

In addition, pursuant to Section I(B)(3) of the Agreement, BeneFirst, LLC was obligated to maintain all claims records for two years from the date of termination of the Agreement. The Agreement was terminated on or about December 31, 2004. Plaintiff's Complaint was filed less than one year later, on or about September 12, 2005. BeneFirst, LLC was contractually obligated to maintain all claims records and failed to do so. Further, once BeneFirst, LLC was aware of the likelihood of litigation, it was obligated to maintain all claims records and refrain from destroying them. Plaintiff reserves the right to move the Court for sanctions against BeneFirst, LLC for its clear spoliation of evidence. Notwithstanding and without waiving the foregoing objections, Plaintiff provides the following Answer:

Please refer to Plaintiff's Supplemental Answers to Interrogatory Nos. 5-9 and Exhibits I-III. Notwithstanding the woefully insufficient documentation produced by BeneFirst, LLC and the limited audit sample, to date Plaintiff has determined that BeneFirst, LLC has overpaid or underpaid claims totaling $330,532.58; BeneFirst, LLC has insufficiently investigated and thus improperly adjudicated claims totaling $827,078.07; and has undocumented claims totaling

$2,555,922.38.[2]

Further, Plaintiff's position is that based on a statistically sound extrapolation of the value of errors reflected in Exhibits I and II[3] against the total amount of claims paid in the audit population, BeneFirst, LLC's claim errors total $7,989,415.69. This amount was arrived at by adding together the total values of Payment Errors, Procedural Errors and Undocumented Claims, subtracting that amount from the total dollar amount of claim payments audited, dividing that amount by the total dollar amount of claim payments audited, subtracting that amount from 100% and multiplying that figure by the total dollars paid for the audit population.

Each documented claim transaction which was subject to Plaintiff's audit was examined to determine adjudication accuracy, including the following: 1) Claimant eligibility verification; 2) Detection of duplicate claim payments; 3) Verification of creditable coverage or application of preexisting conditions limitations, if applicable; 4) Recognition of negotiated provider discounts; 5) Detection of other insurance coverage; 6) Application of coordination of benefits provisions; 7) Application of Plan design provisions; 8) Calculation of benefit payments amounts; and 9) Completeness of file documentation and information to process claims.

Further answering, Plaintiff states that since discovery is ongoing, Plaintiff reserves the right to supplement this Answer if and when it discovers further damages suffered as a result of BeneFirst, LLC's errors and omissions in connection with its administration of the above-referenced Plans.

Interrogatory No. 18

Identify your stop loss insurers for the Plan from 5 years before the first plan year that you identified as a response to Interrogatory #4 up to the present, and for each policy year, identify the applicable premium rate, the number of employee and family units covered, and any applicable

---

[2] These totals combine the Procedural and Payment Claim Errors reflected in Exhibits I - III.

[3] Exhibits I and II reflect the results of Plaintiff's audit conducted in September/October, 2007 which was based on BeneFirst, LLC's incomplete document production.

24

aggregate factors that applied on a per employee or per family basis.

Answer No. 18

**OBJECTION**: Plaintiff objects to this Interrogatory to the extent that it is overly broad, unduly burdensome and vague. Plaintiff further objects to the term "applicable aggregate factors," which is vague and undefined. Plaintiff will limit its Answer to plan years at issue in this action. Notwithstanding and without waiving the foregoing objections, Plaintiff states the following:

For the policy year 2001-2002 the stop loss insurer was BCS Underwriters. The annual premium for the Specific Excess Loss was $116,412.00. It covered 175 single and 324 family units. The aggregate factor was $381.88.

For the policy year 2002-2003 the stop loss insurer was Combined Insurance Company of America. The aggregate premium rate payable per covered participant unit per month was $3.98 and the specific monthly premium rates payable per covered participant unit for the coverage period was $10.31 (single) and $24.07 (family). It covered 155 single and 320 family units.

For the policy year 2003-2004 the stop loss insurer was Combined Insurance Company of America. The aggregate premium rate payable per covered participant unit per month was $3.72 and the specific monthly premium rates payable per covered participant unit for the coverage period was $8.13 (single) and $19.88 (family). It covered 168 single and 311 family units.

For the policy year 2004-2005 the stop loss insurer was Starline USA, LLC the Issuing Carrier was Underwriters at Lloyd's of London. The annual premium was $181,217.00. Total aggregate factors were $495.00 (single) and $1,248.00 (family). It covered 159 single and 304 family units.

In further response to this Interrogatory, Plaintiff refers to insurance materials produced pursuant to Fed.R.Civ.P. 33(d).

Interrogatory No. 19

Have you ever had any communications with any representative of BeneFirst regarding any of the acts, omissions, or errors identified in any of your answers to the foregoing interrogatories? If so, please identify when the conversation occurred, how it took place (i.e. telephone, e-mail, mail, face to face, etc.), who the parties to the conversation were, and the substance of the conversation.

Answer No. 19

No.

Interrogatory No. 20

Please state what actions have been taken by you to mitigate the damage sought by you in this lawsuit, the date any such actions were taken, and the results of said action.

Answer No. 20

Plaintiff changed its Third Party Administrator.

Interrogatory No. 21

Was there a broker for your account with BeneFirst and if so, identify the broker(s).

Answer No. 21

Charles S. Lord of the Chittenden Insurance Group.

Interrogatory No. 22

Who was the broker for your account(s) with the stop loss insurers identified in your Answer to the preceding interrogatories.

Answer No. 22

Charles S. Lord of Chittenden Insurance Group.

Interrogatory No. 23

Do you claim to be entitled to payment of your attorney's fees in connection with this matter? If so, state the amount of attorney's fees you have incurred to date and state the basis for

your claim of attorney's fees.

Answer No. 23

Yes.  Plaintiff is entitled to attorney's fees under ERISA, 29 U.S.C. § 1001 *et seq*.  Plaintiff reserves the right to supplement this Answer in the future.

Interrogatory No. 24

Please identify what documents you received from BeneFirst before, during and after BeneFirst's tenure with the Plan, and who presently has custody of them.

Answer No. 24

**OBJECTION**:  Plaintiff objects to this Interrogatory to the extent that it is overly broad, vague and unduly burdensome.  Notwithstanding and without waiving the foregoing objections, Plaintiff states that all documents provided to Plaintiff by BeneFirst, LLC, to the extent that they exist, are in Plaintiff's possession.

Interrogatory No. 25

Do you claim that you were a fiduciary for purposes of ERISA for any given year identified in your response to interrogatory number 4?  If so, please state the year or years you were a fiduciary and the factual basis for your assertion.

Answer No. 25

No.

Supplemental Answer No. 25

W.E. Aubuchon Co., Inc. was a "named fiduciary" under the Medical Summary Plan Description for the years 2001-2004.

{Client Files\lit\302508\0002\01035216.DOC;1}

Signed under the pains and penalties of perjury this 14 day of November, 2007.

Sarah Q. Arel, Benefits Manager,
W.E. Aubuchon Co., Inc.

AS TO OBJECTIONS:

Louis M. Ciavarra (BBO#546481)
Ryan T. Killman (BBO#654562)
Colleen E. Cushing (BBO# 663498)
Bowditch & Dewey, LLP
311 Main Street
P.O. Box 15156
Worcester, MA 01615-0156
Telephone: (508) 926-3408
Facsimile: (508) 929-3011

Dated: November 14, 2007

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of November, 2007 I served the foregoing document by mailing a copy of same, first class, postage prepaid, to:

Stephen D. Rosenberg, Esq.
Eric L. Brodie, Esq.
The McCormack Firm, LLC
One International Place, 7th Floor
Boston, MA 021010

Ryan T. Killman

28

{Client Files\lit\302508\0002\01035216.DOC;1}

**1**

{}

# EXHIBIT I

## Undocumented Claims
## W. E. Aubuchon Co., Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| Agate, Michael | 104681445 | Lisa | 40101713-01 | 9/29/2004 | $ 7,618.01 |
| | | | 40107749-01 | 9/29/2004 | $ 4,000.00 |
| | | | 40091204-01 | 7/2/2004 | $ 2,004.95 |
| | | | 40107747-01 | 9/29/2004 | $ 1,520.00 |
| | | | 10120258-01 | 8/25/2001 | $ 743.59 |
| | | | 40088428-01 | 6/16-6/30/04 | $ 975.00 |
| | | | 40107750-01 | 9/29/2004 | $ 1,000.00 |
| | | | 10138194-01 | 8/25/2001 | $ 586.00 |
| Agate, Michael | 104681445 | Self | 30010578-01 | 12/10/2002 | $ 800.00 |
| Aiken, Allen | 019509540 | Self | 20118082-01 | 9/16/2002 | $ 2,618.00 |
| Aivaliotis, Steven | 003487861 | Laura | 40018017-02 | 1/26/2004 | $ 1,910.00 |
| Alger, Stephen | 016428328 | Self | 2006946-01 | 9/5/2002 | $ 592.00 |
| Anastasio, Paul | 006605350 | Nicolas | 40007029-01 | 11/7/2003 | $ 594.39 |
| Archambeault, Dennis | 003406732 | Donna | 40098079-02 | 9/17/2004 | $ 3,074.25 |
| | | | 20117685-01 | 8/14/2002 | $ 1,200.00 |
| | | | 10103541-01 | 7/9/2001 | $ 626.00 |
| Archambeault, Dennis | 003406732 | Allison | 40020958-01 | 2/1/2004 | $ 2,446.00 |
| | | | 20120736-01 | 10/7/2002 | $ 784.80 |
| Archambeault, Dennis | 003406732 | Self | 40061597-01 | 5/26/2004 | $ 1,911.20 |
| | | | 40061603-01 | 5/26/2004 | $ 871.00 |
| Archambeault, Dennis | 003406732 | Andrea | 40098713-01 | 5/20/2004 | $ 700.00 |
| Archambeault, Gerard | 001368023 | Self | 40106229-01 | 9/15-9/17/04 | $ 2,986.48 |
| | | | 40090030-01 | 11/19/2003 | $ 2,575.00 |
| | | | 40094361-01 | 8/17/2004 | $ 1,943.00 |
| | | | 40087088-01 | 7/13/2004 | $ 1,533.41 |
| | | | 40098080-01 | 8/17/2004 | $ 1,530.00 |
| | | | 40057717-01 | 11/19/2003 | $ 1,464.00 |
| | | | 40092541-01 | 8/17/2004 | $ 1,346.00 |
| | | | 40022421-01 | 1/17/2004 | $ 990.00 |
| | | | 40061620-01 | 5/20/2004 | $ 1,165.00 |
| | | | 40087480-01 | 8/4/2004 | $ 1,165.00 |

# EXHIBIT I

## Undocumented Claims
## W. E. Aubuchon Co., Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 40098082-01 | 9/16/2004 | $ 1,175.00 |
| | | | 40098083-01 | 9/16/2004 | $ 950.00 |
| | | | 40046916-01 | 4/9/2004 | $ 995.00 |
| | | | 40098081-01 | 8/31/2004 | $ 658.00 |
| Archambeault, Gerard | 001368023 | Patricia | 40060284-01 | 5/7/2004 | $ 1,003.00 |
| Andre, Arel | 003544806 | Self | 40081171-01 | 7/29/2004 | $ 1,304.00 |
| | | | 20103848-01 | 8/27/2007 | $ 827.00 |
| Andre, Arel | 003544806 | Sarah | 40094967-01 | 8/17/2004 | $1,175.00 |
| Andre, Arel | 025363234 | Sawyer | 20115001-02 | 8/26/2002 | $898.00 |
| | | | 20114997-01 | 8/26/2002 | $3,850.00 |
| | | | 20115001-01 | 8/26/2002 | $1,552.00 |
| Armitage, William | 147383106 | Shirley | 40101722-01 | 9/30/2004 | $578.00 |
| Ashley, Wayne | 009387299 | Self | 40086494-01 | 7/26/2004 | $2,289.91 |
| | | | 40051678-01 | 4/2/04-4/30/04 | $1,976.11 |
| | | | 20105147-01 | 8/22/2002 | $1,782.13 |
| | | | 40105318-01 | 9/29/2004 | $1,294.00 |
| | | | 40086495-01 | 7/26/2004 | $1,198.00 |
| | | | 40099919-01 | 9/29/2004 | $1,148.24 |
| | | | 40012932-01 | 1/8/2004 | $1,125.00 |
| | | | 20104963-01 | 8/22/2002 | $527.00 |
| Aubuchon, Daniel | 013381491 | Susan | 20088247-03 | 7/12/2002 | $ 2,100.00 |
| | | | 20124385-01 | 7/12/2002 | $ 8,431.15 |
| | | | 20124388-01 | 7/30/2002 | $ 4,833.31 |
| | | | 20101804-01 | 7/14/02-7/29/02 | $ 1,024.00 |
| | | | 20004826-01 | 1/9/2002 | $ 2,520.00 |
| | | | 40098090-01 | 9/22/2004 | $ 1,374.00 |
| | | | 20104469-01 | 7/29/02-7/31/02 | $ 1,175.00 |
| | | | 20104472-01 | 8/23/2002 | $ 1,200.00 |
| | | | 20120004-01 | 7/17/02-9/30/02 | $ 948.00 |
| | | | 20103555-02 | 7/30/2002 | $ 600.00 |
| | | | 20110206-01 | 8/23/2002 | $ 525.00 |

# EXHIBIT I

Undocumented Claims

W. E. Aubuchon Co., Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| Aubuchon, Donat | 003345938 | Suzette | 20118376-01 | 9/21/2002 | $ 1,134.00 |
| Aubuchon, Daniel | 013381491 | Susan | 40098089-01 | 9/22/2004 | $ 1,161.44 |
| Aubuchon, David | 24303387 | Beverly | 40002341-01 | 12/2/2003 | $ 1,850.00 |
| | | | 30126481-01 | 11/24/2003 | $ 705.00 |
| Aubuchon, Gerard | 017126667 | Self | 40012498-01 | 1/15/2004 | $ 500.00 |
| Aubuchon, Lindsey | 021628786 | Alexander | 40046920-01 | 4/12/2004 | $ 901.00 |
| Aubuchon, Michael | 023369201 | Self | 20120799-01 | 10/9/2002 | $ 2,050.00 |
| | | | 20027025-01 | 2/26/2002 | $ 2,550.00 |
| Aubuchon, Michael | 023369201 | Gloria | 10108373-01 | 8/22/2001 | $ 1,600.00 |
| Aubuchon, Phillip | 032368632 | Self | 20108879-01 | 3/29/2002 | $ 3,732.95 |
| | | | 20120794-01 | 3/29/2002 | $ 750.00 |
| Aubuchon, Scott | 027682251 | Kirsten | 30062003-01 | 5/22/2003 | $ 2,900.00 |
| | | | 30054033-01 | 4/15/2003 | $ 649.00 |
| ᴊuchon, Thomas | 017503470 | Self | 20103888-01 | 3/20/2002 | $ 1,075.50 |
| | | | 20122789-01 | 10/24/2002 | $ 1,391.23 |
| | | | 20118087-01 | 9/19/2002 | $ 1,123.00 |
| | | | 20039024-01 | 2/7/2002 | $ 903.70 |
| Aubuchon, Thomas | 017503470 | Patricia | 20078810-01 | 6/10/2002 | $ 1,950.00 |
| Aubuchon, William | 033345935 | Karson | 30001903-01 | 12/23/2002 | $ 1,275.85 |
| | | | 40001555-01 | 12/12/2003 | $ 2,603.00 |
| | | | 30116648-01 | 10/20/2003 | $ 1,078.00 |
| | | | 30116645-01 | 10/20/2003 | $ 1,072.00 |
| | | | 40012942-01 | 12/12/2003 | $ 885.00 |
| Aubuchon, William | 033345935 | Self | 40108662-01 | 10/27/2004 | $ 1,350.00 |
| Aubuchon, Brittany | 019363864 | Brittany | 40116955-01 | 11/10/2004 | $ 780.00 |
| Aubuchon, William | 015059456 | Camille | 40007136-01 | 9/18/2003 | $1,345.00 |
| | | | 20004825-01 | 1/9/2002 | $2,000.00 |
| | | | 20106270-01 | 9/5/2002 | $912.00 |
| | | | 30070651-01 | 6/24/2003 | $1,175.00 |

# EXHIBIT I

## Undocumented Claims
### W. E. Aubuchon Co., Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| Aubuchon, William | 015059456 | Self | 20029944-01 | 1/25/2002 | $4,050.00 |
| | | | 10133759-01 | 10/25/2001 | $7,275.00 |
| | | | 40007133-01 | 9/18/2003 | $632.00 |
| | | | 30105434-01 | 9/26/2003 | $750.00 |
| Aubuchon, Pierre | 033223323 | Self | 30050354-01 | 4/15/2003 | $ 1,950.00 |
| | | | 30050337-01 | 4/1/2003 | $ 750.00 |
| | | | 20062660-01 | 3/14/2002 | $ 3,058.85 |
| Aumand, Patrick | 008429685 | Ryan | 20074792-01 | 1/24/2002 | $ 1,042.50 |
| | | | 20074794-01 | 4/2/2002 | $ 1,042.50 |
| Aumand, Patrick | 008429685 | Tara | 10121073-01 | 10/5/2001 | $ 960.00 |
| Aumand, Patrick | 008429685 | Patrick | 40033500-02 | 3/18/2004 | $ 676.87 |
| | 008429685 | | 40111905-01 | 11/1/2004 | $ 584.79 |
| Avery, Tamela | 074502519 | Carl | 10121662-01 | 7/23/2001 | $ 3,247.92 |
| | | | 10121663-01 | 7/20/2001 | $ 1,959.55 |
| Avery, Tamela | 074502519 | Self | 30131552-01 | 9/27/2003 | $ 1,690.30 |
| | | | 40007183-01 | 12/18/2003 | $ 1,375.00 |
| | | | 40003978-01 | 12/22/2003 | $ 569.89 |
| Bacon, Donald | 028164971 | Jessie | 10101402-01 | 7/17/2001 | $4,600.00 |
| | | | 10104747-01 | 7/17/01-7/19/01 | $1,900.00 |
| Bacon, Donald | 028164971 | Self | 20128733-01 | 11/4/2002 | $1,867.00 |
| | | | 20128044-01 | 11/8/2002 | $1,044.00 |
| Bairos, Joao | 025529026 | Patrick | 40057760-02 | 5/10/2004 | $ 968.00 |
| | | | 40057757-02 | 5/5/2004 | $ 918.00 |
| Bairos, Joao | 025529026 | Maria | 40087598-02 | 8/3/2004 | $ 1,650.00 |
| | | | 40057755-01 | 5/3/2004 | $ 632.00 |
| Baker, James | 009603842 | Self | 20068696-01 | 5/9/02-5/10/02 | $ 12,920.50 |
| Baker, Joseph | 005462572 | Self | 10139190-01 | 9/24/2001 | $ 3,933.00 |
| | | | 10133542-01 | 10/5/2001 | $ 1,716.00 |
| | | | 10123363-01 | 9/7/2001 | $ 997.00 |
| Baker Jr., Gary | 008468618 | Self | 40088948-01 | 7/15/2004 | $ 1,597.00 |
| Barrett, William | 033600977 | Self | 40108668-01 | 10/19/2004 | $ 1,452.79 |

# EXHIBIT I

## Undocumented Claims

### W. E. Aubuchon Co., Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| Barrows, Shannon | 009526734 | Jennifer | 40076994-01 | 7/13/2004 | $ 1,691.00 |
| | | | 40086850-01 | 7/27/2004 | $ 976.00 |
| | | | 40083561-01 | 7/27/2004 | $ 675.00 |
| Basque, Pauline | 012348682 | Self | 20125976-01 | 11/12/2002 | $ 1,600.00 |
| | | | 20128634-01 | 11/12/2002 | $ 1,752.00 |
| | | | 20039095-01 | 2/6/02-2/28/02 | $ 1,079.00 |
| Beauchemin, Donna | 020343481 | Peter | 20074508-01 | 8/21/2001 | $ 1,130.00 |
| Bedard, Roberta | 049661631 | Kristin | 40068857-01 | 6/15/2004 | $ 2,880.00 |
| | | | 40062607-01 | 6/14/04-6/17/04 | $ 28,130.23 |
| | | | 40066842-01 | 6/11/2004 | $ 732.00 |
| | | | 30084168-01 | 7/25/2003 | $ 620.00 |
| Bedard, Roberta | 049661631 | Samuel | 30082099-01 | 6/26/2003 | $ 2,658.00 |
| | | | 20002372-01 | 9/18/2001 | $ 1,495.00 |
| | | | 20131169-02 | 11/12/2002 | $ 1,169.00 |
| | | | 20105688-01 | 9/3/2002 | $ 923.00 |
| | | | 20118084-01 | 10/1/2002 | $ 834.00 |
| | | | 20074967-01 | 5/28/2002 | $ 784.00 |
| | | | 20102838-01 | 8/6/2002 | $ 772.00 |
| Bedard, Samuel | 007820809 | Self | 40111941-01 | 6/15/2004 | $ 3,000.00 |
| | | | 40087096-01 | 7/27/2004 | $ 2,429.00 |
| | | | 40083308-01 | 7/13/2004 | $ 1,328.00 |
| | | | 40083310-01 | 7/16/2004 | $ 1,242.00 |
| | | | 40088001-01 | 8/6/2004 | $ 1,219.00 |
| | | | 40079999-01 | 7/2/2004 | $ 820.00 |
| | | | 40076708-01 | 7/6/2004 | $ 796.00 |
| | | | 40080002-01 | 7/9/2004 | $ 796.00 |
| | | | 40083320-01 | 7/20/2004 | $ 796.00 |
| | | | 40086549-01 | 7/23/2004 | $ 796.00 |
| | | | 40088004-01 | 8/10/2004 | $ 796.00 |
| | | | 40090147-01 | 8/13/2004 | $ 796.00 |

# EXHIBIT I

Undocumented Claims

W. E. Aubuchon Co., Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 40090149-01 | 8/17/2004 | $ 796.00 |
| | | | 40094356-01 | 8/31/2004 | $ 796.00 |
| | | | 40108674-01 | 7/30/2004 | $ 796.00 |
| | | | 40025615-01 | 12/23/03-12/24/03 | $ 776.00 |
| | | | 40083311-01 | 7/16/2004 | $ 735.00 |
| | | | 40051720-01 | 4/30/2004 | $ 708.00 |
| Bedard, Samuel | 007820809 | Samuel | 4009165401 | 8/24/2004 | $ 1,346.00 |
| Bellavance, Marc | 008420415 | Self | 40008990-01 | 1/13/2004 | $ 1,060.00 |
| | | | 40009236-02 | 1/13/2004 | $ 741.00 |
| Bellavance, Marc | 008420415 | Joyce | 40066847-01 | 5/18/2004 | $ 5,356.84 |
| Beloin, Gregory | 014580694 | Kehaulant | 20130289-01 | 10/16/2002 | $ 3,000.00 |
| | | | 30004587-01 | 11/22/2002 | $ 500.00 |
| Beloin, Gregory | 014580694 | Jaime | 40100864-01 | 10/14/04-10/15/04 | $ 6,063.71 |
| | | | 20125032-01 | 10/16/02-10/19/02 | $ 2,250.54 |
| Bergeron, Andrew | 008504811 | Self | 20128168-01 | 10/22/2002 | $ 1,780.00 |
| | | | 20119671-01 | 10/3/2002 | $ 1,397.90 |
| | | | 20116417-01 | 10/3/2002 | $ 1,000.00 |
| | | | 20121443-01 | 10/3/2002 | $ 525.00 |
| Berlo, Eric | 026509910 | Trevor | 40098096-01 | 9/23/2004 | $ 1,280.00 |
| | | | 40101823-02 | 9/23/2004 | $ 550.00 |
| Beroney, Kenny | 002566995 | Mitchell | 20118518-01 | 10/2/2002 | $ 664.00 |
| | | | 20104343-01 | 5/29/2002 | $ 1,983.83 |
| Beroney, Kenny | 002566995 | Rhonda | 40094266-01 | 9/14/2004 | $ 786.99 |
| Bezanson, Lorraine | 028244110 | Self | 40051725-01 | 4/27/2004 | $ 1,218.00 |
| | | | 40061657-01 | 5/6/04-5/25/04 | $ 1,024.00 |
| | | | 40054136-01 | 4/22/04-4/29/04 | $ 941.00 |

# EXHIBIT I

## Undocumented Claims
### W. E. Aubuchon Co., Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 40012994-01 | 1/14/2004 | $ 642.50 |
| | | | 40072823-01 | 6/3/04-6/8/04 | $ 548.00 |
| Bezio, Christopher | 006661443 | Mary | 40083348-01 | 7/17/04-7/18/04 | $ 2,199.50 |
| | | | 40083340-01 | 5/21/04-5/28/04 | $ 2,023.51 |
| | | | 40083344-01 | 7/15/04-7/16/04 | $ 912.32 |
| Bezio, Christopher | 006661443 | Self | 40112562-01 | 11/4/2004 | $ 646.00 |
| Bicknell, Justin | 008701394 | Self | 40000292-01 | 12/11/2003 | $ 522.90 |
| Bielski, David | 029766747 | Self | 40094210-01 | 8/31/2004 | $ 1,730.19 |
| Bierly, Naomi | 009449989 | Dennis | 40009259-01 | 1/13/2004 | $ 1,793.22 |
| | | | 40015544-01 | 1/21/2004 | $ 673.13 |
| | | | 40014267-01 | 1/21/2004 | $ 610.00 |
| Bierly, Naomi | 009449989 | Self | 40053935-01 | 5/3/2004 | $ 760.00 |
| Blodgett, Mark | 001405564 | Self | 40092583-01 | 8/26/2004 | $ 2,284.85 |
| | | | 40088014-01 | 8/3/2004 | $ 2,243.32 |
| | | | 40007206-01 | 12/26/2003 | $ 1,427.00 |
| | | | 40072832-01 | 6/16/2004 | $ 1,471.00 |
| | | | 40007208-01 | 12/31/2003 | $ 959.84 |
| | | | 40083367-01 | 6/15/2004 | $ 769.00 |
| Blood, Elizabeth | 024547760 | Self | 40107821-01 | 10/21/2004 | $ 797.00 |
| | | | 40116675-01 | 8/20/2004 | $ 880.00 |
| Boucher, Dennis | 032368751 | Self | 40026697-01 | 1/27/2004 | $ 4,169.00 |
| | | | 40018139-01 | 1/27/2004 | $ 1,507.00 |
| | | | 40094389-01 | 8/31/2004 | $ 903.00 |
| Boucher, Dennis | 032368751 | Maria | 40000183-01 | 11/26/2003 | $ 7,565.61 |
| | | | 40088019-02 | 8/2/2004 | $ 7,819.75 |
| | | | 40072839-01 | 6/22/2004 | $ 1,350.00 |
| | | | 40087637-02 | 8/2/2004 | $ 680.00 |
| | | | 30110767-01 | 10/9/2003 | $ 825.00 |
| Boudreau, Pierre | 008449730 | Patricia | 40008962-01 | 10/7/2003 | $ 672.00 |
| Boyer, James | 096585841 | Zachary | 40111451-01 | 11/17/2004 | $ 1,005.15 |

# EXHIBIT I

## Undocumented Claims
## W. E. Aubuchon Co., Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| Braden, Arnold | 005443804 | Self | 40076753-01 | 7/9/2004 | $ 2,200.00 |
| | | | 40083377-01 | 4/4/2004 | $ 1,404.50 |
| | | | 40080016-01 | 7/9/2004 | $ 1,254.00 |
| Bradley, Dennis | 383963782 | Hannah | 10137231-01 | 6/9/01-6/14/01 | $ 17,135.19 |
| | | | 10138220-01 | 8/16/2001 | $ 760.00 |
| Bradley, Dennis | 383963782 | Self | 40043443-01 | 4/2/2004 | $ 725.00 |
| Bradley, Dennis | 383963782 | Carrie | 40006225-01 | 12/22/2003 | $ 775.15 |
| | | | 40007403-01 | 12/30/2003 | $ 584.05 |
| | | | 20051839-01 | 3/6/2002 | $ 585.00 |
| Brea, Leo | 556277217 | Self | 20038343-01 | 1/16/2002 | $ 1,050.75 |
| Brochu, Gary | 009464305 | Janine | 40116966-01 | 11/19/2004 | $ 645.00 |
| Brown, Kelly | 009700903 | Self | 40029278-01 | 3/2/2004 | $ 981.45 |
| | | | 40088033-01 | 8/12/2004 | $ 683.59 |
| | | | 40094720-01 | 9/12/04-9/13/04 | $ 610.55 |
| | | | 40094370-01 | 9/11/2004 | $ 544.51 |
| Bryant, Jeffrey | 032646418 | Julia | 30033519-01 | 4/1/2003 | $ 1,025.00 |
| | | | 20118475-01 | 10/3/2002 | $ 995.00 |
| | | | 20115304-01 | 9/6/2002 | $ 800.00 |
| Bryant, Jeffrey | 032646418 | Self | 40010500-01 | 12/26/2003 | $ 888.00 |
| Bryson, Ronnie | 002603643 | Self | 40076763-01 | 7/1/2004 | $ 572.55 |
| Buckner, Marlow | 020860582 | Kristen | 40013143-01 | 1/16/2004 | $ 662.00 |
| Bulger, Mary | 001381349 | Self | 30054117-02 | 4/24/2003 | $ 872.00 |
| Burgoyne, Raymond | 0032637323 | Self | 30101582-02 | 8/18/03-9/20/03 | $ 104,379.88 |
| | | | 30090959-01 | 6/18/03-6/30/03 | $ 78,363.89 |
| | | | 30090959-03 | 7/1/03-8/17/03 | $ 165,000.00 |
| | | | 30090959-02 | 6/18/03-6/30/03 | $ 44,037.52 |
| | | | 30090959-04 | 7/1/03-8/17/03 | $ 34,096.30 |
| | | | 30090959-08 | 6/18/03-6/30/03 | $ 38,061.61 |
| | | | 30090959-07 | 7/1/03-8/17/03 | $ 30,673.35 |
| | | | 30116262-02 | 9/17/03-10/15/03 | $ 28,439.10 |
| | | | 30090959-10 | 6/18/03-6/30/03 | $ 17,353.71 |

# EXHIBIT I

## Undocumented Claims
### W. E. Aubuchon Co., Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 30090959-05 | 7/1/03-8/17/03 | $ 3,933.50 |
| | | | 30082578-01 | 7/3/03-7/27/03 | $ 2,805.00 |
| | | | 30071422-01 | 6/13/2003 | $ 1,450.00 |
| | | | 30102284-01 | 8/30/03-9/16/03 | $ 1,595.00 |
| | | | 40009271-01 | 11/1/03-11/30/03 | $ 1,360.00 |
| | | | 30071019-01 | 6/20/03-6/27/03 | $ 1,500.00 |
| | | | 30092342-01 | 7/28/03-8/8/03 | $ 1,320.00 |
| | | | 40009280-01 | 12/9/2003 | $ 1,007.00 |
| | | | 30009760-01 | 11/27/2002 | $ 1,059.00 |
| | | | 30094424-01 | 7/22/2003 | $ 1,568.80 |
| | | | 20074973-01 | 5/15/2002 | $ 799.30 |
| | | | 40004019-01 | 11/12/2003 | $ 782.00 |
| | | | 40057838-01 | 5/5/2004 | $ 782.00 |
| | | | 30094428-01 | 8/16/03-8/22/03 | $ 880.00 |
| | | | 40021067-10 | 1/9/2004 | $ 674.00 |
| | | | 30094440-01 | 8/23/03-8/29/03 | $ 880.00 |
| | | | 30092365-01 | 8/9/03-8/15/03 | $ 770.00 |
| Burns, Kristi | 022563525 | Self | 20023402-01 | 1/13/2002 | $ 2,351.89 |
| | | | 40057846-02 | 5/11/2004 | $ 1,210.00 |
| | | | 40099955-01 | 9/20/2004 | $ 1,138.80 |
| | | | 40057844-02 | 5/11/2004 | $ 965.00 |
| Butland, Dale | 023408251 | Susan | 40087537-01 | 8/10/2004 | $ 1,238.88 |
| | | | 40021092-01 | 2/6/2004 | $ 1,133.30 |
| | | | 40066871-01 | 6/11/2004 | $ 695.35 |
| Cahoon, Deborah | 003421295 | Timothy | 20079618-01 | 6/11/2002 | $ 2,204.94 |
| | | | 40116109-01 | 12/8/2004 | $ 802.00 |
| Cannon, Michael | 015663654 | Beth | 40049437-01 | 4/9/2004 | $ 2,909.73 |
| | | | 40049471-01 | 4/9/2004 | $ 2,070.00 |
| Canual, Robert | 018548814 | Self | 40057851-01 | 4/28/2004 | $ 930.80 |
| | | | 40015564-01 | 1/12/2004 | $ 1,650.00 |
| Carlson, Richard | 002527879 | Candy | 20106921-01 | 8/19/2002 | $ 1,859.00 |

# EXHIBIT I

Undocumented Claims

W. E. Aubuchon Co., Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 20105518-01 | 8/19/2002 | $ 1,621.93 |
| Carlson, Richard | 002527879 | Stacey | 40049491-01 | 4/27/04-4/28/04 | $ 850.42 |
| Case, Roger | 073602295 | Self | 20102031-01 | 7/19/2002 | $ 731.17 |
| | | | 40083411-01 | 7/30/2004 | $ 750.00 |
| | | | 40054161-01 | 5/13/2004 | $ 700.00 |
| Cashin, William | 034321392 | Eileen | 20120618-01 | 10/15/2002 | $ 1,230.00 |
| Chabot, Roger | 007764135 | Self | 40069812-01 | 6/11/2004 | $ 2,126.00 |
| | | | 40069813-01 | 6/11/2004 | $ 973.00 |
| Chamberlain, Carol | 002304552 | Self | 20120467-01 | 10/11/2002 | $ 1,049.25 |
| | | | 20110757-01 | 10/11/2002 | $ 710.00 |
| Chamberlain, Marcel | 002265924 | Self | 10103096-01 | 7/28/01-8/1/01 | $ 61,739.93 |
| | | | 40099981-01 | 6/23/2004 | $ 2,323.80 |
| | | | 40023665-01 | 2/17/2004 | $ 1,625.00 |
| | | | 20026926-01 | 9/23/2001 | $ 505.55 |
| Chamberlain, Nancy | 008429649 | Self | 20074977-01 | 5/20/2002 | $ 1,912.95 |
| | | | 20106066-01 | 9/6/2002 | $ 1,717.07 |
| | | | 20074978-01 | 5/21/2002 | $ 592.00 |
| Chartier, John | 055329429 | Self | 40029331-01 | 12/3/2003 | $ 3,000.00 |
| | | | 20008272-01 | 1/4/2002 | $ 1,395.68 |
| | | | 40029326-01 | 11/17/03-11/20/03 | $ 1,150.00 |
| | | | 40005739-01 | 12/3/03-12/19/03 | $ 902.50 |
| | | | 40029327-01 | 11/20/2003 | $ 1,000.00 |
| | | | 40029332-01 | 12/5/2003 | $ 850.00 |
| | | | 40029335-01 | 12/12/03-12/17/03 | $ 850.00 |
| | | | 40007588-01 | 12/23/03-12/24/03 | $ 850.00 |
| | | | 40029324-01 | 11/20/03-11/26/03 | $ 850.00 |
| | | | 40029329-01 | 11/28/03-12/4/03 | $ 850.00 |
| | | | 40049689-01 | 11/19/2003 | $ 539.00 |
| Chauvin, Richard | 033382809 | Self | 20104111-01 | 7/30/2002 | $ 2,220.00 |
| | | | 30006092-01 | 7/9/2002 | $ 1,440.00 |
| | | | 20105616-01 | 8/26/02-8/28/02 | $ 1,605.00 |

# EXHIBIT I

## Undocumented Claims

### W. E. Aubuchon Co., Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 20105998-01 | 7/25/2002 | $ 11,114.46 |
| | | | 20116488-01 | 8/28/2002 | $ 1,050.00 |
| | | | 20108369-01 | 7/31/02-8/14/02 | $ 900.00 |
| | | | 20116775-01 | 7/19/02-7/31/02 | $ 780.00 |
| | | | 20108367-01 | 7/31/02-8/2/02 | $ 585.60 |
| | | | 20117048-01 | 7/9/2002 | $ 1,509.85 |
| | | | 20103922-01 | 8/25/2002 | $ 522.61 |
| Cheney, Phillip | 022329302 | Elizabeth | 30061997-01 | 5/15/2003 | $ 2,947.00 |
| | | | 30050108-01 | 4/30/2003 | $ 1,217.00 |
| Cheney, Phillip | 022329302 | Self | 20002699-01 | 12/6/2001 | $ 1,545.00 |
| | | | 20004804-01 | 1/7/2002 | $ 1,950.00 |
| Clark, Donald | 014368897 | Jane | 40087344-02 | 8/3/2004 | $ 2,190.00 |
| | | | 40099990-01 | 10/1/2004 | $ 1,656.00 |
| | | | 40090173-02 | 8/3/2004 | $ 560.00 |
| Clayton, Jason | 231084505 | Constance | 30031103-01 | 2/12/03-2/13/03 | $ 1,568.92 |
| Clayton, Jason | 231084505 | Self | 10145257-01 | 11/27/2001 | $ 800.00 |
| Companion, Susan | 008523777 | Self | 40114264-01 | 11/17/2004 | $ 631.75 |
| | | | 40101892-01 | 10/7/2004 | $ 545.00 |
| Corey, Erika | 058622424 | Emma | 40090970-01 | 5/27/03-12/17/03 | $ 1,520.00 |
| Craker, Peggy | 455720740 | Self | 40005461-01 | 1/6/2004 | $ 4,053.79 |
| | | | 40099653-01 | 8/16/2004 | $ 1,380.00 |
| | | | 40014685-02 | 1/30/04-2/2/04 | $ 1,027.94 |
| | | | 40088065-01 | 8/16/2004 | $ 1,000.00 |
| | | | 40013104-01 | 1/6/2004 | $ 958.00 |
| | | | 40018172-01 | 1/23/2004 | $ 616.00 |
| Crammond, Gary | 075381957 | Gary | 10120236-01 | 7/25/2001 | $ 688.16 |
| Currin, Stephen | 312621090 | Self | 40018193-01 | 1/12/2004 | $ 1,484.66 |
| | | | 40007273-01 | 12/23/2003 | $ 1,041.30 |
| | | | 40018194-01 | 1/12/2004 | $ 1,350.00 |
| Currin, Stephen | 312621090 | Anne Marie | 40018180-02 | 1/22/2004 | $ 1,197.55 |
| Currin, Stephen | 312621090 | Self | 40108030-01 | 10/26/2004 | $ 1,000.00 |

# EXHIBIT I

Undocumented Claims

W. E. Aubuchon Co., Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| Dahlberg, Eric | 008460014 | Self | 40100001-01 | 9/24/2004 | $ 2,131.00 |
| | | | 40080091-01 | 7/7/2004 | $ 755.00 |
| | | | 40111474-01 | 11/5/2004 | $ 500.00 |
| Dahlberg, Eric | 008460014 | Amanda | 20104824-01 | 7/10/2002 | $ 1,583.56 |
| Dahlberg, Eric | 008460014 | Daniel | 10109548-01 | 8/21/2001 | $ 1,650.00 |
| Dailey, Alicia | 009629575 | Mark | 20038916-01 | 1/4/2002 | $ 2,701.94 |
| | | | 40108347-01 | 10/6/04-11/9/04 | $ 1,005.00 |
| Dailey, Alicia | 009629575 | Cory | 20068555-01 | 5/21/2002 | $ 1,520.00 |
| Dailey, Alicia | 009629575 | Self | 40096580-01 | 8/3/04-9/28/04 | $ 740.00 |
| Daly, Richard | 157369360 | Self | 40092643-01 | 8/24/2004 | $ 2,817.00 |
| Daly, Richard | 157369360 | Mary | 40090194-01 | 6/3/2004 | $ 983.25 |
| | | | 20105685-01 | 7/22/02-7/23/02 | $ 892.00 |
| Dansereau, Todd | 008706340 | Hillary | 40108785-01 | 10/28/2004 | $ 552.00 |
| Darby, Wayne | 174360913 | Self | 20017386-01 | 1/15/2002 | $ 1,696.00 |
| Dragirda, Thomas | 008483480 | Self | 40078741-01 | 5/22/2004 | $ 812.70 |
| Davis, David | 258868992 | Jaime | 40008509-01 | 12/10/2003 | $ 4,425.00 |
| Davis, David | 258868992 | Self | 40087095-01 | 7/30/2004 | $ 1,576.00 |
| | | | 40069829-01 | 6/15/2004 | $ 795.02 |
| Davis, David | 258868992 | Josiah | 40071950-01 | 6/30/2004 | $ 2,090.00 |
| Davis, David | 258868992 | Julie | 40111864-01 | 11/1/2004 | $ 900.00 |
| | | | 40096286-01 | 9/8/2004 | $ 729.00 |
| Davis, David | 258868992 | Joshua | 40115257-01 | 11/11/2004 | $ 774.65 |
| Deberadinis, Kenneth | 018467864 | Debra | 10121386-01 | 7/11/2001 | $ 5,006.48 |
| | | | 10102388-01 | 7/11/2001 | $ 5,470.00 |
| Decker, Ginger | 007546635 | Self | 40044465-02 | 4/8/2004 | $ 1,300.00 |
| Decoster, Mechelle | 016645976 | Self | 30052189-02 | 4/14/03-4/15/03 | $ 977.38 |
| Disilits, Raymond. | 001386202 | Self | 40044466-01 | 4/5/2004 | $ 1,029.41 |
| Dipace, Tricia | 013708849 | Self | 40001629-01 | 12/25/2003 | $ 2,500.00 |
| Dipace, Tricia | 013708849 | Joshua | 40009460-01 | 12/25/03-12/27/03 | $ 2,567.53 |
| Donaldson, Jeffrey | 069625060 | Heather | 40102094-02 | 9/14/2004 | $ 1,039.73 |
| Downie, Dana | 021626013 | Self | 10108270-01 | 8/13/2001 | $ 1,153.00 |

# EXHIBIT I

## Undocumented Claims
## W. E. Auchuchon Co., Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| Downs-Will, Bridget | 260271908 | Self | 20031776-01 | 1/10/2002 | $ 900.00 |
| | | | 20059563-01 | 3/4/2002 | $ 1,235.50 |
| Doyle, Florence | 009500618 | Self | 20109620-01 | 9/12/2002 | $ 808.72 |
| | | | 20112185-01 | 9/12/2002 | $ 925.00 |
| Doyle, Florence | 009500618 | Edward | 40049721-01 | 4/28/2004 | $ 622.00 |
| Doyon, Donald | 008405989 | Jamie | 20093306-01 | 7/12/2002 | $ 946.00 |
| Driscoll, Carl | 20065180 | Self | 20065180-01 | 5/24/2002 | $ 1,735.00 |
| Drummond, William | 014525854 | Self | 40113659-01 | 11/13/2004 | $ 1,757.80 |
| Dubuque, Michael | 008709655 | Kary | 40114281-01 | 10/28/2004 | $ 1,818.00 |
| | | | 40061061-01 | 5/27/2004 | $ 1,016.00 |
| | | | 40111484-01 | 10/31/2004 | $ 675.00 |
| Dubuque, Michael | 008709655 | Adam | 40111919-01 | 10/31/04-11/1/04 | $ 865.51 |
| Duell, Stephen | 076441337 | Self | 40080132-01 | 6/25/2004 | $ 644.53 |
| Dufort, Marilyn | 029365043 | Self | 40060239-01 | 5/25/2004 | $ 1,079.00 |
| ...n, Dana | 008548687 | Kevin | 10108262-01 | 8/10/2001 | $ 1,172.00 |
| Dunn, Dana | 008548687 | Kathleen | 40069869-01 | 4/21/2004 | $ 2,189.19 |
| Durand, Anthony | 028323977 | Self | 20039127-01 | 2/20/02-2/22/02 | $ 2,507.50 |
| | | | 20039086-01 | 2/16/2002 | $ 1,549.75 |
| | | | 20124958-01 | 10/28/2002 | $ 868.00 |
| Durham, Jason | 155624125 | Self | 20127631-01 | 10/21/2002 | $ 2,362.25 |
| | | | 10105366-01 | 7/12/01-7/13/01 | $ 1,914.30 |
| | | | 10112035-01 | 7/25/2001 | $ 971.00 |
| | | | 10105143-01 | 7/10/2001 | $ 961.00 |
| | | | 40091954-01 | 8/30/2004 | $ 857.50 |
| | | | 10113348-01 | 7/23/2001 | $ 584.00 |
| | | | 10105454-01 | 7/20/2001 | $ 565.00 |
| Durkin, Kathleen | 030302964 | Self | 20105428-01 | 8/19/2002 | $ 2,555.25 |
| | | | 20106127-01 | 7/25/2002 | $ 2,168.00 |
| | | | 40044506-01 | 3/8/2004 | $ 1,890.93 |
| | | | 40031139-01 | 2/6/2004 | $ 1,571.47 |
| | | | 20109759-01 | 8/19/2002 | $ 1,450.00 |

# EXHIBIT I

## Undocumented Claims
### W. E. Aubuchon Co., Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 20106116-01 | 4/9/2002 | $ 867.00 |
| | | | 20109702-01 | 7/25/2002 | $ 900.00 |
| | | | 20026848-01 | 12/31/2001 | $ 827.00 |
| Duso, Linda | 059427015 | Self | 10120231-01 | 7/19/2001 | $ 617.33 |
| Duso, Bernard | 078662855 | Erika | 40004029-01 | 12/22/2003 | $ 1,650.99 |
| | | | 40000186-01 | 12/6/2003 | $ 1,588.15 |
| | | | 40064977-01 | 5/26/2004 | $ 1,478.00 |
| | | | 20052946-01 | 1/24/02-1/25/02 | $ 1,365.20 |
| | | | 40054182-01 | 5/7/2004 | $ 1,125.00 |
| | | | 40007596-01 | 12/6/2003 | $ 1,092.00 |
| | | | 40111794-01 | 10/21/2004 | $ 1,131.34 |
| | | | 30115793-01 | 10/14/2003 | $ 1,069.00 |
| | | | 40054183-01 | 5/7/2004 | $ 1,540.00 |
| | | | 40088481-01 | 5/5/2004 | $ 895.39 |
| | | | 30129888-01 | 11/24/03-11/25/03 | $ 2,118.00 |
| | | | 40001528-01 | 11/24/03-11/26/03 | $ 905.00 |
| | | | 40067516-01 | 6/7/2004 | $ 579.77 |
| Duso, Bernard | 078662855 | Julia | 20121456-01 | 7/11/2002 | $ 1,208.31 |
| | | | 40092663-02 | 7/20/2004 | $ 762.40 |
| Duso, Bernard | 078662855 | Self | 30082571-01 | 7/21/2003 | $ 725.00 |
| Eastman, Robert | 144442179 | Darlene | 20038972-01 | 2/7/2002 | $ 2,793.21 |
| Eaton, Robert | 010526432 | Self | 20025643-01 | 2/20/2002 | $ 3,293.20 |
| | | | 40067442-02 | 5/19/2004 | $ 4,000.00 |
| | | | 40067442-01 | 5/19/2004 | $ 4,000.00 |
| | | | 40060492-01 | 5/19/2004 | $ 1,507.00 |
| Eaton, Robert | 010526432 | Elizabeth | 40087297-01 | 7/30/2004 | $ 3,000.00 |
| | | | 40078318-01 | 7/30/04-8/1/04 | $ 4,797.56 |
| | | | 40029432-01 | 2/20/2004 | $ 715.00 |
| Ecker, Harry | 043361286 | Self | 40001779-01 | 12/8/2003 | $ 1,601.00 |
| Ecker, Harry | 043361286 | Robert | 40000339-01 | 12/8/2003 | $ 1,586.00 |
| Ellis, Steven | 026502133 | Kathryn | 40009467-02 | 12/2/03-12/31/03 | $ 2,117.00 |

# EXHIBIT I

Undocumented Claims

W. E. Aubuchon Co., Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 40057889-02 | 5/7/2004 | $ 1,171.00 |
| | | | 40069939-01 | 6/14/2004 | $ 954.00 |
| | | | 40061935-01 | 5/14/2004 | $ 674.00 |
| | | | 40113784-01 | 11/4/2004 | $ 674.00 |
| Ellis, Steven | 026502133 | Courtney | 20115394-01 | 9/9/2002 | $ 5,165.00 |
| Ellsworth, Jeffrey | 019461996 | Karen | 40111493-01 | 11/12/2004 | $ 3,018.00 |
| | | | 40098808-02 | 8/18/2004 | $ 2,167.00 |
| | | | 40115303-01 | 11/16/04-11/23/04 | $ 1,221.44 |
| | | | 40111490-01 | 11/12/2004 | $ 1,327.11 |
| | | | 40116153-01 | 11/13/2004 | $ 1,010.00 |
| Ewertz, Deborah | 525132745 | David | 40088945-01 | 1/12/2004 | $ 1,270.12 |
| | | | 40060050-01 | 1/12/2004 | $ 800.00 |
| Feldmus, Aaron | 006689109 | Chelsey | 40044520-01 | 4/5/2004 | $ 881.00 |
| Feldmus, Aaron | 006689109 | Felicia | 40088499-01 | 8/6/2004 | $ 550.00 |
| F---land, Cynthia | 008506725 | Self | 40114289-01 | 11/14/2004 | $ 2,068.76 |
| | | | 10123446-01 | 10/2/2001 | $ 1,120.00 |
| | | | 40115312-01 | 11/18/2004 | $ 607.00 |
| | | | 40114288-01 | 11/14/2004 | $ 503.00 |
| Fillo, Joseph | 048486181 | Self | 40116170-01 | 11/30/2004 | $ 988.00 |
| Firda, Thomas | 016648757 | Self | 40077929-01 | 7/8/2004 | $ 1,650.00 |
| | | | 40099562-01 | 8/10/2004 | $ 1,040.00 |
| Flagg, Donna | 141628392 | Self | 40004042-01 | 11/18/2003 | $ 1,223.74 |
| | | | 40054235-01 | 4/25/2004 | $ 902.00 |
| | | | 40064990-01 | 4/25/2004 | $ 527.00 |
| Fletcher, Rosalie | 008586909 | Self | 40049744-01 | 2/19/2004 | $ 581.34 |
| Florence, Tricia | 503045563 | Teagan | 20116341-01 | 9/25/2002 | $ 1,161.21 |
| Florence, Tricia | 503045563 | Self | 20008939-01 | 7/20/2001 | $ 1,068.10 |
| | | | 20008938-01 | 7/20/2001 | $ 698.00 |
| Florence, Tricia | 503045563 | Taylor | 40029438-01 | 2/22/2004 | $ 748.71 |
| Forrest, Chad | 136584483 | Chad | 20104030-01 | 10/11/2001 | $ 1,208.00 |
| | | | 40096690-02 | 9/4/2004 | $ 736.00 |

# EXHIBIT I

## Undocumented Claims

## W. E. Aubuchon Co., Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 20104026-01 | 10/11/2001 | $ 512.00 |
| Forrest, Chad | 136584483 | Jasmyne | 20104045-01 | 1/22/2002 | $ 730.00 |
| Fox, Melissa | 535047996 | Self | 40116173-01 | 11/29/2004 | $ 1,245.00 |
| | | | 40096293-01 | 9/14/2004 | $ 1,650.00 |
| Fredrette, Ronald | 009461417 | Joshua | 40015755-01 | 1/2/04-1/3/04 | $ 1,494.46 |
| Furst, Daniel | 006721188 | Self | 20106105-01 | 7/26/2002 | $ 1,971.23 |
| Furst, Daniel | 006721188 | Jeremy | 30069920-01 | 6/19/2003 | $ 815.00 |
| Furst, Daniel | 006721188 | Jeffrey | 40092677-02 | 8/16/2004 | $ 640.50 |
| | | | 20121610-01 | 9/12/2002 | $ 1,160.00 |
| Furst, Daniel | 006721188 | Diane | 40115327-01 | 11/10/2004 | $ 583.18 |
| Gagne, Brian | 022525330 | Rebecca | 10103546-01 | 7/20/01-7/21/01 | $ 2,001.56 |
| Gagne, Brian | 022525330 | Charlene | 40083463-01 | 7/19/2004 | $ 950.00 |
| Gahan, Nancy | 888100132 | Self | 40061065-01 | 5/21/2004 | $ 2,094.00 |
| | | | 40092686-01 | 8/26/2004 | $ 1,045.00 |
| | | | 40070768-01 | 6/17/2004 | $ 751.00 |
| Gahan, Nancy | 888100132 | Philip | 40086659-02 | 7/21/2004 | $ 1,132.26 |
| Gates, Josiah | 009688422 | Self | 40042349-02 | 3/27/2004 | $ 687.02 |
| Giammolvo, Scott | 025686700 | Amy | 20127643-01 | 11/6/02-11/7/02 | $ 1,354.80 |
| Gillis, Thomas | 004703588 | Ashley | 20121449-01 | 10/10/2002 | $ 1,399.26 |
| | | | 40096697-01 | 9/17/2004 | $ 1,560.00 |
| Gillis, Thomas | 004703588 | Brenda | 40018495-01 | 1/23/2004 | $ 1,100.00 |
| Gillis, Thomas | 004703588 | Megan | 40096577-01 | 5/23/2004 | $ 966.16 |
| Ginn, Jeffrey | 002384306 | Self | 40072928-01 | 6/12/2004 | $ 1,005.43 |
| | | | 40070772-01 | 6/10/2004 | $ 942.00 |
| | | | 40067545-01 | 6/10/2004 | $ 620.00 |
| Goldsmith, Donald | 006560212 | Lori | 40061955-01 | 3/23/2004 | $ 774.40 |
| Goodfield, Robert | 032366479 | Self | 20107229-01 | 8/21/2002 | $ 755.00 |
| Goudreau, Andrew | 009325847 | Judy | 20124904-01 | 10/14/2002 | $ 1,310.10 |
| | | | 20121441-01 | 10/14/2002 | $ 685.00 |
| Goodreau, Jacques | 009425140 | Doreen | 40083494-01 | 7/22/2004 | $ 754.00 |
| Goodreau, Jacques | 009425140 | Self | 10105175-01 | 7/14/2001 | $ 875.00 |

# EXHIBIT I

## Undocumented Claims
## W. E. Aubuchon Co., Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| Graffam, Robert | 007521183 | Self | 40091910-02 | 7/14/04-8/19/04 | $ 949.00 |
| Grant, Alan | 030606810 | Sarah | 40063720-01 | 4/30/04-5/4/04 | $ 2,940.00 |
| Grant, Alan | 030606810 | Rhea | 40047182-01 | 4/8/04-4/9/04 | $ 1,940.15 |
| | | | 40052514-01 | 4/30/2004 | $ 962.00 |
| | | | 40054272-01 | 4/27/20047 | $ 679.40 |
| Gregory, Michael | 001546023 | Self | 40087063-01 | 8/6/2004 | $ 2,151.74 |
| | | | 40095620-01 | 8/6/2004 | $ 900.00 |
| Grytebust, Albert | 130620640 | Stephanie | 40077940-01 | 7/13/2004 | $ 2,100.00 |
| | | | 40080158-01 | 7/13/2004 | $ 2,050.90 |
| | | | 40057923-01 | 5/10/2004 | $ 1,874.27 |
| Haile, Nick | 009561010 | Benjamin | 40023969-01 | 2/3/2004 | $ 1,241.71 |
| | | | 40023970-01 | 2/4/2004 | $ 601.71 |
| Haines, Jason | 007702700 | Kirsten | 40116027-01 | 12/12/2003 | $ 797.00 |
| Haley, Reginald | 008345689 | Sharon | 40100533-01 | 9/14/2004 | $ 524.28 |
| 'l, Richard | 027463081 | Self | 20105157-01 | 8/21/2002 | $ 930.00 |
| | | | 20102037-01 | 7/8/2002 | $ 1,078.00 |
| | | | 20105154-01 | 8/21/2002 | $ 631.00 |
| Hannula, Lynn | 016585115 | Self | 40056406-01 | 6/4/04-6/6/04 | $ 4,917.25 |
| | | | 40067640-01 | 6/4/2004 | $ 700.00 |
| | | | 40013247-01 | 12/30/2003 | $ 674.00 |
| Hart, Army | 065480247 | Self | 20038969-01 | 2/12/2002 | $ 4,665.04 |
| | | | 20059839-01 | 2/12/2002 | $ 3,485.00 |
| | | | 20023326-01 | 1/23/2002 | $ 1,763.96 |
| | | | 20038671-01 | 2/12/2002 | $ 1,040.00 |
| | | | 40111567-01 | 11/2/2004 | $ 1,172.41 |
| | | | 20004174-01 | 12/18/2001 | $ 790.18 |
| | | | 20021127-01 | 2/7/2002 | $ 651.69 |
| Hayward, Helen | 008301407 | Merlin | 20038983-01 | 2/7/2002 | $ 869.00 |
| Herschel, Chad | 008488850 | Dekota | 40053929-01 | 5/10/2004 | $ 1,155.00 |
| Herschel, Chad | 008488850 | Aimee | 20009103-01 | 12/11/2001 | $ 745.00 |
| | | | 40067643-01 | 6/16/2004 | $ 760.00 |

# EXHIBIT I

Undocumented Claims

W. E. Aubuchon Co., Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| Herschel, Chad | 008488850 | Self | 40096310-01 | 9/23/2004 | $ 667.00 |
| | | | 40095617-01 | 7/14/2004 | $ 696.00 |
| Herschel, Dennis | 008549295 | Self | 40015842-01 | 3/31/2003 | $ 1,348.00 |
| Hickey, Kristine | 022666003 | Self | 40070798-01 | 6/12/2004 | $ 950.00 |
| | | | 40070801-01 | 6/12/04-6/16/04 | $ 950.00 |
| Hoag, Jeffrey | 009582680 | Rhonda | 10097462-01 | 7/3/2001 | $ 1,936.00 |
| | | | 40001787-01 | 12/19/2003 | $ 979.28 |
| Hoag, Jeffrey | 009582680 | Kerri | 20015780-01 | 1/2/2002 | $ 1,587.00 |
| Hodgeman, Gregory | 008628196 | Kailianne | 40090259-01 | 8/9/2004 | $ 924.00 |
| Hodgeman, Gregory | 008628196 | Justin | 40042608-02 | 3/28/2004 | $ 837.00 |
| Holland, Keven | 003506182 | Self | 40094251-01 | 8/24/2004 | $ 1,925.46 |
| | | | 40026995-01 | 2/12/2004 | $ 1,460.68 |
| | | | 40090266-01 | 8/12/2004 | $ 1,334.39 |
| | | | 40116219-01 | 12/2/2004 | $ 1,134.00 |
| | | | 40072973-01 | 6/11/04-6/12/04 | $ 988.17 |
| | | | 40108941-01 | 10/15/2004 | $ 746.94 |
| | | | 40047209-01 | 3/31/2004 | $ 612.26 |
| Holland, Keven | 003506182 | Harley | 40044683-01 | 4/9/2004 | $ 2,099.00 |
| | | | 40073344-01 | 6/10/04-6/11/04 | $ 1,006.00 |
| | | | 40060518-01 | 5/14/2004 | $ 882.00 |
| | | | 40067703-01 | 6/10/2004 | $ 756.00 |
| Holland, Keven | 003506182 | Debra | 40088627-01 | 5/31/2004 | $ 594.13 |
| Holland, Keven | 003506182 | Christopher | 40088907-02 | 8/1/2004 | $ 945.91 |
| Holland, Kim | 003506182 | Self | 40013327-01 | 12/28/03-12/29/03 | $ 949.39 |
| | | | 40076991-01 | 6/23/2004 | $ 864.48 |
| | | | 40108108-01 | 10/6/2004 | $ 730.10 |
| Holland, Ralph | 259178066 | Self | 40083559-01 | 7/20/2004 | $ 1,000.00 |
| Hoover, Amy | 027586977 | Self | 40060276-01 | 6/12/04-6/18/04 | $ 3,424.17 |
| | | | 40029167-02 | 1/26/04-3/1/04 | $ 1,164.00 |
| | | | 40070805-01 | 6/10/2004 | $ 757.00 |
| ...ugh, Richard | 114689246 | Self | 20115351-01 | 8/18/2002 | $ 2,297.12 |

# EXHIBIT I

### Undocumented Claims
### W. E. Aubuchon Co., Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 40073308-01 | 3/26/2004 | $ 1,426.76 |
| | | | 10120232-01 | 8/29/2001 | $ 1,145.50 |
| | | | 10123683-01 | 8/29/2001 | $ 960.00 |
| Hough, Richard | 114689246 | Joshua | 40105463-01 | 5/31/2004 | $ 621.88 |
| Houle, Carol | 013425442 | Self | 40117013-01 | 12/15/2004 | $ 1,600.00 |
| | | | 20010843-01 | 1/15/2002 | $ 863.00 |
| House, Jamey | 005729454 | Indigo | 20118638-01 | 10/4/2002 | $ 681.30 |
| Howell, Ryan | 010382236 | Alex | 30029926-01 | 2/24/2003 | $ 4,150.00 |
| Hudson, Joshua | 052705851 | Self | 20071827-01 | 6/19/2002 | $ 1,075.00 |
| Hughes, Bryan | 011641822 | Self | 20007746-01 | 1/15/2002 | $ 1,030.00 |
| Inburg, William | 074689738 | Self | 20124943-01 | 6/10/2002 | $ 1,114.20 |
| Jackson, Gregory | 072684550 | Self | 20118262-01 | 10/8/2002 | $ 1,825.00 |
| | | | 20112219-01 | 1/23/2002 | $ 1,730.00 |
| | | | 20002627-01 | 11/12/2001 | $ 1,404.00 |
| kson, Lisa | 008566106 | Self | 20103817-01 | 7/1/02-7/16/02 | $ 607.50 |
| Jankowski, Matthew | 187344590 | Self | 10114149-01 | 9/17/2001 | $ 700.00 |
| Johnson, Kenneth | 007501866 | Self | 40001991-01 | 11/26/2003 | $ 1,905.00 |
| | | | 40004194-01 | 12/17/2003 | $ 1,426.00 |
| | | | 40007419-01 | 12/17/2003 | $ 3,734.00 |
| | | | 40001994-01 | 11/26/2003 | $ 922.00 |
| | | | 40007424-01 | 12/17/2003 | $ 1,867.00 |
| Johnson, Stephanie | 025561129 | Self | 40101703-01 | 10/8/2004 | $ 1,650.00 |
| Joseph, Troy | 009420870 | Shannon | 10113424-01 | 7/21/01-7/22/01 | $ 6,563.74 |
| | | | 10099490-01 | 7/21/2001 | $ 2,648.00 |
| | | | 40027001-01 | 2/2/2004 | $ 2,132.00 |
| | | | 10121340-01 | 7/31/2001 | $ 1,720.00 |
| | | | 20102071-01 | 8/14/2002 | $ 1,500.00 |
| | | | 10113472-01 | 7/21/2001 | $ 770.00 |
| | | | 20105779-01 | 8/14/2002 | $ 800.00 |
| | | | 40061972-01 | 5/26/2004 | $ 798.00 |
| | | | 40021318-01 | 1/20/2004 | $ 687.57 |

# EXHIBIT I

## Undocumented Claims

### W. E. Aubuchon Co., Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|----------|-----------|----------|--------------|--------------------|---------------|
| | | | 40029463-01 | 2/10/2004 | $ 500.00 |
| Joseph, Troy | 009420870 | Self | 20023303-01 | 1/10/02-1/11/02 | $ 1,855.15 |
| Joseph, Troy | 009420870 | Abigail | 20053719-01 | 3/3/2002 | $ 815.69 |
| | | | 40000203-01 | 12/13/2003 | $ 784.50 |
| | | | 20128237-01 | 11/4/2002 | $ 787.25 |
| Karads, John | 009303855 | Frances | 20013752-01 | 1/23/2002 | $ 2,350.00 |
| Kassel, Jeffrey | 152484538 | Self | 30121383-01 | 10/9/2003 | $ 1,175.00 |
| Kilgore, Douglas | 231028041 | Self | 20112238-01 | 9/14/02-9/17/02 | $ 900.00 |
| | | | 20116326-01 | 9/14/2002 | $ 635.24 |
| Kilgore, Douglas | 231028041 | Janna | 20127620-01 | 4/16/2002 | $ 702.00 |
| | | | 20128232-01 | 4/11/2002 | $ 547.20 |
| King, Arlene | 014424817 | Self | 20101798-01 | 7/18/2002. | $ 836.00 |
| | | | 40098685-01 | 9/17/2004 | $ 600.00 |
| | | | 40076999-01 | 7/8/2004 | $ 701.09 |
| g, Barry | 002565988 | Cynthia | 40031247-01 | 2/26/2004 | $ 1,888.00 |
| | | | 50013501-01 | 5/10/2004 | $ 1,840.00 |
| | | | 40061068-01 | 5/7/2004 | $ 1,715.00 |
| | | | 40102461-01 | 9/1/04-9/30/04 | $ 1,247.00 |
| | | | 40021321-02 | 1/2/04-1/27/04 | $ 1,050.00 |
| | | | 40095828-01 | 8/18/04-8/31/04 | $ 831.30 |
| | | | 40061974-01 | 5/10/2004 | $ 910.00 |
| | | | 40073310-01 | 6/28/2004 | $ 910.00 |
| | | | 40111583-01 | 10/1/04-10/31/04 | $ 821.00 |
| | | | 40007453-01 | 12/22/03-12/29/03 | $ 635.00 |
| King, Barry | 002565988 | Danielle | 40018527-01 | 1/22/2004 | $ 606.60 |
| Kingsley, Robyn | 002586874 | Edgar | 40049818-01 | 4/8/04-4/22/04 | $ 682.68 |
| Konik, Justin | 063642497 | Jennifer | 20014397-01 | 10/11/2001 | $ 3,814.48 |
| | | | 10143132-01 | 10/11/2001 | $ 3,000.00 |
| | | | 20014395-01 | 10/7/2001 | $ 870.41 |
| | | | 40088648-01 | 8/20/2004 | $ 803.11 |
| Konik, Justin | 063642497 | Mackenzie | 20014398-01 | 10/11/01-10/13/01 | $ 1,586.97 |

# EXHIBIT I

Undocumented Claims

W. E. Aubuchon Co., Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| Kosakowski, Linda | 011387084 | Dennis | 40067441-02 | 5/17/2004 | $ 4,000.00 |
| | | | 40067441-01 | 5/17/2004 | $ 4,000.00 |
| | | | 40065036-01 | 5/17/2004 | $ 900.00 |
| Kucerak, Milan | 105309851 | Dawn | 40098253-02 | 8/30/2004 | $ 669.00 |
| Labeau, Darryl | 571437672 | Courtney | 20023479-01 | 2/14/07-2/17/07 | $ 9,466.25 |
| | | | 10126823-01 | 10/8/2001 | $ 651.34 |
| Labeau, Darryl | 571437672 | Cassidy | 30003824-01 | 6/4/2002 | $ 563.00 |
| Labeau, Darryl | 571437672 | Jeneen | 10125071-01 | 5/21/2001 | $ 796.00 |
| Labombard, Howard | 132420934 | Self | 40086857-01 | 7/14/2004 | $ 2,347.76 |
| | | | 40086856-01 | 7/14/2004 | $ 1,100.00 |
| | | | 50014474-01 | 7/15/2003 | $ 832.70 |
| Labombard, Howard | 132420934 | Margaret | 40065040-01 | 5/4/04-5/28/04 | $ 2,035.77 |
| | | | 40060509-01 | 5/24/2004 | $ 1,820.00 |
| | | | 40047236-01 | 4/5/2004 | $ 1,709.94 |
| | | | 40047251-01 | 4/12/2004 | $ 1,709.94 |
| | | | 40052341-01 | 4/2/04-4/29/04 | $ 1,618.89 |
| | | | 40060611-01 | 5/24/2004 | $ 1,730.44 |
| | | | 40047225-01 | 4/5/2004 | $ 1,738.50 |
| | | | 40047265-01 | 4/19/2004 | $ 1,738.50 |
| | | | 40047247-01 | 4/12/2004 | $ 1,688.50 |
| | | | 40052344-01 | 4/30/2004 | $ 1,055.47 |
| | | | 40058402-01 | 4/5/2004 | $ 850.00 |
| | | | 40058404-01 | 4/13/2004 | $ 850.00 |
| | | | 40071270-01 | 5/18/2004 | $ 850.00 |
| | | | 40089098-01 | 5/25/2004 | $ 850.00 |
| | | | 40043418-01 | 3/17/04-3/18/04 | $ 2,325.00 |
| | | | 40053938-01 | 4/5/04-4/6/04 | $ 2,000.00 |
| | | | 40002506-01 | 10/8/2003 | $ 539.00 |
| | | | 40077012-01 | 5/11/2004 | $ 539.00 |
| | | | 40080175-01 | 1/12/2004 | $ 539.00 |
| | | | 40080176-01 | 3/5/2004 | $ 539.00 |

# EXHIBIT I

## Undocumented Claims

## W. E. Aubuchon Co., Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 40102561-01 | 9/24/2004 | $ 539.00 |
| | | | 40039474-01 | 3/17/2004 | $ 1,400.00 |
| Labrecque, Kenneth | 008600947 | Betany | 10110197-01 | 8/30/2001 | $ 4,200.00 |
| Labrecque, Kenneth | 008600947 | Kaitlyn | 20120328-01 | 9/26/2002 | $ 773.32 |
| Labrecque, Kenneth | 008600947 | Kendra | 40093432-01 | 9/3/2004 | $ 682.00 |
| | | | 40095204-01 | 9/9/2004 | $ 595.00 |
| Lacroix, Roger | 008500963 | Self | 20075526-01 | 6/11/2002 | $ 2,772.00 |
| | | | 20052881-01 | 1/17/02-1/24/02 | $ 2,837.00 |
| | | | 20038666-01 | 2/19/2002 | $ 531.00 |
| Lacroix, Roger | 008500963 | Brenda | 40086860-01 | 7/19/2004 | $ 1,700.00 |
| Lafferty, John | 021404409 | Self | 20121573-01 | 6/1/2002 | $ 732.77 |
| Laliberte, Paula | 024324108 | Self | 40116228-01 | 11/22/2004 | $ 3,346.00 |
| | | | 40098260-01 | 9/24/2004 | $ 2,690.00 |
| | | | 40098259-01 | 9/24/2004 | $ 4,329.00 |
| | | | 40102563-01 | 9/29/2004 | $ 1,756.00 |
| Landry, Erana | 020349254 | Self | 40086864-01 | 7/22/2004 | $ 1,996.00 |
| Lane, Arthur | 013367937 | Self | 20106959-01 | 8/27/2002 | $ 2,522.00 |
| | | | 20105632-01 | 8/27/2002 | $ 1,208.00 |
| | | | 20101397-01 | 7/31/2002 | $ 1,056.00 |
| | | | 20116328-01 | 9/25/2002 | $ 790.00 |
| | | | 20128853-01 | 11/12/2002 | $ 683.00 |
| Lapointe, Eric | 010540649 | Tyler | 20106441-01 | 9/3/2002 | $ 1,026.74 |
| Lapointe, Gregory | 007722723 | Self | 20001076-01 | 11/14/2001 | $ 9,453.17 |
| | | | 10123368-01 | 8/19/2001 | $ 1,702.00 |
| Lapointe, Gregory | 007722723 | Ann Marie | 20051569-02 | 3/22/2002 | $ 2,163.54 |
| | | | 20053732-01 | 1/31/2002 | $ 766.00 |
| Lapointe, Gregory | 007722723 | Brandon | 40043458-01 | 3/15/2004 | $ 795.00 |
| Larson-Moran, Denise | 031404523 | Self | 40087090-01 | 7/22/2004 | $ 3,044.00 |
| | | | 40096745-01 | 9/2/2004 | $ 2,728.00 |
| | | | 20066985-01 | 5/16/2002 | $ 1,701.41 |
| | | | 40098262-01 | 9/14/2004 | $ 1,326.00 |

# EXHIBIT I

Undocumented Claims

W. E. Aubuchon Co., Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 40096751-01 | 9/14/2004 | $ 1,125.00 |
| | | | 40091884-01 | 8/20/2004 | $ 1,007.80 |
| | | | 40087087-01 | 7/22/2004 | $ 1,009.00 |
| | | | 40065043-01 | 5/28/2004 | $ 682.00 |
| | | | 40080185-01 | 7/15/2004 | $ 749.00 |
| | | | 40087089-01 | 7/15/2004 | $ 750.00 |
| Law, Gary | 009462740 | Jennifer | 40087347-01 | 8/3/2004 | $ 866.00 |
| | | | 40030784-01 | 1/11/2004 | $ 950.00 |
| Leblond, Ronald | 039386496 | Bonnie | 40098517-01 | 9/16/2004 | $ 2,205.00 |
| | | | 40096307-02 | 9/16/2004 | $ 1,056.00 |
| | | | 40098497-01 | 8/28/2004 | $ 934.00 |
| | | | 40084293-01 | 8/28/04-8/30/04 | $ 646.73 |
| | | | 40103477-01 | 8/28/2004 | $ 600.00 |
| Leblond, Ronald | 039386496 | Sara | 40062246-01 | 4/29/2004 | $ 1,072.83 |
| er, Giselle | 030582208 | Tyler | 20124381-01 | 10/18/2002 | $ 879.00 |
| Leger, Giselle | 030582206 | Self | 30041107-01 | 3/26/2003 | $ 672.00 |
| Lemoine, Madeline | 003308295 | Self | 40061073-01 | 5/19/2004 | $ 2,030.25 |
| | | | 40057937-01 | 5/6/04-5/7/04 | $ 1,214.00 |
| | | | 40065052-01 | 5/19/2004 | $ 1,129.00 |
| | | | 40047298-01 | 4/1/2004 | $ 781.40 |
| | | | 40100097-01 | 9/16/2004 | $ 781.40 |
| | | | 40054581-01 | 5/7/2004 | $ 897.00 |
| | | | 20110189-01 | 9/5/2002 | $ 661.70 |
| | | | 40057938-01 | 5/19/2004 | $ 616.00 |
| Letourneau, Robert | 008582975 | Tanya | 30092368-01 | 8/14/2003 | $ 825.00 |
| | | | 30092366-01 | 8/13/2003 | $ 675.00 |
| Lison, Richard | 010329962 | Self | 40049898-01 | 4/19/2004 | $ 1,830.00 |
| | | | 40054584-01 | 4/20/2004 | $ 580.00 |
| Lord, Jonathan | 003629383 | Abigail | 40031257-01 | 2/24/2004 | $ 568.50 |
| Lord, Jonathan | 003629383 | Self | 40057940-01 | 11/13/03-11/14/03 | $5,957.00 |
| y, Karole | 003541101 | Self | 40021337-01 | 1/22/04-1/23/04 | $ 7,333.49 |

# EXHIBIT I

## Undocumented Claims

### W. E. Aubuchon Co., Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 40057335-01 | 1/5/2004 | $ 3,400.00 |
| | | | 40013368-01 | 1/5/2004 | $ 1,583.15 |
| | | | 40015893-01 | 1/5/2004 | $ 1,704.00 |
| | | | 40015900-01 | 1/22/2004 | $ 1,015.00 |
| | | | 40015895-01 | 1/15/2004 | $ 540.00 |
| | | | 40007614-01 | 1/5/2004 | $ 528.00 |
| Lucy, Karole | 003541101 | Kaylie | 20106961-01 | 5/28/2002 | $ 1,635.00 |
| | | | 40077038-1 | 7/5/2004 | $ 1,342.42 |
| | | | 40018545-01 | 1/23/2004 | $ 1,269.00 |
| | | | 20106972-01 | 3/19/2002 | $ 1,026.00 |
| | | | 20106973-01 | 3/11/2002 | $ 534.00 |
| | | | 40077041-01 | 7/5/2004 | $ 759.00 |
| Lucy, Karole | 003541101 | Parker | 40102581-01 | 10/3/2004 | $ 1,558.25 |
| | | | 40090289-01 | 8/10/2004 | $ 526.80 |
| chia, Miranda | 009603901 | Kyle | 20052958-01 | 2/26/02-2/27/02 | $ 1,559.61 |
| Mackay, John | 017509173 | Sandra | 20106113-01 | 8/31/2002 | $ 984.00 |
| Mackay, John | 017509173 | Self | 20110211-01 | 1/9/02-4/9/02 | $ 1,440.00 |
| Magliacane, Doreen | 020582876 | Self | 20039096-01 | 2/16/02-2/17/02 | $ 9,788.66 |
| Magoon, Wendall | 009642362 | Brendan | 20128679-01 | 11/8/2002 | $ 1,120.05 |
| | | | 20128791-01 | 11/8/2002 | $ 862.00 |
| Maitland, Kellie | 175567963 | Bruce | 40088673-02 | 8/17/2004 | $ 611.60 |
| Martin, Lynn | 133500163 | Self | 40111634-01 | 11/3/2004 | $ 1,404.62 |
| Maruszewski, Paul | 086487955 | Kathryn | 40105605-01 | 10/12/2004 | $ 765.00 |
| Maruszewski, Paul | 086487955 | Self | 40108192-01 | 10/21/2004 | $ 1,045.00 |
| Mattson, Michael | 031547580 | Ryan | 20039028-01 | 2/12/2002 | $ 629.00 |
| Maxfield, Bridgette | 009703266 | Branden | 20101836-01 | 8/8/2002 | $ 2,255.00 |
| | | | 20101834-01 | 8/8/2002 | $ 825.00 |
| Mayer, Paul | 008385222 | Self | 40007634-01 | 12/16/2003 | $ 840.00 |
| Mayville, Leonard | 122284901 | Self | 20039107-01 | 2/12/02-2/17/02 | $ 13,715.79 |
| | | | 20059798-01 | 2/12/2002 | $ 1,190.00 |
| ayville, Leonard | 122284901 | Anna | 10124082-01 | 8/19/2001 | $ 1,350.52 |

# EXHIBIT I

Undocumented Claims

W. E. Aubuchon Co., Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| Mazza, John | 097602685 | John | 10118442-01 | 8/10/01-8/12/01 | $ 4,158.01 |
| | | | 20101908-01 | 7/18/2002 | $ 1,157.23 |
| | | | 10120244-01 | 7/31/01-8/24/01 | $ 655.00 |
| Mazza, John | 097602685 | Self | 40027166-01 | 2/11/2004 | $ 3,121.46 |
| McAdams, James | 463997325 | Self | 40018565-01 | 1/22/2004 | $ 853.03 |
| McCarthy, Carol | 014407451 | John | 40043497-01 | 4/20/2004 | $ 1,914.50 |
| | | | 40114477-01 | 11/10/2004 | $ 1,930.74 |
| | | | 40070068-01 | 6/29/04-6/30/04 | $ 4,403.52 |
| | | | 40073735-01 | 6/29/2004 | $ 1,419.50 |
| | | | 40062187-01 | 6/1/2004 | $ 1,370.00 |
| | | | 40049973-01 | 4/16/04-4/20/04 | $ 1,147.40 |
| | | | 40062010-01 | 5/27/2004 | $ 1,146.29 |
| | | | 40087263-01 | 6/29/2004 | $ 962.39 |
| | | | 40065087-01 | 6/1/2004 | $ 999.60 |
| | | | 40083593-01 | 7/22/04-7/23/04 | $ 842.66 |
| | | | 40087290-01 | 7/23/2004 | $ 759.50 |
| | | | 40062148-01 | 5/27/2004 | $ 707.79 |
| | | | 40077102-01 | 6/1/2004 | $ 707.79 |
| | | | 40089109-01 | 7/22/2004 | $659.07 |
| McCormick, Danny | 001443430 | Ronnie | 20118333-01 | 10/2/2002 | $ 1,567.00 |
| | | | 20118339-01 | 10/2/2002 | $ 720.00 |
| McGee, Ann | 023427002 | Albert | 40077119-01 | 6/25/2004 | $ 5,000.00 |
| | | | 40105609-01 | 10/6/2004 | $ 2,792.50 |
| | | | 40109015-01 | 10/22/2004 | $ 2,151.00 |
| | | | 40037178-02 | 3/3/2004 | $ 1,955.00 |
| | | | 40070836-01 | 6/2/2004 | $ 3,169.71 |
| | | | 40027174-01 | 2/10/2004 | $ 1,186.00 |
| | | | 10123344-01 | 10/5/2001 | $ 1,345.00 |
| | | | 40065263-01 | 6/2/2004 | $ 1,300.00 |
| | | | 40100157-01 | 10/6/2004 | $ 610.00 |
| 'cKirryher, Bradford | 008347496 | Self | 40100166-01 | 10/4/2004 | $ 1,950.00 |

# EXHIBIT I

## Undocumented Claims
### W. E. Aubuchon Co., Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|----------|-----------|----------|--------------|-------------------|---------------|
| | | | 40089021-01 | 8/2/2004 | $ 1,213.18 |
| | | | 30076135-01 | 6/5/2003 | $ 845.00 |
| McMahon, Kim | 019500104 | William | 40073380-01 | 6/7/04-6/8/04 | $ 1,663.00 |
| McMahon, Kim | 019500104 | Self | 20006956-01 | 11/26/2001 | $ 787.50 |
| | | | 40108212-01 | 10/11/2004 | $ 1,350.00 |
| | | | 20107223-01 | 8/25/2002 | $ 823.03 |
| | | | 20116274-01 | 9/25/2002 | $ 750.00 |
| McMahon, Kim | 019500104 | John | 40013399-01 | 1/2/2004 | $ 1,053.00 |
| | | | 40004716-01 | 1/2/2004 | $ 900.00 |
| | | | 40109020-01 | 10/19/2004 | $ 723.00 |
| | | | 40013400-02 | 1/10/2004 | $ 1,319.00 |
| Menz, John | 018503058 | Self | 40004724-01 | 11/4/2003 | $ 1,455.00 |
| Meredith, Robert | 313382266 | Self | 10133999-01 | 9/6/2001 | $ 2,150.00 |
| | | | 10127510-01 | 9/26/2001 | $ 1,311.81 |
| | | | 10119464-01 | 9/26/2001 | $ 1,255.00 |
| Metrano, Joseph | 028306717 | Shirley | 30099688-01 | 9/16/2003 | $ 925.00 |
| | | | 20107246-01 | 4/29/2002 | $ 738.40 |
| Michaud, Allan | 008383447 | Self | 20124478-01 | 10/30/2002 | $ 815.00 |
| Michaud, Carolyn | 007765130 | Self | 40013402-01 | 12/20/03-12/21/03 | $ 1,157.26 |
| | | | 40105616-01 | 10/8/2004 | $ 721.00 |
| | | | 40087108-01 | 2/13/2004 | $ 560.25 |
| Michener, Gary | 098408020 | Self | 40067725-01 | 6/2/2004 | $ 1,375.00 |
| Michener, Gary | 098408020 | Dori | 40000481-01 | 3/20/2003 | $ 1,080.00 |
| | | | 40073386-01 | 6/24/2004 | $ 569.91 |
| Millhime, James | 162400358 | Monica | 30092242-02 | 3/27/2003 | $ 842.00 |
| Misner, Brian | 028548788 | Ashleigh | 40101704-01 | 9/24/2004 | $ 1,500.00 |
| | | | 40100170-01 | 9/23/2004 | $ 767.00 |
| Misner, Brian | 028548788 | Self | 40015931-02 | 1/14/2004 | $ 767.00 |
| Molinaro, Carole | 041681519 | Self | 40080198-01 | 7/12/2004 | $ 1,066.65 |
| | | | 40087287-01 | 7/12/2004 | $ 899.00 |
| | | | 40062139-01 | 6/2/2004 | $ 790.00 |

# EXHIBIT I

## Undocumented Claims
## W. E. Aubuchon Co., Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| Monette, Steven | 008384577 | Self | 20128205-01 | 10/18/2002 | $ 2,733.65 |
| | | | 40102899-01 | 10/5/2004 | $ 1,765.00 |
| | | | 40108249-01 | 10/13/2004 | $ 1,595.00 |
| | | | 40105621-01 | 10/13/2004 | $ 1,390.00 |
| | | | 40091883-01 | 8/25/2004 | $ 1,205.60 |
| | | | 20114584-02 | 10/18/2002 | $ 858.00 |
| | | | 40087098-01 | 7/30/2004 | $ 644.40 |
| Monette, Steven | 008384577 | Christopher | 20011999-01 | 12/28/2001 | $ 1,460.00 |
| Moore, Edward | 003707029 | Marie | 40077201-01 | 7/5/2004 | $ 1,584.40 |
| | | | 40067731-01 | 6/14/2004 | $ 962.00 |
| Moore, Edward | 003707029 | Paige | 40088692-01 | 8/4/074 | $ 1,204.00 |
| Moore, Edward | 003707029 | Miranda | 40115318-01 | 11/13/2004 | $ 993.00 |
| Moore, Kenneth | 027441662 | Ashley | 10124148-01 | 10/29/2001 | $ 3,880.00 |
| | | | 20124553-01 | 7/30/2002 | $ 1,115.00 |
| | | | 40013550-01 | 1/5/04-1/6/04 | $ 709.00 |
| Moore, Kenneth | 027441662 | Self | 40060629-01 | 5/20/2004 | $ 1,258.00 |
| Moore, Travis | 005845792 | Self | 40087105-01 | 8/10/2004 | $ 1,140.00 |
| Moran, Gregory | 013366891 | Self | 30024626-01 | 1/13/2003 | $ 2,597.65 |
| | | | 40005456-01 | 12/26/2003 | $ 2,030.00 |
| | | | 20120496-01 | 10/6/2002 | $ 2,208.00 |
| | | | 20084925-02 | 6/22/2002 | $ 1,667.00 |
| | | | 20085049-03 | 6/22/2002 | $ 1,212.32 |
| Moran, Gregory | 013366891 | Deirdre | 40065295-01 | 6/7/2004 | $ 750.00 |
| | | | 20121246-01 | 5/10/2002 | $ 590.00 |
| Moran, Gregory | 013366891 | Caitlin | 40071317-01 | 6/16/2004 | $ 639.00 |
| Moran III, Marcus | 011522237 | Jennifer | 20110478-01 | 9/16/02-9/18/02 | $ 5,524.06 |
| | | | 30001902-01 | 2/15/2002 | $ 955.50 |
| Moran III, Marcus | 011522237 | Self | 20004807-01 | 1/8/2002 | $ 1,345.00 |
| Moran Jr, M. Marcus | 030345751 | Self | 30011911-01 | 2/3/2003 | $ 1,171.00 |
| Moran Sr, M. Marcus | 030073006 | Claire | 30050511-01 | 5/6/03-5/8/03 | $ 3,602.63 |

# EXHIBIT I

### Undocumented Claims
### W. E. Aubuchon Co., Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 40007696-01 | 12/10/2003 | $ 4,329.00 |
| | | | 40000483-01 | 12/10/2003 | $ 1,500.00 |
| | | | 40086903-01 | 8/1/2004 | $ 1,380.00 |
| | | | 30056962-01 | 5/12/2003 | $ 1,670.00 |
| | | | 30129951-01 | 12/9/03-12/10/03 | $ 3,085.87 |
| | | | 40088695-01 | 8/2/04-8/3/04 | $ 5,691.65 |
| | | | 30132468-01 | 12/10/2003 | $ 1,470.00 |
| | | | 40021517-01 | 12/9/2003 | $ 553.00 |
| Moran Sr, M. Marcus | 030073006 | Self | 50001888-01 | 8/20/03 | $ 3,339.00 |
| | | | 20022043-01 | 1/17/02 | $ 2,099.69 |
| | | | 40000228-01 | 11/6/03 | $ 2,045.00 |
| | | | 40098321-01 | 11/6/2003 | $ 1,810.00 |
| | | | 50001890-01 | 8/20/2003 | $ 1,430.00 |
| | | | 20102033-01 | 7/29/2002 | $ 750.00 |
| | | | 40027200-02 | 1/10/04-1/29/04 | $ 700.00 |
| | | | 50001889-01 | 8/20/2003 | $ 922.00 |
| | | | 40094261-01 | 9/13/2004 | $ 775.00 |
| | | | 40023996-01 | 1/3/2004 | $ 523.00 |
| Morin, Alan | 551431850 | Self | 10099483-01 | 7/17/2001 | $ 3,318.41 |
| | | | 10095725-01 | 7/17/2001 | $ 2,805.00 |
| | | | 10103577-01 | 7/17/2001 | $ 770.00 |
| Morse, Ashley | 011709904 | Self | 40061079-01 | 5/13/2004 | $ 5,717.23 |
| | | | 20120771-01 | 8/15/2002 | $ 1,019.00 |
| | | | 40060657-01 | 5/13/2004 | $ 627.00 |
| | | | 40062029-01 | 5/13/2004 | $ 510.00 |
| Morse, Nancy | 019483976 | Self | 40039515-01 | 3/31/2004 | $ 652.00 |
| Muter, Kevin | 287743885 | Self | 40095208-01 | 9/4/2004 | $ 506.00 |
| Nadin, George | 048309641 | Self | 20069912-01 | 5/28/2002 | $ 1,051.00 |
| Nason, Herbert | 075303503 | Self | 20052197-01 | 1/10/2002 | $ 588.00 |
| Neal, Travis | 007762370 | Ethan | 20128520-01 | 10/30/2002 | $ 1,738.00 |
| | | | 20128066-01 | 10/30/2002 | $ 580.00 |

# EXHIBIT I

Undocumented Claims

W. E. Aubuchon Co., Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| Needham, Brett | 006725745 | Barbara | 40110389-01 | 10/14/2004 | $ 864.48 |
| | | | 40007771-01 | 12/8/2003 | $ 641.40 |
| | | | 40113901-01 | 11/1/2004 | $ 562.38 |
| Needham, James | 009385824 | Marilee | 20120615-01 | 10/9/02-10/28/02 | $ 1,945.00 |
| Neves, Daniel | 022543582 | Self | 40111854-01 | 10/18/2004 | $ 687.00 |
| Newman, Mark | 002447261 | Jared | 10103549-01 | 7/11/2001 | $ 653.00 |
| Nichuals, Richard | 091484722 | Self | 40077234-01 | 7/7/2004 | $ 1,891.87 |
| | | | 40080205-01 | 7/7/2004 | $ 836.00 |
| | | | 40067749-01 | 6/11/2004 | $ 594.00 |
| | | | 40077236-01 | 7/7/2004 | $ 594.00 |
| Nielsen, Brian | 005661867 | Katherine | 40096814-01 | 9/1/2004 | $ 1,496.00 |
| | | | 40116320-01 | 10/1/03-12/31/03 | $ 1,993.98 |
| | | | 40077261-01 | 6/29/2004 | $ 1,354.56 |
| | | | 40114521-01 | 11/11/2004 | $ 1,400.00 |
| | | | 40080207-01 | 6/29/2004 | $ 1,102.00 |
| | | | 40047378-01 | 4/6/04-4/21/04 | $ 750.00 |
| | | | 40054623-01 | 3/18/2004 | $ 614.00 |
| Nielsen, Brian | 005661867 | Elizabeth | 40049690-01 | 3/16-3/17/04 | $ 814.62 |
| Norway, Donna | 008407166 | Self | 30135411-02 | 11/4/03-11/30/03 | $ 1,131.00 |
| | | | 40009620-02 | 12/2/03-12/31/03 | $ 792.00 |
| O'Connor, Keith | 025681748 | Self | 10104748-01 | 7/9/2001 | $ 700.00 |
| Olson, David | 028449298 | Self | 20101814-01 | 7/23/2002 | $ 1,996.47 |
| | | | 40047382-01 | 4/19/2004 | $ 686.50 |
| O'Neill, Susan | 020524272 | Samanta | 20102744-01 | 8/3/02-8/5/02 | $ 2,795.40 |
| | | | 20128352-01 | 11/13/2002 | $ 1,060.00 |
| | | | 20101768-01 | 8/2/2002 | $ 975.00 |
| | | | 20102747-01 | 8/2/2002 | $ 760.41 |
| Oslund, Jason | 025609332 | Self | 20003543-01 | 10/11/2001 | $ 609.84 |
| Ouellette, Roger | 024303550 | Self | 20124392-01 | 10/25/2002 | $ 3,089.32 |
| | | | 40027225-01 | 1/21/2004 | $ 3,125.00 |
| | | | 40021536-01 | 1/21/2004 | $ 5,917.17 |

# EXHIBIT I

Undocumented Claims

W. E. Aubuchon Co., Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 30129836-01 | 11/25/2003 | $ 1,500.00 |
| | | | 40018662-01 | 1/21/2004 | $ 765.00 |
| | | | 20128239-01 | 10/25/2002 | $ 600.00 |
| | | | 20130851-01 | 5/10/2002 | $ 600.00 |
| Ouellette, Roger | 024303550 | Joan | 40102642-01 | 9/29/2004 | $ 1,017.00 |
| | | | 20127985-01 | 11/4/2002 | $ 924.00 |
| | | | 40073582-01 | 6/15/2004 | $ 714.00 |
| | | | 40071240-01 | 6/18/2004 | $ 750.00 |
| | | | 10145292-01 | 11/28/2001 | $1,050.00 |
| Parsons, Mary | 007729785 | Stephanie | 40054636-02 | 4/27/2004 | $ 1,428.19 |
| Parsons, Mary | 007729785 | Terri | 40060533-01 | 5/6/2004 | $ 789.38 |
| Pasierb, Paul | 015382401 | Kathleen | 20122777-01 | 10/21/2002 | $ 2,714.02 |
| | | | 20052956-01 | 2/21/02-2/22/02 | $ 12,082.95 |
| | | | 40097725-01 | 5/15/2004 | $ 751.13 |
| | | | 40065388-01 | 5/15/04-5/16/04 | $ 668.47 |
| Patient, Heidi | 022609574 | Self | 20053717-01 | 2/26/2002 | $ 7,997.37 |
| | | | 20050243-01 | 2/26/2002 | $ 900.00 |
| | | | 20038981-01 | 2/2/2002 | $ 701.33 |
| Pederson, Louise | 040626217 | Stephanie | 40001825-01 | 12/8/2003 | $ 1,328.90 |
| | | | 40007814-01 | 12/18/2003 | $ 1,170.00 |
| | | | 40029579-01 | 12/8/03-12/11/03 | $ 11,537.52 |
| | | | 40010499-01 | 12/8/2003 | $ 570.41 |
| | | | 40029588-01 | 12/8/03-12/9/03 | $ 750.00 |
| | | | 40029594-01 | 12/10/03-12/11/03 | $ 750.00 |
| Pederson, Louise | 040626217 | Dwayne | 40058165-01 | 5/7/2004 | $ 1,121.00 |
| Pederson, Louise | 040626217 | Self | 40058166-01 | 5/10/2004 | $ 972.94 |
| | | | 40100529-01 | 9/29/2004 | $ 1,650.00 |
| Pelletier, Michael | 005642212 | Ashley | 30062819-01 | 8/18/02-12/6/02 | $ 1,300.00 |
| Pelletier, Michael | 005642212 | Susan | 30115825-01 | 10/17/2003 | $ 2,354.00 |
| Percifull, Anush | 020842563 | Scott | 20007992-01 | 1/17/2002 | $ 700.00 |
| ~terson, Martin | 014608722 | Lynette | 20020685-01 | 2/19/2002 | $ 1,075.00 |

# EXHIBIT I

## Undocumented Claims

## W. E. Aubuchon Co., Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|----------|-----------|----------|--------------|---------------------|---------------|
| Pierce, Craig | 030544747 | Self | 20127639-01 | 10/22/2002 | $ 1,973.00 |
| | | | 20128252-01 | 10/22/2002 | $ 813.00 |
| | | | 20058984-01 | 11/29/2001 | $ 675.00 |
| Pitkin, Fred | 003422404 | Self | 40094394-02 | 9/4/2004 | $ 1,281.57 |
| | | | 40091967-02 | 9/7/2004 | $ 1,460.00 |
| | | | 40115493-01 | 11/4/2004 | $ 1,295.00 |
| | | | 40065413-01 | 5/12/2004 | $ 532.79 |
| Poirier, Randy | 008520915 | Judith | 40073592-01 | 6/24/2004 | $ 700.69 |
| Poirier, Randy | 008520915 | Self | 40111705-01 | 11/11/2004 | $ 573.35 |
| Pucillo, Ann | 016307057 | Self | 20118400-01 | 9/30/2002 | $ 1,653.00 |
| Rabideau, Danford | 114428324 | Self | 40016456-02 | 1/27/2004 | $ 954.62 |
| | | | 40001548-01 | 12/3/2003 | $ 573.65 |
| | | | 40093086-01 | 5/7/2004 | $ 564.50 |
| Racette, Pamela | 028647101 | Self | 40062052-01 | 5/20/2004 | $ 674.00 |
| neau, Amy | 016605290 | Self | 20104822-01 | 8/14/2002 | $ 674.00 |
| | | | 20118030-01 | 9/26/2002 | $ 674.00 |
| Rasmussen, Duncan | 023521311 | Catherine | 40090325-01 | 7/29/2004 | $ 1,450.00 |
| Reid, John | 127504187 | Deanne | 40004067-01 | 12/19/2003 | $ 1,414.18 |
| | | | 20105595-01 | 8/14/2002 | $ 834.61 |
| | | | 40001803-01 | 12/17/2003 | $ 634.64 |
| Relihan, Maurice | 002321754 | Self | 40098482-01 | 9/1/2004 | $ 1,255.70 |
| | | | 40103476-01 | 9/1/2004 | $ 1,496.00 |
| | | | 40055852-01 | 5/17/2004 | $ 1,900.00 |
| | | | 40090326-01 | 8/9/2004 | $ 709.25 |
| Remal, Brian | 013567837 | Self | 20059699-01 | 1/2/2002 | $ 925.75 |
| | | | 20107198-01 | 8/15/2002 | $ 1,585.00 |
| | | | 20105186-01 | 8/15/2002 | $ 675.00 |
| Renzi, Dawn | 010585689 | Korey | 40105735-01 | 10/22/2004 | $ 1,530.00 |
| Renzi, Dawn | 010585689 | Self | 40086933-01 | 7/10/2004 | $ 688.00 |
| Rhoades, Joseph | 023568011 | Self | 40102650-01 | 9/30/2004 | $ 873.00 |
| hone, Brian | 113729872 | Kristal | 10120246-01 | 8/10/01-8/13/01 | $ 6,151.25 |

# EXHIBIT I

Undocumented Claims

W. E. Aubuchon Co., Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 20009924-01 | 1/3/2002 | $ 1,981.40 |
| | | | 20008259-01 | 9/26/2001 | $ 984.80 |
| | | | 10133998-01 | 9/12/2001 | $ 723.30 |
| Rhone, Brian | 113729872 | Kandal | 40044757-01 | 11/24/2003 | $ 595.00 |
| Richard, Albert | 004581551 | Self | 10123698-01 | 6/26/2001 | $ 1,676.83 |
| Richard, Rene | 012444181 | Self | 20106124-01 | 8/20/2002 | $ 2,690.00 |
| | | | 30076115-01 | 7/9/2003 | $ 1,450.00 |
| | | | 40018673-01 | 11/21/2003 | $ 1,650.00 |
| | | | 30018714-01 | 11/20/2002 | $ 670.20 |
| Richard, Rene | 012444181 | Suzanne | 40077431-01 | 7/2/2004 | $ 1,019.52 |
| | | | 40073718-01 | 6/29/2004 | $ 1,450.00 |
| | | | 40098630-01 | 9/15/2004 | $ 600.00 |
| | | | 30103007-01 | 9/2/2003 | $ 674.00 |
| | | | 40013556-01 | 1/7/2004 | $ 674.00 |
| | | | 40098715-01 | 9/15/2004 | $ 675.00 |
| Richardson, Bruce | 001325325 | Self | 30107385-01 | 10/6/2003 | $ 720.00 |
| Rivard, Gloria | 009583222 | Self | 40004081-02 | 12/3/03-12/26/03 | $ 800.52 |
| Rivenburg, Scott | 100746269 | Tara | 40088963-01 | 4/20/2004 | $ 1,429.56 |
| | | | 40093097-01 | 8/4/2004 | $ 520.00 |
| Roche, Thomas | 003363681 | Brittany | 20039129-01 | 2/27/2002 | $ 4,129.00 |
| | | | 40073802-01 | 7/6/2004 | $ 1,290.00 |
| | | | 40016047-01 | 1/15/2004 | $ 1,196.00 |
| | | | 40054704-01 | 4/28/2004 | $ 1,016.00 |
| | | | 20127613-01 | 2/27/2002 | $ 867.00 |
| | | | 40083724-01 | 7/13/2004 | $ 860.00 |
| | | | 40094254-01 | 8/18/2004 | $ 891.00 |
| | | | 40093098-01 | 8/18/2004 | $ 747.00 |
| | | | 40077482-01 | 7/1/2004 | $ 732.00 |
| Rodriquez, Jason | 028608894 | Self | 20059554-01 | 3/8/2002 | $ 930.00 |
| Rosario, Louis | 084585432 | Self | 20115352-01 | 9/16/2002 | $ 2,633.18 |
| Rossib, Cathy | 021566985 | Self | 40116475-01 | 11/27/2004 | $ 1,350.00 |

# EXHIBIT I

Undocumented Claims

W. E. Aubuchon Co., Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| Rule, Kim | 060502312 | Self | 20038999-01 | 1/22/2002 | $ 1,150.53 |
| Rule, Kim | 060502312 | Ashley | 20039010-01 | 11/6/2001 | $ 544.09 |
| | | | 10110131-01 | 8/30/2001 | $ 676.00 |
| Rydlewski, Darrer | 064743364 | Self | 40087622-02 | 5/18/04-6/15/04 | $ 900.00 |
| Sauve, Andre | 088568002 | Dawn | 10123183-01 | 7/31/2001 | $ 717.18 |
| Savoie, Steven | 025660068 | Self | 20103538-01 | 8/20/2002 | $ 7,382.81 |
| | | | 20105626-01 | 8/20/2002 | $ 2,000.00 |
| | | | 20105176-01 | 8/20/2002 | $ 792.00 |
| Schmid, Frank | 086402380 | Diane | 40077483-01 | 7/12/2004 | $ 1,090.35 |
| | | | 40086970-01 | 7/12/2004 | $ 800.00 |
| Schmid, Frank | 086402380 | Self | 40083725-01 | 7/7/2004 | $ 720.00 |
| | | | 40077948-01 | 7/7/2004 | $ 877.00 |
| | | | 40080665-01 | 7/7/2004 | $ 596.00 |
| | | | 40008544-02 | 1/5/2004 | $ 520.00 |
| en, Walter | 011344307 | Self | 30087462-01 | 6/6/2003 | $ 635.00 |
| Scopellitti, Brian | 018524112 | Jennifer | 40027268-01 | 2/2/2004 | $ 2,348.77 |
| | | | 40009660-02 | 12/24/2003 | $ 1,428.00 |
| | | | 40009661-02 | 12/30/2003 | $ 910.00 |
| | | | 40115508-01 | 11/22/2004 | $ 750.00 |
| Seavey, Christopher | 004848731 | Stephanie | 40069650-20 | 6/1/04-6/19/04 | $ 40,482.42 |
| | | | 40088817-01 | 7/31/2004 | $ 3,395.72 |
| | | | 40095142-01 | 8/11/2004 | $ 1,667.00 |
| | | | 40097691-01 | 7/13/04-7/18/04 | $ 3,170.00 |
| | | | 20002651-01 | 11/2/2001 | $ 1,118.50 |
| | | | 40098531-01 | 7/23/2004 | $ 1,032.00 |
| | | | 40080697-01 | 7/6/2004 | $ 969.00 |
| | | | 40098791-01 | 5/21/2004 | $ 1,200.00 |
| | | | 40088820-01 | 7/31/2004 | $ 937.50 |
| | | | 40090357-01 | 8/18/2004 | $ 781.00 |
| | | | 40090358-01 | 8/18/2004 | $ 781.00 |
| | | | 40090360-01 | 7/6/04-7/11/04 | $ 1,196.00 |

# EXHIBIT I

## Undocumented Claims
### W. E. Aubuchon Co., Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 40088814-01 | 7/28/2004 | $ 711.00 |
| | | | 40069662-01 | 6/22/2004 | $ 665.00 |
| | | | 40086992-01 | 7/31/2004 | $ 660.00 |
| | | | 40088786-01 | 7/12/04-7/18/04 | $ 700.00 |
| | | | 40094263-02 | 7/6/2004 | $ 712.09 |
| | | | 40084537-01 | 5/12/2004 | $ 690.00 |
| | | | 40083747-01 | 7/17/2004 | $ 626.00 |
| | | | 40088790-01 | 7/18/2004 | $ 626.00 |
| | | | 40098788-01 | 7/16/2004 | $ 630.00 |
| | | | 40083795-01 | 5/12/2004 | $ 960.00 |
| Shapiro, Larry | 108429234 | Jayne | 40087536-01 | 7/30/2004 | $ 1,906.50 |
| | | | 10123672-01 | 10/4/2001 | $ 1,900.00 |
| | | | 40091531-01 | 2/4/2004 | $ 840.00 |
| | | | 4001071-01 | 12/18/2003 | $ 827.00 |
| ٦, William | 001344277 | Self | 20039006-01 | 1/29/2002 | $ 1,284.63 |
| Sherman, William | 008561832 | Self | 20103833-01 | 8/22/2002 | $ 1,908.00 |
| | | | 20118106-01 | 9/20/2002 | $ 1,065.00 |
| Smith, Diane | 008360969 | Renee | 40069631-01 | 6/15/2004 | $ 560.50 |
| Smith, Fred | 006641219 | Lisa | 40021596-01 | 1/27/2004 | $ 1,653.00 |
| Spears, Glen | 009423952 | Joy | 40069817-01 | 4/29/2004 | $ 3,739.20 |
| | | | 40076773-01 | 5/13/2004 | $ 2,435.00 |
| | | | 40076770-01 | 4/29/2004 | $ 2,435.00 |
| | | | 40083415-01 | 9/19/2003 | $ 1,017.61 |
| | | | 40021106-02 | 1/26/2004 | $ 7,749.07 |
| St. Cyr, Janice | 026320778 | Roger | 40097694-01 | 1/28/2004 | $ 4,152.54 |
| | | | 40097695-01 | 6/15/04-6/16/04 | $ 4,096.79 |
| | | | 40088833-01 | 8/20/2004 | $ 721.00 |
| | | | 40016083-01 | 1/28/2004 | $ 525.00 |
| St. Cyr, Janice | 026320778 | Self | 20102858-01 | 8/14/2002 | $ 500.00 |
| St. Pierre, Thomas | 021404783 | Self | 40029641-01 | 2/26/2004 | $ 3,014.00 |
| | | | 20023251-01 | 1/24/2002 | $ 649.00 |

# EXHIBIT I

## Undocumented Claims

## W. E. Aubuchon Co., Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| St. Pierre, Thomas | 021404783 | Susan | 40018842-01 | 1/13/2004 | $ 1,700.00 |
|  |  |  | 40018839-01 | 1/13/2004 | $ 11,488.34 |
| St. Pierre, Joshua | 033627802 | Madison | 40108360-02 | 10/26/2004 | $ 1,040.00 |
|  |  |  | 40108356-01 | 10/26/2004 | $ 510.00 |
| Stanovich, June | 014629030 | Self | 40090368-01 | 8/6/2004 | $ 1,360.44 |
|  |  |  | 20128045-01 | 11/2/2002 | $ 1,305.00 |
|  |  |  | 40089081-01 | 8/6/2004 | $ 700.00 |
| Staples, Troy | 009364806 | Self | 40027290-01 | 2/26/2004 | $ 1,375.00 |
| Steinman, Johnathan | 009547873 | Self | 20130919-01 | 11/21/2002 | $ 795.00 |
| Stewart, Renee | 001509991 | Joshua | 40083755-01 | 7/19/2004 | $ 2,382.61 |
|  |  |  | 40083756-01 | 7/19/2004 | $ 762.00 |
| Stewart, Renee | 001509991 | Self | 30011894-01 | 1/27/2003 | $ 2,843.00 |
|  |  |  | 40102715-01 | 9/17/2004 | $ 555.50 |
| Stewart, Renee | 001509991 | Michael | 40060551-01 | 2/3/2004 | $ 736.40 |
| ...ry, Daniel | 231841218 | Abigail | 40055004-01 | 4/6/04-4/27/04 | $ 1,367.85 |
|  |  |  | 40050108-01 | 2/8/2004 | $ 1,650.00 |
|  |  |  | 40108368-02 | 9/29/04-9/30/04 | $ 640.50 |
| Story, Daniel | 231841218 | David | 30032903-02 | 3/21/2003 | $ 1,000.00 |
| Strasswimmer, Aaron | 123566113 | Kierstyn | 10118441-01 | 9/20/2001 | $ 1,172.78 |
| Strong, Wayne | 089401185 | Self | 30122198-01 | 10/22/03-11/19/03 | $ 50,557.14 |
| Sturick, Joan Marie | 054645406 | Self | 40047448-01 | 7/11/2003 | $ 1,803.02 |
|  |  |  | 40102737-01 | 10/8/2004 | $ 1,519.00 |
| Sullivan, Charles | 033364855 | Self | 40091652-01 | 8/23/2004 | $ 2,090.85 |
|  |  |  | 40105764-01 | 10/19/2004 | $ 1,905.00 |
|  |  |  | 40089129-01 | 8/23/2004 | $ 1,225.00 |
|  |  |  | 40065562-01 | 5/20/2004 | $ 723.58 |
| Sullivan, Charles | 033364855 | Judith | 30076141-01 | 7/8/2003 | $ 980.00 |
| Sullivan, Scott | 094601062 | Sandra | 40098536-02 | 8/13/2004 | $ 1,439.05 |
| Sullivan, Scott | 094601062 | Carly | 20028501-01 | 1/3/2002 | $ 568.54 |
| Sumner, Michael | 009406522 | Donna | 20120855-01 | 3/8/2002 | $ 1,800.00 |
|  |  |  | 40058276-01 | 5/4/2004 | $ 1,632.00 |

# EXHIBIT I

## Undocumented Claims
### W. E. Aubuchon Co., Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 40055006-01 | 4/29/2004 | $ 962.00 |
| | | | 40029649-01 | 3/2/2004 | $ 600.00 |
| | | | 40027314-01 | 2/17/2004 | $ 685.00 |
| Sumner, Michael | 009406522 | Katherine | 40008980-01 | 1/14/2004 | $ 1,043.00 |
| | | | 30011709-01 | 1/2/2003 | $ 1,045.00 |
| Swanson, David | 014343997 | Self | 40047697-01 | 9/12/2003 | $ 1,166.00 |
| Taft, Lucille | 009249320 | Self | 40083762-01 | 7/16/2004 | $ 2,219.89 |
| | | | 40087258-01 | 8/2/2004 | $ 1,078.00 |
| Taylor, Gary | 009527128 | Self | 20108378-01 | 6/26/2002 | $ 995.00 |
| | | | 20108379-01 | 5/30/2002 | $ 975.00 |
| Taylor, Gary | 009527128 | Justin | 10113192-01 | 7/9/2001 | $ 2,508.00 |
| Tessier, George | 019522003 | Christine | 20088216-01 | 7/12/2002 | $ 1,920.00 |
| Thomas, Shane | 021608389 | Mionie | 40035433-01 | 4/1/04-4/2/04 | $ 4,081.55 |
| | | | 40094384-01 | 9/7/2004 | $ 3,616.59 |
| | | | 40098540-01 | 9/7/2004 | $ 3,000.00 |
| | | | 40044833-01 | 4/1/2004 | $ 836.00 |
| | | | 40044836-01 | 4/1/2004 | $ 810.00 |
| | | | 40098541-01 | 9/7/2004 | $ 988.00 |
| | | | 40088950-01 | 7/17/2004 | $ 610.00 |
| Thompson, Brian | 002544486 | Self | 40065574-02 | 5/27/2004 | $ 1,699.00 |
| | | | 40027325-01 | 2/12/2004 | $ 1,155.75 |
| | | | 40024045-01 | 2/12/2004 | $ 924.00 |
| Tinker, Charles | 009301101 | Self | 30107414-01 | 3/18/2003 | $ 874.00 |
| Toland, Terry | 003320882 | Self | 30066577-02 | 5/28/2003 | $ 4,260.00 |
| Tomasi, Rhonda | 083528568 | Self | 20118020-01 | 9/24/2002 | $ 552.67 |
| Torrey, Dennis | 008449147 | Susan | 40108398-01 | 10/20/2004 | $ 1,762.33 |
| | | | 40105770-02 | 10/20/2004 | $ 900.00 |
| | | | 30042683-01 | 4/1/2003 | $ 975.00 |
| Tranka, Edward | 075721981 | Nancey | 40108400-01 | 10/14/2004 | $ 2,426.78 |
| | | | 40110428-01 | 10/28/2004 | $ 2,882.53 |
| | | | 40100233-01 | 9/17/2004 | $ 1,902.07 |

# EXHIBIT I

### Undocumented Claims

### W. E. Aubuchon Co., Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|----------|-----------|----------|--------------|---------------------|---------------|
| | | | 20008274-01 | 12/26/2001 | $ 1,681.30 |
| | | | 40058289-01 | 5/15/2004 | $ 905.34 |
| Tranka, Edward | 075721981 | Self | 10124238-01 | 8/6/2001 | $ 742.69 |
| | | | 40027347-01 | 1/23/2004 | $ 507.00 |
| Tranka, Edward | 075721981 | Piper | 40117339-01 | 11/27/2004 | $ 578.00 |
| Triplett, Napolean | 403302486 | Self | 10104752-01 | 7/26/2001 | $ 3,025.00 |
| Triplett, Napolean | 403302486 | Irene | 20032027-01 | 7/26/2001 | $ 2,600.00 |
| Valeski, Stephen | 015486840 | Self | 20017373-01 | 1/28/02-1/30/02 | $ 20,006.45 |
| | | | 20049955-01 | 3/9/02-3/28/02 | $ 7,121.89 |
| | | | 20110495-01 | 9/11/02-9/18/02 | $ 2,143.73 |
| | | | 20124372-01 | 10/25/02-10/30/02 | $ 2,091.04 |
| | | | 20042591-01 | 2/19/02-2/28/02 | $ 2,196.00 |
| | | | 20101705-01 | 7/1/2002 | $ 2,275.00 |
| | | | 20105621-01 | 8/1/2002 | $ 2,275.00 |
| | | | 20118247-01 | 9/1/2002 | $ 2,275.00 |
| | | | 40087177-01 | 7/1/2004 | $ 2,275.00 |
| | | | 40093171-01 | 8/1/2004 | $ 2,275.00 |
| | | | 40095188-01 | 9/1/2004 | $ 1,806.01 |
| | | | 40098831-01 | 9/27/2004 | $ 1,806.01 |
| | | | 20121386-01 | 10/15/2002 | $ 2,073.70 |
| | | | 20119663-01 | 10/2/2002 | $ 1,731.17 |
| | | | 20079394-01 | 6/1/02-6/6/02 | $ 1,615.67 |
| | | | 30054833-01 | 4/9/03-4/30/03 | $ 1,588.46 |
| | | | 20110474-01 | 9/25/2002 | $ 1,334.00 |
| | | | 20049956-01 | 3/29/2002 | $ 1,223.00 |
| | | | 20127633-01 | 11/6/2002 | $ 932.00 |
| | | | 20128182-01 | 11/13/2002 | $ 932.00 |
| | | | 20120738-01 | 10/16/2002 | $ 916.00 |
| | | | 20103836-01 | 8/28/2002 | $ 878.22 |
| | | | 20101801-01 | 6/29/2002 | $ 799.00 |
| | | | 20104333-01 | 8/21/2002 | $ 799.00 |

**EXHIBIT I**

Undocumented Claims

W. E. Aubuchon Co., Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 20131077-01 | 10/15/2002 | $ 1,500.00 |
| | | | 20106938-01 | 9/4/2002 | $ 664.00 |
| | | | 20131272-01 | 11/18/2002 | $ 664.00 |
| Viault, Fred | 009307896 | Self | 20011245-01 | 1/8/2002 | $ 2,818.95 |
| | | | 40099657-01 | 7/27/2004 | $ 2,000.00 |
| Viault, Fred | 009307896 | Joan | 40024056-02 | 2/11/2004 | $ 1,125.00 |
| | | | 40098559-01 | 9/28/2004 | $ 897.58 |
| | | | 40001540-01 | 12/7/2003 | $ 810.21 |
| | | | 40004865-01 | 12/8/2003 | $ 798.00 |
| | | | 40011249-02 | 12/17/2003 | $ 560.00 |
| Vradenburg, Angela | 118569614 | James | 20107109-01 | 8/23/2002 | $ 731.17 |
| Vradenburg, Angela | 118569614 | Self | 20121287-01 | 8/16/2002 | $ 602.14 |
| Ward, Scott | 234068823 | Self | 20049958-01 | 3/19/2002 | $ 8,760.86 |
| | | | 40060561-01 | 5/18/2004 | $ 1,575.00 |
| | | | 40073652-01 | 5/18/2004 | $ 1,610.48 |
| | | | 40058300-01 | 5/18/2004 | $ 3,660.00 |
| | | | 40062095-01 | 5/18/2004 | $ 4,575.00 |
| | | | 10120227-01 | 8/12/2001 | $ 749.38 |
| | | | 20008322-01 | 11/7/2001 | $ 680.54 |
| | | | 20012894-01 | 1/28/2002 | $ 950.00 |
| | | | 40071454-01 | 3/17/2004 | $ 2,176.00 |
| | | | 4055058-01 | 4/21/2004 | $ 1,390.00 |
| Ward, Scott | 234068823 | Kathleen | 20106301-01 | 8/26/2002 | $ 825.17 |
| | | | 40071452-01 | 5/27/04-6/7/04 | $ 845.00 |
| | | | 20052949-01 | 2/7/2002 | $ 704.19 |
| | | | 40071453-01 | 6/1/2004 | $ 520.00 |
| | | | 40062134-01 | 5/28/2004 | $ 559.37 |
| Ward, Scott | 234068823 | Rebecca | 20126405-01 | 10/24/2002 | $ 631.13 |
| | | | 20093952-01 | 7/16/2002 | $ 559.45 |
| Warren, Robin | 028580545 | Daniel | 30009675-01 | 4/30/2002 | $ 3,700.00 |
| Washburn, Katherine | 009408472 | Mark | 10104724-01 | 7/21/2001 | $ 822.50 |

**EXHIBIT I**

Undocumented Claims

W. E. Aubuchon Co., Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 20057034-01 | 3/1/2002 | $ 610.00 |
| | | | 20053725-01 | 3/1/2002 | $ 574.89 |
| Weeks, Hayley | 003749270 | Self | 20067240-01 | 5/15/2002 | $ 4,295.00 |
| | | | 40077861-01 | 6/29/2004 | $ 1,628.42 |
| | | | 40079455-01 | 6/15/04-6/22/04 | $ 1,613.58 |
| | | | 40077962-01 | 7/8/2004 | $ 1,378.00 |
| | | | 40079456-01 | 6/23/04-6/28/04 | $ 1,215.17 |
| | | | 40053926-01 | 4/14/2004 | $ 1,201.00 |
| | | | 40050121-01 | 4/14/2004 | $ 1,182.65 |
| | | | 40077972-01 | 7/8/2004 | $ 1,137.41 |
| | | | 40068134-01 | 6/9/2004 | $ 1,235.00 |
| | | | 40079454-01 | 6/11/2004 | $ 908.81 |
| | | | 40108408-01 | 6/11/04-6/30/04 | $ 960.00 |
| | | | 40088958-01 | 7/8/04-7/9/04 | $ 909.41 |
| | | | 40093182-01 | 7/7/04-7/8/04 | $ 802.12 |
| | | | 40073665-01 | 6/2/2004 | $ 701.00 |
| | | | 20124642-01 | 10/27/2002 | $ 616.16 |
| Wentzell, Shriley | 001280096 | Self | 20066114-01 | 6/5/2002 | $ 1,280.00 |
| Wescott, David | 042546043 | Casey | 20007377-01 | 12/31/2001 | $ 745.00 |
| White, Christine | 012644584 | Self | 30095793-02 | 6/18/2003 | $ 1,850.00 |
| | | | 30090522-01 | 7/18/2003 | $ 500.00 |
| Whittington, Terry | 091703078 | Self | 40039399-01 | 3/18/2004 | $ 1,020.00 |
| Wilcox, Craig | 086461184 | Donna | 40102754-01 | 10/5/2004 | $ 1,098.72 |
| | | | 40013626-01 | 1/15/2004 | $ 2,500.00 |
| | | | 40009730-01 | 1/15/2004 | $ 910.00 |
| | | | 40100249-01 | 10/1/2004 | $ 832.41 |
| Wilkinson, David | 006708398 | Jeremy | 20128063-01 | 11/7/2002 | $ 967.50 |
| Wilkinson, David | 006708398 | Carol | 20124666-01 | 10/16/2002 | $ 585.75 |
| Williams, Dennis | 008286378 | Self | 30094981-01 | 8/25/2003 | $ 1,795.83 |
| Williams, Dennis | 008286378 | Lorette | 40016315-01 | 1/26/2004 | $ 1,328.23 |
| | | | 40031646-01 | 3/11/2004 | $ 642.00 |

# EXHIBIT I

## Undocumented Claims

### W. E. Aubuchon Co., Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| Williams, Paul | 009549535 | Self | 40052468-01 | 5/4/2004 | $ 773.00 |
| Woods, Susan | 028509891 | Self | 20040395-01 | 12/14/2001 | $ 840.00 |
| Wylie, Donald | 077606521 | Denise | 20115341-01 | 8/23/2002 | $ 867.48 |
| Young, Mark | 008528956 | Self | 10125334-01 | 9/18/2001 | $ 1,193.81 |
| Young, Mark | 028482746 | Elise | 20011068-01 | 11/15/2001 | $ 801.00 |
| Young, Mark | 008528956 | Self | 20116016-01 | 9/30/2002 | $ 995.00 |
| Young, Philip | 002468828 | Self | 40115566-01 | 11/19/2004 | $ 1,809.00 |
| | | | 40024063-01 | 2/6/2004 | $ 1,715.00 |
| | | | 40098575-01 | 9/13/2004 | $ 747.00 |
| | | | 40114630-01 | 11/11/2004 | $ 810.00 |
| Young, Robert | 006460002 | Self | 10114054-01 | 8/31/2001 | $ 631.00 |
| Zampieri, Brenda | 009280070 | Self | 40077890-01 | 2/10/2004 | $ 1,668.67 |
| | | | 40018971-01 | 2/10/2004 | $ 1,232.00 |
| Zampieri, Brenda | 009280070 | Joseph | 20040196-01 | 3/8/2002 | $ 1,815.00 |
| mojtel, Linda | 025400040 | Self | 40080795-01 | 7/6/2004 | $ 720.32 |
| | | | | Exhibit Total: | $2,555,922.38 |

**2**

{}

# EXHIBIT II

Procedural and Payment Claim Errors

W. E. Aubuchon Co., Inc.

| | Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|---|
| 1 | Agate, Michael | Self | 104681445 | 10122100-01 | 8/27/2001 | $ 817.20 | $ 817.20 | |
| | **Comments:** The diagnosis of closed fracture of metatarsal was not investiagted by Benefirst, causing a missed potential recovery opportunity. | | | | | | | |
| 2 | Arel, Andre | Self | 003544806 | Various | 1/8/02-8/11/03 | $ 9,027.70 | $ 9,027.70 | |
| | **Comments:** The diagnosis of tear meniscus of knee was not investiagted by Benefirst, causing a missed potential recovery opportunity. | | | | | | | |
| 3 | Burns, Kristi | Self | 022563525 | 30069527-01 | 5/27/2003 | $ 647.45 | $ 647.45 | |
| | **Comments:** The diagnosis of other and unspecified injury to knee, leg, ankle and foot was not investiagted by Benefirst, causing a missed potential recovery opportunity. | | | | | | | |
| 4 | Canuel, Robert | Rachel | 018548814 | 30099950-01 | 4/13/2003 | $ 567.88 | $ 567.88 | |
| | **Comments:** The diagnosis of open wound of fingers was not investiagted by Benefirst, causing a missed potential recovery opportunity. | | | | | | | |
| 5 | Dailey, Alicia | Cory Kelley | 009629575 | 20023059-01 | 10/31/2001 | $ 925.52 | $ 925.52 | |
| | **Comments:** The diagnosis of fracture of radius; accidental fall from playground equipment was not investiagted by Benefirst, causing a missed potential recovery opportunity. | | | | | | | |
| 6 | Dunphe, Mark | Self | 035387596 | 20058538-01 | 1/3/2002 | $ 600.00 | $ 600.00 | |
| | | | | 20051413-01 | 4/11/2002 | $ 3,485.29 | $ 3,485.29 | |
| | | | | 20051415-01 | 4/11/2002 | $ 1,960.00 | $ 1,960.00 | |
| | **Comments:** The diagnosis of other and unspecified injury to knee, leg, ankle and foot was not investiagted by Benefirst, causing a missed potential recovery opportunity. | | | | | | | |
| 7 | Ellis, Steven | Courtney | 026502330 | Various | 8/3/01-6/2/03 | $ 4,729.66 | $ 4,729.66 | |

**EXHIBIT II**

Procedural and Payment Claim Errors

W. E. Aubuchon Co., Inc.

| | Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|---|
| 8 | Forrest, Chad | Chad Jr. | 136584483 | Various | 10/2/01-11/6/01 | $ 256.00 | $ 256.00 | |
| | **Comments:** The diagnosis of dislocation of patella, sprain of wrist, unspecified injury of elbow, forearm and wrist was not investigated by Benefirst, causing a missed potential recovery opportunity. | | | | | | | |
| 9 | Forrest, Chad | Jasmyne | 136584483 | Various | 1/21/02-8/8/04 | $ 1,796.05 | $ 1,796.05 | |
| | **Comments:** The diagnosis of fracture of shaft of radius and ulnar was not investigated by Benefirst, causing a missed potential recovery opportunity. | | | | | | | |
| 10 | Harkins, Gary | Self | 005846818 | Various | 9/5/2001 | $ 4,992.62 | $ 4,992.62 | |
| | **Comments:** The diagnosis of fracture of distal end of radius was not investigated by Benefirst, causing a missed potential recovery opportunity. | | | | | | | |
| 11 | Higgins, Ronald | Ronald | 001461463 | Various | 10/17/01-11/5/01 | $ 968.27 | $ 968.27 | |
| | **Comments:** The diagnosis of fracture of other facial bones was not investigated by Benefirst, causing a missed potential recovery opportunity. | | | | | | | |
| 12 | Hodgeman, Greg | Kailianne | 008628196 | 300732297-01 | 3/20/2003 | $670.40 | $670.40 | |
| | **Comments:** The diagnosis of closed fracture of other facial bones was not investigated by Benefirst, causing a missed potential recovery opportunity. | | | | | | | |
| 13 | Jackson, Gregory | Self | 072684550 | Various | 11/12/2002 | $21,445.66 | $21,445.66 | |
| | **Comments:** The diagnosis of closed fracture of other facial bones was not investigated by Benefirst, causing a missed potential recovery opportunity. | | | | | | | |
| 14 | Lavelli, Beverly | David | 026520982 | 300176617-01 | 12/5/2002 | $ 517.40 | $ 517.40 | |
| | **Comments:** The diagnosis of retinal detachment with giant tear was not investigated by Benefirst, causing a missed potential recovery opportunity. | | | | | | | |
| | **Comments:** The diagnosis of open wound of finger was not investigated by Benefirst, causing a missed potential recovery opportunity. | | | | | | | |

# EXHIBIT II

Procedural and Payment Claim Errors

W. E. Aubuchon Co., Inc.

| | Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|---|
| 15 | Letourneau, Robert | Ryan | 008582975 | 10124392-01 | 9/27/2001 | $ 455.40 | $ 455.40 | |
| | | | | 10124393-01 | 9/27/2001 | $ 553.50 | $ 553.50 | |
| | **Comments:** The diagnosis of unspecified head injury was not investigated by Benefirst, causing a missed potential recovery opportunity. | | | | | | | |
| 16 | Misner, Brian | Amanda | 028548788 | 30060242-01 | 5/12/2003 | $ 517.40 | $ 517.40 | |
| | **Comments:** The diagnosis of open wound of scalp was not investigated by Benefirst, causing a missed potential recovery opportunity. | | | | | | | |
| 17 | Moore, Kenneth | Self | 027441662 | 20060766-01 | 3/22/2003 | $ 1,377.50 | $ 1,377.50 | |
| | | | | 30135443-01 | 11/25/2003 | $ 598.50 | $ 598.50 | |
| | **Comments:** The diagnosis of concussion and sprain of knee and leg was not investigated by Benefirst, causing a missed potential recovery opportunity. | | | | | | | |
| 18 | Stanovich, Jane | Self | 014629030 | 20011035-01 | 7/31/2001 | $ 702.74 | $ 702.74 | |
| | **Comments:** The diagnosis of sprain of ankle was not investigated by Benefirst, causing a missed potential recovery opportunity. | | | | | | | |
| 19 | Stanovich, Jane | Thomas | 014629030 | Various | 10/10/03-11/21/03 | $ 1,341.67 | $ 1,341.67 | |
| | **Comments:** The diagnosis of fracture of distal end of radius was not investigated by Benefirst, causing a missed potential recovery opportunity. | | | | | | | |

# EXHIBIT II

Procedural and Payment Claim Errors

W. E. Aubuchon Co., Inc.

| | Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|---|
| 20 | Viault, Fred | Self | 009307896 | 20058684-01 | 1/8/2002 | $ 2,460.00 | $ 2,460.00 | |
| | **Comments:** The diagnosis of tear medial meniscus was not investigated by Benefirst, causing a missed potential recovery opportunity. | | | | | | | |
| 21 | Lizotte, Robert | Eleanor | 010425321 | 30118871-01 | 10/10/2003 | $ 1,520.00 | | $ 760.00 |
| | | | | 30118873-01 | 10/10/2003 | $ 760.00 | | $ 380.00 |
| | **Comments:** When both an MD and a CRNA bill for anesthesia services, each should receive 50 percent allowance. Both of the above charges had 100 percent allowed. | | | | | | | |
| 22 | Bradley, Dennis | Carrie | 383963782 | 40018153-02 | 1/14/04-1/30/04 | $615.99 | | $6.09 |
| | **Comments:** A 10 percent benefit calculation error was made after application of the MultiPlan discount. Allowed was $684.90 less $75 copay, reimbursement should have been $609.90. | | | | | | | |
| 23 | Butchko, Edward | Nancey | 075721981 | 30024728-01 | 12/20/2002 | $ 6,323.41 | | $ 2.26 |
| | **Comments:** A benefit calculation error was made after application of the MultiPlan discount. Allowed amount was $6,351.15 less $30 copay, reimbursement should have been $6,321.15 | | | | | | | |
| 24 | Konik, Justin | Jennifer | 063642497 | 30056605-01 | 4/25/2003 | $ 477.39 | | $ 2.27 |
| | **Comments:** A benefit calculation error was made after application of the MultiPlan discount. Allowed amount was $126.28, less $30 copay, reimbursement should have been $475.12 | | | | | | | |
| 25 | Moore, Kenneth | Ashley | 027441662 | 30038613-01 | 3/5/2003 | $ 631.82 | | $ 10.00 |
| | **Comments:** A benefit calculation error was made after application of the MultiPlan discount. Allowed amount was $656.82 less $15 copay, reimbursement should have been $641.82, producing an | | | | | | | |
| 26 | Nason, Herbert | Self | 075303503 | 10130586-01 | 9/1/01-9/13/01 | $40,949.14 | | $117.67 |
| | **Comments:** The billed amount was entered incorrectly as $43,434.64 rather than the correct billed amount of $45,499.04, so that when the 10 percent discount was applied, a $117.67 underpayment | | | | | | | |

# EXHIBIT II

## Procedural and Payment Claim Errors

## W. E. Aubuchon Co., Inc.

| | Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|---|
| 27 | Seavey, Christopher | Stephanie | 00484721 | 30050657-01 | 4/8/2003 | $ 559.80 | | $ 130.62 |
| | **Comments:** The PPO discount was overlooked in the adjudication of the claim. | | | | | | | |
| 28 | Tranka, Edward | Kaitlyn | 075721981 | 20082400-01 | 6/11/2002 | $ 652.52 | | $ 1.89 |
| | **Comments:** A benefit calculation error was made after application of the MultiPlan discount. Allowed amount was $675.63 less $25 copay, reimbursement should have been $650.63 | | | | | | | |
| 29 | Vradenburg, Angela | Self | 118569614 | 30068941-01 | 5/27/2003 | $ 540.23 | | $ 2.27 |
| | **Comments:** A benefit calculation error was made after application of the MultiPlan discount. Allowed amount was $567.96 less $30 copay, reimbursement should have been $537.96 | | | | | | | |
| 30 | Aubuchon, Pierre | Self | 033223323 | 30088310-02 | 6/11/2003 | $ 697.85 | | $ 553.65 |
| | **Comments:** Claimant has Medicare coverage as prime; however, charges were paid as primary by BeneFirst. Our deduction is based upon the typical Medicare calculation of 80 percent reimbursement of billed which was $821.00. The 20 percent balance would have been $164.20, the maximum BeneFirst should have paid. | | | | | | | |
| 31 | Dailey, Alicia | Mark | 009629575 | 20038249-01 | 1/4/2002 | $ 900.00 | | $ 900.00 |
| | | | | 200470058-01 | 1/4/2002 | $ 180.00 | | $ 180.00 |
| | **Comments:** Benefist notes indicate that the claimant has primary coverage. Primary carrier payment was not considered on any claims. | | | | | | | |
| 32 | Larivee, Betty | Self | 008305761 | Various | 2/7/02-11/30/04 | $ 1,138.60 | | $ 1,138.60 |
| | **Comments:** Benefist notes indicate that employee has primary coverage through Blue Cross Blue Shield. Primary carrier payment was not considered on any claims. | | | | | | | |

# EXHIBIT II

## Procedural and Payment Claim Errors

### W. E. Aubuchon Co., Inc.

| | Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|---|
| 33 | Lavelli, Beverly | Kathy | 026520982 | Various | 1/25/01-12/27/01 | $ 6,402.76 | | $ 6,402.76 |
| | **Comments:** Benefirst notes indicate that the claimant has primary coverage. Primary carrier payment was not considered on any claims. | | | | | | | |
| 34 | Lavelli, Beverly | Kathy | 026520982 | 2002078-01 | 12/31/2001 | $ 884.85 | | $ 884.85 |
| | **Comments:** Provider is Henry Heywood Memorial Hospital; however, payment was made to Susan E. Bonadonna, MD. Additionally, claimant has own medical coverage which is primary. Primary carrier payment was not considered on this claim. | | | | | | | |
| 35 | Bedard, Samuel | Self | 007820809 | Various | 11/7/03-11/15/04 | $ 307,693.85 | $ 307,693.85 | |
| | **Comments:** Eligibility on-line indicates that a COBRA was effective 1/1/03. No documentation noted on-line indicating that a COBRA election form was completed or that premium payments were made. | | | | | | | |
| 36 | Bryant, Jeffrey | Self | 032646418 | Various | 12/26/2003 | $ 1,179.64 | $ 1,179.64 | |
| | **Comments:** Eligibility on-line indicates that COBRA was effective 11/20/03. No documentation noted on-line indicating that a COBRA election form was completed or that premium payments were made. | | | | | | | |
| 37 | Bryant, Jeffrey | Jagger | 032646418 | Various | 12/19/03-3/23/04 | $ 179.00 | 179.00 | |
| | **Comments:** Eligibility on-line indicates that COBRA was effective 11/20/03. No documentation noted on-line indicating that a COBRA election form was completed or that premium payments were made. | | | | | | | |
| 38 | Deschamps, Louis | Self | 009288195 | Various | 8/2/01-9/10/02 | $ 2,025.30 | | $ 1,446.70 |
| | **Comments:** Eligibility on-line indicates that COBRA was effective 9/1/02. Medicare is indicated on bills received, and Medicare is primary over COBRA. Therefore, BeneFirst should have paid no more than 20 percent of the billed amount o $2,893.00, or $578.60. | | | | | | | |

# EXHIBIT II

## Procedural and Payment Claim Errors

### W. E. Aubuchon Co., Inc.

| | Employee | Claimant | ID Number | Claim Number/ Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|
| 39 | Deschamps, Louis | Angeline | 009288195 | Various 8/2/01-6/17/03 | $ 248.60 | $ 248.60 | |
| | **Comments:** Eligibility on-line indicates that a COBRA was effective 9/1/01. No documentation noted on-line indicating that a COBRA election form was completed or that payments were made. | | | | | | |
| 40 | Kugler, Chester | Self | 019325987 | Various 10/29/02-4/7/04 | $ 4,100.77 | $ 4,100.77 | |
| | **Comments:** Eligibility on-line indicates that COBRA was effective 7/1/02. No documentation noted on-line indicating that a COBRA election form was completed or that premium payments were made. | | | | | | |
| 41 | McLaughlin, Karen | Self | 079386504 | Various 7/24/01-8/29/03 | $ 4,491.72 | $ 4,491.72 | |
| | **Comments:** Eligibility on-line indicates that COBRA was effective 5/14/01. No documentation noted on-line indicating that a COBRA election form was completed or that premium payments were made. | | | | | | |
| 42 | Morin, Alan | Self | 551431850 | Various 4/24/02-7/1/02 | $ 1,113.51 | $ 1,113.51 | |
| | **Comments:** Eligibility on-line indicates that COBRA was effective 2/1/02. No documentation noted on-line indicating that a COBRA election form was completed or that premium payments were made. | | | | | | |
| 43 | Nason, Herbert | Self | 075303503 | Various 9/1/01-1/31/02 | $ 68,995.49 | $ 68,995.49 | |
| | **Comments:** COBRA coverage was effective on 1/31/02. No documentation was submitted confirming COBRA election or payment of COBRA premium payments. | | | | | | |
| 44 | Pierce, Craig | Self | 030544747 | Various 7/8/02-1/29/04 | $ 6,140.96 | $ 6,140.96 | |
| | **Comments:** Eligibility on-line indicates that COBRA was effective 7/2/02. No documentation noted on-line indicating that a COBRA election form was completed or that premium payments were made. | | | | | | |

# EXHIBIT II

Procedural and Payment Claim Errors

W. E. Aubuchon Co., Inc.

| | Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|---|
| 45 | Tomasi, Rhonda | Self | 083528568 | Various | 2/7/02-10/23/02 | $ 15,905.02 | $ 15,905.02 | |
| | Comments: Eligibility on-line indicates that a COBRA election form was completed or that premium payments were made. | | | | | | | |
| 46 | Williams, Dennis | Self | 008286378 | Various | 5/9/03-10/15/03 | $ 3,268.77 | $ 3,268.77 | |
| | Comments: Eligibility on-line indicates that COBRA was effective 1/1/02. No documentation noted on-line indicating that a COBRA election form was completed or that premium payments were made. | | | | | | | |
| 47 | Aubuchon III, William | Self | 033346935 | 1012134-3-01 | 8/2/2001 | $ 1,035.00 | | $ 103.50 |
| | Comments: The Plan allows colonoscopy charges at 90 percent. This claim was paid at 100 percent. | | | | | | | |
| 48 | Bickford, Marilyn | Self | 010217211 | 3005070-75-01 | 6/12/2002 | $ 1,016.00 | | $ 101.60 |
| | Comments: The Plan allows colonoscopy charges at 90 percent. This claim was paid at 100 percent. | | | | | | | |
| 49 | Desilets, Raymond | Self | 001386202 | 3012369-7-01 | 10/2/2003 | $ 864.00 | | $ 86.40 |
| | Comments: The Plan allows colonoscopy charges at 90 percent. This claim was paid at 100 percent. | | | | | | | |
| 50 | Doyle, Florence | Edward | 009500618 | 4003702-0-02 | 3/19/2004 | $ 650.00 | | $ 65.00 |
| | Comments: The Plan allows colonoscopy charges at 90 percent. This claim was paid at 100 percent. | | | | | | | |
| 51 | Eaton, Robert | Self | 010526432 | 3003837-5-02 | 2/20/2002 | $ 700.00 | | $ 70.00 |
| | Comments: The Plan allows colonoscopy charges at 90 percent. This claim was paid at 100 percent. | | | | | | | |
| 52 | Fillo, Joseph | Mary Ellen | 048486181 | 3013198-8-01 | 10/31/2003 | $ 650.00 | | $ 65.00 |
| | Comments: The Plan allows colonoscopy charges at 90 percent. This claim was paid at 100 percent. | | | | | | | |

**EXHIBIT II**

Procedural and Payment Claim Errors

W. E. Aubuchon Co., Inc.

| | Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|---|
| 53 | Graffam, Robert | Debra | 007521183 | 30029404-01 | 2/3/2003 | $ 900.00 | | $ 90.00 |
| | **Comments:** The Plan allows colonoscopy charges at 90 percent. This claim was paid at 100 percent. | | | | | | | |
| 54 | Haley, Reginald | Self | 008345689 | 20051527-01 | 4/5/2002 | $ 1,296.25 | | $ 129.62 |
| | **Comments:** The Plan allows colonoscopy charges at 90 percent. This claim was paid at 100 percent. | | | | | | | |
| 55 | Kassel, Jeffrey | Self | 152484538 | 30121364-01 | 8/15/2003 | $ 741.50 | | $ 74.15 |
| | **Comments:** The Plan allows colonoscopy charges at 90 percent. This claim was paid at 100 percent. | | | | | | | |
| 56 | Kugler, Chester | Self | 019325987 | 20077905-01 | 5/31/2002 | $ 650.00 | | $ 65.00 |
| | **Comments:** The Plan allows colonoscopy charges at 90 percent. This claim was paid at 100 percent. | | | | | | | |
| 57 | Rhone, Brian | Kristal | 113729872 | 10141293-01 | 8/13/2001 | $ 750.00 | | $ 75.00 |
| | **Comments:** The Plan allows colonoscopy charges at 90 percent. This claim was paid at 100 percent. | | | | | | | |
| 58 | Sullivan, Charles | Judith | 033364855 | 30032119-01 | 2/7/2003 | $ 650.00 | | $ 65.00 |
| | **Comments:** The Plan allows colonoscopy charges at 90 percent. This claim was paid at 100 percent. | | | | | | | |
| 59 | Chauvin, Richard | Self | 033382809 | 20092705-01 | 6/4/02-6/21/02 | $ 996.07 | | $ 30.00 |
| | **Comments:** The Plan requires a $15 copay for each physical therapy visit. Copays were not taken on two claims. | | | | | | | |
| 60 | Doyon, Donald | Self | 008405989 | 20127599-01 | 11/5/03-11/30/03 | $ 1,111.80 | | $ 15.00 |
| | **Comments:** The Plan requires a $15 copay for each physical therapy visit. The copay was not taken. | | | | | | | |

# EXHIBIT II

## Procedural and Payment Claim Errors

### W. E. Aubuchon Co., Inc.

| | Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|---|
| 61 | Murphy, Michael | Self | 010605085 | 20031334-01 | 1/13/2002 | $ 1,000.56 | | $ 25.00 |
| | **Comments:** The Plan requires a $25 emergency room copay which was not taken on this claim. | | | | | | | |
| 62 | Pasierb, Paul | Self | 015382401 | 30043436-01 | 3/5/03-3/31/03 | $ 506.55 | | $ 45.00 |
| | **Comments:** The Plan requires a $15 copay for each psychotherapy visit. Three copays were not taken. | | | | | | | |
| 63 | Shea, William | Phyllis | 001344277 | 20101541-01 | 7/4/2002 | $ 580.53 | | $ 25.00 |
| | **Comments:** The Plan requires a $25 emergency room copay which was not taken on this claim. | | | | | | | |
| 64 | Baker, James | Kim Lapinski | 009603842 | 20057118-01 | 10/6/01-11/10/03 | $ 2,220.81 | $ 2,220.81 | $ 953.75 |
| | **Comments:** The child has a different last name than the employee, and in previous visits to BeneFirst, we asked for verification that she resides with the employee and is eligible to be claimed as a dependent on the employee's Federal Income Tax, as required by the plan. BeneFirst provided a copy of the enrollment form, which shows that the child is enrolled as a step-daughter, but did not provide any further eligibility verification. We asked BeneFirst to obtain confirmation of the child's status for the claimant's Federal Income Tax, and BeneFirst responded they were unable to obtain written verification from the employee, and did not want to pursue it, as the child is deceased. We believe that this claim should not be allowed until eligibility status is verified. In addition, one claim was paid to the wrong provider: to Kathleen Martin, MD, rather than to Fletcher Allen Health Care. | | | | | | | |
| 65 | Kingsley, Robyn | Shea Brown | 002586874 | Various | 1/23/02-10/2/03 | $ 5,462.66 | | $ 5,462.66 |
| | **Comments:** This claimant has a different last name than the employee. We found nothing in on-line notes to indicate that the relationship of this dependent to the employee was investigated to confirm eligibility status. | | | | | | | |

# EXHIBIT II

## Procedural and Payment Claim Errors

### W. E. Aubuchon Co., Inc.

| | Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|---|
| 66 | Moore, Kenneth | Ryan Oliveira | 027441662 | Various | 8/8/01-3/10/04 | $ 22,876.31 | $ 22,876.31 | |
| | **Comments:** This claimant has a different last name than the employee. We found nothing in on-line notes to indicate that the relationship of this dependent to the employee was investigated to confirm eligibility status. | | | | | | | |
| 67 | Nielsen, Brian | Chesley, Elizabeth | 005661867 | Various | 10/1/03-9/15/04 | $ 19,553.24 | $ 19,553.24 | |
| | **Comments:** This claimant has a different last name than the employee. We found nothing in on-line notes to indicate that the relationship of this dependent to the employee was investigated to confirm eligibility status. | | | | | | | |
| 68 | Bedard, Samuel | Self | 007820809 | 40029226-01 | 2/29/2004 | $ 1,422.00 | | $ 170.64 |
| | **Comments:** Like charges billed by this provider had a 12 percent discount applied; however, this charge was paid at 100 percent of billed. We have applied a 12 percent reduction to the billed amount of $1,422.00 | | | | | | | |
| 69 | Duso, Bernard | Julia | 078662855 | 30090833-01 | 7/31/03-7/31/03 | $ 814.44 | | $ 0.44 |
| | **Comments:** PPO discount should have been $90.44; however, only $90.00 was taken. | | | | | | | |
| 70 | Duso, Bernard | Erika | 078662855 | 20086220-01 | 5/1/02-12/31/04 | $ 1,200.00 | $ 1,200.00 | |
| | **Comments:** This provider is noted as being in-network; however, no discount was taken on this claim and BeneFirst did not investigate this discrepancy. We were unable to determine what the discount might have been since we found no other claims for this provider that would allow a comparison. | | | | | | | |
| 71 | Archambeault, Gerard | Self | 001368023 | 30064193-02 | 5/19/2003 | $ 545.60 | | $ 545.60 |
| | **Comments:** Although this claim was noted as part of the "documented" transactions, no bill copy was provided. | | | | | | | |

# EXHIBIT II

## Procedural and Payment Claim Errors
### W. E. Aubuchon Co., Inc.

| | Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|---|
| 72 | Aubuchon, Thomas | Self | 017503470 | 20004324-01 | 11/29/2001 | $ 584.80 | | $ 584.08 |
| | **Comments:** Although this claim was noted as part of the "documented" transactions, the bill copy provided was for another claim, not this transaction. | | | | | | | |
| 73 | Beroney, Kenny | Self | 002566995 | 20023471-01 | 1/2/2002 | $ 635.23 | | $ 635.23 |
| | **Comments:** Although this claim was noted as part of the "documented" transactions, the bill copy provided was for another claim, not this transaction. | | | | | | | |
| 74 | Burgoyne, Raymond | Self | 003263723 | 30101582-01 | 8/18/03-9/20/03 | $ 22,963.58 | | $ 22,963.58 |
| | **Comments:** Although this claim was noted as part of the "documented" transactions, the bill copy provided was for another claim, not this transaction. | | | | | | | |
| 75 | Lucero, Charles | Self | 00862870-9 | 20015668-01 | 1/1/2001 | $ 714.06 | | $ 714.06 |
| | **Comments:** Although this claim was noted as part of the "documented" transactions, the bill copy provided was for another claim, not this transaction. | | | | | | | |
| 76 | Magliacane, Doreen | Self | 020582876 | 20023409-01 | 1/8/2002 | $ 619.42 | | $ 619.42 |
| | **Comments:** Although this claim was noted as part of the "documented" transactions, the bill copy provided was for another claim, not this transaction. | | | | | | | |
| 77 | Strong, Wayne | Self | 089401185 | Various | 5/30/03-11/19/036 | $ 126,011.59 | $ 126,011.59 | |
| | **Comments:** This claimant had numerous hospitalizations between May and November 2003, and the severity of his diagnosis may indicate that he was not able to be actively-at-work. We believe his coverage continuation status should have been questioned by BeneFirst. | | | | | | | |
| 78 | Abbott, Diane | Self | 001426120 | 20049711-01 | 4/9/2002 | $ 3,188.00 | | $ 600.00 |
| | **Comments:** Multiple surgery rules were not applied in the adjudication of this claim. | | | | | | | |
| 79 | Downs-Will, Brenda | Self | 260271908 | 20039854-01 | 1/10/2002 | $ 2,400.00 | | $ 400.00 |

## EXHIBIT II

### Procedural and Payment Claim Errors
### W. E. Aubuchon Co., Inc.

| | Employee | Claimant | ID Number | Claim Number/ | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|---|
| 80 | Herschel, Chad | Self | 008488850 | 30071612-014 | 6/5/2003 | $ 572.40 | | $ 85.50 |
| | Comments: Multiple surgery rules were not applied in the adjudication of this claim. | | | | | | | |
| 81 | Labeau, Darryl | Courtney | 571437672 | 3020 | 2/14/2002 | $ 2,000.00 | | $ 297.50 |
| | Comments: Multiple surgery rules were not applied in the adjudication of this claim. | | | | | | | |
| 82 | Labombard, Howard | Marguerite | 132420934 | 30098734-01 | 8/25/2003 | $ 7,397.00 | | $ 1,639.70 |
| | Comments: Multiple surgery rules were not applied in the adjudication of this claim. Additionally, the 90 percent coinsurance rate was not applied to this out-of-network claim. | | | | | | | |
| 83 | Lapointe, Gregory | Ann Marie | 007722723 | 20051570-01 | 3/22/2002 | $ 1,321.20 | | $ 347.00 |
| | Comments: Multiple surgery rules were not applied in the adjudication of this claim. | | | | | | | |
| 84 | Lavalley, Joy | Self | 038702728 | 20085675-01 | 5/30/2002 | $ 1,918.00 | | $ 298.00 |
| | Comments: Multiple surgery rules were not applied in the adjudication of this claim. Additionally, the physician's charge for a hospital care visit should have been bundled with the surgical fee. | | | | | | | |
| 85 | Magoon Jr, Wendall | Brendan | 009642362 | 30032031-01 | 2/7/2003 | $ 1,239.05 | | $ 104.00 |
| | Comments: Multiple surgery rules were not applied in the adjudication of this claim. | | | | | | | |
| 86 | Moran, Gregory | Self | 013366891 | 30019214-01 | 1/13/2003 | $ 1,653.00 | | $ 81.00 |
| | Comments: Multiple surgery rules were not applied in the adjudication of this claim. | | | | | | | |
| 87 | Moran Sr, Marcus | Self | 030073006 | 20085190-01 | 8/17/2001 | $ 896.00 | | $ 127.50 |
| | Comments: Multiple surgery rules were not applied in the adjudication of this claim. | | | | | | | |
| 88 | Basque, Pauline | Self | 012348682 | 20023112-01 | 1/18/02-1/21/02 | $ 3,450.00 | | $ 200.00 |
| | Comments: Multiple surgery rules were not applied in the adjudication of this claim. | | | | | | | |

# EXHIBIT II

## Procedural and Payment Claim Errors
### W. E. Aubuchon Co., Inc.

| | Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|---|
| 89 | Camuel, Robert | Kayla | 018548814 | 20049723-01 | 2/7/02-2/14/02 | $ 7,318.95 | | $ 200.00 |
| | **Comments:** The plan requires precertification for all inpatient confinements or a penalty of $200 applies. No precertification documented in on-line notes. | | | | | | | |
| 90 | Gustin, Robby | Self | 005763667 | 20063136-01 | 3/25/02-4/1/02 | $ 871.06 | | $ 200.00 |
| | **Comments:** The plan requires precertification for all inpatient confinements or a penalty of $200 applies. No precertification documented in on-line notes. | | | | | | | |
| 91 | Labeau, Darryl | Cassidy | 571437672-02 | 20065235-01 | 4/15/02-4/17/02 | $ 11,881.81 | | $ 200.00 |
| | **Comments:** The plan requires precertification for all inpatient confinements or a penalty of $200 applies. No precertification documented in on-line notes. | | | | | | | |
| 92 | Muro, Vincent | Matthew | 008384999-02 | 20062290-01 | 12/16/01-12/18/01 | $ 1,788.70 | | $ 200.00 |
| | **Comments:** The plan requires precertification for all inpatient confinements or a penalty of $200 applies. No precertification documented in on-line notes. | | | | | | | |
| 93 | Shumski, Michael | Self | 018467546 | 10113347-01 | 7/2/01-7/13/01 | $ 3,060.00 | | $ 200.00 |
| | **Comments:** The plan requires precertification for all inpatient confinements or a penalty of $200 applies. No precertification documented in on-line notes. | | | | | | | |
| 94 | Andrews, David | Cathy | 035422045 | 20024892-01 | 9/24/2001 | $ 506.60 | | $ 506.60 |
| | **Comments:** The plan requires precertification for all inpatient confinements or a penalty of $200 applies. No precertification noted in claimant's file. | | | | | | | |
| 95 | Avery, Tamela | Self | 074502519 | 1012510-01 | 8/14/2001 | $ 1,550.86 | | $ 1,550.86 |
| | **Comments:** Reimbursement issued to Susan E. Bonadonna, MD rather than to provider Henry Heywood Memorial Hospital. | | | | | | | |

**EXHIBIT II**

Procedural and Payment Claim Errors

W. E. Aubuchon Co., Inc.

| | Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|---|
| 96 | Burns, Kristi | Self | 022563525 | 20038729-01 | 2/5/2002 | $ 6,248.01 | | $ 6,248.01 |
| | **Comments:** Reimbursement issued to Kathleen Martin, MD rather than to provider Fletcher Allen Health Care. | | | | | | | |
| 97 | Chamberlain, Nancy | Raymond | 008429649 | 10119384-01 | 9/4/2001 | $ 2,140.52 | | $ 2,140.52 |
| | **Comments:** Reimbursement issued to Susan E. Bonadonna, MD rather than to provider Henry Heywood Memorial Hospital. | | | | | | | |
| 98 | Ellis, Steven | Courtney | 026502330 | 20028416-01 | 9/27/01 | $ 523.60 | | $ 523.60 |
| | | | | 20004356-01 | 11/1/01-11/13/01 | $ 1,498.00 | | $ 1,498.00 |
| | | | | 20039069-01 | 10/15/01-10/31/01 | $ 710.95 | | $ 710.95 |
| | | | | 20024906-01 | 12/4/01-12/31/01 | $ 546.00 | | $ 546.00 |
| | **Comments:** Reimbursement issued to Kathleen Martin, MD rather than to provider Fletcher Allen Health Care. | | | | | | | |
| | **Comments:** Reimbursement issued to Susan E. Bonadonna, MD rather than to provider Henry Heywood Memorial Hospital. Additionally, physical therapy charges considered without indication of attending physician's orders as required by the Plan. | | | | | | | |

# EXHIBIT II

## Procedural and Payment Claim Errors
### W. E. Aubuchon Co., Inc.

| | Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|---|
| 99 | Hoag, Jeffrey | Kerri | 009582680 | 20063219-01 | 5/3/2002 | $ 953.75 | | $ 953.75 |
| | **Comments:** Reimbursement issued to Kathleen Martin, MD rather than to provider Fletcher Allen Health Care. | | | | | | | |
| 100 | Lavelli, Beverly | Kathy | 026520982 | 10119168-01 | 8/17/2001 | $ 544.00 | | $ 544.00 |
| | | | | 20028278-01 | 12/31/2001 | $ 884.85 | | $ 884.85 |
| | **Comments:** Reimbursement issued to Susan E. Bonadonna, MD rather than to provider Henry Heywood Memorial Hospital. | | | | | | | |
| 101 | Machia, Miranda | Self | 009603901 | 1012396-01 | 9/8/2001 | $ 1,146.45 | | $ 1,146.45 |
| | | | | 20048201-01 | 3/25/02-4/8/02 | $ 27,783.24 | | $ 27,783.24 |
| | | | | 20053727-01 | 1/18/02-1/22/02 | $ 1,817.52 | | $ 1,817.52 |
| | | | | 20060440-01 | 4/20/02-5/7/02 | $ 32,554.40 | | $ 32,554.40 |
| | **Comments:** Reimbursement issued to Kathleen Martin, MD rather than to provider Fletcher Allen Health Care. Additionally, for the inpatient stay from 4/20/02 through 5/7/02, only six days out of the 17 were precertified; therefore, even if charges had been paid to the correct provider an overpayment of $13,360.68 was made. | | | | | | | |
| 102 | Machia, Miranda | Kyle | 009603901 | 20038992-01 | 1/18/02-1/22/02 | $ 6,433.49 | | $ 6,433.49 |
| | **Comments:** Reimbursement issued to Kathleen Martin, MD rather than to provider Fletcher Allen Health Care. | | | | | | | |

## EXHIBIT II

### Procedural and Payment Claim Errors
### W. E. Aubuchon Co., Inc.

| | Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|---|
| 103 | Mattson, Michael | Lori | 031547580 | 1021462-01 | 9/7/2001 | $ 520.20 | $ | $ 520.20 |
| | Comments: Reimbursement issued to Susan E. Bonadonna, MD rather than to provider Henry Heywood Memorial Hospital. | | | | | | | |
| 104 | Mattson, Michael | Ryan | 031547580 | 10142359-01 | 10/24/01-10/26/01 | $ 1,890.01 | $ | $ 1,890.01 |
| | | | | 10142377-01 | 10/31/01-11/1/01 | $ 839.80 | $ | $ 839.80 |
| | Comments: Reimbursement issued to Susan E. Bonadonna, MD rather than to provider Henry Heywood Memorial Hospital. | | | | | | | |
| 105 | Patient, Heidi | Self | 022609574 | 10143589-01 | 10/11/2001 | $ 988.20 | $ | $ 988.20 |
| | | | | 10142379-01 | 10/31/2001 | $ 1,361.70 | $ | $ 1,361.70 |
| | | | | 20028087-01 | 12/27/2001 | $ 598.40 | $ | $ 598.40 |
| | Comments: Reimbursement issued to Susan E. Bonadonna, MD rather than to provider Henry Heywood Memorial Hospital. | | | | | | | |
| 106 | Young, Mark | Self | 008528956 | 20063519-01 | 4/25/2002 | $ 886.50 | $ | $ 886.50 |
| | Comments: Reimbursement issued to Kathleen Martin, MD rather than to provider Fletcher Allen Health Care. | | | | | | | |
| 107 | Bradley, Dennis | Self | 383963782 | 20041187-01 | 3/6/2002 | $ 965.00 | $ | $ 123.55 |
| | Comments: 90 percent coinsurance was not applied to this out-of-network claim. Additionally, $30.05 of the 2002 deductible was not satisfied. | | | | | | | |
| 108 | Bruno, Steven | Self | 043567642 | 40036912-01 | 3/13/04-3/15/04 | $ 560.00 | $ | $ 56.00 |
| | Comments: 90 percent coinsurance was not applied to this out-of-network claim. | | | | | | | |
| 109 | Burke, Denise | Self | 007664947 | 20000419-01 | 7/14/2001 | $ 591.78 | $ | $ 59.18 |
| | Comments: 90 percent coinsurance was not applied to this out-of-network claim. | | | | | | | |

# EXHIBIT II

### Procedural and Payment Claim Errors
### W. E. Aubuchon Co., Inc.

| | Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|---|
| 110 | Chauvin, Richard | Self | 033382809 | 20103130-01 | 7/30/2002 | $ 719.00 | | $ 71.90 |
| | Comments: 90 percent coinsurance was not applied to this out-of-network claim. | | | | | | | |
| 111 | Hart, Army | Self | 065480247 | 20046910-01 | 2/12/2002 | $ 871.25 | | $ 87.13 |
| | | | | 30058406-01 | 5/2/2003 | $ 585.00 | | $ 58.50 |
| | Comments: 90 percent coinsurance was not applied to this out-of-network claim. | | | | | | | |
| 112 | Hart, Army | Winona | 065480247 | 30029432-01 | 2/14/2003 | $ 1,170.00 | | $ 117.00 |
| | Comments: 90 percent coinsurance was not applied to this out-of-network claim. | | | | | | | |
| 113 | Kingsley, Robyn | Shea Brown | 002586874 | 20034250-01 | 11/30/2002 | $ 795.00 | | $ 79.50 |
| | Comments: 90 percent coinsurance was not applied to this out-of-network claim. | | | | | | | |
| 114 | Lacroix, Roger | Self | 008500963 | 20052873-01 | 1/25/2002 | $ 650.00 | | $ 65.00 |
| | Comments: 90 percent coinsurance was not applied to this out-of-network claim. | | | | | | | |
| 115 | Nielsen, Brian | Elizabeth Chesley | 005661867 | Various | 11/9/04-11/24/04 | $ 1,308.50 | | $ 1,308.50 |
| | Comments: Benefirst on-line notes and eligibility screens indicate that dependent coverage terminated on 9/15/04. These charges were incurred after this termination date. | | | | | | | |

# EXHIBIT II

Procedural and Payment Claim Errors

W. E. Aubuchon Co., Inc.

116

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|
| Magliacane, Doreen | Self | 020582876 | 20065363-01 | 3/4/02-3/31/02 | $ 1,857.15 | $ 1,857.15 | |
| | | | 20060752-01 | 4/3/02-4/30/02 | $ 532.75 | $ 532.75 | |
| **Comments:** Physical therapy charges considered without indication of attending physician's orders as required by the Plan. | | | | | | | |
| | | | | **Exhibit Totals:** | $915,154.20 | $654,445.65 | $141,350.21 |

**3**

{}

# EXHIBIT III

## Procedural and Payment Claim Errors

### W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|
| Arel, Andre | Self | 2005741400 | 20055753-01 | 4/5/2002 | $0.00 | | |
| | | | 20101591-01 | 4/5/2002 | $ 7,637.90 | | $ 7,637.90 |
| | | | 20057420-01 | 4/5/2002 | $ 300.00 | $ 300.00 | |
| | | | 20057424-01 | 4/5/2002 | $ 1,725.00 | $ 1,725.00 | |
| | | | 20083238-01 | 4/5/2002 | $ 1,650.00 | $ 975.00 | $ 675.00 |
| | | | 20057414-01 | 4/5/2002 | $ 3,250.00 | $ 3,250.00 | |

**Comments:** Notes indicate that the claimant was hit in the face by a baseball while coaching, and that claims should be pended for clarification of coverage from school insurance, but that Aubuchon instructed that the claims be paid with post-payment investigation of the potential of recovery from the school insurance. BeneFirst paid the claim, but never pursued the investigation. In our experience, schools typically carry accident coverage for coaches, so we believe recovery should have been pursued. Secondary to our questioning of the pursuit of recovery for these claims, we found a duplicate payment agreed by BeneFirst of $7,637.90 (claim 20101591-01 and 20083238-01), and a missed multiple surgery discount of $675.00 (claim 2005741401), also agreed by BeneFirst. Therefore, regardless of the missed recovery, this claim is overpaid by $8,312.90

# EXHIBIT III

## Procedural and Payment Claim Errors

### W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|
| Archambeault, Dennis | Andrea | 003406732 | Various | 2002-2004 | $ 11,093.76 | $ 10,681.26 | $ 412.50 |
| **Comments:** Andrea's address is different than the employee's address. The plan requires that an eligible dependent reside with the employee and be eligible to be claimed as a dependent on the employee's Federal Income Tax. We asked BeneFirst to confirm this claimant's eligibility, and BeneFirst responded that the claimant had requested that her mail be sent to her dorm address as she is a full-time college student. However, student status verification provided by BeneFirst is for Allison, not Andrea. When we questioned BeneFirst further, BeneFirst responded that they could not obtain anything from the employee. We believe that this claimant's claims should not be allowed until her eligibility status is clearly verified. We also identified **an** overpayment on claim number 30075901-02 of $412.50 for mis-application of multiple surgery rules. | | | | | | | |
| Archambeault, Dennis | Allison | 003406732 | Various | 2002-2004 | $ 4,623.87 | $ 4,623.87 | |
| **Comments:** In questioning the above claim, we were sent documentation regarding another dependent's student status, Allison, and noted that Allison's address also is different than the employee's address. The plan requires that an eligible dependent reside with the employee and be eligible to be claimed as a dependent on the employee's Federal Income Tax. When we asked BeneFirst to confirm Andrea's eligibility, BeneFirst responded that the claimant had requested that her mail be sent to her dorm address as she is a full-time college student. We confirmed that the school she attends, New Hampshire Community Technical College, does not have dorms. When we questioned BeneFirst further regarding Andrea's eligibility, BeneFirst responded that they could not obtain anything from the employee. We believe that this claimant's claims should not be allowed until her eligibility status is clearly verified. | | | | | | | |

2

3

# EXHIBIT II

## Procedural and Payment Claim Errors

### W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|----------|----------|-----------|--------------|--------------------|-------------|-------------------|----------------|
| Ashley, Wayne | Self | 009387299 | 400129334-01 | 1/12/2004 | $ 9,976.40 | | $ 2,542.86 |

**Comments:** Multiple surgery rules were not applied in the adjudication of this claim. BeneFirst agrees.

| Aumand, Patrick F. Sr. | Ryan | 008429685-03 | 20074786-01 | 12/23/2001 | $ 4,248.85 | | |
| | | | 20074792-01 | 1/24/2002 | $ 990.38 | | |
| | | | 20074794-01 | 4/2/2002 | $ 990.38 | $ 4,260.86 | $ 1,968.75 |

**Comments:** This claim was the result of a motor vehicle accident. In correspondence provided to BeneFirst, the auto carrier indicated that it made two payments to the hospital, one for $1,839.75 and one for $1,968.25. Only the $1,839.75 was noted on the hospital bill sent to BeneFirst, so BeneFirst ignored the auto carrier's correspondence and only considered the $1,839.75 in its claim adjudication. In addition, BeneFirst indicated that it did not pursue identification of other auto insurance recovery, such as from Uninsured/Underinsured Motorist (UM) or Bodily Injury (BI) coverages. At the very least, this claim is overpaid by $1,968.75, and further recovery might have been possible had BeneFirst pursued the information.

# EXHIBIT III

## Procedural and Payment Claim Errors

### W. E. Aubuchon Co., Inc.

| | Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|---|
| 6 | Baker, James E. | Kim Lapinski | 009603842 | Various | 2002-2004 | $ 11,828.37 | $ 11,828.37 | |
| | **Comments:** The child has a different last name than the employee, and is eligible to be claimed as a dependent on the employee's Federal Income Tax, as required by the plan. BeneFirst provided a copy of the enrollment form, which shows that the child is enrolled as a step-daughter, but did not provide any further eligibility verification. We asked BeneFirst to obtain confirmation of the child's status for the claimant's Federal Income Tax, and BeneFirst responded they were unable to obtain written verification from the employee, and did not want to pursue it, as the child is deceased. We believe that this claim should not be allowed until eligibility status is verified. | | | | | | | |
| 7 | Barrows, Shannon | Jennifer Holmes | 00952673+-03 | Various | 07/01/04-12/31/04 | $ 6,400.04 | | $ 6,400.04 |
| | **Comments:** The claimant was added to the plan on 03/01/03 when her father's insurance was terminated. She is the employee's stepdaughter. The patient has a different address than the employee, and the Aubuchon plan requires that a dependent reside with the employee to be eligible. Therefore, we believe that this is not an eligible dependent. | | | | | | | |
| 8 | Bedard, Robert | Samuel | 049661631-02 | 20074966-01 | 05/16-18/02 | $ 3,154.33 | | |
| | | | | 20066684-01 | 05/16-18/02 | $ 48.86 | | |
| | | | | 20118036-01 | 05/16-18/02 | $ 3,744.00 | | $ 3,744.00 |
| | **Comments:** Claim 20118036-01 is a duplicate payment. BeneFirst agrees. | | | | | | | |
| 9 | Boucher, Dennis R. | Maria | 032368751 | 30132446-01 | 11/26/2003 | $ 5,260.00 | | $ 1,100.00 |
| | **Comments:** Multiple surgery rules were not applied in the adjudication of this claim. BeneFirst agrees. | | | | | | | |

# EXHIBIT III

## Procedural and Payment Claim Errors

### W. E. Aubuchon Co., Inc.

| | Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|---|
| 10 | Bradley, Dennis | Carrie | 383963782 | 4000448 6-01 | 01/02-03/2004 | $ 3,163.00 | | $ 316.30 |
| | **Comments:** 90% coinsurance was not applied to this out-of-network claim. BeneFirst agrees. | | | | | | | |
| 11 | Brea, Leo | Self | 556277217-00 | 20031825-01 | 1/17/2005 | $70.00 | | $70.00 |
| | **Comments:** This claim is a follow-up to surgery on 01/16/02, CPT code 63030. Usual, customary and reasonable guidelines (UCR) published by MediCode indicate that any follow-up within 90-days of surgery is included in the surgical fee. Therefore, we believe that this visit should not have been allowed. BeneFirst responded that "Nothing in the CPT book says that 63030 can't have a follow-up visit." We agree. The CPT book does not include considerations of UCR. We asked BeneFirst to check our reference source, MediCode, a UCR reference guide, but they did not. | | | | | | | |
| 12 | Brea, Leo | Self | 556277217-00 | 20032128-01 | 1/24/2002 | $22.00 | | $22.00 |
| | **Comments:** This claim is a follow-up to surgery on 01/16/02, CPT code 63030. Usual, customary and reasonable guidelines (UCR) published by MediCode indicate that any follow-up within 90 days of surgery is included in the surgical fee. Therefore, we believe that this visit should not have been allowed. BeneFirst responded that "Nothing in the CPT book says that 63030 can't have a follow-up visit." We agree. The CPT book does not include considerations of UCR. We asked BeneFirst to check our reference source, MediCode, a UCR reference guide, but they did not. | | | | | | | |

# EXHIBIT III

## Procedural and Payment Claim Errors

### W. E. Aubuchon Co., Inc.

| | Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|---|
| 13 | Daly, Richard | Mary | 15736936O-S | 20100318-01 | 07/22-23/02 | $5,829.91 | | |
| | | | | 20105685-01 | 07/22-23/02 | $731.44 | | |
| | | | | 20116339-01 | 07/22-23/02 | $6,361.35 | | $6,361.35 |
| | | | | 20089785-01 | 7/22/2002 | $1,960.00 | | |
| | | | | 20010326-01 | 7/22/2002 | $36.00 | | |
| | | | | 20085198-01 | 7/11/2002 | $65.00 | $8,622.35 | |

**Comments:** The diagnosis of internal derangement of knee was never investigated by BeneFirst, causing a missed potential recovery opportunity. Regardless, Claim 20116339-01 appears to be a duplicate of 20100318-01 and 20105685-01, but BeneFirst cannot confirm this because it cannot find copies of the claims. The claim is at least overpaid by $6,361.35, even if there is no potential for other party liability/subrogation recovery.

| | Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|---|
| 14 | Deprey, Kevin L. | Self | 004782499 | 400157714-01 | 12/20/2003 | $ 2,349.00 | | $ 500.00 |

**Comments:** Multiple surgery rules were not applied in the adjudication of this claim. BeneFirst agrees.

| | Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|---|
| 15 | Drummond, William | Laura | 014525854 | 30084301-01 | 7/3/2003 | $ 3,808.00 | | $ 952.00 |

**Comments:** Multiple surgery rules were not applied in the adjudication of this claim. BeneFirst agrees.

# EXHIBIT III

## Procedural and Payment Claim Errors

### W. E. Aubuchon Co., Inc.

| | Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|---|
| 16 | Duso, Bernard | Julia | 078662855 | 30092113-01 | 8/12/2003 | $ 3,036.00 | | $ 483.60 |
| | **Comments:** $200 deductible and 90% coinsurance were not applied to this out-of-network claim. BeneFirst agrees. | | | | | | | |
| 17 | Feldmus, Aaron | Delaney Keller | 006689109-03 | Various | 07/01/04-12/31/04 | $ 3,535.53 | | $ 3,535.53 |
| | **Comments:** This claimant has a different last name than employee, and claims show she has a different address. We asked BeneFirst to provide details of the relationship of the claimant to the employee, and BeneFirst responded "enrollment states she is his daughter." BeneFirst did not explain why she has a different last name and different address. Because the Aubuchon plan requires that, to be eligible, dependents reside with the employee, we believe these claims are not eligible. | | | | | | | |
| 18 | Hart, Army | Self | 065480247 | 30059164-01 | 5/2/2003 | $ 3,975.00 | | $ 577.50 |
| | **Comments:** $200 deductible and 90% coinsurance were not applied to this out-of-network claim. BeneFirst agrees. | | | | | | | |
| 19 | Herschel, Chad | Dekota Rain | 008488850 | 40054294-01 | 5/10/2004 | $ 4,152.26 | | $ 381.71 |
| | **Comments:** Multiple surgery rules were not applied in the adjudication of this claim. BeneFirst agrees. | | | | | | | |

## EXHIBIT III

Procedural and Payment Claim Errors

W. E. Aubuchon Co., Inc.

| | Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|---|
| 20 | Holland, Keven | Harley Maples | 007801364 | Various | 2003 | $ 25,741.56 | | $ 25,741.56 |
| | Holland, Keven | Harley Maples | 007801364 | Various | 2004 | $ 7,436.13 | | $ 7,436.13 |

**Comments:** COB notes for this claimant indicate she is the great niece of the enrolled employee's wife. The Plan covers a dependent for whom the Covered Employee is legal guardian and who is eligible to be claimed as a dependent on the Covered Employee's Federal Income Tax return. We asked BeneFirst to confirm this claimant's enrolled status, and BeneFirst provided an enrollment form that showed that the claimant is enrolled as the Employee's step child, which is not true. BeneFirst further referenced an "attached adoption order." The legal document attached and referenced is not an adoption order, but an "Order Adopting Commissioner's Recommendations" that gives the Employee's wife, Debra Banks, legal custody of the claimant, Harley Maples. There is no reference to status granted to the Employee, Keven Holland. Because the claimant is not the child of the Employee's wife, but a great niece, step child status does not apply, and the child is in the legal custody of the wife, not the Employee. Therefore, we do not believe that, according to the Plan wording, this is an eligible dependent.

| | Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|---|
| 21 | Holland, Keven | Self | 007801364 | 40045124-02 | 4/1/2004 | $ 8,700.00 | | $ 7,600.00 |
| | | | | 40045123-02 | 4/1/2004 | $ 9,150.00 | | |

**Comments:** Multiple surgery rules were not applied in the adjudication of this claim. BeneFirst agrees.

| | Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|---|
| 22 | Holland, Kevin | Self | 007801364-00 | 40105556-01 | 9/30/2004 | $2,570.40 | | $179.00 |

**Comments:** We asked BeneFirst to confirm that the claimant's out-of-network deductible was met. BeneFirst advised that only $21 of the $200 was met for 2004, producing an overpayment on this claim of $179.

# EXHIBIT III

## Procedural and Payment Claim Errors
### W. E. Auchuchon Co., Inc.

| | Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|---|
| 23 | House, Jamey | Indigo | 005729454-01 | Various | 07/01/02-06/30/03 | $ 7,405.92 | $ 7,405.92 | |
| | **Comments:** The claimant was effective 03/01/02, and had a tonsilectomy on 05/21/02. BeneFirst never confirmed prior creditable coverage or performed a preexisting condition investigation. Therefore, the claim could be overpaid. | | | | | | | |
| 24 | Johnson, Gary | April | 017486347 | 30040897-02 | 3/10/2003 | $ 4,798.80 | | $ 531.90 |
| | **Comments:** Multiple surgery rules were not applied in the adjudication of this claim. BeneFirst agrees. | | | | | | | |
| 25 | Johnson, Kenneth P. | Self | 007501866 | 40013331-01 | 12/17/2003 | $ 8,440.04 | | $ 19.16 |
| | **Comments:** BeneFirst received a refund from the provider for $44.72, for a $63.88 recovery obtained by a company identified as "AIM," who kept a $19.16 commission. We asked BeneFirst who AIM was and why they sent a refund on this claim. BeneFirst replied that they had no idea. Since neither BeneFirst nor Aubuchon authorized this company to take a commission on this recovery, we do not believe that commission should not have been allowed. | | | | | | | |
| 26 | Joseph, Troy | Shannon | 009420870 | 20107231-01 | 8/13/2002 | | | $200.00 |
| | **Comments:** BeneFirst confirmed that a precertification penalty was taken in error on this claim, producing an underpayment. | | | | | | | $4,336.57 |
| 27 | Labombard, Howard | Marguerite | 132420934 | 40052345-01 | 5/3/2004 | $ 3,210.00 | | $ 321.00 |
| | **Comments:** 90% coinsurance was not applied to this out-of-network claim. BeneFirst agrees. | | | | | | | |
| 28 | Larson-Moran, Denise | Self | 031404523-00 | 40094422-01 | 9/14/2004 | $ 3,205.00 | | $ 262.50 |
| | **Comments:** Multiple surgery rules were not applied in the adjudication of this claim. BeneFirst agrees. | | | | | | | |

# EXHIBIT III

## Procedural and Payment Claim Errors

### W. E. Aubuchon Co., Inc.

| | Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|---|
| 29 | Letourneau, Robert D. | Tanya | 008582975 | 30094034-01 | 8/13/2003 | $ 2,050.00 | | $ 205.00 |
| | **Comments:** 90% coinsurance was not applied to this out-of-network claim. BeneFirst agrees. | | | | | | | |
| 30 | Letourneau, Robert D. | Tanya | 008582975 | 30094032-01 | 8/13/2003 | $ 6,060.82 | | $ 606.08 |
| | **Comments:** 90% coinsurance not applied to this out-of-network claim. BeneFirst agrees. | | | | | | | |
| 31 | Magoon, Wendell Jr. | Cameron | 009642362-01 | 2012537-02 | 11/27/2002 | $ 330.00 | | $ 330.00 |
| | **Comments:** This claim is for an assistant surgeon. MediCode UCR indicates that a surgical assist is not warranted for procedure 67311 and 67314. Therefore, we believe that the claim should have been denied. BeneFirst responded that "Nothing in the CPT book says that an assistant is not warranted for this surgery." We agree. The CPT book does not include considerations of UCR. We asked BeneFirst to check MediCode, a UCR reference guide, as we did, but they did not. | | | | | | | |
| 32 | McCarthy, Carol A. | John | 01407451-S | Multiple | 6/26/1905 | $ 51,164.97 | | $ 17,425.59 |
| | **Comments:** The plan allows 45 days for inpatient treatment of mental/nervous claims. The claimant was confined for 66 days, and BeneFirst did not cut the benefits at 45 days. BeneFirst agrees the claim was overpaid, but stated that it paid for 64 days not 66. However, BeneFirst did not explain its calculation of 64 versus 66 days, so our deduction is based upon 66 days, with 21 days in excess of the limit. | | | | | | | |
| 33 | McKiryher, Bradford | Self | 00834496-01 | 40106841-01 | 10/4/2004 | $ 8,325.00 | | $ 1,300.00 |
| | **Comments:** Multiple surgery rules were not applied in the adjudication of this claim. BeneFirst agrees. | | | | | | | |

34

# EXHIBIT III

Procedural and Payment Claim Errors

W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|---|
| Misner, Brian A. | Ashleigh | 028548788-01 | 40113896-01 | 10/29/2004 | $ | 216.75 | $ 216.75 | $ - |
| | | | 50007042-01 | 10/29/2004 | $ | - | $ - | |
| | | | 40109033-01 | 10/22/2004 | $ | - | $ - | |
| | | | 40109033-02 | 10/22/2004 | $ | 216.75 | $ 216.75 | |
| | | | 40114002-01 | 10/22/2004 | $ | 36.00 | $ 36.00 | |
| | | | 40105619-01 | 10/8/2004 | $ | - | $ - | |
| | | | 40105619-02 | 10/8/2004 | $ | 216.75 | $ 216.75 | |
| | | | 40111831-01 | 10/8/2004 | $ | 36.00 | $ 36.00 | |
| | | | 40102624-01 | 10/1/2004 | $ | 216.75 | $ 216.75 | |
| | | | 40100171-01 | 9/24/2004 | $ | 2,927.40 | $ 2,927.40 | |
| | | | 40101704-01 | 9/24/2004 | $ | 825.00 | $ 825.00 | |
| | | | 40102623-01 | 9/24/2004 | $ | 275.00 | $ 275.00 | |
| | | | 40100170-01 | 9/23/2004 | $ | 621.95 | $ 621.95 | |
| | | | 40101689-01 | 9/23/2004 | $ | 36.00 | $ 36.00 | |

**Comments**: The diagnosis for these claims is fracture metatarsal. We asked BeneFirst for details of how this injury occurred, to determine if other party liability or subrogation applied. BeneFirst responded that the former claims manager had instructed examiners that, for accidents for children under 15, the claims should be paid without investigation of accident details. We disagree, and believe these claims should not have been paid without investigation of accident details.

# EXHIBIT III

## Procedural and Payment Claim Errors

### W. E. Aubuchon Co., Inc.

| | Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|---|
| 35 | Moore, Kenneth | April | 02741662-S | 30037139-01 | 02/26-28/03 | $ 3,752.00 | | $ 3,752.00 |
| | | | | 30035102-01 | 2/26/2003 | $ 1,190.00 | | $ 1,190.00 |
| | | | | 30037140-01 | 2/26/2003 | $ 1,800.00 | | $ 1,800.00 |
| | | | | 30037141-01 | 2/26/2003 | $ 346.40 | | $ 346.40 |
| | | | | 30045564-01 | 2/26/2003 | $ 360.00 | | $ 360.00 |

**Comments:** BeneFirst's utilization review vendor, Med-Value, issued a determination that the proposed surgery as reflected in these claims was not medically necessary. BeneFirst's explanation as to why the claim was paid is that the "examiner was never given the denial from Med-Value and the notes were not put in the system to deny."

| | Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|---|
| 36 | Moran, Gregory | Self | 013366891 | 40020440-01 | 12/26/2003 | $ 4,512.00 | | $ 375.00 |

**Comments:** Multiple surgery rules were not applied in the adjudication of this claim. BeneFirst agrees.

| | Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|---|
| 37 | Moran, Gregory | Self | 013366891 | 40039396-01 | 12/24/2003 | $ 3,753.60 | | $ 832.20 |

**Comments:** Multiple surgery rules were not applied in the adjudication of this claim. BeneFirst agrees.

| | Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|---|
| 38 | Moran, Gregory | Self | 013366891 | 40050033-01 | 3/1/2004 | $ 2,667.20 | | $ 585.00 |

**Comments:** Multiple surgery rules were not applied in the adjudication of this claim. BeneFirst agrees.

# EXHIBIT III

## Procedural and Payment Claim Errors

### W. E. Aubuchon Co., Inc.

| | Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|---|
| 39 | Moran Sr., Marcus | Claire | 03007306 | 40018908-01 | 8/27/2003 | $ 2,465.60 | | $ 500.00 |
| | **Comments:** Multiple surgery rules were not applied in the adjudication of this claim. BeneFirst agrees. | | | | | | | |
| 40 | Moran, Marcus III | Jennifer | 011522237-S | 2010861-01 | 9/16/2002 | $ 3,100.00 | | 400.00 |
| | **Comments:** Multiple surgery rules were not applied in the adjudication of this claim. BeneFirst agrees. | | | | | | | |
| 41 | O'Neill, Susan | Samantha Murray | 020524272-01 | Various | 07/01/02-06/30/03 | $ 21,180.05 | | $ 17,305.05 |
| | | | | | | | | $ 3,875.00 |
| | **Comments:** BeneFirst never investigated potential coordination of benefits from the father's insurance. In addition, the plan requires that, to be eligible, a dependent must reside with the employee. BeneFirst confirmed that this claimant lived with her grandparents. Therefore, we believe that no claims paid for this claimant should be allowed. Regardless, an overpayment of $3,875.00 was made because only 15 days of the 19-day confinement from 11/13/02-12/02/02 was authorized. BeneFirst agrees that the hospital claim was overpaid. | | | | | | | |
| 42 | Pederson, Louise B. | Stephanie | 04062217 | 40009635-01 | 12/8/2003 | $ 2,600.00 | | 2,600.00 |
| | | | | 30129948-01 | 12/08-11/2003 | $ 8,971.34 | | $ 8,971.34 |
| | **Comments:** These claims were originally denied for accident details, and then released for no apparent reason because accident details were never obtained. BeneFirst agrees that claims of this dollar amount should not have been paid without accident details. | | | | | | | |

# EXHIBIT III

## Procedural and Payment Claim Errors

### W. E. Aubuchon Co., Inc.

| | Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|---|
| 43 | Schmid, Frank | Self | 086402380-00 | Various | 07/01/04-12/31/04 | $ 6,286.87 | $ 6,286.87 | |
| | **Comments:** The claimant was effective 12/01/03, and had claims in June of 2004. BeneFirst never confirmed prior creditable coverage or performed a preexisting condition investigation. Therefore, the claim could be overpaid. | | | | | | | |
| 44 | Shapiro, Larry | Jayne | 108429234 | 400018932-01 | 2/4/2004 | $ 2,875.50 | | $ 1,087.65 |
| | **Comments:** Multiple surgery rules were not applied in the adjudication of this claim. BeneFirst agrees.. | | | | | | | |
| 45 | Spears, Glen | Joy | 009423952 | 400062272-01 | 3/19/2004 | $ 3,290.50 | | $ 1.14 |
| | **Comments:** An error was made in applying the primary carrier's payment when calculating benefits as secondary payor. BeneFirst believes that, due to the small amount of the overpayment, the error should be disregarded. | | | | | | | |

# EXHIBIT III

## Procedural and Payment Claim Errors

### W. E. Aubuchon Co., Inc.

| | Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|---|
| 46 | Spears, Glenn | Joy | 009423952 | Various | 07/01/04-12/31/04 | $ 61,077.70 | $ 61,077.70 | |
| | **Comments:** This claimant has her own health plan, which is primary over Aubuchon's plan. Industry standards for coordinating benefits are that, when the secondary plan adjudicates the claim, the secondary plan calculates benefits as it would have done if it was primary, applying PPO discounts, deductibles, coinsurance, and the like, and then subtracts the primary plan payment to determine the net benefit payable. For example, for a $1,000 bill with a $200 PPO discount, the Aubuchon plan's 100 percent benefit would be $800. If the primary plan paid $500, the net payable under Aubuchon's plan is $300, with $200 not the patient's liability as the PPO discount. BeneFirst did not use this method to calculate the secondary plan's liability. Instead, BeneFirst took the full billed amount, deducted the primary plan payment, and paid the full balance, regardless of the secondary plan's actual benefit limits. We believe that this incorrect procedure resulted in multiple overpayments on the Aubuchon plan, and we show as an error the full amount paid for this claimant until BeneFirst recalculates all claims with the correct coordination of benefit | | | | | | | |
| 47 | St. Cyr, Janice | Roger | 02632077S-S | 20120103-01 | 6/6/2002 | $ 3,234.73 | | $ 3,234.73 |
| | **Comments:** BeneFirst was unable to locate a copy of this claim. Therefore, the claim is overpaid, because BeneFirst cannot provide the supporting documentation to confirm that its actions in adjudicating this claim were accurate. | | | | | | | |

# EXHIBIT III

## Procedural and Payment Claim Errors

### W. E. Aubuchon Co., Inc.

| | Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|---|
| 48 | St. Pierre, Thomas | Susan | 021404783 | 40018891-01 | 1/13/2004 | $ 2,566.00 | | $ 622.50 |
| | **Comments:** Multiple surgery rules were not applied in the adjudication of this claim. BeneFirst agrees. | | | | | | | |
| 49 | Valeski, Stephen | Self | 015486840-00 | Various | 07/01/04-12/31/04 | $ 77,367.46 | $ 37,491.46 | $ 39,876.00 |
| | **Comments:** Because of the nature of this claimant's condition and the volume of claims, we questioned whether the claimant was actually working 40 or 47 hours per week, as required by the plan. BeneFirst's response to our question was "you have to get that from Aubuchon." Until the claimant's actively-at-work status was clarified, we believe that none of the claims were eligible. As a separate issue, the claimant's Medicare coverage became primary as of 08/01/04, but $39,876 was paid with no coordination of benefits with Medicare. BeneFirst advised that "refund requests were made for those claims" but did not provide details of the amount or status of refund requests. Until this is provided, we believe that at least $39,876.00 is overpaid on this claimant. | | | | | | | |
| 50 | Viault, Fred | Joan | 009307896 | 40004870-02 | 12/17/2003 | $ 2,619.00 | | $ 886.50 |
| | **Comments:** Multiple surgery rules were not applied in the adjudication of this claim. BeneFirst agrees. | | | | | | | |
| 51 | Wilcox, Craig | Donna | 086461184 | 40013624-01 | 1/15/2004 | $ 2,500.00 | | $ 430.00 |
| | **Comments:** $200 deductible and 90% coinsurance were not applied to this out-of-network claim. BeneFirst agrees. | | | | | | | |

# EXHIBIT III

## Procedural and Payment Claim Errors

### W. E. Aubuchon Co., Inc.

| | Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|---|
| 52 | Wylie, Donald | Self | 77606521 | 30059964-01 | 5/6/2003 | $ 2,323.50 | | $ 312.90 |
| | **Comments:** Out-of-network benefits not applied for this non-contracted provider and multiple surgery rules were not applied in the adjudication of this claim. BeneFirst agrees. | | | | | | | |
| 53 | Young, Philip R. | Self | 002468828-00 | 30043766-01 | 3/14/2003 | $ 5,245.41 | $ 5,245.41 | |
| | | | | 30043768-01 | 3/14/2003 | $ 1,960.00 | $ 1,960.00 | |
| | | | | 30043776-01 | 3/14/2003 | $ 1,240.00 | $ 1,240.00 | |
| | | | | 30050885-01 | 3/14/2003 | $ 34.00 | 34.00 | |
| | **Comments:** BeneFirst never investigated the origin of the diagnosis of these back surgery claims to determine if there was a potential for other party liability or subrogation recovery. | | | | | | | |
| | | | | | **Exhibit Totals:** | $503,885.05 | $172,632.42 | $189,182.37 |

**10**

{}

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| W.E. AUBUCHON CO., INC., AUBUCHON DISTRIBUTION, INC., W.E. AUBUCHON CO. INC. EMPLOYEE MEDICAL BENEFIT PLAN, and AUBUCHON DISTRIBUTION, INC. EMPLOYEE MEDICAL BENEFIT PLAN<br>     Plaintiffs,<br><br>v.<br><br>BENEFIRST, LLC,<br>     Defendant. | C.A. No. 05-40159FDS<br>(Louis M. Ciavarra. BBO# 546481)<br>(Ryan T. Killman BBO# 654562)<br>(Colleen E. Cushing BBO# 663498) |

## PLAINTIFF AUBUCHON DISTRIBUTION, INC.'S SUPPLEMENTAL ANSWERS TO INTERROGATORIES

### GENERAL OBJECTIONS

1.    Plaintiff Aubuchon Distribution, Inc. ("Plaintiff"), objects to each and every Interrogatory to the extent that it seeks information and/or materials privileged from discovery by the attorney-client privilege and/or the attorney work-product doctrine.

2.    Plaintiff objects to each and every Interrogatory to the extent that it seeks information which is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

3.    Plaintiff objects to each and every Interrogatory to the extent that it is overly broad and/or unduly burdensome.

4.    Plaintiff objects to each and every Interrogatory to the extent that it is vague and ambiguous.

5.    Plaintiff objects to each and every interrogatory to the extent that it purports to

establish a continuing duty to supplement, or seeks to impose a duty beyond those imposed by the

Federal Rules of Civil Procedure.

6.     Each of the General Objections shall be deemed to apply to each of Defendant's

separate Interrogatories.

## ANSWERS

Interrogatory No. 1

Please identify the person answering and signing these interrogatories, including name,

age, residence address, occupation, business address, job title, and the relationship and capacity of

such person to the Plan.

Answer No. 1

Sarah Q. Arel, Benefits Manager, W.E. Aubuchon Co., Inc., 95 Aubuchon Drive,

Westminster, Massachusetts 01473-0473.

Interrogatory No. 2

State the full name and current residence address for each person who has knowledge of

any of the Plaintiff's claims against BeneFirst, and for each such person, describe your

understanding of the subject of their knowledge and what they know.

Answer No. 2

**OBJECTION:**  Plaintiff objects to this Interrogatory to the extent that it seeks information

and/or materials which are privileged from discovery pursuant to the attorney-client privilege

and/or the work product doctrine.  Plaintiff further objects to this Interrogatory on the grounds that

it is overly broad, vague and ambiguous.  Notwithstanding and without waiving the foregoing

objections, Plaintiff states as follows:

M. Marcus Moran, Jr., President and Treasurer of W.E. Aubuchon Co. Inc., 95 Aubuchon

Street, Westminster, MA. 01473, has knowledge regarding the retention of BeneFirst, LLC as Third Party Administrator and BeneFirst, LLC's wrongful acts and omissions consisting of breach of the Administrative Services Agreement (the "Agreement") and the negligent delivery of services under the W.E. Aubuchon Co. Inc. Employee Medical Benefit Plan and Aubuchon Distribution, Inc. Employee Medical Benefit Plan (the "Plans").

Sarah Q. Arel, Benefits Manager of W.E. Aubuchon Co. Inc., 95 Aubuchon Street, Westminster, MA 01473, has knowledge regarding the retention of BeneFirst, LLC as Third Party Administrator and BeneFirst, LLC's wrongful acts and omissions consisting of breach of the Agreement and the negligent delivery of services under the Plans.

Charles T. Dobens, 30 Parkers Grove Lane, Duxbury, MA, upon information and belief, has knowledge of the mishandling of plan participants' claims by BeneFirst, LLC.

Carrie Reddie, formerly of BeneFirst, LLC, upon information and belief, has knowledge of the mishandling of plan participants' claims by BeneFirst, LLC.

Paul Sullivan, formerly of BeneFirst, LLC, upon information and belief, has knowledge of the mishandling of plan participants' claims by BeneFirst, LLC.

Sandra Schnabel of BP, Inc., 6160 Summit Drive, Brooklyn Center, MN, upon information and belief, has knowledge regarding excess insurance coverage issues relating to the payment of claims made by plan participants and the effect of BeneFirst, LLC's mishandling of said claims on Plaintiff's excess insurance.

Adria L. Garneau, CEBS, of Northshore International Insurance Services, 199 Rosewood Drive, Danvers, MA 01923, has knowledge regarding the mishandling of plan participants' claims by BeneFirst, LLC.

Charles S. Lord, of the Chittenden Insurance Group, Burlington, Vermont, upon information and belief, has knowledge regarding the retention of BeneFirst, LLC as Third Party

3

Administrator and BeneFirst, LLC's wrongful acts and omissions consisting of breach of the Agreement and the negligent delivery of services under the Plans

Interrogatory No. 3

Identify and describe the role of:

a.    all persons who participated or played any role in negotiating the Plan's retention of BeneFirst as the plan's administrator;

b.    all persons who participated or played any role in the administration or management of the Plan during any year BeneFirst administered the Plan.

Answer No. 3

a.    Sarah Q. Arel, M. Marcus Moran, Jr., and Charles S. Lord participated in negotiating the retention of BeneFirst, LLC as Third Party Administrator.

b.    Sarah Q. Arel participated in the administration and/or management of the W.E. Aubuchon Co. Inc. Employee Medical Benefit Plan and Aubuchon Distribution Inc. Employee Medical Benefit Plan while BeneFirst, LLC served as Third Party Administrator of said Plans.

Interrogatory No. 4

Please identify the plan years that are at issue in your complaint.

Answer No. 4

Plaintiff states that its Complaint alleges damages relating to negligent acts and/or omissions by BeneFirst, LLC, as Third Party Administrator, during each year in which BeneFirst, LLC was Third Party Administrator, 2001-2002. However, whereas discovery is ongoing in this matter and Plaintiff has been delayed by Defendant's failure to provide it with data necessary to conduct a full audit of all claims administered by BeneFirst, LLC, Plaintiff reserves the right to supplement this Answer if and when it discovers negligent acts and/or omissions by BeneFirst, LLC relating to claims made in other years.

4

Interrogatory No. 5

Do you contend that the defendant improperly paid claims for **ineligible procedures, services, or benefits**? If so, for each such claim, identify each such claim by claimant, date of claim, claim number, amount paid, and description of procedure/service/benefit, and state why you contend the procedure/service/benefit was ineligible.

Answer No. 5

Yes. Plaintiff alleges that BeneFirst, LLC, through its negligent acts and omissions failed to properly investigate and pay plan participants' claims in violation of the Agreement, the express provisions of the respective plans, industry-wide third party administrator processing guidelines, and BeneFirst, LLC's own policies and procedures. Further answering, Plaintiff states that discovery is ongoing and Plaintiff has been delayed in conducting a full audit of all claims under the Plans by BeneFirst, LLC's failure to provide Plaintiff with all relevant data, Plaintiff reserves the right to supplement this Answer after it conducts an audit of claims handled by BeneFirst in connection with the Aubuchon Distribution, Inc. Employee Medical Benefit Plan and if and when it discovers other wrongful or negligent acts in the administration of the above-referenced Plans by BeneFirst, LLC.

Supplemental Answer No. 5

**OBJECTION:** Plaintiff objects to this Interrogatory to the extent that it is limited to "improperly paid claims for ineligible procedures, services, or benefits" where BeneFirst, LLC's improper claims adjudication falls outside the scope of that specific category. Further, BeneFirst, LLC has failed to comply with the Court's (Hillman, J.) February 6, 2007 Order which required BeneFirst, LLC to "produce the Medical Bills and Claims Forms for the approximately 3,000 claims as specified by the Plaintiffs . . . ." BeneFirst, LLC has only produced claims records relating to 1,882 of the 2,991 claims subject to the Court's Order.

5

BeneFirst, LLC's failure to comply with the Court's Order of February 6, 2007, has resulted in Plaintiff having insufficient documentation to conduct a full audit and therefore Plaintiff is unable to provide a complete Answer to this Interrogatory. Plaintiff refers to Exhibit I attached hereto which reflects all of the claims for which BeneFirst, LLC has failed to provide supporting records, which include "provider bills." Because the provider bill is the document that initiates and supports the request for reimbursement consideration, if this key document is missing, it is impossible to affirm that adjudication of eligible benefits occurred correctly. Such undocumented claims represent claim errors since BeneFirst, LLC cannot produce the provider bills that would allow affirmation of accurate adjudication. Notwithstanding and without waiving the foregoing objections, Plaintiff provides the following Answer:

Yes, BeneFirst, LLC has improperly paid claims for ineligible procedures, services, or benefits and refers to Exhibit I and Exhibit II (No. 18).[1]

Further answering, Plaintiff states that while discovery is ongoing and where BeneFirst, LLC has failed to comply with the Court's Order of February 6, 2007, Plaintiff reserves the right to supplement this Answer if and when it discovers other wrongful or negligent acts in the administration of the above-referenced Plans by BeneFirst, LLC.

Interrogatory No. 6

Do you contend that the defendant improperly paid claims for **persons ineligible to receive benefits**? If so, for each such claim, identify each such claim by claimant, date of claim, claim number, amount paid, and description of procedure/service/benefit, and state why you contend the claimant was ineligible.

---

[1] It should be noted that when reviewing Exhibit II, "Processing Errors" indicate instances where BeneFirst, LLC failed to properly investigate a claim or claims. The failure to sufficiently investigate a claim constitutes an improper adjudication of that claim. "Payment Errors" are those where BeneFirst, LLC made improper payments.

6

Answer No. 6

Yes. Please refer to Plaintiff's Answer to Interrogatory No. 5.

Supplemental Answer No. 6

**OBJECTION:** Plaintiff objects to this Interrogatory to the extent that it is limited to "improperly paid claims for persons ineligible to receive benefits" where BeneFirst, LLC's improper claims adjudication falls outside the scope of that specific category. Further, BeneFirst, LLC has failed to comply with the Court's (Hillman, J.) February 6, 2007 Order which required BeneFirst, LLC to "produce the Medical Bills and Claims Forms for the approximately 3,000 claims as specified by the Plaintiffs . . . ." BeneFirst, LLC has only produced claims records relating to 1,882 of the 2,991 claims subject to the Court's Order.

BeneFirst, LLC's failure to comply with the Court's Order of February 6, 2007, has resulted in Plaintiff having insufficient documentation to conduct a full audit and therefore Plaintiff is unable to provide a complete Answer to this Interrogatory. Plaintiff refers to Exhibit I attached hereto which reflects all of the claims for which BeneFirst, LLC has failed to provide supporting records, which include "provider bills." Because the provider bill is the document that initiates and supports the request for reimbursement consideration, if this key document is missing, it is impossible to affirm that adjudication of eligible benefits occurred correctly. Such undocumented claims represent claim errors since BeneFirst, LLC cannot produce the provider bills that would allow affirmation of accurate adjudication. Notwithstanding and without waiving the foregoing objections, Plaintiff provides the following Answer:

Yes, BeneFirst, LLC has improperly paid claims for persons ineligible to receive benefits and refers to Exhibit I and Exhibit II (Nos. 2-7).

Further answering, Plaintiff states that while discovery is ongoing and where BeneFirst, LLC has failed to comply with the Court's Order of February 6, 2007, Plaintiff reserves the right

7

to supplement this Answer if and when it discovers other wrongful or negligent acts in the administration of the above-referenced Plans by BeneFirst, LLC.

Interrogatory No. 7

Do you contend that the defendant paid **duplicate** claims? If so, identify each such claim by claimant, claim number, amount paid, and description of procedure/service/benefit, and the date(s) such payments were made, and state why you believe the payment(s) were duplicates.

Answer No. 7

Yes. Please refer to Plaintiff's Answer to Interrogatory No. 5.

Supplemental Answer No. 7

**OBJECTION**: Plaintiff objects to this Interrogatory to the extent that it is limited to instances where BeneFirst "paid duplicate claims" where BeneFirst, LLC's improper claims adjudication falls outside the scope of that specific category. Further, BeneFirst, LLC has failed to comply with the Court's (Hillman, J.) February 6, 2007 Order which required BeneFirst, LLC to "produce the Medical Bills and Claims Forms for the approximately 3,000 claims as specified by the Plaintiffs . . . ." BeneFirst, LLC has only produced claims records relating to 1,882 of the 2,991 claims subject to the Court's Order.

BeneFirst, LLC's failure to comply with the Court's Order of February 6, 2007, has resulted in Plaintiff having insufficient documentation to conduct a full audit and therefore Plaintiff is unable to provide a complete Answer to this Interrogatory. Plaintiff refers to <u>Exhibit I</u> attached hereto which reflects all of the claims for which BeneFirst, LLC has failed to provide supporting records, which include "provider bills." Because the provider bill is the document that initiates and supports the request for reimbursement consideration, if this key document is missing, it is impossible to affirm that adjudication of eligible benefits occurred correctly. Such undocumented claims represent claim errors since BeneFirst, LLC cannot produce the provider

8

bills that would allow affirmation of accurate adjudication. Notwithstanding and without waiving the foregoing objections, Plaintiff provides the following Answer:

BeneFirst, LLC may have paid duplicate claim s. Plaintiff refers to <u>Exhibit I</u>, which references 61 claims for which BeneFirst, LLC has failed to produce supporting documentation.

Further answering, Plaintiff states that while discovery is ongoing and where BeneFirst, LLC has failed to comply with the Court's Order of February 6, 2007, Plaintiff reserves the right to supplement this Answer if and when it discovers other wrongful or negligent acts in the administration of the above-referenced Plans by BeneFirst, LLC.

Interrogatory No. 8

Do you contend that the defendant paid **improper amounts** for claims? If so, identify each such claim by claimant, date of claim, claim number, amount paid, and description of procedure/service/benefit, and state the amount you believe should have been paid and the basis for your contention.

Answer No. 8

Yes. Please refer to Plaintiff's Answer to Interrogatory No. 5.

Supplemental Answer No. 8

**OBJECTION:** Plaintiff objects to this Interrogatory to the extent that it is limited to instances where BeneFirst "paid improper amounts for claims" where BeneFirst, LLC's improper claims adjudication falls outside the scope of that specific category. Further, BeneFirst, LLC has failed to comply with the Court's (Hillman, J.) February 6, 2007 Order which required BeneFirst, LLC to "produce the Medical Bills and Claims Forms for the approximately 3,000 claims as specified by the Plaintiffs . . . ." BeneFirst, LLC has only produced claims records relating to 1,882 of the 2,991 claims subject to the Court's Order.

BeneFirst, LLC's failure to comply with the Court's Order of February 6, 2007, has

9

resulted in Plaintiff having insufficient documentation to conduct a full audit and therefore Plaintiff is unable to provide a complete Answer to this Interrogatory. Plaintiff refers to Exhibit I attached hereto which reflects all of the claims for which BeneFirst, LLC has failed to provide supporting records, which include "provider bills." Because the provider bill is the document that initiates and supports the request for reimbursement consideration, if this key document is missing, it is impossible to affirm that adjudication of eligible benefits occurred correctly. Such undocumented claims represent claim errors since BeneFirst, LLC cannot produce the provider bills that would allow affirmation of accurate adjudication. Notwithstanding and without waiving the foregoing objections, Plaintiff provides the following Answer:

Yes, BeneFirst, LLC has paid improper amounts for claims and refers to Exhibit I and Exhibit II (Nos. 1, 8-11).

Further answering, Plaintiff states that while discovery is ongoing and where BeneFirst, LLC has failed to comply with the Court's Order of February 6, 2007, Plaintiff reserves the right to supplement this Answer if and when it discovers other wrongful or negligent acts in the administration of the above-referenced Plans by BeneFirst, LLC.

Interrogatory No. 9

Do you contend that the defendant improperly calculated applicable **deductibles**? If so, identify relevant claims by claimant, date of claim, claim number, description of procedure/service/benefit, and the deductible that was applied, the deductible that you believe should have been applied and the basis for your contention.

Answer No. 9

Yes. Please refer to Plaintiff's Answer to Interrogatory No. 5.

10

Supplemental Answer No. 9

**OBJECTION**:  Plaintiff objects to this Interrogatory to the extent that it is limited to instances where BeneFirst "improperly calculated applicable deductibles" where BeneFirst, LLC's improper claims adjudication falls outside the scope of that specific category.  Further, BeneFirst, LLC has failed to comply with the Court's (Hillman, J.) February 6, 2007 Order which required BeneFirst, LLC to "produce the Medical Bills and Claims Forms for the approximately 3,000 claims as specified by the Plaintiffs . . . ."  BeneFirst, LLC has only produced claims records relating to 1,882 of the 2,991 claims subject to the Court's Order.

BeneFirst, LLC's failure to comply with the Court's Order of February 6, 2007, has resulted in Plaintiff having insufficient documentation to conduct a full audit and therefore Plaintiff is unable to provide a complete Answer to this Interrogatory.  Plaintiff refers to Exhibit I attached hereto which reflects all of the claims for which BeneFirst, LLC has failed to provide supporting records, which include "provider bills."  Because the provider bill is the document that initiates and supports the request for reimbursement consideration, if this key document is missing, it is impossible to affirm that adjudication of eligible benefits occurred correctly.    Such undocumented claims represent claim errors since BeneFirst, LLC cannot produce the provider bills that would allow affirmation of accurate adjudication.  Notwithstanding and without waiving the foregoing objections, Plaintiff provides the following Answer

BeneFirst, LLC may have improperly calculated applicable deductibles.  Plaintiff refers to Exhibit I, which references 61 claims for which BeneFirst, LLC has failed to produce supporting documentation.

Further answering, Plaintiff states that while discovery is ongoing and where BeneFirst, LLC has failed to comply with the Court's Order of February 6, 2007, Plaintiff reserves the right to supplement this Answer if and when it discovers other wrongful or negligent acts in the

11

administration of the above-referenced Plans by BeneFirst, LLC.

Interrogatory No. 10

Do you contend that your stop loss policy **premiums** were affected by anything done by the defendant? If so, describe the basis for your contention that your premiums were so affected and the amounts to which they were affected.

Answer No. 10

Yes. Because premiums are impacted by loss history, the fact that Plaintiff's losses appeared greater than they actually were increased Plaintiff's premium. Plaintiff does not know yet the extent of that loss. Whereas discovery is ongoing in this matter, Plaintiff reserves the right to supplement this Answer in the future.

Supplemental Answer No. 10

Plaintiff does not contend that its stop loss policy premiums were affected.

Interrogatory No. 11

Do you contend that you have been damaged by any other act, error, or omission on the part of BeneFirst that has not been described in your response to a preceding interrogatory? If so, describe the nature of said act, error, or omission.

Answer No. 11

Plaintiff is unaware of any damages by any other act, error, or omission on the part of BeneFirst, LLC other than those referenced in Plaintiff's Answer to Interrogatory No. 5. Further answering, Plaintiff states that since discovery is ongoing, Plaintiff reserves the right to supplement this Answer if and when it discovers any other act, error, or omission on the part of BeneFirst that has not been described in Plaintiff's Answers to the preceding interrogatories.

Supplemental Answer No. 11

**OBJECTION:** Plaintiff objects to this Interrogatory on the grounds that BeneFirst, LLC

12

has failed to comply with the Court's (Hillman, J.) February 6, 2007 Order which required BeneFirst, LLC to "produce the Medical Bills and Claims Forms for the approximately 3,000 claims as specified by the Plaintiffs . . . ." BeneFirst, LLC has only produced claims records relating to 1,882 of the 2,991 claims subject to the Court's Order. BeneFirst, LLC's failure to comply with the Court's Order of February 6, 2007, has resulted in Plaintiffs having insufficient documentation to conduct a full audit and therefore Plaintiff is unable to provide a complete Answer to this Interrogatory. Plaintiff refers to <u>Exhibit I</u> attached hereto which reflects all of Plaintiff's employees' claims for which BeneFirst, LLC has failed to provide supporting records, which include "provider bills." Because the provider bill is the document that initiates and supports the request for reimbursement consideration, if this key document is missing, it is impossible to affirm that adjudication of eligible benefits occurred correctly. Such undocumented claims represent claim errors since BeneFirst, LLC cannot produce the provider bills that would allow affirmation of accurate adjudication. Notwithstanding and without waiving the foregoing objections, Plaintiff provides the following Answer:

Plaintiff is unaware of any damages by any other act, error, or omission on the part of BeneFirst, LLC other than those referenced in Plaintiff's Supplemental Answers to Interrogatory Nos. 5-9. Further answering, Plaintiff states that since discovery is ongoing, Plaintiff reserves the right to supplement this Answer if and when it discovers any other act, error, or omission on the part of BeneFirst, LLC that has not been described in Plaintiff's Answers to these interrogatories.

Interrogatory No. 12

If you contend that any act, error or omission by BeneFirst constituted a breach of contract, identify the contract at issue, the specific language of the contract you contend was breached, and how BeneFirst breached that contractual language.

13

Answer No. 12

Plaintiff claims that BeneFirst, LLC breached the Agreement. Plaintiff states that BeneFirst, LLC breached Section I(B)(1) which provides that "the Plan Administrator, as Agent of the Plan Sponsor, shall:… [p]ay plan benefits in its usual and customary manner subject to and in accordance with this Agreement to or on behalf of persons entitled to receive plan benefits…" Further answering, Plaintiff states that since discovery is ongoing, Plaintiff reserves the right to supplement this Answer if and when it discovers other contract provisions which were breached as a result of the acts or omissions of BeneFirst, LLC in connection with its administration of the above-referenced Plans. In further response to this Interrogatory, Plaintiff refers to its Answer to Interrogatory No. 5.

Supplemental Answer No. 12

Plaintiff claims that BeneFirst, LLC breached the Agreement. Plaintiff states that BeneFirst, LLC has breached the following provisions of the Agreement:

Section I(B)(1) which provides:

The Plan Administrator, as Agent of the Plan Sponsor, shall:… [p]ay plan benefits in its usual and customary manner subject to and in accordance with this Agreement to or on behalf of persons entitled to receive plan benefits….

Section I(B)(3): which provides:

The Plan Administrator, as Agent of Plan Sponsor, shall… [m]aintain, for the duration of this Agreement and for two (2) years thereafter, adequate records of all transactions between Plan Sponsor, the Plan Administrator and plan participants. The records are the property of the Plan Sponsor. The Plan Sponsor has the right to continuing access to their records.

Section IV(C) which provides:

If it is determined that any payment has been made under this Agreement to an ineligible employee or dependent, or if its determined that more or less than the correct amount has been paid by the Plan Administrator, the Plan Administrator will make a diligent effort to recover the payment made to an ineligible person but,

14

the Plan Administrator will not be required to initiate court proceedings for any such recovery.

Further answering, Plaintiff states that since discovery is ongoing, Plaintiff reserves the right to supplement this Answer if and when it discovers other contract provisions which were breached as a result of the acts or omissions of BeneFirst, LLC in connection with its administration of the above-referenced Plans. In further response to this Interrogatory, Plaintiff refers to its Supplemental Answers to Interrogatory Nos. 5-9.

Interrogatory No. 13

Do you claim that BeneFirst was a fiduciary for purposes of ERISA with respect to the Plan for any given year identified in your response to interrogatory number 4? If so, please state:

a.      the year or years;

b.      the aspects of the Plan's management, operation or administration for which BeneFirst was a fiduciary;

c.      the damages you allegedly suffered as a result; and

d.      the factual basis for these assertions.

Answer No. 13

Yes.

a.      2001-2002.

b.      The aspects of the Plan's management, operation or administration for which BeneFirst was a fiduciary are outlined in the parties' Agreement and the respective Summary Plan Descriptions.

c.      Please refer to Plaintiff's Answer to Interrogatory No. 5.

d.      Please refer to Plaintiff's Answer to Interrogatory No. 5.

15

Supplemental Answer No. 13

Yes.

a.    2001 - 2002.

b.    The aspects of the Plan's management, operation or administration for which BeneFirst was a fiduciary are outlined in the parties' Agreement and the respective Summary Plan Descriptions.

c.    Please refer to Plaintiff's Supplemental Answers to Interrogatory Nos. 5-9 and 17 and Exhibits I -II.

d.    Please refer to Plaintiff's Supplemental Answers to Interrogatory Nos. 5-9 and 17 and Exhibits I -II.

Interrogatory No. 14

Do you claim that BeneFirst had discretionary authority with respect to the Plan or any aspect of it for any given year identified in your response to interrogatory number 4? If so, please state:

a.    the year or years;

b.    the aspects of the Plan's management, operation or administration for which BeneFirst exercised discretionary authority;

c.    the damages you allegedly suffered as a result; and

d.    the factual basis for these assertions.

Answer No. 14

Yes.

a.    2001-2002.

b.    The aspects of the Plan's management, operation or administration for which BeneFirst was a fiduciary are outlined in the parties' Agreement and the respective

16

Summary Plan Descriptions.

c.    Please refer to Plaintiff's Answer to Interrogatory No. 5.

d.    Please refer to Plaintiff's Answer to Interrogatory No. 5.

Supplemental Answer No. 14

Yes.

a.    2001 - 2002.

b.    The aspects of the Plan's management, operation or administration for which BeneFirst was a fiduciary are outlined in the parties' Agreement and the respective Summary Plan Descriptions.

c.    Please refer to Plaintiff's Supplemental Answers to Interrogatory Nos. 5-9 and 17 and Exhibits I -II.

d.    Please refer to Plaintiff's Supplemental Answers to Interrogatory Nos. 5-9 and 17 and Exhibits I -II.

Interrogatory No. 15

Do you claim that BeneFirst committed breaches of fiduciary duty with respect to the Plan for the given year identified in your response to interrogatory number 4?  If so, please state:

a.    the year or years;

b.    the exact acts by BeneFirst which constituted such breaches;

c.    the damages you allegedly suffered as a result; and

d.    the factual basis for these assertions.

Answer No. 15

Yes.

a.    2001-2002.

b.    BeneFirst breached its fiduciary duty to Plaintiff by improperly performing its

17

responsibilities as Third Party Administrator and erroneously paying claims as described in Plaintiff's Answer to Interrogatory No. 5.

c.      Please refer to Plaintiff's Answer to Interrogatory No. 5.

d.      Please refer to Plaintiff's Answer to Interrogatory No. 5.

Further answering, Plaintiff states that discovery is ongoing and Plaintiff has been delayed in conducting a full audit of all claims under the Plans by BeneFirst, LLC's failure to provide Plaintiff with all relevant data, Plaintiff reserves the right to supplement this Answer after it conducts an audit of claims handled by BeneFirst in connection with the Aubuchon Distribution, Inc. Employee Medical Benefit Plan and if and when it discovers further breaches of fiduciary duty and/or other damages suffered as a result of BeneFirst, LLC's breaches of fiduciary duty in connection with its administration of the above-referenced Plans.

Supplemental Answer No. 15

Yes.

a.      2001 - 2002.

b.      BeneFirst breached its fiduciary duty to Plaintiff by improperly performing its responsibilities as Third Party Administrator and failing to investigate and/or erroneously paying claims as more specifically described in Plaintiff's Supplemental Answers to Interrogatory Nos. 5-9.

c.      Please refer to Plaintiff's Supplemental Answers to Interrogatory Nos. 5-9 and 17 and Exhibits I -II.

d.      Please refer to Plaintiff's Supplemental Answers to Interrogatory Nos. 5-9 and 17 and Exhibits I -II.

Further answering, Plaintiff states that since discovery is ongoing, Plaintiff reserves the right to supplement this Answer if and when it discovers further breaches of fiduciary duty and/or

18

other damages suffered as a result of BeneFirst, LLC's breaches of fiduciary duty in connection with its administration of the above-referenced Plans.

Interrogatory No. 16

How and when did you first discover the acts, errors, or omissions previously discussed in your answers to the preceding interrogatories?

Answer No. 16

Plaintiff first discovered BeneFirst, LLC's acts, errors, and/or omissions after receiving a report from Plaintiff's excess insurance carrier on or about April 22, 2005, regarding certain acts, errors, and/or omissions by BeneFirst, LLC in connection with the administration of the W.E. Aubuchon Co, Inc. Employee Medical Benefit Plan.

Interrogatory No. 17

For each category of acts, errors or omissions you have discussed in your response to any of the preceding interrogatories, state the damages you claim to have sustained, and describe the method or basis used to calculate your damages.

Answer No. 17

Please refer to Plaintiff's Answer to Interrogatory No. 5. Further answering, Plaintiff states that since discovery is ongoing, Plaintiff reserves the right to supplement this Answer if and when it discovers further damages suffered as a result of BeneFirst, LLC's errors and omissions in connection with its administration of the above-referenced Plans.

Supplemental Answer No. 17

**OBJECTION**: Plaintiff objects to this Interrogatory on the grounds that BeneFirst, LLC has failed to comply with the Court's (Hillman, J.) February 6, 2007 Order which required BeneFirst, LLC to "produce the Medical Bills and Claims Forms for the approximately 3,000 claims as specified by the Plaintiffs . . . ." BeneFirst, LLC has only produced claims records

19

relating to 1,882 of the 2,991 claims subject to the Court's Order.

BeneFirst, LLC's failure to comply with the Court's Order of February 6, 2007, has resulted in Plaintiffs having insufficient documentation to conduct a full audit and therefore Plaintiff is unable to provide a complete Answer to this Interrogatory. Plaintiff refers to Exhibit I attached hereto which reflects all of Plaintiff's employees' claims for which BeneFirst, LLC has failed to provide supporting records, including: "provider bills." Because the provider bill is the document that initiates and supports the request for reimbursement consideration, if this key document is missing, it is impossible to affirm that adjudication of eligible benefits occurred correctly. Such undocumented claims represent claim errors since BeneFirst, LLC cannot produce the provider bills that would allow affirmation of accurate adjudication. Notwithstanding and without waiving the foregoing objections, Plaintiff provides the following Answer:

Please refer to Plaintiff's Supplemental Answers to Interrogatory Nos. 5-9 and Exhibits I-II. Notwithstanding the woefully insufficient documentation produced by BeneFirst, LLC and the limited audit sample, to date Plaintiff has determined that BeneFirst, LLC has overpaid or underpaid claims totaling $17,196.84; BeneFirst, LLC has insufficiently investigated and thus improperly adjudicated claims totaling $48,044.88; and have undocumented claims totaling $116,485.86.

Further, Plaintiff's position is that based on a statistically sound extrapolation of the value of errors reflected in Exhibits I and II[2] against the total amount of claims paid in the audit population, BeneFirst, LLC's claim errors total $289,095.56. This amount was arrived at by adding together the total values of Payment Errors, Procedural Errors and Undocumented Claims, subtracting that amount from the total dollar amount of claim payments audited, dividing that

---

[2] Exhibits I and II reflect the results of Plaintiff's audit conducted in September/October, 2007 which was based on BeneFirst, LLC's incomplete document production.

20

amount by the total dollar amount of claim payments audited, subtracting that amount from 100% and multiplying that figure by the total dollars paid for the audit population.

Each documented claim transaction was examined to determine adjudication accuracy, including the following: 1) Claimant eligibility verification; 2) Detection of duplicate claim payments; 3) Verification of creditable coverage or application of preexisting conditions limitations, if applicable; 4) Recognition of negotiated provider discounts; 5) Detection of other insurance coverage; 6) Application of coordination of benefits provisions; 7) Application of Plan design provisions; 8) Calculation of benefit payments amounts; and 9) Completeness of file documentation and information to process claims.

Further answering, Plaintiff states that since discovery is ongoing, Plaintiff reserves the right to supplement this Answer if and when it discovers further damages suffered as a result of BeneFirst, LLC's errors and omissions in connection with its administration of the above-referenced Plans.

Interrogatory No. 18

Identify your stop loss insurers for the Plan from 5 years before the first plan year that you identified as a response to Interrogatory #4 up to the present, and for each policy year, identify the applicable premium rate, the number of employee and family units covered, and any applicable aggregate factors that applied on a per employee or per family basis.

Answer No. 18

**OBJECTION**: Plaintiff objects to this Interrogatory to the extent that it is overly broad, unduly burdensome and vague. Plaintiff further objects to the term "applicable aggregate factors," which is vague and undefined. Plaintiff will limit its Answer to the plan years at issue in this action. Notwithstanding and without waiving the foregoing objections, Plaintiff states the following:

21

For the plan year 2001-2002 the stop loss insurer was BCS Underwriters. The annual specific premium was $75,394.92. The annual aggregate premium was $15,633.00. The policy covered 13 single and 54 family units. In further response to this Interrogatory, Plaintiff refers to insurance materials produced pursuant to Fed.R.Civ.P. 33(d).

Interrogatory No. 19

Have you ever had any communications with any representative of BeneFirst regarding any of the acts, omissions, or errors identified in any of your answers to the foregoing interrogatories? If so, please identify when the conversation occurred, how it took place (i.e. telephone, e-mail, mail, face to face, etc.), who the parties to the conversation were, and the substance of the conversation.

Answer No. 19

No.

Interrogatory No. 20

Please state what actions have been taken by you to mitigate the damage sought by you in this lawsuit, the date any such actions were taken, and the results of said action.

Answer No. 20

Plaintiff changed its Third Party Administrator prior to discovering any acts, errors, and/or omissions by BeneFirst, LLC, due to union negotiations.

Interrogatory No. 21

Was there a broker for your account with BeneFirst and if so, identify the broker(s).

Answer No. 21

Charles S. Lord of the of the Chittenden Insurance Group.

Interrogatory No. 22

Who was the broker for your account(s) with the stop loss insurers identified in your

22

answer to the preceding interrogatories.

Answer No. 22

Charles S. Lord of the of the Chittenden Insurance Group.

Interrogatory No. 23

Do you claim to be entitled to payment of your attorney's fees in connection with this matter? If so, state the amount of attorney's fees you have incurred to date and state the basis for your claim of attorney's fees.

Answer No. 23

Yes. Plaintiff is entitled to attorney's fees under ERISA, 29 U.S.C. § 1001, *et seq.* Plaintiff reserves the right to supplement this Answer in the future.

Interrogatory No. 24

Please identify what documents you received from BeneFirst before, during and after BeneFirst's tenure with the Plan, and who presently has custody of them.

Answer No. 24

**OBJECTION**: Plaintiff objects to this Interrogatory to the extent that it is overly broad, vague and unduly burdensome. Notwithstanding and without waiving the foregoing objections, Plaintiff states that all documents provided to Plaintiff by BeneFirst, LLC, to the extent that they exist, are in Plaintiff's possession.

Interrogatory No. 25

Do you claim that you were a fiduciary for purposes of ERISA for any given year identified in your response to interrogatory number 4? If so, please state the year or years you were a fiduciary and the factual basis for your assertion.

Answer No. 25

Yes. 2001-2002.

23

Supplemental Answer No. 25

    W.E. Aubuchon Co., Inc. was a "named fiduciary" under the Medical Summary Plan

Description for the years 2001-2002.

    **Signed under the pains and penalties of perjury this __14__ day of November, 2007.**

                                  Sarah Q. Arel, Benefits Manager,
                                  W.E. Aubuchon Co., Inc.

AS TO OBJECTIONS:

Louis M. Ciavarra (BBO#546481)
Ryan T. Killman (BBO#654562)
Colleen E. Cushing (BBO# 663498)
Bowditch & Dewey, LLP
311 Main Street
P.O. Box 15156
Worcester, MA 01615-0156
Telephone:  (508) 926-3408
Facsimile:  (508) 929-3011

Dated:  November __14__, 2007

## CERTIFICATE OF SERVICE

    I hereby certify that on this __14th__ day of November, 2007 I served the foregoing
document by mailing a copy of same, first class, postage prepaid, to:

                Stephen D. Rosenberg, Esq.
                Eric L. Brodie, Esq.
                The McCormack Firm, LLC
                One International Place, 7th Floor
                Boston, MA 021010

Ryan T. Killman

{Client Files\lit\302508\0002\PLD\01031480.DOC;1}

**1**

{}

# EXHIBIT I

## Undocumented Claims
## Aubuchon Distribution, Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| Basque, Yvonne | 023280490 | Self | 20037920-01 | 02/06/02 | $ 995.00 |
| | | | 20083216-01 | 02/06-02/08/02 | $ 1,051.30 |
| Bellar, Donald | 010425533 | Self | 10112944-01 | 07/23/01 | $ 2,175.00 |
| | | | 10112946-01 | 07/23/01 | $ 1,200.00 |
| Boudreau, William | 030345316 | Self | 10113137-01 | 07/20/01 | $ 3,951.00 |
| | | | 10113115-01 | 03/09-08/09/01 | $ 1,379.00 |
| | | | 10120252-01 | 07/20/01 | $ 778.00 |
| Brownell, Donna | 030346924 | Self | 20034063-01 | 02/25-02/28/02 | $ 10,756.00 |
| | | | 20103020-01 | 08/23/02 | $ 629.00 |
| | | | 20090214-01 | 07/11/02 | $ 603.00 |
| Carroll, Reginald | 022307148 | Self | 20101597-01 | 2/26/2002 | $ 4,020.14 |
| | | | 20029043-01 | 1/9/2002 | $ 1,550.00 |
| Chartier, Dana | 031469138 | Self | 20039093-01 | 12/21/2001 | $ 759.00 |
| Cotton, Edward | 027461442 | Adam | 20100333-01 | 07/22/02 | $ 925.00 |
| Crosby, Julie | 031404455 | Self | 20067657-02 | 06/05/02 | $ 819.00 |
| Delisle, Paul | 025369395 | Self | 10145278-01 | 10/31/01 | $ 1,529.00 |
| | | | 20007980-01 | 01/17/02 | $ 1,920.00 |
| Fournier, Louis | 030362370 | Pamela | 20066873-01 | 05/06/02 | $ 1,040.00 |
| Gallant, Steven | 019484255 | Eric | 20020069-01 | 07/27/01 | $ 890.00 |
| | | | 20083147-01 | 06/05/02 | $ 677.00 |
| Gallant, Steven | 019484255 | Christopher | 20083201-01 | 02/27/02 | $ 764.20 |
| Girouard, Bruce | 032548367 | Self | 20089834-01 | 06/26/02 | $ 674.00 |
| Girouard, Leo | 015347941 | Self | 20089826-01 | 07/02/02 | $ 1,415.00 |
| Hines, Joseph | 026320799 | Self | 20084980-01 | 06/14-06/28/02 | $ 1,049.00 |
| Houle, Brian | 028526353 | Stephanie | 20018703-01 | 8/31/2001 | $ 1,520.00 |
| Karkutt, John | 024303169 | Gail | 20110033-01 | 06/20/02 | $ 3,870.39 |

# EXHIBIT I

## Undocumented Claims
## Aubuchon Distribution, Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 30010025-01 | 07/01-07/31/02 | $ 1,048.00 |
| | | | 20121458-01 | 05/23/05 | $ 1,350.00 |
| | | | 30004251-01 | 06/20/02 | $ 751.00 |
| LaFortune, Robert | 015368371 | Joanne | 20046680-01 | 03/08/02 | $ 3,944.00 |
| LeBlanc, Bruce | 016581358 | Self | 20015102-01 | 07/26/01 | $ 1,197.00 |
| Leger, Eugene | 027288341 | Barbara | 20015555-01 | 10/09/01 | $ 790.00 |
| Legros, Robert | 030346679 | Self | 20031342-01 | 10/03-10/31/01 | $ 16,994.74 |
| | | | 10118383-01 | 08/10-08/14/01 | $ 1,158.00 |
| | | | 20081835-01 | 12/28-1/21/02 | $ 1,000.00 |
| | | | 20002508-01 | 07/06/01 | $ 845.00 |
| | | | 20002513-01 | 08/10/01 | $ 718.00 |
| | | | 10121332-01 | 07/14/01 | $ 700.00 |
| Maillet, Alphee | 016400162 | Self | 20128077-01 | 08/20/02 | $ 2,070.00 |
| | | | 20095936-01 | 05/01/02 | $ 1,762.00 |
| Morin, Donald | 010426282 | Self | 20104329-01 | 07/12/02 | $ 1,652.62 |
| | | | 20102824-01 | 08/05/02 | $ 1,041.00 |
| | | | 20085761-01 | 07/12/02 | $ 1,550.00 |
| | | | 20037930-01 | 03/01/02 | $ 900.00 |
| Nyman, Gary | 016400755 | Paula | 20058880-01 | 04/30/02 | $ 2,300.00 |
| Pelletier, Michael | 019484821 | Self | 20101403-01 | 07/12-07/13/02 | $ 830.41 |
| Pelletier, Michael | 019484821 | Mary | 20087423-01 | 06/11/02 | $ 1,700.00 |
| Price, David | 006347444 | Self | 20090482-01 | 07/12/02 | $ 750.00 |
| Roach, Bruce | 023523626 | Self | 20087392-01 | 05/24/02 | $ 646.00 |
| Rouleau, Philip | 014322579 | Self | 10114072-01 | 09/13/01 | $ 1,300.00 |
| Storm, Glenn | 019281114 | Self | 30004196-01 | 04/04/02 | $ 5,400.00 |
| | | | 20001160-01 | 11/01-11/30/01 | $ 2,415.00 |

# EXHIBIT I

## Undocumented Claims
## Aubuchon Distribution, Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|----------|-----------|----------|--------------|--------------------|---------------|
| | | | 20084470-01 | 05/02-05/31/02 | $ 1,957.00 |
| | | | 20037898-01 | 01/25/02 | $ 1,650.00 |
| | | | 20092723-01 | 04/02/02 | $ 1,050.00 |
| Therrien, Todd | 029587741 | Self | 20083253-01 | 10/24/2001 | $ 1,084.00 |
| Whitestone, Mark | 021605088 | Mark | 20120120-01 | 06/21/02 | $ 1,190.10 |
| | | | 20090910-01 | 06/21/02 | $ 650.00 |
| Whitestone, Mark | 021605088 | Janice | 20089837-01 | 06/14/02 | $ 1,650.00 |
| Whitestone, Mark | 021605088 | Kelly | 20106436-01 | 08/19/02 | $ 694.00 |
| Woltering, Marvin | 018480930 | Self | 30032146-01 | 08/01/02 | $ 4,808.96 |
| | | | | **Exhibit Total:** | **$116,485.86** |

**2**

{}

# EXHIBIT II

## Procedural and Payment Claim Errors

### Auchubon Distribution, Inc.

| | Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|---|
| 1 | Lopes, Lonnie | Max | 031404455 | Various | 9/24/01-8/7/02 | $ 2,968.20 | | $ 2,968.20 |
| | **Comments:** Notes on-line indicate that there is other coverage through Blue Cross Blue Shield which is the primary payor for Max due to the birthday rule. Therefore, BeneFirst paid this claim as primary in error. | | | | | | | |
| 2 | Basque, Yvonne | Self | 023280490 | Various | 1/29/02-6/25/02 | $ 4,468.00 | $ 4,468.00 | |
| 3 | Brownell, Donna | Self | 030346924 | Various | 7/16/01-8/23/02 | $ 5,685.80 | $ 5,685.80 | |
| | **Comments:** Eligibility on-line indicates that COBRA was effective 1/1/00. No documentation noted on-line indicating that a COBRA election form was completed or that premium payments were made. | | | | | | | |
| 4 | Jacoby, Paul | Self | 029284907 | Various | 8/20/01-8/14/02 | $ 3,779.64 | $ 3,779.64 | |
| | | Raili | 029284907 | Various | 8/30/01-4/29/02 | $ 804.75 | $ 804.75 | |
| | **Comments:** Eligibility on-line indicates that COBRA was effective 1/1/00. No documentation noted on-line indicating that a COBRA election form was completed or that premium payments were made. | | | | | | | |
| 5 | Legros, Robert | Self | 030346679 | Various | 11/1/01-1/31/02 | $ 17,994.74 | $ 17,994.74 | |
| | **Comments:** Eligibility on-line indicates that COBRA was effective 11/1/01. No documentation noted on-line indicating that a COBRA election form was completed or that premium payments were made. | | | | | | | |

# EXHIBIT II

## Procedural and Payment Claim Errors

### Auchuchon Distribution, Inc.

| | Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|---|
| 6 | Sumner, Kenneth | Self | 020349061 | Various | 9/6/01-9/29/01 | $ 9,091.60 | $ 9,091.60 | |
| | **Comments:** Eligibility on-line indicates that COBRA was effective 9/6/01. No documentation noted on-line indicating that a COBRA election form was completed or that premium payments were made. | | | | | | | |
| 7 | Wilson, Duane | Carl Ogert | 027545935 | 20079403-01 | 10/14/01-10/17/01 | $ 333.70 | $ 333.70 | |
| | **Comments:** The dependent has a different last name than the employee. We found no notes on-line to indicate that investigation was initiated to verify that the employee was responsible for this child as required by the Plan. | | | | | | | |
| 8 | LaFortune, Robert | Joanne | 015368371 | 20047378-01 | 03/08/02 | $ 720.00 | | $ 60.00 |
| | **Comments:** Multiple surgery rules were not applied in the adjudication of this claim. | | | | | | | |
| 9 | Carroll, Reginald | Self | 022307148 | 20120180-01 | 01/15/02 | $ 129.20 | | $ 129.20 |
| | **Comments:** Charges of $1,767.00 incurred on 1/15/02 at Health Alliance were repriced to $1,501.95 (claim number 20023055). However, when charges were processed, revenue code 636 (Drug/Detail Code) in the amount of $152.00 was omitted from the total charge amount entered on line but payment of $1,501.95 was still issued. Further, the $152.00 was later processed under claim number 20120180-01 and $129.20 was issued. Therefore, an overpayment of $129.20 was created in this file. | | | | | | | |
| 10 | Hansen, Carl | Self | 042103575 | 20044558-01 | 3/7-3/12/02 | $ 6,439.35 | | $ 200.00 |
| | **Comments:** The plan requires precertification for all inpatient confinements or a penalty of $200 applies. No precertification documented in on-line notes. | | | | | | | |
| 11 | LeBlanc, Bruce | Self | 016581358 | 10142322-01 | 7/26-7/28/01 | $ 2,436.00 | | $ 200.00 |

# EXHIBIT II

## Procedural and Payment Claim Errors

### Aubuchon Distribution, Inc.

| | Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|---|
| 12 | DeBarge, James | Self | 031402510 | 20011081-01 | 12/14/01 | $ 575.95 | | $ 575.95 |
| | **Comments:** Reimbursement issued to Susan E. Bonadonna, MD rather than to provider Henry Heywood Memorial Hospital. | | | | | | | |
| 13 | Gallant, Steven | Self | 019484255 | 20004343-01 | 09/27/01 | $ 1,728.90 | | $ 1,728.90 |
| | | | | 20004344-01 | 09/26/01 | $ 479.96 | | $ 479.96 |
| | | | | 20004345-01 | 07/20/01 | $ 233.75 | | $ 233.75 |
| | | | | 20038866-01 | 01/25/02 | $ 928.50 | | $ 928.50 |
| | **Comments:** Reimbursement issued to Susan E. Bonadonna, MD rather than to provider Henry Heywood Memorial Hospital. | | | | | | | |
| 14 | Gallant, Steven | Eric | 019484255 | 10114167-01 | 07/27/01 | $ 1,184.67 | | $ 1,184.67 |
| | | | | 10114170-01 | 07/27/01 | $ 417.00 | | $ 417.00 |
| | **Comments:** Reimbursement issued to Susan E. Bonadonna, MD rather than to provider Henry Heywood Memorial Hospital. | | | | | | | |

**Comments:** The Plan requires precertification for all inpatient confinements or a penalty of $200 applies. No precertification documentation noted in claimant's file.

# EXHIBIT II

## Procedural and Payment Claim Errors

### Auburchon Distribution, Inc.

| | Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|---|
| 15 | Pike, David | Self | 024480531 | 10123690-01 | 08/29/01 | $ 804.60 | | $ 804.60 |
| | **Comments:** Reimbursement issued to Susan E. Bonadonna, MD rather than to provider Henry Heywood Memorial Hospital. | | | | | | | |
| 16 | Storm, Glenn | Self | 019281114 | 10124965-01 | 08/28/01 | $ 4,722.06 | | $ 4,722.06 |
| | | | | 20001160-01 | 11/29/01 | $ 1,917.75 | | $ 1,917.75 |
| | | | | 20016010-01 | 11/27/01 | $ 345.95 | | $ 345.95 |
| | | | | 10115984-01 | 08/27/01 | $ 300.35 | | $ 300.35 |
| | **Comments:** Reimbursement issued to Susan E. Bonadonna, MD rather than to provider Henry Heywood Memorial Hospital. | | | | | | | |
| 17 | Wilson, Duane | Carl Ogert | 027545935 | 10147703-01 | 10/14/01 | $ 550.45 | $ 550.45 | |
| | **Comments:** Reimbursement issued to Susan E. Bonadonna, MD rather than to provider Henry Heywood Memorial Hospital. | | | | | | | |

18

## EXHIBIT II

### Procedural and Payment Claim Errors

### Aubuchon Distribution, Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Payment Errors |
|---|---|---|---|---|---|---|---|
| Storm, Glenn | Self | 01928114 | 20066807-01 | 10/15-10/29/01 | $ 1,020.65 | $ 1,020.65 | |
| | | | 20029154-01 | 12/4-12/31/01 | $ 1,386.45 | $ 1,386.45 | |
| | | | 20038203-01 | 1/4-1/30/02 | $ 956.35 | $ 956.35 | |
| | | | 20066802-01 | 2/1-2/22/02 | $ 1,266.90 | $ 1,266.90 | |
| | | | 20060799-01 | 4/19-4/30/02 | $ 705.85 | $ 705.85 | |
| | | | | Exhibit Totals: | $74,377.07 | $48,044.88 | $17,196.84 |

**Comments:** Physical therapy charges considered without indication of attending physician's orders as required by the Plan.  Please note that claim number 20001160-01 deducted for reimbursement to incorrect provider also is questioned for physical therapy authorization.

**11**

{}



# ADMINISTRATIVE SERVICES AGREEMENT

By and Between

## W.E. Aubuchon Co., Inc. Distribution Center

And

## BENEFIRST, LLC.

This Agreement ("Agreement") between W.E. Aubuchon Co., Inc. Distribution Center ("Plan Sponsor") and BENEFIRST, LLC. ("Plan Administrator"), for the purpose of establishing the terms and conditions which the Plan Administrator agrees to provide administrative services to the Plan Sponsor under the Plan Sponsor's Benefit Plan ("Benefit Plan") in consideration for the payment by the Plan Sponsor of administration fees and the agreements set forth below:

## SECTION I.    CLAIMS ADMINISTRATION

A. The Plan Sponsor shall:

1. Retain the final authority and responsibility for he Benefit Plan and its operations. The Plan Sponsor gives the Plan Administrator the authority to act on behalf of the Plan Sponsor in connection with the Benefit Plan, but only expressly stated in this Agreement or as mutually agreed upon in writing by the Plan Sponsor and the Plan Administrator;

2. Pay the Plan Administrator as set forth in this Agreement;

3. Provide funds for the payment of plan benefits as set forth in this Agreement;

4. Furnish the information needed by the Plan Administrator to perform its functions under this Agreement. Information regarding the Benefit Plan includes any information concerning the eligibility and entitlement of persons to receive plan benefits;

5. Reimburse the Plan Administrator for the expense of any printed matter prepared especially for the Benefit Plan of the Plan Sponsor, except expenses specifically assumed by the Plan Administrator in the Schedule of Fees of Exhibit A;

6. Indemnify the Plan Administrator and hold it harmless from and against all loss, liability, damage, expense or other obligation resulting from or arising out of claims, demands or lawsuits against the Plan Administrator in connection with benefit payments or services performed under this Agreement; and,

7. Indemnify the Plan Administrator and hold it harmless against any liability, expenses, demand or other obligation resulting from or arising out of any tax or similar assessment (federal or state) which, (a) BeneFirst may incur with respect to plan benefits which are the obligation and liability of the Plan Sponsor, or (b) would have been levied on any charges or fees payable by the Plan Sponsor to the Plan Administrator under this Agreement.

B. The Plan Administrator, as Agent of the Plan Sponsor, shall:

1. Pay plan benefits in its usual and customary manner subject to and in accordance with this Agreement to or on behalf of persons entitled to receive plan benefits;

Confidential
8/2/2005

2. Notify any plan participant, whose request for plan benefits is denied, of the reasons for the denial, and of that plan participant's right to have the denial reviewed. The notification and review will be in a manner agreed upon by the Plan Sponsor and the Plan Administrator designed to satisfy the requirements of the Employee Retirement Income Security Act of 1974 (ERISA);

3. Maintain, for the duration of this Agreement and for two (2) years thereafter, adequate records of all transactions between Plan Sponsor, the Plan Administrator and plan participants. The records are the property of the Plan Sponsor. The Plan Sponsor has the right of continuing access to their records;

4. Refer to the Plan Sponsor for determination of: (a) any claim or class of claims the Plan Sponsor may specify, (b) any disputed claim, (c) any claim involving any question of eligibility or entitlement of the claimant for coverage under the Benefit Plan, (d) any question with respect to the amount of payment due, or, (e) any other question;

5. Provide the Plan Sponsor service and assistance in connection with the design and development of the Benefit Plan, initially and in connection with Benefit Plan revisions. Service and assistance includes; (a) underwriting and actuarial services, (b) estimates of initial plan costs, (c) cost projections of any proposed plan revisions, and (d) advice regarding the preparation of plan documents and summary plan description booklets;

6. Furnish the plan participants the items described in the following subsections:

    i.      an annual report of information available to the Plan Administrator which may be needed by the Plan Sponsor to satisfy plan requirements of ERISA.

    ii.     administrative forms including the initial supply of summary plan description booklets (but not any subsequent reprints) needed to facilitate the performance of BeneFirst's duties pursuant to this Agreement; and,

7. Indemnify the Plan Sponsor and hold it harmless from and against all claims, lawsuits, settlements, judgements, costs, penalties and expenses, including attorney fees, with respect to this Agreement resulting from or arising out of the gross negligence or the dishonest, fraudulent or criminal acts of the Plan Administrator or its employees, acting alone or in collusion with others.

## SECTION IL      PLAN FUNDING

A.    The Plan Sponsor shall establish and maintain a bank account ("Account") to be used solely for the purpose of funding claims due under the Benefit Plan.

B.    The Plan Sponsor shall fund the Account on a timely basis with funds sufficient to cover all amounts to be paid when due under the Benefit Plan and this Agreement.

C.    The Plan Sponsor shall expressly authorize the Plan Administrator to issue checks for benefit payments under the Benefit Plan on behalf of the Plan Sponsor.

D.    The Plan Sponsor shall adequately fund the Account so that all claims can be paid within twenty-one (21) days of processing. In the event that the Plan Sponsor fails to adequately fund the Account within 21 days of claim processing, the Plan Administrator shall notify the Plan Sponsor by certified mail that the Plan Sponsor has fourteen (14) days to fund the Account. If the Plan Sponsor fails to adequately fund the Account within the 14-day period, the Plan Sponsor will be in breach of the Agreement and the Plan Administrator shall have the power to terminate administrative services. In the event of such termination, the Plan Sponsor shall promptly notify all covered employees and dependents of such termination, however, the Plan Administrator reserves the right to so notify covered employees and dependents as well. Failure to terminate

services at the end of the 14-day period in no way prejudices the Plan Administrator from their right to do so at a later date.

E.  If the Plan Sponsor (a) commences a voluntary case under the federal bankruptcy laws or admits in writing its insolvency or its inability to pay its debts as they become due, or applies for, consents to or acquiesces in the appointment of, or taking possession by, a trustee, receiver, custodian or similar official or agent for itself or any substantial part of its property or generally does not pay its debts as they become due; or (b) shall have an order or decree for relief in bankruptcy in any case under federal bankruptcy laws entered against it, or if a petition seeking reorganization, readjustment, arrangement, composition or other similar relief as to the Plan Sponsor under the federal bankruptcy laws or any similar law for the relief of debtors shall be brought against it and shall be consented to by it or shall remain undismissed for sixty days; or (c) if a trustee, receiver, custodian or similar official or agent shall be appointed to take charge of all or any art of the Plan Sponsor's property; then in any of these cases, the Plan Administrator may, immediately or at any time thereafter while under such condition continues and without demand and without prejudice to any remedies which might otherwise be used for arrears of funds due to pay claims or administrative service fees, give notice of termination of this Agreement to the Plan Sponsor and, upon giving such notice, this Agreement shall terminate. The Plan Administrator may, at its option, allow this Agreement to continue on the condition that the Plan Sponsor give the Plan Administrator a security deposit equal to one month's estimated claims liability and one month of administrative services fees as protection against loss the Plan Administrator would sustain by virtue of the Plan Sponsor's default hereunder.

F.  The Plan Sponsor agrees to promptly reimburse participating Network providers within thirty (30) days from their receipt of the claim. The Plan Sponsor agrees that claims not reimbursed within thirty (30) days are payable at the full original billed amount and will not be eligible for the HCVM discount if requested by the participating provider.

## SECTION III.    PLAN **SPONSOR LIABILITY**

The Plan Administrator does not insure nor underwrite the liability of the Plan Sponsor under the Benefit Plan. The Plan Sponsor retains the ultimate responsibility for claims made pursuant to the Benefit Plan. The Plan Sponsor is responsible for all expenses incident to the Benefit Plan except expenses specifically assumed by the Plan Administrator in this Agreement.

## SECTION IV.    PLAN ADMINISTRATOR LIABILITY

A.  The Plan Administrator shall, to the extent possible, advise the Plan Sponsor as to matters which come to its attention involving potential legal actions involving the Benefit Plan and shall promptly advise the Plan Sponsor of legal actions commenced against the Plan Sponsor which comes to its attention. The defense of any legal action involving a claim for benefits under the Benefit Plan shall not be the obligation of the Plan Administrator under this Agreement, but it is understood and agreed that the Plan Administrator shall fully cooperate with the Plan Sponsor in the defense of any action arising out of matters related to this Agreement.

B.  The Plan Administrator will use reasonable care and due diligence in the exercise of its powers in the performance of its duties under this Agreement. The Plan Administrator will not be liable for any mistake of judgement or other actions taken in good faith.

C.  If it is determined that any payment has been made under this Agreement to an ineligible employee or dependent, or if it is determined that more or less than the correct amount has been paid by the Plan Administrator, the Plan Administrator will make a diligent effort to recover the payment made to an ineligible person but, the Plan Administrator will not be required to initiate court proceedings for any such recovery.

12.   The Plan Administrator does not insure nor underwrite the liability for medical stop loss under the Benefit Plan. The Plan Sponsor retains the ultimate responsibility for claims made under the Benefit Plan and all expenses incidental to the Benefit Plan. If the Plan Sponsor purchases stop loss coverage from any insurance carrier, any claims that the Plan Sponsor may want paid that are not covered by the terms and conditions of the Benefit Plan will not be included as covered expenses for the purposes of the stop loss contract. The Plan Sponsor understands the coverage provided under any stop loss coverage purchased, and agrees that the coverage is appropriate for the Benefit Plan.

E.   The Plan Sponsor agrees to indemnify, defend and hold the Plan Administrator safe and harmless from all liability, losses and expense, including reasonable attorneys fees arising from:

1.   any claims or proceedings that may be made or brought by any third party against the Plan Administrator which claim or proceeding arises out of a benefit claim determination made in accordance with the Plan specifications incorporated into the Plan Document approved by the Plan Sponsor;

2.   any breach of Plan Sponsor's duties of confidentiality;

3.   any claims which are unrelated to the obligations of BeneFirst under this Agreement, including but not limited to, claim related to the provision of pharmacy services, "24/7" member access, quality assurance and utilization review;

4.   any claims involving injuries incurred or suffered by members of the Benefit Plan which injuries are caused by the negligence or misconduct of providers under the Benefit Plan

In the event that the Plan Administrator claims a right of indemnification under this Agreement it shall give prompt written notice of such claim to the Plan Sponsor. The Plan Sponsor shall have the right to control the defense of any such action and the Plan Administrator agrees to cooperate with the Plan Sponsor and provide such assistance as is reasonably requested.

## SECTION V.        COMPENSATION OF THE PLAN ADMINISTRATOR                                I

A.  For the Plan Administrator services provided pursuant to this Agreement, the Plan Sponsor will pay the Plan Administrator the charges set forth in the Schedule of Fees. Fees will be due and payable within thirty (30) days of invoicing.

B.  The Plan Sponsor shall reimburse the Plan Administrator for any expenses incurred by BeneFirst, including expenses for utilization review procedures, hospital audits and large case management reviews. The Plan Administrator may deduct and pay such expenses from the Plan Sponsor's benefits claims account subject to all the limits and conditions of this Agreement.

C. The Plan Administrator has the right to change the monthly administration fee and other fees set forth in Exhibit A, Schedule of Fees. BeneFirst will give the Plan Sponsor no less than thirty (30) days written notice of the change. The notice will state the amount of the new monthly fee and the effective date of the change. The fees in use at the time of the notice must be in effect at least twelve (12) months before a change can be made unless;

1.   the Plan Sponsor amends the Benefit Plan in such a way that the cost, nature, or extent of the claims administration of the Benefit Plan is materially altered,

2.   the number of employees covered under the Benefit Plan changes by twenty-five percent (25%) or more since the date the then current charges were effective, or,

3.   there exists a change in the scope of the services to be performed by the Plan Administrator under the Benefit Plan or this Agreement.

D. The Plan Administrator shall have the option to engage the services of a third party vendor to handle the negotiations and settlement of non-network provider and facility claims. Plan Sponsor agrees to pay the third party vendor the billed negotiation fee plus agrees to pay the Plan Administrator a service fee equal to ten percent (10%) of the savings.

SECTION VI.       PERFORMANCE STANDARDS

A.       The Plan Administrator warrants that the following claims processing times and restrictions will be maintained at all times possible:

1.   Claims Mail. Claims mail will be date stamped the day received. Claims will be inputted into the system within two days of the date of receipt.
2.   Non-Pended Claims. 80% of all non-pended claims and tracers will be processed within an average of 15 days after being entered into the system. 98% of all nonpended claims and tracers will be processed within an average of 30 days after being entered into the system.
3.   Pended Claims. All pended claims shall be resolved within an average of 90 days of receipt by BeneFirst of all necessary information required by BeneFirst unless this time period is otherwise extended by written and oral instruction by the Plan Sponsor.
4.   Adjustments. BeneFirst shall reprocess all claims on reprocessing forms within an average of five (5) days of receipt by BeneFirst of all required information unless this time period is otherwise extended by written and oral instruction of the Plan Sponsor.
5.   Member and Provider Data Input. Members who are added to the Plan Sponsor's Benefit Plan will be inputted within 48 hours of receipt of all required documentation.
6.   Claims Payments. The Plan Administrator will issue claims payments (using Plan Sponsor supplied funds) on a weekly basis.

B.       The Plan Administrator warrants that the following 'claims accuracy standards will be in place at all times:

1.   Claim Financial Accuracy. The Claim Accuracy Ratio shall average .98 or greater as indicated by the the Plan Administrator Claims Audit Reports (as measured year to date by the said monthly reports). Financial accuracy will be calculated by dividing the number of claims audited with no financial error by the total number of claims audited.
2.   Claims Payment Accuracy. The total number of claims audited accurately divided by the total number of claims audited shall average .95 or greater as indicated by the Plan Administrator Claims Audit Reports (as measured year-to-date by the said monthly reports).
3.   Claims Coding Accuracy. The total number of correct coding entries audited divided by total number of coding entries audited shall average .95 or greater as indicated by the Plan Administrator Claims Audit Reports (as measured year-to-date by the said monthly reports).

SECTION VII.      PHARMACY BENEFIT MANAGEMENT PROGRAM

A.       BeneFirst shall issue dispensing cards to individuals covered under the Plan Sponsor's Benefit Plan pursuant to the Administrative Agreement between the Plan Administrator and the Pharmacy Benefit Manager (PBM).

B.       The Plan Sponsor agrees to pay the Plan Administrator the amount charged for all drugs dispensed on the pharmacy cards to individuals covered under the Plan Sponsor's Benefit Plan. Further, the Plan Sponsor agrees that they are responsible for the payment of all drugs dispensed under the PBM under the Plan Sponsor's Benefit Plan until the expiration date of each card.

The Plan Sponsor agreed that drugs dispensed after the termination of this Agreement with the Plan Administrator, or drugs dispensed to terminated employees and dependents that have retained possession of the PBM card will continue to be the responsibility of the Plan Sponsor.

## SECTION VIII.    CONFIDENTIALITY

The Plan Administrator acknowledges that certain material and information which is or will come into its possession or knowledge in connection with this Agreement includes confidential proprietary information of the Plan Sponsor, disclosure of which to third parties may be damaging. Therefore, the Plan Administrator agrees to hold such material and information in confidence to be used only for the performance of this Agreement, and to be released only to permitted users and to those persons requiring access to the information for such performance or as required by law. For purposes of this Agreement, "permitted users" shall mean such persons as the Plan Sponsor identifies as permitted users.

## SECTION IX.    **SEVERABILITY**

If any provision of this Agreement is held invalid by law or by a court of law, the invalidity will not affect any other provision of this Agreement. The provisions of this Agreement are severable. It is provided, however, that the basic purposes of this Agreement must be achieved through the remaining valid provisions.

## SECTION X.    CAPTIONS AND HEADINGS

The captions and headings throughout this Agreement are for convenience and reference only. The words of the captions and hea Zings will in no way be held or deemed to define, describe, explain, modify or limit the meaning of an provision, or the scope or intent of this Agreement.

## SECTION XI.    CONTRACT COMPLIANCE - NONWAIVER

Failure by the Plan Sponsor, the Plan Administrator or both to insist upon compliance with any term or provision of this Agreement at any time or under any set of circumstances will not operate to waive or modify that provision or render it unenforceable at any other time whether the circumstances are or are not the same. No waiver of any of the terms or provisions of this Agreement will be valid or of any force or effect unless each instance the waiver or modification is contained in a written memorandum expressing such alteration or modification and executed by the Plan Sponsor and the Plan Administrator

## SECTION XII.    ASSIGNMENT

The rights, obligations and benefits established by this Agreement shall be nonassignable by the Plan Sponsor without the prior written consent of the Plan Administrator. The Plan Administrator may assign its rights and obligations hereunder with thirty(30) days written notice to the Plan Sponsor. For the purposes of this Agreement, a change in the controlling legal or beneficial ownership interest of the Plan Sponsor shall be deemed an assignment requiring the Plan Sponsor to request written consent from the Plan Administrator

## SECTION XIII GOVERNING LAW

This Agreement shall be subject to and governed by the laws of the Commonwealth of Massachusetts. Any and all proceedings relating to the subject matter thereof shall be maintained in the courts of the Commonwealth of Massachusetts or the Federal District Courts sitting in Massachusetts.

## SECTION XIV.    ENTIRE AGREEMENT

This Agreement constitutes the entire agreement between the parties pertaining to the subject matter and supersedes all prior and contemporary agreements, understandings, negotiations and discussions, whether oral or written, of the parties.

## SECTION XV.    TERMINATION

A. This Agreement may be terminated either by the Plan Sponsor or by the Plan Administrator at any time provided the terminating party gives the other party prior written notice. The written notice will state the effective date of the termination. The written notice will be given no less than thirty (30) days prior to the date of the termination.

B.    This Agreement will terminate automatically and immediately as of the date:

1.    the Plan Sponsor fails to pay any charges within thirty (30) days after charges are due and payable as provided in this Agreement, or,

2.    the Plan Sponsor fails to perform its obligations regarding the plan benefit payments in accordance with this Agreement. Termination will not relieve the Plan Sponsor of its obligations to the Plan Administrator for payment of compensation due under this Agreement, or,

3.    the Plan Sponsor amends the Benefit Plan regarding plan benefits subject to this Agreement without prior written acknowledgement or approval by the Plan Administrator, or,

4.    the Benefit Plan subject to this Agreement is terminated, or,

5.    the Plan Sponsor becomes insolvent or bankrupt or subject to liquidation, receivership or conservatorship as described in Sect. II, (E).

C. If the Benefit Plan subject to this Agreement is terminated, the Plan Sponsor and the Plan Administrator may mutually agree that the provisions of this Agreement will continue in effect for the purposes of payment of plan benefit expense claims incurred before the date of termination but not paid on or before the date of termination.

D. If this Agreement is terminated while the Benefit Plan continues in effect, the Plan Sponsor and the Plan Administrator may mutually agree that the provisions of this Agreement will continue in effect for the purpose of payment of any claims for which proofs of loss have been received by BeneFirst, before the date of termination.

E. If provisions of this Agreement are continued in effect in accordance with subsection (C.) or (D.) of this section, the Plan Sponsor will pay the Plan Administrator an amount equal to the monthly administrative fee of the renewal proposal for the number of months the Plan Sponsor during the period the provisions of this Agreement are continued.

F.    Termination of this Agreement will not terminate the rights or obligations of either party arising out of the period during which this Agreement was in effect.

In WITNESS WHEREOF, the Plan Sponsor and the Plan Administrator have caused this Agreement to be executed in their names by their undersigned officers, the same being duly authorized to do so:

W. E. Aubuchon Co., Inc. Distribution Center

By: _____

Title: _____

Date: _____

Witness: _____

BENEFIRST, LLC

By _____

Title: _____

Date:

Witness:

8/2/2005

# EXHIBIT A

## Schedule of Fees

## Plan Year 2001-2002

### Set-Up Fee of $4,500.00

This is an annual fee and covers the preparation of Enrollment Kits and I.D. Cards needed for the initial group enrollment, and employee meetings at up to three locations. Subsequent printings will be billed to the client at cost. This fee also covers the building of the Plan in the claim system.

### Monthly Fixed Costs

A Monthly Fixed Cost of $91.05 per Single and $150.81 per Family will be charged. The Monthly fixed cost provides administrative services and excess loss coverage as follows:

- Excess Loss premiums for coverage previously agreed upon.
- Maintaining a claims account for participant contributions, if appropriate.
- Invoicing and funding of Benefit Plan benefits.
- Recordkeeping and invoicing of fixed costs.
- Benefit administration, including cost containment pretrams.
- Plan amendments as required.
- Monthly benefit analyses. /
- Annual financial report on the Benefit Plan to the Plan sponsor, where appropriate.
- Routine-type consulting and assistance.
- Precertification of hospital admissions.
- COBRA premium invoicing, collection, and recordkeeping (where elected).
- Risk Management services, where appropriate.
- Recordkeeping, invoicing, and claim filing of life insurance benefits.
- Annual re-quoting of excess loss terms on a "best terms" basis.

### Additional Service Fees

- **Booklet Reprints:** Booklet reprints are charged at cost.
- **IRS/DOL 5500 or 5500-C:** $150.00 annual fee to compile data necessary to prepare the 5500/55000.
- **HIPAA Certificates:** HIPAA Certificates provided with $.75 per Employee per month fee as listed on the Plan Administrator sales proposal.
- **Additional Fees:** Any additional fees (medical records, medical fees, legal fees, Health Resources pre-certification charges.) needed to process Benefit Plan benefits will appear on the claims invoice as a non-benefit Plan expense. Closed Plan Year expenses by the Plan Administrator occasioned by a Medicare or Medicaid audit by the Health Care Financing Agency will be an additional fee but with an advance notice by the Plan Administrator to the Plan Sponsor.

### Miscellaneous

- **Compensations:** The broker of record receives a commission of 10% of the excess loss premium.
- The Plan Administrator encourages the Plan Sponsor to have all Plan documents reviewed by its attorney.

## EXHIBIT B

## COBRA SERVICE AGREEMENT

This COBRA Service Agreement ("Agreement") is between BeneFirst, LLC and W.E. Aubuchon Co., Inc. Distribution Center ("Plan Sponsor"). It is effective as of 25 Aug 01 (the "Effective Date"). This Agreement establishes the terms and conditions as recited below:

SECTION I.        **DUTIES OF PLAN SPONSOR**

1. COBRA requires the Plan Sponsor to provide an initial notice of COBRA rights to covered employees and covered spouses at the time COBRA first applies to Plan Sponsor's Medical Plan(s) and at the time an individual first becomes a covered employee or covered spouse. The Plan Sponsor shall provide these initial notices of COBRA rights and BeneFirst will have no obligation with respect to them.

2. Whenever a qualifying event as defined in the COBRA law occurs, the Plan Sponsor shall promptly notify BeneFirst's COBRA Department via a completed BeneFirst provided notification form with the following information:

   (i)        the type of qualifying event incurred;

   (ii)       the date of the qualifying event;

   (iii)      the names, addresses, telephone numbers and birthdates of all the qualified beneficiaries;

   (iv)       the Plan Sponsor's Medical Plan(s) in which the qualified beneficiaries had coverage.

3. If Plan Sponsor so: us a notification form to BeneFirst via facsimile transmission, Plan Sponsor will also send the same notice via U.S. Mail.

SECTION II.       **DUTIES OF BENEFIRST**

1. Within 14 days of receipt of a COBRA notification form from the Plan Sponsor, BeneFirst will send, a notice of right to continue coverage and an election form to the qualified beneficiary. Also, BeneFirst will alert its claims system to hold coverage pending the COBRA election of the qualified beneficiary.

2. BeneFirst will then track the qualified beneficiary's 60-day election period.

3. If a qualified beneficiary's election form is not received within the 60-day election period or if the coverage is declined on the election form, then the qualified beneficiary will be terminated from the Plan Sponsor's Medical Plan(s).

4. When an election form indicates a qualified beneficiary's intent to continue coverage, BeneFirst will immediately mail a confirmation letter with coupons for premium payments.

5. Grace Periods for COBRA premium payments will be monitored. If BeneFirst does not receive a premium payment for the qualified beneficiary by the end of any COBRA grace period, then the qualified beneficiary will be terminated from the Plan Sponsor's Medical Plan(s). However, BeneFirst will consult with the Plan Sponsor concerning any questionable late premium payments. All claims which are incurred after the qualified beneficiary's paid through date are held until the appropriate premium is received.

6. If applicable, BeneFirst will send a conversion notice to a qualified beneficiary plus an application for conversion six months prior to the qualified beneficiary's termination date.

7. Prior to a Plan Sponsor's Medical Plan(s) anniversary, BeneFirst will mail a COBRA renewal notice advising the qualified beneficiary of any upcoming premium changes. Subsequently, a renewal letter with new coupons will be sent to the qualified beneficiary.

# SECTION III.    ADDITIONAL PROVISIONS

1. BeneFirst will, to the extent possible, advise the Sponsor as to matters which come to BeneFirst's attention involving potential legal actions concerning the supervision of COBRA continuation rights. The defense of any legal action involving a claim for benefits under the supervision of COBRA continuation rights will not be the obligation of BeneFirst under this Agreement, but it is understood and agreed that BeneFirst will fully cooperate with Sponsor in the defense if any action arises out of matter related to this Agreement.

2. BeneFirst will advise Sponsor of any known changes to COBRA as they affect the Sponsor. In order to remain compliant, BeneFirst may implement required administrative procedures without notification to Sponsor.

3. BeneFirst will use ordinary care and due diligence in the exercise of its powers and the performance of its duties, but will not be liable for any mistake or judgment or other action taken in good faith or for any loss unless resulting from its gross negligence; provided that BeneFirst agrees to indemnify and hold harmless the Sponsor and its directors, officers and employees against any and all claims, lawsuits, settlements, judgments, costs penalties and expenses, including attorney's fees with respect to the Agreement resulting from or arising out of the dishonest, fraudulent, or criminal acts of BeneFirst or its employees, acting alone or in collusion with others.

4. The Sponsor agrees to indemnify and hold harmless BeneFirst and its directors, officers, and employees against any and all claims, lawsuits, settlements, judgments, costs, penalties, and expenses, including attorneys' fees, resulting from, or arising out of or in connection with any function of BeneFirst in connection with a claim for benefits under the administration of COBRA continuation rights unless it is determined that the liability therefore was the direct consequence of dishonest or criminal conduct, gross negligence or fraud on the part of BeneFirst or any of its directors, officers or employees.

# SECTION IV. COMPENSATION OF THE PLAN ADMINISTRATOR 1.

Sponsor agrees to pay BeneFirst as follows for COBRA Administration:

(a)    Two percent (2%) of any collected premiums received from qualified beneficiaries.

(b)    $.75 per Employee per Month

The Sponsor will be billed via a monthly invoice indicating the COBRA fees which are owed to BeneFirst for the previous month. This payment is due to BeneFirst the first day of the month following the billing date.

DATED AT _____ ON _____

PLAN SPONSOR _____

BY: _____ TITLE:_____

WITNESS:_____SOLICITING AGENT:_____

## EXHIBIT C
## PLAN DISCLOSURE NOTICE

The Department of Labor requires full disclosure of all fees and commissions on the part of any entity receiving compensation from a qualified ERISA plan. BeneFirst, LLC is compensated through the fees and percentages specified in the preceding proposal through our subsidiary BeneFirst Insurance Agency, Inc. Arrangements between BeneFirst and any Broker regarding the sharing of fees or commission is reflected in the following schedule:

## COMPENSATION DISTRIBUTION

| Line of Coverage/Service | BeneFirst | Broker 1 | |
|---|---|---|---|
| Specific Excess Premium | 0 | 10% | |
| Aggregate Excess Premium | 0 | 10% | |
| Group Life | | | |
| Group AD&D | | | |
| Group Short Term Disability | | | |
| Administrative Fees | 100% | 0 | |
| Service Fee | | | |
| Medical Claim Fee | 100% | | |
| Dental Claim Fee | 100% | | |
| HIPAA Service Fee | 100% | | |
| COBRA Service Fee | 100% | | |
| Flex Fees | | | |
| PPO Fees (HCVM/NPPN,et al) | 0% | 0% | |
| Pre-Cert and/or Review Services | 100% | | |
| Prescription Program Compensation | | | |
| Interest on Custodial Accounts | 100% | | |

WITNESS:

SOLICITING AGENT:

DATED        AT_____ON _____

_____ PLA _____

N SPONSOR BY:_____        TITLE: _____

_____

EXHIBIT D

## Preferred Provider Organizations

This Agreement made effective as of the 25th day of August, 2001 between HealthCare VALUE Management, Inc. ("HCVM") a Corporation organized under the Laws of Massachusetts and W.E. Aubuchon Co., Inc. Distribution Center a Client of BeneFirst, LLC.

The Client agrees with the terms of the Contract between HealthCare VALUE Management, Inc. and BeneFirst, LLC effective August 25, 2001.

Client Insurance and Indemnification. Client will indemnify and hold HCVM and its agents, staff and employees harmless from any and all liability, loss claims, demands, or expenses, including attorneys' fees, caused by the negligent or intentional acts or omission of Client, its agents or employees in carrying out their responsibilities under this Agreement. Client shall procure and maintain policies of comprehensive general liability, professional liability and other insurance as may be necessary to protect it against such claims.

HCVM Insurance and Indemnification. HCVM will indemnify and hold Client and its agents, staff and employees harmless from any and all liability, loss, claims, demands, or expenses, including attorneys' fees, caused by the negligent or intentional acts of omissions of HCVM, its agents or employees in carrying out their responsibilities under this Agreement. HCVM shall procure and maintain policies of comprehensive fineral liability, professional liability and other insurance as may be necessary to protect it against such claims.

This Agreement will be made part of the Plan Supervisory Agreement between W.E. Aubuchon Co., Inc. Distribution Center, and BeneFirst, LLC.

Signed By:


DATED AT _____                                                   ON
_____

PLAN SPONSOR  W.E. Aubuchon Co., Inc. Distribution Center _____

BY: _____

TITLE: _____

WITNESS: _____ SOLICITING AGENT: _____

**12**

{}

# THE McCORMACK FIRM, LLC

Attorneys at Law

ONE INTERNATIONAL PLACE - 7ᵀᴴ FLOOR
BOSTON, MASSACHUSETTS   02110

Phone   617•951•2929
Fax      617•951•2672

Michael J. McCormack
Mark E. Cohen
Joseph H. Aronson
Brian C. Duffey
Amy M. Soisson
Marc L. LaCasse
Stephen D. Rosenberg
David T. Mitrou
Robert J. Maselek, Jr.

Eric L. Brodie
Donna E. Hess
Sylvia Chu
Gerald S. Frim
Laura G. Ryan
Jon A. Halaby

Mary-Elise Connolly
Caroline M. Fiore
Brooks von Biberstein
Of Counsel

Sender's E-Mail:
srosenberg@mccormackfirm.com

August 31, 2007

**Via DHL Express**

Louis M. Ciavarra, Esq.
Ryan T. Killman, Esq.
**Bowditch & Dewey, LLP**
311 Main Street
P.O. Box 15156
Worcester, MA      01615-0156

RE:  <u>W.E. Aubuchon Co., Inc. et al. v. BeneFirst, LLC</u>
     **U.S.D.C. C.A. No.:**    05-40159FDS
     **Our File No.:**         8157 ~ 259.08157

Dear Attorneys Ciavarra and Killman:

Please find enclosed a supplemental production of the claims information ordered produced by Magistrate Judge Hillman.  The documents being produced today are documents located after a comprehensive review of every claims image available to BeneFirst, as obtained from CD-ROMS containing scanned images from a vendor, images from backup tapes of the BeneFirst server, and images obtained from third parties pursuant to subpoena.[1]  According to our tabulations, of the 2991 claims listed in the Aubuchon Employee Benefits Plan spreadsheet that you provided to us, we have been able to locate 1777 of those claims.  Of the 166 claims listed in the Aubuchon Distribution Employee Benefits Plan spreadsheet provided to us, we have been able to locate 105 of those claims.  At this time, we have exhausted every known source of claims or claims images, and every available claims image has been checked against the spreadsheets you have provided to us.  Each claim for which images have been located and are being produced is marked with an "X" on the enclosed spreadsheets.

We plan on filing a status report with the court to advise the court of the results of our review of BeneFirst's claims image archives, and to also advise the court, with your assent, that the parties agree that BeneFirst is in compliance with that order.  Absent your assent, we will instead file a motion simply asking the court to deem BeneFirst as in compliance with Judge Hillman's prior order, so that we may close the book on this phase of the litigation and move forward.

---

[1]This production contains images from all three sources and includes the images previously produced that contained images obtained from the CD-ROMs only.

THE MCCORMACK FIRM, LLC

Louis M. Ciavarra, Esq.
Ryan T. Killman, Esq.
August 31, 2007
Page 2


Please feel free to contact me should you wish to discuss any of the foregoing, or if you would like an electronic copy of the spreadsheets enclosed with the hard copies of claims images.


Sincerely yours,

Stephen D. Rosenberg


SDR/ELB
101726.2
Enclosures as noted

Louis M. Ciavarra, Esq.
Ryan T. Killman, Esq.
**Claims Audit**
Employer:    W.E. Aubuchon Co., Inc.
                    Aubuchon Distribution, Inc.
April 8, 2008
Page 8

Clearly, when the extrapolations are considered, the value of the identified errors represents a significant monetary impact against Aubuchon's claims funds.

Thank you for this opportunity to be of service. Should you have any questions or comments, we would be pleased to respond.

Very truly yours,

Adria L. Garneau, CEBS

ALG/mh

# Exhibit I

EXHIBIT I

Provided by:    Northshore International Insurance Services, Inc.

Date:           April 8, 2008

## EXHIBIT I

Undocumented Claims

W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| Agate, Michael | Lisa | 104681445 | 40101713-01 | 9/29/2004 | $ 7,618.01 |
| | | | 40107749-01 | 9/29/2004 | $ 4,000.00 |
| | | | 40091204-01 | 7/2/2004 | $ 2,004.95 |
| | | | 40107747-01 | 9/29/2004 | $ 1,520.00 |
| | | | 10120258-01 | 8/25/2001 | $ 743.59 |
| | | | 40088428-01 | 6/16-6/30/04 | $ 975.00 |
| | | | 40107750-01 | 9/29/2004 | $ 1,000.00 |
| | | | 10138194-01 | 8/25/2001 | $ 586.00 |
| Agate, Michael | Self | 104681445 | 30010578-01 | 12/10/2002 | $ 800.00 |
| Aiken, Allen | Self | 019509540 | 20118082-01 | 9/16/2002 | $ 2,618.00 |
| Aivaliotis, Steven | Laura | 003487861 | 40018017-02 | 1/26/2004 | $ 1,910.00 |
| Alger, Stephen | Self | 016428328 | 2006946-01 | 9/5/2002 | $ 592.00 |
| Anastasio, Paul | Nicolas | 006605350 | 40007029-01 | 11/7/2003 | $ 594.39 |
| Archambeault, Dennis | Donna | 003406732 | 40098079-02 | 9/17/2004 | $ 3,074.25 |
| | | | 20117685-01 | 8/14/2002 | $ 1,200.00 |
| | | | 10103541-01 | 7/9/2001 | $ 626.00 |
| Archambeault, Dennis | Allison | 003406732 | 40020958-01 | 2/1/2004 | $ 2,446.00 |
| | | | 20120736-01 | 10/7/2002 | $ 784.80 |
| Archambeault, Dennis | Self | 003406732 | 40061597-01 | 5/26/2004 | $ 1,911.20 |
| | | | 40061603-01 | 5/26/2004 | $ 871.00 |
| Archambeault, Dennis | Andrea | 003406732 | 40098713-01 | 5/20/2004 | $ 700.00 |
| Archambeault, Gerard | Self | 001368023 | 40106229-01 | 9/15-9/17/04 | $ 2,986.48 |
| | | | 40090030-01 | 11/19/2003 | $ 2,575.00 |
| | | | 40094361-01 | 8/17/2004 | $ 1,943.00 |
| | | | 40087088-01 | 7/13/2004 | $ 1,533.41 |
| | | | 40098080-01 | 8/17/2004 | $ 1,530.00 |
| | | | 40057717-01 | 11/19/2003 | $ 1,464.00 |
| | | | 40092541-01 | 8/17/2004 | $ 1,346.00 |
| | | | 40022421-01 | 1/17/2004 | $ 990.00 |
| | | | 40061620-01 | 5/20/2004 | $ 1,165.00 |
| | | | 40087480-01 | 8/4/2004 | $ 1,165.00 |

# EXHIBIT I

## Undocumented Claims
## W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 40098082-01 | 9/16/2004 | $ 1,175.00 |
| | | | 40098083-01 | 9/16/2004 | $ 950.00 |
| | | | 40046916-01 | 4/9/2004 | $ 995.00 |
| | | | 40098081-01 | 8/31/2004 | $ 658.00 |
| Archambeault, Gerard | Patricia | 001368023 | 40060284-01 | 5/7/2004 | $ 1,003.00 |
| Andre, Arel | Self | 003544806 | 40081171-01 | 7/29/2004 | $ 1,304.00 |
| | | | 20103848-01 | 8/27/2007 | $ 827.00 |
| Andre, Arel | Sarah | 003544806 | 40094967-01 | 8/17/2004 | $1,175.00 |
| Andre, Arel | Sawyer | 025363234 | 20115001-02 | 8/26/2002 | $898.00 |
| | | | 20114997-01 | 8/26/2002 | $3,850.00 |
| | | | 20115001-01 | 8/26/2002 | $1,552.00 |
| Armitage, William | Shirley | 147383106 | 40101722-01 | 9/30/2004 | $578.00 |
| Ashley, Wayne | Self | 009387299 | 40086494-01 | 7/26/2004 | $2,289.91 |
| | | | 40051678-01 | 4/2/04-4/30/04 | $1,976.11 |
| | | | 20105147-01 | 8/22/2002 | $1,782.13 |
| | | | 40105318-01 | 9/29/2004 | $1,294.00 |
| | | | 40086495-01 | 7/26/2004 | $1,198.00 |
| | | | 40099919-01 | 9/29/2004 | $1,148.24 |
| | | | 40012932-01 | 1/8/2004 | $1,125.00 |
| | | | 20104963-01 | 8/22/2002 | $527.00 |
| Aubuchon, Daniel | Susan | 013381491 | 20088247-03 | 7/12/2002 | $ 2,100.00 |
| | | | 20124385-01 | 7/12/2002 | $ 8,431.15 |
| | | | 20124388-01 | 7/30/2002 | $ 4,833.31 |
| | | | 20101804-01 | 7/14/02-7/29/02 | $ 1,024.00 |
| | | | 20004826-01 | 1/9/2002 | $ 2,520.00 |
| | | | 40098090-01 | 9/22/2004 | $ 1,374.00 |
| | | | 20104469-01 | 7/29/02-7/31/02 | $ 1,175.00 |
| | | | 20104472-01 | 8/23/2002 | $ 1,200.00 |
| | | | 20120004-01 | 7/17/02-9/30/02 | $ 948.00 |
| | | | 20103555-02 | 7/30/2002 | $ 600.00 |
| | | | 20110206-01 | 8/23/2002 | $ 525.00 |

# EXHIBIT I

Undocumented Claims

W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| Aubuchon, Donat | Suzette | 003345938 | 20118376-01 | 9/21/2002 | $ 1,134.00 |
| Aubuchon, Daniel | Susan | 013381491 | 40098089-01 | 9/22/2004 | $ 1,161.44 |
| Aubuchon, David | Beverly | 24303387 | 40002341-01 | 12/2/2003 | $ 1,850.00 |
| | | | 30126481-01 | 11/24/2003 | $ 705.00 |
| Aubuchon, Gerard | Self | 017126667 | 40012498-01 | 1/15/2004 | $ 500.00 |
| Aubuchon, Lindsey | Alexander | 021628786 | 40046920-01 | 4/12/2004 | $ 901.00 |
| Aubuchon, Michael | Self | 023369201 | 20120799-01 | 10/9/2002 | $ 2,050.00 |
| | | | 20027025-01 | 2/26/2002 | $ 2,550.00 |
| Aubuchon, Michael | Gloria | 023369201 | 10108373-01 | 8/22/2001 | $ 1,600.00 |
| Aubuchon, Phillip | Self | 032368632 | 20108879-01 | 3/29/2002 | $ 3,732.95 |
| | | | 20120794-01 | 3/29/2002 | $ 750.00 |
| Aubuchon, Scott | Kirsten | 027682251 | 30062003-01 | 5/22/2003 | $ 2,900.00 |
| | | | 30054033-01 | 4/15/2003 | $ 649.00 |
| Aubuchon, Thomas | Self | 017503470 | 20103888-01 | 3/20/2002 | $ 1,075.50 |
| | | | 20122789-01 | 10/24/2002 | $ 1,391.23 |
| | | | 20118087-01 | 9/19/2002 | $ 1,123.00 |
| | | | 20039024-01 | 2/7/2002 | $ 903.70 |
| Aubuchon, Thomas | Patricia | 017503470 | 20078810-01 | 6/10/2002 | $ 1,950.00 |
| Aubuchon, William | Karson | 033345935 | 30001903-01 | 12/23/2002 | $ 1,275.85 |
| | | | 40001555-01 | 12/12/2003 | $ 2,603.00 |
| | | | 30116648-01 | 10/20/2003 | $ 1,078.00 |
| | | | 30116645-01 | 10/20/2003 | $ 1,072.00 |
| | | | 40012942-01 | 12/12/2003 | $ 885.00 |
| Aubuchon, William | Self | 033345935 | 40108662-01 | 10/27/2004 | $ 1,350.00 |
| Aubuchon, Brittany | Brittany | 019363864 | 40116955-01 | 11/10/2004 | $ 780.00 |
| Aubuchon, William | Camille | 015059456 | 40007136-01 | 9/18/2003 | $1,345.00 |
| | | | 20004825-01 | 1/9/2002 | $2,000.00 |
| | | | 20106270-01 | 9/5/2002 | $912.00 |
| | | | 30070651-01 | 6/24/2003 | $1,175.00 |
| Aubuchon, William | Self | 015059456 | 20029944-01 | 1/25/2002 | $4,050.00 |

Prepared by:  Northshore International Insurance Services, Inc.
Date:  4/8/2008

# EXHIBIT I

## Undocumented Claims
## W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 10133759-01 | 10/25/2001 | $7,275.00 |
| | | | 40007133-01 | 9/18/2003 | $632.00 |
| | | | 30105434-01 | 9/26/2003 | $750.00 |
| Aubuchon, Pierre | Self | 033223323 | 30050354-01 | 4/15/2003 | $ 1,950.00 |
| | | | 30050337-01 | 4/1/2003 | $ 750.00 |
| | | | 20062660-01 | 3/14/2002 | $ 3,058.85 |
| Aumand, Patrick | Ryan | 008429685 | 20074792-01 | 1/24/2002 | $ 1,042.50 |
| | | | 20074794-01 | 4/2/2002 | $ 1,042.50 |
| Aumand, Patrick | Tara | 008429685 | 10121073-01 | 10/5/2001 | $ 960.00 |
| Aumand, Patrick | Patrick | 008429685 | 40033500-02 | 3/18/2004 | $ 676.87 |
| | | 008429685 | 40111905-01 | 11/1/2004 | $ 584.79 |
| Avery, Tamela | Carl | 074502519 | 10121662-01 | 7/23/2001 | $ 3,247.92 |
| | | | 10121663-01 | 7/20/2001 | $ 1,959.55 |
| Avery, Tamela | Self | 074502519 | 30131552-01 | 9/27/2003 | $ 1,690.30 |
| | | | 40007183-01 | 12/18/2003 | $ 1,375.00 |
| | | | 40003978-01 | 12/22/2003 | $ 569.89 |
| Bacon, Donald | Jessie | 028164971 | 10101402-01 | 7/17/2001 | $4,600.00 |
| | | | 10104747-01 | 7/17/01-7/19/01 | $1,900.00 |
| Bacon, Donald | Self | 028164971 | 20128733-01 | 11/4/2002 | $1,867.00 |
| | | | 20128044-01 | 11/8/2002 | $1,044.00 |
| Bairos, Joao | Patrick | 025529026 | 40057760-02 | 5/10/2004 | $ 968.00 |
| | | | 40057757-02 | 5/5/2004 | $ 918.00 |
| Bairos, Joao | Maria | 025529026 | 40087598-02 | 8/3/2004 | $ 1,650.00 |
| | | | 40057755-01 | 5/3/2004 | $ 632.00 |
| Baker, James | Self | 009603842 | 20068696-01 | 5/9/02-5/10/02 | $ 12,920.50 |
| Baker, Joseph | Self | 005462572 | 10139190-01 | 9/24/2001 | $ 3,933.00 |
| | | | 10133542-01 | 10/5/2001 | $ 1,716.00 |
| | | | 10123363-01 | 9/7/2001 | $ 997.00 |
| Baker Jr., Gary | Self | 008468618 | 40088948-01 | 7/15/2004 | $ 1,597.00 |
| Barrett, William | Self | 033600977 | 40108668-01 | 10/19/2004 | $ 1,452.79 |
| Barrows, Shannon | Jennifer | 009526734 | 40076994-01 | 7/13/2004 | $ 1,691.00 |

Prepared by:  Northshore International Insurance Services, Inc.
Date:  4/8/2008

# EXHIBIT I

## Undocumented Claims
## W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 40086850-01 | 7/27/2004 | $ 976.00 |
| | | | 40083561-01 | 7/27/2004 | $ 675.00 |
| Basque, Pauline | Self | 012348682 | 20125976-01 | 11/12/2002 | $ 1,600.00 |
| | | | 20128634-01 | 11/12/2002 | $ 1,752.00 |
| | | | 20039095-01 | 2/6/02-2/28/02 | $ 1,079.00 |
| Beauchemin, Donna | Peter | 020343481 | 20074508-01 | 8/21/2001 | $ 1,130.00 |
| Bedard, Roberta | Kristin | 049661631 | 40068857-01 | 6/15/2004 | $ 2,880.00 |
| | | | 40062607-01 | 6/14/04-6/17/04 | $ 28,130.23 |
| | | | 40066842-01 | 6/11/2004 | $ 732.00 |
| | | | 30084168-01 | 7/25/2003 | $ 620.00 |
| Bedard, Roberta | Samuel | 049661631 | 30082099-01 | 6/26/2003 | $ 2,658.00 |
| | | | 20002372-01 | 9/18/2001 | $ 1,495.00 |
| | | | 20131169-02 | 11/12/2002 | $ 1,169.00 |
| | | | 20105688-01 | 9/3/2002 | $ 923.00 |
| | | | 20118084-01 | 10/1/2002 | $ 834.00 |
| | | | 20074967-01 | 5/28/2002 | $ 784.00 |
| | | | 20102838-01 | 8/6/2002 | $ 772.00 |
| Bedard, Samuel | Self | 007820809 | 40111941-01 | 6/15/2004 | $ 3,000.00 |
| | | | 40087096-01 | 7/27/2004 | $ 2,429.00 |
| | | | 40083308-01 | 7/13/2004 | $ 1,328.00 |
| | | | 40083310-01 | 7/16/2004 | $ 1,242.00 |
| | | | 40088001-01 | 8/6/2004 | $ 1,219.00 |
| | | | 40079999-01 | 7/2/2004 | $ 820.00 |
| | | | 40076708-01 | 7/6/2004 | $ 796.00 |
| | | | 40080002-01 | 7/9/2004 | $ 796.00 |
| | | | 40083320-01 | 7/20/2004 | $ 796.00 |
| | | | 40086549-01 | 7/23/2004 | $ 796.00 |
| | | | 40088004-01 | 8/10/2004 | $ 796.00 |
| | | | 40090147-01 | 8/13/2004 | $ 796.00 |
| | | | 40090149-01 | 8/17/2004 | $ 796.00 |

Prepared by: Northshore International Insurance Services, Inc.
Date: 4/8/2008

## EXHIBIT I

### Undocumented Claims
### W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 40094356-01 | 8/31/2004 | $ 796.00 |
| | | | 40108674-01 | 7/30/2004 | $ 796.00 |
| | | | 40025615-01 | 12/23/03-12/24/03 | $ 776.00 |
| | | | 40083311-01 | 7/16/2004 | $ 735.00 |
| | | | 40051720-01 | 4/30/2004 | $ 708.00 |
| Bedard, Samuel | Samuel | 007820809 | 4009165401 | 8/24/2004 | $ 1,346.00 |
| Bellavance, Marc | Self | 008420415 | 40008990-01 | 1/13/2004 | $ 1,060.00 |
| | | | 40009236-02 | 1/13/2004 | $ 741.00 |
| Bellavance, Marc | Joyce | 008420415 | 40066847-01 | 5/18/2004 | $ 5,356.84 |
| Beloin, Gregory | Kehaulant | 014580694 | 20130289-01 | 10/16/2002 | $ 3,000.00 |
| | | | 30004587-01 | 11/22/2002 | $ 500.00 |
| Beloin, Gregory | Jaime | 014580694 | 40100864-01 | 10/14/04-10/15/04 | $ 6,063.71 |
| | | | 20125032-01 | 10/16/02-10/19/02 | $ 2,250.54 |
| Bergeron, Andrew | Self | 008504811 | 20128168-01 | 10/22/2002 | $ 1,780.00 |
| | | | 20119671-01 | 10/3/2002 | $ 1,397.90 |
| | | | 20116417-01 | 10/3/2002 | $ 1,000.00 |
| | | | 20121443-01 | 10/3/2002 | $ 525.00 |
| Berlo, Eric | Trevor | 026509910 | 40098096-01 | 9/23/2004 | $ 1,280.00 |
| | | | 40101823-02 | 9/23/2004 | $ 550.00 |
| Beroney, Kenny | Mitchell | 002566995 | 20118518-01 | 10/2/2002 | $ 664.00 |
| | | | 20104343-01 | 5/29/2002 | $ 1,983.83 |
| Beroney, Kenny | Rhonda | 002566995 | 40094266-01 | 9/14/2004 | $ 786.99 |
| Bezanson, Lorraine | Self | 028244110 | 40051725-01 | 4/27/2004 | $ 1,218.00 |
| | | | 40061657-01 | 5/6/04-5/25/04 | $ 1,024.00 |
| | | | 40054136-01 | 4/22/04-4/29/04 | $ 941.00 |
| | | | 40012994-01 | 1/14/2004 | $ 642.50 |

Prepared by:  Northshore International Insurance Services, Inc.
Date:  4/8/2008

# EXHIBIT I

## Undocumented Claims
### W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 40072823-01 | 6/3/04-6/8/04 | $ 548.00 |
| Bezio, Christopher | Mary | 006661443 | 40083348-01 | 7/17/04-7/18/04 | $ 2,199.50 |
| | | | 40083340-01 | 5/21/04-5/28/04 | $ 2,023.51 |
| | | | 40083344-01 | 7/15/04-7/16/04` | $ 912.32 |
| Bezio, Christopher | Self | 006661443 | 40112562-01 | 11/4/2004 | $ 646.00 |
| Bicknell, Justin | Self | 008701394 | 40000292-01 | 12/11/2003 | $ 522.90 |
| Bielski, David | Self | 029766747 | 40094210-01 | 8/31/2004 | $ 1,730.19 |
| Bierly, Naomi | Dennis | 009449989 | 40009259-01 | 1/13/2004 | $ 1,793.22 |
| | | | 40015544-01 | 1/21/2004 | $ 673.13 |
| | | | 40014267-01 | 1/21/2004 | $ 610.00 |
| Bierly, Naomi | Self | 009449989 | 40053935-01 | 5/3/2004 | $ 760.00 |
| Blodgett, Mark | Self | 001405564 | 40092583-01 | 8/26/2004 | $ 2,284.85 |
| | | | 40088014-01 | 8/3/2004 | $ 2,243.32 |
| | | | 40007206-01 | 12/26/2003 | $ 1,427.00 |
| | | | 40072832-01 | 6/16/2004 | $ 1,471.00 |
| | | | 40007208-01 | 12/31/2003 | $ 959.84 |
| | | | 40083367-01 | 6/15/2004 | $ 769.00 |
| Blood, Elizabeth | Self | 024547760 | 40107821-01 | 10/21/2004 | $ 797.00 |
| | | | 40116675-01 | 8/20/2004 | $ 880.00 |
| Boucher, Dennis | Self | 032368751 | 40026697-01 | 1/27/2004 | $ 4,169.00 |
| | | | 40018139-01 | 1/27/2004 | $ 1,507.00 |
| | | | 40094389-01 | 8/31/2004 | $ 903.00 |
| Boucher, Dennis | Maria | 032368751 | 40000183-01 | 11/26/2003 | $ 7,565.61 |
| | | | 40088019-02 | 8/2/2004 | $ 7,819.75 |
| | | | 40072839-01 | 6/22/2004 | $ 1,350.00 |
| | | | 40087637-02 | 8/2/2004 | $ 680.00 |
| | | | 30110767-01 | 10/9/2003 | $ 825.00 |
| Boudreau, Pierre | Patricia | 008449730 | 40008962-01 | 10/7/2003 | $ 672.00 |
| Boyer, James | Zachary | 096585841 | 40111451-01 | 11/17/2004 | $ 1,005.15 |
| Braden, Arnold | Self | 005443804 | 40076753-01 | 7/9/2004 | $ 2,200.00 |

**EXHIBIT I**

Undocumented Claims

W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 40083377-01 | 4/4/2004 | $ 1,404.50 |
| | | | 40080016-01 | 7/9/2004 | $ 1,254.00 |
| Bradley, Dennis | Hannah | 383963782 | 10137231-01 | 6/9/01-6/14/01 | $ 17,135.19 |
| | | | 10138220-01 | 8/16/2001 | $ 760.00 |
| Bradley, Dennis | Self | 383963782 | 40043443-01 | 4/2/2004 | $ 725.00 |
| Bradley, Dennis | Carrie | 383963782 | 40006225-01 | 12/22/2003 | $ 775.15 |
| | | | 40007403-01 | 12/30/2003 | $ 584.05 |
| | | | 20051839-01 | 3/6/2002 | $ 585.00 |
| Brea, Leo | Self | 556277217 | 20038343-01 | 1/16/2002 | $ 1,050.75 |
| Brochu, Gary | Janine | 009464305 | 40116966-01 | 11/19/2004 | $ 645.00 |
| Brown, Kelly | Self | 009700903 | 40029278-01 | 3/2/2004 | $ 981.45 |
| | | | 40088033-01 | 8/12/2004 | $ 683.59 |
| | | | 40094720-01 | 9/12/04-9/13/04 | $ 610.55 |
| | | | 40094370-01 | 9/11/2004 | $ 544.51 |
| Bryant, Jeffrey | Julia | 032646418 | 30033519-01 | 4/1/2003 | $ 1,025.00 |
| | | | 20118475-01 | 10/3/2002 | $ 995.00 |
| | | | 20115304-01 | 9/6/2002 | $ 800.00 |
| Bryant, Jeffrey | Self | 032646418 | 40010500-01 | 12/26/2003 | $ 888.00 |
| Bryson, Ronnie | Self | 002603643 | 40076763-01 | 7/1/2004 | $ 572.55 |
| Buckner, Marlow | Kristen | 020860582 | 40013143-01 | 1/16/2004 | $ 662.00 |
| Bulger, Mary | Self | 001381349 | 30054117-02 | 4/24/2003 | $ 872.00 |
| Burgoyne, Raymond | Self | 0032637323 | 30101582-02 | 8/18/03-9/20/03 | $ 104,379.88 |
| | | | 30090959-01 | 6/18/03-6/30/03 | $ 78,363.89 |
| | | | 30090959-03 | 7/1/03-8/17/03 | $ 165,000.00 |
| | | | 30090959-02 | 6/18/03-6/30/03 | $ 44,037.52 |
| | | | 30090959-04 | 7/1/03-8/17/03 | $ 34,096.30 |
| | | | 30090959-08 | 6/18/03-6/30/03 | $ 38,061.61 |
| | | | 30090959-07 | 7/1/03-8/17/03 | $ 30,673.35 |
| | | | 30116262-02 | 9/17/03-10/15/03 | $ 28,439.10 |
| | | | 30090959-10 | 6/18/03-6/30/03 | $ 17,353.71 |
| | | | 30090959-05 | 7/1/03-8/17/03 | $ 3,933.50 |

# EXHIBIT I

Undocumented Claims

W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 30082578-01 | 7/3/03-7/27/03 | $ 2,805.00 |
| | | | 30071422-01 | 6/13/2003 | $ 1,450.00 |
| | | | 30102284-01 | 8/30/03-9/16/03 | $ 1,595.00 |
| | | | 40009271-01 | 11/1/03-11/30/03 | $ 1,360.00 |
| | | | 30071019-01 | 6/20/03-6/27/03 | $ 1,500.00 |
| | | | 30092342-01 | 7/28/03-8/8/03 | $ 1,320.00 |
| | | | 40009280-01 | 12/9/2003 | $ 1,007.00 |
| | | | 30009760-01 | 11/27/2002 | $ 1,059.00 |
| | | | 30094424-01 | 7/22/2003 | $ 1,568.80 |
| | | | 20074973-01 | 5/15/2002 | $ 799.30 |
| | | | 40004019-01 | 11/12/2003 | $ 782.00 |
| | | | 40057838-01 | 5/5/2004 | $ 782.00 |
| | | | 30094428-01 | 8/16/03-8/22/03 | $ 880.00 |
| | | | 40021067-10 | 1/9/2004 | $ 674.00 |
| | | | 30094440-01 | 8/23/03-8/29/03 | $ 880.00 |
| | | | 30092365-01 | 8/9/03-8/15/03 | $ 770.00 |
| Burns, Kristi | Self | 022563525 | 20023402-01 | 1/13/2002 | $ 2,351.89 |
| | | | 40057846-02 | 5/11/2004 | $ 1,210.00 |
| | | | 40099955-01 | 9/20/2004 | $ 1,138.80 |
| | | | 40057844-02 | 5/11/2004 | $ 965.00 |
| Butland, Dale | Susan | 023408251 | 40087537-01 | 8/10/2004 | $ 1,238.88 |
| | | | 40021092-01 | 2/6/2004 | $ 1,133.30 |
| | | | 40066871-01 | 6/11/2004 | $ 695.35 |
| Cahoon, Deborah | Timothy | 003421295 | 20079618-01 | 6/11/2002 | $ 2,204.94 |
| | | | 40116109-01 | 12/8/2004 | $ 802.00 |
| Cannon, Michael | Beth | 015663654 | 40049437-01 | 4/9/2004 | $ 2,909.73 |
| | | | 40049471-01 | 4/9/2004 | $ 2,070.00 |
| Canual, Robert | Self | 018548814 | 40057851-01 | 4/28/2004 | $ 930.80 |
| | | | 40015564-01 | 1/12/2004 | $ 1,650.00 |
| Carlson, Richard | Candy | 002527879 | 20106921-01 | 8/19/2002 | $ 1,859.00 |
| | | | 20105518-01 | 8/19/2002 | $ 1,621.93 |

Prepared by: Northshore International Insurance Services, Inc.

Date: 4/8/2008

# EXHIBIT I

Undocumented Claims

W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| Carlson, Richard | Stacey | 002527879 | 40049491-01 | 4/27/04-4/28/04 | $ 850.42 |
| Case, Roger | Self | 073602295 | 20102031-01 | 7/19/2002 | $ 731.17 |
| | | | 40083411-01 | 7/30/2004 | $ 750.00 |
| | | | 40054161-01 | 5/13/2004 | $ 700.00 |
| Cashin, William | Eileen | 034321392 | 20120618-01 | 10/15/2002 | $ 1,230.00 |
| Chabot, Roger | Self | 007764135 | 40069812-01 | 6/11/2004 | $ 2,126.00 |
| | | | 40069813-01 | 6/11/2004 | $ 973.00 |
| Chamberlain, Carol | Self | 002304552 | 20120467-01 | 10/11/2002 | $ 1,049.25 |
| | | | 20110757-01 | 10/11/2002 | $ 710.00 |
| Chamberlain, Marcel | Self | 002265924 | 10103096-01 | 7/28/01-8/1/01 | $ 61,739.93 |
| | | | 40099981-01 | 6/23/2004 | $ 2,323.80 |
| | | | 40023665-01 | 2/17/2004 | $ 1,625.00 |
| | | | 20026926-01 | 9/23/2001 | $ 505.55 |
| Chamberlain, Nancy | Self | 008429649 | 20074977-01 | 5/20/2002 | $ 1,912.95 |
| | | | 20106066-01 | 9/6/2002 | $ 1,717.07 |
| | | | 20074978-01 | 5/21/2002 | $ 592.00 |
| Chartier, John | Self | 055329429 | 40029331-01 | 12/3/2003 | $ 3,000.00 |
| | | | 20008272-01 | 1/4/2002 | $ 1,395.68 |
| | | | 40029326-01 | 11/17/03-11/20/03 | $ 1,150.00 |
| | | | 40005739-01 | 12/3/03-12/19/03 | $ 902.50 |
| | | | 40029327-01 | 11/20/2003 | $ 1,000.00 |
| | | | 40029332-01 | 12/5/2003 | $ 850.00 |
| | | | 40029335-01 | 12/12/03-12/17/03 | $ 850.00 |
| | | | 40007588-01 | 12/23/03-12/24/03 | $ 850.00 |
| | | | 40029324-01 | 11/20/03-11/26/03 | $ 850.00 |
| | | | 40029329-01 | 11/28/03-12/4/03 | $ 850.00 |
| | | | 40049689-01 | 11/19/2003 | $ 539.00 |
| Chauvin, Richard | Self | 033382809 | 20104111-01 | 7/30/2002 | $ 2,220.00 |
| | | | 30006092-01 | 7/9/2002 | $ 1,440.00 |
| | | | 20105616-01 | 8/26/02-8/28/02 | $ 1,605.00 |
| | | | 20105998-01 | 7/25/2002 | $ 11,114.46 |

# EXHIBIT I

## Undocumented Claims

### W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 20116488-01 | 8/28/2002 | $ 1,050.00 |
| | | | 20108369-01 | 7/31/02-8/14/02 | $ 900.00 |
| | | | 20116775-01 | 7/19/02-7/31/02 | $ 780.00 |
| | | | 20108367-01 | 7/31/02-8/2/02 | $ 585.60 |
| | | | 20117048-01 | 7/9/2002 | $ 1,509.85 |
| | | | 20103922-01 | 8/25/2002 | $ 522.61 |
| Cheney, Phillip | Elizabeth | 022329302 | 30061997-01 | 5/15/2003 | $ 2,947.00 |
| | | | 30050108-01 | 4/30/2003 | $ 1,217.00 |
| Cheney, Phillip | Self | 022329302 | 20002699-01 | 12/6/2001 | $ 1,545.00 |
| | | | 20004804-01 | 1/7/2002 | $ 1,950.00 |
| Clark, Donald | Jane | 014368897 | 40087344-02 | 8/3/2004 | $ 2,190.00 |
| | | | 40099990-01 | 10/1/2004 | $ 1,656.00 |
| | | | 40090173-02 | 8/3/2004 | $ 560.00 |
| Clayton, Jason | Constance | 231084505 | 30031103-01 | 2/12/03-2/13/03 | $ 1,568.92 |
| Clayton, Jason | Self | 231084505 | 10145257-01 | 11/27/2001 | $ 800.00 |
| Companion, Susan | Self | 008523777 | 40114264-01 | 11/17/2004 | $ 631.75 |
| | | | 40101892-01 | 10/7/2004 | $ 545.00 |
| Corey, Erika | Emma | 058622424 | 40090970-01 | 5/27/03-12/17/03 | $ 1,520.00 |
| Craker, Peggy | Self | 455720740 | 40005461-01 | 1/6/2004 | $ 4,053.79 |
| | | | 40099653-01 | 8/16/2004 | $ 1,380.00 |
| | | | 40014685-02 | 1/30/04-2/2/04 | $ 1,027.94 |
| | | | 40088065-01 | 8/16/2004 | $ 1,000.00 |
| | | | 40013104-01 | 1/6/2004 | $ 958.00 |
| | | | 40018172-01 | 1/23/2004 | $ 616.00 |
| Crammond, Gary | Gary | 075381957 | 10120236-01 | 7/25/2001 | $ 688.16 |
| Currin, Stephen | Self | 312621090 | 40018193-01 | 1/12/2004 | $ 1,484.66 |
| | | | 40007273-01 | 12/23/2003 | $ 1,041.30 |
| | | | 40018194-01 | 1/12/2004 | $ 1,350.00 |
| Currin, Stephen | Anne Marie | 312621090 | 40018180-02 | 1/22/2004 | $ 1,197.55 |
| Currin, Stephen | Self | 312621090 | 40108030-01 | 10/26/2004 | $ 1,000.00 |
| Dahlberg, Eric | Self | 008460014 | 40100001-01 | 9/24/2004 | $ 2,131.00 |

Prepared by: Northshore International Insurance Services, Inc.
Date: 4/8/2008

## EXHIBIT I

Undocumented Claims

W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Billed Amount |
|----------|----------|-----------|--------------|--------------------|---------------|
| | | | 40080091-01 | 7/7/2004 | $ 755.00 |
| | | | 40111474-01 | 11/5/2004 | $ 500.00 |
| Dahlberg, Eric | Amanda | 008460014 | 20104824-01 | 7/10/2002 | $ 1,583.56 |
| Dahlberg, Eric | Daniel | 008460014 | 10109548-01 | 8/21/2001 | $ 1,650.00 |
| Dailey, Alicia | Mark | 009629575 | 20038916-01 | 1/4/2002 | $ 2,701.94 |
| | | | 40108347-01 | 10/6/04-11/9/04 | $ 1,005.00 |
| Dailey, Alicia | Cory | 009629575 | 20068555-01 | 5/21/2002 | $ 1,520.00 |
| Dailey, Alicia | Self | 009629575 | 40096580-01 | 8/3/04-9/28/04 | $ 740.00 |
| Daly, Richard | Self | 157369360 | 40092643-01 | 8/24/2004 | $ 2,817.00 |
| Daly, Richard | Mary | 157369360 | 40090194-01 | 6/3/2004 | $ 983.25 |
| | | | 20105685-01 | 7/22/02-7/23/02 | $ 892.00 |
| Dansereau, Todd | Hillary | 008706340 | 40108785-01 | 10/28/2004 | $ 552.00 |
| Darby, Wayne | Self | 174360913 | 20017386-01 | 1/15/2002 | $ 1,696.00 |
| Daugirda, Thomas | Self | 008483480 | 40078741-01 | 5/22/2004 | $ 812.70 |
| Davis, David | Jaime | 258868992 | 40008509-01 | 12/10/2003 | $ 4,425.00 |
| Davis, David | Self | 258868992 | 40087095-01 | 7/30/2004 | $ 1,576.00 |
| | | | 40069829-01 | 6/15/2004 | $ 795.02 |
| Davis, David | Josiah | 258868992 | 40071950-01 | 6/30/2004 | $ 2,090.00 |
| Davis, David | Julie | 258868992 | 40111864-01 | 11/1/2004 | $ 900.00 |
| | | | 40096286-01 | 9/8/2004 | $ 729.00 |
| Davis, David | Joshua | 258868992 | 40115257-01 | 11/11/2004 | $ 774.65 |
| Deberadinis, Kenneth | Debra | 018467864 | 10121386-01 | 7/11/2001 | $ 5,006.48 |
| | | | 10102388-01 | 7/11/2001 | $ 5,470.00 |
| Decker, Ginger | Self | 007546635 | 40044465-02 | 4/8/2004 | $ 1,300.00 |
| Decoster, Mechelle | Self | 016645976 | 30052189-02 | 4/14/03-4/15/03 | $ 977.38 |
| Disilits, Raymond | Self | 001386202 | 40044466-01 | 4/5/2004 | $ 1,029.41 |
| Dipace, Tricia | Self | 013708849 | 40001629-01 | 12/25/2003 | $ 2,500.00 |
| Dipace, Tricia | Joshua | 013708849 | 40009460-01 | 12/25/03-12/27/03 | $ 2,567.53 |
| Donaldson, Jeffrey | Heather | 069625060 | 40102094-02 | 9/14/2004 | $ 1,039.73 |
| Downie, Dana | Self | 021626013 | 10108270-01 | 8/13/2001 | $ 1,153.00 |
| Downs-Will, Bridget | Self | 260271908 | 20031776-01 | 1/10/2002 | $ 900.00 |

## EXHIBIT I

Undocumented Claims

W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 20059563-01 | 3/4/2002 | $ 1,235.50 |
| Doyle, Florence | Self | 009500618 | 20109620-01 | 9/12/2002 | $ 808.72 |
| | | | 20112185-01 | 9/12/2002 | $ 925.00 |
| Doyle, Florence | Edward | 009500618 | 40049721-01 | 4/28/2004 | $ 622.00 |
| Doyon, Donald | Jamie | 008405989 | 20093306-01 | 7/12/2002 | $ 946.00 |
| Driscoll, Carl | Self | 20065180 | 20065180-01 | 5/24/2002 | $ 1,735.00 |
| Drummond, William | Self | 014525854 | 40113659-01 | 11/13/2004 | $ 1,757.80 |
| Dubuque, Michael | Kary | 008709655 | 40114281-01 | 10/28/2004 | $ 1,818.00 |
| | | | 40061061-01 | 5/27/2004 | $ 1,016.00 |
| | | | 40111484-01 | 10/31/2004 | $ 675.00 |
| Dubuque, Michael | Adam | 008709655 | 40111919-01 | 10/31/04-11/1/04 | $ 865.51 |
| Duell, Stephen | Self | 076441337 | 40080132-01 | 6/25/2004 | $ 644.53 |
| Dufort, Marilyn | Self | 029365043 | 40060239-01 | 5/25/2004 | $ 1,079.00 |
| Dunn, Dana | Kevin | 008548687 | 10108262-01 | 8/10/2001 | $ 1,172.00 |
| Dunn, Dana | Kathleen | 008548687 | 40069869-01 | 4/21/2004 | $ 2,189.19 |
| Durand, Anthony | Self | 028323977 | 20039127-01 | 2/20/02-2/22/02 | $ 2,507.50 |
| | | | 20039086-01 | 2/16/2002 | $ 1,549.75 |
| | | | 20124958-01 | 10/28/2002 | $ 868.00 |
| Durham, Jason | Self | 155624125 | 20127631-01 | 10/21/2002 | $ 2,362.25 |
| | | | 10105366-01 | 7/12/01-7/13/01 | $ 1,914.30 |
| | | | 10112035-01 | 7/25/2001 | $ 971.00 |
| | | | 10105143-01 | 7/10/2001 | $ 961.00 |
| | | | 40091954-01 | 8/30/2004 | $ 857.50 |
| | | | 10113348-01 | 7/23/2001 | $ 584.00 |
| | | | 10105454-01 | 7/20/2001 | $ 565.00 |
| Durkin, Kathleen | Self | 030302964 | 20105428-01 | 8/19/2002 | $ 2,555.25 |
| | | | 20106127-01 | 7/25/2002 | $ 2,168.00 |
| | | | 40044506-01 | 3/8/2004 | $ 1,890.93 |
| | | | 40031139-01 | 2/6/2004 | $ 1,571.47 |
| | | | 20109759-01 | 8/19/2002 | $ 1,450.00 |
| | | | 20106116-01 | 4/9/2002 | $ 867.00 |

Prepared by: Northshore International Insurance Services, Inc.
Date: 4/8/2008

## EXHIBIT I

Undocumented Claims

W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 20109702-01 | 7/25/2002 | $ 900.00 |
| | | | 20026848-01 | 12/31/2001 | $ 827.00 |
| Duso, Linda | Self | 059427015 | 10120231-01 | 7/19/2001 | $ 617.33 |
| Duso, Bernard | Erika | 078662855 | 40004029-01 | 12/22/2003 | $ 1,650.99 |
| | | | 40000186-01 | 12/6/2003 | $ 1,588.15 |
| | | | 40064977-01 | 5/26/2004 | $ 1,478.00 |
| | | | 20052946-01 | 1/24/02-1/25/02 | $ 1,365.20 |
| | | | 40054182-01 | 5/7/2004 | $ 1,125.00 |
| | | | 40007596-01 | 12/6/2003 | $ 1,092.00 |
| | | | 40111794-01 | 10/21/2004 | $ 1,131.34 |
| | | | 30115793-01 | 10/14/2003 | $ 1,069.00 |
| | | | 40054183-01 | 5/7/2004 | $ 1,540.00 |
| | | | 40088481-01 | 5/5/2004 | $ 895.39 |
| | | | 30129888-01 | 11/24/03-11/25/03 | $ 2,118.00 |
| | | | 40001528-01 | 11/24/03-11/26/03 | $ 905.00 |
| | | | 40067516-01 | 6/7/2004 | $ 579.77 |
| Duso, Bernard | Julia | 078662855 | 20121456-01 | 7/11/2002 | $ 1,208.31 |
| | | | 40092663-02 | 7/20/2004 | $ 762.40 |
| Duso, Bernard | Self | 078662855 | 30082571-01 | 7/21/2003 | $ 725.00 |
| Eastman, Robert | Darlene | 144442179 | 20038972-01 | 2/7/2002 | $ 2,793.21 |
| Eaton, Robert | Self | 010526432 | 20025643-01 | 2/20/2002 | $ 3,293.20 |
| | | | 40067442-02 | 5/19/2004 | $ 4,000.00 |
| | | | 40067442-01 | 5/19/2004 | $ 4,000.00 |
| | | | 40060492-01 | 5/19/2004 | $ 1,507.00 |
| Eaton, Robert | Elizabeth | 010526432 | 40087297-01 | 7/30/2004 | $ 3,000.00 |
| | | | 40078318-01 | 7/30/04-8/1/04 | $ 4,797.56 |
| | | | 40029432-01 | 2/20/2004 | $ 715.00 |
| Ecker, Harry | Self | 043361286 | 40001779-01 | 12/8/2003 | $ 1,601.00 |
| Ecker, Harry | Robert | 043361286 | 40000339-01 | 12/8/2003 | $ 1,586.00 |
| Ellis, Steven | Kathryn | 0265021330 | 40009467-02 | 12/2/03-12/31/03 | $ 2,117.00 |
| | | | 40057889-02 | 5/7/2004 | $ 1,171.00 |

Prepared by:  Northshore International Insurance Services, Inc.
Date:  4/8/2008

# EXHIBIT I

Undocumented Claims

W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 40069939-01 | 6/14/2004 | $ 954.00 |
| | | | 40061935-01 | 5/14/2004 | $ 674.00 |
| | | | 40113784-01 | 11/4/2004 | $ 674.00 |
| Ellis, Steven | Courtney | 0265021330 | 20115394-01 | 9/9/2002 | $ 5,165.00 |
| Ellsworth, Jeffrey | Karen | 019461996 | 40111493-01 | 11/12/2004 | $ 3,018.00 |
| | | | 40098808-02 | 8/18/2004 | $ 2,167.00 |
| | | | 40115303-01 | 11/16/04-11/23/04 | $ 1,221.44 |
| | | | 40111490-01 | 11/12/2004 | $ 1,327.11 |
| | | | 40116153-01 | 11/13/2004 | $ 1,010.00 |
| Ewertz, Deborah | David | 525132745 | 40088945-01 | 1/12/2004 | $ 1,270.12 |
| | | | 40060050-01 | 1/12/2004 | $ 800.00 |
| Feldmus, Aaron | Chelsey | 006689109 | 40044520-01 | 4/5/2004 | $ 881.00 |
| Feldmus, Aaron | Felicia | 006689109 | 40088499-01 | 8/6/2004 | $ 550.00 |
| Ferland, Cynthia | Self | 008506725 | 40114289-01 | 11/14/2004 | $ 2,068.76 |
| | | | 10123446-01 | 10/2/2001 | $ 1,120.00 |
| | | | 40115312-01 | 11/18/2004 | $ 607.00 |
| | | | 40114288-01 | 11/14/2004 | $ 503.00 |
| Fillo, Joseph | Self | 048486181 | 40116170-01 | 11/30/2004 | $ 988.00 |
| Firda, Thomas | Self | 016648757 | 40077929-01 | 7/8/2004 | $ 1,650.00 |
| | | | 40099562-01 | 8/10/2004 | $ 1,040.00 |
| Flagg, Donna | Self | 141628392 | 40004042-01 | 11/18/2003 | $ 1,223.74 |
| | | | 40054235-01 | 4/25/2004 | $ 902.00 |
| | | | 40064990-01 | 4/25/2004 | $ 527.00 |
| Fletcher, Rosalie | Self | 008586909 | 40049744-01 | 2/19/2004 | $ 581.34 |
| Florence, Tricia | Teagan | 503045563 | 20116341-01 | 9/25/2002 | $ 1,161.21 |
| Florence, Tricia | Self | 503045563 | 20008939-01 | 7/20/2001 | $ 1,068.10 |
| | | | 20008938-01 | 7/20/2001 | $ 698.00 |
| Florence, Tricia | Taylor | 503045563 | 40029438-01 | 2/22/2004 | $ 748.71 |
| Forrest, Chad | Chad | 136584483 | 20104030-01 | 10/11/2001 | $ 1,208.00 |
| | | | 40096690-02 | 9/4/2004 | $ 736.00 |
| | | | 20104026-01 | 10/11/2001 | $ 512.00 |

Prepared by: Northshore International Insurance Services, Inc.
Date: 4/8/2008

**EXHIBIT I**

Undocumented Claims

W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| Forrest, Chad | Jasmyne | 136584483 | 20104045-01 | 1/22/2002 | $ 730.00 |
| Fox, Melissa | Self | 535047996 | 40116173-01 | 11/29/2004 | $ 1,245.00 |
| | | | 40096293-01 | 9/14/2004 | $ 1,650.00 |
| Fredrette, Ronald | Joshua | 009461417 | 40015755-01 | 1/2/04-1/3/04 | $ 1,494.46 |
| Furst, Daniel | Self | 006721188 | 20106105-01 | 7/26/2002 | $ 1,971.23 |
| Furst, Daniel | Jeremy | 006721188 | 30069920-01 | 6/19/2003 | $ 815.00 |
| Furst, Daniel | Jeffrey | 006721188 | 40092677-02 | 8/16/2004 | $ 640.50 |
| | | | 20121610-01 | 9/12/2002 | $ 1,160.00 |
| Furst, Daniel | Diane | 006721188 | 40115327-01 | 11/10/2004 | $ 583.18 |
| Gagne, Brian | Rebecca | 022525330 | 10103546-01 | 7/20/01-7/21/01 | $ 2,001.56 |
| Gagne, Brian | Charlene | 022525330 | 40083463-01 | 7/19/2004 | $ 950.00 |
| Gahan, Nancy | Self | 888100132 | 40061065-01 | 5/21/2004 | $ 2,094.00 |
| | | | 40092686-01 | 8/26/2004 | $ 1,045.00 |
| | | | 40070768-01 | 6/17/2004 | $ 751.00 |
| Gahan, Nancy | Philip | 888100132 | 40086659-02 | 7/21/2004 | $ 1,132.26 |
| Gates, Josiah | Self | 009688422 | 40042349-02 | 3/27/2004 | $ 687.02 |
| Giammolvo, Scott | Amy | 025686700 | 20127643-01 | 11/6/02-11/7/02 | $ 1,354.80 |
| Gillis, Thomas | Ashley | 004703588 | 20121449-01 | 10/10/2002 | $ 1,399.26 |
| | | | 40096697-01 | 9/17/2004 | $ 1,560.00 |
| Gillis, Thomas | Brenda | 004703588 | 40018495-01 | 1/23/2004 | $ 1,100.00 |
| Gillis, Thomas | Megan | 004703588 | 40096577-01 | 5/23/2004 | $ 966.16 |
| Ginn, Jeffrey | Self | 002384306 | 40072928-01 | 6/12/2004 | $ 1,005.43 |
| | | | 40070772-01 | 6/10/2004 | $ 942.00 |
| | | | 40067545-01 | 6/10/2004 | $ 620.00 |
| Goldsmith, Donald | Lori | 006560212 | 40061955-01 | 3/23/2004 | $ 774.40 |
| Goodfield, Robert | Self | 032366479 | 20107229-01 | 8/21/2002 | $ 755.00 |
| Goudreau, Andrew | Judy | 009325847 | 20124904-01 | 10/14/2002 | $ 1,310.10 |
| | | | 20121441-01 | 10/14/2002 | $ 685.00 |
| Goodreau, Jacques | Doreen | 009425140 | 40083494-01 | 7/22/2004 | $ 754.00 |
| Goodreau, Jacques | Self | 009425140 | 10105175-01 | 7/14/2001 | $ 875.00 |
| Graffam, Robert | Self | 007521183 | 40091910-02 | 7/14/04-8/19/04 | $ 949.00 |

Prepared by: Northshore International Insurance Services, Inc.
Date: 4/8/2008

# EXHIBIT I

## Undocumented Claims
### W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| Grant, Alan | Sarah | 030606810 | 40063720-01 | 4/30/04-5/4/04 | $ 2,940.00 |
| Grant, Alan | Rhea | 030606810 | 40047182-01 | 4/8/04-4/9/04 | $ 1,940.15 |
| | | | 40052514-01 | 4/30/2004 | $ 962.00 |
| | | | 40054272-01 | 4/27/20047 | $ 679.40 |
| Gregory, Michael | Self | 001546023 | 40087063-01 | 8/6/2004 | $ 2,151.74 |
| | | | 40095620-01 | 8/6/2004 | $ 900.00 |
| Grytebust, Albert | Stephanie | 130620640 | 40077940-01 | 7/13/2004 | $ 2,100.00 |
| | | | 40080158-01 | 7/13/2004 | $ 2,050.90 |
| | | | 40057923-01 | 5/10/2004 | $ 1,874.27 |
| Haile, Nick | Benjamin | 009561010 | 40023969-01 | 2/3/2004 | $ 1,241.71 |
| | | | 40023970-01 | 2/4/2004 | $ 601.71 |
| Haines, Jason | Kirsten | 007702700 | 40116027-01 | 12/12/2003 | $ 797.00 |
| Haley, Reginald | Sharon | 008345689 | 40100533-01 | 9/14/2004 | $ 524.28 |
| Hall, Richard | Self | 027463081 | 20105157-01 | 8/21/2002 | $ 930.00 |
| | | | 20102037-01 | 7/8/2002 | $ 1,078.00 |
| | | | 20105154-01 | 8/21/2002 | $ 631.00 |
| Hannula, Lynn | Self | 016585115 | 40056406-01 | 6/4/04-6/6/04 | $ 4,917.25 |
| | | | 40067640-01 | 6/4/2004 | $ 700.00 |
| | | | 40013247-01 | 12/30/2003 | $ 674.00 |
| Hart, Army | Self | 065480247 | 20038969-01 | 2/12/2002 | $ 4,665.04 |
| | | | 20059839-01 | 2/12/2002 | $ 3,485.00 |
| | | | 20023326-01 | 1/23/2002 | $ 1,763.96 |
| | | | 20038671-01 | 2/12/2002 | $ 1,040.00 |
| | | | 40111567-01 | 11/2/2004 | $ 1,172.41 |
| | | | 20004174-01 | 12/18/2001 | $ 790.18 |
| | | | 20021127-01 | 2/7/2002 | $ 651.69 |
| Hayward, Helen | Merlin | 008301407 | 20038983-01 | 2/7/2002 | $ 869.00 |
| Herschel, Chad | Dekota | 008488850 | 40053929-01 | 5/10/2004 | $ 1,155.00 |
| Herschel, Chad | Aimee | 008488850 | 20009103-01 | 12/11/2001 | $ 745.00 |
| | | | 40067643-01 | 6/16/2004 | $ 760.00 |
| Herschel, Chad | Self | 008488850 | 40096310-01 | 9/23/2004 | $ 667.00 |

Prepared by:  Northshore International Insurance Services, Inc.
Date:  4/8/2008

## EXHIBIT I

Undocumented Claims

W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 40095617-01 | 7/14/2004 | $ 696.00 |
| Herschel, Dennis | Self | 008549295 | 40015842-01 | 3/31/2003 | $ 1,348.00 |
| Hickey, Kristine | Self | 022666003 | 40070798-01 | 6/12/2004 | $ 950.00 |
| | | | 40070801-01 | 6/12/04-6/16/04 | $ 950.00 |
| Hoag, Jeffrey | Rhonda | 009582680 | 10097462-01 | 7/3/2001 | $ 1,936.00 |
| | | | 40001787-01 | 12/19/2003 | $ 979.28 |
| Hoag, Jeffrey | Kerri | 009582680 | 20015780-01 | 1/2/2002 | $ 1,587.00 |
| Hodgeman, Gregory | Kailianne | 008628196 | 40090259-01 | 8/9/2004 | $ 924.00 |
| Hodgeman, Gregory | Justin | 008628196 | 40042608-02 | 3/28/2004 | $ 837.00 |
| Holland, Keven | Self | 003506182 | 40094251-01 | 8/24/2004 | $ 1,925.46 |
| | | | 40026995-01 | 2/12/2004 | $ 1,460.68 |
| | | | 40090266-01 | 8/12/2004 | $ 1,334.39 |
| | | | 40116219-01 | 12/2/2004 | $ 1,134.00 |
| | | | 40072973-01 | 6/11/04-6/12/04 | $ 988.17 |
| | | | 40108941-01 | 10/15/2004 | $ 746.94 |
| | | | 40047209-01 | 3/31/2004 | $ 612.26 |
| Holland, Keven | Harley | 003506182 | 40044683-01 | 4/9/2004 | $ 2,099.00 |
| | | | 40073344-01 | 6/10/04-6/11/04 | $ 1,006.00 |
| | | | 40060518-01 | 5/14/2004 | $ 882.00 |
| | | | 40067703-01 | 6/10/2004 | $ 756.00 |
| Holland, Keven | Debra | 003506182 | 40088627-01 | 5/31/2004 | $ 594.13 |
| Holland, Keven | Christopher | 003506182 | 40088907-02 | 8/1/2004 | $ 945.91 |
| Holland, Kim | Self | 003506182 | 40013327-01 | 12/28/03-12/29/03 | $ 949.39 |
| | | | 40076991-01 | 6/23/2004 | $ 864.48 |
| | | | 40108108-01 | 10/6/2004 | $ 730.10 |
| Holland, Ralph | Self | 259178066 | 40083559-01 | 7/20/2004 | $ 1,000.00 |
| Hoover, Amy | Self | 027586977 | 40060276-01 | 6/12/04-6/18/04 | $ 3,424.17 |
| | | | 40029167-02 | 1/26/04-3/1/04 | $ 1,164.00 |
| | | | 40070805-01 | 6/10/2004 | $ 757.00 |
| Hough, Richard | Self | 114689246 | 20115351-01 | 8/18/2002 | $ 2,297.12 |
| | | | 40073308-01 | 3/26/2004 | $ 1,426.76 |

Prepared by: Northshore International Insurance Services, Inc.

Date: 4/8/2008

# EXHIBIT I

Undocumented Claims

W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 10120232-01 | 8/29/2001 | $ 1,145.50 |
| | | | 10123683-01 | 8/29/2001 | $ 960.00 |
| Hough, Richard | Joshua | 114689246 | 40105463-01 | 5/31/2004 | $ 621.88 |
| Houle, Carol | Self | 013425442 | 40117013-01 | 12/15/2004 | $ 1,600.00 |
| | | | 20010843-01 | 1/15/2002 | $ 863.00 |
| House, Jamey | Indigo | 005729454 | 20118638-01 | 10/4/2002 | $ 681.30 |
| Howell, Ryan | Alex | 010382236 | 30029926-01 | 2/24/2003 | $ 4,150.00 |
| Hudson, Joshua | Self | 052705851 | 20071827-01 | 6/19/2002 | $ 1,075.00 |
| Hughes, Bryan | Self | 011641822 | 20007746-01 | 1/15/2002 | $ 1,030.00 |
| Inburg, William | Self | 074689738 | 20124943-01 | 6/10/2002 | $ 1,114.20 |
| Jackson, Gregory | Self | 072684550 | 20118262-01 | 10/8/2002 | $ 1,825.00 |
| | | | 20112219-01 | 1/23/2002 | $ 1,730.00 |
| | | | 20002627-01 | 11/12/2001 | $ 1,404.00 |
| Jackson, Lisa | Self | 008566106 | 20103817-01 | 7/1/02-7/16/02 | $ 607.50 |
| Jankowski, Matthew | Self | 187344590 | 10114149-01 | 9/17/2001 | $ 700.00 |
| Johnson, Kenneth | Self | 007501866 | 40001991-01 | 11/26/2003 | $ 1,905.00 |
| | | | 40004194-01 | 12/17/2003 | $ 1,426.00 |
| | | | 40007419-01 | 12/17/2003 | $ 3,734.00 |
| | | | 40001994-01 | 11/26/2003 | $ 922.00 |
| | | | 40007424-01 | 12/17/2003 | $ 1,867.00 |
| Johnson, Stephanie | Self | 025561129 | 40101703-01 | 10/8/2004 | $ 1,650.00 |
| Joseph, Troy | Shannon | 009420870 | 10113424-01 | 7/21/01-7/22/01 | $ 6,563.74 |
| | | | 10099490-01 | 7/21/2001 | $ 2,648.00 |
| | | | 40027001-01 | 2/2/2004 | $ 2,132.00 |
| | | | 10121340-01 | 7/31/2001 | $ 1,720.00 |
| | | | 20102071-01 | 8/14/2002 | $ 1,500.00 |
| | | | 10113472-01 | 7/21/2001 | $ 770.00 |
| | | | 20105779-01 | 8/14/2002 | $ 800.00 |
| | | | 40061972-01 | 5/26/2004 | $ 798.00 |
| | | | 40021318-01 | 1/20/2004 | $ 687.57 |
| | | | 40029463-01 | 2/10/2004 | $ 500.00 |

**EXHIBIT I**

Undocumented Claims

W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| Joseph, Troy | Self | 009420870 | 20023303-01 | 1/10/02-1/11/02 | $ 1,855.15 |
| Joseph, Troy | Abigail | 009420870 | 20053719-01 | 3/3/2002 | $ 815.69 |
| | | | 40000203-01 | 12/13/2003 | $ 784.50 |
| | | | 20128237-01 | 11/4/2002 | $ 787.25 |
| Karads, John | Frances | 009303855 | 20013752-01 | 1/23/2002 | $ 2,350.00 |
| Kassel, Jeffrey | Self | 152484538 | 30121383-01 | 10/9/2003 | $ 1,175.00 |
| Kilgore, Douglas | Self | 231028041 | 20112238-01 | 9/14/02-9/17/02 | $ 900.00 |
| | | | 20116326-01 | 9/14/2002 | $ 635.24 |
| Kilgore, Douglas | Janna | 231028041 | 20127620-01 | 4/16/2002 | $ 702.00 |
| | | | 20128232-01 | 4/11/2002 | $ 547.20 |
| King, Arlene | Self | 014424817 | 20101798-01 | 7/18/2002 | $ 836.00 |
| | | | 40098685-01 | 9/17/2004 | $ 600.00 |
| | | | 40076999-01 | 7/8/2004 | $ 701.09 |
| King, Barry | Cynthia | 002565988 | 40031247-01 | 2/26/2004 | $ 1,888.00 |
| | | | 50013501-01 | 5/10/2004 | $ 1,840.00 |
| | | | 40061068-01 | 5/7/2004 | $ 1,715.00 |
| | | | 40102461-01 | 9/1/04-9/30/04 | $ 1,247.00 |
| | | | 40021321-02 | 1/2/04-1/27/04 | $ 1,050.00 |
| | | | 40095828-01 | 8/18/04-8/31/04 | $ 831.30 |
| | | | 40061974-01 | 5/10/2004 | $ 910.00 |
| | | | 40073310-01 | 6/28/2004 | $ 910.00 |
| | | | 40111583-01 | 10/1/04-10/31/04 | $ 821.00 |
| | | | 40007453-01 | 12/22/03-12/29/03 | $ 635.00 |
| King, Barry | Danielle | 002565988 | 40018527-01 | 1/22/2004 | $ 606.60 |
| Kingsley, Robyn | Edgar | 002586874 | 40049818-01 | 4/8/04-4/22/04 | $ 682.68 |
| Konik, Justin | Jennifer | 063642497 | 20014397-01 | 10/11/2001 | $ 3,814.48 |
| | | | 10143132-01 | 10/11/2001 | $ 3,000.00 |
| | | | 20014395-01 | 10/7/2001 | $ 870.41 |
| | | | 40088648-01 | 8/20/2004 | $ 803.11 |
| Konik, Justin | Mackenzie | 063642497 | 20014398-01 | 10/11/01-10/13/01 | $ 1,586.97 |
| Kosakowski, Linda | Dennis | 011387084 | 40067441-02 | 5/17/2004 | $ 4,000.00 |

Prepared by: Northshore International Insurance Services, Inc.
Date: 4/8/2008

# EXHIBIT I

## Undocumented Claims
## W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 40067441-01 | 5/17/2004 | $ 4,000.00 |
| | | | 40065036-01 | 5/17/2004 | $ 900.00 |
| Kucerak, Milan | Dawn | 105309851 | 40098253-02 | 8/30/2004 | $ 669.00 |
| Labeau, Darryl | Courtney | 571437672 | 20023479-01 | 2/14/07-2/17/07 | $ 9,466.25 |
| | | | 10126823-01 | 10/8/2001 | $ 651.34 |
| Labeau, Darryl | Cassidy | 571437672 | 30003824-01 | 6/4/2002 | $ 563.00 |
| Labeau, Darryl | Jeneen | 571437672 | 10125071-01 | 5/21/2001 | $ 796.00 |
| Labombard, Howard | Self | 132420934 | 40086857-01 | 7/14/2004 | $ 2,347.76 |
| | | | 40086856-01 | 7/14/2004 | $ 1,100.00 |
| | | | 50014474-01 | 7/15/2003 | $ 832.70 |
| Labombard, Howard | Margaret | 132420934 | 40065040-01 | 5/4/04-5/28/04 | $ 2,035.77 |
| | | | 40060509-01 | 5/24/2004 | $ 1,820.00 |
| | | | 40047236-01 | 4/5/2004 | $ 1,709.94 |
| | | | 40047251-01 | 4/12/2004 | $ 1,709.94 |
| | | | 40052341-01 | 4/2/04-4/29/04 | $ 1,618.89 |
| | | | 40060611-01 | 5/24/2004 | $ 1,730.44 |
| | | | 40047225-01 | 4/5/2004 | $ 1,738.50 |
| | | | 40047265-01 | 4/19/2004 | $ 1,738.50 |
| | | | 40047247-01 | 4/12/2004 | $ 1,688.50 |
| | | | 40052344-01 | 4/30/2004 | $ 1,055.47 |
| | | | 40058402-01 | 4/5/2004 | $ 850.00 |
| | | | 40058404-01 | 4/13/2004 | $ 850.00 |
| | | | 40071270-01 | 5/18/2004 | $ 850.00 |
| | | | 40089098-01 | 5/25/2004 | $ 850.00 |
| | | | 40043418-01 | 3/17/04-3/18/04 | $ 2,325.00 |
| | | | 40053938-01 | 4/5/04-4/6/04 | $ 2,000.00 |
| | | | 40002506-01 | 10/8/2003 | $ 539.00 |
| | | | 40077012-01 | 5/11/2004 | $ 539.00 |
| | | | 40080175-01 | 1/12/2004 | $ 539.00 |
| | | | 40080176-01 | 3/5/2004 | $ 539.00 |
| | | | 40102561-01 | 9/24/2004 | $ 539.00 |

# EXHIBIT I

Undocumented Claims

W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 40039474-01 | 3/17/2004 | $ 1,400.00 |
| Labrecque, Kenneth | Betany | 008600947 | 10110197-01 | 8/30/2001 | $ 4,200.00 |
| Labrecque, Kenneth | Kaitlyn | 008600947 | 20120328-01 | 9/26/2002 | $ 773.32 |
| Labrecque, Kenneth | Kendra | 008600947 | 40093432-01 | 9/3/2004 | $ 682.00 |
| | | | 40095204-01 | 9/9/2004 | $ 595.00 |
| Lacroix, Roger | Self | 008500963 | 20075526-01 | 6/11/2002 | $ 2,772.00 |
| | | | 20052881-01 | 1/17/02-1/24/02 | $ 2,837.00 |
| | | | 20038666-01 | 2/19/2002 | $ 531.00 |
| Lacroix, Roger | Brenda | 008500963 | 40086860-01 | 7/19/2004 | $ 1,700.00 |
| Lafferty, John | Self | 021404409 | 20121573-01 | 6/1/2002 | $ 732.77 |
| Laliberte, Paula | Self | 024324108 | 40116228-01 | 11/22/2004 | $ 3,346.00 |
| | | | 40098260-01 | 9/24/2004 | $ 2,690.00 |
| | | | 40098259-01 | 9/24/2004 | $ 4,329.00 |
| | | | 40102563-01 | 9/29/2004 | $ 1,756.00 |
| Landry, Erana | Self | 020349254 | 40086864-01 | 7/22/2004 | $ 1,996.00 |
| Lane, Arthur | Self | 013367937 | 20106959-01 | 8/27/2002 | $ 2,522.00 |
| | | | 20105632-01 | 8/27/2002 | $ 1,208.00 |
| | | | 20101397-01 | 7/31/2002 | $ 1,056.00 |
| | | | 20116328-01 | 9/25/2002 | $ 790.00 |
| | | | 20128853-01 | 11/12/2002 | $ 683.00 |
| Lapointe, Eric | Tyler | 010540649 | 20106441-01 | 9/3/2002 | $ 1,026.74 |
| Lapointe, Gregory | Self | 007722723 | 20001076-01 | 11/14/2001 | $ 9,453.17 |
| | | | 10123368-01 | 8/19/2001 | $ 1,702.00 |
| Lapointe, Gregory | Ann Marie | 007722723 | 20051569-02 | 3/22/2002 | $ 2,163.54 |
| | | | 20053732-01 | 1/31/2002 | $ 766.00 |
| Lapointe, Gregory | Brandon | 007722723 | 40043458-01 | 3/15/2004 | $ 795.00 |
| Larson-Moran, Denise | Self | 031404523 | 40087090-01 | 7/22/2004 | $ 3,044.00 |
| | | | 40096745-01 | 9/2/2004 | $ 2,728.00 |
| | | | 20066985-01 | 5/16/2002 | $ 1,701.41 |
| | | | 40098262-01 | 9/14/2004 | $ 1,326.00 |
| | | | 40096751-01 | 9/14/2004 | $ 1,125.00 |

Prepared by: Northshore International Insurance Services, Inc.
Date: 4/8/2008

# EXHIBIT I

## Undocumented Claims
### W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 40091884-01 | 8/20/2004 | $ 1,007.80 |
| | | | 40087087-01 | 7/22/2004 | $ 1,009.00 |
| | | | 40065043-01 | 5/28/2004 | $ 682.00 |
| | | | 40080185-01 | 7/15/2004 | $ 749.00 |
| | | | 40087089-01 | 7/15/2004 | $ 750.00 |
| Law, Gary | Jennifer | 009462740 | 40087347-01 | 8/3/2004 | $ 866.00 |
| | | | 40030784-01 | 1/11/2004 | $ 950.00 |
| Leblond, Ronald | Bonnie | 039386496 | 40098517-01 | 9/16/2004 | $ 2,205.00 |
| | | | 40096307-02 | 9/16/2004 | $ 1,056.00 |
| | | | 40098497-01 | 8/28/2004 | $ 934.00 |
| | | | 40084293-01 | 8/28/04-8/30/04 | $ 646.73 |
| | | | 40103477-01 | 8/28/2004 | $ 600.00 |
| Leblond, Ronald | Sara | 039386496 | 40062246-01 | 4/29/2004 | $ 1,072.83 |
| Leger, Giselle | Tyler | 030582208 | 20124381-01 | 10/18/2002 | $ 879.00 |
| Leger, Giselle | Self | 030582206 | 30041107-01 | 3/26/2003 | $ 672.00 |
| Lemoine, Madeline | Self | 003308295 | 40061073-01 | 5/19/2004 | $ 2,030.25 |
| | | | 40057937-01 | 5/6/04-5/7/04 | $ 1,214.00 |
| | | | 40065052-01 | 5/19/2004 | $ 1,129.00 |
| | | | 40047298-01 | 4/1/2004 | $ 781.40 |
| | | | 40100097-01 | 9/16/2004 | $ 781.40 |
| | | | 40054581-01 | 5/7/2004 | $ 897.00 |
| | | | 20110189-01 | 9/5/2002 | $ 661.70 |
| | | | 40057938-01 | 5/19/2004 | $ 616.00 |
| Letourneau, Robert | Tanya | 008582975 | 30092368-01 | 8/14/2003 | $ 825.00 |
| | | | 30092366-01 | 8/13/2003 | $ 675.00 |
| Lison, Richard | Self | 010329962 | 40049898-01 | 4/19/2004 | $ 1,830.00 |
| | | | 40054584-01 | 4/20/2004 | $ 580.00 |
| Lord, Jonathan | Abigail | 003629383 | 40031257-01 | 2/24/2004 | $ 568.50 |
| Lord, Jonathan | Self | 003629383 | 40057940-01 | 11/13/03-11/14/03 | $5,957.00 |
| Lucy, Karole | Self | 003541101 | 40021337-01 | 1/22/04-1/23/04 | $ 7,333.49 |
| | | | 40057335-01 | 1/5/2004 | $ 3,400.00 |

Prepared by: Northshore International Insurance Services, Inc.
Date: 4/8/2008

# EXHIBIT I

Undocumented Claims

W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 40013368-01 | 1/5/2004 | $ 1,583.15 |
| | | | 40015893-01 | 1/5/2004 | $ 1,704.00 |
| | | | 40015900-01 | 1/22/2004 | $ 1,015.00 |
| | | | 40015895-01 | 1/15/2004 | $ 540.00 |
| | | | 40007614-01 | 1/5/2004 | $ 528.00 |
| Lucy, Karole | Kaylie | 003541101 | 20106961-01 | 5/28/2002 | $ 1,635.00 |
| | | | 40077038-1 | 7/5/2004 | $ 1,342.42 |
| | | | 40018545-01 | 1/23/2004 | $ 1,269.00 |
| | | | 20106972-01 | 3/19/2002 | $ 1,026.00 |
| | | | 20106973-01 | 3/11/2002 | $ 534.00 |
| | | | 40077041-01 | 7/5/2004 | $ 759.00 |
| Lucy, Karole | Parker | 003541101 | 40102581-01 | 10/3/2004 | $ 1,558.25 |
| | | | 40090289-01 | 8/10/2004 | $ 526.80 |
| Machia, Miranda | Kyle | 009603901 | 20052958-01 | 2/26/02-2/27/02 | $ 1,559.61 |
| Mackay, John | Sandra | 017509173 | 20106113-01 | 8/31/2002 | $ 984.00 |
| Mackay, John | Self | 017509173 | 20110211-01 | 1/9/02-4/9/02 | $ 1,440.00 |
| Magliacane, Doreen | Self | 020582876 | 20039096-01 | 2/16/02-2/17/02 | $ 9,788.66 |
| Magoon, Wendall | Brendan | 009642362 | 20128679-01 | 11/8/2002 | $ 1,120.05 |
| | | | 20128791-01 | 11/8/2002 | $ 862.00 |
| Maitland, Kellie | Bruce | 175567963 | 40088673-02 | 8/17/2004 | $ 611.60 |
| Martin, Lynn | Self | 133500163 | 40111634-01 | 11/3/2004 | $ 1,404.62 |
| Maruszewski, Paul | Kathryn | 086487955 | 40105605-01 | 10/12/2004 | $ 765.00 |
| Maruszewski, Paul | Self | 086487955 | 40108192-01 | 10/21/2004 | $ 1,045.00 |
| Mattson, Michael | Ryan | 031547580 | 20039028-01 | 2/12/2002 | $ 629.00 |
| Maxfield, Bridgette | Branden | 009703266 | 20101836-01 | 8/8/2002 | $ 2,255.00 |
| | | | 20101834-01 | 8/8/2002 | $ 825.00 |
| Mayer, Paul | Self | 008385222 | 40007634-01 | 12/16/2003 | $ 840.00 |
| Mayville, Leonard | Self | 122284901 | 20039107-01 | 2/12/02-2/17/02 | $ 13,715.79 |
| | | | 20059798-01 | 2/12/2002 | $ 1,190.00 |
| Mayville, Leonard | Anna | 122284901 | 10124082-01 | 8/19/2001 | $ 1,350.52 |
| Mazza, John | John | 097602685 | 10118442-01 | 8/10/01-8/12/01 | $ 4,158.01 |

Prepared by:  Northshore International Insurance Services, Inc.
Date:  4/8/2008

# EXHIBIT I

Undocumented Claims

W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 20101908-01 | 7/18/2002 | $ 1,157.23 |
| | | | 10120244-01 | 7/31/01-8/24/01 | $ 655.00 |
| Mazza, John | Self | 097602685 | 40027166-01 | 2/11/2004 | $ 3,121.46 |
| McAdams, James | Self | 463997325 | 40018565-01 | 1/22/2004 | $ 853.03 |
| McCarthy, Carol | John | 014407451 | 40043497-01 | 4/20/2004 | $ 1,914.50 |
| | | | 40114477-01 | 11/10/2004 | $ 1,930.74 |
| | | | 40070068-01 | 6/29/04-6/30/04 | $ 4,403.52 |
| | | | 40073735-01 | 6/29/2004 | $ 1,419.50 |
| | | | 40062187-01 | 6/1/2004 | $ 1,370.00 |
| | | | 40049973-01 | 4/16/04-4/20/04 | $ 1,147.40 |
| | | | 40062010-01 | 5/27/2004 | $ 1,146.29 |
| | | | 40087263-01 | 6/29/2004 | $ 962.39 |
| | | | 40065087-01 | 6/1/2004 | $ 999.60 |
| | | | 40083593-01 | 7/22/04-7/23/04 | $ 842.66 |
| | | | 40087290-01 | 7/23/2004 | $ 759.50 |
| | | | 40062148-01 | 5/27/2004 | $ 707.79 |
| | | | 40077102-01 | 6/1/2004 | $ 707.79 |
| | | | 40089109-01 | 7/22/2004 | $659.07 |
| McCormick, Danny | Ronnie | 001443430 | 20118333-01 | 10/2/2002 | $ 1,567.00 |
| | | | 20118339-01 | 10/2/2002 | $ 720.00 |
| McGee, Ann | Albert | 023427002 | 40077119-01 | 6/25/2004 | $ 5,000.00 |
| | | | 40105609-01 | 10/6/2004 | $ 2,792.50 |
| | | | 40109015-01 | 10/22/2004 | $ 2,151.00 |
| | | | 40037178-02 | 3/3/2004 | $ 1,955.00 |
| | | | 40070836-01 | 6/2/2004 | $ 3,169.71 |
| | | | 40027174-01 | 2/10/2004 | $ 1,186.00 |
| | | | 10123344-01 | 10/5/2001 | $ 1,345.00 |
| | | | 40065263-01 | 6/2/2004 | $ 1,300.00 |
| | | | 40100157-01 | 10/6/2004 | $ 610.00 |
| McKirryher, Bradford | Self | 008347496 | 40100166-01 | 10/4/2004 | $ 1,950.00 |
| | | | 40089021-01 | 8/2/2004 | $ 1,213.18 |

Prepared by:  Northshore International Insurance Services, Inc.

Date:  4/8/2008

**EXHIBIT I**

Undocumented Claims

W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 30076135-01 | 6/5/2003 | $ 845.00 |
| McMahon, Kim | William | 019500104 | 40073380-01 | 6/7/04-6/8/04 | $ 1,663.00 |
| McMahon, Kim | Self | 019500104 | 20006956-01 | 11/26/2001 | $ 787.50 |
| | | | 40108212-01 | 10/11/2004 | $ 1,350.00 |
| | | | 20107223-01 | 8/25/2002 | $ 823.03 |
| | | | 20116274-01 | 9/25/2002 | $ 750.00 |
| McMahon, Kim | John | 019500104 | 40013399-01 | 1/2/2004 | $ 1,053.00 |
| | | | 40004716-01 | 1/2/2004 | $ 900.00 |
| | | | 40109020-01 | 10/19/2004 | $ 723.00 |
| | | | 40013400-02 | 1/10/2004 | $ 1,319.00 |
| Menz, John | Self | 018503058 | 40004724-01 | 11/4/2003 | $ 1,455.00 |
| Meredith, Robert | Self | 313382266 | 10133999-01 | 9/6/2001 | $ 2,150.00 |
| | | | 10127510-01 | 9/26/2001 | $ 1,311.81 |
| | | | 10119464-01 | 9/26/2001 | $ 1,255.00 |
| Metrano, Joseph | Shirley | 028306717 | 30099688-01 | 9/16/2003 | $ 925.00 |
| | | | 20107246-01 | 4/29/2002 | $ 738.40 |
| Michaud, Allan | Self | 008383447 | 20124478-01 | 10/30/2002 | $ 815.00 |
| Michaud, Carolyn | Self | 007765130 | 40013402-01 | 12/20/03-12/21/03 | $ 1,157.26 |
| | | | 40105616-01 | 10/8/2004 | $ 721.00 |
| | | | 40087108-01 | 2/13/2004 | $ 560.25 |
| Michener, Gary | Self | 098408020 | 40067725-01 | 6/2/2004 | $ 1,375.00 |
| Michener, Gary | Dori | 098408020 | 40000481-01 | 3/20/2003 | $ 1,080.00 |
| | | | 40073386-01 | 6/24/2004 | $ 569.91 |
| Millhime, James | Monica | 162400358 | 30092242-02 | 3/27/2003 | $ 842.00 |
| Misner, Brian | Ashleigh | 028548788 | 40101704-01 | 9/24/2004 | $ 1,500.00 |
| | | | 40100170-01 | 9/23/2004 | $ 767.00 |
| Misner, Brian | Self | 028548788 | 40015931-02 | 1/14/2004 | $ 767.00 |
| Molinaro, Carole | Self | 041681519 | 40080198-01 | 7/12/2004 | $ 1,066.65 |
| | | | 40087287-01 | 7/12/2004 | $ 899.00 |
| | | | 40062139-01 | 6/2/2004 | $ 790.00 |
| Monette, Steven | Self | 008384577 | 20128205-01 | 10/18/2002 | $ 2,733.65 |

Prepared by: Northshore International Insurance Services, Inc.
Date: 4/8/2008

# EXHIBIT I

Undocumented Claims

W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 40000483-01 | 12/10/2003 | $ 1,500.00 |
| | | | 40086903-01 | 8/1/2004 | $ 1,380.00 |
| | | | 30056962-01 | 5/12/2003 | $ 1,670.00 |
| | | | 30129951-01 | 12/9/03-12/10/03 | $ 3,085.87 |
| | | | 40088695-01 | 8/2/04-8/3/04 | $ 5,691.65 |
| | | | 30132468-01 | 12/10/2003 | $ 1,470.00 |
| | | | 40021517-01 | 12/9/2003 | $ 553.00 |
| Moran Sr, M. Marcus | Self | 030073006 | 50001888-01 | 8/20/03 | $ 3,339.00 |
| | | | 20022043-01 | 1/17/02 | $ 2,099.69 |
| | | | 40000228-01 | 11/6/03 | $ 2,045.00 |
| | | | 40098321-01 | 11/6/2003 | $ 1,810.00 |
| | | | 50001890-01 | 8/20/2003 | $ 1,430.00 |
| | | | 20102033-01 | 7/29/2002 | $ 750.00 |
| | | | 40027200-02 | 1/10/04-1/29/04 | $ 700.00 |
| | | | 50001889-01 | 8/20/2003 | $ 922.00 |
| | | | 40094261-01 | 9/13/2004 | $ 775.00 |
| | | | 40023996-01 | 1/3/2004 | $ 523.00 |
| Morin, Alan | Self | 551431850 | 10099483-01 | 7/17/2001 | $ 3,318.41 |
| | | | 10095725-01 | 7/17/2001 | $ 2,805.00 |
| | | | 10103577-01 | 7/17/2001 | $ 770.00 |
| Morse, Ashley | Self | 011709904 | 40061079-01 | 5/13/2004 | $ 5,717.23 |
| | | | 20120771-01 | 8/15/2002 | $ 1,019.00 |
| | | | 40060657-01 | 5/13/2004 | $ 627.00 |
| | | | 40062029-01 | 5/13/2004 | $ 510.00 |
| Morse, Nancy | Self | 019483976 | 40039515-01 | 3/31/2004 | $ 652.00 |
| Muter, Kevin | Self | 287743885 | 40095208-01 | 9/4/2004 | $ 506.00 |
| Nadin, George | Self | 048309641 | 20069912-01 | 5/28/2002 | $ 1,051.00 |
| Nason, Herbert | Self | 075303503 | 20052197-01 | 1/10/2002 | $ 588.00 |
| Neal, Travis | Ethan | 007762370 | 20128520-01 | 10/30/2002 | $ 1,738.00 |
| | | | 20128066-01 | 10/30/2002 | $ 580.00 |
| Needham, Brett | Barbara | 006725745 | 40110389-01 | 10/14/2004 | $ 864.48 |

Prepared by: Northshore International Insurance Services, Inc.
Date: 4/8/2008

# EXHIBIT I

Undocumented Claims

W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 40007771-01 | 12/8/2003 | $ 641.40 |
| | | | 40113901-01 | 11/1/2004 | $ 562.38 |
| Needham, James | Marilee | 0093858241 | 20120615-01 | 10/9/02-10/28/02 | $ 1,945.00 |
| Neves, Daniel | Self | 022543582 | 40111854-01 | 10/18/2004 | $ 687.00 |
| Newman, Mark | Jared | 002447261 | 10103549-01 | 7/11/2001 | $ 653.00 |
| Nichuals, Richard | Self | 091484722 | 40077234-01 | 7/7/2004 | $ 1,891.87 |
| | | | 40080205-01 | 7/7/2004 | $ 836.00 |
| | | | 40067749-01 | 6/11/2004 | $ 594.00 |
| | | | 40077236-01 | 7/7/2004 | $ 594.00 |
| Nielsen, Brian | Katherine | 005661867 | 40096814-01 | 9/1/2004 | $ 1,496.00 |
| | | | 40116320-01 | 10/1/03-12/31/03 | $ 1,993.98 |
| | | | 40077261-01 | 6/29/2004 | $ 1,354.56 |
| | | | 40114521-01 | 11/11/2004 | $ 1,400.00 |
| | | | 40080207-01 | 6/29/2004 | $ 1,102.00 |
| | | | 40047378-01 | 4/6/04-4/21/04 | $ 750.00 |
| | | | 40054623-01 | 3/18/2004 | $ 614.00 |
| Nielsen, Brian | Elizabeth | 005661867 | 40049690-01 | 3/16-3/17/04 | $ 814.62 |
| Norway, Donna | Self | 008407166 | 30135411-02 | 11/4/03-11/30/03 | $ 1,131.00 |
| | | | 40009620-02 | 12/2/03-12/31/03 | $ 792.00 |
| O'Connor, Keith | Self | 025681748 | 10104748-01 | 7/9/2001 | $ 700.00 |
| Olson, David | Self | 028449298 | 20101814-01 | 7/23/2002 | $ 1,996.47 |
| | | | 40047382-01 | 4/19/2004 | $ 686.50 |
| O'Neill, Susan | Samanta | 020524272 | 20102744-01 | 8/3/02-8/5/02 | $ 2,795.40 |
| | | | 20128352-01 | 11/13/2002 | $ 1,060.00 |
| | | | 20101768-01 | 8/2/2002 | $ 975.00 |
| | | | 20102747-01 | 8/2/2002 | $ 760.41 |
| Oslund, Jason | Self | 025609332 | 20003543-01 | 10/11/2001 | $ 609.84 |
| Ouellette, Roger | Self | 024303550 | 20124392-01 | 10/25/2002 | $ 3,089.32 |
| | | | 40027225-01 | 1/21/2004 | $ 3,125.00 |
| | | | 40021536-01 | 1/21/2004 | $ 5,917.17 |
| | | | 30129836-01 | 11/25/2003 | $ 1,500.00 |

Prepared by:  Northshore International Insurance Services, Inc.
Date:  4/8/2008

# EXHIBIT I

## Undocumented Claims
## W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 40018662-01 | 1/21/2004 | $ 765.00 |
| | | | 20128239-01 | 10/25/2002 | $ 600.00 |
| | | | 20130851-01 | 5/10/2002 | $ 600.00 |
| Ouellette, Roger | Joan | 024303550 | 40102642-01 | 9/29/2004 | $ 1,017.00 |
| | | | 20127985-01 | 11/4/2002 | $ 924.00 |
| | | | 40073582-01 | 6/15/2004 | $ 714.00 |
| | | | 40071240-01 | 6/18/2004 | $ 750.00 |
| | | | 10145292-01 | 11/28/2001 | $1,050.00 |
| Parsons, Mary | Stephanie | 007729785 | 40054636-02 | 4/27/2004 | $ 1,428.19 |
| Parsons, Mary | Terri | 007729785 | 40060533-01 | 5/6/2004 | $ 789.38 |
| Pasierb, Paul | Kathleen | 015382401 | 20122777-01 | 10/21/2002 | $ 2,714.02 |
| | | | 20052956-01 | 2/21/02-2/22/02 | $ 12,082.95 |
| | | | 40097725-01 | 5/15/2004 | $ 751.13 |
| | | | 40065388-01 | 5/15/04-5/16/04 | $ 668.47 |
| Patient, Heidi | Self | 022609574 | 20053717-01 | 2/26/2002 | $ 7,997.37 |
| | | | 20050243-01 | 2/26/2002 | $ 900.00 |
| | | | 20038981-01 | 2/2/2002 | $ 701.33 |
| Pederson, Louise | Stephanie | 040626217 | 40001825-01 | 12/8/2003 | $ 1,328.90 |
| | | | 40007814-01 | 12/18/2003 | $ 1,170.00 |
| | | | 40029579-01 | 12/8/03-12/11/03 | $ 11,537.52 |
| | | | 40010499-01 | 12/8/2003 | $ 570.41 |
| | | | 40029588-01 | 12/8/03-12/9/03 | $ 750.00 |
| | | | 40029594-01 | 12/10/03-12/11/03 | $ 750.00 |
| Pederson, Louise | Dwayne | 040626217 | 40058165-01 | 5/7/2004 | $ 1,121.00 |
| Pederson, Louise | Self | 040626217 | 40058166-01 | 5/10/2004 | $ 972.94 |
| | | | 40100529-01 | 9/29/2004 | $ 1,650.00 |
| Pelletier, Michael | Ashley | 005642212 | 30062819-01 | 8/18/02-12/6/02 | $ 1,300.00 |
| Pelletier, Michael | Susan | 005642212 | 30115825-01 | 10/17/2003 | $ 2,354.00 |
| Percifull, Anush | Scott | 020842563 | 20007992-01 | 1/17/2002 | $ 700.00 |
| Peterson, Martin | Lynette | 014608722 | 20020685-01 | 2/19/2002 | $ 1,075.00 |
| Pierce, Craig | Self | 030544747 | 20127639-01 | 10/22/2002 | $ 1,973.00 |

Prepared by: Northshore International Insurance Services, Inc.
Date: 4/8/2008

# EXHIBIT I

Undocumented Claims

W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 20128252-01 | 10/22/2002 | $ 813.00 |
| | | | 20058984-01 | 11/29/2001 | $ 675.00 |
| Pitkin, Fred | Self | 003422404 | 40094394-02 | 9/4/2004 | $ 1,281.57 |
| | | | 40091967-02 | 9/7/2004 | $ 1,460.00 |
| | | | 40115493-01 | 11/4/2004 | $ 1,295.00 |
| | | | 40065413-01 | 5/12/2004 | $ 532.79 |
| Poirier, Randy | Judith | 008520915 | 40073592-01 | 6/24/2004 | $ 700.69 |
| Poirier, Randy | Self | 008520915 | 40111705-01 | 11/11/2004 | $ 573.35 |
| Pucillo, Ann | Self | 016307057 | 20118400-01 | 9/30/2002 | $ 1,653.00 |
| Rabideau, Danford | Self | 114428324 | 40016456-02 | 1/27/2004 | $ 954.62 |
| | | | 40001548-01 | 12/3/2003 | $ 573.65 |
| | | | 40093086-01 | 5/7/2004 | $ 564.50 |
| Racette, Pamela | Self | 028647101 | 40062052-01 | 5/20/2004 | $ 674.00 |
| Rameau, Amy | Self | 016605290 | 20104822-01 | 8/14/2002 | $ 674.00 |
| | | | 20118030-01 | 9/26/2002 | $ 674.00 |
| Rasmussen, Duncan | Catherine | 023521311 | 40090325-01 | 7/29/2004 | $ 1,450.00 |
| Reid, John | Deanne | 127504187 | 40004067-01 | 12/19/2003 | $ 1,414.18 |
| | | | 20105595-01 | 8/14/2002 | $ 834.61 |
| | | | 40001803-01 | 12/17/2003 | $ 634.64 |
| Relihan, Maurice | Self | 002321754 | 40098482-01 | 9/1/2004 | $ 1,255.70 |
| | | | 40103476-01 | 9/1/2004 | $ 1,496.00 |
| | | | 40055852-01 | 5/17/2004 | $ 1,900.00 |
| | | | 40090326-01 | 8/9/2004 | $ 709.25 |
| Remal, Brian | Self | 013567837 | 20059699-01 | 1/2/2002 | $ 925.75 |
| | | | 20107198-01 | 8/15/2002 | $ 1,585.00 |
| | | | 20105186-01 | 8/15/2002 | $ 675.00 |
| Renzi, Dawn | Korey | 010585689 | 40105735-01 | 10/22/2004 | $ 1,530.00 |
| Renzi, Dawn | Self | 010585689 | 40086933-01 | 7/10/2004 | $ 688.00 |
| Rhoades, Joseph | Self | 023568011 | 40102650-01 | 9/30/2004 | $ 873.00 |
| Rhone, Brian | Kristal | 113729872 | 10120246-01 | 8/10/01-8/13/01 | $ 6,151.25 |
| | | | 20009924-01 | 1/3/2002 | $ 1,981.40 |

Prepared by: Northshore International Insurance Services, Inc.
Date: 4/8/2008

# EXHIBIT I

Undocumented Claims

W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 20008259-01 | 9/26/2001 | $ 984.80 |
| | | | 10133998-01 | 9/12/2001 | $ 723.30 |
| Rhone, Brian | Kandal | 113729872 | 40044757-01 | 11/24/2003 | $ 595.00 |
| Richard, Albert | Self | 004581551 | 10123698-01 | 6/26/2001 | $ 1,676.83 |
| Richard, Rene | Self | 012444181 | 20106124-01 | 8/20/2002 | $ 2,690.00 |
| | | | 30076115-01 | 7/9/2003 | $ 1,450.00 |
| | | | 40018673-01 | 11/21/2003 | $ 1,650.00 |
| | | | 30018714-01 | 11/20/2002 | $ 670.20 |
| Richard, Rene | Suzanne | 012444181 | 40077431-01 | 7/2/2004 | $ 1,019.52 |
| | | | 40073718-01 | 6/29/2004 | $ 1,450.00 |
| | | | 40098630-01 | 9/15/2004 | $ 600.00 |
| | | | 30103007-01 | 9/2/2003 | $ 674.00 |
| | | | 40013556-01 | 1/7/2004 | $ 674.00 |
| | | | 40098715-01 | 9/15/2004 | $ 675.00 |
| Richardson, Bruce | Self | 001325325 | 30107385-01 | 10/6/2003 | $ 720.00 |
| Rivard, Gloria | Self | 009583222 | 40004081-02 | 12/3/03-12/26/03 | $ 800.52 |
| Rivenburg, Scott | Tara | 100746269 | 40088963-01 | 4/20/2004 | $ 1,429.56 |
| | | | 40093097-01 | 8/4/2004 | $ 520.00 |
| Roche, Thomas | Brittany | 003363681 | 20039129-01 | 2/27/2002 | $ 4,129.00 |
| | | | 40073802-01 | 7/6/2004 | $ 1,290.00 |
| | | | 40016047-01 | 1/15/2004 | $ 1,196.00 |
| | | | 40054704-01 | 4/28/2004 | $ 1,016.00 |
| | | | 20127613-01 | 2/27/2002 | $ 867.00 |
| | | | 40083724-01 | 7/13/2004 | $ 860.00 |
| | | | 40094254-01 | 8/18/2004 | $ 891.00 |
| | | | 40093098-01 | 8/18/2004 | $ 747.00 |
| | | | 40077482-01 | 7/1/2004 | $ 732.00 |
| Rodriquez, Jason | Self | 028608894 | 20059554-01 | 3/8/2002 | $ 930.00 |
| Rosario, Louis | Self | 084585432 | 20115352-01 | 9/16/2002 | $ 2,633.18 |
| Roussib, Cathy | Self | 021566985 | 40116475-01 | 11/27/2004 | $ 1,350.00 |
| Rule, Kim | Self | 060502312 | 20038999-01 | 1/22/2002 | $ 1,150.53 |

Prepared by: Northshore International Insurance Services, Inc.
Date: 4/8/2008

## EXHIBIT I

### Undocumented Claims
### W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| Rule, Kim | Ashley | 060502312 | 20039010-01 | 11/6/2001 | $ 544.09 |
| | | | 10110131-01 | 8/30/2001 | $ 676.00 |
| Rydlewski, Darrer | Self | 064743364 | 40087622-02 | 5/18/04-6/15/04 | $ 900.00 |
| Sauve, Andre | Dawn | 088568002 | 10123183-01 | 7/31/2001 | $ 717.18 |
| Savoie, Steven | Self | 025660068 | 20103538-01 | 8/20/2002 | $ 7,382.81 |
| | | | 20105626-01 | 8/20/2002 | $ 2,000.00 |
| | | | 20105176-01 | 8/20/2002 | $ 792.00 |
| Schmid, Frank | Diane | 086402380 | 40077483-01 | 7/12/2004 | $ 1,090.35 |
| | | | 40086970-01 | 7/12/2004 | $ 800.00 |
| Schmid, Frank | Self | 086402380 | 40083725-01 | 7/7/2004 | $ 720.00 |
| | | | 40077948-01 | 7/7/2004 | $ 877.00 |
| | | | 40080665-01 | 7/7/2004 | $ 596.00 |
| | | | 40008544-02 | 1/5/2004 | $ 520.00 |
| Schoen, Walter | Self | 011344307 | 30087462-01 | 6/6/2003 | $ 635.00 |
| Scopellitti, Brian | Jennifer | 018524112 | 40027268-01 | 2/2/2004 | $ 2,348.77 |
| | | | 40009660-02 | 12/24/2003 | $ 1,428.00 |
| | | | 40009661-02 | 12/30/2003 | $ 910.00 |
| | | | 40115508-01 | 11/22/2004 | $ 750.00 |
| Seavey, Christopher | Stephanie | 004848731 | 40069650-20 | 6/1/04-6/19/04 | $ 40,482.42 |
| | | | 40088817-01 | 7/31/2004 | $ 3,395.72 |
| | | | 40095142-01 | 8/11/2004 | $ 1,667.00 |
| | | | 40097691-01 | 7/13/04-7/18/04 | $ 3,170.00 |
| | | | 20002651-01 | 11/2/2001 | $ 1,118.50 |
| | | | 40098531-01 | 7/23/2004 | $ 1,032.00 |
| | | | 40080697-01 | 7/6/2004 | $ 969.00 |
| | | | 40098791-01 | 5/21/2004 | $ 1,200.00 |
| | | | 40088820-01 | 7/31/2004 | $ 937.50 |
| | | | 40090357-01 | 8/18/2004 | $ 781.00 |
| | | | 40090358-01 | 8/18/2004 | $ 781.00 |
| | | | 40090360-01 | 7/6/04-7/11/04 | $ 1,196.00 |
| | | | 40088814-01 | 7/28/2004 | $ 711.00 |

Prepared by: Northshore International Insurance Services, Inc.
Date: 4/8/2008

**EXHIBIT I**

Undocumented Claims

W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 40069662-01 | 6/22/2004 | $ 665.00 |
| | | | 40086992-01 | 7/31/2004 | $ 660.00 |
| | | | 40088786-01 | 7/12/04-7/18/04 | $ 700.00 |
| | | | 40094263-02 | 7/6/2004 | $ 712.09 |
| | | | 40084537-01 | 5/12/2004 | $ 690.00 |
| | | | 40083747-01 | 7/17/2004 | $ 626.00 |
| | | | 40088790-01 | 7/18/2004 | $ 626.00 |
| | | | 40098788-01 | 7/16/2004 | $ 630.00 |
| | | | 40083795-01 | 5/12/2004 | $ 960.00 |
| Shapiro, Larry | Jayne | 108429234 | 40087536-01 | 7/30/2004 | $ 1,906.50 |
| | | | 10123672-01 | 10/4/2001 | $ 1,900.00 |
| | | | 40091531-01 | 2/4/2004 | $ 840.00 |
| | | | 4001071-01 | 12/18/2003 | $ 827.00 |
| Shea, William | Self | 001344277 | 20039006-01 | 1/29/2002 | $ 1,284.63 |
| Sherman, William | Self | 008561832 | 20103833-01 | 8/22/2002 | $ 1,908.00 |
| | | | 20118106-01 | 9/20/2002 | $ 1,065.00 |
| Smith, Diane | Renee | 008360969 | 40069631-01 | 6/15/2004 | $ 560.50 |
| Smith, Fred | Lisa | 006641219 | 40021596-01 | 1/27/2004 | $ 1,653.00 |
| Spears, Glen | Joy | 009423952 | 40069817-01 | 4/29/2004 | $ 3,739.20 |
| | | | 40076773-01 | 5/13/2004 | $ 2,435.00 |
| | | | 40076770-01 | 4/29/2004 | $ 2,435.00 |
| | | | 40083415-01 | 9/19/2003 | $ 1,017.61 |
| | | | 40021106-02 | 1/26/2004 | $ 7,749.07 |
| St. Cyr, Janice | Roger | 026320778 | 40097694-01 | 1/28/2004 | $ 4,152.54 |
| | | | 40097695-01 | 6/15/04-6/16/04 | $ 4,096.79 |
| | | | 40088833-01 | 8/20/2004 | $ 721.00 |
| | | | 40016083-01 | 1/28/2004 | $ 525.00 |
| St. Cyr, Janice | Self | 026320778 | 20102858-01 | 8/14/2002 | $ 500.00 |
| St. Pierre, Thomas | Self | 021404783 | 40029641-01 | 2/26/2004 | $ 3,014.00 |
| | | | 20023251-01 | 1/24/2002 | $ 649.00 |
| St. Pierre, Thomas | Susan | 021404783 | 40018842-01 | 1/13/2004 | $ 1,700.00 |

Prepared by:  Northshore International Insurance Services, Inc.
Date:  4/8/2008

# EXHIBIT I

Undocumented Claims

W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 40018839-01 | 1/13/2004 | $ 11,488.34 |
| St. Pierre, Joshua | Madison | 033627802 | 40108360-02 | 10/26/2004 | $ 1,040.00 |
| | | | 40108356-01 | 10/26/2004 | $ 510.00 |
| Stanovich, June | Self | 014629030 | 40090368-01 | 8/6/2004 | $ 1,360.44 |
| | | | 20128045-01 | 11/2/2002 | $ 1,305.00 |
| | | | 40089081-01 | 8/6/2004 | $ 700.00 |
| Staples, Troy | Self | 009364806 | 40027290-01 | 2/26/2004 | $ 1,375.00 |
| Steinman, Johnathan | Self | 009547873 | 20130919-01 | 11/21/2002 | $ 795.00 |
| Stewart, Renee | Joshua | 001509991 | 40083755-01 | 7/19/2004 | $ 2,382.61 |
| | | | 40083756-01 | 7/19/2004 | $ 762.00 |
| Stewart, Renee | Self | 001509991 | 30011894-01 | 1/27/2003 | $ 2,843.00 |
| | | | 40102715-01 | 9/17/2004 | $ 555.50 |
| Stewart, Renee | Michael | 001509991 | 40060551-01 | 2/3/2004 | $ 736.40 |
| Story, Daniel | Abigail | 231841218 | 40055004-01 | 4/6/04-4/27/04 | $ 1,367.85 |
| | | | 40050108-01 | 2/8/2004 | $ 1,650.00 |
| | | | 40108368-02 | 9/29/04-9/30/04 | $ 640.50 |
| Story, Daniel | David | 231841218 | 30032903-02 | 3/21/2003 | $ 1,000.00 |
| Strasswimmer, Aaron | Kierstyn | 123566113 | 10118441-01 | 9/20/2001 | $ 1,172.78 |
| Strong, Wayne | Self | 089401185 | 30122198-01 | 10/22/03-11/19/03 | $ 50,557.14 |
| Sturick, Joan Marie | Self | 054645406 | 40047448-01 | 7/11/2003 | $ 1,803.02 |
| | | | 40102737-01 | 10/8/2004 | $ 1,519.00 |
| Sullivan, Charles | Self | 033364855 | 40091652-01 | 8/23/2004 | $ 2,090.85 |
| | | | 40105764-01 | 10/19/2004 | $ 1,905.00 |
| | | | 40089129-01 | 8/23/2004 | $ 1,225.00 |
| | | | 40065562-01 | 5/20/2004 | $ 723.58 |
| Sullivan, Charles | Judith | 033364855 | 30076141-01 | 7/8/2003 | $ 980.00 |
| Sullivan, Scott | Sandra | 094601062 | 40098536-02 | 8/13/2004 | $ 1,439.05 |
| Sullivan, Scott | Carly | 094601062 | 20028501-01 | 1/3/2002 | $ 568.54 |
| Sumner, Michael | Donna | 009406522 | 20120855-01 | 3/8/2002 | $ 1,800.00 |
| | | | 40058276-01 | 5/4/2004 | $ 1,632.00 |
| | | | 40055006-01 | 4/29/2004 | $ 962.00 |

Prepared by: Northshore International Insurance Services, Inc.
Date: 4/8/2008

# EXHIBIT I

Undocumented Claims

W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Billed Amount |
|----------|----------|-----------|--------------|--------------------|---------------|
| | | | 40029649-01 | 3/2/2004 | $ 600.00 |
| | | | 40027314-01 | 2/17/2004 | $ 685.00 |
| Sumner, Michael | Katherine | 009406522 | 40008980-01 | 1/14/2004 | $ 1,043.00 |
| | | | 30011709-01 | 1/2/2003 | $ 1,045.00 |
| Swanson, David | Self | 014343997 | 40047697-01 | 9/12/2003 | $ 1,166.00 |
| Taft, Lucille | Self | 009249320 | 40083762-01 | 7/16/2004 | $ 2,219.89 |
| | | | 40087258-01 | 8/2/2004 | $ 1,078.00 |
| Taylor, Gary | Self | 009527128 | 20108378-01 | 6/26/2002 | $ 995.00 |
| | | | 20108379-01 | 5/30/2002 | $ 975.00 |
| Taylor, Gary | Justin | 009527128 | 10113192-01 | 7/9/2001 | $ 2,508.00 |
| Tessier, George | Christine | 019522003 | 20088216-01 | 7/12/2002 | $ 1,920.00 |
| Thomas, Shane | Mionie | 021608389 | 40035433-01 | 4/1/04-4/2/04 | $ 4,081.55 |
| | | | 40094384-01 | 9/7/2004 | $ 3,616.59 |
| | | | 40098540-01 | 9/7/2004 | $ 3,000.00 |
| | | | 40044833-01 | 4/1/2004 | $ 836.00 |
| | | | 40044836-01 | 4/1/2004 | $ 810.00 |
| | | | 40098541-01 | 9/7/2004 | $ 988.00 |
| | | | 40088950-01 | 7/17/2004 | $ 610.00 |
| Thompson, Brian | Self | 002544486 | 40065574-02 | 5/27/2004 | $ 1,699.00 |
| | | | 40027325-01 | 2/12/2004 | $ 1,155.75 |
| | | | 40024045-01 | 2/12/2004 | $ 924.00 |
| Tinker, Charles | Self | 009301101 | 30107414-01 | 3/18/2003 | $ 874.00 |
| Toland, Terry | Self | 003320882 | 30066577-02 | 5/28/2003 | $ 4,260.00 |
| Tomasi, Rhonda | Self | 083528568 | 20118020-01 | 9/24/2002 | $ 552.67 |
| Torrey, Dennis | Susan | 008449147 | 40108398-01 | 10/20/2004 | $ 1,762.33 |
| | | | 40105770-02 | 10/20/2004 | $ 900.00 |
| | | | 30042683-01 | 4/1/2003 | $ 975.00 |
| Tranka, Edward | Nancey | 075721981 | 40108400-01 | 10/14/2004 | $ 2,426.78 |
| | | | 40110428-01 | 10/28/2004 | $ 2,882.53 |
| | | | 40100233-01 | 9/17/2004 | $ 1,902.07 |
| | | | 20008274-01 | 12/26/2001 | $ 1,681.30 |

Prepared by:  Northshore International Insurance Services, Inc.
Date:  4/8/2008

# EXHIBIT I

## Undocumented Claims
## W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 40058289-01 | 5/15/2004 | $ 905.34 |
| Tranka, Edward | Self | 075721981 | 10124238-01 | 8/6/2001 | $ 742.69 |
| | | | 40027347-01 | 1/23/2004 | $ 507.00 |
| Tranka, Edward | Piper | 075721981 | 40117339-01 | 11/27/2004 | $ 578.00 |
| Triplett, Napolean | Self | 403302486 | 10104752-01 | 7/26/2001 | $ 3,025.00 |
| Triplett, Napolean | Irene | 403302486 | 20032027-01 | 7/26/2001 | $ 2,600.00 |
| Valeski, Stephen | Self | 015486840 | 20017373-01 | 1/28/02-1/30/02 | $ 20,006.45 |
| | | | 20049955-01 | 3/9/02-3/28/02 | $ 7,121.89 |
| | | | 20110495-01 | 9/11/02-9/18/02 | $ 2,143.73 |
| | | | 20124372-01 | 10/25/02-10/30/02 | $ 2,091.04 |
| | | | 20042591-01 | 2/19/02-2/28/02 | $ 2,196.00 |
| | | | 20101705-01 | 7/1/2002 | $ 2,275.00 |
| | | | 20105621-01 | 8/1/2002 | $ 2,275.00 |
| | | | 20118247-01 | 9/1/2002 | $ 2,275.00 |
| | | | 40087177-01 | 7/1/2004 | $ 2,275.00 |
| | | | 40093171-01 | 8/1/2004 | $ 2,275.00 |
| | | | 40095188-01 | 9/1/2004 | $ 1,806.01 |
| | | | 40098831-01 | 9/27/2004 | $ 1,806.01 |
| | | | 20121386-01 | 10/15/2002 | $ 2,073.70 |
| | | | 20119663-01 | 10/2/2002 | $ 1,731.17 |
| | | | 20079394-01 | 6/1/02-6/6/02 | $ 1,615.67 |
| | | | 30054833-01 | 4/9/03-4/30/03 | $ 1,588.46 |
| | | | 20110474-01 | 9/25/2002 | $ 1,334.00 |
| | | | 20049956-01 | 3/29/2002 | $ 1,223.00 |
| | | | 20127633-01 | 11/6/2002 | $ 932.00 |
| | | | 20128182-01 | 11/13/2002 | $ 932.00 |
| | | | 20120738-01 | 10/16/2002 | $ 916.00 |
| | | | 20103836-01 | 8/28/2002 | $ 878.22 |
| | | | 20101801-01 | 6/29/2002 | $ 799.00 |
| | | | 20104333-01 | 8/21/2002 | $ 799.00 |
| | | | 20131077-01 | 10/15/2002 | $ 1,500.00 |

Prepared by: Northshore International Insurance Services, Inc.
Date: 4/8/2008

# EXHIBIT I

## Undocumented Claims
## W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 20106938-01 | 9/4/2002 | $ 664.00 |
| | | | 20131272-01 | 11/18/2002 | $ 664.00 |
| Viault, Fred | Self | 009307896 | 20011245-01 | 1/8/2002 | $ 2,818.95 |
| | | | 40099657-01 | 7/27/2004 | $ 2,000.00 |
| Viault, Fred | Joan | 009307896 | 40024056-02 | 2/11/2004 | $ 1,125.00 |
| | | | 40098559-01 | 9/28/2004 | $ 897.58 |
| | | | 40001540-01 | 12/7/2003 | $ 810.21 |
| | | | 40004865-01 | 12/8/2003 | $ 798.00 |
| | | | 40011249-02 | 12/17/2003 | $ 560.00 |
| Vradenburg, Angela | James | 118569614 | 20107109-01 | 8/23/2002 | $ 731.17 |
| Vradenburg, Angela | Self | 118569614 | 20121287-01 | 8/16/2002 | $ 602.14 |
| Ward, Scott | Self | 234068823 | 20049958-01 | 3/19/2002 | $ 8,760.86 |
| | | | 40060561-01 | 5/18/2004 | $ 1,575.00 |
| | | | 40073652-01 | 5/18/2004 | $ 1,610.48 |
| | | | 40058300-01 | 5/18/2004 | $ 3,660.00 |
| | | | 40062095-01 | 5/18/2004 | $ 4,575.00 |
| | | | 10120227-01 | 8/12/2001 | $ 749.38 |
| | | | 20008322-01 | 11/7/2001 | $ 680.54 |
| | | | 20012894-01 | 1/28/2002 | $ 950.00 |
| | | | 40071454-01 | 3/17/2004 | $ 2,176.00 |
| | | | 4055058-01 | 4/21/2004 | $ 1,390.00 |
| Ward, Scott | Kathleen | 234068823 | 20106301-01 | 8/26/2002 | $ 825.17 |
| | | | 40071452-01 | 5/27/04-6/7/04 | $ 845.00 |
| | | | 20052949-01 | 2/7/2002 | $ 704.19 |
| | | | 40071453-01 | 6/1/2004 | $ 520.00 |
| | | | 40062134-01 | 5/28/2004 | $ 559.37 |
| Ward, Scott | Rebecca | 234068823 | 20126405-01 | 10/24/2002 | $ 631.13 |
| | | | 20093952-01 | 7/16/2002 | $ 559.45 |
| Warren, Robin | Daniel | 028580545 | 30009675-01 | 4/30/2002 | $ 3,700.00 |
| Washburn, Katherine | Mark | 009408472 | 10104724-01 | 7/21/2001 | $ 822.50 |
| | | | 20057034-01 | 3/1/2002 | $ 610.00 |

Prepared by:  Northshore International Insurance Services, Inc.
Date:  4/8/2008

## EXHIBIT I

Undocumented Claims

W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 20053725-01 | 3/1/2002 | $ 574.89 |
| Weeks, Hayley | Self | 003749270 | 20067240-01 | 5/15/2002 | $ 4,295.00 |
| | | | 40077861-01 | 6/29/2004 | $ 1,628.42 |
| | | | 40079455-01 | 6/15/04-6/22/04 | $ 1,613.58 |
| | | | 40077962-01 | 7/8/2004 | $ 1,378.00 |
| | | | 40079456-01 | 6/23/04-6/28/04 | $ 1,215.17 |
| | | | 40053926-01 | 4/14/2004 | $ 1,201.00 |
| | | | 40050121-01 | 4/14/2004 | $ 1,182.65 |
| | | | 40077972-01 | 7/8/2004 | $ 1,137.41 |
| | | | 40068134-01 | 6/9/2004 | $ 1,235.00 |
| | | | 40079454-01 | 6/11/2004 | $ 908.81 |
| | | | 40108408-01 | 6/11/04-6/30/04 | $ 960.00 |
| | | | 40088958-01 | 7/8/04-7/9/04 | $ 909.41 |
| | | | 40093182-01 | 7/7/04-7/8/04 | $ 802.12 |
| | | | 40073665-01 | 6/2/2004 | $ 701.00 |
| | | | 20124642-01 | 10/27/2002 | $ 616.16 |
| Wentzell, Shriley | Self | 001280096 | 20066114-01 | 6/5/2002 | $ 1,280.00 |
| Wescott, David | Casey | 042546043 | 20007377-01 | 12/31/2001 | $ 745.00 |
| White, Christine | Self | 012644584 | 30095793-02 | 6/18/2003 | $ 1,850.00 |
| | | | 30090522-01 | 7/18/2003 | $ 500.00 |
| Whittington, Terry | Self | 091703078 | 40039399-01 | 3/18/2004 | $ 1,020.00 |
| Wilcox, Craig | Donna | 086461184 | 40102754-01 | 10/5/2004 | $ 1,098.72 |
| | | | 40013626-01 | 1/15/2004 | $ 2,500.00 |
| | | | 40009730-01 | 1/15/2004 | $ 910.00 |
| | | | 40100249-01 | 10/1/2004 | $ 832.41 |
| Wilkinson, David | Jeremy | 006708398 | 20128063-01 | 11/7/2002 | $ 967.50 |
| Wilkinson, David | Carol | 006708398 | 20124666-01 | 10/16/2002 | $ 585.75 |
| Williams, Dennis | Self | 008286378 | 30094981-01 | 8/25/2003 | $ 1,795.83 |
| Williams, Dennis | Lorette | 008286378 | 40016315-01 | 1/26/2004 | $ 1,328.23 |
| | | | 40031646-01 | 3/11/2004 | $ 642.00 |
| Williams, Paul | Self | 009549535 | 40052468-01 | 5/4/2004 | $ 773.00 |

Prepared by:  Northshore International Insurance Services, Inc.
Date:  4/8/2008

# EXHIBIT I

Undocumented Claims

W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Billed Amount |
|----------|----------|-----------|--------------|--------------------|---------------|
| Woods, Susan | Self | 028509891 | 20040395-01 | 12/14/2001 | $ 840.00 |
| Wylie, Donald | Denise | 077606521 | 20115341-01 | 8/23/2002 | $ 867.48 |
| Young, Mark | Self | 008528956 | 10125334-01 | 9/18/2001 | $ 1,193.81 |
| Young, Mark | Elise | 028482746 | 20011068-01 | 11/15/2001 | $ 801.00 |
| Young, Mark | Self | 008528956 | 20116016-01 | 9/30/2002 | $ 995.00 |
| Young, Philip | Self | 002468828 | 40115566-01 | 11/19/2004 | $ 1,809.00 |
| | | | 40024063-01 | 2/6/2004 | $ 1,715.00 |
| | | | 40098575-01 | 9/13/2004 | $ 747.00 |
| | | | 40114630-01 | 11/11/2004 | $ 810.00 |
| Young, Robert | Self | 006460002 | 10114054-01 | 8/31/2001 | $ 631.00 |
| Zampieri, Brenda | Self | 009280070 | 40077890-01 | 2/10/2004 | $ 1,668.67 |
| | | | 40018971-01 | 2/10/2004 | $ 1,232.00 |
| Zampieri, Brenda | Joseph | 009280070 | 20040196-01 | 3/8/2002 | $ 1,815.00 |
| Zemojtel, Linda | Self | 025400040 | 40080795-01 | 7/6/2004 | $ 720.32 |
| | | | | **Exhibit Total:** | **$2,555,922.38** |

# Exhibit II

EXHIBIT II

Provided by:    Northshore International Insurance Services, Inc.

Date:           April 8, 2008

# EXHIBIT II

## Undocumented Claims
## Aubuchon Distribution, Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| Basque, Yvonne | 023280490 | Self | 20037920-01 | 02/06/02 | $ 995.00 |
| | | | 20083216-01 | 02/06-02/08/02 | $ 1,051.30 |
| Bellar, Donald | 010425533 | Self | 10112944-01 | 07/23/01 | $ 2,175.00 |
| | | | 10112946-01 | 07/23/01 | $ 1,200.00 |
| Boudreau, William | 030345316 | Self | 10113137-01 | 07/20/01 | $ 3,951.00 |
| | | | 10113115-01 | 03/09-08/09/01 | $ 1,379.00 |
| | | | 10120252-01 | 07/20/01 | $ 778.00 |
| Brownell, Donna | 030346924 | Self | 20034063-01 | 02/25-02/28/02 | $ 10,756.00 |
| | | | 20103020-01 | 08/23/02 | $ 629.00 |
| | | | 20090214-01 | 07/11/02 | $ 603.00 |
| Carroll, Reginald | 022307148 | Self | 20101597-01 | 2/26/2002 | $ 4,020.14 |
| | | | 20029043-01 | 1/9/2002 | $ 1,550.00 |
| Chartier, Dana | 031469138 | Self | 20039093-01 | 12/21/2001 | $ 759.00 |
| Cotton, Edward | 027461442 | Adam | 20100333-01 | 07/22/02 | $ 925.00 |
| Crosby, Julie | 031404455 | Self | 20067657-02 | 06/05/02 | $ 819.00 |
| Delisle, Paul | 025369395 | Self | 10145278-01 | 10/31/01 | $ 1,529.00 |
| | | | 20007980-01 | 01/17/02 | $ 1,920.00 |
| Fournier, Louis | 030362370 | Pamela | 20066873-01 | 05/06/02 | $ 1,040.00 |
| Gallant, Steven | 019484255 | Eric | 20020069-01 | 07/27/01 | $ 890.00 |
| | | | 20083147-01 | 06/05/02 | $ 677.00 |
| Gallant, Steven | 019484255 | Christopher | 20083201-01 | 02/27/02 | $ 764.20 |
| Girouard, Bruce | 032548367 | Self | 20089834-01 | 06/26/02 | $ 674.00 |
| Girouard, Leo | 015347941 | Self | 20089826-01 | 07/02/02 | $ 1,415.00 |
| Hines, Joseph | 026320799 | Self | 20084980-01 | 06/14-06/28/02 | $ 1,049.00 |
| Houle, Brian | 028526353 | Stephanie | 20018703-01 | 8/31/2001 | $ 1,520.00 |
| Karkutt, John | 024303169 | Gail | 20110033-01 | 06/20/02 | $ 3,870.39 |

Prepared by:  Northshore International Insurance Services, Inc.
Date:  4/8/2008

# EXHIBIT II

## Undocumented Claims
## Aubuchon Distribution, Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 30010025-01 | 07/01-07/31/02 | $ 1,048.00 |
| | | | 20121458-01 | 05/23/05 | $ 1,350.00 |
| | | | 30004251-01 | 06/20/02 | $ 751.00 |
| LaFortune, Robert | 015368371 | Joanne | 20046680-01 | 03/08/02 | $ 3,944.00 |
| LeBlanc, Bruce | 016581358 | Self | 20015102-01 | 07/26/01 | $ 1,197.00 |
| Leger, Eugene | 027288341 | Barbara | 20015555-01 | 10/09/01 | $ 790.00 |
| Legros, Robert | 030346679 | Self | 20031342-01 | 10/03-10/31/01 | $ 16,994.74 |
| | | | 10118383-01 | 08/10-08/14/01 | $ 1,158.00 |
| | | | 20081835-01 | 12/28-1/21/02 | $ 1,000.00 |
| | | | 20002508-01 | 07/06/01 | $ 845.00 |
| | | | 20002513-01 | 08/10/01 | $ 718.00 |
| | | | 10121332-01 | 07/14/01 | $ 700.00 |
| Maillet, Alphee | 016400162 | Self | 20128077-01 | 08/20/02 | $ 2,070.00 |
| | | | 20095936-01 | 05/01/02 | $ 1,762.00 |
| Morin, Donald | 010426282 | Self | 20104329-01 | 07/12/02 | $ 1,652.62 |
| | | | 20102824-01 | 08/05/02 | $ 1,041.00 |
| | | | 20085761-01 | 07/12/02 | $ 1,550.00 |
| | | | 20037930-01 | 03/01/02 | $ 900.00 |
| Nyman, Gary | 016400755 | Paula | 20058880-01 | 04/30/02 | $ 2,300.00 |
| Pelletier, Michael | 019484821 | Self | 20101403-01 | 07/12-07/13/02 | $ 830.41 |
| Pelletier, Michael | 019484821 | Mary | 20087423-01 | 06/11/02 | $ 1,700.00 |
| Price, David | 006347444 | Self | 20090482-01 | 07/12/02 | $ 750.00 |
| Roach, Bruce | 023523626 | Self | 20087392-01 | 05/24/02 | $ 646.00 |
| Rouleau, Philip | 014322579 | Self | 10114072-01 | 09/13/01 | $ 1,300.00 |
| Storm, Glenn | 019281114 | Self | 30004196-01 | 04/04/02 | $ 5,400.00 |
| | | | 20001160-01 | 11/01-11/30/01 | $ 2,415.00 |

## EXHIBIT II

### Undocumented Claims
### Aubuchon Distribution, Inc.

| Employee | ID Number | Claimant | Claim Number | Date(s) of Service | Billed Amount |
|---|---|---|---|---|---|
| | | | 20084470-01 | 05/02-05/31/02 | $  1,957.00 |
| | | | 20037898-01 | 01/25/02 | $  1,650.00 |
| | | | 20092723-01 | 04/02/02 | $  1,050.00 |
| Therrien, Todd | 029587741 | Self | 20083253-01 | 10/24/2001 | $  1,084.00 |
| Whitestone, Mark | 021605088 | Mark | 20120120-01 | 06/21/02 | $  1,190.10 |
| | | | 20090910-01 | 06/21/02 | $  650.00 |
| Whitestone, Mark | 021605088 | Janice | 20089837-01 | 06/14/02 | $  1,650.00 |
| Whitestone, Mark | 021605088 | Kelly | 20106436-01 | 08/19/02 | $  694.00 |
| Woltering, Marvin | 018480930 | Self | 30032146-01 | 08/01/02 | $  4,808.96 |
| | | | | **Exhibit Total:** | **$116,485.86** |

# Exhibit III

{}

EXHIBIT III

Provided by:    Northshore International Insurance Services, Inc.

Date:          April 8, 2008

# EXHIBIT III

## Procedural and Financial Claim Errors
### W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Financial Errors |
|---|---|---|---|---|---|---|---|
| Agate, Michael | Self | 104681445 | 10122100-01 | 8/27/2001 | $ 817.20 | | $ 817.20 |
| **Comments:** The diagnosis of closed fracture of metatarsal was not investigated by BeneFirst, causing a missed potential recovery opportunity. | | | | | | | |
| Arel, Andre | Self | 003544806 | Various | 1/8/02-8/11/03 | $ 9,027.70 | $ 9,027.70 | |
| **Comments:** The diagnosis of tear meniscus of knee was not investigated by BeneFirst, causing a missed potential recovery opportunity. | | | | | | | |
| Burns, Kristi | Self | 022563525 | 30069527-01 | 5/27/2003 | $ 647.45 | $ 647.45 | |
| **Comments:** The diagnosis of other and unspecified injury to knee, leg, ankle and foot was not investigated by BeneFirst, causing a missed potential recovery opportunity. | | | | | | | |
| Canuel, Robert | Rachel | 018548814 | 30099950-01 | 4/13/2003 | $ 567.88 | $ 567.88 | |
| **Comments:** The diagnosis of open wound of fingers was not investigated by BeneFirst, causing a missed potential recovery opportunity. | | | | | | | |
| Dailey, Alicia | Cory Kelley | 009629575 | 20023059-01 | 10/31/2001 | $ 925.52 | $ 925.52 | |
| **Comments:** The diagnosis of fracture of radius; accidental fall from playground equipment was not investigated by BeneFirst, causing a missed potential recovery opportunity. | | | | | | | |
| Dunphe, Mark | Self | 035387596 | 20058538-01 | 1/3/2002 | $ 600.00 | $ 600.00 | |
| | | | 20051413-01 | 4/11/2002 | $ 3,485.29 | $ 3,485.29 | |
| | | | 20051415-01 | 4/11/2002 | $ 1,960.00 | $ 1,960.00 | |
| **Comments:** The diagnosis of other and unspecified injury to knee, leg, ankle and foot was not investigated by BeneFirst, causing a missed potential recovery opportunity. | | | | | | | |

Prepared by: Northshore International Insurance Services, Inc.
Date: 4/8/2008

**13**

{}

**Arel, Sarah**

| | |
|---|---|
| **From:** | Cheryl MacLeod [CMacLeod@benefirst.com] |
| **Sent:** | Tuesday, May 17, 2005 3:53 PM |
| **To:** | Arel, Sarah |
| **Subject:** | Requested info - Aggregate audit |





Aggregate claim
selection.pdf ...

Good afternoon Sarah,

Per your request I have attached a listing of the claims selected by BP Inc for the aggregate audit. The total paid claims for the plan year was $4,558,282.37 of which $1,162,810.61 was audited. This calculates to 20% of paid claims were audited, of which there was a total of $30,885.99 which was listed as ineligible charges which is approximately a 5% error ratio overall. I am not sure of the total number of claims paid, however there were 208 which were audited.

<<Aggregate claim selection.pdf>>
If you should need anything further please do not hesitate to call or email me.

Regards,

Cheryl MacLeod
Reinsurance Coordinator
phone 781-837-4402 x208
fax 781-837-4403


CONFIDENTIALITY NOTICE: This email message, including any attachments, is for the sole use of intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies in the original message.

AUB 074

## Claim Selection - W.E. Aubuchon

| Worksheet Number | Claimant Name | Claim # | Amount Paid | Comments |
|---|---|---|---|---|
| 1 | Archambeault, Andrea | 30075901-02 | 2,500.00 | |
| 2 | Archambeault, Andrea | 30095636-01 | 5,239.27 | |
| 3 | Archambeault, Gerard | 40031598-01 | 3,650.00 | |
| 4 | Archambeault, Gerard | 40036820-02 | 20,512.00 | |
| 5 | Archambeault, Gerard | 40036820-03 | 5,128.00 | |
| 6 | Archambeault, Gerard | 40042062-01 | 2,825.40 | |
| 7 | Archambeault, Gerard | 40044016-02 | 8,571.20 | |
| 8 | Archambeault, Gerard | 40044016-03 | 2,142.80 | |
| 9 | Arel, Andre | 30093351-01 | 2,100.00 | |
| 10 | Arel, Andre | 30120721-01 | 2,401.20 | |
| 11 | Ashley, Wayne | 40010486-01 | 29,104.20 | |
| 12 | Ashley, Wayne | 40012921-01 | 4,217.71 | |
| 13 | Ashley, Wayne | 40012934-01 | 9,976.40 | |
| 14 | Ashley, Wayne | 40015406-01 | 2,205.00 | |
| 15 | Ashley, Wayne | 40024618-01 | 11,403.08 | |
| 16 | Aubuchon, Gerard | 40019763-01 | 4,147.00 | |
| 17 | Aubuchon, Kirsten | 30055742-01 | 2,016.00 | |
| 18 | Aubuchon, William | 40009216-01 | 2,380.85 | |
| 19 | Baker, Kim | 30082886-02 | 9,677.22 | |
| 20 | Basque, Lionel | 30099701-01 | 2,445.79 | |
| 21 | Bellavance, Marc | 40015495-01 | 8,863.50 | |
| 22 | Bezanson, Lorraine | 40015536-01 | 2,238.32 | |
| 23 | Bierly, Naomi | 40049481-01 | 2,280.00 | |
| 24 | Blodgett, Mark | 40004005-01 | 2,534.84 | |
| 25 | Bocash, Michael | 40007210-01 | 9,228.66 | |

AUB 075

## Claim Selection - W.E. Aubuchon

| Worksheet Number | Claimant Name | Claim # | Amount Paid | Comments |
|---|---|---|---|---|
| 26 | Boucher, Maria | 30132446-01 | 5,260.00 | |
| 27 | Bradley, Dennis | 40042194-01 | 2,005.74 | |
| 28 | Bradley, Carrie | 4004486-01 | 3,163.00 | |
| 29 | Bradley, Carrie | 40013019-01 | 2,403.79 | |
| 30 | Brennan, Joyce | 30076024-01 | 3,957.47 | |
| 31 | Brennan, Joyce | 30095798-01 | 3,252.47 | |
| 32 | Brennan, Joyce | 30118406-01 | 2,840.67 | |
| 33 | Brennan, Joyce | 4001767-01 | 3,335.67 | |
| 34 | Burns, Kristi | 40042232-02 | 2,225.30 | |
| 35 | Canuel, Robert | 40032337-02 | 24,988.27 | |
| 36 | Canuel, Robert | 40057849-01 | 2,105.60 | |
| 37 | Chamberlain, Marcel | 30095810-01 | 2,567.00 | |
| 38 | Chamberlain, Marcel | 30096973-01 | 32,790.01 | |
| 39 | Chamberlain, Marcel | 40029663-01 | 15,042.51 | |
| 40 | Chartier, John | 30063171-01 | 2,174.58 | |
| 41 | Chartier, John | 30118262-01 | 18,349.39 | |
| 42 | Chartier, John | 30118262-02 | 3,968.80 | |
| 43 | Chartier, John | 30128743-01 | 4,000.00 | |
| 44 | Chartier, John | 30128744-01 | 2,929.60 | |
| 45 | Chartier, John | 30135351-01 | 9,002.09 | |
| 46 | Chartier, John | 40000511-01 | 15,110.08 | |
| 47 | Chartier, John | 40011899-01 | 16,759.51 | |
| 48 | Chartier, John | 40031771-01 | 3,754.78 | |
| 49 | Constance, Clayton | 30057908-01 | 3,030.82 | |
| 50 | Craker, Peggy | 40014685-01 | 19,988.80 | |

AUB 076

## Claim Selection - W.E. Aubuchon

| Worksheet Number | Claimant Name | Claim # | Amount Paid | Comments |
|---|---|---|---|---|
| 51 | Craker, Peggy | 40018177-01 | 5,087.18 | |
| 52 | Craker, Peggy | 40021138-01 | 2,278.50 | |
| 53 | Craker, Peggy | 40044460-01 | 2,702.51 | |
| 54 | Daly, Richard | 30056349-01 | 17,103.87 | |
| 55 | Daly, Richard | 30090797-01 | 2,300.00 | |
| 56 | Daugirda, Thomas | 30098232-01 | 2,393.50 | |
| 57 | Desilets, Raymond | 30115194-01 | 2,345.90 | |
| 58 | Desilets, Raymond | 30125431-01 | 4,932.67 | |
| 59 | Dipace, Tricia | 40009459-01 | 2,406.00 | |
| 60 | Drummond, Laura | 30084289-01 | 7,706.01 | |
| 61 | Drummond, Laura | 30084301-01 | 3,808.00 | |
| 62 | Durkin, Kathleen | 30079361-01 | 2,064.53 | |
| 63 | Durkin, Kathleen | 40001774-01 | 3,196.80 | |
| 64 | Duso, Erika | 30048329-01 | 3,582.00 | |
| 65 | Duso, Erika | 30127123-01 | 5,060.00 | |
| 66 | Duso, Erika | 30132087-01 | 8,121.78 | |
| 67 | Duso, Erika | 40010582-01 | 4,095.65 | |
| 68 | Duso, Julia | 30092113-01 | 3,036.00 | |
| 69 | Duso, Julia | 30093834-01 | 2,097.83 | |
| 70 | Ecker, Harry | 30120867-01 | 3,760.00 | |
| 71 | Ewertz, Deborah | 40044516-01 | 2,565.16 | |
| 72 | Ewertz, Deborah | 40044517-01 | 2,770.32 | |
| 73 | Fillo, Katherine | 30066099-01 | 4,161.81 | |
| 74 | Flagg, Joseph | 40054228-01 | 2,276.67 | |
| 75 | Flagg, Donna | 40043385-01 | 8,326.82 | |

AUB 077

## Claim Selection - W.E. Aubuchon

| Worksheet Number | Claimant Name | Claim # | Amount Paid | Comments |
|---|---|---|---|---|
| 76 | Flagg, Donna | 40052104-01 | 2,300.00 | |
| 77 | Florence, Tricia | 30127140-01 | 3,573.72 | |
| 78 | Florence, Tricia | 30129878-01 | 2,760.00 | |
| 79 | Goodfield, Joanne | 30100286-01 | 3,545.00 | |
| 80 | Graffam, Robert | 30125447-01 | 2,150.30 | |
| 81 | Graffam, Robert | 40061067-01 | 3,847.48 | |
| 82 | Grant, Rhea | 40046699-01 | 5,469.78 | |
| 83 | Grant, Rhea | 40052506-01 | 2,300.00 | |
| 84 | Hagen, Katrina | 30054364-01 | 2,676.21 | |
| 85 | Hagen, Peter | 40015807-01 | 2,513.91 | |
| 86 | Hannula, Lynn | 40062162-01 | 2,300.00 | |
| 87 | Hanrahan, James | 30066132-01 | 2,383.62 | |
| 88 | Hart, Army | 30058405-01 | 5,431.94 | |
| 89 | Hart, Army | 30059164-01 | 3,975.00 | |
| 90 | Herschel, Dekota | 40054294-01 | 4,152.26 | |
| 91 | Herschel, Dekota | 40061970-01 | 5,178.73 | |
| 92 | Hoag, Kerri | 40044581-0 | 2,241.40 | |
| 93 | Hough, Richard | 30117315-01 | 5,122.04 | |
| 94 | Johnson, April | 30040897-02 | 4,798.80 | |
| 95 | Joseph, Shannon | 30121355-01 | 4,238.57 | |
| 96 | Joseph, Shannon | 40015690-01 | 20,838.00 | |
| 97 | Joseph, Shannon | 40023957-01 | 4,569.69 | |
| 98 | King, Cynthia | 40061069-01 | 9,482.94 | |
| 99 | Kingsley, Christopher | 30071641-01 | 2,082.17 | |
| 100 | Labombard, Margaret | 30102866-01 | 10,579.38 | |

AUB 078

## Claim Selection - W.E. Aubuchon

| Worksheet Number | Claimant Name | Claim # | Amount Paid | Comments |
|---|---|---|---|---|
| 101 | Labombard, Margaret | 40013338-02 | 3,581.08 | |
| 102 | Labombard, Margaret | 40042640-01 | 7,302.68 | |
| 103 | Labombard, Margaret | 40052313-01 | 8,736.39 | |
| 104 | Labombard, Margaret | 40052345-01 | 3,210.00 | |
| 105 | Labombard, Margaret | 40054578-01 | 3,581.08 | |
| 106 | Lane, Christopher | 30118835-01 | 2,426.20 | |
| 107 | Larson, Denise | 30096079-01 | 4,184.72 | |
| 108 | Letourneau, Tanya | 30094032-01 | 6,060.82 | |
| 109 | Letourneau, Tanya | 30094034-01 | 2,050.00 | |
| 110 | Lizotte, Eleanor | 30115555-01 | 2,250.00 | |
| 111 | Lizotte, Eleanor | 30121484-01 | 5,750.00 | |
| 112 | Lucy, Karole | 40005702-01 | 7,368.78 | |
| 113 | McCarthy, John | 40043383-01 | 4,410.00 | |
| 114 | McCarthy, John | 40048847-01 | 10,919.38 | |
| 115 | McGee, Albert | 30076572-01 | 2,583.20 | |
| 116 | McGee, Albert | 30079577-01 | 7,892.80 | |
| 117 | McGee, Albert | 30092217-01 | 8,091.20 | |
| 118 | McGee, Albert | 30110756-01 | 2,800.00 | |
| 119 | McGee, Albert | 30115565-01 | 5,750.00 | |
| 120 | McGee, Albert | 40000214-01 | 2,580.80 | |
| 121 | McGee, Albert | 40009523-01 | 2,049.63 | |
| 122 | McGee, Albert | 40021503-01 | 4,173.65 | |
| 123 | McGee, Albert | 40033148-01 | 4,052.40 | |
| 124 | Metrano, Shirley | 30118896-01 | 2,188.20 | |
| 125 | Michener, Gary | 40023976-01 | 2,705.78 | |

AUB 079

## Claim Selection - W.E. Aubuchon

| Worksheet Number | Claimant Name | Claim # | Amount Paid | Comments |
|---|---|---|---|---|
| 126 | Moore, Ashley | 30131678-01 | 3,501.00 | |
| 127 | Moore, Ashley | 40001827-01 | 2,008.50 | |
| 128 | Moran, Caitlin | 40061076-01 | 2,418.25 | |
| 129 | Moran, Gregory | 40002352-01 | 31,789.47 | |
| 130 | Moran, Gregory | 40002352-02 | 3,938.87 | |
| 131 | Moran, Gregory | 40004743-01 | 5,024.00 | |
| 132 | Moran, Gregory | 40020440-01 | 4,512.00 | |
| 133 | Moran, Gregory | 40023024-01 | 2,504.78 | |
| 134 | Moran, Gregory | 40033936-01 | 3,753.60 | |
| 135 | Moran, Gregory | 40050033-01 | 2,667.20 | |
| 136 | Moran, Gregory | 40052360-01 | 2,786.17 | |
| 137 | Moran, Gregory | 40061077-01 | 3,360.00 | |
| 138 | Moran, Marcus | 30105107-01 | 5,100.00 | |
| 139 | Moran, Marcus | 40005700-01 | 6,900.00 | |
| 140 | Moran, Claire | 30066614-01 | 2,850.30 | |
| 141 | Moran, Claire | 30132100-01 | 8,300.00 | |
| 142 | Moran, Claire | 40018908-01 | 2,465.60 | |
| 143 | Moran, Claire | 40040616-01 | 2,663.05 | |
| 144 | Pederson, Stephanie | 30128948-01 | 8,971.34 | |
| 145 | Pederson, Stephanie | 4009635-01 | 2,600.00 | |
| 146 | Rabideau, Dawn | 30053704-01 | 10,278.85 | |
| 147 | Rabideau, Dawn | 30055065-01 | 2,294.31 | |
| 148 | Rhone, Kristal | 30096147-01 | 2,423.78 | |
| 149 | Richard, Rene | 30088368-01 | 2,226.18 | |
| 150 | Roche, Ashley | 30083512-01 | 4,153.95 | |

## Claim Selection - W.E. Aubuchon

| Worksheet Number | Claimant Name | Claim # | Amount Paid | Comments |
|---|---|---|---|---|
| 151 | Roche, Brittany | 30112871-01 | 6,607.54 | |
| 152 | Roche, Brittany | 40018679-01 | 4,293.30 | |
| 153 | Roche, Brittany | 40054703-01 | 6,673.35 | |
| 154 | Sauve, Dawn | 30116565-01 | 7,400.75 | |
| 155 | Sauve, Dawn | 30124295-01 | 9,932.86 | |
| 156 | Schoen, Walter | 30071986-01 | 3,592.50 | |
| 157 | Shapiro, Jayne | 40018932-01 | 2,875.50 | |
| 158 | Shapiro, Jayne | 40021582-01 | 5,055.38 | |
| 159 | Spears, Joy | 40062272-01 | 3,290.50 | |
| 160 | St. Pierre, Susan | 40018891-01 | 2,566.00 | |
| 161 | Staples, Krista | 30124412-01 | 2,005.13 | |
| 162 | Staples, Troy | 40029643-01 | 2,341.89 | |
| 163 | Story, David | 30125539-01 | 3,178.32 | |
| 164 | Sumner, Katherine | 30124420-01 | 2,632.50 | |
| 165 | Sumner, Donna | 30089705.01 | 2,170.38 | |
| 166 | Sumner, Donna | 40031597-02 | 2,348.00 | |
| 167 | Sumner, Donna | 40052453-01 | 10,910.28 | |
| 168 | Sumner, Donna | 40061081-01 | 2,741.20 | |
| 169 | Sweeney, Edward | 30113620-01 | 2,000.00 | |
| 170 | Tranka, Edward | 40024050-02 | 3,184.23 | |
| 171 | Viault, Joan | 40004870-02 | 2,619.00 | |
| 172 | Viault, Joan | 40013619-02 | 8,691.81 | |
| 173 | Weeks, Hayley | 30110875-01 | 2,583.90 | |
| 174 | Wilcox, Donna | 40010583-01 | 5,417.41 | |
| 175 | Wilcox, Donna | 40013624-01 | 2,500.00 | |

## Claim Selection - W.E. Aubuchon

| Worksheet Number | Claimant Name | Claim # | Amount Paid | Comments |
|---|---|---|---|---|
| 176 | Wylie, Donald | 30056964-01 | 2,323.50 | |
| 177 | Wylie, Donald | 30059058-01 | 2,065.51 | |
| 178 | Young, Ethan | 30097322-01 | 15,015.02 | |
| 179 | Young, Katherine | 30094968-01 | 5,898.49 | |
| 180 | Zampieri, Brenda | 40018928-01 | 2,113.20 | |
| 181 | Zampieri, Brenda | 40027396-01 | 4,619.39 | |
| 182 | Zampieri, Joseph | 30119823-01 | 2,076.11 | |
| 183 | Bezio, Christopher | 40015541-01 | 2,013.79 | |
| 184 | Bruno, Steven | 40030432-01 | 6,183.73 | |
| 185 | Deprey, Kevin | 40009456-01 | 6,779.18 | |
| 186 | Deprey, Kevin | 40016714-01 | 2,349.00 | |
| 187 | Durand, Valda | 30131611-01 | 4,579.38 | |
| 188 | Holland, Harley | 40041355-01 | 17,477.37 | |
| 189 | Holland, Harley | 40044682-01 | 2,846.00 | |
| 190 | Holland, Harley | 40060517-01 | 2,716.95 | |
| 191 | Holland, Kevin | 30071625-01 | 8,305.97 | |
| 192 | Holland, Kevin | 40040110-02 | 32,520.28 | |
| 193 | Holland, Kevin | 40044601-02 | 3,528.00 | |
| 194 | Holland, Kevin | 40045123-02 | 9,150.00 | |
| 195 | Holland, Kevin | 40045124-02 | 8,700.00 | |
| 196 | Johnson, Kenneth | 40013331-01 | 8,440.04 | |
| 197 | Lison, Richard | 40052350-01 | 3,165.64 | |
| 198 | Lord, Jonathan | 30102890-01 | 2,164.72 | |
| 199 | Lord, Jonathan | 40004057-01 | 7,820.87 | |
| 200 | McClure, Barbara | 30115564-01 | 6,728.41 | |

AUB 082

## Claim Selection - W.E. Aubuchon

| Worksheet Number | Claimant Name | Claim # | Amount Paid | Comments |
|---|---|---|---|---|
| 201 | Neal, Alyssa | 40054606-01 | 2,319.48 | |
| 202 | Needham, Barbara | 30115640-01 | 6,575.26 | |
| 203 | Pelletier, Michael | 30073760-01 | 5,005.03 | |
| 204 | Pelletier, Susan | 30088446-01 | 12,326.94 | |
| 205 | Smith, Lisa | 30070236-01 | 9,248.86 | |
| 206 | Rigger, Cassandra | 30121516-01 | 3,600.00 | |
| 207 | Rigger, Cassandra | 40004988-02 | 3,375.04 | |
| 208 | Tomasi, Rhonda | 30076705-01 | 7,682.89 | |
| | | | 1,162,810.61 | |

AUB 083

**14**

{}



**BENEFIRST**
The First Choice in Benefits Administration

| | |
|---|---|
| **1020 Plain Street** | PHONE: 781.837.4402 |
| **Suite 220** | FAX: 781.837.4403 |
| **PO Box 1421** | EMAIL: SALES@BENEFIRST.COM |
| **Marshfield, MA 02050** | |

June 29, 2004



Mr. M. Marcus Moran, Jr.
President / Treasurer
W.E. Aubuchon Co., Inc.
95 Aubuchon Drive
Westminster, MA

Re:    Aggregate Reimbursement

Dear Marcus:

W.E. Aubuchon Co., Inc. **Specific** stop-loss contract is based on a 12/24 basis. The coverage for this contract basis covers claims incurred and paid between July 1, 2003 through June 30, 2004. This contract allows an additional twelve months after June 30, 2004 for claims incurred during your policy period to be paid.

W.E. Aubuchon Co., Inc. **Aggregate** contract is based on a PAID basis (24/12). The PAID contract covers claims incurred and paid in your contract period of July 1, 2003 through June 30, 2004 as well as claims INCURRED twelve months prior to the contract period.

Marcus, your aggregate contract ends June 30, 2004. On or around July 1, 2004 we will be putting together your aggregate claim looking for reimbursement over the annual attachment point. Please find the enclosed Loss Report that shows your paid claims up to June 30, 2004 that are eligible to your aggregate. Please also see the Year to Date Attachment Point. The difference between the two is an estimate of your aggregate reimbursement. The difference between your paid claims and your aggregate liability is $478,000.00. It is very important for you to realize that a claim of this size will have an on sight audit by the stop-loss carrier. The loss ratio report is an unaudited report. The final aggregate claim will be determined by the final audit.

BeneFirst, LLC has gone through a few aggregate reimbursement audits. I am proud to report that the results were flawless on each one.

A LIMITED LIABILITY COMPANY

AUB 486

Page Two
Aggregate Reimbursement


BeneFirst will be pushing for an expedient return of the W.E. Aubuchon Co., Inc's claims
funded over the aggregate. Paul Gatanti, Direct of Claims for BeneFirst has estimated
based on past dealings with Combined Life Insurance Company that this audit should be
completed in November 2004.

Marcus, please let us know what else we can do for you and W.E. Aubuchon Co., Inc.

Sincerely,
BeneFirst Insurance Agency, Inc.

*Paul P. Sullivan*

Paul P. Sullivan
President


c.      Charles S. Lord – Chittenden
        Sarah Q. Arel
        Kim R. McMahon
        William E. Aubuchon, IV
        Maureen E. FitzGerald

**15**

{}





April 8, 2005

Ms. Sandra Schnabel
Vice President, Claim Administration
BP Inc.
6160 Summit Drive, Suite 345
Brooklyn Center, Minnesota 55430

RE:  Aggregate Claim Review
     Insured: W. E. Aubuchon Co., Inc.
     Carrier: Combined Insurance Company of America
     Contract Period: July 1, 2003, through June 30, 2004 (24/12)
     Administrator: BeneFirst LLC
     Review Dates: March 2-3, 2005
     Our Reference: I-05-079-1096

<div align="center">

### EXECUTIVE SUMMARY

</div>

Dear Ms. Schnabel:

    In accordance with your instructions, Adria L. Garneau, CEBS, of this firm, visited the Marshfield, Massachusetts, offices of BeneFirst LLC ["BeneFirst"] on March 2-3, 2005. Our contact at BeneFirst was Cheryl MacLeod, Reinsurance Coordinator. Responses to the questions raised during this audit were completed by Ms. MacLeod on April 4, 2005. The following narrative and **Exhibit I** summarize our findings, and will serve as our final report in regard to this engagement.

## A.  EXHIBIT:

    Exhibit I       -       Miscellaneous Claim Deductions.

## B.  SCOPE OF REVIEW:

    We were contracted to perform a review of a sample of claim transactions selected by BPI in regard to the captioned Insured's aggregate excess claim, to confirm adjudication competency and accuracy. Ms. Schnabel indicated that all other audit activities related to the adjudication of the aggregate excess claim were performed by BPI.

Ms. Sandra Schnabel
Re:     **Aggregate Claim Review**
          Insured: W. E. Aubuchon Co., Inc.
April 8, 2005
Page 2

## C.    FINDINGS:

1.  On-site at BeneFirst, we reviewed 208 claim transactions totaling
    $1,162,810.61. The primary goal of the claim audit was to examine in detail
    previously processed individual claim transactions to determine if each was
    processed according to the benefit provisions of the Insured's Plan, industry-
    wide processing guidelines and BeneFirst's established policies and
    procedures. Each audited claim transaction was examined to determine
    processing correctness in:

    - Claimant eligibility verification;
    - Detection of duplicate claim payments;
    - Evaluation of medical necessity;
    - Verification of creditable coverage or application of preexisting
      conditions limitations, if applicable;
    - Application of utilization review requirements;
    - Recognition of negotiated provider discounts;
    - Detection of other insurance coverage;
    - Application of coordination of benefits provisions;
    - Application of Plan design provisions;
    - Calculation of benefit payments amounts; and
    - Completeness of file documentation and information to process
      claims.

2.  Pursuant to our audit, we identified claim deductions in the amount of
    $107,057.90, as shown in **Exhibit I,** Miscellaneous Claim Deductions.

3.  BeneFirst has indicated agreement with the majority of our deductions, as
    noted in **Exhibit I**. The deductions relate, for the most part, to incorrect
    application of the Plan's multiple surgery rules, misapplication of out-of-
    network benefits and eligibility issues.

## D.    REMARKS AND RECOMMENDATIONS:

1.  At this time, we recommend a deduction from the aggregate excess claim
    of $107,057.90.

2.  Although BeneFirst agreed with our deductions for the most part, we
    welcome the opportunity to review any additional documentation that
    might be provided regarding claims issues we have raised.

AUB 561

Ms. Sandra Schnabel
Re:     **Aggregate Claim Review**
          Insured: W. E. Aubuchon Co., Inc.
April 8, 2005
Page 3

3.      We recommend that BPI carefully review all claim submissions with multiple surgery transactions, as application of a plan's multiple surgery rules is a manual process at BPI, which we believe offers greater opportunity for error than system-programmed adjudication.

4.      As we discussed with you, in its replies to claim questions we raised regarding out-of-pocket calculations on out-of-network claims, BeneFirst indicated that out-of-network claims were not adjudicated with a 90 percent coinsurance accumulating to the out-of-network out-of-pocket, due to a plan building error. Benefits were programmed to indicate that the out-of-network out-of-pocket was included in the deductible. BeneFirst acknowledges that this was an error in building plan benefit parameters for Aubuchon. Of course, when we identified this error on a claim selected for audit, the overpayment is quantified. However, even if we had full paid claims data, quantifying this error for the entire paid claims population as reported for the aggregate excess claim submission will be difficult, as the stop loss policy year does not correspond to the plan year. Therefore, we defer such a calculation to you.

          Thank you for this opportunity to be of service. Enclosed for your consideration is our service fee billing regarding this engagement. Should you have any questions or comments regarding our findings, we would be pleased to respond.

                                        Very truly yours,

                                        Adria L. Garneau, CEBS

ALG/sr2
cc:     Stephen V. Murphy
          Northshore International Insurance Services, Inc.

AUB 562

# WORKSHEET SUMMARY

**POLICYHOLDER: W. E. Aubuchon**

**POLICY YEAR: 7/1/03-6/30/04**

| NiiS Worksheet No. | TPA Agree | TPA Disagree | Deduction | Pending | OK | Comments |
|---|---|---|---|---|---|---|
| #1 Andrea Archambeault | | | | $10,681.26 | | Documentation is required that confirms this dependent meets the eligibility requirements as stated in the plan. $412.50 is being reduced because the multiple surgery rules were not applied in the adjudication of various claims. |
| | | | $412.50 | | | |
| #1 Allison Archambeault | | | | $4,623.87 | | Documentation is required that confirms this dependent meets the eligibility requirements as stated in the plan. |
| #3 Gerard Archambeault | | | $15,329.00 | | | There was no documentation provided that the chair lift, adjustable bed and mattress and the stair lift/elevator were prescribed as medical treatment for the diagnosis. It appears these items were paid as extra contractual claim payments. |
| #4 Wayne Ashley | X | | $2,542.86 | | | Multiple surgery rules were not applied in the adjudication of claim #40012934-01. |
| #5 Kim Lapinski (Baker) | | | | $11,828.37 | | Documentation is required that confirms this dependent meets the eligibility requirements as stated in the plan. |
| #6 Maria Boucher | X | | $1,100.00 | | | Multiple surgery rules were not applied in the adjudication of claim #30132446-01. |
| #7 Carrie Bradley | X | | $316.30 | | | The 90% coinsurance was not applied to this out of network provider on claim #4000486-01. |
| #8 Army Hart | X | | $577.50 | | | The $200 deductible and 90% coinsurance was not applied to this out of network provider on claim #30059164-01. |
| #9 Laura Drummond | X | | $952.00 | | | Multiple surgery rules were not applied in the adjudication of claim #30084301-01 |
| #10 Kathleen Durkin | X | | $2,752.00 | | | Claim notes indicate the procedure paid on claim #40001774-01 are not covered per the medical review and the payment should be coded as extra contractual. The claim was not coded as extra contractual when payment was issued. |
| #11 Julia Duso | X | | $483.60 | | | The $200 deductible and 90% coinsurance was not applied to this out of network provider on claim #30092113-01. |


APR 2 2005

| NiiS Worksheet No. | TPA Agree | TPA Disagree | Deduction | Pending | OK | Comments |
|---|---|---|---|---|---|---|
| #13 Dekota Rain (Herschel) | X | | $381.71 | | | Multiple surgery rules were not applied in the adjudication of claim #40054294-01. |
| #14 April Johnson | X | | $531.90 | | | Multiple surgery rules were not applied in the adjudication of claim #30040897-02. |
| #15 Marguerite Labombard | X | | $321.00 | | | The 90% coinsurance was not applied to this out of network provider on claim #40052345-01. |
| #16 Tanya Letourneau | X | | $205.00 | | | The 90% coinsurance was not applied to this out of network provider on claim #30094034-01. |
| #16 Tanya Letourneau | X | | $606.08 | | | The 90% coinsurance was not applied to this out of network provider on claim #30094032-01. |
| #18 Gregory Moran | X | | $375.00 | | | Multiple surgery rules were not applied in the adjudication of claim #40020440-01. |
| #19 Gregory Moran | X | | $832.20 | | | Multiple surgery rules were not applied in the adjudication of claim #40033936-01. |
| #20 Gregory Moran | X | | $585.00 | | | Multiple surgery rules were not applied in the adjudication of claim #40050033-01. |
| #21 Claire Moran | X | | $500.00 | | | Multiple surgery rules were not applied in the adjudication of claim #40018908-01. |
| #23 Stephanie Pederson | | | | $11,571.34 | | Claim #4000935-01 and #30129948-01 were originally denied for accident details. The claims were then released without the details. Need to have a copy of the accident details. |
| #24 Jayne Shapiro | X | | $1,087.65 | | | Multiple surgery rules were not applied in the adjudication of claim #40018932-01. |
| #25 Joy Spears | | | $1.14 | | | Coordination of benefits incorrectly applied. |
| #25 Susan St. Pierre | X | | $622.50 | | | Multiple surgery rules were not applied in the adjudication of claim #40018891-01. |

| NiiS Worksheet No. | TPA Agree | TPA Disagree | Deduction | Pending | OK | Comments |
|---|---|---|---|---|---|---|
| #29 Donna Summer | | | $2,348.00 | | | This claim was received more than a year after the incurred date and was denied by the administrator as having been submitted to late, according to the claim submission rules fo the Plan. The claim was later released at the instruction of the employer. This claim should have been processed as an extra contractual exception. |
| #30 Joan Viault | X | | $886.50 | | | Multiple surgery rules were not applied in the adjudication of claim #40004870-02. |
| #31 Donna Wilcox | X | | $430.00 | | | The 90% coinsurance was not applied to this out of network provider on claim #40013624-01. |
| #32 Donald Wylie | X | | $312.90 | | | The out of network benefits were not applied and the multiple surgery rules were not applied in the adjudication of claim #30056964-01. |
| #34 Kevin Deprey | X | | $500.00 | | | Multiple surgery rules were not applied in the adjudication of claim #40015714-01. |
| #35 Harley Maples (Holland) | | | $25,741.56 | | | The COB notes indicate this individual is the great niece of the employee's wife. The Plan covers a dependent for who the Covered Employee is the legal guardian and who is eligible to be claimed as a dependent on the Covered Employee's Federal Income Tax return. The enrollment form provided by BeneFirst showed the claimant was enrolled as the Employee's step child which is not true. BeneFirst further referenced an "attached adoption order". The legal document attached and referenced is not an adoption order, but an "Order Adopting Commissioner's Recommendations" that gives the Employee's wife, Debra Banks custody of the claimant, Harley Maples. There is no reference to status granted to the Employee, Keven Holland. Because the claimant is not the child of the Employee's wife, but a great niece, step child status does not apply and the child is in the legal custody of the wife, not the Employee. Therefore, this is not an eligible dependent as stated in the plan. |
| #36 Keven Holland | X | | $7,600.00 | | | Multiple surgery rules were not applied in the adjudication of claim #40045124-02 and 40045123-02. |

AUB 565

| NiiS Worksheet No. | TPA Agree | TPA Disagree | Deduction | Pending | OK | Comments |
|---|---|---|---|---|---|---|
| #37 Kenneth Johnson | | | $19.16 | | | BeneFirst received a refund from the provider for $44.72, for a $63.88 recovery obtained by a company identified as "AIM" who kept a $19.16 commission.  BeneFirst does not know who "AIM" is.  The stop loss is not liable for the reduction due to the recovery.  This applies to claim #40013331-01. |
| Stephanie Seavey | | | | $24,796.41 | | This is the difference between the amount on the RIP report and the RPC for this specific claimant.  Based on our comparison of the two reports the difference is due to claim #30098847-01 which is on the RPC dated 9/1/04 but not on the RIP report dated 10/5/04.  The specific claim filing appears to be overpaid by this amount since this claim was reimbursed by BPI on the initial submission. |
| Gregory Moran | | | | $7,276.75 | | This is the amount of the overpayment on this claimant. |
| Claim Deduction | | | $87.42 | | | Injectibles are not covered under the plan. |
| Claim Deduction | | | $1,320.65 | | | Medical claims paid after the termination date. |
| Claim Deduction | | | $2,080.23 | | | Prescription claims paid after the termination date. |
| Claim Deduction | | | | $63,634.86 | | Non network out of pocket claims that were not applied correctly. |
| TOTALS | | | $71,841.36 | $134,412.86 | | |

owed to us for uncollected OOP on non-network

MGU:                BP Inc.
POLICYHOLDER:       W. E. Aubuchon Co., Inc.
POLICY PERIOD:      7/1/03-6/30/04
ISL DEDUCTIBLE:     $125,000.00
PREPARED BY:        Terry Flannigan
TPA:                BeneFirst

| AGGREGATE FACTORS | | POLICY TYPE | |
|---|---|---|---|
| MEDICAL | | CURRENT YR | PRIOR YR |
| SINGLE | $309.95 | SPEC | 12/24 |
| FAMILY | $763.60 | AGG | 24/12 |

PAID CLAIMS                          MONTHLY COUNTS

| POLICY MONTH | MED/VISION | RX | SINGLE | FAMILY | AGG FACTORS TIMES COUNTS | CORRECTED AGGREGATE |
|---|---|---|---|---|---|---|
| 7/03 | $267,381.48 | $38,277.87 | 163 | 313 | $289,528.65 | $289,528.65 |
| 8/03 | $148,638.24 | $19,475.17 | 166 | 314 | $291,222.10 | $291,222.10 |
| 9/03 | $465,203.64 | $42,548.33 | 160 | 311 | $287,071.60 | $287,071.60 |
| 10/03 | $373,235.62 | $41,876.13 | 165 | 307 | $285,566.95 | $285,566.95 |
| 11/03 | $190,551.81 | $33,147.51 | 163 | 312 | $288,765.05 | $288,765.05 |
| 12/03 | $643,859.90 | $39,432.60 | 163 | 316 | $291,819.45 | $291,819.45 |
| 1/04 | $228,127.22 | $41,771.00 | 166 | 315 | $291,985.70 | $291,985.70 |
| 2/04 | $290,021.26 | $41,572.81 | 165 | 313 | $290,148.55 | $290,148.55 |
| 3/04 | $509,818.48 | $43,120.66 | 165 | 311 | $288,931.30 | $288,931.30 |
| 4/04 | $199,615.59 | $42,890.21 | 165 | 306 | $284,803.35 | $284,803.35 |
| 5/04 | $226,140.34 | $42,533.11 | 168 | 308 | $287,260.40 | $287,260.40 |
| 6/04 | $526,714.44 | $62,328.95 | 172 | 308 | $288,500.20 | $288,500.20 |
| TOTALS: | $4,069,308.02 | $488,974.35 | 1982 | 3734 | $3,465,603.30 | $3,465,603.30 |
| | | | | | OR MIN ATTACHMENT PT | $3,474,614.00 |

PAID CLAIMS:
+MEDICAL                    $4,069,308.02
+DENTAL                     $488,974.35
TOTAL PAID CLAIMS:          $4,558,282.37

LESS INELIGIBLE:
-CURRENT YEAR ISL EXCESS        ($507,240.86)
-PRIOR YEAR ISL EXCESS          ($190,115.54)
-EXCEPTIONS                     ($22,003.47)
-MEDICAL RECORD FEES            ($15.60)
-PPO REPRICING FEES             ($291.74)
-RX ADMIN FEES                  ($2,320.96)
ELIGIBLE AGG CLAIMS:            $3,836,294.20

AGGREGATE DEDUCTIBLE:           ($3,474,614.00)
AGGREGATE CLAIM TO DATE:        $361,680.20

-NON NETWORK OUT OF POCKET      ($63,634.86)
-AUDIT DEDUCTIONS               ($71,841.36)
-AUDIT DEDUCTIONS PENDING       ($38,704.84)
-DIFF BETWEEN AMTS ON RPC & RIP ($24,796.41) Stephanie Seavey
-GREGORY MORAN OVERPAYMENT      ($7,276.75)
NET AGGREGATE CLAIM:            $155,423.98

CLAIMS EXCEEDING ISL:
| PAID - Current Year ISL | $EXCEEDS |
|---|---|
| Samuael Bedard | $50,115.56 |
| Raymond Burgoyne | $273,238.82 |
| Stephanie Seavey | $12,314.47 |
| Wayne Strong | $96,024.25 |
| Stephen Valeski | $75,547.76 |
| Total | $507,240.86 |

| PAID - Prior Year ISL | $ EXCEEDS |
|---|---|
| Raymond Burgoyne | $190,086.54 |
| Richard Chauvin | $29.00 |
| Total | $190,115.54 |

*from improper programming of claim SPD language by Benefirst* (handwritten)

*received check from BP, Inc.* (handwritten)

APR 2 ?005 (handwritten)

W E AubuchonAggCalc 02.xls04/25/20058:10 AM

AUB 567

**EXHIBIT I**

Miscellaneous Claim Deductions

W. E. Aubuchon, Co., Inc.

Policy Period: July 1, 2003, through June 30, 2004 (24/12)

| Employee | NiiS Worksheet No. | Claimant | ID Number | Claim Number | Date(s) of Service | Billed Amount | Paid Amount | Amount at Issue |
|---|---|---|---|---|---|---|---|---|
| Archambeault, Dennis | 1 | Andrea | 003406732 | Various | 2002-2004 | N/A | $11,093.76 | $11,093.76 |
| Comments: Andrea's address is different than the employee's address. The plan requires that an eligible dependent reside with the employee and be eligible to be claimed as a dependent on the employee's Federal Income Tax. We asked BeneFirst to confirm this claimant's eligibility, and BeneFirst responded that the claimant had requested that her mail be sent to her dorm address as she is a full-time college student. However, student status verification provided by BeneFirst is for Allison, not Andrea. When we questioned BeneFirst further, BeneFirst responded that they could not obtain anything from the employee. We believe that this claimant's claims should not be allowed until her eligibility status is clearly verified. NOTE: If this claimant's eligibility is verified, then an overpayment on claim number 30075901-02 (NiiS Worksheet Number 2) of $412.50 should be deducted for mis-application of multiple surgery rules. | | | | | | | | |
| Archambeault, Dennis | N/A | Allison | 003406732 | Various | 2002-2004 | N/A | $4,623.87 | $4,623.87 |
| Comments: In questioning the above claim, we were sent documentation regarding Allison's student status, and noted that Allison's address is also different than the employee's address. The plan requires that an eligible dependent reside with the employee and be eligible to be claimed as a dependent on the employee's Federal Income Tax. When we asked BeneFirst to confirm Andrea's eligibility, BeneFirst responded that the claimant had requested that her mail be sent to her dorm address as she is a full-time college student. We confirmed that the school she attends, NHCTC, does not have dorms. When we questioned BeneFirst further regarding Andrea's eligibility, BeneFirst responded that they could not obtain anything from the employee. We believe that this claimant's claims should not be allowed until her eligibility status is clearly verified. | | | | | | | | |
| Archambeault, Gerard | 3 | Self | 001368023 | 4002421-01 | 1/17/2004 | $965.00 | $965.00 | $965.00 |
| | | | | 40031611-01 | 2/7/2004 | $3,800.00 | $3,800.00 | $3,650.00 |
| | | | | 40044016-01,02,03 | 4/13/2004 | $10,714.00 | $10,714.00 | $10,714.00 |
| Comments: Claims were paid for a commercial chair lift for $965 from a retail furniture store, an adjustable bed and mattress for $3,650 from a retail vendor and the purchase and installation of a stair lift/elevator for $10,714. Under the DME benefit, the plan covers mechanical equipment necessary for the treatment of the patient. We asked BeneFirst to provide documentation that these items were prescribed by a physician as medical treatment for the claimant's diagnosis of ALS. BeneFirst provided copies of the prescription for the claimant's power wheelchair, but not these items, and advised that Aubuchon authorized reimbursement for any of the claimant's equipment. We believe this constitutes an extra contractual claims payment which is not covered by the stop loss contract. | | | | | | | | |
| Ashley, Wayne | 4 | Self | 009387299 | 40012934-01 | 1/12/2004 | $10,180.00 | $9,976.40 | $2,542.86 |
| Comments: Multiple surgery rules were not applied in the adjudication of this claim. BeneFirst agrees. | | | | | | | | |

APR 2 - 2005

Prepared by: Northshore International Insurance Services, Inc.

Date: 4/8/2005

**EXHIBIT I**

Miscellaneous Claim Deductions

W. E. Aubuchon, Co., Inc.

Policy Period: July 1, 2003, through June 30, 2004 (24/12)

| Employee | NliS Worksheet No. | Claimant | ID Number | Claim Number | Date(s) of Service | Billed Amount | Paid Amount | Amount at Issue |
|---|---|---|---|---|---|---|---|---|
| Baker, James E. | 5 | Kim Lapinski | 009603842 | Various | 2002-2004 | N/A | $11,828.37 | $11,828.37 |
| Comments: The child has a different last name than the employee, and we asked for verification that she resides with the employee and is eligible to be claimed as a dependent on the employee's Federal Income Tax, as required by the plan. BeneFirst provided a copy of the enrollment form, which shows that the child is enrolled as a step-daughter, but did not provide any further eligibility verification. We asked BeneFirst to obtain confirmation of the child's status for the claimant's Federal Income Tax, and BeneFirst responded they were unable to obtain written verification from the employee, and did not want to pursue it, as the child is deceased. | | | | | | | | |
| Boucher, Dennis R. | 6 | Maria | 032368751 | 30132446-01 | 11/26/2003 | $7,650.00 | $5,260.00 | $1,100.00 |
| Comments: Multiple surgery rules were not applied in the adjudication of this claim. BeneFirst agrees. Please also note that accident details were not sought for this claim in 2003; however, it likely is too late at this point to pursue an investigation. | | | | | | | | |
| Bradley, Dennis | 7 | Carrie | 383963782 | 40004486-01 | 01/02-03/2004 | $3,163.00 | $3,163.00 | $316.30 |
| Comments: 90% coinsurance not applied to this out-of-network claim. BeneFirst agrees. | | | | | | | | |
| Hart, Army | 8 | Self | 065480247 | 30059164-01 | 5/2/2003 | $3,975.00 | $3,975.00 | $577.50 |
| Comments: $200 deductible and 90% coinsurance not applied to this out-of-network claim. BeneFirst agrees. | | | | | | | | |
| Drummond, William | 9 | Laura | 014525854 | 30084301-01 | 7/3/2003 | $7,840.00 | $3,808.00 | $952.00 |
| Comments: Multiple surgery rules were not applied in the adjudication of this claim. BeneFirst agrees. | | | | | | | | |
| Durkin, Kathleen | 10 | Self | 030302964 | 40001774-01 | 11/18/2003 | $3,194.40 | $2,752.00 | $2,752.00 |
| Comments: Claim notes indicate that the procedure is not covered per medical review and that payment should be coded as extra contractual. Such coding was not applied when the claim was adjudicated. BeneFirst agrees. | | | | | | | | |
| Duso, Bernard | 11 | Julia | 078662855 | 30092113-01 | 8/12/2003 | $3,036.00 | $3,036.00 | $483.60 |
| Comments: $200 deductible and 90% coinsurance not applied to this out-of-network claim. BeneFirst agrees. | | | | | | | | |
| Herschel, Chad | 13 | Dekota Rain | 008488850 | 40054294-01 | 5/10/2004 | $4,237.00 | $4,152.26 | $381.71 |
| Comments: Multiple surgery rules were not applied in the adjudication of this claim. BeneFirst agrees. | | | | | | | | |
| Johnson, Gary | 14 | April | 017486347 | 30040897-02 | 3/10/2003 | $5,600.00 | $4,798.80 | $531.90 |
| Comments: Multiple surgery rules were not applied in the adjudication of this claim. BeneFirst agrees. | | | | | | | | |
| Labombard, Howard | 15 | Marguerite | 132420934 | 40052345-01 | 5/3/2004 | $3,252.00 | $3,210.00 | $321.00 |
| Comments: 90% coinsurance not applied to this out-of-network claim. BeneFirst agrees. | | | | | | | | |

Prepared by: Northshore International Insurance Services, Inc.

Date: 4/8/2005

Page 2 of 4

**EXHIBIT I**

Miscellaneous Claim Deductions

W. E. Aubuchon, Co., Inc.

Policy Period: July 1, 2003, through June 30, 2004 (24/12)

| Employee | NiiS Worksheet No. | Claimant | ID Number | Claim Number | Date(s) of Service | Billed Amount | Paid Amount | Amount at Issue |
|---|---|---|---|---|---|---|---|---|
| Letourneau, Robert D. | 16 | Tanya | 008582975 | 30094034-01 | 8/13/2003 | $2,050.00 | $2,050.00 | $205.00 |
| Comments: 90% coinsurance not applied to this out-of-network claim. BeneFirst agrees. | | | | | | | | |
| Letourneau, Robert D. | 16 | Tanya | 008582975 | 30094032-01 | 8/13/2003 | $6,532.36 | $6,060.82 | $606.08 |
| Comments: 90% coinsurance not applied to this out-of-network claim. BeneFirst agrees. | | | | | | | | |
| Moran, Gregory | 18 | Self | 013366891 | 40020440-01 | 12/26/2003 | $6,010.00 | $4,512.00 | $375.00 |
| Comments: Multiple surgery rules were not applied in the adjudication of this claim. BeneFirst agrees. | | | | | | | | |
| Moran, Gregory | 19 | Self | 013366891 | 4003936-01 | 12/24/2003 | $4,692.00 | $3,753.60 | $832.20 |
| Comments: Multiple surgery rules were not applied in the adjudication of this claim. BeneFirst agrees. | | | | | | | | |
| Moran, Gregory | 20 | Self | 013366891 | 4050033-01 | 3/1/2004 | $3,624.00 | $2,667.20 | $585.00 |
| Comments: Multiple surgery rules were not applied in the adjudication of this claim. BeneFirst agrees. | | | | | | | | |
| Moran Sr., Marcus | 21 | Claire | 030073006 | 44018908-01 | 8/27/2003 | $3,487.00 | $2,465.60 | $500.00 |
| Comments: Multiple surgery rules were not applied in the adjudication of this claim. BeneFirst agrees. | | | | | | | | |
| Pederson, Louise B. | 23 | Stephanie | 040626217 | 40000963-01 | 12/8/2003 | $5,492.00 | $2,600.00 | $2,600.00 |
| | | | | 30129948-01 | 12/08-11/2003 | $10,554.52 | $8,971.34 | $8,971.34 |
| Comments: These claims were originally denied for accident details, and then released for no apparent reason because accident details were never obtained. BeneFirst agrees that claims of this dollar amount should not have been paid without accident details. | | | | | | | | |
| Shapiro, Larry | 24 | Jayne | 108429234 | 40018932-01 | 2/4/2004 | $3,195.00 | $2,875.50 | $1,087.65 |
| Comments: Multiple surgery rules were not applied in the adjudication of this claim. BeneFirst agrees. | | | | | | | | |
| Spears, Glen | 25 | Joy | 009423952 | 40062272-01 | 3/19/2004 | $6,257.00 | $3,290.50 | $1.14 |
| Comments: Coordination of benefits incorrectly applied. BeneFirst believes that, due to the small amount of the overpayment, the error should be disregarded. | | | | | | | | |
| St. Pierre, Thomas | 26 | Susan | 021404783 | 40018891-01 | 1/13/2004 | $2,566.00 | $2,566.00 | $622.50 |
| Comments: Multiple surgery rules were not applied in the adjudication of this claim. BeneFirst agrees. | | | | | | | | |
| Summer, Michael | 29 | Donna | 009406522 | 4003597-02 | 11/18/2002 | $2,348.00 | $2,348.00 | $2,348.00 |
| Comments: This claim was received more than a year after the incurred date, and BeneFirst denied the claim as having been submitted too late, according to the claim submission rules of the Plan according to BeneFirst. The claim was later released and paid in full, at the instruction of the employer. We believe the denial should have been upheld, or the claim should have been processed as an extra contractual exception. | | | | | | | | |

Prepared by: Northshore International Insurance Services, Inc.

Date: 4/8/2005

AUB 570

# EXHIBIT I

## Miscellaneous Claim Deductions

### W. E. Aubuchon, Co., Inc.

Policy Period: July 1, 2003, through June 30, 2004 (24/12)

| Employee | NIIS Worksheet No. | Claimant | ID Number | Claim Number | Date(s) of Service | Billed Amount | Paid Amount | Amount at Issue |
|---|---|---|---|---|---|---|---|---|
| Viault, Fred | 30 | Joan | 009307896 | 40004870-02 | 12/17/2003 | $2,619.00 | $2,619.00 | $886.50 |
| Comments: Multiple surgery rules were not applied in the adjudication of this claim. BeneFirst agrees. | | | | | | | | |
| Wilcox, Craig | 31 | Donna | 086461184 | 40013624-01 | 1/15/2004 | $2,500.00 | $2,500.00 | $430.00 |
| Comments: $200 deductible and 90% coinsurance not applied to this out-of-network claim. BeneFirst agrees. | | | | | | | | |
| Wylie, Donald | 32 | Self | 77606521 | 30056964-01 | 5/6/2003 | $3,740.00 | $2,323.50 | $312.90 |
| Comments: Out-of-network benefits not applied for this non-contracted provider and multiple surgery rules were not applied in the adjudication of this claim. BeneFirst agrees. | | | | | | | | |
| Deprey, Kevin L. | 34 | Self | 004782499 | 40015714-01 | 12/20/2003 | $3,000.00 | $2,349.00 | $500.00 |
| Comments: Multiple surgery rules were not applied in the adjudication of this claim. BeneFirst agrees. | | | | | | | | |
| Holland, Keven | 35 | Harley Maples | 007801364 | | Various | Various | various | $25,741.56 |
| Comments: COB notes for this claimant indicate she is the great niece of the enrolled employee's wife. The Plan covers a dependent for whom the Covered Employee is legal guardian and who is eligible to be claimed as a dependent on the Covered Employee's Federal Income Tax return. We asked BeneFirst to confirm this claimant's enrolled status, and BeneFirst provided an enrollment form that showed that the claimant is enrolled as the Employee's step child, which is not true. BeneFirst further referenced an "attached adoption order." The legal document attached and referenced is not an adoption order, but an "Order Adopting Commissioner's Recommendations" that gives the Employee's wife, Debra Banks, legal custody of the claimant, Harley Maples. There is no reference to status granted to the Employee, Keven Holland. Because the claimant is not the child of the Employee's wife, but a great niece, step child status does not apply, and the child is in the legal custody of the wife, not the Employee. Therefore, we do not believe that, according to the Plan wording, this is an eligible dependent. | | | | | | | | |
| Holland, Keven | 36 | Self | 007801364 | 40045124-02 | 4/1/2004 | $15,400.00 | $8,700.00 | $7,600.00 |
| | | | | 40045123-02 | 4/1/2004 | $25,000.00 | $9,150.00 | |
| Comments: Multiple surgery rules were not applied in the adjudication of this claim. BeneFirst agrees. | | | | | | | | |
| Johnson, Kenneth P. | 37 | Self | 007501866 | 40013331-01 | 12/17/2003 | $8,525.72 | $8,440.04 | $19.16 |
| Comments: BeneFirst received a refund from the provider for $44.72, for a $63.88 recovery obtained by a company identified as "AIM," who kept a $19.16 commission. We asked BeneFirst who AIM was and why they sent a refund on this claim. BeneFirst replied that they had no idea. Since neither BeneFirst nor the stop loss carrier authorized this company to take a commission on this recovery, we do not believe that the stop loss carrier should be liable for this reduction in the recovery amount. | | | | | | | | |
| | | | | | Exhibit Totals | $159,540.00 | $114,397.16 | $107,057.90 |

Prepared by: Northshore International Insurance Services, Inc.

Date: 4/8/2005

Page 4 of 4

# WORKSHEET SUMMARY--5/26/05

**POLICYHOLDER: W. E. Aubuchon**

**POLICY YEAR: 7/1/03-6/30/04**

| NIIS Worksheet No. | TPA Agree | TPA Disagree | Deduction | Pending | OK | Comments |
|---|---|---|---|---|---|---|
| #1 Andrea Archambeault | | | | | | Documentation is required that confirms this dependent meets the eligibility requirements as stated in the plan. |
| #1 Allison Archambeault | | | $412.50 | $10,681.26 | | $412.50 is being reduced because the multiple surgery rules were not applied in the adjudication of various claims. |
| | | | | $4,623.87 | | Documentation is required that confirms this dependent meets the eligibility requirements as stated in the plan. |
| #3 Gerard Archambeault | | | $15,329.00 | | | There was no documentation provided that the chair lift, adjustable bed and mattress and the stair lift/elevator were prescribed as medical treatment for the diagnosis. It appears these items were paid as extra contractual claim payments. |
| #4 Wayne Ashley | X | | $2,542.86 | | | Multiple surgery rules were not applied in the adjudication of claim #40012934-01. |
| #5 Kim Lapinski (Baker) | | | | $11,828.37 | | Documentation is required that confirms this dependent meets the eligibility requirements as stated in the plan. |
| #6 Maria Boucher | X | | $1,100.00 | | | Multiple surgery rules were not applied in the adjudication of claim #30132446-01. |
| #7 Carrie Bradley | X | | $316.30 | | | The 90% coinsurance was not applied to this out of network provider on claim #4000486-01. |
| #8 Army Hart | X | | $577.50 | | | The $200 deductible and 90% coinsurance was not applied to this out of network provider on claim #30059164-01. |
| #9 Laura Drummond | X | | $952.00 | | | Multiple surgery rules were not applied in the adjudication of claim #30084301-01 |
| #10 Kathleen Durkin | X | | $2,752.00 | | | Claim notes indicate the procedure paid on claim #40001774-01 are not covered per the medical review and the payment should be coded as extra contractual. The claim was not coded as extra contractual when payment was issued. |
| #11 Julia Duso | X | | $483.60 | | | The $200 deductible and 90% coinsurance was not applied to this out of network provider on claim #30092113-01. |

| NIiS Worksheet No. | TPA Agree | TPA Disagree | Deduction | Pending | OK | Comments |
|---|---|---|---|---|---|---|
| #13 Dekota Rain (Herschel) | X | | $381.71 | | | Multiple surgery rules were not applied in the adjudication of claim #40054294-01. |
| #14 April Johnson | X | | $531.90 | | | Multiple surgery rules were not applied in the adjudication of claim #30040897-02. |
| #15 Marguerite Labombard | X | | $321.00 | | | The 90% coinsurance was not applied to this out of network provider on claim #40052345-01. |
| #16 Tanya Letourneau | X | | $205.00 | | | The 90% coinsurance was not applied to this out of network provider on claim #30094034-01. |
| #16 Tanya Letourneau | X | | $606.08 | | | The 90% coinsurance was not applied to this out of network provider on claim #30094032-01. |
| #18 Gregory Moran | X | | $375.00 | | | Multiple surgery rules were not applied in the adjudication of claim #40020440-01. |
| #19 Gregory Moran | X | | $832.20 | | | Multiple surgery rules were not applied in the adjudication of claim #40033936-01. |
| #20 Gregory Moran | X | | $585.00 | | | Multiple surgery rules were not applied in the adjudication of claim #40050033-01. |
| #21 Claire Moran | X | | $500.00 | | | Multiple surgery rules were not applied in the adjudication of claim #40018908-01. |
| #23 Stephanie Pederson | | | | $11,571.34 | | Claim #40000935-01 and #30129948-01 were originally denied for accident details.  The claims were then released without the details.  Need to have a copy of the accident details. |
| #24 Jayne Shapiro | X | | $1,087.65 | | | Multiple surgery rules were not applied in the adjudication of claim #40018932-01. |
| #25 Joy Spears | | | $1.14 | | | Coordination of benefits incorrectly applied. |
| #25 Susan St. Pierre | X | | $622.50 | | | Multiple surgery rules were not applied in the adjudication of claim #40018891-01. |

| NiiS Worksheet No. | TPA Agree | TPA Disagree | Deduction | Pending | OK | Comments |
|---|---|---|---|---|---|---|
| #29 Donna Summer | | | | | | This claim was received more than a year after the incurred date and was denied by the administrator as having been submitted to late, according to the claim submission rules to the Plan. The claim was later released at the instruction of the employer. This claim should have been processed as an extra contractual exception. |
| #30 Joan Viault | X | | $2,348.00 | | | Multiple surgery rules were not applied in the adjudication of claim #40004870-02. |
| #31 Donna Wilcox | X | | $886.50 | | | The 90% coinsurance was not applied to this out of network provider on claim #40013624-01. |
| #32 Donald Wylie | X | | $430.00 | | | The out of network benefits were not applied and the multiple surgery rules were not applied in the adjudication of claim #30056964-01. |
| #34 Kevin Deprey | X | | $312.90 | | | Multiple surgery rules were not applied in the adjudication of claim #40015714-01. |
| #35 Harley Maples (Holland) | | | $500.00 | | | The COB notes indicate this individual is the great niece of the employee's wife. The Plan covers a dependent for who the Covered Employee is the legal guardian and who is eligible to be claimed as a dependent on the Covered Employee's Federal Income Tax return. The enrollment form provided by BeneFirst showed the claimant was enrolled as the Employee's step child which is not true. BeneFirst further referenced an "attached adoption order". The legal document attached and referenced is not an adoption order, but an "Order Adopting Commissioner's Recommendations" that gives the Employee's wife, Debra Banks custody of the claimant, Harley Maples. There is no reference to status granted to the Employee, Keven Holland. Because the claimant is not the child of the Employee's wife, but a great niece, step child status does not apply and the child is in the legal custody of the wife, not the Employee. Therefore, this is not an eligible dependent as stated in the plan. |
| #36 Keven Holland | X | | $25,741.56 | | | |
| | | | $7,600.00 | | | Multiple surgery rules were not applied in the adjudication of claim #40045124-02 and 40045123-02. |

| NiiS Worksheet No. | TPA Agree | TPA Disagree | Deduction | Pending | OK | Comments |
|---|---|---|---|---|---|---|
| #37 Kenneth Johnson | | | $19.16 | | | BeneFirst received a refund from the provider for $44.72, for a $63.88 recovery obtained by a company identified as "AIM" who kept a $19.16 commission. BeneFirst does not know who "AIM" is. The stop loss is not liable for the reduction due to the recovery. This applies to claim #40013331-01. |
| Stephanie Seavey | | | | $24,796.41 | | This is the difference between the amount on the RIP report and the RPC for this specific claimant. Based on our comparison of the two reports the difference is due to claim #30098847-01 which is on the RPC dated 9/1/04 but not on the RIP report dated 10/5/04. The specific claim filing appears to be overpaid by this amount since this claim was reimbursed by BPI on the initial submission. |
| Gregory Moran | | | | $7,276.75 | | This is the amount of the overpayment on this claimant. |
| Claim Deduction | | | $87.42 | | | Injectibles are not covered under the plan. |
| Claim Deduction | | | $1,320.65 | | | Medical claims paid after the termination date. |
| Claim Deduction | | | $2,080.23 | | | Prescription claims paid after the termination date. |
| Claim Deduction | | | | $20,082.97 | | Non network out of pocket claims that were not applied correctly. |
| Claim Deduction | | | $96.24 | | | Ineligible claims paid for New York Surcharges where full refunds were received on the original claim payments. |
| TOTALS | | | $71,937.60 | $90,860.97 | | |

AUB 575

# Tab 16

{}

# NiiS

*FILE COPY*

NORTHSHORE

July 22, 2005

Ms. Sarah Q. Arel
Benefits Manager
W. E. Aubuchon Co., Inc.
95 Aubuchon Drive
Westminster, Massachusetts  01473-0473

Mr. Charles S. Lord
Chairman
Chittenden Insurance Group
100 Bank Street, P.O. Box 485
Burlington, Vermont  05402



RE:    **Claim Audit**
    Administrator:  BeneFirst LLC
    Audit Periods:  Claims Paid 07/01/02-06/30/2003
                  Claims Paid 07/01/04-06/30/2005
    Review Dates:  June 21-23, 2005
    Our Reference:  J-05-249-1142

## EXECUTIVE SUMMARY

Dear Ms. Arel and Mr. Lord:

    In accordance with your instructions, Adria L. Garneau, CEBS, of this firm, visited the Marshfield, Massachusetts, offices of BeneFirst LLC ["BeneFirst"] on June 21-23, 2005.  Our contact at BeneFirst was Carrie Reddie, Claims Manager.  Responses to the questions raised during this audit were completed by Ms. Reddie and provided to us on July 1, 2005, and July 19, 2005.  The following narrative and **Exhibit I** summarize our findings, and will serve as our final report in regard to this engagement.

A.    <u>SCOPE OF REVIEW</u>:

    As agreed, the scope of this review was to audit a sample of claims selected from paid transactions from July 1, 2002, through June 30, 2003, and July 1, 2004, through June 30, 2004.

    For the 2002-2003 period, we selected 122 transactions totaling $717,876.76.  For the 2004 period, we selected 138 transactions totaling $1,018,906.57.  This selection included a review of 10 transactions for prescription drug card claims totaling $226,157.63, to confirm that accurate claim and administrative fee data had been processed by BeneFirst in regard to these high-dollar transactions.

B.    <u>FINDINGS</u>:

    The primary goal of the claim audit was to examine individual, previously processed claim transactions in detail to determine if each was processed according to the benefit

Ms. Sarah Q. Arel
Mr. Charles S. Lord
Re: **Claim Audit**
July 22, 2005
Page 2

provisions of the Insured's Plan, industry-wide processing guidelines and BeneFirst's established policies and procedures. Each audited claim transaction was examined to determine processing correctness in:

- Claimant eligibility verification;
- Detection of duplicate claim payments;
- Evaluation of medical necessity;
- Verification of creditable coverage or application of preexisting conditions limitations, if applicable;
- Application of utilization review requirements;
- Recognition of negotiated provider discounts;
- Detection of other insurance coverage;
- Application of coordination of benefits provisions;
- Application of Plan design provisions;
- Calculation of benefit payments amounts; and
- Completeness of file documentation and information to process claims.

Pursuant to our audit, we identified potential errors in the amount of $278,476.39, and confirmed errors of $194,055.17, as shown in **Exhibit I,** Miscellaneous Claim Errors. We also bring to your attention that one error is an underpayment of $200. However, for the purposes of a claim audit, an error is given the same weight in considering the error total, whether it is an underpayment or an overpayment.

BeneFirst has indicated agreement with many of our deductions, as noted in **Exhibit I**. Although BeneFirst agreed with many of our deductions, we welcome the opportunity to review any additional documentation that might be provided regarding claims issues we have raised.

Thank you for this opportunity to be of service. Enclosed for your consideration is our service fee billing regarding this engagement. Should you have any questions or comments regarding our findings, we would be pleased to respond.

Very truly yours,


Adria L. Garneau, CEBS

ALG/mh3

cc:     Stephen V. Murphy
        Northshore International Insurance Services, Inc.

## EXHIBIT I
### Miscellaneous Claim Errors
### BeneFirst LLC

| Employee | NiiS Worksheet No. | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Potential Errors | Actual Errors |
|---|---|---|---|---|---|---|---|---|
| Arel, Andre | 2 | Self | 20057414-00 | 20055753-01 | 4/5/2002 | $0.00 | $14,562.90 | $8,312.90 |
| | | | | 20101591-01 | 4/5/2002 | $7,637.90 | | |
| | | | | 20057420-01 | 4/5/2002 | $300.00 | | |
| | | | | 20057424-01 | 4/5/2002 | $1,725.00 | | |
| | | | | 20083238-01 | 4/5/2002 | $1,650.00 | | |
| | | | | 20057414-01 | 4/5/2002 | $3,250.00 | | |

**Comments:** Notes indicate that the claimant was hit in the face by a baseball while coaching, and that claims should be pended for clarification of coverage from school insurance, but that Aubuchon instructed that the claims be paid with post-payment investigation of the potential of recovery from the school insurance. BeneFirst paid the claim, but never pursued the investigation. In our experience, schools typically carry accident coverage for coaches, so we believe recovery should have been pursued. Secondary to our questioning of the pursuit of recovery for these claims, we found a duplicate payment agreed by BeneFirst of $7,637.90 (claim 20101591-01 and 20083238-01), and a missed multiple surgery discount of $675.00 (claim 20057414-01), also agreed by BeneFirst. Therefore, regardless of the missed recovery, this claim is overpaid by $8,312.90.

| Employee | NiiS Worksheet No. | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Potential Errors | Actual Errors |
|---|---|---|---|---|---|---|---|---|
| Aumand, Patrick F. Sr. | 4 | Ryan | 0084296.85-03 | 20074786-01 | 12/23/2001 | $4,248.85 | $6,229.61 | $1,968.75 |
| | | | | 20074792-01 | 1/24/2002 | $990.38 | | |
| | | | | 20074794-01 | 4/2/2002 | $990.38 | | |

**Comments:** This claim was the result of a motor vehicle accident. In correspondence provided to BeneFirst, the auto carrier indicated that it made two payments to the hospital, one for $1,839.75 and one for $1,968.25. Only the $1,839.75 was noted on the hospital bill sent to BeneFirst, so BeneFirst ignored the auto carrier's correspondence and only considered the $1,839.75 in its claim adjudication. In addition, BeneFirst indicated that it did not pursue identification of other auto insurance recovery, such as from Uninsured/Underinsured Motorist (UM) or Bodily Injury (BI) coverages. At the very least, this claim is overpaid by $1,968.75, and further recovery might have been possible had BeneFirst pursued the information.

Prepared by: Northshore International Insurance Services, Inc.
Date: 7/22/2005

**EXHIBIT I**

Miscellaneous Claim Errors

BeneFirst LLC

| Employee | NiiS Worksheet No. | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Potential Errors | Actual Errors |
|---|---|---|---|---|---|---|---|---|
| Bedard, Roberts | 5 | Samuel | 049661631-02 | 20074966-01 | 05/16-18/02 | $3,154.33 | $3,744.00 | $3,744.00 |
| | | | | 20066684-01 | 05/16-18/02 | $48.86 | | |
| | | | | 20118036-01 | 05/16-18/02 | $3,744.00 | | |

**Comments:** Claim 20118036-01 is a duplicate payment. BeneFirst agrees.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Brea, Leo | 6 | Self | 556277217-00 | 20031825-01 | 1/17/2005 | $70.00 | $70.00 | $70 |

**Comments:** This claim is a follow-up to surgery on 01/16/02, CPT code 63030. Usual, customary and reasonable guidelines (UCR) published by MediCode indicate that any follow-up within 90-days of surgery is included in the surgical fee. Therefore, we believe that this visit should not have been allowed. BeneFirst responded that "Nothing in the CPT book says that 63030 can't have a follow-up visit." We agree. The CPT book does not include considerations of UCR. We asked BeneFirst to check MediCode, a UCR reference source, but they did not.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Brea, Leo | 7 | Self | 556277217-00 | 20032128-01 | 1/24/2002 | $22.00 | $22.00 | $22.00 |

**Comments:** This claim is a follow-up to surgery on 01/16/02, CPT code 63030. Usual, customary and reasonable guidelines (UCR) published by MediCode indicate that any follow-up within 90-days of surgery is included in the surgical fee. Therefore, we believe that this visit should not have been allowed. BeneFirst responded that "Nothing in the CPT book says that 63030 can't have a follow-up visit." We agree. The CPT book does not include considerations of UCR. We asked BeneFirst to check MediCode, a UCR reference guide, our reference source, but they did not.

Prepared by: Northshore International Insurance Services, Inc.

Date: 7/22/2005

# EXHIBIT I
## Miscellaneous Claim Errors
### BeneFirst LLC

| Employee | NitS Worksheet No. | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Potential Errors | Actual Errors |
|---|---|---|---|---|---|---|---|---|
| Daly, Richard | 8 | Mary | 157369360-S | 20100318-01 | 07/22-23/02 | $5,829.91 | $14,983.70 | $6,361.35 |
| | | | | 20105685-01 | 07/22-23/02 | $731.44 | | |
| | | | | 20116339-01 | 07/22-23/02 | $6,361.35 | | |
| | | | | 20089785-01 | 7/22/2002 | $1,960.00 | | |
| | | | | 20010326-01 | 7/22/2002 | $36.00 | | |
| | | | | 20085198-01 | 7/11/2002 | $65.00 | | |

**Comments:** The diagnosis of internal derangement of knee was never investigated by BeneFirst. Potential recovery opportunity missed. Regardless, Claim 20116339-01 appears to be a duplicate of 20100318-01 and 20105685-01, but BeneFirst cannot confirm this because it cannot find copies of the claims. The claim is at least overpaid by $6,361.35, even if there is no potential for other party liability/subrogation recovery.

| Employee | NitS Worksheet No. | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Potential Errors | Actual Errors |
|---|---|---|---|---|---|---|---|---|
| Magoon, Wendell Jr. | 15 | Cameron | 0096423262-01 | 20125137-02 | 11/27/2002 | $330.00 | $330.00 | $330.00 |

**Comments:** This claim is for an assistant surgeon. MediCode UCR indicates that a surgical assist is not warranted for procedure 67311 and 67314. Therefore, we believe that the claim should have been denied. BeneFirst responded that "Nothing in the CPT book says that an assistant is not warranted for this surgery." We agree. The CPT book does not include considerations of UCR. We asked BeneFirst to check MediCode, a UCR reference guide, as we did, but they did not.

| Employee | NitS Worksheet No. | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Potential Errors | Actual Errors |
|---|---|---|---|---|---|---|---|---|
| Moore, Kenneth | 17 | April | 027441662-S | 30037139-01 | 02/26-28/03 | $3,752.00 | $7,448.40 | $7,448.40 |
| | | | | 30035102-01 | 2/26/2003 | $1,190.00 | | |
| | | | | 30037140-01 | 2/26/2003 | $1,800.00 | | |
| | | | | 30037141-01 | 2/26/2003 | $346.40 | | |
| | | | | 30045564-01 | 2/26/2003 | $360.00 | | |

**Comments:** BeneFirst's utilization review vendor, Med-Value, issued a determination that the proposed surgery as reflected in these claims was not medically necessary. BeneFirst's explanation as to why the claim was paid is that the "examiner was never given the denial from Med-Value and the notes were not put in the system to deny."

Prepared by: Northshore International Insurance Services, Inc.
Date: 7/22/2005

## EXHIBIT I
### Miscellaneous Claim Errors
### BeneFirst LLC

| Employee | NiiS Worksheet No. | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Potential Errors | Actual Errors |
|---|---|---|---|---|---|---|---|---|
| Moran, Marcus III | 18 | Jennifer | 011522237-S | 20109861-01 | 9/16/2002 | $3,100.00 | $400.00 | $400.00 |
| **Comments:** Multiple surgery rules were not applied in the adjudication of this claim. BeneFirst agrees. | | | | | | | | |
| O'Neill, Susan | 19 | Samantha Murray | 020524272-01 | Various | 07/01/02-06/30/03 | $21,180.05 | $21,180.05 | $21,180.05 |
| **Comments:** BeneFirst never investigated potential coordination of benefits from the father's insurance. In addition, the plan requires that, to be eligible, a dependent must reside with the employee. BeneFirst confirmed that this claimant lived with her grandparents. Therefore, we believe that no claims paid for this claimant should be allowed. Regardless, an overpayment of $3,875.00 was made because only 15 days of the 19-day confinement from 11/13/02-12/02/02 was authorized. BeneFirst agrees that the hospital claim was overpaid. | | | | | | | | |
| St. Cyr, Janice | 20 | Roger | 026320778-S | 20120103-01 | 6/6/2002 | $3,234.73 | $3,234.73 | $3,234.73 |
| **Comments:** BeneFirst was unable to locate a copy of this claim. Therefore, the claim is overpaid, because BeneFirst cannot confirm that its actions in adjudicating this claim are accurate. | | | | | | | | |
| Young, Philip R. | 23 | Self | 002468828-00 | 30043766-01 | 3/14/2003 | $5,245.41 | $8,479.41 | $0.00 |
| | | | | 30043768-01 | 3/14/2003 | $1,960.00 | | |
| | | | | 30043776-01 | 3/14/2003 | $1,240.00 | | |
| | | | | 30050885-01 | 3/14/2003 | $34.00 | | |
| **Comments:** BeneFirst never investigated the origin of the diagnosis of these back surgery claims to determine if there was a potential for other party liability or subrogation recovery. | | | | | | | | |
| House, Jamey | 25 | Indigo | 005729454-01 | Various | 07/01/02-06/30/03 | $7,405.92 | $7,405.92 | $0.00 |
| **Comments:** The claimant was effective 03/01/02, and had a tonsilectomy on 05/21/02. BeneFirst never confirmed prior creditable coverage or performed a preexisting condition investigation. Therefore, the claim could be overpaid. | | | | | | | | |

Prepared by: Northshore International Insurance Services, Inc.
Date:  7/22/2005

Page 4 of 8

## EXHIBIT I
### Miscellaneous Claim Errors
### BeneFirst LLC

| Employee | NitS Worksheet No. | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Potential Errors | Actual Errors |
|---|---|---|---|---|---|---|---|---|
| Barrows, Shannon | 27 | Jennifer Holmes | 009526734-03 | Various | 07/01/04-12/31/04 | $6,400.04 | $6,400.04 | $6,400.04 |
| **Comments:** The clamant was added to the plan on 03/01/03 when her father's insurance was terminated. She is the employee's stepdaughter. The patient has a different address than the employee, and the Aubuchon plan requires that a dependent reside with the employee to be eligible. Therefore, we believe that this is not an eligible dependent. We asked BeneFirst to address the issue of the different address, and although BeneFirst provided other eligibility documentation, BeneFirst did not address the issue of the different address. | | | | | | | | |
| Larson-Moran, Denise | 32 | Self | 031404523-00 | 40094422-01 | 9/14/2004 | $3,205.00 | $262.50 | $26. |
| **Comments:** Multiple surgery rules were not applied in the adjudication of this claim. BeneFirst agrees. | | | | | | | | |
| McCarthy, Carol A. | 33 | John | 014407451-S | Multiple | 6/26/1905 | $51,164.97 | $17,425.59 | $17,425.59 |
| **Comments:** The plan allows 45 days for inpatient treatment of mental/nervous claims. The claimant was confined for 66 days, and BeneFirst did not cut the benefits at 45 days. BeneFirst agrees the claim was overpaid, but stated that it paid for 64 days not 66. However, BeneFirst did not explain its calculation of 64 versus 66 days, so our deduction is based upon 66 days, with 21 days in excess of the limit. | | | | | | | | |
| McKirryher, Bradford | 34 | Self | 008347496-01 | 40106841-01 | 10/4/2004 | $8,325.00 | $1,300.00 | $1,300.00 |
| **Comments:** Multiple surgery rules were not applied in the adjudication of this claim. BeneFirst agrees. | | | | | | | | |

Prepared by: Northshore International Insurance Services, Inc.
Date: 7/22/2005

**EXHIBIT I**

Miscellaneous Claim Errors

BeneFirst LLC

| Employee | NiiS Worksheet No. | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Potential Errors | Actual Errors |
|---|---|---|---|---|---|---|---|---|
| Misner, Brian A. | 35 | Ashleigh | 028548788-01 | 40113896-01 | 10/29/2004 | $216.75 | $5,624.35 | $0.00 |
| | | | | 50007042-01 | 10/29/2004 | $0.00 | | |
| | | | | 40109033-01 | 10/22/2004 | $0.00 | | |
| | | | | 40109033-02 | 10/22/2004 | $216.75 | | |
| | | | | 40114002-01 | 10/22/2004 | $36.00 | | |
| | | | | 40105619-01 | 10/8/2004 | $0.00 | | |
| | | | | 40105619-02 | 10/8/2004 | $216.75 | | |
| | | | | 40111831-01 | 10/8/2004 | $36.00 | | |
| | | | | 40102624-01 | 10/1/2004 | $216.75 | | |
| | | | | 40100171-01 | 9/24/2004 | $2,927.40 | | |
| | | | | 40101704-01 | 9/24/2004 | $825.00 | | |
| | | | | 40102623-01 | 9/24/2004 | $275.00 | | |
| | | | | 40100170-01 | 9/23/2004 | $621.95 | | |
| | | | | 40101689-01 | 9/23/2004 | $36.00 | | |

**Comments:** The diagnosis for these claims is fracture metatarsal. We asked BeneFirst for details of how this injury occurred, to determine if other party liability or subrogation applied. BeneFirst responded that the former claims manager had instructed examiners that, for accidents for children under 15, the claims should be paid without investigation of accident details. We disagree, and believe these claims should not have been paid without investigation of accident details.

Prepared by: Northshore International Insurance Services, Inc.

Date: 7/22/2005

## EXHIBIT I
### Miscellaneous Claim Errors
### BeneFirst LLC

| Employee | NiiS Worksheet No. | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Potential Errors | Actual Errors |
|---|---|---|---|---|---|---|---|---|
| Schmid, Frank | 39 | Self | 086402380-00 | Various | 07/01/04-12/31/04 | $6,286.87 | $6,286.87 | $0.00 |
| **Comments:** The claimant was effective 12/01/03, and had claims in June of 2004. BeneFirst never confirmed prior creditable coverage or performed a preexisting condition investigation. Therefore, the claim could be overpaid. | | | | | | | | |
| Spears, Glenn | 40 | Joy | 009423952 | Various | 07/01/04-12/31/04 | $64,368.20 | $64,368.20 | $64,368.20 |
| **Comments:** This claimant has her own health plan, which is primary over Aubuchon's plan. Industry standards for coordinating benefits are that, when the secondary plan adjudicates the claim, the secondary plan calculates benefits as it would have done if it was primary, applying PPO discounts, deductibles, coinsurance, and the like, and then subtracts the primary plan payment to determine the net benefit payable. For example, for a $1,000 bill with a $200 PPO discount, the Aubuchon plan's 100 percent benefit would be $800. If the primary plan paid $500, the net payable under Aubuchon's plan is $300, with $200 not the patient's liability as the PPO discount. BeneFirst did not use this method to calculate the secondary plan's liability. Instead, BeneFirst took the full billed amount, deducted the primary plan payment, and paid the full balance, regardless of the secondary plan's actual benefit limits. We believe that this incorrect procedure resulted in multiple overpayments on the Aubuchon plan, and we show as an error the full amount paid for this claimant until BeneFirst recalculates all claims with the correct coordination of benefits procedure. | | | | | | | | |
| Valeski, Stephen | 43 | Self | 015486840-00 | Various | 07/01/04-12/31/04 | $77,367.46 | $77,367.46 | $39,876.00 |
| **Comments:** Because of the nature of this claimant's condition and the volume of claims, we questioned whether the claimant was actually working 40 or 47 hours per week, as required by the plan. BeneFirst's response to our question was "you have to get that from Aubuchon." Until the claimant's actively-at-work status was clarified, we believe that none of the claims were eligible. As a separate issue, the claimant's Medicare coverage became primary as of 08/01/04, but $39,876 was paid with no coordination of benefits with Medicare. BeneFirst advised that "refund requests were made for those claims" but did not provide details of the amount or status of refund requests. Until this is provided, we believe that at least $39,876.37 is overpaid on this claimant. | | | | | | | | |

Prepared by: Northshore International Insurance Services, Inc.

Date: 7/22/2005

Page 7 of 8

## EXHIBIT I
### Miscellaneous Claim Errors
### BeneFirst LLC

| Employee | NiiS Worksheet No. | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Potential Errors | Actual Errors |
|---|---|---|---|---|---|---|---|---|
| Feldmus, Aaron | 45 | Delaney Keller | 0066891109-03 | Various | 07/01/04-12/31/04 | $3,535.53 | $3,535.53 | $3,535.53 |
| **Comments:** This claimant has a different last name than employee, and claims show she has a different address. We asked BeneFirst to provide details of the relationship of the claimant to the employee, and BeneFirst responded "enrollment states she is his daughter." BeneFirst did not explain why she has a different last name and different address. Because the Aubuchon plan requires that, to be eligible, dependents reside with the employee, we believe these claims are not eligible. | | | | | | | | |
| Holland, Kevin | 47 | Harley Maples | 0078013364-02 | Various | 07/01/04-12/31/04 | $7,436.13 | $7,436.13 | $7,43. |
| **Comments:** COB notes for this claimant indicate she is the great niece of the enrolled employee's wife. The Plan covers a dependent for whom the covered employee is legal guardian and who is eligible to be claimed as a dependent on the covered employee's Federal Income Tax return. We asked BeneFirst to confirm this claimant's enrolled status, and BeneFirst provided an enrollment form that showed that the claimant is enrolled as the employee's stepchild, which is not true. BeneFirst further referenced an "attached adoption order." The legal document attached and referenced is not an adoption order, but an "Order Adopting Commissioner's Recommendations" that gives the employee's wife, Debra Banks, legal custody of the claimant, Harley Maples. There is no reference to status granted to the employee, Keven Holland. Because the claimant is not the child of the employee's wife, but a great niece, stepchild status does not apply, and the child is in the legal custody of the wife, not the employee. Therefore, we do not believe that, according to the Plan wording, this is an eligible dependent. | | | | | | | | |
| Holland, Kevin | 48 | Self | 0078013364-00 | 40105556-01 | 9/30/2004 | $2,570.40 | $179.00 | $179.00 |
| **Comments:** We asked BeneFirst to confirm that the claimant's out-of-network deductible was met. BeneFirst advised that only $21 of the $200 was met for 2004, producing an overpayment on this claim of $179. | | | | | | | | |
| Joseph, Troy | 14 | Shannon | 009420870 | 20107231-01 | 8/13/2002 | $4,336.57 | $200.00 | $200.00 |
| **Comments:** BeneFirst confirmed that a precertification penalty was taken in error on this claim, producing an underpayment. | | | | | | | | |
| | | | | | **Exhibit Totals:** | $334,614.43 | $278,476.39 | $194,055.17 |

Prepared by: Northshore International Insurance Services, Inc.
Date: 7/22/2005

Page 8 of 8

**17**

{}



**NiiS**

NORTHSHORE

April 8, 2008

Louis M. Ciavarra, Esq.
Ryan T. Killman, Esq.
Bowditch & Dewey, LLP
311 Main Street
P.O. Box 15156
Worcester, Massachusetts  01615-0156

Re:  W.E. Aubuchon Co., Inc. et al. v. BeneFirst, LLC
    <u>Civil Action No. 05-40159-FDS</u>
    **Claims Audit**
    Employer:      W.E. Aubuchon Co., Inc.
                   Aubuchon Distribution, Inc.
    Administrator:  BeneFirst, LLC
    Our Reference:  J-05-249-1142

<div align="center">SUMMARY REPORT</div>

Dear Mr. Ciavarra and Mr. Killman:

**A.**    <u>**EXHIBITS:**</u>

    **Exhibit I**   -   Undocumented Claims, W.E. Aubuchon Co, Inc.;

    **Exhibit II**  -   Undocumented Claims, Aubuchon Distribution, Inc.

    **Exhibit III** -   Procedural and Financial Claim Errors, W.E. Aubuchon Co., Inc.

    **Exhibit IV** -   Procedural and Financial Claim Errors, Aubuchon Distribution, Inc.

Louis M. Ciavarra, Esq.
Ryan T. Killman, Esq.
**Claims Audit**
Employer:    W.E. Aubuchon Co., Inc.
                    Aubuchon Distribution, Inc.
April 8, 2008
Page 2

## B.    BACKGROUND:

In February 2005, Northshore International Insurance Services, Inc.
["Northshore"] was engaged by a stop loss managing general underwriter, BP
Inc., to complete an audit of a selection of 208 claim transactions processed by
BeneFirst, LLC ["BeneFirst"] for enrollees of W.E. Aubuchon Co., Inc.
["Aubuchon"].  This audit addressed claims inuring to the July 1, 2003, through
June 30, 2004, aggregate stop loss policy period.  The claims to be audited were
selected by BP Inc., and our findings pursuant to this audit were detailed in our
report to BP Inc. dated April 8, 2005.

Subsequently, Aubuchon engaged Northshore to complete an audit of a selection
of 122 claim transactions processed by BeneFirst for enrollees of Aubuchon from
July 1, 2002, through June 30, 2003, and 138 claim transactions processed by
BeneFirst from July 1, 2004, through December 31, 2004.  The claims to be
audited were selected from claim reports provided by BeneFirst, and represented
high dollar transactions.  Our findings pursuant to this audit were detailed in our
report to Aubuchon dated July 22, 2005.

As a result of these claims audits, Northshore identified $172,632.42 in
Procedural claim errors, and $189,182.37 in Financial claim errors.  Procedural
errors are those where we do not believe that BeneFirst utilized diligent claim
investigation protocols, and the results of further investigation could reveal a
Financial error.  Financial errors are those where an overpayment or
underpayment occurred.  Please note that these figures do not consider issues
applicable only to the stop loss coverage.

Although the claims selected for review in these audits were not chosen on the
basis of statistically valid sampling techniques, and, thus, the findings cannot be
extrapolated, it is important to note that the errors identified were agreed by
BeneFirst and do reflect a financial impact to Aubuchon.

As we understand it, the pattern of errors identified in these audits led Aubuchon
to question BeneFirst's overall competency and, ultimately, to engage Northshore
to perform further review activities.

## C.    AUDIT SAMPLE:

Pursuant to the captioned civil action, Northshore was asked to conduct an audit
of additional claim transactions.  For Aubuchon, we were provided with an Excel

Louis M. Ciavarra, Esq.
Ryan T. Killman, Esq.
**Claims Audit**
Employer:  W.E. Aubuchon Co., Inc.
                    Aubuchon Distribution, Inc.
April 8, 2008
Page 3

spreadsheet entitled *BeneFirst RPC 097351* containing paid claim data for the period that BeneFirst had processed claims for Aubuchon, July 1, 2001, through December 31, 2004. This spreadsheet contains 39,078 transactions with paid amounts totaling $11,612,522.80. Please note that one claim can consist of one or more transactions lines.

For Aubuchon, we eliminated all claim payments of $499.99 and less, which represents payments totaling $3,255,083.01; all claim transactions previously reviewed in the audit conducted for BP, which represent payments totaling $1,161,549.01; all claim transactions previously reviewed in the audit conducted for Aubuchon, which represent payments totaling $1,735,195.91; and all claims with a description of "Expense E", which we knew from prior audits were claims for prescription drugs, which represents payments totaling $488,974.35. The remaining 2,991 transactions were identified as the current audit population, with payments totaling $4,971,720.52.

Typically, the next audit step would be to select a statistically valid sample from the audit population, which most often is a sample of 300 to 350 claims. Instead, to increase the statistical validity of this audit, it was decided to audit the entire population.

We understand that, in addition to medical claims, BeneFirst processed dental claims for Aubuchon, and that, therefore, dental claims were included in the Excel spreadsheet provided. Unfortunately, there was no code or identifier shown in the spreadsheet that allowed us to differentiate between a dental claim and a medical claim. As such, we knew that the claim audit sample would include dental claims, which were not intended to be included in this audit. Pursuant to our review of the documents provided, we identified 124 dental claims with paid amounts totaling $98,771.40. Thus, the net audit sample for Aubuchon was 2,867 transactions with payments totaling $4,872,949.12.

For Aubuchon Distribution, Inc. ["Distribution"], we were provided with an Excel spreadsheet entitled *BeneFirst Aubuchon Distribution RPC 097352* containing paid claim data for the period that BeneFirst had processed claims for Distribution, July 1, 2001, through August 24, 2002. This spreadsheet contains 2,048 transactions with paid amounts totaling $444,079.27. Please note that one claim can consist of one or more transactions lines.

For Distribution, from the total of claims all claims listed in the Excel spreadsheet provided, we eliminated all claim payments of $499.99 and less. The remaining 166 claims were identified as the audit population, with payments totaling

Louis M. Ciavarra, Esq.
Ryan T. Killman, Esq.
**Claims Audit**
Employer:   W.E. Aubuchon Co., Inc.
                    Aubuchon Distribution, Inc.
April 8, 2008
Page 4

$279,149.30.  There were no dental claims for Distribution.  Since a statistically valid audit sample typically contains 300 to 350 claims, in this instance the entire population of 166 claims was identified as the audit sample.

## D.   FINDINGS:

The purpose of a claim audit is to affirm and verify that accurate reimbursement was made to the provider submitting the claim, according to the benefits available from the employer Plan.  The first step in this verification or audit process is a review of the actual provider bill.  As such, we requested a copy of the bills submitted by the providers for each claim selected for audit.

We were advised that, of the 2,991 claims included in the audit selection for Aubuchon, only 1,777 or 60 percent of the provider bills could be located, and of the 166 claims selected for Distribution, only 105 or 64 percent could be located, indicating that there were 1,214 undocumented claims for Aubuchon and 61 undocumented claims for Distribution.

Because the provider bill is the document that initiates and supports the request for reimbursement consideration, if this key document is missing, it is impossible to affirm that adjudication of eligible benefits occurred correctly.  In order to support its activities, an administrator *must* retain the source document upon which the decision to release funds was based.  The lack of a comprehensive system to catalog and store these key source documents is unacceptable claims administration practice and protocol.

We have listed the 1,214 undocumented claims for Aubuchon and the 61 undocumented claims for Distribution in the attached **Exhibits I** and **II**, respectively.  As shown, payment amounts for undocumented Aubuchon claims total $2,555,922.38, and the 61 for Distribution total $116,485.86.  Being that the provider bill is the key document that initiates the process of claim adjudication, if the provider bill cannot be produced, there is no way to confirm that the claim payment was accurate, or even that the claim payment should have occurred at all. Therefore, an undocumented claim is a claim paid in error.

Each documented claim transaction was examined to determine adjudication accuracy, including the following:

- Claimant eligibility verification;
- Detection of duplicate claim payments;

Louis M. Ciavarra, Esq.
Ryan T. Killman, Esq.
**Claims Audit**
Employer:    W.E. Aubuchon Co., Inc.
                  Aubuchon Distribution, Inc.
April 8, 2008
Page 5

- Verification of creditable coverage or application of preexisting conditions limitations, if applicable;
- Recognition of negotiated provider discounts;
- Detection of other insurance coverage;
- Application of coordination of benefits provisions;
- Application of Plan design provisions;
- Calculation of benefit payments amounts; and
- Completeness of file documentation and information to process claims.

An identified error is classified as either Procedural, also known as Potential, or Financial, also known as Actual. A Financial error is one where there is an identifiable overpayment or underpayment. A Procedural error occurs when a claim is identified which contains an error for which the exact financial effect cannot be determined (failure to pursue coordination of benefits or investigate student status, for example); thus, the entire payment is suspect in the absence of correct claims handling protocol.

Pursuant to our audit, for Aubuchon, we identified Procedural errors in the amount of $654,445.65, and Financial errors in the amount of $141,350.21, as shown in **Exhibit III**. For Distribution, we identified Procedural errors of $48,044.88 and Financial errors of $17,196.84, as shown in **Exhibit IV**. These are in addition to the totals shown in **Exhibits I** and **II**, respectively, for undocumented claims identified for Aubuchon of $2,555,922.38 and Distribution of $116,485.86.

The industry standard for Financial accuracy is at least 99.0 percent; that is, only one percent or less of claims should have a financial error. As shown in the following tables, even considering just the Financial claim errors, BeneFirst did not meet this metric. As shown, for Aubuchon, 2.9 percent of all claims were paid incorrectly, and for Distribution, 6.2 percent of all claims were paid incorrectly.

When the undocumented claims are added, less than half of the Aubuchon claims and only slightly more than half of the Distribution claims were paid accurately. Again referring to the following tables, including Financial errors and undocumented claims, for Aubuchon, 55.4 percent of all claims were paid incorrectly, and for Distribution, 47.9 percent of all claims were paid incorrectly.

Louis M. Ciavarra, Esq.
Ryan T. Killman, Esq.
**Claims Audit**
Employer:   W.E. Aubuchon Co., Inc.
            Aubuchon Distribution, Inc.
April 8, 2008
Page 6

When the Procedural claim errors are taken into consideration, the results are unacceptable, with errors in 68.8 percent of all claims for Aubuchon, and errors in 65.1 percent of all claims for Distribution.

| | *Audit Results* W. E. Aubuchon Co., Inc. | |
|---|---|---|
| a | Total number of claims in audit population | 39,078 |
| b | Total dollars paid for audit population | $11,612,522.80 |
| c | Total number of claims audited | 2,867 |
| d | Total dollar amount of claim payments audited | $4,872,949.12 |
| e | Total Financial errors (overpayments and underpayments) | $141,350.21 |
| f | Total undocumented claims | $2,555,922.38 |
| g | Total Procedural errors | $654,445.65 |
| h | Financial Accuracy -- Financial errors only [d-e÷d] | 97.1% |
| i | Value of errors extrapolated against total population b x [100% - (d-e÷d)] | $336,763.16 |
| j | Financial Accuracy -- Financial and undocumented only [d-(e+f)÷d] | 44.6% |
| k | Value of errors extrapolated against total population b x [100% - (d-(e+f)÷d)] | $6,433,337.63 |
| l | Financial Accuracy -- Financial, undocumented and Procedural [d-(e+f+g)÷d] | 31.2% |
| m | Value of errors extrapolated against total population b x [100% - (d-(e+f+g)÷d)] | $7,989,415.69 |

Louis M. Ciavarra, Esq.
Ryan T. Killman, Esq.
**Claims Audit**
Employer:   W.E. Aubuchon Co., Inc.
                   Aubuchon Distribution, Inc.
April 8, 2008
Page 7

| | *Audit Results*<br>*Aubuchon Distribution, Inc.* | |
|---|---|---|
| a | Total number of claims in audit population | 2,048 |
| b | Total dollars paid for audit population | $444,079.27 |
| c | Total number of claims audited | 166 |
| d | Total dollar amount of claim payments audited | $279,149.30 |
| e | Total Financial errors (overpayments and underpayments) | $17,196.84 |
| f | Total undocumented claims | $116,485.86 |
| g | Total Procedural errors | $48,044.88 |
| h | Financial Accuracy -- Financial errors only<br>[d-e÷d] | 93.8% |
| i | Value of errors extrapolated against total population<br>b x [100% - (d-e÷d)] | $27,532.92 |
| j | Financial Accuracy -- Financial and undocumented only<br>[d-(e+f)÷d] | 52.1% |
| k | Value of errors extrapolated against total population<br>b x [100% - (d-(e+f)÷d)] | $212,713.97 |
| l | Financial Accuracy – Financial, undocumented and Procedural<br>[d-(e+f+g)÷d] | 34.9% |
| m | Value of errors extrapolated against total population<br>b x [100% - (d-(e+f+g)÷d)] | $289,095.56 |

# EXHIBIT III

## Procedural and Financial Claim Errors

### W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Financial Errors |
|---|---|---|---|---|---|---|---|
| Ellis, Steven | Courtney | 026502330 | Various | 8/3/01-6/2/03 | $ 4,729.66 | $ 4,729.66 | |
| **Comments:** The diagnosis of dislocation of patella, sprain of wrist, unspecified injury of elbow, forearm and wrist was not investigated by BeneFirst, causing a missed potential recovery opportunity. | | | | | | | |
| Forrest, Chad | Chad Jr. | 136584483 | Various | 10/2/01-11/6/01 | $ 256.00 | $ 256.00 | |
| **Comments:** The diagnosis of fracture of shaft of radius and ulnar was not investigated by BeneFirst, causing a missed potential recovery opportunity. | | | | | | | |
| Forrest, Chad | Jasmyne | 136584483 | Various | 1/21/02-8/8/04 | $ 1,796.05 | $ 1,796.05 | |
| **Comments:** The diagnosis of fracture of distal end of radius was not investigated by BeneFirst, causing a missed potential recovery opportunity. | | | | | | | |
| Harkins, Gary | Self | 005846818 | Various | 9/5/2001 | $ 4,992.62 | $ 4,992.62 | |
| **Comments:** The diagnosis of fracture of distal end of radius was not investigated by BeneFirst, causing a missed potential recovery opportunity. | | | | | | | |
| Higgins, Ronald | Ronald | 001461463 | Various | 10/17/01-11/5/01 | $968.27 | $968.27 | |
| **Comments:** The diagnosis of closed fracture of other facial bones was not investigated by BeneFirst, causing a missed potential recovery opportunity. | | | | | | | |
| Hodgeman, Greg | Kailianne | 008628196 | 30073297-01 | 3/20/2003 | $670.40 | $670.40 | |
| **Comments:** The diagnosis of closed fracture of other facial bones was not investigated by BeneFirst, causing a missed potential recovery opportunity. | | | | | | | |
| Jackson, Gregory | Self | 072684550 | Various | 11/12/2002 | $21,445.66 | $21,445.66 | |
| **Comments:** The diagnosis of retinal detachment with giant tear was not investigated by BeneFirst, causing a missed potential recovery opportunity. | | | | | | | |

## EXHIBIT III

### Procedural and Financial Claim Errors
### W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Financial Errors |
|---|---|---|---|---|---|---|---|
| Lavelli, Beverly | David | 026520982 | 30017617-01 | 12/5/2002 | $ 517.40 | $ 517.40 | |
| **Comments:** The diagnosis of open wound of finger was not investigated by BeneFirst, causing a missed potential recovery opportunity. | | | | | | | |
| Letourneau, Robert | Ryan | 008582975 | 10124392-01 | 9/27/2001 | $ 455.40 | $ 455.40 | |
| | | | 10124393-01 | 9/27/2001 | $ 553.50 | $ 553.50 | |
| **Comments:** The diagnosis of unspecified head injury was not investigated by BeneFirst, causing a missed potential recovery opportunity. | | | | | | | |
| Misner, Brian | Amanda | 028548788 | 30060242-01 | 5/12/2003 | $ 517.40 | $ 517.40 | |
| **Comments:** The diagnosis of open wound of scalp was not investigated by BeneFirst, causing a missed potential recovery opportunity. | | | | | | | |
| Moore, Kenneth | Self | 027441662 | 20060766-01 | 3/22/2003 | $ 1,377.50 | $ 1,377.50 | |
| | | | 30135443-01 | 11/25/2003 | $ 598.50 | $ 598.50 | |
| **Comments:** The diagnosis of concussion and sprain of knee and leg was not investigated by BeneFirst, causing a missed potential recovery opportunity. | | | | | | | |
| Stanovich, Jane | Self | 014629030 | 20011035-01 | 7/31/2001 | $ 702.74 | $ 702.74 | |
| **Comments:** The diagnosis of sprain of ankle was not investigated by BeneFirst, causing a missed potential recovery opportunity. | | | | | | | |
| Stanovich, Jane | Thomas | 014629030 | Various | 10/10/03-11/21/03 | $ 1,341.67 | $ 1,341.67 | |
| **Comments:** The diagnosis of fracture of distal end of radius was not investigated by BeneFirst, causing a missed potential recovery opportunity. | | | | | | | |

## EXHIBIT III

### Procedural and Financial Claim Errors

### W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Financial Errors |
|---|---|---|---|---|---|---|---|
| Viault, Fred | Self | 009307896 | 20058684-01 | 1/8/2002 | $ 2,460.00 | $ 2,460.00 | |
| **Comments:** The diagnosis of tear medial meniscus was not investigated by BeneFirst, causing a missed potential recovery opportunity. | | | | | | | |
| Lizotte, Robert | Eleanor | 010425321 | 30118871-01 | 10/10/2003 | $ 1,520.00 | | $ 760.00 |
| | | | 30118873-01 | 10/10/2003 | $ 760.00 | | $ 380.00 |
| **Comments:** When both an MD and a CRNA bill for anesthesia services, each should receive 50 percent allowance. Both of the above charges had 100 percent allowed. | | | | | | | |
| Bradley, Dennis | Carrie | 383963782 | 40018153-02 | 1/14/04-1/30/04 | $615.99 | | $6.09 |
| **Comments:** A 10 percent benefit calculation error was made after application of the MultiPlan discount. Allowed was $684.90 less $75 copay, reimbursement should have been $609.90. | | | | | | | |
| Butchko, Edward | Nancey | 075721981 | 30024728-01 | 12/20/2002 | $ 6,323.41 | | $ 2.26 |
| **Comments:** A benefit calculation error was made after application of the MultiPlan discount. Allowed amount was $6,351.15 less $30 copay, reimbursement should have been $6,321.15 | | | | | | | |
| Konik, Justin | Jennifer | 063642497 | 30056605-01 | 4/25/2003 | $ 477.39 | | $ 2.27 |
| **Comments:** A benefit calculation error was made after application of the MultiPlan discount. Allowed amount was $126.28, less $30 copay, reimbursement should have been $475.12 | | | | | | | |
| Moore, Kenneth | Ashley | 027441662 | 30038613-01 | 3/5/2003 | $ 631.82 | | $ 10.00 |
| **Comments:** A benefit calculation error was made after application of the MultiPlan discount. Allowed amount was $656.82 less $15 copay, reimbursement should have been $641.82, producing | | | | | | | |
| Nason, Herbert | Self | 075303503 | 10130586-01 | 9/1/01-9/13/01 | $40,949.14 | | $117.67 |
| **Comments:** The billed amount was entered incorrectly as $43,434.64 rather than the correct billed amount of $45,499.04, so that when the 10 percent discount was applied, a $117.67 underpayment | | | | | | | |

Prepared by: Northshore International Insurance Services, Inc.
Date: 4/8/2008

# EXHIBIT III

## Procedural and Financial Claim Errors
### W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Financial Errors |
|---|---|---|---|---|---|---|---|
| Seavey, Christopher | Stephanie | 004848721 | 30050657-01 | 4/8/2003 | $ 559.80 | | $ 130.62 |
| **Comments:** The PPO discount was overlooked in the adjudication of the claim. | | | | | | | |
| Tranka, Edward | Kaitlyn | 075721981 | 20082400-01 | 6/11/2002 | $ 652.52 | | $ 1.89 |
| **Comments:** A benefit calculation error was made after application of the MultiPlan discount. Allowed amount was $675.63 less $25 copay, reimbursement should have been $650.63 | | | | | | | |
| Vradenburg, Angela | Self | 118569614 | 30068941-01 | 5/27/2003 | $ 540.23 | | $ 2.27 |
| **Comments:** A benefit calculation error was made after application of the MultiPlan discount. Allowed amount was $567.96 less $30 copay, reimbursement should have been $537.96 | | | | | | | |
| Aubuchon, Pierre | Self | 033223323 | 30088310-02 | 6/11/2003 | $ 697.85 | | $ 533.65 |
| **Comments:** Claimant has Medicare coverage as prime; however, charges were paid as primary by BeneFirst. Our deduction is based upon the typical Medicare calculation of 80 percent reimbursement of billed which would have been $821.00. The 20 percent balance would have been $164.20, the maximum BeneFirst should have paid. | | | | | | | |
| Dailey, Alicia | Mark | 009629575 | 2003249-01 | 1/4/2002 | $ 900.00 | | $ 900.00 |
| | | | 2004708-01 | 1/4/2002 | $ 180.00 | | $ 180.00 |
| **Comments:** BeneFirst notes indicate that the claimant has primary coverage. Primary carrier payment was not considered on any claims. | | | | | | | |
| Larivee, Betty | Self | 008305761 | Various | 2/7/02-11/30/04 | $ 1,138.60 | | $ 1,138.60 |
| **Comments:** BeneFirst notes indicate that employee has primary coverage through Blue Cross Blue Shield. Primary carrier payment was not considered on any claims. | | | | | | | |
| Lavelli, Beverly | Kathy | 026520982 | Various | 1/25/01-12/27/01 | $ 6,402.76 | | $ 6,402.76 |
| **Comments:** BeneFirst notes indicate that the claimant has primary coverage. Primary carrier payment was not considered on any claims. | | | | | | | |
| Lavelli, Beverly | Kathy | 026520982 | 20020278-01 | 12/31/2001 | $ 884.85 | | $ 884.85 |
| **Comments:** Provider is Henry Heywood Memorial Hospital; however, payment was made to Susan E. Bonadonna, MD. Additionally, claimant has own medical coverage which is primary. Primary carrier payment was not considered on this claim. | | | | | | | |

Prepared by: Northshore International Insurance Services, Inc.

Date: 4/8/2008

## EXHIBIT III

### Procedural and Financial Claim Errors

### W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Financial Errors |
|----------|----------|-----------|--------------|---------------------|-------------|-------------------|------------------|
| Bedard, Samuel | Self | 007820809 | Various | 11/7/03-11/15/04 | $ 307,693.85 | $ 307,693.85 | |
| **Comments:** Eligibility on-line indicates that COBRA was effective 1/1/03. No documentation noted on-line indicating that a COBRA election form was completed or that premium payments were made. | | | | | | | |
| Bryant, Jeffrey | Self | 032646418 | Various | 12/26/2003 | $ 1,179.64 | $ 1,179.64 | |
| **Comments:** Eligibility on-line indicates that COBRA was effective 11/20/03. No documentation noted on-line indicating that a COBRA election form was completed or that premium payments were made. | | | | | | | |
| Bryant, Jeffrey | Jagger | 032646418 | Various | 12/19/03-3/23/04 | $ 179.00 | $ 179.00 | |
| **Comments:** Eligibility on-line indicates that COBRA was effective 11/20/03. No documentation noted on-line indicating that a COBRA election form was completed or that premium payments were made. | | | | | | | |
| Deschamps, Louis | Self | 009288195 | Various | 8/2/01-9/10/02 | $ 2,025.30 | | $ 1,446.70 |
| **Comments:** Eligibility on-line indicates that COBRA was effective 9/1/02. Medicare is indicated on bills received, and Medicare is primary over COBRA. Therefore, BeneFirst should have paid no more than 20 percent of the billed amount o $2,893.00, or $578.60. | | | | | | | |
| Deschamps, Louis | Angeline | 009288195 | Various | 8/2/01-6/17/03 | $ 248.60 | $ 248.60 | |
| **Comments:** Eligibility on-line indicates that COBRA was effective 9/1/02. No documentation noted on-line indicating that a COBRA election form was completed or that premium payments were made. | | | | | | | |
| Kugler, Chester | Self | 019325987 | Various | 10/29/02-4/7/04 | $ 4,100.77 | $ 4,100.77 | |
| **Comments:** Eligibility on-line indicates that COBRA was effective 7/1/02. No documentation noted on-line indicating that a COBRA election form was completed or that premium payments were made. | | | | | | | |

## EXHIBIT III

### Procedural and Financial Claim Errors
### W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Financial Errors |
|---|---|---|---|---|---|---|---|
| McLaughlin, Karen | Self | 079386504 | Various | 7/24/01-8/29/03 | $ 4,491.72 | $ 4,491.72 | |
| **Comments:** Eligibility on-line indicates that COBRA was effective 5/14/01. No documentation noted on-line indicating that a COBRA election form was completed or that premium payments were made. | | | | | | | |
| Morin, Alan | Self | 551431850 | Various | 4/24/02-7/11/02 | $ 1,113.51 | $ 1,113.51 | |
| **Comments:** Eligibility on-line indicates that COBRA was effective 2/1/02. No documentation noted on-line indicating that a COBRA election form was completed or that premium payments were made. | | | | | | | |
| Nason, Herbert | Self | 075303503 | Various | 9/1/01-1/31/02 | $ 68,995.49 | $ 68,995.49 | |
| **Comments:** COBRA coverage was effective on 1/31/02. No documentation was submitted confirming COBRA election or payment of COBRA premium payments. | | | | | | | |
| Pierce, Craig | Self | 030544747 | Various | 7/8/02-1/29/04 | $ 6,140.96 | $ 6,140.96 | |
| **Comments:** Eligibility on-line indicates that COBRA was effective 7/2/02. No documentation noted on-line indicating that a COBRA election form was completed or that premium payments were made. | | | | | | | |
| Tomasi, Rhonda | Self | 083528568 | Various | 2/7/02-10/23/02 | $ 15,905.02 | $ 15,905.02 | |
| **Comments:** Eligibility on-line indicates that COBRA was effective 1/1/02. No documentation noted on-line indicating that a COBRA election form was completed or that premium payments were made. | | | | | | | |
| Williams, Dennis | Self | 008286378 | Various | 5/9/03-10/15/03 | $ 3,268.77 | $ 3,268.77 | |
| **Comments:** Eligibility on-line indicates that COBRA was effective 3/21/03. No documentation noted on-line indicating that a COBRA election form was completed or that premium payments were made. | | | | | | | |
| Aubuchon III, William | Self | 033346935 | 1012134301 | 8/2/2001 | $ 1,035.00 | | $ 103.50 |
| **Comments:** The Plan allows colonoscopy charges at 90 percent. This claim was paid at 100 percent. | | | | | | | |

# EXHIBIT III

## Procedural and Financial Claim Errors
### W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Financial Errors |
|---|---|---|---|---|---|---|---|
| Bickford, Marilyn | Self | 010217211 | 30057075-01 | 6/12/2002 | $ 1,016.00 | | $ 101.60 |
| Comments: The Plan allows colonoscopy charges at 90 percent. This claim was paid at 100 | | | | | | | |
| Desilets, Raymond | Self | 001386202 | 30123697-01 | 10/2/2003 | $ 864.00 | | $ 86.40 |
| Comments: The Plan allows colonoscopy charges at 90 percent. This claim was paid at 100 percent | | | | | | | |
| Doyle, Florence | Edward | 009500618 | 40037020-02 | 3/19/2004 | $ 650.00 | | $ 65.00 |
| Comments: The Plan allows colonoscopy charges at 100 | | | | | | | |
| Eaton, Robert | Self | 010526432 | 30038375-02 | 2/20/2002 | $ 700.00 | | $ 70.00 |
| Comments: The Plan allows colonoscopy charges at 90 percent. This claim was paid at 100 percent | | | | | | | |
| Fillo, Joseph | Mary Ellen | 048486181 | 30131988-01 | 10/31/2003 | $ 650.00 | | $ 65.00 |
| Comments: The Plan allows colonoscopy charges at 90 percent. This claim was paid at 100 percent. | | | | | | | |
| Graffam Robert | Debra | 007521183 | 30029404-01 | 2/3/2003 | $ 900.00 | | $ 90.00 |
| Comments: The Plan allows colonoscopy charges at 90 percent. This claim was paid at 100 percent. | | | | | | | |

# EXHIBIT III

## Procedural and Financial Claim Errors

### W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Financial Errors |
|---|---|---|---|---|---|---|---|
| Haley, Reginald | Self | 008345689 | 20051527-01 | 4/5/2002 | $ 1,296.25 | | $ 129.62 |
| **Comments:** The Plan allows colonoscopy charges at 90 percent. This claim was paid at 100 percent. | | | | | | | |
| Kassel, Jeffrey | Self | 152484538 | 3012364-01 | 8/15/2003 | $ 741.50 | | $ 74.15 |
| **Comments:** The Plan allows colonoscopy charges at 90 percent. This claim was paid at 100 percent. | | | | | | | |
| Kugler, Chester | Self | 019325987 | 20077905-01 | 5/31/2002 | $ 650.00 | | $ 65.00 |
| **Comments:** The Plan allows colonoscopy charges at 90 percent. This claim was paid at 100 percent. | | | | | | | |
| Rhone, Brian | Kristal | 113729872 | 1014293-01 | 8/13/2001 | $ 750.00 | | $ 75.00 |
| **Comments:** The Plan allows colonoscopy charges at 90 percent. This claim was paid at 100 percent. | | | | | | | |
| Sullivan, Charles | Judith | 033364855 | 30032119-01 | 2/7/2003 | $ 650.00 | | $ 65.00 |
| **Comments:** The Plan allows colonoscopy charges at 90 percent. This claim was paid at 100 percent. | | | | | | | |
| Chauvin, Richard | Self | 033382809 | 20092705-01 | 6/4/02-6/21/02 | $ 996.07 | | $ 30.00 |
| **Comments:** The Plan requires a $15 copay for each physical therapy visit. Copays were not taken on two claims. | | | | | | | |
| Doyon, Donald | Self | 008405989 | 2012759-01 | 11/5/03-11/30/03 | $ 1,111.80 | | $ 15.00 |
| **Comments:** The Plan requires a $15 copay for each physical therapy visit. The copay was not taken. | | | | | | | |

Prepared by: Northshore International Insurance Services, Inc.
Date: 4/8/2008

# EXHIBIT III

## Procedural and Financial Claim Errors
### W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Financial Errors |
|---|---|---|---|---|---|---|---|
| Murphy, Michael | Self | 010605085 | 20031334-01 | 1/13/2002 | $ 1,000.56 | | $ 25.00 |
| **Comments:** The Plan requires a $25 emergency room copay which was not taken on this claim. | | | | | | | |
| Pasierb, Paul | Self | 015382401 | 30043436-01 | 3/5/03-3/31/03 | $ 506.55 | | $ 45.00 |
| **Comments:** The Plan requires a $15 copay for each psychotherapy visit. Three copays were not taken. | | | | | | | |
| Shea, William | Phyllis | 001344277 | 20101541-01 | 7/4/2002 | $ 580.53 | | $ 25.00 |
| **Comments:** The Plan requires a $25 emergency room copay which was not taken on this claim. | | | | | | | |
| Baker, James | Kim Lapinski | 009603842 | Various | 10/6/01-11/10/03 | $ 2,220.81 | $ 2,220.81 | |
| | | | 20057118-01 | 2/18/2002 | $ 953.75 | | $ 953.75 |
| **Comments:** The child has a different last name than the employee, and in previous visits to BeneFirst, we asked for verification that she resides with the employee and is eligible to be claimed as a dependent on the employee's Federal Income Tax, as required by the plan. BeneFirst provided a copy of the enrollment form, which shows that the child is enrolled as a step-daughter, but did not provide any further eligibility verification. We asked BeneFirst to obtain confirmation of the child's status for the claimant's Federal Income Tax, and BeneFirst responded they were unable to obtain written verification from the employee, and did not want to pursue it, as the child is deceased. We believe that this claim should not be allowed until eligibility status is verified. In addition, one claim was paid to the wrong provider: to Kathleen Martin, MD, rather than to Fletcher Allen Health Care. | | | | | | | |
| Kingsley, Robyn | Shea Brown | 002586874 | Various | 1/23/02-10/2/03 | $ 5,462.66 | $ 5,462.66 | |
| **Comments:** This claimant has a different last name than the employee. We found nothing in on-line notes to indicate that the relationship of this dependent to the employee was investigated to confirm eligibility status. | | | | | | | |
| Moore, Kenneth | Ryan Oliveira | 027441662 | Various | 8/8/01-3/10/04 | $ 22,876.31 | $ 22,876.31 | |
| **Comments:** This claimant has a different last name than the employee. We found nothing in on-line notes to indicate that the relationship of this dependent to the employee was investigated to confirm eligibility status. | | | | | | | |
| Nielsen, Brian | Chesley, Elizabeth | 005661867 | Various | 10/1/03-9/15/04 | $ 19,553.24 | $ 19,553.24 | |

Prepared by: Northshore International Insurance Services, Inc.
Date: 4/8/2008

**EXHIBIT III**

Procedural and Financial Claim Errors

W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Financial Errors |
|---|---|---|---|---|---|---|---|
| **Comments:** This claimant has a different last name than the employee. We found nothing in on-line notes to indicate that the relationship of this dependent to the employee was investigated to confirm eligibility status. | | | | | | | |

Prepared by:  Northshore International Insurance Services, Inc.
Date:  4/8/2008

## EXHIBIT III

### Procedural and Financial Claim Errors

#### W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Financial Errors |
|---|---|---|---|---|---|---|---|
| Bedard, Samuel | Self | 007820809 | 40029226-01 | 2/29/2004 | $ 1,422.00 | | $ 170.64 |
| **Comments:** Like charges billed by this provider had a 12 percent discount applied; however, this charge was paid at 100 percent of billed. We have applied a 12 percent reduction to the billed amount of $1,422.00 | | | | | | | |
| Duso, Bernard | Julia | 078662855 | 30090833-01 | 7/31/03-7/31/03 | $ 814.44 | | $ 0.44 |
| **Comments:** PPO discount should have been $90.44; however, only $90.00 was taken. | | | | | | | |
| Duso, Bernard | Erika | 078662855 | 20086220-01 | 5/1/02-12/31/04 | | $ 1,200.00 | |
| **Comments:** This provider is noted as being in-network; however, no discount was taken on this claim and BeneFirst did not investigate this discrepancy. We were unable to determine what the discount might have been since we found no other claims for this provider that would allow a comparison. | | | | | | | |
| Archambeault, Gerard | Self | 001368023 | 30064193-02 | 5/19/2003 | $ 545.60 | | $ 545.60 |
| **Comments:** Although this claim was noted as part of the "documented" transactions, no bill copy was provided. | | | | | | | |
| Aubuchon, Thomas | Self | 017503470 | 20004324-01 | 11/29/2001 | $ 584.80 | | $ 584.08 |
| **Comments:** Although this claim was noted as part of the "documented" transactions, the bill copy provided was for another claim, not this transaction. | | | | | | | |
| Beroney, Kenny | Self | 002566995 | 200234713-01 | 1/2/2002 | $ 635.23 | | $ 635.23 |
| **Comments:** Although this claim was noted as part of the "documented" transactions, the bill copy provided was for another claim, not this transaction. | | | | | | | |
| Burgoyne, Raymond | Self | 003263723 | 30101582-01 | 8/18/03-9/20/03 | $ 22,963.58 | | $ 22,963.58 |
| **Comments:** Although this claim was noted as part of the "documented" transactions, the bill copy provided was for another claim, not this transaction. | | | | | | | |

# EXHIBIT III

## Procedural and Financial Claim Errors

### W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Financial Errors |
|---|---|---|---|---|---|---|---|
| Lucero, Charles | Self | 008628709 | 20015668-01 | 1/1/2001 | $ 714.06 | | $ 714.06 |
| **Comments:** Although this claim was noted as part of the "documented" transactions, the bill copy provided was for another claim, not this transaction. | | | | | | | |
| Magliacane, Doreen | Self | 020582876 | 20023409-01 | 1/8/2002 | $ 619.42 | | $ 619.42 |
| **Comments:** Although this claim was noted as part of the "documented" transactions, the bill copy provided was for another claim, not this transaction. | | | | | | | |
| Strong, Wayne | Self | 089401185 | Various | 5/30/03–11/19/036 | $ 126,011.59 | $ 126,011.59 | |
| **Comments:** This claimant had numerous hospitalizations between May and November 2003, and the severity of his diagnosis may indicate that he was not able to be actively-at-work. We believe his coverage continuation status should have been questioned by BeneFirst. | | | | | | | |
| Abbott, Diane | Self | 001426120 | 20049711-01 | 4/9/2002 | $ 3,188.00 | | $ 600.00 |
| **Comments:** Multiple surgery rules were not applied in the adjudication of this claim. | | | | | | | |
| Downs-Will, Brenda | Self | 260271908 | 2003985401 | 1/10/2002 | $ 2,400.00 | | $ 400.00 |
| **Comments:** Multiple surgery rules were not applied in the adjudication of this claim. | | | | | | | |
| Herschel, Chad | Self | 008488850 | 30071612-014 | 6/5/2003 | $ 572.40 | | $ 85.50 |
| **Comments:** Multiple surgery rules were not applied in the adjudication of this claim. | | | | | | | |

Prepared by: Northshore International Insurance Services, Inc.
Date: 4/8/2008

# EXHIBIT III

## Procedural and Financial Claim Errors

### W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Financial Errors |
|---|---|---|---|---|---|---|---|
| Labeau, Darryl | Courtney | 571437672 | 3020 | 2/14/2002 | $ 2,000.00 | | $ 297.50 |
| **Comments:** Multiple surgery rules were not applied in the adjudication of this claim. | | | | | | | |
| Labombard, Howard | Marguerite | 13242034 | 30098734-01 | 8/25/2003 | $ 7,397.00 | | $ 1,639.70 |
| **Comments:** Multiple surgery rules were not applied in the adjudication of this claim. Additionally, the 90 percent coinsurance rate was not applied to this out-of-network claim. | | | | | | | |
| Lapointe, Gregory | Ann Marie | 007722723 | 20051570-01 | 3/22/2002 | $ 1,321.20 | | $ 347.00 |
| **Comments:** Multiple surgery rules were not applied in the adjudication of this claim. | | | | | | | |
| Lavalley, Joy | Self | 058702728 | 20085675-01 | 5/30/2002 | $ 1,918.00 | | $ 298.00 |
| **Comments:** Multiple surgery rules were not applied in the adjudication of this claim. Additionally, the physician's charge for a hospital care visit should have been bundled with the surgical fee. | | | | | | | |
| Magoon Jr, Wendall | Brendan | 009642362 | 30032031-01 | 2/7/2003 | $ 1,239.05 | | $ 104.00 |
| **Comments:** Multiple surgery rules were not applied in the adjudication of this claim. | | | | | | | |
| Moran, Gregory | Self | 013366891 | 30019214-01 | 1/13/2003 | $ 1,653.00 | | $ 81.00 |
| **Comments:** Multiple surgery rules were not applied in the adjudication of this claim. | | | | | | | |

**EXHIBIT III**

Procedural and Financial Claim Errors

W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Financial Errors |
|---|---|---|---|---|---|---|---|
| Moran Sr, Marcus | Self | 030073006 | 20085190-01 | 8/17/2001 | $ 896.00 | | $ 127.50 |
| **Comments:** Multiple surgery rules were not applied in the adjudication of this claim. | | | | | | | |
| Basque, Pauline | Self | 012348682 | 20023112-01 | 1/18/02-1/21/02 | $ 3,450.00 | | $ 200.00 |
| **Comments:** The plan requires precertification for all inpatient confinements or a penalty of $200 applies. No precertification documented in on-line notes. | | | | | | | |
| Canuel, Robert | Kayla | 018548814 | 20049723-01 | 2/7/02-2/14/02 | $ 7,318.95 | | $ 200.00 |
| **Comments:** The plan requires precertification for all inpatient confinements or a penalty of $200 applies. No precertification documented in on-line notes. | | | | | | | |
| Gustin, Robby | Self | 005763667 | 20063136-01 | 3/25/02-4/1/02 | $ 871.06 | | $ 200.00 |
| **Comments:** The plan requires precertification for all inpatient confinements or a penalty of $200 applies. No precertification documented in on-line notes. | | | | | | | |
| Labeau, Darryl | Cassidy | 5714376672-02 | 20065235-01 | 4/15/02-4/17/02 | $ 11,881.81 | | $ 200.00 |
| **Comments:** The plan requires precertification for all inpatient confinements or a penalty of $200 applies. No precertification documented in on-line notes. | | | | | | | |
| Muro, Vincent | Matthew | 008384999-02 | 20063290-01 | 12/16/01-12/18/01 | $ 1,788.70 | | $ 200.00 |
| **Comments:** The plan requires precertification for all inpatient confinements or a penalty of $200 applies. No precertification documented in on-line notes. | | | | | | | |

Prepared by: Northshore International Insurance Services, Inc.
Date: 4/8/2008

**EXHIBIT III**

Procedural and Financial Claim Errors

W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Financial Errors |
|---|---|---|---|---|---|---|---|
| Shumski, Michael | Self | 018467546 | 10113347-01 | 7/2/01-7/13/01 | $ 3,060.00 | | $ 200.00 |
| **Comments:** The plan requires precertification for all inpatient confinements or a penalty of $200 applies. No precertification noted in claimant's file. | | | | | | | |
| Andrews, David | Cathy | 035422045 | 20024892-01 | 9/24/2001 | $ 506.60 | | $ 506.60 |
| **Comments:** Reimbursement issued to Susan E. Bonadonna, MD rather than to provider Henry Heywood Memorial Hospital. | | | | | | | |
| Avery, Tamela | Self | 074502519 | 10121510-01 | 8/14/2001 | $ 1,550.86 | | $ 1,550.86 |
| **Comments:** Reimbursement issued to Kathleen Martin, MD rather than to provider Fletcher Allen Health Care. | | | | | | | |
| Burns, Kristi | Self | 022563525 | 20038729-01 | 2/5/2002 | $ 6,248.01 | | $ 6,248.01 |
| **Comments:** Reimbursement issued to Susan E. Bonadonna, MD rather than to provider Henry Heywood Memorial Hospital. | | | | | | | |
| Chamberlain, Nancy | Raymond | 008429649 | 10119384-01 | 9/4/2001 | $ 2,140.52 | | $ 2,140.52 |
| **Comments:** Reimbursement issued to Kathleen Martin, MD rather than to provider Fletcher Allen Health Care. | | | | | | | |

# EXHIBIT III

## Procedural and Financial Claim Errors
### W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Financial Errors |
|---|---|---|---|---|---|---|---|
| Ellis, Steven | Courtney | 026502330 | 20028416-01 | 9/27/01 | $ 523.60 | | $ 523.60 |
| | | | 20004356-01 | 11/1/01-11/13/01 | $ 1,498.00 | | $ 1,498.00 |
| | | | 20039069-01 | 10/15/01-10/31/01 | $ 710.95 | | $ 710.95 |
| | | | 20024906-01 | 12/4/01-12/31/01 | $ 546.00 | | $ 546.00 |
| **Comments:** Reimbursement issued to Susan E. Bonadonna, MD rather than to provider Henry Heywood Memorial Hospital. Additionally, physical therapy charges considered without indication of attending physician's orders as required by the Plan. | | | | | | | |
| Hoag, Jeffrey | Kerri | 009582680 | 20063219-01 | 5/3/2002 | $ 953.75 | | $ 953.75 |
| **Comments:** Reimbursement issued to Kathleen Martin, MD rather than to provider Fletcher Allen Health Care. | | | | | | | |
| Lavelli, Beverly | Kathy | 026520982 | 10119168-01 | 8/17/2001 | $ 544.00 | | $ 544.00 |
| | | | 20028278-01 | 12/31/2001 | $ 884.85 | | $ 884.85 |
| **Comments:** Reimbursement issued to Susan E. Bonadonna, MD rather than to provider Henry Heywood Memorial Hospital. | | | | | | | |
| Machia, Miranda | Self | 009603901 | 10121396-01 | 9/8/2001 | $ 1,146.45 | | $ 1,146.45 |
| | | | 20048201-01 | 3/25/02-4/8/02 | $ 27,783.24 | | $ 27,783.24 |
| | | | 20053727-01 | 1/18/02-1/22/02 | $ 1,817.52 | | $ 1,817.52 |
| | | | 20060440-01 | 4/20/02-5/7/02 | $ 32,554.40 | | $ 32,554.40 |
| **Comments:** Reimbursement issued to Kathleen Martin, MD rather than to provider Fletcher Allen Health Care. Additionally, for the inpatient stay from 4/20/02 through 5/7/02, only six days out of the 17 were precertified; therefore, even if charges had been paid to the correct provider, an overpayment of $13,360.68 was made. | | | | | | | |

Prepared by: Northshore International Insurance Services, Inc.
Date: 4/8/2008

# EXHIBIT III

## Procedural and Financial Claim Errors
### W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Financial Errors |
|---|---|---|---|---|---|---|---|
| Machia, Miranda | Kyle | 009603901 | 20038992-01 | 1/18/02-1/22/02 | $ 6,433.49 | | $ 6,433.49 |
| **Comments:** Reimbursement issued to Kathleen Martin, MD rather than to provider Fletcher Allen Health Care. | | | | | | | |
| Mattson, Michael | Lori | 031547580 | 10121462-01 | 9/7/2001 | $ 520.20 | | $ 520.20 |
| | | | 10142359-01 | 10/24/01-10/26/01 | $ 1,890.01 | | $ 1,890.01 |
| **Comments:** Reimbursement issued to Susan E. Bonadonna, MD rather than to provider Henry Heywood Memorial Hospital. | | | | | | | |
| Mattson, Michael | Ryan | 031547580 | 10142377-01 | 10/31/01-11/1/01 | $ 839.80 | | $ 839.80 |
| **Comments:** Reimbursement issued to Susan E. Bonadonna, MD rather than to provider Henry Heywood Memorial Hospital. | | | | | | | |
| Patient, Heidi | Self | 022609574 | 10134589-01 | 10/11/2001 | $ 988.20 | | $ 988.20 |
| | | | 10142379-01 | 10/31/2001 | $ 1,361.70 | | $ 1,361.70 |
| | | | 20028087-01 | 12/27/2001 | $ 598.40 | | $ 598.40 |
| **Comments:** Reimbursement issued to Susan E. Bonadonna, MD rather than to provider Henry Heywood Memorial Hospital. | | | | | | | |
| Young, Mark | Self | 008528956 | 20063519-01 | 4/25/2002 | $ 886.50 | | $ 886.50 |
| **Comments:** Reimbursement issued to Kathleen Martin, MD rather than to provider Fletcher Allen Health Care. | | | | | | | |

# EXHIBIT III

## Procedural and Financial Claim Errors

### W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Financial Errors |
|---|---|---|---|---|---|---|---|
| Bradley, Dennis | Self | 383963782 | 20041187-01 | 3/6/2002 | $ 965.00 | | $ 123.55 |
| **Comments:** 90 percent coinsurance was not applied to this out-of-network claim. Additionally, $30.05 of the 2002 deductible was not satisfied. | | | | | | | |
| Bruno, Steven | Self | 043567642 | 40036912-01 | 3/13/04-3/15/04 | $ 560.00 | | $ 56.00 |
| **Comments:** 90 percent coinsurance was not applied to this out-of-network claim. | | | | | | | |
| Burke, Denise | Self | 007664947 | 20000419-01 | 7/14/2001 | $ 591.78 | | $ 59.18 |
| **Comments:** 90 percent coinsurance was not applied to this out-of-network claim. | | | | | | | |
| Chauvin, Richard | Self | 033382809 | 20103130-01 | 7/30/2002 | $ 719.00 | | $ 71.90 |
| **Comments:** 90 percent coinsurance was not applied to this out-of-network claim. | | | | | | | |
| Hart, Army | Self | 065480247 | 20046910-01 | 2/12/2002 | $ 871.25 | | $ 87.13 |
| | | | 30058406-01 | 5/2/2003 | $ 585.00 | | $ 58.50 |
| **Comments:** 90 percent coinsurance was not applied to this out-of-network claim. | | | | | | | |
| Hart, Army | Winona | 065480247 | 30029432-01 | 2/14/2003 | $ 1,170.00 | | $ 117.00 |
| **Comments:** 90 percent coinsurance was not applied to this out-of-network claim. | | | | | | | |
| Kingsley, Robyn | Shea Brown | 002586874 | 20034250-01 | 11/30/2002 | $ 795.00 | | $ 79.50 |
| **Comments:** 90 percent coinsurance was not applied to this out-of-network claim. | | | | | | | |

# EXHIBIT III

## Procedural and Financial Claim Errors
### W. E. Aubuchon Co., Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Financial Errors |
|---|---|---|---|---|---|---|---|
| Lacroix, Roger | Self | 008500963 | 20052873-01 | 1/25/2002 | $ 650.00 | | $ 65.00 |
| **Comments:** 90 percent coinsurance was not applied to this out-of-network claim. | | | | | | | |
| Nielsen, Brian | Elizabeth Chesley | 005661867 | Various | 11/9/04-11/24/04 | $ 1,308.50 | | $ 1,308.50 |
| **Comments:** BeneFirst on-line notes and eligibility screens indicate that dependent coverage terminated on 9/15/04. These charges were incurred after this termination date. | | | | | | | |
| Magliacane, Doreen | Self | 020582876 | 20065363-01 | 3/4/02-3/31/02 | $ 1,857.15 | $ 1,857.15 | |
| | | | 20060752-01 | 4/3/02-4/30/02 | $ 532.75 | $ 532.75 | |
| **Comments:** Physical therapy charges considered without indication of attending physician's orders as required by the Plan. | | | | | | | |
| | | | | **Exhibit Totals:** | **$915,154.20** | **$654,445.65** | **$141,350.21** |

Prepared by: Northshore International Insurance Services, Inc.
Date: 4/8/2008

# Exhibit IV

{}

EXHIBIT IV

Provided by:     Northshore International Insurance Services, Inc.

Date:              April 8, 2008

# EXHIBIT IV

Procedural and Financial Claim Errors

Aubuchon Distribution, Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Financial Errors |
|---|---|---|---|---|---|---|---|
| Lopes, Lonnie | Max | 031404455 | Various | 9/24/01-8/7/02 | $ 2,968.20 | | $ 2,968.20 |
| **Comments:** Notes on-line indicate that there is other coverage through Blue Cross Blue Shield which is the primary payor for Max due to the birthday rule. Therefore, BeneFirst paid this claim as primary in error. | | | | | | | |
| Basque, Yvonne | Self | 023280490 | Various | 1/29/02-6/25/02 | $ 4,468.00 | $ 4,468.00 | |
| **Comments:** Eligibility on-line indicates that COBRA was effective 12/31/01. No documentation noted on-line indicating that a COBRA election form was completed or that premium payments were made. | | | | | | | |
| Brownell, Donna | Self | 030346924 | Various | 7/16/01-8/23/02 | $ 5,685.80 | $ 5,685.80 | |
| **Comments:** Eligibility on-line indicates that COBRA was effective 1/1/00. No documentation noted on-line indicating that a COBRA election form was completed or that premium payments were made. | | | | | | | |
| Jacoby, Paul | Self | 029284907 | Various | 8/20/01-8/14/02 | $ 3,779.64 | $ 3,779.64 | |
| | Raili | 029284907 | Various | 8/30/01-4/29/02 | $ 804.75 | $ 804.75 | |
| **Comments:** Eligibility on-line indicates that COBRA was effective 1/1/00. No documentation noted on-line indicating that a COBRA election form was completed or that premium payments were made. | | | | | | | |
| Legros, Robert | Self | 030346679 | Various | 11/1/01-1/31/02 | $ 17,994.74 | $ 17,994.74 | |
| **Comments:** Eligibility on-line indicates that COBRA was effective 11/1/01. No documentation noted on-line indicating that a COBRA election form was completed or that premium payments were made. | | | | | | | |

Prepared by: Northshore International Insurance Services, Inc.
Date: 4/8/2008

# EXHIBIT IV

Procedural and Financial Claim Errors

Aubuchon Distribution, Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Financial Errors |
|---|---|---|---|---|---|---|---|
| Sumner, Kenneth | Self | 020349061 | Various | 9/6/6/01-9/29/01 | $ 9,091.60 | $ 9,091.60 | |
| **Comments:** Eligibility on-line indicates that COBRA was effective 9/6/01. No documentation noted on-line indicating that a COBRA election form was completed or that premium payments were made. | | | | | | | |
| Wilson, Duane | Carl Ogert | 027545935 | 2007940-3-01 | 10/14/01-10/17/01 | $ 333.70 | $ 333.70 | |
| **Comments:** The dependent has a different last name than the employee. We found no notes on-line to indicate that investigation was initiated to verify that the employee was responsible for this child as required by the Plan. | | | | | | | |
| LaFortune, Robert | Joanne | 015368371 | 2004378-01 | 03/08/02 | $ 720.00 | | $ 60.00 |
| **Comments:** Multiple surgery rules were not applied in the adjudication of this claim. | | | | | | | |
| Carroll, Reginald | Self | 022307148 | 20120180-01 | 01/15/02 | $ 129.20 | | $ 129.20 |
| **Comments:** Charges of $1,767.00 incurred on 1/15/02 at Health Alliance were repriced to $1,501.95 (claim number 20023055). However, when charges were processed, revenue code 636 (Drug/Detail Code) in the amount of $152.00 was omitted from the total charge amount entered on line but payment of $1,501.95 was still issued. Further, the $152.00 was later processed under claim number 20120180-01 and $129.20 was issued. Therefore, an overpayment of $129.20 was created in this file. | | | | | | | |
| Hansen, Carl | Self | 042103575 | 2004458-01 | 3/7-3/12/02 | $ 6,439.35 | | $ 200.00 |
| **Comments:** The plan requires precertification for all inpatient confinements or a penalty of $200 applies. No precertification documented on on-line notes. | | | | | | | |
| LeBlanc, Bruce | Self | 016581358 | 10142322-01 | 7/26-7/28/01 | $ 2,436.00 | | $ 200.00 |

Prepared by: Northshore International Insurance Services, Inc.

Date: 4/8/2008

Page 2 of 5

## EXHIBIT IV

Procedural and Financial Claim Errors

Aubuchon Distribution, Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Financial Errors |
|---|---|---|---|---|---|---|---|
| **Comments:** The Plan requires precertification for all inpatient confinements or a penalty of $200 applies. No precertification documentation noted in claimant's file. | | | | | | | |
| DeBarge, James | Self | 031402510 | 20011081-01 | 12/14/01 | $ 575.95 | | $ 575.95 |
| **Comments:** Reimbursement issued to Susan E. Bonadonna, MD rather than to provider Henry Heywood Memorial Hospital. | | | | | | | |
| Gallant, Steven | Self | 019484255 | 20004343-01 | 09/27/01 | $ 1,728.90 | | $ 1,728.90 |
| | | | 20004344-01 | 09/26/01 | $ 479.96 | | $ 479.96 |
| | | | 20004345-01 | 07/20/01 | $ 233.75 | | $ 233.75 |
| | | | 2003866-01 | 01/25/02 | $ 928.50 | | $ 928.50 |
| **Comments:** Reimbursement issued to Susan E. Bonadonna, MD rather than to provider Henry Heywood Memorial Hospital. | | | | | | | |
| Gallant, Steven | Eric | 019484255 | 10114167-01 | 07/27/01 | $ 1,184.67 | | $ 1,184.67 |
| | | | 10114170-01 | 07/27/01 | $ 417.00 | | $ 417.00 |
| **Comments:** Reimbursement issued to Susan E. Bonadonna, MD rather than to provider Henry Heywood Memorial Hospital. | | | | | | | |

Prepared by: Northshore International Insurance Services, Inc.
Date: 4/8/2008

# EXHIBIT IV

Procedural and Financial Claim Errors

Aubuchon Distribution, Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Financial Errors |
|---|---|---|---|---|---|---|---|
| Pike, David | Self | 024480531 | 10123690-01 | 08/29/01 | $ 804.60 | | $ 804.60 |
| **Comments:** Reimbursement issued to Susan E. Bonadonna, MD rather than to provider Henry Heywood Memorial Hospital. | | | | | | | |
| Storm, Glenn | Self | 019281114 | 10124965-01 | 08/28/01 | $ 4,722.06 | | $ 4,722.06 |
| | | | 20001160-01 | 11/29/01 | $ 1,917.75 | | $ 1,917.75 |
| | | | 20016010-01 | 11/27/01 | $ 345.95 | | $ 345.95 |
| | | | 10115984-01 | 08/27/01 | $ 300.35 | | $ 300.35 |
| **Comments:** Reimbursement issued to Susan E. Bonadonna, MD rather than to provider Henry Heywood Memorial Hospital. | | | | | | | |
| Wilson, Duane | Carl Ogert | 027545935 | 1014703-01 | 10/14/01 | $ 550.45 | $ 550.45 | |
| **Comments:** Reimbursement issued to Susan E. Bonadonna, MD rather than to provider Henry Heywood Memorial Hospital. | | | | | | | |

Prepared by: Northshore International Insurance Services, Inc.
Date: 4/8/2008

Page 4 of 5

**EXHIBIT IV**

Procedural and Financial Claim Errors

Aubuchon Distribution, Inc.

| Employee | Claimant | ID Number | Claim Number | Date(s) of Service | Paid Amount | Procedural Errors | Financial Errors |
|---|---|---|---|---|---|---|---|
| Storm, Glenn | Self | 019281114 | 2006807-01 | 10/15-10/29/01 | $ 1,020.65 | $ 1,020.65 | |
| | | | 20029154-01 | 12/4-12/31/01 | $ 1,386.45 | $ 1,386.45 | |
| | | | 20038203-01 | 1/4-1/30/02 | $ 956.35 | $ 956.35 | |
| | | | 20066802-01 | 2/1-2/22/02 | $ 1,266.90 | $ 1,266.90 | |
| | | | 2006799-01 | 4/19-4/30/02 | $ 705.85 | $ 705.85 | |
| | | | | **Exhibit Totals:** | $74,377.07 | $48,044.88 | $17,196.84 |

**Comments:** Physical therapy charges considered without indication of attending physician's orders as required by the Plan. Please note that claim number 20001160-01 deducted for reimbursement to incorrect provider also is questioned for physical therapy authorization.

Prepared by: Northshore International Insurance Services, Inc.
Date: 4/8/2008

Page 5 of 5

**18**

{}

**COPY**

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| W.E. AUBUCHON CO., INC., AUBUCHON DISTRIBUTION, INC., W.E. AUBUCHON CO. INC EMPLOYEE MEDICAL BENEFIT PLAN, and AUBUCHON DISTRIBUTION, INC. EMPLOYEE MEDICAL BENEFIT PLAN, ) ) ) ) ) | |
| Plaintiffs, ) ) | ) **CIVIL ACTION** NO. **05-40159-FDS** |
| v. ) ) | |
| BENEFIRST, LLC, ) ) | |
| Defendant. ) ) | |

## ORDER ON BENEFIRST'S MOTION FOR RECONSIDERATION OF COURT'S DISCOVERY ORDER RELATED TO MEDICAL BILLS
### February 6, 2007

HILLMAN, M.J.

### INTRODUCTION

By order of this Court dated September 7, 2006, the Defendant, BeneFirst, LLC

("BeneFirst"), was ordered to produce medical claims files, including actual bills in its

possession, custody, or control (Docket #28). On September 18, 2006, BeneFirst filed the

instant Motion for Reconsideration of Court's Discovery Order Related to Medical Bills (Docket

#29), together with an accompanying memorandum and affidavit.[1] BeneFirst claims that the

documents are not reasonably accessible because the cost of their production far outweighs their

value to the Plaintiffs. For the reasons set forth below, I deny the motion.

---

[1] The parties attempted several times to work this matter out by themselves. Unfortunately, despite their best efforts, they were unable to come to agreement.

## BACKGROUND

This case involves the administration of qualified benefits plans under the Employee

Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001, *et seq.*   W.E. Aubuchon

Co., Inc. ("Aubuchon") is the employer, sponsor and administrator of the W.E. Aubuchon Co.,

Inc. Employee Medical Benefit Plan ("Aubuchon Plan").   Aubuchon is the sponsor and

Aubuchon Distribution, Inc. ("Aubuchon Distribution") is the employer and administrator of the

W.E. Aubuchon Co., Inc. & Aubuchon Distribution, Inc. Employee Medical Benefit Plan

("Aubuchon Distribution Plan", and, together with the Aubuchon Plan, the "ERISA Plans").

BeneFirst, which is a Massachusetts limited liability company based in Marshfield,

Massachusetts, entered into a contract with the Plaintiffs pursuant to which BeneFirst assumed

the rights, duties and obligations to administer the ERISA Plans, as a third-party administrator.

BeneFirst's obligations included "investigating and determining eligibility, payments, co-pays,

co-insurance and subrogation claims," for which BeneFirst allegedly "exercised discretion and

control over [its] decisions [presumably with respect to payment of claims] and was paid to

execute these duties properly." (*Amended Complaint*, Docket #19, ¶¶8,14).   The Plaintiffs

charge that BeneFirst failed to perform its duties in a reasonably prudent manner, thereby

breaching its fiduciary duty (Counts I and II) and that it breached the underlying contract by

failing to provide services accurately and completely (Counts III and IV).

In the initial motion to compel (Docket #24), Plaintiffs sought, among other things, to

compel BeneFirst to produce all medical claims files, including the actual medical bills in

BeneFirst's custody or control.   This Court ruled that BeneFirst was to provide those files and

bills.   It is that ruling that is the subject of this motion for reconsideration.

2

## FACTS

BeneFirst is no longer in operation.  Therefore, I will set out a historical summary of the procedures utilized by BeneFirst for processing, storing and retrieving claims at the time it administered the ERISA Plans.  In order to comply with this Court's initial ruling, BeneFirst would have to hire personnel to retrieve the claims sought by the Plaintiffs in accordance with the procedures described below.

BeneFirst would typically receive requests for payment from medical providers who had provided covered medical services to Aubuchon/Aubuchon Distribution personnel.  These requests for payment were on claim forms.[2]  These claims would be sorted or "batched" into client groups for processing.  Once processed for payment, the claim forms were retained for a 60 day period.  After 60 days, the batch of claim forms would be scanned and stored as electronic images and then destroyed.  These scanned forms were stored in groups according to their processing date and the person who processed the claim.

If a claim needed to be retrieved after the 60 day period, the claim number, processor, and date of processing would be needed in order to retrieve the image.  If all of this information was available, then the search would take 3-4 minutes.  If all of the information was not available, it could take upwards of 7 minutes.  It is particularly important to the search process to have the name of the person who processed the claim because on any given day, 3-4 claims examiners would process Plaintiffs' claims and during the relevant period, 14 different

---

[2] It is unclear whether the claim form was the 'medical bill' or whether the claim form had a medical bill attached, or some combination.  The Defendant takes great pains to point out that there were never "claim files" as referenced in this Court's earlier ruling.  Instead, medical professionals would submit "claim forms" and those forms would be sorted into client groups for processing.  *See Affidavit of Charles T. Dobens* (Docket #31).  It is my understanding, after review of the pleadings, particularly the Doben Affidavit, that no information, other than the clam form, would be needed for the claims examiner to process a medical bill.

examiners were employed. Furthermore, for parts of 2001, 2002 and 2003, BeneFirst utilized an outside vendor to process claims. The outside vendor would scan the claims and return them to BeneFirst on a CD-R for further processing. The images scanned by the outside vendor would then be batched in the same way as was done during in-house processing.

The search process for retrieving claims is further complicated by the fact that there is no index of images *per se*. The images are stored on BeneFirst's server first, according to year of processing, then by claims examiner, then by the month of processing, and finally by the actual processing date. Inexplicably, BeneFirst's system was not set up to for the wholesale retrieval of claim images on a group by group basis.

During the 3.5 years at issue in this litigation, BeneFirst was administering up to 48 different plans and, by its estimation, processed between 550,000 and 600,000 claims. Of that number, 34,112 claims were submitted for processing under the ERISA Plans. Of that number, the Plaintiffs have narrowed their request, based upon a dollar value, to approximately 3,000 claims. BeneFirst estimates that it would cost approximately $80,000.00 and take almost 4,000 hours to retrieve all 34,112 claims. They have not provided a cost/time estimate for the retrieval of the 3,000 claims.

## DISCUSSION

Our courts have repeatedly reiterated that "'notice pleading standard relies on liberal discovery rules' ... ." and that "it is now beyond dispute that '[b]road discovery is a cornerstone of the litigation process contemplated by the Federal Rules of Civil Procedure.'" *Zublulake v. UBS Warburg*, 217 F.R.D. 309, 311 (2003)(alteration in original). While the principle is relatively straightforward, its application is not. This principle of liberal discovery is sorely

4

tested when the object of the discovery is electronic data. As of December 1, 2006, the Federal

Rules of Civil Procedure were amended to give greater guidance to courts and litigants in

dealing with electronic discovery issues. There are four key areas of change to the Rules that

address electronic discovery: early attention to e-discovery issues; the role of accessibility; the

form of production; and sanctions under Rule 37. This case squarely presents the question of

whether the information sought is reasonably accessible within the meaning of the Rule and if

not, whether it still should be produced.

<div align="center">The Recent Amendments</div>

On December 1, 2006, Rule 26 was amended, in relevant part, to provide the following

limitation to the general rule that a party may obtain discovery of any matter, not privileged, that

is relevant to such party's claim or defenses:

> A party need not provide discovery of electronically stored information
> from sources that the party identifies as not reasonably accessible because of
> undue burden or cost. On motion to compel discovery or for a protective order,
> the party from whom discovery is sought musts show that the information is not
> reasonably accessible because of undue burden or cost. If that showing is made,
> the court may nonetheless order discovery from such sources if the requesting
> party shows good cause, considering the limitations of Rule 26(b)(2)(C). The
> court may specify conditions for the discovery.

F.R.C.P. 26(b)(2)(B).

The Order of the Supreme Judicial Court of the United States adopting this amendment to

Rule 26 provides that such amendments ". . . shall take effect on December 1, 2006, and shall

govern in all proceedings thereafter commenced and, insofar as just and practicable, all

proceedings then pending." This case was filed before December 1, 2006 and the instant dispute

arose before the effective date of the amendment. At the same time, the case is still in the

discovery stages. Furthermore, in briefing the issue, the parties have cited to the seven-step

<div align="center">5</div>

analysis for determining whether or not to shift the cost of production proposed by Judge

Scheindlin in *Zublulake*. The notes to the 2006 Amendment to Rule 26 to a large degree adopt

Judge Scheindlin's seven-step analysis for purposes of determining whether a party should be

required to search for and produce information that is not reasonably accessible. *See*

Fed.R.Civ.P. Advisory Committee's note to 2006 Amendment. Under these circumstances, I

find that it is just and practicable to apply the recent amendments to Rule 26 to the instant

dispute.

### Application of The Rule 26 Amendment

Under Rule 26, as revised, this Court must determine whether the information sought is

reasonably accessible. If the information is not reasonably accessible, this Court may still order

discovery if Aubuchon shows good cause for requesting the information, taking into

consideration the limitations of Rule 26(b)(2)(C).

### Is the requested information 'reasonably accessible' within the meaning of FRCP 26(b)(2)?

BeneFirst asserts that the requested claims forms are not reasonably accessible within the

meaning of FRCP 26(b)(2)(B) because of the high cost to retrieve such information (both in

monetary terms and in terms of the man hours it would require to retrieve the information).

BeneFirst contends that the high cost/time to retrieve such data is necessitated by the fact that it

is maintained in an inaccessible format.

In *Zubulake,* the court found that the time and expense required to retrieve documents

and electronic data depends primarily on whether such information "is kept in an *accessible or*

*inaccessible* format ... [furthermore,] [w]hether electronic data is accessible or inaccessible turns

largely on the media on which it is stored ". *Zubulake*, 217 F.R.D. at 318 (emphasis in original).

6

*Zubulake* broke down electronic data into the following five categories, listed in order of most

accessible to least accessible: (1) active on-line data (hard drives, for example); (2) near-line data

(typically, robotic storage devices such as optical disks); (3) offline storage/archives (removable

optical disks or magnetic tape media which can be labeled and stored in a shelf or rack); (4)

backup tapes (devices like tape recorders that read data from and write it onto a tape; they are

sequential access devices which are typically not organized for retrieval of individual documents

or files); and (5) erased, fragmented or damaged data (such data can only be accessed after

significant processing). *Id.*, at 318-319.

Generally, the first three categories of data are considered "accessible" and the last two

categories are considered "inaccessible". That the data is deemed "accessible" does not mean it

is readily obtainable, "the time it takes to actually access [such] data ranges from milliseconds to

days, [however] the data does not need to be restored or otherwise manipulated to be usable".

*Id.*, at 320. "'Inaccessible' data, on the other hand, is not readily usable. Backup tapes must be

restored ... fragmented data must be defragmented, and erased data must be reconstructed. That

makes such data inaccessible". *Id.*

Because, as noted by Judge Sheindlin, the determination of whether the production of

electronic data is expensive or unduly burdensome often depends on whether it is maintained in

an "accessible" or "inaccessible" format, I find that it is instructive to apply this media based

analytical approach in considering whether electronic data is "reasonably accessible" for

purposes of the new Rule 26(b)(2)(B). In this case, the records sought by the Plaintiffs are

stored on a server used by BeneFirst in Pembroke Massachusetts, which is clearly an accessible

format. However, because of BeneFirst's method of storage and lack of an indexing system, it

will be extremely costly to retrieve the requested data. I am hard pressed to understand the

rationale behind having a system that is only searchable by year of processing, then claims

examiner, then the month of processing, and finally the claims date. None of these search

criteria reflect the name of the individual claimant, the date that the claimant received the

medical service, who the provider was, or even the company that employed the benefit holder. It

would seem that such a system would only serve to discourage audits and the type of inquiries

that have led to the instant litigation[3]. Nevertheless, the retrieval of the records will be costly

and for the purposes of this decision, I find that such retrieval would involve undue burden or

cost. Accordingly, the images are not reasonably accessible within the meaning of Fed.R.Civ.P.

26(b)(2)(B).

### Since the images are not reasonably accessible is there 'good cause' to order their production?

The Plaintiffs argue that the information they have requested goes to the heart of their

case and that they have established "good cause" for production of the same. In making a

determination of whether the requesting party has established "good cause", this Court must

consider whether: "(i) the discovery sought is unreasonably cumulative or duplicative, or is

obtainable from some other source that is more convenient, less burdensome, or less expensive;

(ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain

the information sought; or (iii) the burden or expense of the proposed discovery outweighs its

---

[3]BeneFirst's Managing Member, Charles T. Dobens states that "the decision to store the images in this manner was one that was made by Paul Gatani, BeneFirst's former claims manager, and myself. This setup was designed to locate, within a reasonable amount of time, a particular claim if it became necessary to locate the associated image. However, the image itself was generally not required in the normal course of BeneFirst's claims processing operations. The organization of the image files was not designed for the wholesale retrieval of images on a group-by-group basis." *Affidavit of Charles T. Dobens* (Docket #31), at ¶13.

likely benefit, taking into account the needs of the case, the amount in controversy, the parties'

resources, the importance of the issues at stake in the litigation, and the importance of the

proposed discovery in resolving the issues." Fed.R.Civ.P. 26(b)(2)(C).  To the extent not

covered by the aforementioned factors, the Court should also consider:

> (1) the specificity of the discovery request; (2) the quantity of information
> available from other and more easily accessed sources; (3) the failure to produce
> relevant information that seems likely to have existed but is no longer available
> on more easily accessed sources; (4) the likelihood of finding relevant, responsive
> information that cannot be obtained from other, more easily accessed sources; (5)
> predictions as to the importance and usefulness of the further information; (6) the
> importance of the issues at stake in the litigation; and (7) the parties' resources.

Fed.R.Civ.P. 26 Advisory Committee's note, to 2006 Amendment.

### The specificity of the discovery request.

BeneFirst's Motion seeks reconsideration of this Court's earlier discovery order which

ordered BeneFirst to produce "all claims files, including the actual bills in BeneFirst's

possession

or control." The parties have responded intelligently and vigorously to this Order and there is no

misunderstanding or confusion about the specificity of the information sought by the Plaintiffs.

This factor favors the Plaintiffs.

### The quantity of information available from other and more easily accessed sources;The failure to produce relevant information that seems likely to have existed but is no longer available from more easily accessed sources.

The gravamen of the Plaintiffs' Amended Complaint is that BeneFirst mishandled their

employees' medical claims by failing to determine eligibility for payment, the availability of co-

payment and co-insurance, and subrogation.  The processing of the claim forms was presumably

9

the mechanism for making these determinations. While the Amended Complaint and subsequent pleadings are silent, the relevant time period appears to be from 2001 to 2004.[4]

According to BeneFirst, the original claim forms and medical bills were processed by hand, kept for 60 days, converted to a digital image and then destroyed. Therefore, digital images which constitute the information requested by the Plaintiffs are in the custody and control of BeneFirst and are not available through any other source.

These factors favor the Plaintiffs.

**Predictions as to the importance and usefulness of the further information; the likelihood of finding relevant, responsive information that cannot be obtained from other, more easily accessed sources.**

I agree with the Plaintiffs that the requested claim forms and medical bills are clearly an integral part of the litigation; the requested information goes not only to BeneFirst's culpability, but also to the amount of damages, if any, to which the Plaintiffs may be entitled. There can be no serious contention that the information is not highly relevant. In fact, it is difficult to imagine how this case could be prosecuted or defended without the claims forms and attendant bills. As previously found, they are not available from any other source (a determination which is uncontroverted).

These factors favor the Plaintiffs.

---

[4] I so find because this litigation was commenced in 2005 and it seems safe to assume that none of the original claim forms and medical bills were still in existence at that time (if they were, BeneFirst presumably would have retained them).

### The importance of the issues at stake in the litigation.

While the importance of the claims/issues in this case are real and substantial *vis a vis* the parties, such claims/issues to not raise any global concerns.

This factor favors the Defendants (if it favors any party at all).

### The parties resources.

While the Defendant has understandably engaged in a lengthy discussion of the cost of production, neither party has provided the court with any information about their resources. BeneFirst does represent that they no longer have a full time staff and that in order to retrieve the images that they would have to hire temporary help. At the same time, as previously noted, the Plaintiffs have significantly narrowed the breadth of their request and therefore, the time and cost for BeneFirst to produce the requested information should be *significantly* reduced.

Given the lack of information available to the Court, this factor is neutral.

### Other relevant considerations.

In addition to the above 7 factors, it is important to note that a provision in the Service Agreement between the parties provided that: " ... The Records are the property of the Plan Sponsor. The Plan Sponsor has the right of continuing access to their records. . . ." . In other words, although in the custody and control of BeneFirst, the records at issue are the property of the Plaintiffs.[5]

### The Plaintiffs Have Met Their Burden To Establish Good Cause

---

[5]BeneFirst argues that the Service Agreement does not contain any express terms which would impose the expense of the records production upon them. That argument begs the question of the role of these records in this lawsuit. While the agreement provides that the records belong to the Plaintiffs, they have always been in the care, custody and control of the Defendant. As discussed above, the Plaintiffs' claims will inevitably rise or fall upon what those records reveal. They are not extraneous to the lawsuit or marginally relevant to some arcane side issue. Given that the parties have ended up in litigation, the issue of whether they must be produced and, if so, who must bear the expense of such production is properly determined in accordance with Rule 26(b)(2)(B).

On balance, I find that the Plaintiffs have clearly established good cause for requiring BeneFirst to produce the requested information. As noted above, the Plaintiffs have significantly narrowed their original request from approximately 34,000 claims to a list of approximately 3,000. This reduction should serve to reduce the time and expense of retrieving the requested information. Under the circumstances, I find that the requested information should be produced by BeneFirst at its own expense.

### ORDER

For the reasons set forth above, BeneFirst's Motion for Reconsideration of Court's Discovery Order Related to Medical Bills (Docket # 29) is <u>denied</u>. BeneFirst shall produce the Medical Bills and Claims Forms for the approximately 3,000 claims as specified by the Plaintiffs at their own expense.


/S/ Timothy S. Hillman
TIMOTHY S. HILLMAN
UNITED STATES MAGISTRATE JUDGE

12

# Tab 19

{}

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

W.E. AUBUCHON CO , INC., AUBUCHON          )
DISTRIBUTION, INC., W.E. AUBUCHON          )
CO. INC. EMPLOYEE MEDICAL                  )        Civil Action 05-40159FDS
BENEFIT PLAN, and AUBUCHON                 )        (Louis M. Ciavarra BBO# 546481)
DISTRIBUTION, INC. EMPLOYEE                )        (James P. Hoban BBO #633929)
MEDICAL BENEFIT PLAN                       )        (Colleen E. Cushing BBO# 663498)
    Plaintiffs,                             )
                                           )
v.                                         )
                                           )
                                           )
BENEFIRST, LLC,                            )
    Defendant.                              )

## AFFIDAVIT OF SARAH AREL

I, Sarah Arel, do depose and state as follows:

1.      I am the Benefits Manager of the Plaintiff, W.E. Aubuchon Co., Inc.

("Aubuchon") and have held the position since prior to the engagement of the Defendant,

Benefirst, LLC ("Benefirst"). I served as the primary contact between Aubuchon and Benefirst

and provide this Affidavit based upon my own personal knowledge.

2.      I understand that Benefirst's lawyers have argued that Benefirst did not exercise

discretion over the functioning of the health benefit Plan. This is absolutely untrue. We relied

upon Benefirst not only to perform the ministerial functions assigned to them under the terms of

our contract, but in addition they exercised almost complete discretion over the determination of

benefits, the pursuit of recovery from third-party claims, the collection and payment of money,

and we deferred to their interpretation of our Plan and the law. We have relied upon them to

exercise their best judgment in order to insure that the employees of Aubuchon received the

benefit of the Plan, which Benefirst helped design. We were passive in our involvement and we trusted and relied upon Benefirst to exercise its expertise and judgment with respect to the operation of the Plan.

Signed under the pains and penalties of perjury this _27_ day of August, 2008.

Sarah Arel