UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| W.E. AUBUCHON CO., INC., AUBUCHON DISTRIBUTION, INC., W.E. AUBUCHON CO. INC. EMPLOYEE MEDICAL BENEFIT PLAN, and AUBUCHON DISTRIBUTION, INC. EMPLOYEE MEDICAL BENEFIT PLAN Plaintiffs, | ) ) ) ) ) ) ) ) ) ) ) ) ) | C.A. No. 05-40159FDS (Louis M. Ciavarra BBO# 546481) (James P. Hoban BBO #633929) (Colleen E. Cushing BBO# 663498) |
| v. | | |
| BENEFIRST, LLC, Defendant. | | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
(LEAVE GRANTED AUGUST 28, 2008, FOR FILING IN EXCESS OF 20 PAGES)**

INTRODUCTION

This case arises out of the defendant, BeneFirst, LLC's ("BeneFirst"), oversight of the

W.E. Aubuchon Co., Inc. Employee Medical Benefit Plan and the Aubuchon Distribution Inc.

Employee Medical Benefit Plan (collectively the "Plans") pursuant to Administrative Service

Agreements it entered into with W.E. Aubuchon Co., Inc. ("W.E. Aubuchon") and Aubuchon

Distribution Inc. ("Aubuchon Distribution") (collectively the "Aubuchon Companies").

It is not disputed that there were multiple millions of dollars in claims errors made during

BeneFirst's oversight of the Plans. It is undisputed that these claims errors were documented by

two different pre-suit audits of BeneFirst's claims decisions. It is also undisputed that BeneFirst

exercised substantial authority and control over the Plans' assets, as exemplified by the fact that

it was a signatory on the Plans' checking accounts, that it disbursed funds from the Plans'

checking accounts, that it received COBRA premium payments on behalf of the Plans, that it

paid itself commissions from the COBRA premiums it collected prior to forwarding the balance

of those premiums to the Aubuchon Companies, and that it made claims and received payments from stop loss insurers on behalf of the Plans. It is also undisputed that BeneFirst's claims examiner's applied their judgment in determining whether to pay claims, in deciding whether to pursue other insurance available with respect to a particular claim, and in deciding whether to pursue potential subrogation claims with respect to a particular claim. It is also undisputed that BeneFirst unilaterally determined whether to report adverse information to the Plans and the Aubuchon Companies, including without limitation the fact that BeneFirst was not able to obtain even half of the $478,000 aggregate stop loss reimbursement payment that it had advised W.E. Aubuchon that it expected to obtain. It is further undisputed that BeneFirst destroyed approximately forty percent of all claims records which the Plans and the Aubuchon Companies sought in discovery in order to substantiate their claims as to liability and damages, despite a contractual obligation to maintain those claims records.

Notwithstanding these undisputed points, the case is now before this Court on BeneFirst's Motion for Summary Judgment on the grounds that it is not an ERISA fiduciary and therefore not subject to liability under ERISA and that the Plaintiffs' state law breach of contract claims against it are preempted, even though it is not an ERISA fiduciary and therefore essentially immune from suit. The motion must be denied as BeneFirst is identified as a "Plan Administrator" and therefore is a "named fiduciary" for purposes of ERISA under any reasonable construction of the SPD governing the Plans. Further, the undisputed facts are sufficient to establish that BeneFirst's activities with respect to the Plans were sufficient to render it a functional fiduciary for ERISA purposes. In the alternative, settled precedent establishes that if BeneFirst was no more than a non-fiduciary service provider to the Plans, as it contends, ERISA does not preempt the Plaintiffs' state law claims.

2

## MATERIAL FACTS

W.E. Aubuchon and Aubuchon Distribution are Massachusetts corporations and were the plan sponsors for Plans, which provided medical benefits to their respective qualifying employees. It is not disputed that the Plans are covered by ERISA. The Plans are self-insured. (See W.E.A.S.P.D. (7/1/01), p. 3; W.E.A.S.P.D. (9/1/02), p. 3; A.D.S.P.D., p. 3.) The Aubuchon Companies have never administered their own Plans, but rather have always retained the services of a third-party administrator ("TPA"). (See Moran dep., p. 40.) The Aubuchon Companies reached agreement with BeneFirst for it to act as TPA for both Plans. (See BF 30(b)(6) dep. (4/15/08 – Dobens), pp. 64, 66.) BeneFirst was the TPA for the Aubuchon Plan from July 1, 2001 to June 30, 2002, and for the W.E. Aubuchon plan from July 1, 2001 until December 31, 2004. (See BF 30(b)(6) dep. (4/15/08 – Dobens, pp. 31, 66; Distrib. Supp. Ans. Ints., No. 4; BF 30(b)(6) dep. (4/15/08 – Dobens), p. 31.. W.E.A. Supp. Ans. Ints., No. 4.)

Although no signed copies of the Administrative Services Agreements ("ASA") for the Plans have been located; the parties do not dispute that the unsigned copy which is included in these papers embodies the essential terms of the agreements between BeneFirst and W.E. Aubuchon and between BeneFirst and Aubuchon Distribution. (See BF 30(b)(6)(4/15/08 – Dobens), pp. 65-68, 73, 77, 80, 117-18; Moran dep., p. 107; Arel dep., pp. 31-36; ASA.)

The ASA requires, among other things, that BeneFirst pay, on a weekly basis, Plan benefits "in its usual and customary manner," maintain claims records, provide the respective Plan sponsor with "service and assistance in connection with the design and development of the Benefit Plan, prepare necessary reports, make diligent efforts to correct any over payment or under payment made by it, send COBRA notices, election forms, and coupon books to qualified beneficiaries, and to collect COBRA premiums from those electing coverage. (See ASA, pp. 1-

3

2, 5.)[1]  In addition, BeneFirst authorized to and did pay itself its commissions from COBRA premiums it collected prior to paying the net premiums over to the Aubuchon Companies. (See ASA, pp. 4, 11; BF 30(B)(6)(4/15/08 – Dobens), pp. 126-27; 131-32.)   The Aubuchon Companies agreed to, among other things, open, maintain, and fund, as directed, a bank account on which BeneFirst was a signatory for claims payments purposes, and pay specified fees in return for these services. (See ASA, pp. 2, 9, 11.)

It is not disputed that BeneFirst did, in fact, perform all of these functions with respect to the Plans. (See BF 30(b)(6) dep. (4/15/08-Dobens), pp. 77-80, 86, 126-27, 131-132.; Gatanti dep., pp. 46-47, 82, 86-88, 91-92, 104-109, 136-37, 139-40; Reddie dep., pp. 38-40, 59, 63-67, 71-72, 74-75, 99, 105-06, 116-17; Arel Aff., pp. 1-2)

BeneFirst's claims examiners would on a daily basis, make determinations as to whether something was within or without the Plans. (See BF 30(b)(6) Dep. (4/15/08 - Dobens), p. 86.) It is conceded that not all such decisions were black and white, that claims adjudication involves some thought on the part of the examiner, that there is some interpretation of the plan in certain cases and that claims examining is not just data entry. (See Gatanti dep., pp. 46-47, 82, 91-92, 104-109, 136-37; Reddie dep. 38-40, 59, 99, 116-17.)  There was testimony that if a claims examiner determined that a certain claim could be paid, but the system denied the claim the claims examiner could and sometimes did override the system or "finagle the claim to pay how they wanted it to pay." (See Gatanti dep., pp. 24-25; Reddie dep. 25-26.)  BeneFirst's claims examiner also were responsible to determine whether there was other available insurance to pay

---

[1] It is also not disputed that for at least a portion of times that BeneFirst acted as TPA, that it expressly warranted that it would have a claims accuracy average of 98% or better.  (See ASA, p. 5.)  BeneFirst's managing member testified that it was his recollection that the standards were dropped from the ASA when the Health Insurance Portability and Accountability Act of 1996 (HIPAA) became effective and imposed even  more stringent standards than those contained in the Agreement  (See BF 30(b)(6) dep. (4/15/08 - Dobens), pp. 74-77.)  As such, it is undisputed that BeneFirst was obligated to have a claims accuracy average at least 98% during its entire tenure as TPA.

4

a claim, to determine whether there was subrogation claim, to conduct investigations in connection with making those determinations, and to pursue other insurance and subrogation where it deemed appropriate. (See BF 30(b)(6) dep. (4/15/08 - Dobens), p. 92-94.) As a practical matter, the Aubuchon Companies had no involvement in the claims adjudication process, unless approached by an employee regarding a denial of benefits by BeneFirst. (See Reddie dep. p. 82; Lord Dep., pp. 42-45, Arel dep., pp. 165-67; Arel Aff., pp. 1-2..) W.E. Aubuchon deferred to and relied upon BeneFirst's interpretation of the Plan. (See Reddie dep., pp. 111-12; Arel Aff., pp. 1-2) BeneFirst does not deny that claims were paid in error. (See BF 30(b)(6) dep. (Dobens), pp. 102-04; Reddie dep., pp. 91-92, 96; 5/17/08 Email.)

It is also undisputed that BeneFirst had authority and control over the collection and disposition of Plan Assets. (See BF 30(b)(6) dep. (4/15/08-Dobens), p. 40-42; Gatanti Dep., pp. 35-36, 96-99; Reddie Dep. 62-63; ASA, pp. 1, 2, 5.BeneFirst determined, on a weekly basis, the number and dollar amounts of the claims to be paid and reported that figure to the Aubuchon Companies in a "Check Edit Report." (See BF 30(b)(6) dep. (4/15/08-Dobens), p. 40-42,44-45, 47,126-27, 131-132.; Gatanti Dep., pp. 35-36, 96-99; Reddie Dep. 62-63; ASA, pp. 1, 2, 5.) It also had discretionary authority to and did pay itself commissions with respect to its COBRA functions, prior to remitting the net COBRA premium to the Aubuchon Companies. (See BF 30(b)(6) Dep. (4/15/08-Dobens), p. 126-27, 131-132, ASA, pp. 4, 11)

BeneFirst was aware that there was no one within the Aubuchon Companies that was trained in claims administration and that they were relying upon BeneFirst for claims adjudication. (See BF 30(b)(6) dep. (4/15/08 - Dobens), p. 84.) Despite this, BeneFirst contends that it was "just a record keeper for the plan" and "nothing more than a vendor to a plan sponsor or a fiduciary of a plan." (See BF 30(b)(6) dep. (4/15/08 - Dobens), pp. 81, 97.) BeneFirst

5

contends that it did not have discretion over the plan, could not decide what benefits to provide to participants, and solely paid claims according to the plan document. (See BF 30(b)(6) dep. (4/15/08 - Dobens), pp. 80-82.) BeneFirst contends that while it had a fiduciary responsibility to its clients, it did not have such a responsibility to the plans. (See BF 30(b)(6) dep. (4/15/08 - Dobens), pp. 82-83.)

W.E. Aubuchon terminated BeneFirst effective December 31, 2004 because it no longer had confidence in their oversight of the Plan. (See BF 30(b)(6) dep. (4/15/08-Dobens), p. 31; Arel dep., pp. 52-53; Moran dep., 73.) In this regard, BeneFirst had reported a very large anticipated stop loss insurance reimbursement for the 2003-2004 Plan year based on its own erroneous report, discovered and hid its error from W.E. Aubuchon for months despite repeated inquires regarding the reimbursement, and a large portion of the claim was disallowed by the carrier. (See Gatanti dep., pp. 61, 69-75,149; Reddie dep., pp. 78-79, 96-97; Arel dep., p. 52-56, 95; BF 30(b)(6) dep. (4/15/08 - Dobens), pp. 25-26, 6/29/04 Letter, p. 1; 5/17/05 Email; Moran dep., p. 73; W.E.A. Supp. Ans. Ints., No. 20..) Claims errors by BeneFirst were confirmed by two different, pre-litigation audits. (See 4/8/05 NIIS Report, pp. 1-3; 7/22/05 NIIS Report, pp. 1-2; 4/8/08 NIIS Report, p. 2.)

It is not disputed that the only plan document for each of the Aubuchon Companies' Plans was the Summary Plan Description ("SPD"). (See BF 30(b)(6) dep. (4/15/08 - Dobens), pp. 63-64.) All of the relevant language of the three SPDs is identical. Each of the SPDs provide that the "Plan Administrator shall be a named fiduciary" for ERISA purposes, and that the "Plan Administrative" is the relevant Aubuchon Company and "any person or persons to whom the Plan Administrator delegates all or part of its authority under the Plan," and "delegate[s] claims administration and other day-to-day functions for all benefits" to BeneFirst.

6

(See W.E.A.S.P.D. (7/1/01), p. 1, 4, 58-59); W.E.A.S.P.D. (9/1/02), p.1, 3, 60; A.D.S.P.D., p. 1, 4, 57-58.)

For purposes of summary judgment, there is no dispute that BeneFirst made multiple millions of dollars in claims errors. (See 4/8/05 NIIS Report, p. 1; 7/22/05 NIIS Report, 4/8/05 NIIS Report; 5/17/05 Email.) There is no serious dispute that BeneFirst's failure to maintain the claims records at issue was a breach of the ASA. (ASA, p. 2.)[2]

ARGUMENT

A.    Standard For Imposition Of Fiduciary Liability Under ERISA.

There are two different bases for the imposition of fiduciary obligations on a person under ERISA. The first is to be a named fiduciary, which is defined as those persons listed as fiduciaries in the plan documents or those who are otherwise identified as fiduciaries pursuant to a procedure specified by the plan. See Beddall v. State Street Bank and Trust Company, 137 F.3d 12, 18 (1st Cir, 1998)(citing 29 U.S.C. § 1102(a)(2)). The second is to be deemed a functional fiduciary as a result of performing any one of a group of specifically identified functions with respect to a plan despite the absence of an identification of the person performing those functions as a fiduciary in the plan documents. See Bedall, 137 F.3d at 18 (citing U.S.C. § 1102(21)(A)). Fiduciary liability is not an all or nothing proposition under ERISA. See Beddall, 137 F.3d at 18. Rather, "fiduciary liability arises in specific increments correlated to the vesting or performance of particular fiduciary functions in service of the plan, not in broad, general terms." Id.

In this case, as set forth more fully below, BeneFirst qualifies as both a named fiduciary and a functional fiduciary. This is so because BeneFirst is a "Plan Administrator" under the

---

[2] In this regard, this action was commenced less than a year after the termination of BeneFirst on December 31, 2004.

SPDs for the Plans as a result of the delegation of authority to it by the Aubuchon Companies and because it exercised authority and control over the disposition of Plan assets. (See Arel Aff., pp. 1-2.)

     1.     <u>BeneFirst's Status As A Named Fiduciary Under The Aubuchon And Aubuchon Distribution Plans.</u>

Contrary to BeneFirst's assertions in its papers, BeneFirst is, in fact, a "named fiduciary" under the Plan documents pursuant to settled rules of construction.  In this regard, the Introduction in Section I of each of the relevant SPDs provide in pertinent part as follows:

> The Plan Administrator has full discretionary *authority to interpret this Plan and its provisions and regulations with regard to eligibility, coverage, benefit entitlement, benefit determination and general administrative matters*.  The Plan Administrator's decisions will be binding on all Covered Employees and their beneficiaries and conclusive on all questions of coverage under this Plan. (emphasis added)

(See W.E.A.S.P.D. (7/1/01), p. 1); W.E.A.S.P.D. (9/1/02), p.1; A.D.S.P.D., p. 1.)

The SPD further provides in its General Plan Provisions at VIII.A.3. that:

> The Plan Administrator *shall be a named fiduciary for purposes of Section 402(a)(1) of ERISA*, shall administer the Plan in accordance with its terms, and shall have complete discretionary authority and all powers necessary to carry out its terms and to control and manage the operation and administration of the Plan, including, but not limited to the following:
>
> ...
>
> (g)    to employ or retain counsel, accountants, *third party administrators*, actuaries or such other consultants as may be required to assist in administering the Plan;...(emphasis added)

(See W.E.A.S.P.D. (7/1/01), pp. 58-59; W.E.A.S.P.D. (9/1/02), p. 60; A.D.S.P.D. (8/25/01), pp. 57-58.)

The SPDs' Definitions provides, in pertinent part, the following:

> **Contract Administrator.**  BeneFirst, LLC together with any other of its programs, units, or divisions that is designed to perform claims administration functions under the Plan ...
>
> ...

8

**Plan Administrator.** W.E. Aubuchon Co., Inc. [or W.E. Aubuchon Distribution Co., Inc.]. *The term Plan Administrator also means any person or persons to whom the Plan Administrator delegates all or part of its authority under the Plan.* (emphasis added)

(See W.E.A.S.P.D. (7/1/01), pp. 72, 79; W.E.A.S.P.D. (9/1/02), pp. 74, 81; A.D.S.P.D. pp. 71, 78.)

The SPD further provides in its Summary Plan Information in Section II as follows:

The Plan is self administered by the Employer, which is a "named fiduciary" and the "plan administrator" under ERISA. The Employer has *delegated claims administration and other day-to-day functions* for all benefits except prescription drug benefits and certain vision care benefits to the following Contract Administrator:

BeneFirst, LLC
P.O. Box 1421
Marshfield, MA 02025-0877
823-6334 (Member Services)
www.BeneFirst.com

(See W.E.A.S.P.D. (7/1/01), p. 4; W.E.A.S.P.D. (9/01/02), p. 3; A.D.S.P.D., p. 4) (emphasis added).

Thus, in accord with their authority under the respective Plan documents, the Aubuchon Companies delegated "claims administration and other day-to-day functions" for benefits for BeneFirst. As such, under the express terms of the definition of "Plan Administrator" BeneFirst is incorporated into that definition as a result of that delegation of authority. See Nault v. U.S., 517 F.3d 2, 4 (1st Cir. 2008)("terms within a contract are accorded their 'plain, ordinary and natural meaning'"); Nadherny v. Roseland Property Company, Inc., 390 F. 3d 44, 49 (1st Cir. 2004)("There is also the interpretive rule that all of the contract's terms should be construed together to find a coherent whole. As such, a court may look to related provisions of a contract to cast light on the meaning of disputed language." (internal citations omitted)(applying Massachusetts law)). Moreover, all Plan Administrators are expressly designated named fiduciaries for ERISA purposes in the SPD. Thus, contrary to its assertions, BeneFirst is a

9

"named fiduciary" based on its incorporation into the definition of "Plan Adminstrator" by virtue of the Plans delegation of authority to it under settled rules of construction.    See Nault; Nadherny, *supra*.

> 2.    Even if BeneFirst Was Not Named Fiduciary Under The Plans, Which It Is, BeneFirst Is A Fiduciary Because It Exercised Authority Or Control Over The Disposition Of Plan Assets Within The Meaning Of 29 U.S.C.§ 1002(21)(A)(i)

A party may be found to be a functional fiduciary and therefore subject to fiduciary liability if they perform any one of certain enumerated functions with respect to a plan. See, e.g.. Bedall, 137 F.3d at 18. In this regard, 29 U.S.C. § 1002(21)(A) provides as follows:

> a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such a plan *or exercises any authority or control respecting management or disposition of its assets,* (ii) he renders investment advise for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such a plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. (emphasis added.)

Thus, under the plain language of the statute, no discretion is required where the person "exercises any" authority or control over plan assets. See Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997)(where language of a statute is clear and unambiguous the inquiry into its meaning is at an end.) At least six Circuits have adopted this construction and held that a person need not exercise discretion in order to be subject to fiduciary liability under 29 U.S.C. § 1002(21)(A)(i) where the person has *any* authority or control over disposition of plan assets. See Briscoe v. Fine, 444 F.3d 478 (6th Cir. 2006); Chao v. Day, 436 F.3d 234 (D.C. Cir. 2006); David P. Coldesina D.D.S. v. Estate of Simper, 407 F.3d 1126 (10th Cir. 2005); IT Corp. v. Gen. Am. Life Ins. Co., 107 F.3d, 1415, 1421-22 (9th Cir. 1997); FirsTier Bank, N.A. v. Zeller, 16 F.3d 907, 911 (8th Cir. 1994); LoPresti v. Terwilliger, 126 F.3d 34, 40 (2d Cir. 1997). The Sixth

Circuit has held that "[t]he plain language of the statute establishes that it imposes fiduciary duties not only on those entities that exercise *discretionary* control over the disposition of plan assets, but also imposes such duties on entities or companies that exercise '*any* authority or control' over the covered assets." Briscoe v. Fine, 444 F.3d at 491, quoting Smith v. Provident Bank, 170 F.3d 609, 613 (6th Cir. 1999) (emphasis in original). Indeed, this would appear to be the result reached by a majority of the Circuits which have decided the issue. See Briscoe, 444 F.3d 478; Chao, 436 F.3d 234; Coldesina, 407 F.3d 1126; IT Corp., 107 F.3d at 1421 ("[t]he words of the ERISA statute, and its purpose of assuring that people who have practical control over an ERISA plan's money have fiduciary responsibility to the plan's beneficiaries, *require* that a person who has authority to direct payment of a plan's money be deemed a fiduciary"); FirsTier Bank, 16 F.3d at 911 (holding that ERISA imposes fiduciary duties "whenever one deals with plan assets"); LoPresti, 126 F.3d at 40; Smith, 170 F.3d at 613(["T]hose acts designed to carry out the very purposes of the plan, are subject to ERISA's fiduciary duties"). This construction of 29 U.S.C. § 1002(21)(A) is also consistent with trust law generally. See Coldesina, 407 F.3d at 1132 ("In Congress's judgment, and consistent with general trust law, parties controlling plan assets are *automatically* in a position of confidence by virtue of that control, and as such they are obligated to act accordingly." (citations omitted)(emphasis in original)). Indeed, the Appeals Court in Chao rejected the defendant's efforts to import the discretion element from the prior, disjunctive clause; stating that such a construction "does violence to the statutory text." Chao, 436 F.3d at 236. In Chao, the Appeal Court noted that "Congress plainly framed § 1002(21)(A)(i) in the *alternative*, and it further bifurcated the subsection with the parallel inclusion of the verb "exercises' at the beginning of both the discretionary clause and the disposition clauses" and therefore the Court "cannot commingle the

11

textually distinct provisions of the two clauses." Chao, 436 F.3d at 236. The Appeals Court further noted that this construction of 21 U.S.C. § 1002(2)(A)(i) was also supported by the structure of the statute itself, which includes two references to "discretion" in the first clause of subsection (i) and completely omits any reference to "discretion" in the second clause of subsection (i). Chao, 436 F.3d at 236. This construction by the Appeal Court in is in accord with settled rules of statutory construction. See Jama v. Immigration & Customs Enforcement, 543 U.S. 335, 341, 125 S. Ct. 694, 700, 160 L.Ed 2d 708 (2005)

Similarly, the Sixth Circuit has explained the basis for this construction of the statute as follows:

> Under one clause, a person is a fiduciary to the extent that he or she 'exercises any *discretionary* authority or *discretionary* control' over the management of the ERISA plan. 29 U.S.C. § 1002(21)(A)(i)(emphasis added). The second part of the same sentence, however, confers fiduciary status upon a person to the extent that he or she 'exercises *any* authority or control respecting management or disposition of [the plan's] assets.' *Id.* (emphasis added.) We will presume under prevailing canons of statutory construction that Congress's omission of the word 'discretionary' in the second part of the sentence was intentional, and that the threshold for acquiring fiduciary responsibilities is therefore lower for persons or entities responsible for the handling of plan assets than for those who manage the plan. See, e.g., Keene Corp. v. U.S., 508 U.S. 200, 208, 113 S.Ct. 2035, 124 L.Ed. 2d 118 (1993)('[W]here Congress includes particular language in one section of a statute but omits it in another …, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.')(alteration in original)(citation and quotation marks omitted).

Briscoe, 444 F.3d at 490-91.

Based on this construction, other Circuits have found that acting as the signatory on a plan account brings is sufficient to establish fiduciary status. See Coldesina, 407 F.3d at 1133; IT Corp., 107 F.3d at 1421-22. See also LoPresti, 126 F.3d at 40. It is undisputed that BeneFirst was a signatory on Plan accounts. It is also undisputed that BeneFirst collected and disbursed

12

Plan funds, and, in fact, had and exercised the authority and discretion to pay itself commissions from the COBRA premiums it collected prior to paying the Aubuchon Companies. Under the majority position, this exercise of control of the Plans' funds is sufficient to give rise to fiduciary status under the second clause of 29 U.S.C. § 1002(21)(A)(i). See, e.g., Briscoe, Chao, supra.

      a.    The First Circuit's Decisions in *Cottrill v. Sparrow, Johnson & Ursillo, Inc.*, and *Beddall v. State Street Bank And Trust Company*, Are Distinguishable On Their Facts And Therefore Do Not Control.

The First Circuit's decisions in Cottrill v. Sparrow, Johnson & Ursillo, Inc., 74 F.3d 20 (1st Cir. 1996) and Beddall v. State Street Bank And Trust Company, 137 F.3d 12 (1st Cir. 1997) are distinguishable on their facts and therefore do not control. In Cottrill, defendants claimed that the plaintiff, Cotrill, was a fiduciary as a result of his assertion of control of the disposition of plan assets. Cottrill was not a third-party administrator and, in fact, had no formal relationship with the plan except as a plan beneficiary. 137 F.3d at 21. Rather, his alleged disposition of plan assets for which imposition of fiduciary liability was sought was the gratuitous recommendation of an investment to the plan's trustee and, upon the trustee's admitted authorization of the investment, acting as the conduit for the disbursement of the funds for that investment through a partnership in which he was a partner. As such, the person against whom imposition of fiduciary liability was sought under the second clause of 29 U.S.C. § 1002(21)((A)(i)in the Cottrill was involved in a single, expressly approved disbursement of plan funds. Unlike the Plaintiff in Cottrill, BeneFirst has a formal relationship to the Plan as its third party administrator. More significantly, unlike Cottrill, BeneFirst did not merely engage in an isolated, expressly sanctioned transaction, but instead was the entity responsible for the regular collection and disbursement of plan assets over a multi-year period. As such, Cottrill is clearly

distinguishable on its facts and does not control this Court's determination of BeneFirst's fiduciary relationship to Plans here.

Similarly, the facts in Beddall demonstrate that it is not controlling of the present case. In Beddall, the Defendant, State Street Bank and Trust Company ("State Street"), was directed by the plan's administrative committee to segregate all or a portion of the plan assets into "Investment Management Accounts." The administrative committee, not State Street, then appointed "Investment Managers" for the Investment Management Accounts and vested in the Investment Managers the authority to discharge their duties. 137 F.3d at 19-20. As a result, although nominally denominated a trustee, State Street merely held the plan's assets in trust, "managed" them as expressly directed by others, and periodically reported their value to the plan based in relevant part, by appraisals supplied by others. Bedall,137 F.3d at 13. Over a period of time, a consultant retained by the Investment Manager, despite a declining real estate market, reported inaccurately high values for real estate investments held by the fund to State Street, which in turn, had reported those inflated values to the fund, which in turn had relied on those inflated values and unknowingly overpaid retirees electing lump sum pensions and, consequently, devalued the retirement benefits of those electing the payment of pension benefits over time.

On the facts of Bedall, State Street, although named a trustee, had, in fact, been divested of authority and instead was acting merely as a custodian or depository. As such, although State Street had physical possession of the plan assets, it no more exercised authority or control over them than a bank does over a depositor's account. See, e.g., Srein v. Frankford Trust Co., 323 F.3d 214, 222 (3d Cir. 2003); IT Corp., 107 F.3d at 1422. See also Briscoe, 444 F.3d at 495;

14

Chao, 436 F.3d at 237-38.  In such circumstances other Circuits, have also declined to impose fiduciary liability. Id.

Unlike State Street, which the Court found to lack a fiduciary duty to the plaintiff in Bedall, BeneFirst was not merely the custodian or depository of Plan assets.  Instead, BeneFirst was the administrator of the Plan, charged with the regular collection and disbursement of plan assets over a multi-year period.  Because of the substantially greater role of BeneFirst in disposition of the assets of the Plan, BeneFirst is unlike the defendant in Bedall, and Bedall does not control here.

> 3.   Even if BeneFirst Was Not A Functional Fiduciary Under The Plans By Virtue Of Its Authority And Control Over The Disposition of Plan Assets, Which It Is, BeneFirst Is A Fiduciary Because It Exercised Sufficient Discretionary Authority Or Control Over Plan Management Within The Meaning Of 29 U.S.C.§ 1002(21)(A)(i)

The deposition testimony in this case is unanimous that BeneFirst did, in fact, assume all oversight of the Plans pursuant to the authority delegated to it by the Aubuchon Companies. (See Arel Aff., pp. 1-2.)  BeneFirst made all claims determinations, built out a computerized claims adjudication system to assist with claims determinations, made adjustments and changes to that claims adjudication system whenever it deemed that the system was not making appropriate determinations, interpreted the Plan documents on as an as needed basis, issued all necessary COBRA letters and coupons, collected COBRA payments, determined whether there were and determined whether to pursue subrogation claims, determined whether there was and determined whether to pursue other available insurance with respect to a claim, determined weekly funding requirements for the Plans, exercised control over and disbursed Plan funds to providers on the claims it approved, pursued and received payments on over payments to

15

providers, filed reimbursement claims with the Plans' stop loss insurers, responded to stop loss insurer audits, and appealed stop loss insurer reimbursement determinations.

It was not disputed by any witness that BeneFirst's claims examiners did interpret the SPD and used their own judgment. (See BF 30(b)(6) dep (4/15/08 – Dobens), p. 86; Gatanti dep., pp. 46-47, 82, 91-92, 104-109, 136-37; Reddie dep., pp. 38-40, 59, 99, 116-17.) The record evidence also demonstrates that BeneFirst exercised its own discretion, and advanced its own interests over those of the Plans, with respect to when and what information to share with them concerning stop loss reimbursement claims and, in fact, failed to correct its report of an inaccurate anticipated stop loss reimbursement payment for months after it had advised the Plan of that expected amount. The record also demonstrates that despite BeneFirst's contractual obligations to the Aubuchon Companies under the ASAs to maintain claims records, BeneFirst exercised its own independent discretion by deleting or destroying claims images. (See 8/31/07 Letter.) In such circumstances, BeneFirst exercised sufficient discretionary control to be liable as a fiduciary with respect to these functions. See Bedall, 137 F.3d at 18.

B.    ERISA Does Not Preempt The State Law Breach Of Contract Claims If BeneFirst Is Not A Fiduciary With Respect To The Plans.

As an initial matter, the Aubuchon Companies agree that if, on all the evidence, BeneFirst is found to be an ERISA fiduciary, then the only remedies available to them are those provided by ERISA and its state law breach of contract claims are preempted. See 29 U.S.C. § 1144(a). The Aubuchon Companies advance the state law claims in the alternative to its ERISA claims, as those state law claims cannot be preempted unless BeneFirst is a fiduciary. See, e.g., Pharmaceutical Care Management Ass'n. v. Rowe, 429 F.3d 294, 305 (1st Cir. 2005). BeneFirst contends that it was not a fiduciary under ERISA because it merely performed ministerial functions and was "just a record keeper for the plan" and "nothing more than a vendor to a plan

16

sponsor or a fiduciary of a plan." (See BF 30(b)(6) dep. (4/15/08 - Dobens), pp. 81, 97.) Despite this, BeneFirst also contends that the Aubuchon Companies' state law breach of contract claims are preempted by ERISA. This argument is flawed and must be rejected. To rule otherwise, would leave W.E. Aubuchon with no recourse and no avenue of recompense despite being injured by claims errors made by BeneFirst, which are believed to be in excess of $2 Million and such a result is manifestly unjust. (See 4/8/08 NIIS Report, pp. 4-8.)

      1.    ERISA Preemption Standard.

"ERISA's preemption provision states explicitly that ERISA 'shall supercede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan.'" Rowe, 429 F.3d at 301 (quoting 29 U.S.C. § 1144(a)). "The basic thrust of the preemption clause ... was to avoid a multiplicity of regulation in order to promote uniform administration of employee benefit plans." New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 657, 115 S.Ct. 1671, 131 L.Ed. 2d 695 (1995). See Rowe, 429 F.3d at 302. "State laws that impede this goal of national uniformity will be preempted." Rowe, 429 F.3d at 302.

However, the ERISA preemption provision is still construed from "the starting point presumption that Congress does not intend to supplant state law" and "that, unless congressional intent to preempt clearly appears, ERISA will not be deemed to supplant state law in areas traditionally regulated by the states." Travelers Ins. Co., 514 U.S. at 654, 661, 115 S.Ct. 1671. See Carpenters Local Union No. 26 v. U.S. Fid. & Guar. Co., 215 F.3d 136, 139-40 (1st Cir. 2000); Rowe, 429 F.3d at 301.

The Supreme Court has fashioned a two prong test to determine whether a state law is preempted by ERISA. See Rowe, 429 F.3d at 301. A particular state law "relates to" an ERISA plan for preemption purposes "if it (1) has a connection with or (2) a reference to such a plan."

17

California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc., 519 U.S. 316, 324, 117 S.Ct. 832, 136 L.Ed. 2d 791 (1997).  See also Rowe, 429 F.3d at 302; Carpenters Local Union No. 26, 215 F.3d at 139.

      State law claims are not automatically preempted because there is some involvement of an ERISA plan.  See Golas v. HomeView, Inc., 106 F.3d 1, 2 (1st Cir. 1997).  The Supreme Court has warned that when evaluating whether a state law has a "connection with" ERISA plans, the Court must avoid "uncritical literalism" and instead be guided by the objectives of the ERISA statute, as well as to the nature of the effect of the state law in question on ERISA plans. See Egelhoff v. Egelhoff, 532 U.S. 141, 147 121 S.Ct. 3122, 149 L.Ed. 2d 264 (2001).  See also Rowe, 429 F.3d at 302. To determine if a state law is "connected to" a plan, the court must decide if the law "precludes the ability of the plan administrators to administer their plans in uniform fashion." Rowe, 429 F.3d at 302.  For example, a state law is "connected with" a plan where the "plan administrators [are] bound to a particular choice of rules - rules mandated by the state for determining beneficiary status." Id. at 303.

      "A state law is preempted by ERISA by virtue of an impermissible 'reference to' an ERISA plan '[w]here a State's law acts immediately and exclusively upon ERISA plans ... or where the existence of ERISA plans is essential to the law's operation." Dillingham Constr., N.A., 519 U.S. at 324-325, 121 S.Ct. 1322.

      "What triggers ERISA preemption is not just any effect on administrative procedures but rather an effect on the primary administrative functions of benefit plans, such as determining an employee's eligibility for a benefit and the amount of that benefit." Aetna Life Ins. Co. v. Borges, 869 F.2d 142, 146-47 (2d Cir. 1989), *cert. denied*, 493 U.S. 811, 110 S.Ct. 57, 107 L.Ed.2d 25(1989).

18

"ERISA preemption proscribes the type of alternative enforcement mechanism that purposes to provide a remedy for the violation of a right expressly guaranteed and exclusively enforced by the ERISA statute." Carpenters Local Union No. 26, 215 F.3d at 141.

1.    State Laws Of General Application Are Not Preempted Even If They Impose Incident Burdens On Plan Administration And, In Any Event, Is Only Available To ERISA Entities.

For purposes of preemption analysis, a law that applies to a wide variety of situations, an appreciable number of which have no specific connection to ERISA plans, is a law of general application. Carpenters Local Union No. 26, 215 F.3d at 144. "It is common ground that state laws of general application are safe from ERISA preemption even if they impose some incidental burdens on the administration of covered plans." Id.

"[C]ommon law claims are preempted only if the relationship between the plaintiff and the defendant is based on a plan governed by ERISA." Cuoco v. Nynex Inc., 722 F.Supp. 884, 886 (D. Mass. 1989). See Coyne & Delany Co. v. Selman, 98 F.3d 1457, 1469 (4th Cir. 1996)("Congress did not intend to preempt traditional state-based laws of general applicability that do not implicate the relations among the traditional ERISA plan entities, including the principals, the employer, the plan, the plan fiduciaries and the beneficiaries."[3]

ERISA preemption does not protect non-fiduciaries who provide services to the plan. See Rowe, 429 F.3d at 305. The First Circuit has found that "although ERISA prescribes the duties that are owed by ERISA entities to one another, and prescribes remedies for their breach, it is not designed to regulate or afford remedies against entities that provide services to plans." Rowe, 429 F.3d at 305 (internal quotation and citation omitted). See Berlin City Ford, Inc. v. Roberts Planning Group, 864 F.Supp. 292, 296 (D.N.H. 1994)( the District Court found that

---

[3]  Under ERISA, the "four principal ERISA entities [are] the employer, the plan, the beneficiaries, and the plan fiduciaries." Woodworker's Supply v. Principal Mut. Life, 170 F.3d 985, 993 (10th Cir. 1999).

ERISA plans should not be construed "to protect non-fiduciaries from state laws of general applicability that are intended to ensure that professional services are rendered with reasonable diligence," and therefore negligence claims against a non-fiduciary plan advisor were not preempted). See also Dudley Supermarket v. Transamerica Life Ins., 302 F.3d 1, 4-5 (1st Cir. 2002) (finding that malpractice claims against defendants who are not ERISA fiduciaries are not preempted). Thus, state law actions by a plan sponsor against a non-fiduciary TPA are not preempted.[4]

    3.    The Cases BeneFirst Relies Upon Are Distinguishable And Do Not Control, If BeneFirst Is Not An ERISA Entity And A Fiduciary.

ERISA defines remedies between participating entities. See Rowe, 429 F.3d at 305. BeneFirst cites to Hampers v. W.R. Grace & Co., Inc., 202 F.3d 44, 52 (1st Cir. 2000), in support of its contention that the breach of contract claims "relate to" an ERISA plan, and therefore are preempted. But, in holding that the state law contract claim related to the ERISA plan for purposes of preemption, the First Circuit acknowledged that its decision relied on the defendant's role as "an ERISA employer and fiduciary" who "exercised discretion and authority or control respecting the management, disposition and administration of the plan." Id. at 53. If BeneFirst is not a fiduciary under ERISA, then the state law contract claims based on the Administrative Services Agreement do not "relate to" an ERISA plan for purposes of preemption. In Hampers, the court specifically distinguishes its decision from one where "the defendant is a third party insurer _or service provider_ who is not an ERISA entity - plan, employer, participant, beneficiary,

---

[4] Since the Supreme Court's decision of Travelers Ins. Co., 514 U.S. 645, 115 S.Ct. 1671, a number of Courts have held that state law actions by plan sponsors against TPAs who are not plan fiduciaries, are not preempted by ERISA. See Geweke Ford v. St. Joseph's Omini Preferred Care, Inc., 130 F.3d 1355, 1358-61 (9th Cir. 1997); Tie Communications, Inc. v. First Health Strategies, Inc., 1998 WL 171126 (D.Kan. 1998). This is in accord with a recognized trend toward the narrowing of ERISA's preemptive effect. See John W. Schuch, _ERISA Preemption of State Law Claims Against Managed Care Entities_, 67 Brook L. Rev. 1221, 1223, 1226-32 (Summer 2002); Lisa M. Campbell, _"Saving" External Review from the Claws of ERISA Preemption Under Corporate Health v. Texas Department of Insurance_, 50 Cath. U. L. Rev. 785, 795-96 n. 56 (Spring 2001)

20

fiduciary - at all." Id. (Emphasis added.) It follows then, that if BeneFirst is not ERISA entity and fiduciary, the Administrative Services Agreement claims are not preempted under Hampers and BeneFirst's reliance on that case is therefore misplaced.

BeneFirst also relies on Carlo v. Reed Rolled Thread Die Co., 49 F.3d 790 (1st Cir. 1995) and Vartanian v. Monsanto Co., 14 F.3d 697 (1st Cir. 1994) in support of its contention that the state law breach of contract claims are preempted by ERISA. But, like Hampers, the state law claims in both Carlo and Vartanian were preempted because the defendant was an ERISA entity. In Carlo, the First Circuit held that an employee's suit against an employer for negligent misrepresentation of the benefits was preempted by ERISA. See Carlo, 49 F.3d at 794. In Vartanian, the First Circuit held that state law action against a fiduciary for unlawful discrimination and misrepresentation was preempted. See Vartanian, 14 F.3d at 700.

BeneFirst contends that the Aubuchon Companies only appropriate remedy was to bring an action for injunctive relief under 29 U.S.C. §1132(a)(3) "to compel the administrator to properly administer the plan's terms." Thus, under BeneFirst's preemption analysis, there are no circumstances in which a plan sponsor may obtain a monetary award against a non-fiduciary TPA. Such a construction of the scope of ERISA preemption would be unconscionable and result in a wind-fall to breaching non-fiduciary service providers as those parties would be effectively immune from liability under both federal and state law for breaches of their service agreements and for any deviation from the standard of care in connection with the provision of services under those agreements regardless of the degree of harm to the ERISA plan. This cannot be. If, in fact, BeneFirst is not an ERISA fiduciary, then it may not use ERISA as a shield to protect it from state law claims based on the purportedly non-fiduciary services it provided to the Plans.

21

The state law breach of contract claim in the present case is not connected to the Plans in that it will not determine whether any benefits are paid and will not directly affect the administration of benefits under the Plans. See Framingham Union Hosp. v. Travelers Ins. Co., 721 F.Supp. 1478, 1490 (D. Mass. 1989) (holding state law claims for professional malpractice, misrepresentation, negligence, and Chapter 93A were not preempted because "none of these causes of action purports to impact the administration of the Plan, provision of benefits or any like concern of ERISA."); Pace v. Signal Technology Corp., 417 Mass. 154, 156 (1994) (Supreme Judicial Court stated that where "resolution of state law claims will neither determine whether any benefits are paid nor directly affect the administration of benefits under the plan, the claims do not relate to ERISA and accordingly are not preempted.")  Moreover, requiring a non-fiduciary TPA to adhere to the terms of an ASA under state contract law does not in any way affect the manner in which ERISA plans must be structured in Massachusetts nor will it require the structure of plans to be varied from state to state. As such, allowing enforcement of state law contractually agreements between a plan administrator and a self-professed non-fiduciary, ministerial service provider would in no way impinge on the goal of national uniformity. Although permitting an action for breach of contract against a TPA by a plan sponsor will require the TPA to perform its duties under its ASA, this does not "bind" the plan to a "particular choice of rules" for determining beneficiary status or to pay certain benefits. Like in Rowe, the state law applied in such a case is not one that directly limits the organization or structure of ERISA plans or impacts benefits.

The contract law that plaintiffs are asserting is a law of general application and indiscriminately applies to all contracting parties.  Breach of contract claims do not act immediately and exclusively on the Plans.  Rather, they have as their basis a separate ASA

22

pursuant to which BeneFirst was to provide identified services in exchange for stated compensation. Although they may have an incidental effect on the Plan (i.e., recovery of funds lost through BeneFirst's shoddy administration), they impose no legal burdens on the Plans, will not affect the benefits paid to any beneficiaries, and will not affect the determination of any beneficiaries entitlement to benefits under the Plans. As such, the ERISA plans are in no way essential to the existence of those claims and are neither "connected with" nor based on a "reference to" those Plans for purposes of preemptive analysis. Although state contract law may "touch upon" the Plans, it does not affect the "intricate web of relationships among the principal players in the ERISA scenario," if BeneFirst is not a fiduciary, and therefore the state claims are not preempted. See Rowe, 429 F.3d at 301.

## CONCLUSION

In summary, BeneFirst is a "named fiduciary" and functional fiduciary for the reasons set forth above and therefore the motion for summary judgment should be denied. In the alternative, if BeneFirst is merely a non-fiduciary provider of ministerial services to the Plans' sponsors, as it contends, the Aubuchon Companies state law claims are not preempted by ERISA for the reasons and therefore the motion for summary judgment should be denied.

23

W.E. AUBUCHON CO., INC.,
AUBUCHON DISTRIBUTION, INC., W.E.
AUBUCHON CO. INC. EMPLOYEE
MEDICAL BENEFIT PLAN, and
AUBUCHON DISTRIBUTION, INC.
EMPLOYEE MEDICAL BENEFIT PLAN
By their attorneys,


*/s/ James P. Hoban*
Louis M. Ciavarra (BBO #546481)
James P. Hoban (BBO #633929)
Colleen E. Cushing (BBO #663498)
Bowditch & Dewey, LLP
311 Main Street, P.O. Box 15156
Worcester, MA 01615-0156
(508) 791-3511

Date:   August 28, 2008

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 28, 2008.

*/s/ James P. Hoban*
James P. Hoban

24