# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| _____ | ) | |
| **W.E. AUBUCHON CO., INC.;** | ) | |
| **AUBUCHON DISTRIBUTION, INC.;** | ) | |
| **W.E. AUBUCHON CO. INC. EMPLOYEE** | ) | |
| **MEDICAL BENEFIT PLAN; and** | ) | **Civil Action No.** |
| **AUBUCHON DISTRIBUTION, INC.** | ) | **05-40159-FDS** |
| **EMPLOYEE MEDICAL BENEFIT PLAN,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **BENEFIRST, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## MEMORANDUM ON THE COURT'S ORDER ON
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is a dispute arising out of the administration of two employee medical benefit plans.
Defendant BeneFirst, LLC, a third-party administrator, was hired by plaintiffs W.E. Aubuchon
Co., Inc., and Aubuchon Distribution, Inc., the employer sponsors of the relevant benefit plans.
The plans are qualified employee benefit plans within the meaning of the Employee Retirement
Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*.

According to plaintiffs—and for these purposes, the Court will assume that it is
true—BeneFirst made claim processing errors amounting to millions of dollars in additional costs
during the period it served as the third-party administrator to the plans. Plaintiffs have sued for
breach of contract under state law and for breach of fiduciary duty under ERISA. The parties
agree that the two sets of claims are mutually exclusive—that is, plaintiffs can bring either state-

law contract claims or ERISA fiduciary claims, but not both.

BeneFirst has moved for summary judgment in its favor.  First, it contends that plaintiffs'
state-law claims for breach of contract are preempted by ERISA, and therefore must be dismissed.
Second, it contends that it is not a "fiduciary" within the meaning of ERISA, and therefore cannot
be found liable for breach of fiduciary duty.  BeneFirst thus contends, in essence, that plaintiffs'
claims fall into a no-man's land between ERISA and state law, and that plaintiffs can bring *no*
claims of *any* nature against it for *any* malfeasance of *any* kind.

For the reasons set forth below, the Court will grant defendant's motion for summary
judgment as to those portions of Counts 1 and 2 that assert a claim that defendant acted as a
functional fiduciary, and otherwise deny the motion.

## I.  Background

Except where noted, the following facts are presented in the light most favorable to the
non-moving parties.

### A.  The Aubuchon Plans and BeneFirst

Plaintiffs W.E. Aubuchon Co., Inc., and Aubuchon Distribution, Inc., are Massachusetts
corporations that own and operate a chain of hardware stores in New England and New York.
The two corporations sponsor the W.E. Aubuchon Co., Inc. Employee Medical Benefit Plan and
the Aubuchon Distribution Inc. Employee Medical Benefit Plan, respectively.  These plans
provide medical benefits to qualifying employees of the Aubuchon entities.  The plans are covered
by ERISA.  The Aubuchon companies do not administer their own plans, but instead employ a
third-party administrator.

In 2001, Aubuchon retained the services of BeneFirst LLC as administrator of both plans.

BeneFirst served as the administrator for the W.E. Aubuchon Plan from July 1, 2001, through December 31, 2004, at which point it was terminated.  BeneFirst was the administrator for the Aubuchon Distribution Plan for only one year, from July 1, 2001, through June 30, 2002; at the end of the 2002 plan year, the company's employees became covered under a union medical benefit plan.[1]

### B.    The Administrative Services Agreements

The arrangement between the Aubuchon entities and BeneFirst was governed by separate Administrative Services Agreements ("ASAs"), one for each plan.  No signed copies of the ASAs between the Aubuchon entities and BeneFirst have been produced.  However, the parties agree that an unsigned copy of the ASA for the Distribution plan, submitted to the Court as an exemplar, embodies the essential terms of both agreements.[2]  For the sake of convenience, the Court will refer to the companies, the plans, and the ASAs in the singular as "Aubuchon," the "Plan," and the "ASA."

The ASA outlines the roles and responsibilities of the parties with regard to administering the Plan.  In the section captioned "Claims Administration," the ASA sets forth various obligations of the Plan Sponsor [Aubuchon] and the Plan Administrator [BeneFirst].  Among other things, it imposes the following obligation on Aubuchon:

The Plan Sponsor shall:

1.  Retain the final authority and responsibility for the Benefit Plan and its operations.  The Plan Sponsor gives the Plan Administrator the authority to act on

---

[1] BeneFirst contends that the plan year ran from August 25, 2001 through August 24, 2002.  For purposes of this motion, that discrepancy is immaterial.

[2] It was BeneFirst's practice to execute ASAs with its clients based on a standard template.

behalf of the Plan Sponsor in connection with the Benefit Plan but only [as] expressly stated in this Agreement or as mutually agreed upon in writing by the Plan Sponsor and the Plan Administrator[.]

(ASA at I.A.1).

It also imposes the following obligation on BeneFirst:

The Plan Administrator, as Agent of the Plan Sponsor, shall:

1.  Pay plan benefits in its usual and customary manner subject to and in accordance with this Agreement to or on behalf of persons entitled to receive plan benefits;
. . .

3.  Maintain, for the duration of this Agreement and for two (2) years thereafter, adequate records of all transactions between Plan Sponsor, the Plan Administrator and plan participants.  The records are the property of the Plan Sponsor.  The Plan Sponsor has the right of continuing access to their records[.]

(ASA at I.B).

The same section also provides that BeneFirst will notify beneficiaries of claim denials;

refer certain matters to the plan sponsor for determination; and assist the plan sponsor with the

design and development of the plans and preparation of plan documents, both initially and in

connection with any revisions.

The section captioned "Plan Administrator Liability" includes the following:

B.      The Plan Administrator will use reasonable care and due diligence in the exercise of its powers in the performance of its duties under this Agreement.  The Plan Administrator will not be liable for any mistake of judgement or other actions taken in good faith.

C.      If it is determined that any payment has been made under this Agreement to an ineligible employee or dependent, or if it is determined that more or less than the correct amount has been paid by the Plan Administrator, the Plan Administrator will make a diligent effort to recover the payment made to an ineligible person but, the Plan Administrator will not be required to initiate court proceedings for any such recovery.

(ASA at IV.B-C).

The section captioned "Performance Standards" includes the following:

B.     The Plan Administrator warrants that the following claims accuracy
       standards will be in place at all times:

       1.      Claim Financial Accuracy.  The Claim Accuracy Ratio shall average
               .98 or greater as indicated by the Plan Administrator Claims Audit
               Reports (as measured year-to-date by the said monthly reports).
               Financial accuracy will be calculated by dividing the number of
               claims audited with no financial error by the total number of claims
               audited.

       2.      Claims Payment Accuracy.  The total number of claims audited
               accurately divided by the total number of claims audited shall
               average .95 or greater as indicated by the Plan Administrator
               Claims Audit Reports (as measured year-to-date by the said
               monthly reports).

       3.      Claims Coding Accuracy.  The total number of correct coding
               entries audited divided by the total number of coding entries
               audited shall average .95 or greater as indicated by the Plan
               Administrator Claims Audit Reports (as measured year-to-date by
               the said monthly reports).

(ASA at VI.B).

The ASA also authorizes BeneFirst to pay itself commissions from certain premiums it

collected on behalf of the Plan before paying the net amounts over to Aubuchon.  Aubuchon

agreed to pay fees in return for the services BeneFirst provided and to maintain a bank account on

which BeneFirst was a signatory for purposes of paying claims.

C.     **The Plan Documents**

Successive Summary Plan Descriptions ("SPDs") were published for the Plan.  Although

the record is incomplete, the parties do not appear to dispute that the relevant provisions in the

SPD are identical across all iterations.[3]  The Introduction to the SPD provides as follows:

> In any event where a question may arise as to a claim for benefits or denial of a claim for benefits, the Employer, Plan Administrator, Contract Administrator, and such other individuals as may be party to or associated with the Plan will be guided solely by this Plan Document, which is also the Summary Plan Description.

> The Plan Administrator has full discretionary authority to interpret this plan and its provisions and regulations with regard to eligibility, coverage, benefit entitlement, benefit determination and general administrative matters.
> . . .

> The Plan is administered through the Benefits Manager of the Company.  The Company has retained the services of an independent Contract Administrator (contract administrator) to assist it in administering the Plan.

Like the ASA, the SPD also addresses the respective roles and responsibilities of

BeneFirst and Aubuchon:

> The Plan is self-administered by the Employer, which is a "named fiduciary" and the "plan administrator" under ERISA.  The Employer has delegated claims administration and other day-to-day functions for all benefits except prescription drug benefits to the following Contract Administrator . . . :  BeneFirst, LLC . . . .

The General Plan Provisions provide the following definitions:

> **Contract Administrator.**  BeneFirst, LLC, together with any other of its programs, units, or divisions that is designated to perform claims administration functions under the Plan . . . is the Contract Administrator.
> . . .

> **Plan Administrator.**  W.E. Aubuchon Co., Inc..  The Term Plan Administrator also means any person or persons to whom the Plan Administrator delegates all or part of its authority under the Plan.

The SPD also addresses the ERISA fiduciary status of plan actors.  Under the General

Plan Provisions concerning Plan Administration, it provides:

---

[3] The parties have submitted portions of different versions of the SPD without submitting a single complete document of any version.  Again, for the sake of simplicity, the Court will refer to the document as the "SPD."

> The Employer may appoint a person or persons to administer the Plan.  If a Plan
> Administrator is not appointed, the Employer shall be the Plan Administrator.
> . . .
> The Plan Administrator shall be a named fiduciary for purposes of Section
> 402(a)(1) of ERISA, shall administer the Plan in accordance with its terms, and
> shall have complete discretionary authority and all powers necessary to carry out
> its terms and to control and manage the operation and administration of the Plan . .
> . .

The SPD includes a sample list of powers possessed by the Plan Administrator, which includes,

among other things, the power to determine all questions concerning the eligibility of employees

to receive benefits under the Plan; to interpret the Plan's provisions; and to make rules and

regulations for the administration of the Plan.

### D.      The Administration of the Plan

BeneFirst administered the Plan in accordance with the ASA, with the exception of the

disputed matters addressed below.  Among other things, on a daily basis, BeneFirst claims

examiners would make determinations as to whether given claims were within the Plan.  If a

BeneFirst claims examiner determined that a certain claim should be paid but the system denied

the claim, the examiner, with the assistance of a BeneFirst employee trained to work with the

computer system, could override the system to engineer the desired payout result.  On a regular

basis, BeneFirst determined the number and dollar amounts of the claims to be paid and reported

that figure to Aubuchon in a "Check Edit Report."[4]  Upon receipt of the check edit report,

Aubuchon funded the bank account on which BeneFirst was a signatory in the requested amount.[5]

---

[4] There is contradictory evidence in the record as to whether these reports were prepared monthly,
biweekly, or weekly.

[5] In practice, BeneFirst did not write the checks to pay the claims itself.  Instead, BeneFirst outsourced
check-writing duties to a third party, Advanced Business Fulfillment.  ABF had no direct relationship with
Aubuchon.  BeneFirst never told Aubuchon that it was paying claims through a third party; as far as Aubuchon
knew, BeneFirst was making these payments directly.

Aubuchon had no regularly prescribed involvement in the claims administration and adjudication process.[6]  Unless approached by an employee regarding a claim denial, Aubuchon deferred to and relied upon BeneFirst's interpretation of the Plan.  BeneFirst was aware that there was no one at Aubuchon who was trained in claims administration and that Aubuchon was relying on BeneFirst for claims adjudication.

### E.      The Dispute

According to Aubuchon, BeneFirst's malfeasance falls into three principal categories: erroneous reporting of an anticipated stop-loss insurance reimbursement; procedural and financial errors in claims processing; and failure to maintain claims records.

First, Aubuchon contends that BeneFirst made a substantial error concerning an anticipated insurance payment.  On June 29, 2004, BeneFirst sent Aubuchon a letter representing that Aubuchon could expect a $478,000 reimbursement from its aggregate stop-loss insurance carrier, based on Aubuchon's claims history for the period from July 1, 2003, through June 30, 2004.  However, the carrier's audit of the claims failed to substantiate the figure BeneFirst had quoted to Aubuchon.  BeneFirst did not alert Aubuchon to the adverse results of the stop-loss insurer's audit for some months.  Between June and November 2004, Aubuchon inquired repeatedly regarding the status of the stop-loss reimbursement.  Ultimately, at a meeting between representatives of BeneFirst and Aubuchon on November 5, 2004, BeneFirst admitted that the

---

[6] Nonetheless, BeneFirst contends that "Employees of Aubuchon itself, however, were extremely involved in the details of the plaintiffs' employee medical benefit plans, and would become involved in deciding whether to authorize payment for medical benefit claims that were not covered under the express terms of the applicable plans." (Def. Mem. at 6 (citing Gatanti Dep. at 27-29, 97)).

reimbursement figure it had quoted previously was overstated.[7]  BeneFirst was terminated

effective December 31, 2004, in a follow-up conference call several days later.

Second, audits of BeneFirst's performance conducted after that incident revealed the

existence of systemic claims processing problems.  Auditors discovered multiple claims processing

errors committed by BeneFirst; among other things, according to the auditors, as to the

Aubuchon plan, 2.9% of all claims were paid incorrectly, and as to the Distribution plan, 6.2%

were paid incorrectly.[8]

Third, BeneFirst failed to maintain documentation for many of the claims sought to be

reviewed, making it impossible to determine the accuracy of many of the disputed claims

determinations.

### F.    Procedural History

Aubuchon filed an amended complaint on May 17, 2006.  The four-count complaint states

claims under ERISA, 29 U.S.C. §§ 1109 and 1132, for breach of fiduciary duty with regard to the

W.E. Aubuchon Plan (Count 1) and the Aubuchon Distribution Plan (Count 2), as well as

separate breach of contract claims regarding each plan (Counts 3 and 4).

BeneFirst has moved for summary judgment in its favor on all counts.  For the reasons set

forth below, the motion will be denied in part and granted in part.

---

[7] It is unclear precisely what the nature of the injury arising from this incident is, or the damages resulting from that injury.

[8] Because BeneFirst did not document all claims, the auditors concluded that approximately half the claims paid were at least suspect.

II.   <u>**Analysis**</u>

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant . . . would permit a rational fact finder to resolve the issue in favor of either party."  *Medina-Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir. 1990).

Aubuchon seeks recovery under two mutually exclusive theories.  First, it contends that BeneFirst breached its fiduciary duty under ERISA.  Second, and in the alternative, it contends that BeneFirst breached its contractual obligations in its administration of the plans.  In response, BeneFirst contends (1) that it is not subject to suit under ERISA because it is not a "fiduciary" for purposes of that statute and (2) that any state law action against it sounding in contract is preempted by ERISA.  If correct, this line of reasoning would essentially leave BeneFirst immune from suit.

Aubuchon contends that BeneFirst cannot have it both ways.  Either BeneFirst is an ERISA fiduciary, and thus subject to suit for breach of fiduciary duty under ERISA, or it is *not* an ERISA fiduciary, and thus subject to suit for breach of contract.  The Court will address the preemption issue first.

A.   <u>**The State Law Claims for Breach of Contract**</u>

ERISA provides for the preemption of all "State laws insofar as they may now or hereafter

relate to any employee benefit plan." 29 U.S.C. § 1144(a).[9]  "The term 'State laws' includes all

laws, decisions, rules, regulations, or other State action having the effect of law." 29 U.S.C. §

1144(c)(1).  The term "state law" also "includes state common law causes of action to enforce

rights under an ERISA plan." *Curran v. Camden Nat'l Corp.*, 477 F. Supp. 2d 247, 258 (D. Me.

2007) (citing *Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004); *Pilot Life Ins. Co. v.

Dedeaux*, 481 U.S. 41, 52-57 (1987)).  Because the Plan is an employee benefit plan, the state

law breach of contract claims are preempted to the extent that the claims "relate to" the Plan

within the meaning of the statute.

> The broad term "relate to" has been narrowed by judicial construction:

> . . .  the phrase 'relate to,' as used in ERISA's preemption provision, cannot be
> read literally.  If 'relate to' were taken to extend to the furthest stretch of its
> indeterminacy, then for all practical purposes preemption would never run its
> course.  To scale the phrase down to size, the [Supreme] Court has devised a
> disjunctive test:  A law relates to a covered employee benefit plan for purposes of
> § 514(a) if it [1] has a connection with or [2] a reference to such a plan.

*Carpenters Local Union No. 26 v. United States Fid. & Guar. Co.*, 215 F.3d 136, 140 (1st Cir.

2000) (quoting *New York St. Conf. of Blue Cross & Blue Shield Plans v. Travelers*, 514 U.S.

645, 655 (1995) and *Cal. Div. of Labor Stds. Enforcement v. Dillingham Constr., N.A.*, 519 U.S.

316, 324 (1997)) (internal quotation marks omitted); *see Pharmaceutical Care Mgmt. Ass'n v.

Rowe*, 429 F.3d 294, 301 (1st Cir. 2005) (per curiam).

> The first part of the test requires preemption if a state law "has a connection with" an

ERISA plan.  "When determining whether a state law has 'a connection with' ERISA plans, a

court must avoid an 'uncritical literalism' and look instead to 'the objectives of the ERISA statute

---

[9] The parties do not dispute that the Plan constitutes a qualified employee benefit plan for the purposes of
ERISA preemption.

as a guide to the scope of the state law that Congress understood would survive, as well as to the

nature of the effect of the state law on ERISA plans.'"  *Rowe*, 429 F.3d at 302 (quoting *Egelhoff*

*v. Egelhoff*, 532 U.S. 141 (2001)); *see Carpenters Local*, 215 F.3d at 140.  To achieve the

objectives of ERISA, Congress included a preemption clause, the "basic thrust" of which was "to

avoid a multiplicity of regulation in order to permit the nationally uniform administration of

employee benefit plans."  *Rowe*, 429 F.3d at 302 (quoting *Travelers*, 514 U.S. at 617).

    The second part of the test requires preemption if a state law has "reference to" an ERISA

plan.  "A state law is preempted by ERISA by virtue of an impermissible 'reference to' an ERISA

plan 'where a State's law acts immediately and exclusively upon ERISA plans . . . or where the

existence of ERISA plans is essential to the law's operation.'"  *Rowe*, 429 F.3d at 303 (quoting

*Dillingham*, 519 U.S. at 325).

    In accordance with those requirements, ERISA has been held to preempt a variety of state

laws.  As the First Circuit noted in *Zipperer v. Raytheon Co.,* 493 F.3d 50, 53 (1st Cir. 2007)

(internal quotations and citations omitted):

> ERISA's objectives include providing a uniform national administration of ERISA
> plans and avoiding inconsistent state regulation of such plans.  Three categories of
> state regulation that have been identified as conflicting with these objectives are:
> 1) those that mandate employee benefit structures or their administration; 2) those
> that bind plan administrators to a particular choice; and 3) causes of action that
> provide alternative enforcement mechanisms to ERISA's own enforcement
> scheme.

*See Carpenters Local*, 215 F.3d at 141 (noting that ERISA has been held to preempt state laws

that "interfere with the administration of covered employee benefit plans, purport to regulate plan

benefits, or impose additional reporting requirements").

    ERISA preemption may apply even where the result leaves a gap in the enforcement

12

scheme.  *See Howard v. Parisian, Inc.*, 807 F.2d 1560, 1565 (11th Cir. 1987) ("such a gap is

legitimate if it is the result intended by Congress.").  Indeed, it may apply even when it produces

results that are unfair or illogical.  *See, e.g.*, *Carlo v. Reed Rolled Thread Die Co.*, 49 F.3d 790,

794 (1st Cir. 1995) (finding misrepresentation claim concerning ERISA plan benefits preempted

despite "cogent arguments" that preemption in these suits often leaves plaintiffs without a remedy

and may shield wrongdoers from liability).

As noted above, this case involves a state law contract claim by a plan against a third-

party administrator.  Certain types of claims against third-party administrators and other outside

service providers—who are normally not "fiduciaries" within the meaning of ERISA—have been

deemed to be preempted, while others have not.  As a general rule, claims brought by *participants*

*or beneficiaries* seeking to recover damages for failure to receive anticipated benefits have been

found to be preempted.  *See, e.g., McMahon v. Digital Equip. Corp.*, 162 F.3d 28 (1st Cir. 1998)

(breach of contract and tort claims against third-party administrator); *Santana v. Deluxe Corp.*,

920 F. Supp. 2d 249, 257 (D. Mass. 1996) (breach of contract claim against third-party

administrator); *Toomey v. Jones*, 855 F. Supp. 2d 19, 27 (D. Mass. 1994) (breach of contract and

misrepresentation claims against consulting firm that provided administrative and other services).[10]

Claims on behalf of *plans*, however, against third-party administrators for breach of

---

[10] State law claims by participants or beneficiaries against employers or plans seeking to recover benefits have been routinely held to be preempted.  *See, e.g., Zipperer*, 493 F.3d at 50 (claim against former employer for erroneous calculation of early retirement benefit); *Carlo*, 49 F.3d 790 (same); *Vartanian v. Monsanto Co.*, 14 F.3d 697 (1st Cir. 1994) (claim against former employer for misrepresentation of early retirement benefits); *see also Aetna Health,* 542 U.S. 200 (state law claims against HMOs by plan participant alleging negligence in handling coverage decisions held to be preeempted).

contract or professional malpractice generally have not been found to be preempted.  *See, e.g.,* *Geweke Ford v. St. Joseph's Omni Preferred Care*, 130 F.3d 1355 (9th Cir. 1997) (claim by plan administrator against third-party administrator for failure to administer and process benefit claims covered under plan held not to be preempted); *Union Health Care, Inc. v. John Alden Life Ins. Co.*, 908 F. Supp. 429 (S.D. Miss. 1995) (claim by plan administrator against third-party administrator for failure to file insurance claim);  *Berlin City Ford, Inc. v. Roberts Planning Group*,  864 F. Supp. 292 (D.N.H. 1994) (claim by plan administrator against outside advisor and administrator for professional negligence held not to be preempted); *Isaacs v. Group Health, Inc.*, 668 F. Supp. 306, 312 (S.D.N.Y. 1987) (claim by plan trustees against actuary and computer services provider for breach of contract and professional negligence for actuarial errors held not to be preempted).  As the *Geweke* court observed:  "Contract law is a general area of law, traditionally regulated by the states, which does not necessarily affect the relationships regulated under ERISA among employer, plan, participant, and beneficiary."  130 F.3d at 1359.  *See* *Carpenters Local*, 215 F.3d at 141 (noting that the state statute at issue regulated "an area of the law traditionally thought to be the states' preserve:  enforcing contracts under state law for the citizenry's protection").

The First Circuit has never confronted the issue directly, but it has suggested on several occasions that such claims are not normally preempted.   In *Rowe,* the court considered a challenge by an association of pharmacy benefit managers ("PBMs") to certain state law regulations.  The court noted that non-fiduciaries such as PBMs "are outside of the intricate web of relationships among the principal players in the ERISA scenario," and that "although ERISA prescribes the duties that are owed by ERISA entities to one another, and prescribes remedies for

14

their breach, it is not designed to regulate or afford remedies against entities that provide services to plans." 429 F.3d at 305 (internal quotations omitted). In *Dudley Supermarket v. Transamerica Life Ins.*, 302 F.3d 1 (1st Cir. 2002), the plaintiff plan sued a financial services company for breach of contract and tort for, among other things, the sale of inappropriate investments to the plan and the preparation of misleading actuarial valuation reports. The First Circuit concluded that the defendant was a provider of investment advice for a fee, which made it a "fiduciary" within the meaning of ERISA, and therefore the state law claims were preempted. *Id.* at 4. In distinguishing cases cited by the plan, the court noted that those cases "simply indicate" that "the malpractice claims against the defendants there, who were not fiduciaries with respect to an ERISA plan, were not preempted." *Id.* at 4-5. In *Hampers v. W.R. Grace & Co.*, 202 F.3d 44 (1st Cir. 2000), the plaintiff was a former employee who sued the employer under state law for breach of his employment contract, contending that he should have been included in a supplemental employee retirement plan. The court held that the claim was preempted. *Id.* at 53-54. Again, however, in distinguishing the facts of the case, the court noted that it was not "a case where the defendant is a third party insurer or service provider of insurance and administrative services." *Id.* at 53.

In light of that authority, the Court concludes that the state law contract claims here are not preempted by ERISA. The claims arise under the ASA—specifically, its requirements that Benefirst adhere to certain performance standards in the payment of claims and that it maintain certain records. The ASA is a business contract, entered into voluntarily and at arm's length by Aubuchon and Benefirst. Aubuchon is attempting to enforce the terms of that contract; the state "law" invoked by Aubuchon is simply the common law of contracts.

In this context, state law has neither "a connection with" nor "reference to" ERISA, and enforcement of the contract does not implicate any of the concerns of ERISA preemption. Enforcement of the contract would not interfere with the administration of the Plan; to the contrary, it would promote and facilitate that administration, as it would permit the Plan to enter into binding commitments with outside vendors of services.  Indeed, without the ability to enter into enforceable contracts, it is difficult to see how the Plan could be administered in any rational fashion.  Likewise, enforcement of the contract would not mandate employee benefit structures, bind plan administrators to particular choices, provide alternative enforcement mechanisms to ERISA's own enforcement scheme, impose additional reporting requirements, or otherwise interfere with the uniform national administration of ERISA plans.

Again, the ASA is a contractual arrangement that Benefirst entered into knowingly and willingly—in fact, it apparently drafted its terms.  Aubuchon simply seeks to enforce that contract. BeneFirst's position, in substance, is that an ERISA plan and a third-party administrator can never enter into a binding contract, and accordingly the contract is not, and was never, enforceable.  If Benefirst is correct, one wonders why BeneFirst bothered to prepare and sign the contract in the first place.  Such a construction of ERISA would not simply leave a gap in the enforcement scheme; it would leave a gigantic chasm.  There is no reason to believe that Congress intended such an irrational result.  *See Rowe*, 429 F.3d at 301 ("[T]he expansive language of the provision is still subject to the starting presumption that Congress does not intend to supplant state law and has warned that, unless congressional intent to preempt clearly appears, ERISA will not be deemed to supplant state law in areas traditionally regulated by the states.") (internal quotations and citations omitted).

16

It is true, of course, that Aubuchon contends that Benefirst paid claims incorrectly under the Plan. Whether a particular claim was, or was not, paid in accordance with the terms of the Plan might require the Court in some circumstances to interpret the Plan to adjudicate the dispute. If such an interpretation were required, it might be that the claim is preempted. *See Hampers*, 202 F.3d at 52 ("[A] cause of action 'relates to' an ERISA plan when a court must evaluate or interpret the terms of the ERISA-regulated plan to determine liability under the state law cause of action."). But that is not the case here. The ASA sets certain "performance standards," measured by reference to the results of an independent audit; the auditor's findings alone are sufficient to trigger liability if Benefirst's performance falls below the relevant standard. Similarly, the ASA, not the Plan, requires that certain records be maintained; no interpretation of the Plan is required. The basis of the claim concerning the insurance estimate is unclear, but it plainly does not depend upon any particular interpretation of the Plan.

Accordingly, the breach of contract claim by or on behalf of the Plan is not preempted by ERISA. Summary judgment will therefore be denied as to Counts 3 and 4.

### B.      The ERISA Claims for Breach of Fiduciary Duty

The foregoing discussion assumes that BeneFirst is not, in fact, a fiduciary within the meaning of ERISA. If it is a fiduciary, the plan cannot bring a claim under state law, but is limited to the remedies set forth under the statute. *See Rowe*, 429 F.3d at 305.[11]

There are two means by which fiduciary status may be attributed to a person or entity under ERISA. First, that person can be a *named* fiduciary—that is, in accordance with statutory

---

[11] "Whether a person or entity qualifies as a fiduciary is either a question of law or a mixed question of law and fact . . . ." *Briscoe v. Fine*, 444 F.3d 478, 486 (6th Cir. 2006).

requirements, the entity is named as a fiduciary in the plan documents.  Second, that person can

be a *functional* fiduciary—that is, fiduciary status can arise from the conduct of a party.  *See*

*Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 18 (1st Cir. 1998).

>1.  **Named Fiduciary**

ERISA provides that "[e]very employee benefit plan . . . shall provide for one or more

named fiduciaries who jointly or severally shall have authority to control and manage the

operation and administration of the plan."  29 U.S.C. § 1102(a)(1).  There is no question that

Aubuchon is a named fiduciary; the SPD provides that "The Plan is self-administered by the

Employer [that is, Aubuchon], which is a 'named fiduciary' and the 'plan administrator' under

ERISA."  (SPD at 4).

Aubuchon argues that the Plan also provides that Benefirst is a fiduciary in certain

respects.  That argument is based on the interaction of four separate provisions of the SPD.  First,

the SPD states that "[t]he Plan Administrator shall be a named fiduciary for purposes of Section

402(a)(1) of ERISA."  Second, it states that "[t]he term Plan Administrator *also* means any

person or persons to whom the Plan Administrator *delegates* all or part of its authority under the

Plan." (emphasis added).  Third, and as noted above, it states that the "Employer . . . is . . . the

'plan administrator.'"  Fourth, it states that  "[t]he Employer has delegated claims administration

and other day-to-day functions for all benefits except prescription drug benefits to the following

Contract Administrator as of August 25, 2001:  BeneFirst, LLC."

Aubuchon thus argues that by the express terms of the SPD, BeneFirst is a "named

fiduciary"—a "person" to whom "claims administration and other day-to-day functions except

prescription benefits" has been delegated by the Plan Administrator.  BeneFirst contends that this

is a strained reading of the document and that it would be irrational to treat it as a named fiduciary

on this basis—particularly where the SPD never actually uses that term, and instead explicitly

refers to it elsewhere as a contract administrator.  According to BeneFirst, the parties obviously

knew how to designate named fiduciaries, given that the document formally and expressly

identified Aubuchon as a named fiduciary; the failure to name BeneFirst as such was therefore not

an oversight.

> BeneFirst's argument has the force of logic and common sense, and appears to reflect the

intent of the parties.[12]  Aubuchon's argument, however, follows the actual language of the

contract.[13]  Under the circumstances, and because the Court cannot ignore what the document

actually says, the contract must be deemed ambiguous.  "Language is ambiguous when it is

capable of more than one meaning when viewed objectively by a reasonably intelligent person

who has examined the context of the entire integrated agreement."  *Aramony v. United Way of*

*Am.*, 254 F.3d 403, 412 (2d Cir. 2001).  "The existence of an ambiguity is a matter of law; once

language is held to be ambiguous, however, the interpretation of such language is a factual issue

turning on the parties' intent."  *Trustees of Detroit Carpenters Health & Welfare Fund v. River*

*City Constr. Co.*, 99 Fed. Appx. 612, 614 (6th Cir. 2004) (construing terms of a collective

---

[12] The founder and managing member of BeneFirst, Charles Dobens, testified that Aubuchon "would never pass on that fiduciary role by doing that to us.  We would never have accepted it."  (Dobens Dep. 83:18-20).  Without passing on the credibility of this statement, the Court notes that third-party administrators can explicitly disclaim the status of named fiduciary if they so desire.  *See IT Corp. v. General Am. Life Ins. Co.*, 107 F.3d 1415, 1418 (9th Cir. 1997) ("One clause in the agreement . . . said that 'under no circumstances shall the service contractor . . . be considered the named fiduciary under the Plan.'").  BeneFirst did not do so here.

[13] "[A] federal common law of rights and obligations governs the interpretation of an ERISA-regulated group insurance plan."  *Hughes v. Boston Mut. Life Ins. Co.*, 26 F.3d 264, 268 (1st Cir. 1994) (internal quotations and citations omitted).  This body of common law incorporates "common-sense canons of contract interpretation . . . .  Thus, straightforward language in an ERISA-regulated insurance policy should be given its natural meaning."  *Id.* (internal quotations and citations omitted).

bargaining agreement in context of an ERISA action).

That ambiguity can only be resolved by the finder of fact, and therefore summary judgment will be denied as to the breach of fiduciary duty claims insofar as they allege that BeneFirst was a "named" fiduciary.

### 2.      Functional Fiduciary

A person or entity may also be a "functional fiduciary" under ERISA for certain purposes. The statute provides as follows:  "a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."  29 U.S.C. § 1002(21)(A).

"The key determinant of whether a person qualifies as a functional fiduciary is whether that person exercises discretionary authority in respect to, or meaningful control over, an ERISA plan, its administration, or its assets." *Beddall*, 137 F.3d at 18.[14]  Titles and descriptions do not control.  *See, e.g.*, *Donovan v. Mercer*, 747 F.2d 304, 308 (5th Cir. 1984) ("'[F]iduciary' should be defined not only by reference to particular titles, such as 'trustee', but also by considering the authority which a particular person has or exercises over an employee benefit plan.").  "Accordingly, whether an individual or entity is an ERISA fiduciary must be determined by focusing on the function performed."  *Dall v. Chinet Co.*, 33 F. Supp. 2d 26, 39 (D. Me. 1998).

---

[14] While the statutory language about functional fiduciaries is expansive, in practice courts construing that statutory language often construe it quite narrowly.  *See, e.g., Beddall*, 137 F.3d at 21 (referring to "ERISA's somewhat narrow fiduciary provisions").

a.      **Discretionary Authority or Discretionary Control Respecting**
        **Management or Administration**

The first question is whether BeneFirst exercised "any discretionary authority or

discretionary control respecting management of [the] plan" or had "any discretionary authority or

discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A)(i), (iii).

Under the statute, it would appear that the exercise of *any* discretionary authority or

control respecting plan management or *any* discretionary authority or responsibility in plan

administration may be sufficient to confer functional fiduciary status. Nevertheless, the strong

weight of authority suggests that if BeneFirst's essential role was to process claims as a third-

party administrator, it would not be a functional fiduciary. "The calculation of benefits and

preparation of reports concerning participants' benefits are ministerial functions, and a person

who performs purely ministerial functions within a framework of policies, interpretations, rules,

practices and procedures made by other persons is not a fiduciary." *Livick v. Gillette Co.*, 524

F.3d 24, 29 (1st Cir. 2008) (citing 29 C.F.R. § 2509.75-8 D-2) (internal quotations and original

textual alterations omitted); *see Toomey*, 855 F. Supp. 19, 24 (D. Mass. 1994) ("It is undisputed

that the majority of [third-party administrator] PHA's services, at least, were in the nature of

claims processing, communications with employees and calculation o[f] benefits. As such, the

bulk of PHA's responsibilities to the Plan were unquestionably non-fiduciary."); *Santana*, 920 F.

Supp. at 252.[15]

_____

[15] *See also Beddall*, 137 F.3d at 18, 20 ("[T]he mere exercise of physical control or the performance of
mechanical administrative tasks generally is insufficient to confer fiduciary status. . . . Without more, mechanical
administrative responsibilities . . . are insufficient to ground a claim of fiduciary status."); *Baker v. Big Star Div. of
Grand Union Co.*, 893 F.2d 288, 290 (11th Cir. 1989) ("[The employer-plan sponsor] does no more than 'rent' [a]
claims processing department . . . to review claims and determine the amount payable 'in accordance with the
terms and conditions of the Plan.'") (quoting the applicable ASA in the case); *Baxter v. C.A. Muer Corp.*, 941 F.2d
451, 455 (6th Cir. 1991) ("A Department of Labor interpretive bulletin further explains that a person without the

In *Santana*, the  defendant contracted "to provide day-to-day administrative services with respect to certain [] employee benefit plans."  920 F. Supp. at 252.  The court agreed with defendant that, as a third-party administrator of the plan, it was not subject to suit under ERISA.  *Id.* at 252-53.   The court's analysis is directly on point:

> [The TPA's] overriding obligation under its agreement with [the employer] is to provide claims processing services to the Plan.  Following guidelines and procedures set down by [the plan sponsor] while processing a claim under the Plan, [TPA] personnel are charged with certifying that a charge is covered under the Plan; preparing a claim for processing; computing benefits; issuing benefits; furnishing employees with an explanation of benefits; recording accounting and statistical data; producing statistical reports; and coordinating benefits.  In addition to performing the initial examination of a claim, and computing and issuing benefits, [the TPA's] claim services also include preparing the various forms required in connection with claims processing, excluding a plan description; maintaining an accounting of payments to claimants; controlling claim abuses; accumulating and analyzing basic statistics; analyzing the Plan; and, after consulting with [the plan sponsor], making recommendations with respect to changes or modifications of the Plan.

*Id.*  Notwithstanding the extensive list of functions it had just recited, the court declined to assign functional fiduciary status to the TPA.  "Given the ministerial nature of the functions [the TPA] is required to perform under its contract . . ., the Court discerns no reason to distinguish [the TPA]'s relationship with the Plan from the myriad other instances where third-party service providers were found to be nonfiduciaries under ERISA."  *Id.*

Furthermore, most courts have concluded that the retention of final authority by the plan sponsor weighs heavily against a finding of functional fiduciary status.  In *Baker*, the court

---

power to make plan policies or interpretations but who performs purely ministerial functions such as processing claims, applying plan eligibility rules, communicating with employees, and calculating benefits, is not a fiduciary under ERISA.") (citing 29 C.F.R. § 2509.75-8 D-2); *Howard*, 807 F.2d at 1564 (confirming that a plan administrator "performing only claim-processing, investigatory, and record-keeping duties . . . under an independent contract . . . is not a fiduciary of the Plan, and it has no obligation governed by ERISA") (citing 29 U.S.C. § 1002(21)(A)).

concluded that an entity "does not become an ERISA 'fiduciary' simply by performing

administrative functions and claims processing within a framework of rules established by an

employer, *especially if, as in this case, the claims processor has not been granted the authority*

*to review benefits denials and make the ultimate decisions regarding eligibility*."  893 F.2d at

290 (citation omitted) (emphasis added).  Similarly, in *Santana,* the court noted that in situations

"where an employee benefit plan has contracted with a third party to provide claims processing

and other administrative services to the plan, but has retained discretion to decide disputed claims,

courts have universally ruled that the service provider is not a fiduciary of the plan."  920 F. Supp.

at 254.[16]

It is undisputed that BeneFirst decided which claims to pay, which to deny, how much to

pay on particular claims, and the degree of investigation to pursue on particular claims.[17]  Those

---

[16] Although the weight of authority is to the contrary, some courts have imputed fiduciary status to third-party administrators on the basis of discretionary authority.  *See, e.g.*, *Six Clinics Holding Corp., II v. Cafcomp Sys.*, 119 F.3d 393, 402 (6th Cir. 1997); *Curcio v. John Hancock Mut. Life Ins. Co.*, 33 F.3d 226 (3d Cir. 1994); *American Fed'n of Unions Local 102 Health & Welfare Fund v. Equitable Life Assurance Soc.*, 841 F.2d 658 (5th Cir. 1988).  In finding that a third-party administrator was a functional fiduciary, the *Six Clinics* court was influenced by the repetition in the relevant documents of language explicitly deferring to the TPA's judgment:

> The Administrative Services Agreement between ARN and Cafcomp demonstrates that Cafcomp did in fact have discretionary authority over some matters.  Specifically, the agreement listed numerous services that Cafcomp agreed to provide, including: legal documentation, including any updates and amendments "*as Cafcomp deems necessary*"; preparation of annual reports "as required *in the judgment of Cafcomp*"; and transmittals of summary plan descriptions "as required *in the judgment of Cafcomp*."  While some of these activities involve non-fiduciary functions listed in the DOL guidelines, such as the preparation of government-required documents, Cafcomp appears to have had discretionary authority with regard to these functions.

119 F.3d at 402 (citations to the record omitted).

[17] *See* Reddie Dep. 117:6-11 (Q: Now, would it be safe to say that even though you have the plan there is still interpretation that's required to process a claim?  A: Yeah.  Q: Not every scenario is addressed in the plan?  A: Exactly.  Yes.") ; *see also* Gatanti Dep. 82:1-7 ("Q: So to be good at claims examining, you need to be more than a simply data input person; is that fair to say?  A: Correct.  Q: There's some thought that goes into your job?  A: Correct."), 136:22 - 137:1 (Q: Now you had testified about this fact that the claims examiner has to engage in some interpretation when it's processing a claim.  A: Correct.").

functions inevitably involve the exercise of judgment, and thus arguably involved the exercise of

discretionary authority or discretionary control or discretionary responsibility concerning plan

management or administration.  Furthermore, BeneFirst's role clearly involved more than routine

clerical tasks; for example, the investigation of subrogation claims,[18] the application of multiple

surgery rules,[19] the performance of multi-plan repricing,[20] the adjudication of claims for

experimental procedures or those invoking medical necessity,[21] the implementation of internal

quality control measures, and the determination of whether and how aggressively to pursue an

overpayment to a medical provider, all required the exercise of substantial discretion.[22]

There is also evidence BeneFirst understood that discretion inhered in the role it

contracted to undertake.  Its standard form ASA included a liability exclusion "for any mistake of

judgment."  If its role was to be purely mechanical, as BeneFirst now contends, it would not need

to be insulated from liability for mistakes of judgment; no judgment would be involved.

Nonetheless, as noted, the great weight of case law suggests that the exercise of such

---

[18] *See* Gatanti Dep. 107:11-108:8 ("Q: I would think that would require some level of judgment in making that determination; is that correct?  A: Correct.  Q: That's not always obvious, is it?  A: No.").

[19] *See* Gatanti Dep. 46:23-47:12 ("[I]t was pretty much an examiner by examiner [kind of practice]. . . . Again, it was something that the claims examiner would have had to have done by their own fruition.  The system wouldn't have done it on its own.").

[20] *See* Gatanti Dep. 104:12-105:12 ("Q: And all those activities you just described would occur at the claims examiner level?  A: Yes.  Q: So they had to make some judgment of when to access that information or not?  A: Correct.").

[21] *See* Gatanti Dep. 91:16-19 ("The interpretations come in with experimental, medical necessity, those types of issues.  That's where it can get a little gray.").

[22] Designing the computer buildout also inevitably involved choices that required the exercise of discretion.  For example, BeneFirst claims examiner and plan builder Carrie Reddie testified that she erred on the side of caution when doing programming work on the computerized system:  "[A]t the very least I would set it up to deny.  At the worse case scenario they could come back and say, 'no, that's supposed to pay.'  I would err on the side of building it to deny rather than pay."  (Reddie Dep. 99:10-14).

discretionary functions is not sufficient to confer the status of "functional fiduciary" on BeneFirst. It does not appear that the functions performed by or assigned to BeneFirst were substantively different from those performed by a typical third-party administrator.  Furthermore, under the ASA, Aubuchon retained "the final authority and responsibility for the Benefit Plan and its operations" (ASA at  I.A.1) and BeneFirst was required to refer to it any disputed claims and any questions concerning "eligibility or entitlement" or "the amount of payment due."  (ASA at I.B.4). Accordingly, the Court sees no basis on which to "distinguish [the TPA]'s relationship with the Plan from the myriad other instances where third-party service providers were found to be nonfiduciaries under ERISA."  *Santana*, 920 F. Supp. at 253.

### b.       Control Over Plan Assets

The second question is whether BeneFirst exercised "any authority or control respecting management or disposition of [plan] assets."  29 U.S.C. § 1002(21)(A)(i).

Again, not all exercises of authority or control over plan assets will suffice; some level of discretion appears to be required.  *See O'Toole v. Arlington Trust Co.*, 681 F.2d 94, 96 (1st Cir. 1982) ("ERISA defines an individual as a fiduciary to the extent he exercises discretionary control or authority over the plan, its assets, or its administration or renders investment advice . . . . Appellees' responsibilities as the depository for the funds do not include the discretionary, advisory activities described by the statute . . . .  In the absence of these activities, it would be unfair to impose on appellee the responsibilities and liabilities created by the statute for fiduciaries."); *Beddall*, 137 F.3d at 18 (fiduciary status requires "discretionary authority in respect

25

to, or meaningful control over, an ERISA plan, its administration, or its assets").[23]  Thus, "[c]ases

holding that a professional service provider is a fiduciary because he performed fiduciary functions

uniformly involve factual situations where the service provider exercised *broad* authority or

control over the plan assets."  *Useden v. Acker*, 721 F. Supp. 1233, 1244 (S.D. Fla. 1989)

(emphasis added).  "If a fiduciary tells a bookkeeping service to send a check for $950 to Mercy

Hospital, the bookkeeping service does not thereby become a fiduciary."  *IT Corp.*, 107 F.3d at

1419; *see also Chao v. Day*, 436 F.3d 234, 238 (D.C. Cir. 2006) ("[T]he disposition clause does

not . . . extend fiduciary status to every person who exercises 'mere possession, or custody' over

the plans' assets."); *Baxter*, 941 F.2d at 456 (declining to find fiduciary status where defendant

was "merely a claims processor that pays claims in accordance with the terms of the plan").

        BeneFirst exercised control over the Plan assets in at least three different respects.  First, it

was BeneFirst's role to pay the valid claims of the Plan participants.  For this purpose, Aubuchon

funded a bank account on which BeneFirst was a signatory with check-writing authority.  Second,

Aubuchon employees and former employees electing COBRA coverage were instructed to send

their monthly premiums, in the form of checks payable to BeneFirst, directly to BeneFirst, which

would then remit the checks to Aubuchon less a two per cent fee.[24]  Finally, in the event of a claim

overpayment, refunds to the Plan from overpaid providers would be sent to BeneFirst.  BeneFirst

would then have the responsibility of making certain the refunded amounts found their way back

---

        [23] That is apparently true despite the absence of the word "discretionary" from that prong of the statute.
*Cf. IT Corp.*, 107 F.3d at 1419 (holding that the term "discretionary" does not apply to the phrase "exercises any
authority or control respecting management or disposition of [plan] assets").

        [24] As Dobens testified:  "We would receive them and deposit them, take our two percent off the top, and
then remit back to Aubuchon the amount."  (Dobens Dep. 126:15-18).

to the Plan.

Under some circumstances, check-writing authority can form the basis for a finding of functional fiduciary status under ERISA   *See IT Corp.*, 107 F.3d at 1421.  Such authority might also support a finding of fiduciary status for some purposes, but not others.  *See Beddall*, 137 F.3d at 18.[25]  It is fundamentally inconsistent, however, to hold that a third-party administrator does not become a fiduciary merely because it processes and pays claims, but that the existence of check-writing authority to execute the claims payment function does in fact create such a relationship.  Moreover, BeneFirst did not have "broad authority" over the funds of the plan.  *See Useden,* 721 F. Supp. at 1244.  Accordingly, the exercise of authority over bank accounts in the circumstances here is not sufficient to confer the status of "functional fiduciary" on BeneFirst.  Summary judgment will therefore be granted as to any claim of functional fiduciary status.

### C.    Existence of Inconsistent Claims

There remains the issue of the assertion of inconsistent claims.  The parties agree that the state law contract claim and the ERISA breach of fiduciary duty claim are incompatible, and that plaintiff cannot succeed on both.  That issue need not be resolved, however, at this time.  It is possible that plaintiffs, having secured a favorable decision on the preemption issue, may elect to drop the more dubious fiduciary-duty claim.  Or it is possible that the case could be tried on both theories, with a phased trial or appropriately crafted special interrogatories.  *See Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan*, 883 F.3d 345 (5th Cir. 1989) (special

---

[25] "[F]iduciary status is not an all or nothing proposition; the statutory language indicates that a person is a plan fiduciary only 'to the extent' that he possesses or exercises the requisite discretion and control.  29 U.S.C. § 1002(21)(A).  Because one's fiduciary responsibility under ERISA is directly and solely attributable to his possession or exercise of discretionary authority, fiduciary liability arises in specific increments correlated to the vesting or performance of particular fiduciary functions in service of the plan, not in broad, general terms."  *Id.,* 137 F.3d at 18.

interrogatories on defendants' ERISA fiduciary status submitted to jury); *F.H. Krear & Co. v. Nineteen Named Trs.*, 810 F.2d 1250, 1259 (2d Cir. 1987) (approving the district court's instructions to the jury on the subject of determining ERISA fiduciary status); *Stanton v. Shearson Lehman/American Express, Inc.*, 631 F. Supp. 100, 105 (N.D. Ga. 1986) ("Of course, the question of whether defendant Shearson acquired fiduciary status under this theory depends on *whether the jury finds* that [Shearson's representative] acquired fiduciary status and, if so, whether she acted within the scope of her employment when she engaged in the acts which made her an ERISA fiduciary.") (emphasis added).  Those questions, however, are left for another day.

## III.   Conclusion

For the foregoing reasons, defendant's motion for summary judgment is GRANTED as to those portions of Counts 1 and 2 that assert a claim that defendant acted as a functional fiduciary, and is otherwise DENIED.

**So Ordered.**

                                        /s/ F. Dennis Saylor
                                        F. Dennis Saylor IV
Dated: June 12, 2009                    United States District Judge

28